# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS** | § | |
| **Plaintiff/Counterclaim Defendant** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | **Case No. 4:22-cv-00430-O** |
| **V.** | § | |
| | § | |
| | § | |
| **ASSOCIATION OF** | § | |
| **PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS, JULIE** | § | |
| **HEDRICK, ERIK HARRIS** | § | |
| **Defendants/Counterclaim Plaintiff.** | § | |
| | § | |

---

### PLAINTIFFS' RESPONSE TO DEFENDANT'S
### MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF
### AND BRIEF IN SUPPORT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff, EUGENIO VARGAS, and files this, his Response to Defendants', ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS (hereinafter "APFA"), JULIE HEDRICK, AND ERIK HARRIS, 12(b)(6) and 12(b)(1) Motion to Dismiss, and as grounds for support herein would show this Honorable Court the following:

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief, brought pursuant to Federal Rules Civil Procedure §§ 12(b)(1) and 12(b)(6).

## I. <u>INTRODUCTION</u>

Eugenio Vargas (hereinafter referred to as "Plaintiff" or "Vargas"), is a member in good standing of the Association of Professional Flight Attendants union (hereinafter "APFA") and the Former National Treasurer. Plaintiff was charged with violations of the APFA policy after enduring three days of arbitration hearings, and an award being issued against him declaring he breached his fiduciary duty to the union. Plaintiff filed his complaint against APFA, the National President, Julie Hedrick, and National Treasurer, Erik Harris, to vacate the arbitration award after discovering APFA and the National Officers withheld documents and pertinent facts from Plaintiff, the APFA Board of Directors, the APFA Executive Committee members, and Arbitrator Ruben Armendariz in order to acquire an unfavorable arbitration award. Vargas contends this violated his rights under the "Member's Bill of Rights" afforded by the Labor Management Reporting and Disclosure Act, as well as breached the APFA Constitution, and breached the two officer's common-law fiduciary duties to the Plaintiff. Plaintiff asserts Defendants' motivation was Plaintiff's affiliation with and support of Robert "Bob" Ross, the National President during Vargas's term as National Treasurer, and Plaintiff's opposition to a proposed merger of APFA with the Association of Flight Attendants-CWA, AFL-CIO (hereinafter "AFA").

On or about July 14, 2022, Defendants filed a Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support (hereinafter "Motion to Dismiss"). (*Ex. A, Defendant's Motion to Dismiss Plaintiff 's Claims for Relief and Brief in Support*). Defendants assert the following arguments in their Motion to Dismiss:

(1) Plaintiff's claims fail to meet subject matter jurisdiction,

(2) LMRDA provisions no longer govern any internal union matters, and

(3) all remaining claims asserted by Plaintiff are unfounded either

    (a) due to lack of jurisdictional basis,

    (b) due to lack of meeting Plaintiff's legal obligation "to exhaust the mandatory internal union remedies 'prior to taking any legal action'",

    (c) Plaintiff failed to meet the statutory pre-requisite to filing a claim under §501(a) of the Labor Management Reporting and Disclosure Act, and

    (d) all other claims are preempted by the Arbitration Award. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, 5-10*).

Defendants' Motion to Dismiss have provided misleading interpretations of the law, as well as inconsistent interpretations of Plaintiff's claims asserted in this case before the court. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, 5-10*). A clear understanding of both the law and Plaintiff's position clearly show that Defendant's motion to dismiss should be denied.

## II. <u>STATEMENT OF THE CASE</u>

Plaintiff, EUGENIO VARGAS ("Plaintiff") seeks damages alleging unlawful violations of the Labor Management Reporting and Disclosure Act, <u>29 U.S.C. § 411</u>, et seq. ("LMRDA"), the Association of Professional Flight Attendants Union Constitution, and Breach of Fiduciary Duty as provided for under Texas Common Law by Defendants APFA, JULIE HEDRICK, AND ERIK HARRIS ("hereinafter Defendants").

APFA is a labor organization covered under the LMRDA, <u>29 U.S.C. §401</u> et seq, and <u>29 U.S.C. § 158</u>, et seq. Plaintiff is a member in good standing of APFA as defined under the LMRDA

and 29 U.S.C. § 158. On or about January of 2016, the Plaintiff ran for office within the APFA local union elections. For clarification, Robert "Bob" Ross ran for National President Nena Martin ran for National Vice-President, and Eugenio Vargas ran for National Treasurer.

The Plaintiff won the election, with Robert "Bob" Ross being elected President, Nena Martin elected Vice-President, and Eugenio Vargas Treasurer ("Ross Administration"). The Ross Administration opposed a merger of the union with AFA—another multi-airline flight attendants' union. This created two political factions within APFA competing for power: Pro-APFA/AFA and Anti-APFA/AFA. The individuals comprising the Pro-APFA/AFA faction undertook a course of conduct of retaliation and suppression to thwart the efforts of Plaintiff, as well as others within the local union, to silence the opposition, supplement leadership, and effectuate a merger of the two unions. In 2020, the Hedrick Administration (a Pro-APFA/AFA Administration) was elected to National Office.

Plaintiff was subjected to retaliatory and oppressive actions by their union opponents and were subjected to deliberate attempts to suppress their dissent within in the union. Specifically, but not limited to, Plaintiff Vargas was investigated, charged, coerced into signing a promissory note for an alleged over-payment made for Meal Expense Allowance and Special Assignment Fee. It was only **after** Plaintiff repaid his alleged over-payment and he thought the harassment had ended that the union then charged him as well as others in the Ross Administration with multiple frivolous violations including violations for over-payments made to the Ross Administration. However, Plaintiff's union opponents were not satisfied and unlawfully re-charged Plaintiff and forced him to go to Arbitration, where an Award was issued that found he violated APFA Policy, declared he breached his fiduciary duty, suspended his right to run for union office, and found damages in excess of $10,000.

After the award was issued, Plaintiff discovered that APFA officers and officials had withheld pertinent documentation from Plaintiff during the arbitration hearings and presented false testimony to the Executive Committee and the Board of Directors. Furthermore, tactics of intimidation were used to pressure witnesses to not testify in the arbitration proceedings, which altered the results of the award and inhibited Plaintiff's right to a fair and impartial hearing.

Plaintiff was not provided the safeguards against improper disciplinary action provided under the LMRDA. After issuance of the arbitration award against Plaintiff, he discovered documents publicly filed in a lawsuit against Robert "Bob" Ross that contradicted statements the union made prior to and throughout his arbitration that were withheld. Withholding documentation and misrepresenting the facts is an unconscionable violation to Plaintiff's right to a fair hearing and goes beyond any rational explanation that could meet a reasonableness standard. The result of this conduct is that Plaintiff is now forced to repay money that has already been repaid, and is now prohibited from running for office. Plaintiff seeks to have the arbitration award rescinded, as this hearing was clearly fraudulent and was an over-reach of the power of the arbitrator.

### III.  ARGUMENTS AND AUTHORITIES

#### A.  Standards For Dismissal

An FRCP 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction seeks the dismissal of the lawsuit because the court lacks the authority to hear the dispute. *See generally U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984). A claim must be dismissed, pursuant to Rule 12(b)(1), "when the Court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010

(5th Cir. 1998). 29 U.S.C. § 412 clearly states:

> "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

If a FRCP 12(b)(1) motion simply challenges the Court's subject-matter jurisdiction based on the sufficiency of the pleading's allegations, then the motion is a facial attack. *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In a facial attack, the District Court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Ritchie*, 15 F.3d at 598; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

In resolving the question of subject-matter jurisdiction, the District Court can refer to evidence outside the pleadings. *Luckett v. Bure*, 290 F.3d, 496-97 (2d Cir. 2002); *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of the statement of claim for relief in the Plaintiff's complaint. *Doe v. Hillsboro ISD*, 81 F.3d 1395, 1401 (5th Cir. 1996). The motion cannot be used to resolve factual issues or the merits of the case, and is not appropriate unless the Plaintiff's pleadings on their face show, beyond a doubt, that the Plaintiff cannot prove any set of facts that would entitle it to relief. *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Hickey v. Obannon*, 287 F.3d 656, 657 (7th Cir. 2002).

Rule 12(b)(6) motions are disfavored in the law, and a Court will rarely encounter circumstances that justify granting them. *Mahone v. Addicks Utility District of Harris County*,

836 F.2d 921, 926 (5th Cir. 1998). A Court may dismiss a claim only when it is clear that no relief

can be granted under any set of facts that could be proved consistent with the allegations found in

the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A motion to dismiss should not

be granted unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of

his claim that would entitle him or her to relief. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442

(5th Cir. 1986).

   The claimant is not required to set out in detail the facts upon which the claim is based,

rather the Rules require that the claim simply give the Defendant "fair notice." *Leatherman v.*

*Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993). Further, a Court

may not look beyond the pleadings. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.

1995). The Court must accept as true the allegations in the complaint and must view the allegations

in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need

only give the Defendant fair notice of the nature of the claim and the grounds on which it rests.

*See Mahone*, 836 F.2d at 926. The Rules also dictate that the pleadings be liberally construed "as

to substantial justice." *Id.*

**B.**   <u>**Plaintiffs Have Stated Claims Upon Which Relief May Be Granted**</u>.

  (1).  <u>Plaintiff properly brought his causes of action pursuant to the Labor Management</u>
    <u>Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*, and provided Defendant "fair</u>
    <u>notice" therein pursuant to Federal Rule of Civil Procedure § 8(a).</u>

   A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed

with disfavor and is rarely granted. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720,

725 (5th Cir. 2002). The complaint must be liberally construed in favor of the Plaintiff,

and all facts pleaded in the complaint must be taken as true. *Id.* Recent decisions by the Supreme Court have elaborated on the pleading standards for civil litigation *See Ashcroft v Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Supreme Court noted two "working principles" in the *Iqbal* and *Twombly* decisions. First, while a Court must accept all factual allegations in the complaint as true, the court need not accept a complaint's legal conclusions as true; and second, a complaint must state a "plausible claim for relief" to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949-50. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id,* at 1949. The court presumes factual allegations to be true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Lindquist v. City of Pasedena*, 525 F.3d 383, 386 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a). As the Supreme Court has emphasized, Rule 8 does not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, or "detailed factual allegations," *Iqbal*, 129 S. Ct. at 1949.

Defendants allege that Plaintiff has not stated a claim upon which relief can be granted under the LMRDA. (*Ex. A, Def 's Motion to Dismiss Pl's Claims for Relief, 6*). However, Defendants have wholly failed to provide any legal or factual basis supporting their allegations that Plaintiff cannot state a claim upon which relief can be granted under the LMRDA. Defendants argue that LMRDA does not govern disputes between members as these disputes do not classify as a disciplinary measure by the union.  Plaintiff would note that the APFA Const. Art. VII—entitled "Hearings and Disciplinary Procedures"—spells out that members are subject

to fine, suspension or expulsion, or suspension from or removal from office for an enumerated list of violations. (APFA Const. Art. VII, Sec. 1 *et. seq.*). Furthermore, Art. VII, Sec. 2 creates the right for any member in good standing to file charges against another member. (*Id.* at Sec. 2 *et. seq.*). The charges are then presented to the APFA Executive Committee, who vote on whether the charges are timely, valid and specific. The accused is then referred to an arbitrator for an arbitration hearing, which ultimately results an award. If the award stipulates the accused member must pay damages, those damages are collected on by the union. In this case, The APRA National President issued a public announcement to all membership on March 24 ,2022 announcing the arbitrations as a result of the unions publications of financial documentation by the union; furthermore, the arbitration awards were adopted by resolution by the APFA Board on March 8, 2022. (*Ex. D Resolution by Board of Directors March 8, 2022; Ex. E, Presidential Hotline to Membership, March 24, 2022*).

## C.    <u>Subject Matter Jurisdiction</u>

(1) <u>The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act</u>.

The issue of federal subject matter jurisdiction "concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." (13 Wright & Miller § 3522, p. 125). Subject matter jurisdiction is a threshold question for any federal court and one that must be answered in the affirmative before any matter can be heard before the court. It is within the authority of Congress to confer subject matter jurisdiction onto the federal district courts.

While the Federal Arbitration Act does not confer subject matter jurisdiction since the recent Supreme Court decision of *Badgerow v. Walters* was issued on March 31, 2022 reversing

the 5th Circuit Court of Appeals application of the look-through test. (*Badgerow v. Walters*, Docket No. 20-1143 (U.S. Supreme Court, Decided March 31, 2022)). However, in the instant case, the Plaintiff seeks Federal Subject Matter jurisdiction based on its claims stemming from the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

(2)  Subject Matter Jurisdiction is Conferred based on Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

Subject matter jurisdiction exists when a federal question exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. § 1331). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'" (*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 807 (1986) quoting *Franchise Tax Board* v. *Construction Laborers Vacation Trust,* 463 U. S. 1, 8-9 (1983)). An action "arises under" federal law if: (1) "federal law creates the cause of action[,]" or (2) "the vindication of a right under state law necessarily turn[s] on some construction of federal law." (*Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 808-09 (1986) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.,* 463 U.S. 1, 9 (1983)); *see also, Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).

In the matter before this Court, the cause of action at the heart of the case are those claims falling under the LMRDA § 411, *et seq.*  Grounds for a cause of action are created by the federal legislation under LMRDA, 29 U.S.C. § 412 which grants:

> "[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United State for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought

in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." (29 U.S.C. § 412).

The cause of action for the unfair hearing and violation of Plaintiff's rights arise from the federal Labor Management Reporting and Disclosure Act, thus subject matter jurisdiction is clearly established.

**D.      Arbitrator's Decision is Subject to Review**

   (1) The Arbitrator's Decision Is Subject to Judicial Review

Defendants contend that Plaintiff's basis for setting aside the arbitration award is grounded in LMRDA § 411. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, p. 6*). Plaintiff filed the motion to vacate the arbitration award based on the well-established law that arbitration awards where fraud, corruption, misconduct, or where arbitrators exceeded their authority shall be vacated by the court.  (9 U.S.C. § 10). The cause of action under LMRDA §411, *et seq.* is rooted in the Plaintiff's cause of action for damages as a result of the violation of his rights as a union member granted thereunder.  Defendants seem to confuse the two laws—one is a means to vacate an invalid award, the other is a means to recover for damages suffered.

Plaintiff's claim under LMRDA are valid and properly asserted claims.  The *Supreme* Court coined LMRDA "the product of congressional concern with widespread abuses of power by union leadership." *(Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, (1982)).  The *Breininger* Court reviews a steel worker's claim brought against his union denial of referrals at the hiring halls.  The question before the Supreme Court was whether the union's actions were considered disciplinary actions that required notice and a fair hearing under LMRDA 101(a)(5). (*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989)).  The *Breininger*  Court found that "[t]he fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper

disciplinary action,' indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members." (*Id.* at 92). The case addresses the term "otherwise discipline" in the language of LMRDA § 411 for purposes of when a union must give notice and a hearing and when it should not. (*Id).* The Supreme Court holds that "otherwise discipline" indicates "'Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." (*Id*. at 91). At no point does the *Breininger* Court address subject matter jurisdiction. Nor does the *Breininger* Court ever hold that subject matter jurisdiction did not extended to union disciplinary arbitrations.

The *Guidry* Court also did not address subject matter jurisdiction issues, nor did it address arbitration awards regarding union procedures. (*Guidry v. Int'l Union Of Operating Eng*., *406*, <u>882 F. 2d 929</u> (5th Cir. 1989)). This Court, instead, addressed a union members complaint regarding hiring hall procedures between a union and an employer that allowed the union to hire within and outside the union at its discretion. (*Id at* 933-934). Hiring procedures of one of the Business Agent illustrated that he was exploiting and disregarding the hiring hall procedures to enrich those union members loyal to him—detrimentally to his opponents to silence and compel obedience. (*Id).* Here the Court held that under 101(a)(5) you cannot define depriving job referrals as "discipline" in which notice, and a fair hearing is required. However, when it is done as an imposition on a union member's free speech, it can be prohibitive in its effective under 101(a)(1 and 101(a)(2). (*Guidry v. Int'l Union Of Operating Eng*., <u>907 F. 2d 1491, 1493</u> (5th Cir. Ct App. 1990)).

Plaintiff can only assume that Defendants' counsel intended to argue that APFA

disciplinary procedures are conducted by a third-party.  If this is Defendants' argument, then this notion disregards the procedures spelled out in the APFA Constitution.  The APFA Constitution provides that the National Secretary "shall administer Article VII procedures." (*Ex. B, APFA Const. Art. III Sec. 6D(8), pg. 22*).  The National Treasurer oversees all financial records, production of all financial documents, maintain computerization of financial documents, oversee all daily activities of the APFA headquarters office and staff, and assist the National Secretary in the discharge of his duties. (*Ex. B, APFA Const Art. III Sec. 6E et seq., pg. 23-24*).  The National President acts as the chairperson for the Board of Directors, and the Executive Committee, appoints the members on the Executive Committee, and has the authority to retain and hire legal counsel for the union. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 20-21*).  The Vice-President is empowered to hire counsel for members in arbitrations and grievances and assist the National President in the discharge of all duties.  (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 21-22*). The Executive Committee, comprised of all four national officers and appointees made by the National President, review and vote on whether charges are timely, specific, and valid prior to any referral of charges to arbitration (*Ex. B, APFA Const Art. VII Sec. 3 et seq., pg. 42-43*).  The Board of Directors, which includes all four national officers, appoint an arbitrator to preside over the arbitration. (*Ex. B, APFA Const Art. VII Sec. 5 et seq., pg. 44-45*).

A quick review of the APFA Constitution will illustrate that the only means to bring about a disciplinary action is to file charges by an individual member against another individual member through the arbitration process.  There are no provisions outlined in Art. VII of the APFA Constitution or APFA Policy that provide for APFA to bring charges against a member on behalf of the union—the drafters of the APFA Constitution sought to ensure all members were

empowered to implement discipline against one another for violations. Furthermore, there is no provisions or measure for a member to file charges and bring an action against an officer as an officer. The only means to file charges outlined in Art. VII of the APFA Constitution provides for only one member to file charges against another member. Thus to read the Article VII Arbitration Procedures of the APFA Constitution as anything other than a disciplinary proceeding falling within the scope of LMRDA would undermine the statute and its purpose—to protect members from unfair treatment and intimidation tactics.

    (2) <u>Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order Comports with Well-Settled Federal Labor Law Principles.</u>

Defendants argue that the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is final and not subject for review by the judiciary, therefore the arbitrator's award in the case at issue should stand as final and binding. The review of arbitration awards in labor cases was described by the *Misco* Court as "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." (*United Paper Workers International Union v. Misco, Inc.,* 484 U.S. 29, 36-37 108 S.Ct. 364, 371, (1987)). Application of these ordinary contract principles falls squarely within an arbitrator's wide discretion to interpret and apply a collective bargaining agreement. Relying on this interpretation for this case at issue poses three problems: (1) there is not a Collective Bargaining Agreement at issue between Plaintiff and Defendants, (2) this interpretation frustrates the policy and purpose behind the LMRDA and the Member's Bill of Rights as forged by Congress, and (3) labor law principles regarding arbitration still favor vacating arbitration awards in certain circumstances.

The first problem with extending the arbitrator's authority within the case-at-issue is that no Collective Bargaining Agreement is at issue in the current case between Plaintiff and Defendants.  "A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301 (a) for breach of that contract." (*Wooddell v. International Bhd. of Elec. Workers,* 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 619-27, 101 S.Ct. 2546, 2549-53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of* 1477*1477 *Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981)).  A Collective Bargaining Agreement is one typically defined by "contracts between an employer and a labor organization representing employees. . . ."  (29 U. S. C. § 185(a)).

In the case before the court, the employer, American Airlines, Inc., is not a party to the Union Constitution, nor were they a party to the charges filed or the union's disciplinary procedures, or the arbitration hearing.  This is governed solely by the union constitution—which is a contract between the members and APFA.  Therefore, application of the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is not appropriate here.

The second problem with Defendants' argument is that this approach frustrates the policy interest behind LMRDA.  The LMRDA policy interest was clear upon Congress's enactment of the legislation: "[t]he legislative history and the extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. (*Local Union No. 38 v. Pelella,* 350 F.3d 73, 83-84 (2nd Cir. 2003) (citing *Salzhandler v. Caputo,* 316 F.2d 445, 449 (2d Cir.1963))). The Second Circuit Court spells out the policy behind the Union Member's "Bill of Rights" in saying

that "Section 101 of Title I of the LMRDA represents '[o]ne of the most significant remedial provisions of the LMRDA.' (*Pelella*, 350 F. 3d 73, 84 (citing *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation,* 590 F.2d 1139, 1149 (D.C.Cir.1978))). The Union Member's "Bill of Rights," protects members from the abusive or coercive practices of the union's leadership. (*Franza v. International Brotherhood of Teamsters, Local 671,* 869 F.2d 41, 44 (2d Cir.1989)).

In the case before the court, expansion of an arbitrator's interpretations of a Collective Bargaining Agreement to union disciplinary arbitrations would simply stifle and limit the protections afforded to members from abuse of power by union officials and leadership under LMRDA.

The third problem with Defendants' arguments in support of non-judicial review of the arbitrator's award within a Union's disciplinary proceeding is that it ignores those instances in which the courts have vacated arbitration awards even interpreting a collective bargaining agreement. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960))). The Supreme Court in *Garvey,* goes on to state that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award." Here, the court makes clear that when dishonesty has occurred, vacating the arbitration award is

the proper recourse. Again this case applies to those where the arbitration occurs as a result of a collective bargaining agreement. In the case before the court, dishonesty *has* been asserted, if not clearly established by the documents attached to Plaintiff's Original Complaint. (*Ex. C, Pl's Original Compl.*). Therefore, the arbitrator's award should be vacated per the labor law principles.

### E.     Plaintiff's Remaining Claims Have Merit

(1)  Jurisdictional Basis for Remaining Claims is rests in *Gibbs* Supplement Jurisdiction

As previously discussed, the Supreme Court has held that "[a] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). Furthermore, 28 U.S.C. §1331 requirements are met when a case generally arises under federal law when that federal law creates the cause of action. (*Grable & Sons*, 545 U.S. 308, 312).

State law claims asserted between the same parties, based on the same nucleus of facts that gave rise to the cause of action which forms the basis of subject matter jurisdiction, may be heard based on supplemental or pendent jurisdiction. In *Finley,* the Supreme Court reaffirmed what it previously held in *Gibbs* finding that "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [which] comprises but one constitutional 'case.'" (*Finley* v. *United States,* 490 U. S. 545, 548 (1989) quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966)).

In the case before the court, subject matter jurisdiction is conferred based on federal question because the cause of action *arises out of* the LMRDA, <u>29 U.S.C. § 412</u>. Supplemental jurisdiction over state law claims can be founded on the *Gibbs* case and its progeny of broadly interpreting jurisdictional authority over state law claims within an action properly embedded in federal question jurisdiction.

(2) <u>Exhaustion of Internal Remedies was not Required Prior to Filing Suit</u>.

Plaintiff is not required to exhaust internal remedies as a pre-requisite to filing suit against the Defendants. Section 101(a)(4) of the LMRDA, <u>29 U.S.C. § 411(a)(4)</u>, allows courts the discretion to hear a union member claim or require a union member to exhaust his internal remedies before filing suit. (*See* <u>29 U.S.C. § 411(a)(4)</u>; *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982). *Guidry v. Operating Engineers Local 406*, <u>882 F. 2d 1491</u>, (5th Cir. 1990)).

However, Plaintiff did exhaust his internal remedies prior to filing suit, as Plaintiff pursued arbitration and attended the hearings. Plaintiff called witnesses that were not required to appear or that were intimidated and discouraged from testifying on behalf of the Plaintiff during the Arbitration. Plaintiff only brought this lawsuit after discovering that the Union and the National Officers conspired to withhold documents and mis-informed APFA officials to achieve a guilty result.

(3) <u>Common Law Breach of Fiduciary Duty Claims require compliance with LMRDA § 501(b)</u>.

The Breach of Fiduciary Duty claims brought against the officers were asserted under

Texas Common Law, similar to the counterclaim asserted by Defendant. LMRDA § 501(a) clearly asserts a cause of action against an officer that spends union funds or for purposes of pecuniary or personal gain.  Plaintiff's Complaint never asserted any facts regarding the officers' conduct pertaining to their spending of union funds, rather Plaintiff's complaints clearly focus on the withholding of documents, the presentation of false facts, defamation of his character, and conspiring to defame his character.  Consequently, any pre-requisite need to comply with LMRDA § 501(b) is moot, as no claim under LMRDA § 501(a) have been asserted.

(4) <u>Preemption of the Breach of Union Constitution and Breach of Fiduciary Duty claims cannot exist based on the Fraudulent Arbitration Award.</u>

Preemption of the remaining claim cannot be based on an Arbitration that were not based on any claims brought by the Plaintiff and did not address any of the grievances or damages Defendants imposed on the Plaintiff.  The Supreme Court find preemption of state law claims only when the claim is dependent on interpretation of a Collective Bargaining Agreement.  (*Hawaiian Airlines v. Norris*, <u>512 U.S. 246</u> (1994); *Martin v. American Airlines, Inc.*, <u>390 F.3d 601</u> (8th Cir. 2004)).  Consequently, since no Collective Bargaining Agreement is at issue in the case before the Court, then there is no preemption of the state law claims brought against the Defendants.

**F.      Plaintiff Has Satisfied the "Fair Notice" Pleading Requirements Pursuant to Federal Rule of Civil Procedure 8(a).**

<u>Federal Rule of Civil Procedure 8(a)</u> requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. (<u>Fed. R. Civ. P. 8(a)</u>). As the Supreme Court has emphasized, Rule 8 does not require "heightened fact pleading of specifics," or "detailed

factual allegations," (*Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949). Plaintiff has provided

an extremely detailed pleading outlining specific violations of the LMRDA by Defendants.

(*Ex. C, Pl's Original Compl.*).

The law clearly states that the Claimant is not required to set out in detail the facts upon

which the claim is based, rather the Rules require that the claim simply give the Defendants "fair

notice." (*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168

(1993)). Further, the Court must accept as true the allegations in the complaint and must view the

allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the

claim need only give the Defendant fair notice of the nature of the claim and the grounds on which

it rests. (*See Mahone*, 836 F.2d at 926). The Rules also dictate that the pleadings be liberally

construed "as to substantial justice." (*Id).*

Plaintiff has met his burden of providing a detailed factual basis and specific statutory

protections along with specific relief. (*Ex. C, Pl's Original Compl.*).


IV. **CONCLUSION AND PRAYER**

In conclusion, Plaintiff clearly plead, and sought protection and relief, pursuant to his

rights as a member of a labor organization under the LMRDA. Plaintiff alleged and asserted a

detailed factual background demonstrating how Defendants violated his rights. Plaintiff has

provided Defendant with fair notice of the allegations and facts of his claims pursuant to Federal

Rule of Civil Procedure 8(a) and the local rules of this Court. Plaintiff cited specific clauses under

the LMRDA under which their rights are protected, and relief is available. Further, Plaintiff has

also demonstrated that Plaintiff has only plead relief sought from this Court in its

official capacity, and that sound case law exists to protect his rights. For the reasons state herein,

Plaintiff requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC


By: /s/ Heather Abreu
    Heather Abreu
    Texas Bar No. 24122577
    Phone: (972) 327-5800
    Email: heather@KDphillipslaw.com

By: /s/ Kerri Phillips
    Kerri Phillips
    Texas Bar No. 24065906
    Phone: (972) 327-5800
    Email: kerri@KDphillipslaw.com

    5700 Tennyson Parkway, Suite 300
    Plano, Texas 75024
    Fax: (940) 400-0089
    For Service of Filings:
    notice@KDphillipslaw.com

**ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing and Facsimile **on this the** 4<u>th</u> **Day of August, 2022.**


William Osborne
Margot Nikitas
Sanford Denison

        /s/ _____
        Heather Abreu

OCTOBER TERM, 2021

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BADGEROW *v.* WALTERS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–1143.   Argued November 2, 2021—Decided March 31, 2022

The Federal Arbitration Act authorizes a party to an arbitration agreement to petition a federal court for various forms of relief. But the Act's authorization of such petitions does not itself create the subject-matter jurisdiction necessary for a federal court to resolve them. Rather, the federal court must have an "independent jurisdictional basis" to do so. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582. In *Vaden* v. *Discover Bank*, 556 U. S. 49, this Court assessed whether there was a jurisdictional basis to decide an FAA Section 4 petition to compel arbitration by means of examining the parties' underlying dispute. The Court reasoned that specific language in Section 4 instructed a federal court to "look through" the petition to the "underlying substantive controversy." *Id.*, at 62. If the dispute underlying a Section 4 petition falls within the court's jurisdiction—for example, by presenting a federal question—then the court may rule on the petition to compel arbitration.

In this case, the question presented is whether that same "look-through" approach to jurisdiction applies to applications to confirm or vacate arbitral awards under Sections 9 and 10 of the FAA. Petitioner Denise Badgerow initiated an arbitration proceeding against her employer's principals (collectively, Walters), alleging that she was unlawfully terminated. After arbitrators dismissed Badgerow's claims, she filed suit in Louisiana state court to vacate the arbitral award. Walters removed the case to Federal District Court and applied to confirm the award. Badgerow then moved to remand the case to state court, arguing that the federal court lacked jurisdiction to resolve the parties' requests—under Sections 10 and 9 of the FAA, respectively—to vacate or confirm the award. The District Court applied *Vaden*'s look-through approach, finding jurisdiction in the federal-law claims contained in

BADGEROW *v.* WALTERS

Syllabus

Badgerow's underlying employment action.  The District Court acknowledged that Sections 9 and 10 of the FAA lack the distinctive text on which *Vaden* relied, but it applied the look-through approach anyway so that "consistent jurisdictional principles" would govern all kinds of FAA applications.  The Fifth Circuit affirmed.

*Held*: *Vaden*'s "look-through" approach to determining federal jurisdiction does not apply to requests to confirm or vacate arbitral awards under Sections 9 and 10 of the FAA.  Pp. 4–16.

(a) Congress has granted federal district courts jurisdiction over two main kinds of cases: suits between citizens of different States as to any matter valued at more than $75,000 (diversity cases), 28 U. S. C. §1332(a), and suits "arising under" federal law (federal-question cases), §1331.  Normally, a court has federal-question jurisdiction whenever federal law authorizes an action.  But because this Court has held that the FAA's provisions do not themselves support federal jurisdiction, a federal court must find an independent basis for jurisdiction to resolve an arbitral dispute.  In this case, neither application reveals a jurisdictional basis on its face.  So to find an independent basis for jurisdiction, the District Court had to look through the Section 9 and 10 applications to the underlying substantive dispute, where a federal-law claim satisfying §1331 indeed exists.

In *Vaden*, this Court approved the look-through approach for a Section 4 petition by relying on that section's express language.  That language provides that a party to an arbitration agreement may petition for an order to compel arbitration in a "United States district court which, save for [the arbitration] agreement, would have jurisdiction" over "the controversy between the parties."  "The phrase 'save for [the arbitration] agreement,'" the Court stated, "indicates that the district court should assume the absence of the arbitration agreement and determine whether [the court] 'would have jurisdiction . . .' without it" by looking through to the "underlying substantive controversy" between the parties.  556 U. S., at 62.

Sections 9 and 10 of the FAA contain none of the statutory language on which *Vaden* relied.  So under ordinary principles of statutory construction, the look-through method should not apply.  "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act," this Court generally takes the choice to be deliberate.  *Collins* v. *Yellen*, 594 U. S. ___, ___.  That holds true for jurisdictional questions, as federal "district courts may not exercise jurisdiction absent a statutory basis.  *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 552.  Because a statutory basis for look-through jurisdiction is lacking in Sections 9 and 10, the Court cannot reach the same result here as in *Vaden*.  Pp. 4–9.

Syllabus

(b) Walters presents a two-part argument to justify exercising jurisdiction here. Walters first claims that Section 4's language does not authorize look-through jurisdiction, but is only a capacious venue provision designed to give applicants a broad choice among federal courts possessing jurisdiction. Walters next construes Section 6—which requires any FAA application to "be made and heard in the manner provided by law for the making and hearing of motions"—to provide the basis for an FAA-wide look-through rule.

Walters's reading of Section 4 does not comport with how *Vaden* understood Section 4 or with the actual text of that provision, which never mentions venue, and refers only to jurisdiction. And Walters's Section 6 argument fares no better. Courts do not possess jurisdiction to decide ordinary motions by virtue of the look-through method. So Congress would not have prescribed that method by telling courts, as Section 6 does, to treat FAA applications like motions. Pp. 9–12.

(c) Walters also makes several policy arguments preaching the virtues of adopting look-through as a uniform jurisdictional rule. Walters claims that a uniform rule will promote "administrative simplicity"; that the look-through approach will be "easier to apply" than a test grounding jurisdiction on the face of the FAA application itself; and that the look-through rule will provide federal courts with more comprehensive control over the arbitration process. Brief for Respondents 27, 28. But "[e]ven the most formidable policy arguments cannot overcome a clear statutory directive." *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. ___, ___. And anyway, Walters oversells the superiority of his proposal. First, uniformity in and of itself provides no real advantage here because courts can easily tell whether to apply look-through or the normal jurisdictional rules. Second, the use of those ordinary rules, in the context of arbitration applications, is hardly beyond judicial capacity. And third, there are good reasons why state, rather than federal, courts should handle applications like ours in this case. Pp. 12–16.

975 F. 3d 469, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, SOTOMAYOR, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. BREYER, J., filed a dissenting opinion.

Cite as: 596 U. S. ____ (2022)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1143
_____

## DENISE A. BADGEROW, PETITIONER *v.* GREG WALTERS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 31, 2022]

JUSTICE KAGAN delivered the opinion of the Court.

The Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*, authorizes a party to an arbitration agreement to seek several kinds of assistance from a federal court. Under Section 4, for example, a party may ask the court to compel an arbitration proceeding, as the agreement contemplates. And under Sections 9 and 10, a party may apply to the court to confirm, or alternatively to vacate, an arbitral award.

Yet the federal courts, as we have often held, may or may not have jurisdiction to decide such a request. The Act's authorization of a petition does not itself create jurisdiction. Rather, the federal court must have what we have called an "independent jurisdictional basis" to resolve the matter. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582 (2008).

In *Vaden* v. *Discover Bank*, 556 U. S. 49 (2009), we assessed whether there was a jurisdictional basis to decide a Section 4 petition to compel arbitration by means of examining the parties' underlying dispute. The text of Section 4, we reasoned, instructs a federal court to "look through" the

petition to the "underlying substantive controversy" be-
tween the parties—even though that controversy is not be-
fore the court. *Id.*, at 62. If the underlying dispute falls
within the court's jurisdiction—for example, by presenting
a federal question—then the court may rule on the petition
to compel. That is so regardless whether the petition alone
could establish the court's jurisdiction.

The question presented here is whether that same "look-
through" approach to jurisdiction applies to requests to con-
firm or vacate arbitral awards under the FAA's Sections 9
and 10. We hold it does not. Those sections lack Section 4's
distinctive language directing a look-through, on which
*Vaden* rested. Without that statutory instruction, a court
may look only to the application actually submitted to it in
assessing its jurisdiction.

## I

This case grows out of the arbitration of an employment
dispute. Petitioner Denise Badgerow worked as a financial
advisor for REJ Properties, a firm run by respondents Greg
Walters, Thomas Meyer, and Ray Trosclair. (For ease of
reference, we refer from now on only to Walters.)
Badgerow's contract required her to bring claims arising
out of her employment to arbitration, rather than to court.
So when she was (in her view, improperly) fired, she initi-
ated an arbitration action against Walters, alleging unlaw-
ful termination under both federal and state law. The ar-
bitrators sided with Walters, dismissing Badgerow's
claims.

What happened afterward—when Badgerow refused to
give up—created the jurisdictional issue we address today.
Believing that fraud had tainted the arbitration proceeding,
Badgerow sued Walters in Louisiana state court to vacate
the arbitral decision. Walters responded by removing the
case to Federal District Court—and, once there, applying to
confirm the arbitral award. Finally, Badgerow moved to

Opinion of the Court

remand the case to state court, arguing that the federal court lacked jurisdiction over the parties' requests—under Sections 10 and 9, respectively—to vacate or confirm the award.

The District Court assessed its jurisdiction under the look through approach this Court adopted in *Vaden* v. *Discover Bank*. See 2019 WL 2611127, *1 (ED La., June 26, 2019). That approach, as just noted, allows a federal court to exercise jurisdiction over an FAA application when the parties' underlying substantive dispute would have fallen within the court's jurisdiction. See *supra*, at 1–2. The District Court acknowledged that *Vaden* involved a different kind of arbitration dispute: It concerned a petition to compel arbitration under the FAA's Section 4, rather than an application to confirm or vacate an arbitral award under Section 9 or 10. And *Vaden*'s "reasoning was grounded on specific text" in Section 4 that Sections 9 and 10 "do[] not contain." 2019 WL 2611127, *2. But the court thought it should apply the look-through approach anyway, so that "consistent jurisdictional principles" would govern all kinds of FAA applications. *Ibid.* And under that approach, the court had jurisdiction because Badgerow's underlying employment action raised federal-law claims. The court thus went on to resolve the dispute over whether fraud had infected the arbitration proceeding. Finding it had not, the court granted Walters's application to confirm, and denied Badgerow's application to vacate, the arbitral award.

The United States Court of Appeals for the Fifth Circuit affirmed the District Court's finding of jurisdiction, relying on a just-issued Circuit precedent. See 975 F. 3d 469, 472–474 (2020) (citing *Quezada* v. *Bechtel OG&C Constr. Servs., Inc.*, 946 F. 3d 837, 843 (2020)). In that decision, the Fifth Circuit had echoed the reasoning of the District Court here. Yes, the language of Section 4 directing use of the look-through approach "is in fact absent in" the FAA's other sec-

Opinion of the Court

tions. 946 F. 3d, at 842.  But, the court continued, a "principle of uniformity" applying to the FAA "dictates using the same approach for determining jurisdiction under each section of the statute."  *Ibid.*; but see *id.*, at 845–846 (Ho, J., dissenting) (rejecting that asserted principle in favor of "[f]idelity to text").  As applied to this case, that analysis meant that the district court had jurisdiction over Walters's Section 9 and Badgerow's Section 10 applications.

Courts have divided over whether the look-through approach used in *Vaden* can establish jurisdiction in a case like this one—when the application before the court seeks not to compel arbitration under Section 4 but to confirm, vacate, or modify an arbitral award under other sections of the FAA.[1]  We granted certiorari to resolve the conflict, 593 U. S. ___ (2021), and now reverse the judgment below.

## II

The district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute.  See, *e.g.*, *Kokkonen* v. *Guardian Life Ins. Co. of America*, 511 U. S. 375, 377 (1994).  Congress has granted those courts jurisdiction over two main kinds of cases.  District courts have power to decide diversity cases—suits between citizens of different States as to any matter valued at more than $75,000.  See 28 U. S. C. §1332(a).  And they have power to decide federal-question cases—suits "arising under" federal law.  §1331.  Typically,

_____

[1] Compare *Quezada* v. *Bechtel OG&C Constr. Servs., Inc.*, 946 F. 3d 837, 843 (CA5 2020) (holding that the look-through approach applies to applications to confirm, vacate, or modify an arbitral award); *Ortiz-Espinosa* v. *BBVA Securities of P. R., Inc.*, 852 F. 3d 36, 47 (CA1 2017) (same); *Doscher* v. *Sea Port Group Securities, LLC*, 832 F. 3d 372, 381–388 (CA2 2016) (same); *McCormick* v. *America Online, Inc.*, 909 F. 3d 677, 680–684 (CA4 2018) (same), with *Goldman* v. *Citigroup Global Markets Inc.*, 834 F. 3d 242, 252–255 (CA3 2016) (holding that the look-through approach does not apply to those applications); *Magruder* v. *Fidelity Brokerage Servs.*, 818 F. 3d 285, 287–289 (CA7 2016) (same).

Opinion of the Court

an action arises under federal law if that law "creates the cause of action asserted." *Gunn* v. *Minton*, 568 U. S. 251, 257 (2013). So when federal law authorizes the action, the party bringing it—once again, typically—gets to go to federal court.

But that is not necessarily true of FAA-created arbitration actions. As noted above, the FAA authorizes parties to arbitration agreements to file specified actions in federal court—most prominently, petitions to compel arbitration (under Section 4) and applications to confirm, vacate, or modify arbitral awards (under Sections 9 through 11). See *supra*, at 1. But those provisions, this Court has held, do not themselves support federal jurisdiction. See *Hall Street*, 552 U. S., at 581–582; *Vaden*, 556 U. S., at 59. (Were it otherwise, every arbitration in the country, however distant from federal concerns, could wind up in federal district court.) A federal court may entertain an action brought under the FAA only if the action has an "independent jurisdictional basis." *Hall Street*, 552 U. S., at 582. That means an applicant seeking, for example, to vacate an arbitral award under Section 10 must identify a grant of jurisdiction, apart from Section 10 itself, conferring "access to a federal forum." *Vaden*, 556 U. S., at 59. If she cannot, the action belongs in state court. The FAA requires those courts, too, to honor arbitration agreements; and we have long recognized their "prominent role" in arbitral enforcement. *Ibid.*; see *id.,* at 71; *Southland Corp.* v. *Keating*, 465 U. S. 1, 12–16 (1984).[2]

─────────

[2] This Court has held that the FAA's core substantive requirement—Section 2's command to enforce arbitration agreements like other contracts—applies in state courts, just as it does in federal courts. See *Southland Corp.*, 465 U. S., at 12–16. We have never decided whether the FAA's more procedural provisions, including Sections 4 and 9 through 11, also apply in state courts. See *Vaden*, 556 U. S., at 71, n. 20; see also *post,* at 7 (Breyer, J., dissenting) (expressing concern that they do not). But we have made clear that Section 2 "carries with it" a duty for States to provide certain enforcement mechanisms equivalent to the

Opinion of the Court

The issue here is about where a federal court should look to determine whether an action brought under Section 9 or 10 has an independent jurisdictional basis. An obvious place is the face of the application itself. If it shows that the contending parties are citizens of different States (with over $75,000 in dispute), then §1332(a) gives the court diversity jurisdiction. Or if it alleges that federal law (beyond Section 9 or 10 itself) entitles the applicant to relief, then §1331 gives the court federal-question jurisdiction. But those possibilities do Walters no good. He and Badgerow are from the same State. And their applications raise no federal issue. Recall that the two are now contesting not the legality of Badgerow's firing but the enforceability of an arbitral award. That award is no more than a contractual resolution of the parties' dispute—a way of settling legal claims. See *Vaden*, 556 U. S., at 63. And quarrels about legal settlements—even settlements of federal claims—typically involve only state law, like disagreements about other contracts. See *Kokkonen*, 511 U. S., at 378–382. So the District Court here, as Walters recognizes, had to go beyond the face of the Section 9 and 10 applications to find a basis for jurisdiction. See Brief for Respondents 26–27. It had to proceed downward to Badgerow's employment action, where a federal-law claim satisfying §1331 indeed exists. In other words, the court had to look through the Section 9 and 10 applications to the underlying substantive dispute, although that dispute was not before it. Could the court do so?

––––––––

FAA's. See *Vaden*, 556 U. S., at 71 (referring specifically to Sections 3 and 4). And most, if not all, States in fact provide procedural vehicles, similar to those in the FAA, to enforce arbitration agreements—including, as here, to resolve post-arbitration disputes by means of confirming, modifying, or vacating arbitral awards. See, *e.g.,* Revised Uniform Arbitration Act of 2000 §§22–24, 7 U. L. A. 26 (2009) (adopted in 21 States and the District of Columbia); Cal. Civ. Proc. Code Ann. §§1285–1287.6 (West 2022); N. Y. Civ. Prac. Law Ann. §§7510–7511 (West 2022).

Opinion of the Court

In *Vaden,* this Court approved the look-through approach for a Section 4 petition, relying on that section's express language. Under Section 4, a party to an arbitration agreement may petition for an order to compel arbitration in a "United States district court which, save for [the arbitration] agreement, would have jurisdiction" over "the controversy between the parties."[3] That text, we stated, "drives our conclusion that a federal court should determine its jurisdiction by 'looking through' a §4 petition to the underlying substantive controversy"—to see, for example, if that dispute "'arises under' federal law." 556 U. S., at 62.

To show why that is so, we proceeded methodically through Section 4's wording. "The phrase 'save for [the arbitration] agreement,'" we began, "indicates that the district court should assume the absence of the arbitration agreement and determine whether [the court] 'would have jurisdiction . . .' without it." *Ibid.* (first alteration in original). But "[j]urisdiction over what?" *Ibid.* "The text of Section 4," we continued, "refers us to 'the controversy between the parties.'" *Ibid.* And that "controversy," we explained, could not mean the dispute before the court about "the existence or applicability of an arbitration agreement"; after all, the preceding save-for clause had just "direct[ed] courts" to assume that agreement away. *Id.,* at 63. The "controversy between the parties" instead had to mean their "underlying substantive controversy." *Id.,* at 62 (internal quotation marks omitted). "Attending to the language" of

_____

[3] In full, the relevant sentence of Section 4 reads: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

Opinion of the Court

Section 4 thus required "approv[ing] the 'look through' approach" as a means of assessing jurisdiction over petitions to compel arbitration. *Ibid.* The opposite view was not merely faulty; it was "textual[ly] implausib[le]." *Id.*, at 65.

But Sections 9 and 10, in addressing applications to confirm or vacate an arbitral award, contain none of the statutory language on which *Vaden* relied. Most notably, those provisions do not have Section 4's "save for" clause. They do not instruct a court to imagine a world without an arbitration agreement, and to ask whether it would then have jurisdiction over the parties' dispute. Indeed, Sections 9 and 10 do not mention the court's subject-matter jurisdiction at all.[4] So under ordinary principles of statutory construction, the look-through method for assessing jurisdiction should not apply. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act," we generally take the choice to be deliberate. *Collins* v. *Yellen*, 594 U. S. ___, ___ (2021) (slip op., at 23) (internal quotation marks omitted). We have no warrant to redline the FAA, importing Section 4's consequential language into provisions containing nothing like it. Congress could have replicated Section 4's look-through instruction in Sections 9 and 10. Or for that matter, it could have drafted a global look-through provision, applying the approach throughout the FAA. But Congress did neither. And its decision governs.

―――――――――

[4] Section 9 provides, in relevant part, that if an arbitration agreement states "that a judgment of the court shall be entered upon the [arbitral] award," then a "party to the arbitration may apply" within a year to the federal court located where the award was made (or any other court specified) "for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected" as the Act otherwise prescribes.

Section 10 provides, in relevant part, that a United States court "may make an order vacating the award upon the application of any party to the arbitration" if the award is tainted in any of four specified ways.

Opinion of the Court

Nothing in that conclusion changes because a jurisdictional question is before us. The federal "district courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 552 (2005). And the jurisdiction Congress confers may not "be expanded by judicial decree." *Kokkonen*, 511 U. S., at 377. Those bedrock principles prevent us from pulling look-through jurisdiction out of thin air—from somehow finding, without textual support, that federal courts may use the method to resolve various state-law-based, non-diverse Section 9 and 10 applications. The look-through rule is a highly unusual one: It locates jurisdiction not in the action actually before the court, but in another controversy neither there nor ever meant to be. We recognized that rule in *Vaden* because careful analysis of Section 4's text showed that Congress wanted it applied to petitions brought under that provision. See 556 U. S., at 62–65. But Congress has not so directed in Sections 9 and 10. Congress has not authorized a federal court to adjudicate a Section 9 or 10 application just because the contractual dispute it presents grew out of arbitrating different claims, turning on different law, that (save for the parties' agreement) could have been brought in federal court. And because a statutory basis for look-through jurisdiction is lacking here, we cannot reach the same result as in *Vaden*: That would indeed be jurisdictional "expan[sion] by judicial decree." *Kokkonen*, 511 U. S., at 377.

Walters contests that view of the statute. Unlike the Courts of Appeals to have adopted his position, including the Fifth Circuit below, see *supra*, at 3–4, he offers a reading of the FAA's text to justify exercising jurisdiction here.[5]

---

[5] By contrast, the dissenting opinion reads, from start to finish, more like the decisions of the courts below: Even when that opinion finally turns to the FAA's text, it emphasizes something much like the lower courts' uniformity principle. See *post,* at 9–11; *supra,* at 3–4. Because, the dissent says, all the FAA's sections "describe connected components

Opinion of the Court

Walters's argument comes in two parts. First, Walters says, the language in Section 4 that *Vaden* construed does not in fact authorize the use of the look-through jurisdictional method. In his view, that sentence is only a capacious "*venue* provision," serving to "expand[] venue to the limits of [federal] jurisdiction" (and thus to give an applicant a broad choice *among* federal courts possessing jurisdiction). Brief for Respondents 12, 23. Second, Walters claims that Section 6 provides the basis for an FAA-wide look-through jurisdictional rule. Under Section 6, any FAA application "shall be made and heard in the manner provided by law for the making and hearing of motions." That provision, Walters claims, requires use of the look-through approach because "[f]ederal courts have jurisdiction over motions when they have jurisdiction over the underlying action." Brief for Respondents 19 (internal quotation marks omitted). So to recap Walters's theory: Section 4 does not establish any jurisdictional rule for applications to compel in particular, while Section 6 establishes the look-through jurisdictional rule for all kinds of FAA applications.

But Walters's understanding of Section 4 does not comport with what it says. The language of that provision never mentions "venue"; it refers only to "jurisdiction." That is a signal, sharp and clear, that the section provides a jurisdictional rule. And even suppose (against all odds) that Congress had meant to state the venue rule Walters proposes without ever using the word "venue." In that

_____

of a single matter" (namely, a "court's arbitration-related enforcement power"), and because those provisions serve the same "general purpose[]," the statute "permits" a court to hold that "Section 4's jurisdictional rule should apply throughout." *Post,* at 9–12. But the (nigh-inevitable) connection among a statute's diverse provisions does not give a court carte blanche to move rules or concepts from any one section to any or all others. For the reasons already stated, we cannot read this nonuniform statute—setting out a jurisdictional rule in one section but conspicuously omitting it in all others—as though it applied a single rule throughout. See *supra,* at 8–9.

Opinion of the Court

event, Congress could have simply permitted filing the petition in any district court with jurisdiction (or even more simply—because a court can never act without jurisdiction—in any district court). Given that (in Walters's view) the jurisdictional rule comes from another provision, Congress would not have needed to (again) spell out its content. But spelling out the rule's content—by describing the look-through method—is exactly what Section 4 does. That description can serve one purpose only: to establish jurisdiction where it would otherwise not exist.

And that is how *Vaden* understood Section 4. Our decision, like the relevant text, never once referred to venue. Instead, we spoke, throughout the opinion, of the way Section 4 provides for jurisdiction. We formulated the question presented as whether the district court could "exercise jurisdiction over [the party's] §4 petition." 556 U. S., at 53; see *id.*, at 57 (stating that "[w]e granted certiorari" to decide whether district courts could use the look-through method "to determine whether federal-question jurisdiction exists over [a] §4 petition"). And we framed our holding as about jurisdiction: "[A] federal court should determine its jurisdiction by 'looking through' a §4 petition." *Id.*, at 62; see *id.*, at 72 (ROBERTS, C. J., dissenting) (differing about the rule's application, but agreeing that a court presented with a Section 4 petition should use the look-through method "in determining whether it has jurisdiction"). In short, Section 4's "save for" text "dr[ove] our conclusion" not about venue, but about "jurisdiction." *Id.*, at 62. And so that text, as shown above, contradicts Walters's position—for it appears in Section 4 alone, rather than also in Sections 9 and 10. See *supra*, at 8–9.

Walters's theory fares no better in construing Section 6's mention of motions to prescribe a look-through rule for the whole FAA. Here, Walters commits the opposite of his fault in reading Section 4: He now reads a provision containing

no express reference to jurisdiction in fact to set out a juris-
dictional rule. There may be rare contexts in which courts
can, without such a reference, "infer that Congress has ex-
panded our jurisdiction"—but this is not one. *Welch* v.
*Texas Dept. of Highways and Public Transp.*, <u>483 U. S. 468,
474</u> (1987) (plurality opinion). The look-through method, as
noted before, is a jurisdictional outlier. See *supra*, at 9. For
Congress to prescribe it by telling courts, a la Section 6, to
treat FAA applications like motions in other kinds of litiga-
tion would be not just oblique but simply bizarre. Courts,
after all, do not possess jurisdiction to decide ordinary mo-
tions by virtue of the look-through method. A motion (un-
like a typical FAA application) is part of a case actually in
court. Jurisdiction to decide the case includes jurisdiction
to decide the motion; there is no need to "look through" the
motion in search of a jurisdictional basis outside the court.
And if the look-through rule does not apply to motions, then
Section 6's reference to motions cannot direct the look-
through rule. We have formerly described that provision's
function as something different: Section 6, we said, ensures
that FAA applications "get streamlined treatment"—a kind
of "expedited review," as compared to what a party would
receive if she brought a normal contract suit. *Hall Street*,
552 U. S., at 582, and n. 3. However hard we squint, we
cannot also discern in Section 6 an FAA-wide look-through
rule; the only such rule in the FAA, applying only to peti-
tions to compel, resides in Section 4.

   Walters's more thought-provoking arguments sound not
in text but in policy. Here, Walters—now joined by the dis-
sent—preaches the virtues of adopting look-through as a
"single, easy-to-apply jurisdictional test" that will produce
"sensible" results. Brief for Respondents 28 (internal quo-
tation marks omitted); see *post*, at 4–9 (opinion of BREYER,
J.) (lauding the "advantages" of look-through's "practical
consequences"). First, Walters says, a uniform jurisdic-

Opinion of the Court

tional rule, applying to all FAA applications alike, will nec-
essarily promote "administrative simplicity" because a
court will not have to figure out which rule to apply. Brief
for Respondents 27. Second, he claims, the look-through
rule is "easier to apply" than a test that would ground juris-
diction on the face of the FAA application itself. *Id.,* at 28
(internal quotation marks omitted). In particular, he says,
the latter approach confronts courts with "hard questions"
about how to determine diversity jurisdiction (including its
amount-in-controversy component) across a range of set-
tings—for the Section 9 and 10 applications at issue here,
as well as for Section 5 and 7 petitions (obviously not at is-
sue) to appoint arbitrators or compel the presence of wit-
nesses. *Id.,* at 41. (The dissent's vaunted practical "ad-
vantages" also mostly concern avoiding those diversity
issues. *Post,* at 4; see *post*, at 4–7.)[6] Finally, Walters con-
tends that only the look-through rule will provide federal
courts with comprehensive control over the arbitration pro-
cess, including the period after the award. The opposite po-
sition, he says, will "close the federal courthouse doors to
many" post-arbitration motions, even when they grow out
of disputes raising "*exclusively* federal claims." Brief for Re-
spondents 37, 46.

Walters himself quotes back to us the topline answer to
those theories, reflecting its obviousness: "Even the most
formidable policy arguments cannot overcome a clear stat-
utory directive." *Id.,* at 44 (quoting *BP p.l.c.* v. *Mayor and
City Council of Baltimore,* 593 U. S. ___, ___ (2021) (slip op.,
at 12); alteration omitted). Walters's (and the dissent's)
what-makes-best-sense assertions rest on the view that

_____

[6]The dissent's lead item in this vein concerns a Section 5 petition to
appoint an arbitrator that is made "in tandem with" a Section 4 petition
over which a federal court has jurisdiction. *Post,* at 5. Because Section
5 is not at issue here, we do not express any view about whether the
relationship that the dissent hypothesizes would give the court jurisdic-
tion over the appointment request.

"the FAA contains no" such clear "directive" limiting look-through jurisdiction to Section 4. Brief for Respondents 44–45; see *post,* at 10. Having rejected that view, we cannot find much relevance in his ideas, even if plausible, about the optimal jurisdictional rule for the FAA. "It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction." *Whitmore* v. *Arkansas,* 495 U. S. 149, 161 (1990). However the pros and cons shake out, Congress has made its call. We will not impose uniformity on the statute's non-uniform jurisdictional rules.

And anyway, we think Walters oversells the superiority of his proposal. First, uniformity in and of itself provides no real advantage in this sphere. A court can tell in an instant whether an application arises under Section 4 or, as here, under Section 9 or 10; so it can also tell in an instant whether to apply the look-through method or the usual jurisdictional rules. Second, the use of those ordinary rules—most notably, relating to diversity jurisdiction—is hardly beyond judicial capacity. Federal courts have faced, and federal courts have resolved, diversity questions for over two centuries, in diverse and ever-changing legal contexts. Throughout, they have developed workable rules; and we see no reason to think they will do differently here. Indeed, past practice belies Walters's and the dissent's gloomy predictions. Although they spin out hypotheticals designed to make the project look ultra-confusing, they fail to identify any actual problems that have arisen from courts' longstanding application of diversity standards to FAA applications (without using look-through). And Walters's solution does not even avoid the (purported) difficulty of which he complains. For he does not claim (nor could he) that look-through is the exclusive means of establishing federal jurisdiction. Even if the underlying action does not fall within a district court's jurisdiction, the application still might do so—say, because the parties have changed, and

Opinion of the Court

are now diverse. See *supra,* at 6. So courts, on Walters's own view, will still have to resolve questions about—and develop rules for—determining diversity in the FAA context. The difference is only one of degree—and too small, under any plausible theory of statutory interpretation, to adopt Walters's proposal to rewrite the law.

Finally, we can see why Congress chose to place fewer arbitration disputes in federal court than Walters wishes. The statutory plan, as suggested above, makes Section 9 and 10 applications conform to the normal—and sensible—judicial division of labor: The applications go to state, rather than federal, courts when they raise claims between non-diverse parties involving state law. See *supra,* at 5–6. As Walters notes, those claims may have originated in the arbitration of a federal-law dispute. But the underlying dispute is not now at issue. Rather, the application concerns the contractual rights provided in the arbitration agreement, generally governed by state law. And adjudication of such state-law contractual rights—as this Court has held in addressing a non-arbitration settlement of federal claims—typically belongs in state courts. See *Kokkonen,* 511 U. S., at 381–382; *supra,* at 6. To be sure, Congress created an exception to those ordinary jurisdictional principles for Section 4 petitions to compel. But it is one thing to make an exception, quite another to extend that exception everywhere. See *post,* at 8 (disregarding this point). As this Court has often said, the "preeminent" purpose of the FAA was to overcome some judges' reluctance to enforce arbitration agreements when a party tried to sue in court instead. *E.g., Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 221 (1985). We have never detected a similar congressional worry about judges' willingness to enforce arbitration awards already made. So Congress might well have thought an expansion of federal jurisdiction appropriate for petitions to compel alone. Applications about arbitral decisions could and should follow the normal rules.

16           BADGEROW *v.* WALTERS

The result, as Walters laments, is to give state courts a significant role in implementing the FAA.  But we have long recognized that feature of the statute.  "[E]nforcement of the Act," we have understood, "is left in large part to the state courts." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 25, n. 32 (1983); see *Vaden*, 556 U. S., at 59; *Hall Street*, 552 U. S., at 582.  As relevant here, Congress chose to respect the capacity of state courts to properly enforce arbitral awards.  In our turn, we must respect that evident congressional choice.

\*     \*     \*

For the reasons stated, we reverse the judgment of the Court of Appeals for the Fifth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 596 U. S. ____ (2022)  1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–1143

———————

## DENISE A. BADGEROW, PETITIONER *v.* GREG WALTERS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 31, 2022]

JUSTICE BREYER, dissenting.

When interpreting a statute, it is often helpful to consider not simply the statute's literal words, but also the statute's purposes and the likely consequences of our interpretation. Otherwise, we risk adopting an interpretation that, even if consistent with text, creates unnecessary complexity and confusion. That, I fear, is what the majority's interpretation here will do. I consequently dissent.

I

The question presented arises in the context of the Federal Arbitration Act (FAA). 9 U. S. C. §1 *et seq.* The question is technical and jurisdictional: How does a federal court determine whether it has jurisdiction to consider a motion to confirm or vacate an arbitration award? The FAA contains several sections that seem to empower a federal court to take certain specified actions related to arbitration proceedings. These include Section 4, which gives "any United States district court" the power to "order" parties to a written arbitration agreement to "proceed" to arbitration; Section 5, which gives "the court" the power to "designate and appoint an arbitrator"; Section 7, which gives "the United States district court for the district" in which an arbitrator is sitting the power to "compel the attendance" of witnesses whom the arbitrator has "summoned"; Section 9, which

2                    BADGEROW v. WALTERS

                    BREYER, J., dissenting

gives "the United States court in and for the district within which" an arbitration award "was made" the power to enter an "order confirming the award"; Section 10, which gives "the United States court in and for the district wherein the [arbitration] award was made" the power to "make an order vacating the award"; and Section 11, which gives "the United States court in and for the district wherein the [arbitration] award was made" the power to "modif[y] or correc[t] the award." 9 U. S. C. §§4, 5, 7, 9, 10, 11. (Here, as throughout, I have simplified the descriptions of the FAA's sections; the Appendix, *infra*, contains the full relevant statutory language.) This case directly concerns jurisdiction under Sections 9 and 10, but the Court's reasoning applies to all the sections just mentioned.

At first blush, one might wonder why there is *any* question about whether a federal court has jurisdiction to consider requests that it act pursuant to these sections. The sections' language seems explicitly to give federal courts the power to take such actions. Why does that language itself not also grant jurisdiction to act? The answer, as the Court notes, is that we have held that the FAA's "authorization of a petition does not itself create jurisdiction." *Ante*, at 1. "Rather, the federal court must have what we have called an 'independent jurisdictional basis' to resolve the matter." *Ibid.* (quoting *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582 (2008)).

We made clear how this works in *Vaden* v. *Discover Bank*, 556 U. S. 49 (2009), a case involving Section 4. As just noted, Section 4 gives a district court the power to order parties (who have entered into a written arbitration agreement) to submit to arbitration. We held "that a federal court should determine its jurisdiction by 'looking through' a §4 petition to the parties' underlying substantive controversy." *Id.*, at 62. The court asks whether it would have jurisdiction over *that* controversy, namely, whether that

underlying substantive controversy involves a federal question or diversity (a dispute between parties from different States with a value of more than $75,000).  See 28 U. S. C. §§1331, 1332.  If so, then the federal court has jurisdiction over a Section 4 petition asking the court to order the parties to resolve that controversy in arbitration.

The *Vaden* Court gave two reasons for adopting this "look-through" approach.  The first, as the majority today emphasizes, was textual.  See 556 U. S., at 62.  Section 4 says that a party seeking arbitration may petition for an order compelling arbitration from

> "any United States district court which, *save for [the arbitration] agreement*, would have jurisdiction . . . in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties."  (Emphasis added.)

The words "save for [the arbitration] agreement," we reasoned, tell a court not to find jurisdiction by looking to the petition to enforce the agreement itself, but instead to the underlying controversy between the parties.  See *id.*, at 62–63.

The second reason, which the majority today neglects, was practical.  *Id.*, at 65.  To find jurisdiction only where the petition to enforce an arbitration agreement itself established federal jurisdiction, we explained, would result in "curious practical consequences," including unduly limiting the scope of Section 4 and hinging jurisdiction upon distinctions that were "'totally artificial.'"  *Ibid.* (quoting 1 I. Mac-Neil, R. Speidel, & T. Stipanowich, Federal Arbitration Law §9.2.3.3, p. 9:21 (1995) (hereinafter MacNeil)).

Today, the majority holds that this look-through approach does not apply to Section 9 or 10 because those sections lack Section 4's "save for" language.  *Ante*, at 2.  This reasoning necessarily extends to Sections 5, 7, and 11 as

well, for those sections, too, lack Sections 4's "save for" language.  *Ibid.* ("Without [Section 4's] statutory instruction, a court may look only to the application actually submitted to it in assessing its jurisdiction").  Although this result may be consistent with the statute's text, it creates what *Vaden* feared—curious consequences and artificial distinctions. See 556 U. S., at 65.  It also creates what I fear will be consequences that are overly complex and impractical.

## II

I would use the look-through approach to determine jurisdiction under each of the FAA's related provisions—Sections 4, 5, 7, 9, 10, and 11.  Doing so would avoid the same kinds of "curious practical consequences" that drove the *Vaden* Court to adopt the look-through approach in the first place.  *Ibid.*; see also *Cortez Byrd Chips, Inc.* v. *Bill Harbert Constr. Co.*, 529 U. S. 193, 202 (2000) (rejecting interpretation of the FAA that "would create anomalous results").  Most notably, this approach would provide a harmonious and comparatively simple jurisdiction-determining rule— advantages that the majority's jurisdictional scheme seems to lack.  Cf. *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010) (rejecting "[c]omplex jurisdictional tests" in favor of "straightforward" and "[s]imple jurisdictional rules").

Consider some of the likely consequences of the majority's reading, which applies the look-through approach only to Section 4 (where the "save for" language appears), but not to the FAA's other sections (where it does not appear).

*First*, consider Section 5.  That section says that, upon application of one of the parties to an arbitration agreement, "*the* court shall designate and appoint an arbitrator." 9 U. S. C. §5 (emphasis added).  What happens when the look-through approach shows that the underlying controversy raises a federal question, but the application to appoint an arbitrator raises no federal question and does not establish diversity?  A party could ask a federal judge to

BREYER, J., dissenting

*order* arbitration under Section 4, but they could not then ask that same (or any other) federal judge to *appoint* an arbitrator for that very same arbitration under Section 5. That does not seem to be what Congress had in mind for these neighboring provisions—provisions that appear to assume that a judge can appoint an arbitrator in tandem with ordering parties to arbitration. Moreover, how is a federal court to determine, for diversity jurisdiction purposes, the amount at stake in a motion to appoint an arbitrator without a look-through approach? Surely not by assessing the value of the arbitrator's request for pay.

*Second*, consider Section 7. It says that "upon petition the United States district court for the district in which" an arbitrator is sitting "may compel the attendance" of persons whom the arbitrator has "summoned." §7. Suppose that the underlying substantive controversy does not qualify for federal jurisdiction, meaning that a federal court would not have jurisdiction to order arbitration under Section 4. If arbitration proceeds by other means, can a federal judge nonetheless compel the attendance of a witness at that arbitration, based on diversity jurisdiction, if a request to do so shows that the summoned witness lives out of State? If there are two witnesses, one in State and one out of State, can the federal judge compel the attendance of the second, but not the first? Why would Congress have wanted parties to toggle between federal and state court when seeking judicial enforcement of summons issued during a single arbitration?

And at a more basic level, *who* are the relevant parties to a Section 7 request when determining, for diversity purposes, whether the Section 7 dispute is between citizens of different States? The arbitrator and summoned witness? The parties in arbitration? Only the "summoning" party and the witness? Compare *Washington National Insurance Co.* v. *OBEX Group LLC*, 958 F. 3d 126, 134 (CA2 2020)

(evaluating diversity based on summoning party and wit-
ness), with *Amgen, Inc.* v. *Kidney Center of Del. Cty. Ltd.*,
95 F. 3d 562, 567–568 (CA7 1996) (evaluating diversity
based on parties in arbitration). And assume that a federal
court finds it does have jurisdiction over a Section 7 request,
even though the underlying controversy involves neither a
federal question nor diversity. "Why would Congress have
wanted federal courts to intervene to enforce a subpoena
issued in an arbitration proceeding involving a controversy
that itself is not important enough, from a federalism
standpoint, to warrant federal-court oversight?" *Maine
Community Health Options* v. *Albertsons Cos.*, 993 F. 3d
720, 726 (CA9 2021) (Watford, J., concurring).

Moreover, diversity jurisdiction requires not only that the
relevant parties be from different States but also that the
amount in controversy exceed $75,000. See 28 U. S. C.
§1332(a). How does a federal judge determine whether
summoning a witness is itself worth $75,000? By examin-
ing the value of what the witness might say? By accounting
for travel expenses? See *Maine Community Health*, 993
F. 3d, at 723–724. As courts have recognized, there is "very
little case law to guide [them] in determining whether en-
forcement of an arbitration subpoena against a third party
will enable someone to recover more than $75,000 in an ar-
bitration dispute with a different party." *Id.*, at 726 (Wat-
ford, J., concurring). These and other jurisdiction-related
questions do not arise if a federal judge can simply follow
*Vaden*'s principle for all FAA motions: Look through the
motions and determine whether there is federal jurisdiction
over the underlying substantive controversy. See 556 U. S.,
at 62–63.

*Third*, consider now Sections 9 and 10, the FAA sections
directly before us, along with Section 11. Section 9 gives
"the United States court in and for the district within which
[an arbitration] award was made" the power to issue "an
order confirming the award." Section 10 gives the same

BREYER, J., dissenting

court the power to "vacat[e]" the award for certain specified reasons. And Section 11 gives that court the power to "modif[y] or correc[t] the award." Where the parties' underlying dispute involves a federal question (but the parties are not diverse), the majority holds that a party can ask a federal court to order arbitration under Section 4, but it cannot ask that same court to confirm, vacate, or modify the order resulting from that arbitration under Section 9, 10, or 11. But why prohibit a federal court from considering the results of the very arbitration it has ordered and is likely familiar with? Why force the parties to obtain relief—concerning arbitration of an underlying *federal*-question dispute—from a state court unfamiliar with the matter?

Or suppose that a party asks a federal court to vacate an arbitration award under Section 10 because the arbitrator "refus[ed] to hear evidence pertinent and material to the controversy." §10(a)(3). To determine at least one important aspect of diversity jurisdiction—the amount in controversy—must the court not look to the underlying dispute? The same question arises with respect to a Section 11 motion to modify an arbitral award on the ground that it "is imperfect in matter of form not affecting the merits of the controversy." §11(c).

The majority says that these and other problems require only that the parties bring their FAA requests to state courts. *Ante*, at 15–16. But we cannot be sure that state courts have the same powers under the FAA that federal courts have. The FAA says nothing about state courts; it only explicitly mentions federal courts. See §7 ("United States district court"); §9 ("the United States court"); §10 (same); §11 (same). We have never held that the FAA provisions I have discussed apply in state courts, and at least one Member of this Court has concluded that they do not apply there. See, *e.g.*, *DIRECTV, Inc.* v. *Imburgia*, 577 U. S. 47, 59 (2015) (THOMAS, J., dissenting). State courts

Breyer, J., dissenting

have reached similar conclusions. See, *e.g.*, *Cable Connection, Inc.* v. *DIRECTV, Inc.*, 44 Cal. 4th 1334, 1351, 190 P. 3d 586, 597 (2008) (holding that §§4, 10, and 11 apply only in federal court); *In re Beck's Superior Hybrids, Inc.*, 940 N. E. 2d 352, 362–363 (Ind. App. 2011) (same for §7); *Henderson* v. *Summerville Ford-Mercury Inc.*, 405 S. C. 440, 450, 748 S. E. 2d 221, 226 (2013) (same for §9).

Relatedly, the majority also notes, correctly, that Section 9, 10, and 11 disputes about the enforceability of arbitral awards "typically involve only state law." *Ante*, at 6. It thus makes sense, the majority says, that these disputes would belong primarily in state court. See *ante*, at 15. But the same can be said for Section 4 disputes about the enforceability of arbitration agreements. These, too, typically involve only questions of state law. That the dispute does not implicate federal questions thus does not explain why Congress would have wanted more federal court involvement at the Section 4 stage than during the later stages.

It may be possible to eliminate some of these problems by using a federal-question lawsuit or Section 4 motion as a jurisdictional anchor. If a party to an arbitration agreement files a lawsuit in federal court but then is ordered to resolve the claims in arbitration, the federal court may stay the suit and possibly retain jurisdiction over related FAA motions. See §3; *Vaden*, 556 U. S., at 65. Similarly, some courts have held that if a federal court adjudicates a Section 4 motion to order arbitration, the court retains jurisdiction over any subsequent, related FAA motions. See *Maine Community Health*, 993 F. 3d, at 725 (Watford, J., concurring); see also *McCormick* v. *America Online, Inc.*, 909 F. 3d 677, 684 (CA4 2018). But, as *Vaden* points out, to turn jurisdiction over these later motions on the presence or absence of a federal lawsuit or Section 4 motion is to turn jurisdiction on a "'totally artificial distinction'"—particularly when the very purpose of arbitration is to avoid litigation. 556 U. S., at 65 (quoting 1 MacNeil §9.2.3.3, at 9:21).

BREYER, J., dissenting

I relate these practical difficulties in part to illustrate a more fundamental point. The majority has tried to split what is, or should be, a single jurisdictional atom—a single statute with connected parts, which parts give federal judges the power to facilitate a single arbitration proceeding from start to finish: to order arbitration; appoint an arbitrator; summon witnesses; and confirm, vacate, or modify an arbitration award. The need for simplicity, comprehension, workability, and fairness all suggest that these interrelated provisions should follow the same basic jurisdictional approach, namely, as *Vaden* explains, the look-through approach.

### III

The majority's interpretation is also at odds with what this Court has said about the purposes underlying the FAA. We have recognized that the statute reflects a clear "'policy of rapid and unobstructed enforcement of arbitration agreements.'" *Cortez Byrd Chips*, 529 U. S., at 201 (quoting *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 23 (1983)); see also *id.*, at 22 ("Congress' clear intent, in the Arbitration Act, [was] to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible").

We have thus interpreted the FAA to avoid "unnecessarily complicating the law and breeding litigation from a statute that seeks to avoid it." *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 275 (1995). "Why," we asked, "would Congress intend a test that risks the very kind of costs and delay through litigation . . . that Congress wrote the Act to help the parties avoid?" *Id.*, at 278. In other words, the FAA *is* a "sphere" in which "uniformity in and of itself provides [a] real advantage." *Ante*, at 14.

### IV

The majority's main point is straightforward: The text of

the statute compels the result. As the majority rightly points out, we cannot disregard the statutory text or "overcome a clear statutory directive." *Ante*, at 13 (quoting Brief for Respondents 44). A statute that says it applies only to "fish" does not apply to turnips. The majority also rightly points out that the "save for" language setting forth the look-through approach appears only in Section 4, and does not appear in any of the later sections.

That fact, however, does not produce the "clear statutory directive" upon which the majority relies. Nothing in the text prohibits us from applying Section 4's look-through approach to the succeeding sections. The statute does not say that Section 4's jurisdictional rule applies *only* to Section 4, or that the same look-through approach does *not* apply elsewhere. Nor does any other section provide its own jurisdictional rule that would suggest Section 4's rule should not apply there.

Moreover, when we consider Section 4's text setting forth the look-through approach, we "consider not only the bare meaning of the word[s] but also [their] placement and purpose in the statutory scheme." *Bailey* v. *United States*, <u>516 U. S. 137, 145</u> (1995), superseded by statute on other grounds as stated in *Welch* v. *United States*, <u>578 U. S. 120, 133</u> (2016). Various aspects of the FAA's text and structure suggest that Section 4's jurisdictional rule should apply throughout. Section 5, for example, which grants the power to appoint an arbitrator, simply refers to "the court." Those words, most naturally read, refer to the same court to which the immediately preceding section—Section 4—refers: a "United States district court" with jurisdiction as determined by the look-through approach. Requests under the FAA's various sections are also generally described in the text as "applications" or "motions." See §4 ("application"); §5 (same); §9 (same); §10 (same); §11 (same); see also §6; §12 ("motion to vacate, modify, or correct"); §13 ("application to confirm, modify, or correct"). This implies that the

BREYER, J., dissenting

requests are all constituent parts of one broader enforcement proceeding, not standalone disputes meriting individual jurisdictional inquiries. See, *e.g.*, *In re Wild*, 994 F. 3d 1244, 1257 (CA11 2021) (en banc) ("the term 'motion' has *never* been commonly understood to denote a vehicle for initiating a new and freestanding lawsuit"); A Modern Dictionary of the English Language 446 (1911) ("motion in court" means "an application to a court . . . to have a rule or order made which is necessary to the progress of the action").

And, more importantly, all the sections describe connected components of a single matter: a federal court's arbitration-related enforcement power. One can read these sections as a single whole, with each section providing one enforcement tool, and one section—Section 4—providing both an enforcement tool and a jurisdictional rule applicable to the entire toolbox. Read this way, the FAA provides one set of complementary mechanisms through which a federal court might facilitate a single arbitration—but only when the underlying substantive controversy is one that, jurisdictionally speaking, could be brought in a federal court had the parties not agreed to arbitrate. There is no language in any of the sections that states, or suggests, that we cannot interpret the Act in this way.

In brief, the text does not prevent us from reading the statute in a way that better reflects the statute's structure and better fulfills the statute's basic purposes. See *Allied Bruce*, 513 U. S., at 279 (adopting interpretation of FAA that "the statute's language permits" and that is more consistent with "[t]he Act's history"); *Pierce* v. *Underwood*, 487 U. S. 552, 563 (1988) (adopting outcome "that the text of the statute permits, and sound judicial administration counsels").

## V

The FAA's legislative history reinforces the view of the

statute that I have just described.  The Senate Report on the bill that became the FAA refers to the FAA's general purposes.  It makes clear Congress' hope to avoid procedural complexity.  It refers to parties' "desire to avoid the delay and expense of litigation."  S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924).  Proponents of the bill thought it would successfully serve that purpose because it would provide "very simple machinery"; "simplify legal matters"; offer "speedy" and "plain justice"; and allow "no opportunity for technical procedure."  Joint Hearings on S. 1005 et al. before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 16, 26, 27, 36 (1924) (hereinafter Joint Hearings).  These general purposes support a simplified jurisdictional rule.

The language of the House Report suggests more.  It suggests that the bill created a *single* jurisdictional procedure, not a set of different procedures with distinct jurisdictional rules.  The Report says that the bill "provides *a procedure* in the Federal courts for" enforcement of arbitration agreements.  H. R. Rep. No. 96, 68th Cong., 1st Sess., 2 (1924) (emphasis added).  "*The procedure*," the Report continues, "is very simple, . . . reducing technicality, delay, and expense . . . ."  *Ibid.* (emphasis added).  That singular procedure, the Report explains, encompasses not only the initial request for a federal court to order arbitration under Section 4, but subsequent requests to vacate or modify an arbitration award under Sections 10 and 11 as well.  See *ibid.*

The principal drafter of the bill made the same point yet more explicitly.  He testified that under the FAA, "Federal courts are given jurisdiction to enforce [arbitration] agreements *whenever . . . they would normally have jurisdiction of a controversy between the parties.*"  Joint Hearings 34 (statement of Julius H. Cohen) (emphasis added).  Immediately following, he said that "such enforcement" includes the power to appoint arbitrators under Section 5, which, of course, lacks Section 4's "save for" language.  *Ibid.*  And he

BREYER, J., dissenting

then proceeded to discuss the FAA's other sections, all without suggesting that their jurisdictional requirements were any different. *Ibid.*; see also *id.*, at 35–36.

Together, this history reinforces the interpretation of the statute that I would adopt. It suggests that Congress intended a single approach for determining jurisdiction of the FAA's interrelated enforcement mechanisms, not one approach for the mechanism provided in Section 4 and a different approach for the mechanisms provided in all other sections.

\*    \*    \*

In this dissent I hope to have provided an example of what it means to say that we do not interpret a statute's words "in a vacuum." *Abramski* v. *United States*, 573 U. S. 169, 179 (2014). Rather, we should interpret those words "with reference to the statutory context, structure, history and purpose[,] . . . not to mention common sense." *Ibid.* (internal quotation marks omitted). Here, these considerations all favor a uniform look-through approach. And the statute's language permits that approach. Interpretation of a statute must, of course, be consistent with its text. But looking solely to the text, and with a single-minded focus on individual words in the text, will sometimes lead to an interpretation at odds with the statute as a whole. And I fear that is what has happened in this case.

I suggest that by considering not only the text, but context, structure, history, purpose, and common sense, we would read the statute here in a different way. That way would connect the statute more directly with the area of law, and of human life, that it concerns. And it would allow the statute, and the law, to work better and more simply for those whom it is meant to serve. With respect, I dissent.

Appendix to opinion of BREYER, J.

## APPENDIX

9 U. S. C. §§4, 5, 7, 9, 10, 11

"§4. Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination

 "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make

Appendix to opinion of BREYER, J.

an order referring the issue or issues to a jury in the man-
ner provided by the Federal Rules of Civil Procedure, or
may specially call a jury for that purpose. If the jury find
that no agreement in writing for arbitration was made or
that there is no default in proceeding thereunder, the pro-
ceeding shall be dismissed. If the jury find that an agree-
ment for arbitration was made in writing and that there is
a default in proceeding thereunder, the court shall make an
order summarily directing the parties to proceed with the
arbitration in accordance with the terms thereof."

"§5. Appointment of arbitrators or umpire
   "If in the agreement provision be made for a method of
naming or appointing an arbitrator or arbitrators or an um-
pire, such method shall be followed; but if no method be pro-
vided therein, or if a method be provided and any party
thereto shall fail to avail himself of such method, or if for
any other reason there shall be a lapse in the naming of an
arbitrator or arbitrators or umpire, or in filling a vacancy,
then upon the application of either party to the controversy
the court shall designate and appoint an arbitrator or arbi-
trators or umpire, as the case may require, who shall act
under the said agreement with the same force and effect as
if he or they had been specifically named therein; and un-
less otherwise provided in the agreement the arbitration
shall be by a single arbitrator."

"§7. Witnesses before arbitrators; fees; compelling attend-
ance
   "The arbitrators selected either as prescribed in this title
or otherwise, or a majority of them, may summon in writing
any person to attend before them or any of them as a wit-
ness and in a proper case to bring with him or them any
book, record, document, or paper which may be deemed ma-
terial as evidence in the case. The fees for such attendance
shall be the same as the fees of witnesses before masters of

the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States district court for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner provided by law for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States."

"§9. Award of arbitrators; confirmation; jurisdiction; procedure

"If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion

in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court."

"§10. Same; vacation; grounds; rehearing

"(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

"(1) where the award was procured by corruption, fraud, or undue means;

"(2) where there was evident partiality or corruption in the arbitrators, or either of them;

"(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

"(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

"(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

"(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5."

18                    BADGEROW *v.* WALTERS

Appendix to opinion of B REYER, J.

"§11. Same; modification or correction; grounds; order

"In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

"(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

"(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

"(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties."

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/08/22   Page 59 of 497   PageID 1314

**493 U.S. 67** (1989)

# BREININGER

v.

# SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION NO. 6

### No. 88-124.

### Supreme Court of United States.

Argued October 10, 1989

Decided December 5, 1989

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

70      *70 *Francis J. Landry* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Acting Solicitor General Bryson, Stephen L. Nightingale, Joseph E. DeSio, Robert E. Allen, Norton J. Come, Linda Sher, Jerry G. Thorn, Allen H. Feldman, Steven J. Mandel,* and *Anne P. Fugett.*

*Laurence Gold* argued the cause for respondent. With him on the brief were *Jeffrey I. Julius* and *Marsha Berzon.*[*]

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents two questions under the federal labor laws: first, whether the National Labor Relations Board (NLRB or Board) has exclusive jurisdiction over a union member's claims that his union both breached its duty of fair representation and violated the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 519, 29 U. S. C. § 401 *et seq.* (1982 ed.), by discriminating against him in job referrals made by the union hiring hall; and second, whether the union's alleged refusal to refer him to employment through the hiring hall as a result of his political opposition to the union's leadership gives rise to a claim under §§ 101(a)(5) and 609 of the LMRDA, 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.). The Court of Appeals for the Sixth Circuit held that petitioner's suit fell within the exclusive jurisdiction of the Board and that

71      petitioner had failed to state a claim *71 under the LMRDA. 849 F. 2d 997 (1988) *(per curiam).* We reverse the Court of Appeals' decision as to jurisdiction, but we affirm its holding that petitioner did not state a claim under LMRDA §§ 101(a)(5) and 609.

## I

Petitioner Lynn L. Breininger was at all relevant times a member of respondent, Local Union No. 6 of the Sheet Metal Workers International Association. Pursuant to a multiemployer collective-bargaining agreement, respondent operates a hiring hall through which it refers both members and nonmembers of the union for construction work. Respondent maintains an out-of-work list of individuals who wish to be referred to jobs. When an employer contacts respondent for workers, he may request certain persons by name. If he does not, the union begins at the top of the list and attempts to telephone in order each worker listed until it has satisfied the employer's request. The hiring hall is not the exclusive source of employment for sheet metal workers; they are free to seek employment through other mechanisms, and employers are not restricted to hiring only those persons recommended by the union.[1] Respondent also maintains a job referral list under the Specialty Agreement, a separate collective-bargaining agreement negotiated to cover work on siding, decking, and metal buildings.

72      Petitioner alleges that respondent refused to honor specific employer requests for his services and passed him over in making job referrals. He also contends that respondent refused to process his internal union grievances regarding *72 these matters. Petitioner's first amended complaint contained two counts. First, he asserted a violation of the duty of fair representation, contending that respondent, "in its representation of [petitioner], has acted arbitrarily, discriminatorily, and/or in bad faith and/or without reason or cause." First Amended Complaint ¶ 13. Second, petitioner alleged that his union, "in making job referrals, . . . has favored a faction of members . . . who have been known to support . . . the present business manager," as "part of widespread, improper discipline for political opposition in violation of 29 U. S. C. [§ 411(a)(5)] and 29

U. S. C. § 529." *Id.,* ¶ 17. Respondent, in other words, "acting by and through its present business manager . . . and its present business agent [has] `otherwise disciplined' " petitioner within the meaning of LMRDA §§ 101(a)(5) and 609. *Id.,* ¶ 16.

The District Court held that it lacked jurisdiction to entertain petitioner's suit because "discrimination in hiring hall referrals constitutes an unfair labor practice," and "[t]he NLRB has exclusive jurisdiction over discrimination in hiring hall referrals." No. C 83-1126 (ND Ohio, Feb. 20, 1987), p. 6, reprinted in App. to Pet. for Cert. A9. The District Court determined that adjudicating petitioner's claims "would involve interfe[r]ing with the NLRB's exclusive jurisdiction." *Id.,* at 7, App. to Pet. for Cert. A10.

The Court of Appeals affirmed in a brief *per curiam* opinion. With respect to the fair representation claim, the court noted that "[c]ircuit courts have consistently held that . . . fair representation claims must be brought before the Board" and that "if the employee fails to affirmatively allege that his *employer* breached the collective bargaining agreement, which [petitioner] failed to do in the case at bar, he cannot prevail." 849 F. 2d, at 999 (emphasis in original). In regard to the LMRDA count, the Court of Appeals found that "[d]iscrimination in the referral system, because it does not breach the employee's union

73     membership rights, does not constitute `discipline' within the meaning of LMRDA" and *73 that "[h]iring hall referrals are not a function of union membership since referrals are available to nonmembers as well as members." *Ibid.* We granted certiorari. 489 U. S. 1009 (1989).

## II

## A

We have long recognized that a labor organization has a statutory duty of fair representation under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (1982 ed.), "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes,* 386 U. S. 171, 177 (1967); see also *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 203 (1944). In *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), the NLRB determined that violations of the duty of fair representation might also be unfair labor practices under § 8(b) of the NLRA, as amended, 29 U. S. C. § 158(b) (1982 ed.).[2] The Board held that the right of employees under § 7 of the NLRA, as amended, 29 U. S. C. § 157, to form, join, or assist labor organizations, or to refrain from such activities, "is a statutory

74     limitation on statutory bargaining representatives, and . . . that Section 8(b)(1)(A) of the Act *74 accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." 140 N. L. R. B., at 185. In addition, the Board reasoned that "a statutory bargaining representative and an employer also respectively violate Section 8(b)(2) and 8(a)(3) when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." *Id.,* at 186. While petitioner alleged a breach of the duty of fair representation, his claim might relate to conduct that under *Miranda Fuel* also constitutes an unfair labor practice. And, as a general matter, neither state nor federal courts possess jurisdiction over claims based on activity that is "arguably" subject to §§ 7 or 8 of the NLRA. See *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959).

Nevertheless, the District Court was not deprived of jurisdiction. In *Vaca* v. *Sipes, supra,* we held that *Garmon*'s pre-emption rule does not extend to suits alleging a breach of the duty of fair representation. Our decision in *Vaca* was premised on several factors. First, we noted that courts developed and elaborated the duty of fair representation before the Board even acquired statutory jurisdiction over union activities. Indeed, fair representation claims often involve matters "not normally within the Board's unfair labor practice jurisdiction," 386 U. S., at 181, which is typically aimed at "effectuating the policies of the federal labor laws, not [redressing] the wrong done the individual employee," *id.,* at 182, n. 8. We therefore doubted whether "the Board brings substantially greater expertise to bear on these problems than do the courts." *Id.,* at 181. Another consideration in *Vaca* for finding the fair representation claim judicially cognizable was the NLRB General Counsel's unreviewable discretion to refuse to institute unfair labor practice proceedings. "[T]he General Counsel will refuse to bring

75     complaints on behalf *75 of injured employees when the injury complained of is `insubstantial.' " *Id.,* at 183, n. 8. The right of the individual employee to be made whole is "[o]f paramount importance," *Bowen* v. *United States Postal Service,* 459 U. S. 212, 222 (1983), and "[t]he existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine,"

_Vaca, supra,_ at 182-183. Consequently, we were unwilling to assume that Congress intended to deny employees their traditional fair representation remedies when it enacted § 8(b) as part of the Labor Management Relations Act, 1947 (LMRA). As JUSTICE WHITE described _Vaca_ v. _Sipes_ last Term in _Karahalios_ v. _Federal Employees,_ 489 U. S. 527, 535 (1989):

> "As we understood our inquiry, it was whether Congress, in enacting § 8(b) in 1947, had intended to oust the courts of their role enforcing the duty of fair representation implied under the NLRA. We held that the `tardy assumption' of jurisdiction by the NLRB was insufficient reason to abandon our prior cases, such as _Syres_ [v. _Oil Workers,_ 350 U. S. 892 (1955)]."

That a breach of the duty of fair representation might also be an unfair labor practice is thus not enough to deprive a federal court of jurisdiction over the fair representation claim. See _Communications Workers_ v. _Beck,_ 487 U. S. 735, 743 (1988).

76

We decline to create an exception to the _Vaca_ rule for fair representation complaints arising out of the operation of union hiring halls. Although the Board has had numerous opportunities to apply the NLRA to hiring hall policies,[3] we *76 reject the notion that the NLRB ought to possess exclusive jurisdiction over fair representation complaints in the hiring hall context because it has had experience with hiring halls in the past.[4] As an initial matter, we have never suggested that the _Vaca_ rule contains exceptions based on the subject matter of the fair representation claim presented, the relative expertise of the NLRB in the particular area of labor law involved, or any other factor. We are unwilling to begin the process of carving out

77

exceptions now, especially since we *77 see no limiting principle to such an approach. Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals. [5] Furthermore, we have never indicated that NLRB "experience" or "expertise" deprives a court of jurisdiction over a fair representation claim. The Board has developed an unfair labor practice jurisprudence in many areas traditionally encompassed by the duty of fair representation. The Board, for example, repeatedly has applied the _Miranda Fuel_ doctrine in cases involving racial discrimination. See _International Brotherhood of Painters, Local 1066 (W. J. Siebenoller, Jr., Paint Co.),_ 205 N. L. R. B. 651, 652 (1973); _Houston Maritime Assn., Inc. (Longshoremen Local 1351),_ 168 N. L. R. B. 615, 616-617 (1967), enf. denied, 426 F. 2d 584 (CA5 1970); _Cargo Handlers, Inc. (Longshoremen Local 1191),_ 159 N. L. R. B. 321, 322-327 (1966); _United Rubber Workers, Local No. 12 (Business League of Gadsden),_ 150 N. L. R. B. 312, 314-315 (1964), enf'd, 368 F. 2d 12 (CA5 1966), cert. denied, 389 U. S. 837 (1967); _Automobile Workers, Local 453 (Maremont Corp.),_ 149 N. L. R. B. 482, 483-484 (1964); _Longshoremen, Local 1367 (Galveston Maritime Assn., Inc.),_ 148 N. L. R. B. 897, 897-900 (1964), enf'd, 368 F. 2d 1010 (CA5 1966), cert. denied, 389 U. S. 837 (1967); _Independent Metal Workers, Local No. 1 (Hughes Tool Co.),_ 147 N. L. R. B. 1573, 1574 (1964); see also _Handy Andy, Inc.,_ 228 N. L. R. B. 447, 455-456 (1977). In addition, the Board has found gender discrimination by unions to be an unfair labor practice. See _Wolf Trap Foundation for the Performing Arts,_ 287 N. L. R. B. 1040 (1988), 127 LRRM 1129, 1130 (1988); _Olympic S. S. Co.,_ 233 N. L. R. B. 1178,

78

1189 (1977); _Glass Bottle Blowers Assn.,_ *78 _Local 106 (Owens-Illinois, Inc.),_ 210 N. L. R. B. 943, 943-944 (1974), enf'd, 520 F. 2d 693 (CA6 1975); _Pacific Maritime Assn. (Longshoremen and Warehousemen, Local 52),_ 209 N. L. R. B. 519, 519-520 (1974) (Member Jenkins, concurring). In short, "[a] cursory review of Board volumes following _Miranda Fuel_ discloses numerous cases in which the Board has found the duty of fair representation breached where the union's conduct was motivated by an employee's lack of union membership, strifes resulting from intraunion politics, and racial or gender considerations." _United States Postal Service,_ 272 N. L. R. B. 93, 104(1984). Adopting a rule that NLRB expertise bars federal jurisdiction would remove an unacceptably large number of fair representation claims from federal courts.

Respondent calls to our attention language in some of our decisions recognizing that "[t]he problems inherent in the operation of union hiring halls are difficult and complex, and point up the importance of limiting initial competence to adjudicate such matters to a single expert federal agency." _Journeymen and Apprentices_ v. _Borden,_ 373 U. S. 690, 695 (1963) (citation omitted). For this reason, respondent contends that "[w]hether a hiring hall practice is discriminatory and therefore violative of federal law is a determination Congress has entrusted to the Board." _Farmer_ v. _Carpenters,_ 430 U. S. 290, 303, n. 12 (1977). The cases cited by respondent, however, focus not on whether unions have administered properly out-of-work lists as required by their duty of fair representation, but rather on whether exclusive hiring halls have encouraged union membership impermissibly as forbidden by § 8(b). Such exclusive arrangements are not illegal _per se_ under federal labor law, but rather are illegal only if they in fact result in discrimination prohibited by the NLRA. See _Teamsters_ v. _NLRB,_ 365 U. S. 667, 673-677 (1961); see also _Woelke & Romero Framing, Inc._ v. _NLRB,_ 456 U. S. 645, 664-

79

665 (1982). We have found _state law_ pre-empted on the ground that "Board approval *79 of various hiring hall practices would be meaningless if state courts could declare those procedures violative of the contractual rights implicit between a member and his union." _Farmer, supra,_ at 300, n. 9. These state-law claims frequently involve tort, contract, and other

substantive areas of the law that have developed quite independently of federal law. Cf. _Lingle_ v. _Norge Division of Magic Chef, Inc.,_ 486 U. S. 399, 403-406 (1988); _Electrical Workers_ v. _Hechler,_ 481 U. S. 851, 855-859 (1987); _Allis-Chalmers Corp._ v. _Lueck,_ 471 U. S. 202, 211 (1985); _Teamsters_ v. _Lucas Flour Co.,_ 369 U. S. 95, 103-104 (1962).

The duty of fair representation is different. It has "judicially evolved," _Motor Coach Employees_ v. _Lockridge,_ 403 U. S. 274, 301 (1971), as part of federal labor law — predating the prohibition against unfair labor practices by unions in the 1947 LMRA. It is an essential means of enforcing fully the important principle that "no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers." _Ibid._; see also _United Parcel Service, Inc._ v. _Mitchell,_ 451 U. S. 56, 63 (1981) ("[T]he unfair representation claim made by an employee against his union . . . is more a creature of `labor law' as it has developed . . . than it is of general contract law"). The duty of fair representation, unlike state tort and contract law, is part of federal labor policy. Our "refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon our judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy." _Lockridge, supra,_ at 301; see also _Vaca,_ 386 U. S., at 180-181 ("A primary justification for the pre-emption doctrine — the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose — is not applicable to cases involving alleged *80 breaches of the union's duty of fair representation"). We therefore decline to interpret the state-law pre-emption cases as establishing a principle that hiring halls are somehow so different from other union activities that fair representation claims are not cognizable outside of the NLRB.

The Court of Appeals below also held that if an employee fails to allege that his _employer_ breached the collective-bargaining agreement, then he cannot prevail in a fair representation suit against his _union._ See 849 F. 2d, at 999. This is a misstatement of existing law. In _Vaca,_ we identified an "intensely practical consideratio[n]," 386 U. S., at 183, of having the same entity adjudicate a joint claim against both the employer and the union when a wrongfully discharged employee who has not obtained relief through any exclusive grievance and arbitration procedures provided in the collective-bargaining agreement brings a breach-of-contract action against the employer pursuant to § 301(a) of the LMRA, 61 Stat. 156, 29 U. S. C. § 185(a) (1982 ed.). We noted that where the union has control of the grievance and arbitration system, the employee-plaintiff's failure to exhaust his contractual remedies may be excused if the union has wrongfully refused to process his claim and thus breached its duty of fair representation. See _Vaca,_ 386 U. S., at 185-186. "[T]he wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as a bargaining agent breached its duty of fair representation in its handling of the employee's grievance." _Id.,_ at 186.

Our reasoning in _Vaca_ in no way implies, however, that a fair representation action _requires_ a concomitant claim against an employer for breach of contract. Indeed, the earliest fair representation suits involved claims against unions for breach of the duty in _negotiating_ a collective-bargaining agreement, a context in which no breach-of-contract action against an employer is possible. See _Ford Motor Co._ v. *81 _Huffman,_ 345 U. S. 330 (1953); _Steele_ v. _Louisville & Nashville R. Co.,_ 323 U. S. 192 (1944). Even after a collective-bargaining agreement has been signed, we have never required a fair representation plaintiff to allege that his _employer_ breached the agreement in order to prevail. See, _e. g., Communications Workers_ v. _Beck,_ 487 U. S., at 743; _Czosek_ v. _O'Mara,_ 397 U. S. 25, 29 (1970). "[A]n action seeking damages for injury inflicted by a breach of a union's duty of fair representation [is] judicially cognizable in any event, that is, even if the conduct complained of [is] arguably protected or prohibited by the National Labor Relations Act _and whether or not the lawsuit [is] bottomed on a collective agreement." Motor Coach Employees_ v. _Lockridge, supra,_ at 299 (emphasis added).

Respondent argues that the concern in _Vaca_ that suits against the employer and union be heard together in the same forum is applicable to the hiring hall situation, because any action by petitioner against an employer would be premised not on § 301 but rather on the contention that the employer had knowledge of the union conduct violating § 8(b)(1)(A) and acted on that knowledge in making an employment decision.[6] The employer would thereby violate *82 NLRA § 8(a)(3), 29 U. S. C. § 158(a)(3), see _Wallace Corp._ v. _NLRB,_ 323 U. S. 248, 255-256 (1944), and be held jointly and severally liable with the union, _but only in a suit before the Board._[7] In the hiring hall environment, permitting courts to hear fair representation claims against the union would create the danger of bifurcated proceedings before a court and the NLRB. The absence of a § 301 claim, according to respondent, requires that we hold that the NLRB possesses exclusive jurisdiction over petitioner's fair representation suit.

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/08/22   Page 63 of 97   PageID 1358

This argument misinterprets our reasoning in *Vaca*. Because a plaintiff must as a matter of logic prevail on his unfair representation allegation against the union in order to excuse his failure to exhaust contractual remedies before he can litigate the merits of his § 301 claim against his employer, we found it "obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions." 386 U. S., at 187. Moreover, because the union's breach may have enhanced or contributed to the employee's injury, permitting fair representation suits to be heard in court facilitates the fashioning of a remedy. *Ibid.* We concluded that it made little sense to prevent courts from adjudicating fair representation claims.

The situation in the instant case is entirely different. In the hiring hall context, the Board may bring a claim alleging a violation of § 8(b)(1)(A) against the union, and a parallel suit against the employer under § 8(a)(3), without implicating the duty of fair representation at all. Or, as in the instant case, an employee may bring a claim solely against the union based on

83     its wrongful refusal to refer him for work. While in *Vaca* *83 an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a legal claim against the union. The fact that an employee *may* bring his fair representation claim in federal court in order to join it with a § 301 claim does not mean that he *must* bring the fair representation claim before the Board in order to "join" it with a hypothetical unfair labor practice case against the employer that was never actually filed.

Federal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers. We have always assumed that independent federal jurisdiction exists over fair representation claims because the duty is implied from the grant of exclusive bargaining authority, and the claims therefore "arise under" the NLRA. See, *e. g.,* Tunstall v. Locomotive Firemen & Enginemen, 323 U. S. 210, 213 (1944). Lower courts that have addressed the issue have uniformly found that 28 U. S. C. § 1337(a), which provides federal jurisdiction for, *inter alia,* "any civil action or proceeding arising under any Act of Congress regulating commerce," creates federal jurisdiction over fair representation claims, because we held in Capital Service, Inc. v. NLRB, 347 U. S. 501, 504 (1954), that the NLRA is an "Act of Congress regulating commerce." See Chavez v. United Food & Commercial Workers Int'l Union, 779 F. 2d 1353, 1355, 1356 (CA8 1985); Anderson v. United Paper-workers Int'l Union, 641 F. 2d 574, 576 (CA8 1981); Buchholtz v. Swift & Co., 609 F. 2d 317, 332 (CA9 1979), cert. denied, 444 U. S. 1018 (1980); Mumford v. Glover, 503 F. 2d 878, 882-883 (CA5 1974); Retana v. Apartment, Motel, Hotel & Elevator Operators Local 14, 453 F. 2d 1018, 1021-1022 (CA9 1972); De Arroyo v. Sindicato

84     de Trabajadores Packinghouse, 425 F. 2d 281, 283, n. 1 (CA1), cert. denied, 400 *84 U. S. 877 (1970); Nedd v. United Mine Workers of America, 400 F. 2d 103, 106 (CA3 1968); see also Bautista v. Pan American World Airlines, Inc., 828 F. 2d 546, 549 (CA9 1987). We agree with this reasoning. Because federal-court jurisdiction exists over a fair representation claim regardless of whether it is accompanied by a breach-of-contract claim against an employer under § 301,[8] and because a fair representation claim is a separate cause of action from any possible suit against the employer, we decline to adopt a rule that exclusive jurisdiction lies in the NLRB over any fair representation suit whose hypothetical accompanying claim against the employer might be raised before the Board.

The concerns that animated our decision in *Vaca* are equally present in the instant case. The Court of Appeals erred in holding that the District Court was without jurisdiction to hear petitioner's fair representation claim.

## B

Respondent contends that even if jurisdiction in federal court is proper, petitioner has failed to allege a fair representation claim for two reasons.

85     *85 **1**

First, respondent notes that we have interpreted NLRA § 8(a)(3) to forbid employer discrimination in hiring only when it is intended to discriminate on a union-related basis. See, *e. g.,* NLRB v. Brown, 380 U. S. 278, 286 (1965). Respondent maintains that symmetry requires us to interpret § 8(b) (2) as forbidding only discrimination based on union-related criteria and not any other form of maladministration of a union job referral system.[9] Respondent contends that under this standard

86     it committed no unfair labor practice in this case. The LMRA, according to respondent, reflects a purposeful *86 congressional decision to limit the scope of § 8(b)(2) to instances where a union discriminates solely on the basis of union

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/08/22   Page 443 of 497   PageID 1359

membership or lack thereof. This decision would be negated if the duty of fair representation were construed as extending further than the unfair labor practice provisions of the NLRA.

We need not decide the appropriate scope of §§ 8(b)(1)(A) and 8(b)(2) because we reject the proposition that the duty of fair representation should be defined in terms of what is an unfair labor practice. Respondent's argument rests on a false syllogism: (a) because _Miranda Fuel Co._, 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), establishes that a breach of the duty of fair representation is also an unfair labor practice, and (b) the conduct in this case was not an unfair labor practice, therefore (c) it must not have been a breach of the duty of fair representation either. The flaw in the syllogism is that there is no reason to equate breaches of the duty of fair representation with unfair labor practices, especially in an effort to _narrow_ the former category. The NLRB's rationale in _Miranda Fuel_ was precisely the opposite; the Board determined that breaches of the duty of fair representation were also unfair labor practices in an effort to _broaden,_ not _restrict,_ the remedies available to union members. See 140 N. L. R. B. at 184-186.[10] Pegging the duty of fair representation to the Board's definition of unfair labor practices would make the two redundant, despite their different purposes, and would eliminate some of the prime virtues of the duty of fair representation — flexibility and adaptability. See _Vaca_, 386 U. S., at 182-183.

87      The duty of fair representation is not intended to mirror the contours of § 8(b); rather, it arises independently from *87 the grant under § 9(a) of the NLRA, 29 U. S. C. § 159(a) (1982 ed.), of the union's exclusive power to represent all employees in a particular bargaining unit. It serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." _Vaca, supra,_ at 182; see also _NLRB_ v. _Allis-Chalmers Mfg. Co._, 388 U. S. 175, 181 (1967) ("It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation"). Respondent's argument assumes that enactment of the LMRA in 1947 somehow limited a union's duty of fair representation according to the unfair labor practices specified in § 8(b). We have never adopted such a view, and we decline to do so today.

### 2

Second, respondent insists that petitioner has failed to state a claim because in the hiring hall setting a union is acting essentially as an employer in matching up job requests with available personnel. Because a union does not "represent" the employees as a bargaining agent in such a situation, respondent argues that it should be relieved entirely of its duty of fair representation.[11]

88      We cannot accept this proposed analogy. Only because of its status as a Board-certified bargaining representative *88 and by virtue of the power granted to it by the collective-bargaining agreement does a union gain the ability to refer workers for employment through a hiring hall. Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unit have entrusted the union with the task of representing them. That the particular function of job referral resembles a task that an employer might perform is of no consequence. The key is that the union is administering a provision of the contract, something that we have always held is subject to the duty of fair representation. "The undoubted broad authority of the union as exclusive bargaining agent in the negotiation _and administration_ of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." _Humphrey_ v. _Moore_, 375 U. S. 335, 342 (1964) (emphasis added). See _Communications Workers_ v. _Beck_, 487 U. S., at 739; _Hines_ v. _Anchor Motor Freight, Inc._, 424 U. S., 554, 564 (1976); see also _Electrical Workers_ v. _Hechler_, 481 U. S., at 861-862; _id.,_ at 865 (STEVENS, J., concurring in part and dissenting in part).

In _Vaca_ v. _Sipes, supra,_ for example, we held that a union has a duty of fair representation in grievance arbitration, despite the fact that NLRA § 9(a) expressly reserves the right of "any individual employee or group of employees . . . to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." The union in _Vaca_ exercised power over grievances because the contract so provided, not because the NLRA required such an arrangement. Hence, the observation that a contract might provide for the operation of a hiring hall directly by a consortium of interested employers rather than a union is irrelevant; the same might have been said about the

89      system for processing grievances in _Vaca_. In *89 short, a union does not shed its duty of fair representation merely because

Case 4:22-cv-00430-Y   Document 48-1 Filed 08/04/22   Page 54 of 447   PageID 780

it is allocating job openings among competing applicants, something that might be seen as similar to what an employer does.

The union's assumption in the hiring hall of what respondent believes is an "employer's" role in no way renders the duty of fair representation inapplicable. When management administers job rights outside the hiring hall setting, arbitrary or discriminatory acts are apt to provoke a strong reaction through the grievance mechanism. In the union hiring hall, however, there is no balance of power. If respondent is correct that in a hiring hall the union has assumed the mantle of employer, then the individual employee stands alone against a single entity: the joint union/employer. An improperly functioning hiring hall thus resembles a closed shop, " `with all of the abuses possible under such an arrangement, including discrimination against members, prospective employees, members of union minority groups, and operation of a closed union.' " _Teamsters_ v. _NLRB_, 365 U. S., at 674 (quoting S. Rep. No. 1827, 81st Cong., 2d Sess., 14 (1947)); see also Note, Unilateral Union Control of Hiring Halls: The Wrong and the Remedy, 70 Yale L. J. 661, 674 (1961). In sum, if a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly _increases_ rather than _decreases._ That has been the logic of our duty of fair representation cases since _Steele_ v. _Louisville & Nashville R. Co.,_ 323 U. S., at 200.[12]

90      *90 We reject respondent's contention that petitioner's complaint fails to state a fair representation claim.

## III

The Court of Appeals rejected petitioner's LMRDA claim on the ground that petitioner had failed to show that he was "otherwise disciplined" within the meaning of LMRDA §§ 101(a)(5) and 609, 29 U. S. C. §§ 411(a)(5) and 529 (1982 ed.). These provisions make it unlawful for a union to "fin[e], suspen[d], expe[l], or otherwise disciplin[e]" any of its members for exercising rights secured under the LMRDA.[13] The Court of Appeals reasoned that because "[h]iring hall referrals . . . are available to nonmembers as well as members," 849 F. 2d, at 999, and the hiring hall was not an exclusive source of employment for sheet metal workers, petitioner did not suffer discrimination on the basis of rights he held by virtue of his _membership_ in the union. We affirm the Court of Appeals' conclusion, although we do not adopt its reasoning.[14]

91      In _Finnegan_ v. _Leu_, 456 U. S. 431 (1982), we held that removal from appointive union employment is not within the scope of § 609's prohibitions, because that section was "meant to refer only to punitive actions diminishing membership rights, and not to termination of a member's status as an appointed union employee." _Id.,_ at 438 (footnote omitted). *91 Petitioner, joined by the United States as _amicus curiae,_ argues that the Court of Appeals misapplied our reasoning in _Finnegan,_ because Congress could not have intended to prohibit a union from expelling a member of the rank-and-file from a members-only hall for his political opposition to the union leadership, but to permit the leadership to impose the same sanction if the hiring hall included a few token nonmembers as well. Either way, the purpose of the Act would hardly be served if a union were able to coerce its members into obedience by threatening them with a loss of job referrals. Under the reading urged by the United States, _Finnegan_ held only that the LMRDA does not protect the positions and perquisites enjoyed exclusively by union leaders; it did not narrow the protections available to "nonpolicymaking employees, that is, rank-and-file member-employees." _Finnegan, supra,_ at 443 (BLACKMUN, J., concurring).

We need not decide the precise import of the language and reasoning of _Finnegan,_ however, because we find that by using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules. "Discipline is the criminal law of union government." Summers, The Law of Union Discipline, 70 Yale L. J. 175, 178 (1960). The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." _Miller_ v. _Holden_, 535 F. 2d 912, 915 (CA5 1976).

92      Our construction of the statute is buttressed by its structure. First, the specifically enumerated types of discipline — fine, expulsion, and suspension — imply some sort of established disciplinary process rather than ad hoc retaliation *92 by individual union officers.[15] See 2A C. Sands, Sutherland on Statutory Construction § 47.17, p. 166 (4th ed. 1984) _(ejusdem generis)._ Second, § 101(a)(5) includes procedural protections — "written specific charges" served before discipline is imposed, "a reasonable time" in which to prepare a defense, and a "full and fair hearing" — that would not apply to instances of unofficial, _sub rosa_ discrimination. These protections contemplate imposition of discipline through the type of procedure we encountered in _Boilermakers_ v. _Hardeman_, 401 U. S. 233, 236-237 (1971) (expulsion after trial before union

committee, with subsequent internal union review). The fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide "safeguards against improper disciplinary action," indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members. A hiring hall could hardly be expected to provide a hearing before every decision *not* to refer an individual to a job.

The legislative history supports this interpretation of "discipline." Early drafts of § 101(a)(5), for example, contained elaborate lists of "due process protections," such as the presumption of innocence, venue restrictions, the right to counsel,
93    the right to confront and cross-examine witnesses, and *93 other guarantees typically found in the criminal context.[16] Congress envisioned that "discipline" would entail the imposition of punishment by a union acting in its official capacity. See 105 Cong. Rec. 5812 (1959) (remarks of Sen. McClellan) (referring to "safeguards . . . against improper disciplinary action" as procedures that must be followed before a union member can be "expelled or punished," "tried," or "suspend[ed]" by the union); *id.,* at 6023 (remarks of Sen. Kuchel) (noting that discipline may be imposed only on "the usual reasonable constitutional basis upon which [criminal] charges might be brought").

A forerunner of § 101(a)(5) in the Senate provided criminal penalties for *both* improper "discipline" by "any *labor organization,* its officers, agents, representatives, or employees" *and* the use by "*any person* . . . of force or violence, or . . . economic reprisal or threat thereof, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercising by such member of any right to which he is entitled under the provisions of this Act." S. 1555, as reported, 86th Cong., 1st Sess., 53 (1959) (emphasis added); see also S. Rep. No. 187, 86th Cong., 1st Sess., 53-54, 94 (1959); 105 Cong. Rec. 15120 (1959) (comments of Sen. Goldwater). Although S. 1555 was not passed in this form by the Senate,[17] the fact that even in an earlier bill
94    improper *discipline by a labor organization* was listed separately from *economic coercion by any person* shows that the *94 Senate believed that the two were distinct, and that it did not intend to include the type of unauthorized "economic reprisals" suffered by petitioner in the instant case in its definition of "discipline." The bipartisan compromise bill introduced by Representatives Landrum and Griffin, which amended S. 1555 after its passage by the Senate, substituted civil remedies for the criminal penalties. Representative Griffin explained that the bill covered only the "denial of . . . rights through *union discipline,*" 105 Cong. Rec. 13091 (1959) (emphasis added), an apparent reference to penalties imposed by the union in its official capacity as a labor organization. Discipline "must be done in the name of or on behalf of the union as an organizational entity." Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969).

In the instant case, petitioner alleged only that the union business manager and business agent failed to refer him for employment because he supported one of their political rivals. He did not allege acts by the union amounting to "discipline" within the meaning of the statute. According to his complaint, he was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity,* however, was not visited upon petitioner. He was not punished by any tribunal, nor was he the subject of any proceedings convened by respondent. In sum, petitioner has not alleged a violation of §§ 101(a)(5) and 609, and the Court of Appeals correctly dismissed his claim under the LMRDA.[18]

95    *95 **IV**

We express no view regarding the merits of petitioner's claim. We hold only that the Court of Appeals erred when it determined that the District Court lacked jurisdiction over the suit, but that the Court of Appeals correctly found that petitioner failed to state a claim under §§ 101(a)(5) and 609 of the LMRDA. We remand the cause for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

When school officials inflict corporal punishment on a schoolchild, we speak of the child being "disciplined."[1] A prison inmate who is summarily deprived of "good time" credits is also subjected to "discipline."[2] So too is the soldier who as a result of misconduct is required by a superior to perform additional duties.[3] In none of these cases is the discipline imposed by a "tribunal" or as a result of a "proceeding convened by" the disciplinary official. *Ante,* at 94. Rather, what distinguishes the punishment as "discipline" is that it is imposed by one in control with a view to correcting behavior that is considered to be deviant. The Court today holds, however, that a union member who is deprived of work referrals as a

96   result of his intraunion political activities, conduct deemed by the union to be deviate, is nonetheless not being   96
subjected to discipline. Although I join the Court's analysis and disposition of petitioner's duty of fair representation claim in
Parts I and II of its opinion, I cannot join this restrictive interpretation of the LMRDA.

Title I of the LMRDA, the "Bill of Rights" of labor organizations, "was the product of congressional concern with widespread
abuses of power by union leadership." _Finnegan_ v. _Leu_, 456 U. S. 431, 435 (1982). These took at least two forms. First,
many unions were run autocratically and did not accord their members the right of self-governance. See _Sheet Metal_
_Workers_ v. _Lynn_, 488 U. S. 347, 356, n. 8 (1989); _Steelworkers_ v. _Sadlowski_, 457 U. S. 102, 112 (1982). Accordingly,
Congress decreed that union members would have equal voting rights and the freedom of speech and assembly and
provided in § 102, 29 U. S. C. § 412 (1982 ed.), a means of enforcing these rights through a civil cause of action in federal
court. Second, there was evidence that unions imposed discipline on their members in violation of their members' civil rights
or without adequate procedural safeguards.[4] See _Finnegan_, 456 U. S., at 442 (Congress was concerned with "protecting
the rights of union members from arbitrary action by the union or its officers") (emphasis deleted); _Boilermakers_ v.

97   _Hardeman_, 401 U. S. 233, 243-245 (1971). The provisions which address these concerns, *97 LRMDA §§ 101(a)(5)[5] and
609,[6] 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.), are written in expansive language. They respectively prohibit the imposition
of discipline by any labor "organization or any officer thereof," § 411(a)(5), and "any labor organization, or any officer, agent,
shop steward, or other representative of a labor organization, or any employee thereof." § 529. And they refer not only to
fines, suspension, and expulsion, the usual sanctions imposed by a union, but also to unspecified means by which the
union "otherwise discipline[s] its members.

As a matter of plain language, "discipline" constitutes "punishment by one in authority . . . with a view to correction or
training." Webster's Third New International Dictionary 644 (1976); see also Random House Dictionary of the English
Language 562 (2d ed. 1987) ("punishment inflicted by way of correction and training"); 4 Oxford English Dictionary 735 (2d
ed. 1989) (same). Union discipline is thus punishment imposed by the union or its officers "to control the member's conduct
in order to protect the interests of the union or its membership." _Miller_ v. _Holden_, 535 F. 2d 912, 915 (CA5 1976). It easily
includes the use of a hiring hall system by one who is charged with administering it to punish a member for his political

98   opposition. Indeed, the express *98 reference in the Act to "fines," a form of discipline that traditionally was not imposed
after a trial, suggests that Congress intended the Act to reach discipline that is both informal and affects only a member's
economic rights.

Moreover, as a matter of the statute's purpose and policy, it would make little sense to exclude the abuse of a hiring hall to
deprive a member of job referrals from the type of discipline against which the union member is protected. Congress
intended the LMRDA to prevent unions from exercising control over their membership through measures that did not
provide adequate procedural protection. "[I]nterference with employment rights constitute[s] a powerful tool by which union
leaders [can] control union affairs, often in violation of workers' membership rights." _Vandeventer_ v. _Local Union No. 513,_
_Int'l Union of Operating Engineers_, 579 F. 2d 1373, 1378 (CA8 1978); see also Etelson & Smith, Union Discipline Under the
Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969) ("Since the prime motivation to join a union is concern about one's
interests as an employee, it seems manifest that a very effective method of disciplining a union member would be to cause
injury to those interests"). It is inconceivable that a statute written so broadly would not include such sanctions within its
compass.

The Court nonetheless concludes that the denial of hiring hall referrals is not properly attributable to the union and does not
constitute discipline within the meaning of the LMRDA. The Court errs in its construction of petitioner's complaint and in its
interpretation of the LMRDA. At this pleading stage, petitioner's allegations must be accepted as true and his complaint may
be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the
allegations." _Hishon_ v. _King & Spaulding_, 467 U. S. 69, 73 (1984); _Conley_ v. _Gibson_, 355 U. S. 41, 45-46 (1957). Petitioner
alleges "that in failing to refer him for employment . . . the defendant, acting by and through its present business manager,

99   David Williams, *99 and its present business agent, Michael Duffy, have `otherwise disciplined' plaintiff." The union's abuse
of the hiring hall system is further said to have "been part of widespread, improper discipline for political opposition." App. to
Pet. for Cert. A-21. The Court elsewhere acknowledges that "the ability to refer workers for employment through a hiring
hall" is a power of the _union_ granted it by the collective-bargaining agreement, _ante,_ at 88, and it properly concludes that
petitioner's allegations are sufficient to support the imposition of liability upon the union for breaching its duty of fair
representation. Petitioner's allegation that the union's officers used their union-granted authority over the hiring hall to
punish him for his union activities should also be sufficient to support the claim that punishment was imposed "under color

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/08/22   Page 68 of 444   PageID 1735

of the union's right to control its membership and that the "opprobrium of the union *as an entity* was "visited upon petitioner." *Ante,* at 94.

The Court states that the discriminatory use of the hiring hall to punish petitioner does not constitute discipline because it is not an "established disciplinary process" or imposed by "any tribunal" or as the result of "any proceeding." *Ante,* at 91, 94. But, as Congress was well aware,[7] discipline can be imposed informally as well as formally and pursuant to unwritten practices similar to those petitioner has alleged as well as to a formal established policy. The language and structure of the

100    Act do not evince any intention to restrict its coverage to sanctions that are imposed by tribunals *100 or as the result of proceedings. That Congress specified detailed procedures to be followed in disciplinary proceedings does not mean that no procedures need be followed when discipline is imposed without any proceeding whatsoever. Nor does the legislative history, which reflects Congress' intention to prevent a wide range of arbitrary union action, support such a crabbed reading. [8] By holding that the informally imposed sanctions alleged here are not covered by the LMRDA, the Court ironically deprives union members of the protection of the Act's procedural safeguards at a time when they are most needed — when the union or its officers act so secretly and so informally that the member receives no advance notice, no opportunity to be heard, and no explanation for the union's action. This construction of the labor organization's "Bill of Rights" is perverse and cannot have been intended by Congress.

Finally, this case is not controlled, as the Court of Appeals concluded, by our decision in *Finnegan* v. *Leu,* 456 U. S. 431 (1982). In that case, we held that removal from appointive union employment did not constitute discipline within the meaning of § 609. *Id.,* at 437; see also *Sheet Metal Workers* v. *Lynn,* 488 U. S., at 353, n. 5. We stated that "it was rank-and-file union members — not union officers or employees, as such — whom Congress sought to protect," 456 U. S., at 437, and that "Congress [did not] inten[d] to establish a system of job security or tenure for appointed union employees," *id.,* at 438.

101    In his brief for the United States as *101 *Amicus Curiae,* the Solicitor General has cogently explained why *Finnegan* is not controlling:

> "The question presented by this case is far different. Here, participation in the Union's job referral program is a benefit enjoyed by all members of the Union within the bargaining unit, and the issue is whether withdrawal of the benefit can be deemed `discipline' even though that benefit may also be extended to non-members of the Union. *Finnegan*'s emphasis on the distinction between union members and union leaders does not apply to this situation. In fact, the court of appeals' reliance on language in *Finnegan* that drew this distinction turns the Court's approach on its head. *Finnegan*'s conclusion that the Act did not protect the positions and perquisites enjoyed only by union leaders was surely not intended to narrow the class of benefits, enjoyed by the rank-and-file, that cannot be withdrawn in retaliation for the exercise of protected rights.

> "The court of appeals implicitly acknowledged (see Pet. App. A3) that participation in a job referral system limited to union members would be a part of `a union member's rights or status *as a member of the union*' (456 U. S. at 437). The fact that non-members may be included within the system should not alter that characterization. In either case, when a union member's removal from or demotion on an out-of-work list is based upon a violation of a union rule or policy, or political opposition to the union's leadership, the removal or demotion can fairly be characterized as a punitive action taken against the member *as a member* that sets him apart from other members of the rank-and-file. See *id.* at 437-438. Moreover, such an action bears enough similarity to the specific disciplinary actions referred to in Section 609 to fall within the residual

102    category of *102 sanctions — encompassed by the phrase `otherwise disciplined' — that are subject to that provision."[9]

Today the Court correctly refuses to adopt the Court of Appeals' reasoning, but its rationale is just as flawed as that of the Court of Appeals. Retaliation effected through a union job referral system is a form of discipline even if the system is used by nonmembers as well as members and even if the sanction is the result of an *ex parte,* ad hoc, unrecorded decision by the union.

I respectfully dissent from the Court's disposition of petitioner's claim under the Labor-Management Reporting and Disclosure Act of 1959.

[*] Briefs of *amici curiae* urging reversal were filed for the Association for Union Democracy et al. by *Paul Alan Levy, Alan B. Morrison,* and *Arthur L. Fox II;* and for the National Right to Work Legal Defense Foundation by *Rossie D. Alston, Jr.,* and *Glenn M. Taubman.*

[1] The word "exclusive" when used with respect to job referral systems is a term of art denoting the degree to which the union is reserved to the union hiring hall. Hiring is deemed to be "exclusive," for example, if the union retains sole authority to supply workers to the employer up to a designated percentage of the work force or for some specified period of time, such as 24 or 48 hours, before the employer can hire on his own. See *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B. 747, 754 (1986), enf'd, 811 F. 2d 149 (CA2), cert. denied, 484 U. S. 817 (1987).

[2] Section 8(b)(1)(A) provides that it is an unfair labor practice for a labor organization or its agents to restrain or coerce "employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the NLRA]: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U. S. C. § 158(b)(1)(A) (1982 ed.). Section 8(b)(2) makes it an unfair labor practice for a labor organization or its agents "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." § 158(b)(2).

[3] The Board has determined that a labor organization that is the statutory collective-bargaining representative of employees utilizing its exclusive hiring hall is barred from using unfair, irrelevant, or invidious considerations in making referrals of such employees. See *Journeymen Pipe Fitters, Local No. 392*, 252 N. L. R. B. 417, 421 (1980), enf. denied, 712 F. 2d 225 (CA6 1983) *(per curiam)*. The Board has held that "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2), unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function." *Operating Engineers, Local 406*, 262 N. L. R. B. 50, 51 (1982), enf'd, 701 F. 2d 504 (CA5 1983) *(per curiam)*; see also *Teamsters, Local No. 174 (Totem Beverages, Inc.)*, 226 N. L. R. B. 690, 698-700 (1976); *Boilermakers, Local Lodge 169 (Riley Stoker Corp.)*, 209 N. L. R. B. 140, 144-145 (1974). Deviation from clear and unambiguous standards in refusing to refer an employee for work establishes a prima facie violation of §§ 8(b)(1) (A) and 8(b)(2), irrespective of whether the deviation is related to discrimination based on union membership. See *NLRB* v. *International Association of Bridge, Structural and Ornamental Iron Workers*, 600 F. 2d 770, 776-777 (CA9 1979), cert. denied, 445 U. S. 915 (1980); *International Association of Heat and Frost Insulation, Local 22 (Rosendahl, Inc.)*, 212 N. L. R. B. 913 (1974). The Board in some cases has found unfair labor practices based on discriminatory referrals by nonexclusive hiring halls. See *Iron Workers, Local 577 (Tri-State Steel Erectors)*, 199 N. L. R. B. 37 (1972); *Hoisting and Portable Engineers, Local No. 4 (Carlson Corp.)*, 189 N. L. R. B. 366 (1971), enf'd, 456 F. 2d 242 (CA1 1972); *Chauffeurs' Union, Local 923, Teamsters (Yellow Cab Co.)*, 172 N. L. R. B. 2137, 2138 (1968); cf. *Teamsters, Local 17*, 251 N. L. R. B. 1248, 1256-1259 (1980). We intimate no views on the merits of any of the Board's decisions.

[4] That the Board has joined an *amicus* brief supporting petitioner shows that it does not share respondent's concern that its jurisdiction is being invaded in this case. See *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 298, n. 8 (1971).

[5] "Complexity," for example, has never prevented us from holding that unions must arbitrate grievances fairly, see *Vaca* v. *Sipes*, 386 U. S. 171 (1967); *Conley* v. *Gibson*, 355 U. S. 41 (1957), despite the difficult tradeoffs in grievance processing between individual rights and collective welfare.

[6] We accept respondent's characterization of the employer's liability only for the purpose of argument. We note that the Board traditionally had imposed strict liability on an employer party to an exclusive hiring hall, solely on the basis of its being a party to the arrangement and even in the absence of proof that it had knowledge of the union's discriminatory practices. See *Frank Mascali Construction G. C. P. Co.*, 251 N. L. R. B. 219, 222 (1980), enf'd, 697 F. 2d 294 (CA2), cert. denied, 459 U. S. 988 (1982); *Longshoremen, Local 1351 (Galveston Marine Assn., Inc.)*, 122 N. L. R. B. 692, 696 (1958); *Operating Engineers Local 12 (Associated General Contractors)*, 113 N. L. R. B. 655, 661, n. 5 (1955), modified on other grounds, 237 F. 2d 670 (CA9 1956), cert. denied, 353 U. S. 910 (1957). The Board has recently abandoned the strict liability principle, holding instead that "no liability should be imposed when an employer does not have actual notice, or may not reasonably be charged with notice of a union's discriminatory operation of a referral system." *Wolf Trap Foundation for the Performing Arts*, 287 N. L. R. B. 1040, 1041 (1988), 127 LRRM 1129, 1130 (1988). We express no view regarding the standard for liability of any of the employers in the instant case.

[7] We need not determine whether plaintiffs in petitioner's position *could* make out a § 301 claim. We simply note that petitioner in his first amended complaint did not allege a breach of contract by any employer.

[8] The development of the law in the § 301 context is not to the contrary. We have recognized that although a § 301 suit against the employer and a fair representation claim against the union are "inextricably interdependent," *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 66-67 (1981) (Stewart, J., concurring in judgment), breach of the duty of fair representation is a cause of action separate from the claim against the employer. See *DelCostello* v. *Teamsters*, 462 U. S. 151, 164, 165 (1983) (noting that a hybrid fair representation/§ 301 suit "comprises two causes of action" and that "[t]he employee may, if he chooses, sue one defendant and not the other"); *United Parcel Service*, 451 U. S., at 66 (Stewart, J., concurring in judgment) (§ 301 and fair representation claim each has "its own discrete jurisdictional base"); *id.*, at 73, n. 2 (STEVENS, J., concurring in part and dissenting in part) ("[D]espite this close relationship, the two claims are not inseparable. Indeed, although the employee in this case chose to sue both the employer and the union, he was not required to do so; he was free to institute suit against either one as the sole defendant").

[9] Respondent contends that a § (b)(1)(A) should be construed *in pari materia* with § 8(b)(2) as requiring a showing of union-related discrimination. See *Teamsters* v. *NLRB*, 365 U. S. 667, 676 (1961) (§ 8(b)(1) condemns a hiring hall "which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment"); *Local 277, Int'l Brotherhood of Painters* v. *NLRB*, 717 F. 2d 805, 808-809 (CA3 1983); *NLRB* v. *Local Union 633, United Assn. of Journeymen and Plumbers*, 668 F. 2d 921, 922-923 (CA6 1982) *(per curiam)*; *NLRB* v. *Local 143, Moving Picture and Projection Machine Operators Union*, 649 F. 2d 610, 612 (CA8 1981). The NLRB, however, has construed §§ 8(b)(1)(A) and 8(b)(2) more expansively to bar the use of unfair, irrelevant, or invidious considerations in employee referrals of employees, and to prohibit, absent sufficient justification by the union, any departure from established procedures. See n. 3, *supra*. We need not pass on the wisdom of the Board's interpretation, because we hold that whatever the proper reading of § 8(b), petitioner has stated a claim for breach of the duty of fair representation. We note, however, that respondent's arguments are inconsistent. On the one hand, respondent contends that courts should not entertain fair representation suits because to do so would disturb NLRB efforts to create a uniform unfair labor practice body of law governing hiring halls. On the other hand, respondent maintains that the NLRB rules with respect to hiring hall unfair labor practices are actually in excess of what the statute authorizes. If that is so, the NLRB does not seem particularly "expert" in this area. Moreover, if the NLRB's hiring hall rules are void because they are beyond what the statute permits, then there is no overlap between the duty of fair representation and the unfair labor practices developed by the Board, and there is in fact *less* reason to hold that courts lack jurisdiction over hiring hall fair representation claims.

[10] Similarly, in deciding not to enforce *Miranda Fuel*, the Second Circuit explicitly rejected a crabbed view of the duty of fair representation and juxtaposed a statement of the narrowness of § 8 with an acknowledgment that the duty of fair representation is a broader concept. See 326 F. 2d, at 176. No decision of this Court has held otherwise.

[11] Respondent's argument would require us to find that there is no duty of fair representation at all in the hiring hall context; this is a position which cannot be reconciled with numerous decisions of the Courts of Appeals and the NLRB. See, *e. g.*, *Lewis* v. *Local 100, Laborers' Int'l Union*, 750 F. 2d 1368, 1376 (CA7 1984); *Beriault* v. *Local 40, Super Cargoes & Checkers of Int'l Longshoremen's Union*, 501 F. 2d 258, 264-266 (CA9 1974); *Smith* v. *Local No. 25, Sheet Metal Workers Int'l Assn.*, 500 F. 2d 741, 748-749 (CA5 1974); *Operating Engineers, Local 406*, 262 N. L. R. B., at 51, 57; *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B., at 754-755; *Journeymen Pipe Fitters, Local No. 392*, 252 N. L. R. B., at 421-422; *Bricklayers' and Stonemasons' Int'l Union, Local No. 8*, 235 N. L. R. B. 1001, 1006-1008 (1978).

[12] It was for this reason that the Board sought in its decision in *Mountain Pacific Chapter, Associated General Contractors*, 119 N. L. R. B. 883, enf. denied, 270 F. 2d 425 (CA9 1959), to require an exclusive hiring hall to incorporate certain procedural safeguards in the agreement establishing the exclusive arrangement. Although we held in *Teamsters* v. *NLRB*, 365 U. S. 667 (1961), that the Board's approach in *Mountain Pacific* exceeded the mandate of the NLRA, our decision in that case was confined to the unfair labor practice context and did not purport to determine the proper scope of the duty of fair representation. In addition, we were careful to note that the Board retained authority "to determin[e] whether discrimination has in fact been practiced" and to "eliminat[e] discrimination" in the operation of hiring halls. 365 U. S., at 677. *Teamsters* held invalid only the Board's attempt to impose prophylactic safeguards on hiring halls in the absence of any particularized findings of discrimination. It has no bearing on the instant case — a suit by an individual member of the union alleging specific acts in violation of the duty of fair representation.

[13] The phrase "otherwise discipline[e]" appears in both §§ 101(a)(5) and 609, and we have already determined that it has the same meaning in both sections. See *Finnegan* v. *Leu*, 456 U. S. 431, 439, n. 9 (1982).

[14] The Court of Appeals clearly had jurisdiction over the LMRDA claim. See *Boilermakers* v. *Hardeman*, 401 U. S. 233, 238 (1971). To the extent the Court of Appeals held otherwise, it was in error.

[15] We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101 (a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. Even respondent acknowledges that a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules. Contrary to JUSTICE STEVENS' suggestion, *post*, at 99-100, and nn. 7, 8, we do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers.

[16] See, *e. g.*, H. R. 4473, 86th Cong., 1st Sess., 12-16 (1959); H. R. 7265, 86th Cong., 1st Sess., 19-20 (1959); S. 1137, 86th Cong., 1st Sess., 11 (1959).

[17] We traced the legislative history of §§ 101(a)(5) and 609 in *Hardeman*, 401 U. S., at 242-245, and *Finnegan*, 456 U. S., at 435-441. The relevant portion of S. 1555 as passed became LMRDA § 610, 29 U. S. C. § 530 (1982 ed.), which criminalizes the threat or use of force or violence to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of rights granted under the LMRDA. Section 610 does not by its terms extend to economic reprisals.

[18] We do not pass on petitioner's claim that certain of his rights secured by the LMRDA were "infringed" by respondent's conduct, in violation of § 102, 29 U. S. C. § 412 (1982 ed.), because the claim was neither presented to nor decided by the Court of Appeals below, and thus is not properly before us. See *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981). In addition, the § 102 issue is not

included within relevant question on which we granted certiorari (`Whether a union's discriminatory refusal to refuse members to jobs constitutes `discipline' within the meaning of the [LMRDA]?").

[1] See, *e.g.*, *Ingraham* v. *Wright*, 430 U. S. 651 (1977) (use of corporal punishment, without predeprivation hearing, as means of disciplining schoolchildren); *Goss* v. *Lopez*, 419 U. S. 565, 580 (1975) (suspension from school without hearing as form of discipline).

[2] See, *e. g.*, *Preiser* v. *Rodriguez*, 411 U. S. 475, 478-481 (1973) (unauthorized deprivation of prison good time credits as form of discipline).

[3] See Manual for Courts-Martial, United States, 1968, Ch. 26 (detailing forms of nonjudicial disciplinary punishment for minor offenses).

[4] The Court is mistaken in suggesting that the predecessor to § 101 (a)(5), which distinguished between improper discipline imposed by a union and the use of economic reprisal by any person to interfere with the exercise of protected rights, signifies congressional intent that discipline not include economic reprisal. *Ante*, at 93-94. That provision, which was later embodied in § 610 of the Act, is addressed to attempts to interfere with rights protected by the substantive provisions of Title I and not to the arbitrary imposition of discipline at which the procedural provisions are aimed. It does not follow, as the Court seems to assume, that because Congress did not prohibit "all acts that deterred the exercise of rights protected under the LMRDA," *ante*, at 91, that it also intended to permit unions to employ this particularly powerful sanction without any procedural safeguards.

[5] Section 101(a)(5), as set forth in 29 U. S. C. § 411(a)(5) (1982 ed.), provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

[6] Section 609, as set forth in 29 U. S. C. § 529 (1982 ed.), provides:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section."

[7] Contemporaneous sources are replete with examples of discipline imposed informally and through summary procedures. See, *e. g.*, National Industrial Conference Board, Studies in Personnel Policy, No. 150, Handbook of Union Government Structure and Procedures 71-72 (1955) ("A few unions make specific statements in their constitutions that members are to be disciplined without trial for certain offenses. . . . These unions have a membership of 569,857"); Note, The Power of Trade Unions to Discipline Their Members, 96 U. Pa. L. Rev. 537, 541 (1948) ("[H]earings indicate the existence of physical violence and `goon squad' activity as a less formal means of disciplining opposing factions").

[8] Indeed, even union officials testified before Congress that union disciplinary methods were informal and discipline was imposed by workers. See, *e. g.*, Hearings on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., pt. 4, p. 1483 (1959) (testimony of George Meany, President of American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)); see also 105 Cong. Rec. App. 3294 (1959) (AFL-CIO Legislative Department Analysis of Provisions in Senator McClellan's Amendment) ("Often disciplinary proceedings are usually wholly informal").

[9] Brief for United States as *Amicus Curiae* 19-20 (footnote omitted). Most of the Courts of Appeals that have considered the issue have properly concluded that depriving a member of job referrals and other forms of economic reprisals can constitute discipline under the LMRDA. See *Guidry* v. *International Union of Operating Engineers, Local 406*, 882 F. 2d 929, 940-941 (CA5 1989); *Murphy* v. *International Union of Operating Engineers, Local 18*, 774 F. 2d 114, 122-123 (CA6 1985), cert. denied, 475 U. S. 1017 (1986); *Keene* v. *International Union of Operating Engineers*, 569 F. 2d 1375 (CA5 1978); see also *Moore* v. *Local 569, Int'l Brotherhood of Electrical Workers*, 653 F. Supp. 767 (SD Cal. 1987); T. Kheel, Labor Law § 43.06[4], 43-105 (1986); Beaird & Player, Union Discipline of its Membership Under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?, 9 Ga. L. Rev. 383, 392 (1975); Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 733 (1969). But see Comment, Applicability of LMRDA Section 101 (a)(5) to Union Interference with Employment Opportunities, 114 U. Pa. L. Rev. 700 (1966). Two Courts of Appeals have held that suspension of a member from a nonexclusive job referral system did not constitute discipline when such suspension was required by the terms of the collective-bargaining agreement. See *Turner* v. *Local Lodge No. 455, Int'l Brotherhood of Boilermakers*, 755 F. 2d 866, 869-870 (CA11 1985); *Hackenburg* v. *International Brotherhood of Boilermakers*, 694 F. 2d 1237, 1239 (CA10 1982); see also *Figueroa* v. *National Maritime Union of America*, 342 F. 2d 400 (CA2 1965) (although interference with employment opportunities is covered by Act, union's compliance with collective-bargaining agreement in refusing to refer seaman does not constitute discipline).

Save trees - read court opinions online on Google Scholar.

8/4/22, 4:38 PM                Guidry v. INTERN. U. OF OPERATING ENG., LOCAL 406, 882 F. 2d 929 - Court of Appeals, 5th Circuit 1989 - Google Scholar

Case 4:22-cv-00430-Y    Document 28-1 Filed 09/08/22    Page 2 of 497    PageID 1370

882 F.2d 929 (1989)

## Robert GUIDRY, Plaintiff-Appellee, Cross-Appellant,

v.

## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants, Cross-Appellees.

No. 87-4733.

**United States Court of Appeals, Fifth Circuit.**

August 29, 1989.
Rehearing and Rehearing Denied September 28, 1989.

931    *930 *931 Robert H. Urann, Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants cross-appellees.

Maurice L. Tynes, Lake Charles, La., for plaintiff-appellee cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

Rehearing and Rehearing En Banc Denied September 28, 1989.

932    *932 KING, Circuit Judge:

The plaintiff-appellee, Robert Guidry, sued the defendants-appellants, the International Union of Operating Engineers, Local 406 and former and current Union leaders, alleging denial of rights guaranteed by 29 U.S.C. § 411(a) (1985), unlawful discipline in violation of 29 U.S.C. § 529 (1985), and breach of the duty of fair representation. The United States District Court for the Western District of Louisiana found in favor of the plaintiff.[1] The court awarded damages for lost wages, emotional distress, punitive damages and attorneys' fees and ordered that Guidry be reinstated to Union membership. We affirm the judgment of liability, but we remand the award of damages for further findings.

# I. FACTS

The facts, as found by the district court, are summarized as follows:

# A. Background and Players

Plaintiff-appellee Robert Guidry ("Guidry") became a member of the International Union of Operating Engineers, Local 406 (the "Union") in 1949. The Union is a constituent division of the International Union of Operating Engineers and is an unincorporated labor organization with six districts in the state of Louisiana. There is an office within each district, and the statewide central office is in New Orleans.

The Union elects a statewide Business Manager and Financial Secretary who works out of the central New Orleans Office. Defendant Peter Babin III ("Babin") has served in this position since 1976. The Business Manager negotiates collective bargaining agreements in Louisiana, serves on a committee that negotiates the National Pipe Line Agreement, acts as a trustee of the Union's Health and Welfare Fund, and appoints and supervises assistant business managers in the various districts who oversee the day-to-day functioning of the Union. These assistant business managers are also known as "business agents" ("BAs") and they represent the Union at pre-job conferences, administer the hiring hall procedures, and appoint union stewards and master mechanics to act as representatives for the Union on the job.

Babin's predecessor as Business Manager appointed defendant Willard Carlock, Sr. ("Carlock") as BA for the Union's Lake Charles District. After he took office, Babin retained Carlock as BA until Carlock and his administration of the district came under criminal investigation. Babin fired Carlock on March 10, 1984. Taliaferro v. Schiro, 669 F.Supp. 763, 766 (W.D.La.1987).

Case 4:22-cv-00430-Y    Document 28-1   Filed 08/04/22   Page 352 of 497   PageID 1788

Babin appointed defendant Columbus J. Laird ("Laird") as BA for the Lake Charles District in 1978. Laird technically had as much authority as Carlock, but he considered Carlock his boss and followed Carlock's instructions. Laird was in office until January 15, 1985 when he resigned after an indictment was brought against him, Carlock, and others. *Id.*

Babin appointed Don Schiro ("Schiro") to be statewide Pipe Line Business Agent in March 1980. Schiro represented the Union in pipeline construction jobs controlled by the National Pipe Line Agreement and was responsible for attending pre-job conferences and appointing stewards and referring workers to pipeline jobs. However, Schiro generally left these details to BAs such as Carlock and Laird. *Id.*

The district court found that Babin's supervision of the BAs was "totally inadequate." Id. at 775-76. Upon appointing a BA, Babin instructed him to run the hiring hall on a non-discriminatory basis, but otherwise did very little to supervise him. He met with each BA semi-annually to discuss local problems. He had no formal evaluation procedure, but instead relied on his own re-election as evidence that Union members were satisfied with the performances of the BAs from their districts. *Id.* at 765.

## *933 B. The Lake Charles District Hiring Hall

### 1) *Generally*

The Union, as the exclusive collective bargaining agent for operating engineers in its jurisdiction, signed two major collective bargaining agreements. The first agreement is between the Union and the Lake Charles District, Associated General Contractors of Louisiana, Inc. and governs the building and construction industry (the "Building Trades Agreement"). The National Pipe Line Agreement covers all transportation mainline pipeline and underground cable work. Both agreements specify that the Union will provide labor through an exclusive hiring hall. The method for registering applicants for referral is set out in the agreements and involves placing individuals in four groups according to their work experience. The Union has always disregarded this rule and it has, instead, grouped workers together, keeping only a separate group for oilers. The hiring hall maintains two separate lists for building trades projects and pipeline projects, and, since March 1984, a worker can keep his or her name on only one list at a time. Both lists contain names in the order in which the applicant notifies the Union that he or she is available for work.

### 2) *Departures from the Hiring Hall Procedure*

Both Agreements allow the contractor to hire some of its employees on any given job outside the structure of the hiring hall. The Building Trades Agreement allows the contractor to hire key personnel directly and to recall any worker who has been employed by that contractor for at least six of the previous twelve months. The National Pipe Line Agreement allows the contractor to hire half its workforce from a group of "regular employees." Regular employees have either been employed by the contractor in the prior six months or are customarily employed by that contractor whenever it has work. *Id.* at 767.

Additionally, the Union has developed informal departures from the regular hiring hall procedure of offering a referral to the first applicant on the list. The first of these exceptions is based on the fact that the Union can, according to the agreements, name stewards to pipeline projects and master mechanics to building trades jobs to act as Union representatives. The procedure for such appointment under the agreements is to name an individual from among the Union members already referred to the job. Carlock, Laird, and Schiro departed from this rule by naming stewards and master mechanics to jobs, regardless of their positions on the list. Schiro sometimes appointed individuals who were not yet even on the list to steward positions when the job they were working on at the time was nearing completion. *Id.* at 768.

Short-term jobs, which are expected to last one to three days, also were treated as exceptions to the hiring hall procedure. Referrals for these jobs were simply given to those applicants who were present at the Union hall at the time the referral was received, irrespective of the applicants' places on the list. Union leadership made a similar exception for temporary replacements of workers who were incapacitated or could not otherwise perform their jobs. *Id.* at 768.

Finally, the Union's collective bargaining agreement with Dolphin Construction Company required that the Union refer residents of Allen Parish to its construction project there. Allen Parish residents, therefore, received referrals to those jobs before non-residents whose names were higher on the list.

### 3) *Manipulation of the Hiring Hall Procedures and the Exceptions*

The district court found that Carlock "exploited[ed] and, at times, disregard [ed] entirely the hiring hall procedures to enrich his confederates to the detriment of the plaintiff and others." *Id.* at 769. The district court went on to explain specifically the various ways in which Carlock accomplished this: (1) appointing his confederates as stewards or master mechanics irrespective of their skills or their places on the list; (2) abusing the short-term referral exception to designate some jobs as **934**    short-term that he knew to be substantially longer *934 than three days; (3) allowing contractors to employ as "regular employees" workers who did not meet the requirements of that group as outlined in the National Pipe Line Agreement; (4) designating a referral as a recall under the Building Trades Agreement regardless of the individual's eligibility for recall. *Id.* at 769.

The district court found that Carlock quelled opposition by means of "intimidation and threats of retaliation in the form of economic discrimination and physical injury." *Id.* Also, the court found that Union members feared voting against Carlock because the balloting was not secret and they feared retaliation. *Id.* Finally, the court noted that Carlock made it difficult for disgruntled or suspicious workers to check their positions on the out-of-work list by keeping possession of, or control over, that list. *Id.* at 769-70.

## II. PROCEDURAL BACKGROUND

After a bench trial, the district court held in favor of the plaintiffs. The court awarded Guidry — who is the only plaintiff against whom this appeal is brought — lost wages totalling $5,310.50, $20,000 for emotional distress, $10,000 in punitive damages. The court also awarded attorneys' fees in an amount to be agreed to by the parties, or in default of that, to be set by the court. All of the above awarded damages were to be paid by the Union. The court also ordered the reinstatement of Guidry as a Union member. Additionally, the court awarded Guidry $1000 in punitive damages to be paid by Babin. The defendants timely appealed the judgment of the district court, asserting that Guidry failed to prove liability and that the damage awards are improper or excessive. Guidry cross-appeals the amount of damages awarded for emotional distress, lost wages, and punitive damages — arguing that they are inadequate.

## III. THE QUESTIONS OF LIABILITY

The Union, Carlock, Babin, Schiro, and Laird (collectively the "defendants") argue on appeal that the district court erred in holding them liable under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401-531 (1985 and Supp.1986) ("LMRDA"). The defendants also challenge the district court's conclusion that Union hiring hall procedures violated the duty of fair representation under the Labor Management Relations Act section 9(a), 29 U.S.C. § 159(a) (1973) ("LMRA"). Further, the defendants argue that Guidry failed to exhaust his internal union remedies, and therefore, his case should have been dismissed.

## A. The LMRDA Claim

Guidry argued below, and the district court found, that his rights under sections 101(a)(1), (2) of the LMRDA had been abridged, 29 U.S.C. §§ 411(a)(1), (2), and that he had been wrongfully disciplined under sections 101(a)(5) and 609, 29 **935**    U.S.C. §§ 411(a)(5)[2] and 529.[3] The court concluded *935 that the defendants' manipulation of the hiring hall procedures to the detriment of Guidry and the other plaintiffs constituted violations of these provisions. It also concluded that Guidry's expulsion from the Union was violative of the LMRDA. The defendants assert that the evidence presented at trial does not support this portion of the verdict and that, therefore, the district court's factfinding is clearly erroneous for two reasons: (1) that there was no evidence to support the conclusion that Guidry exercised rights guaranteed him by the LMRDA, and (2) that there was no evidence to support the conclusion that the Union acted to retaliate against Guidry for having exercised those rights. Additionally, the defendants argue that even if the evidence supports the district court's underlying fact findings, its legal conclusion that the manipulation of hiring hall procedures constitutes "discipline" within the meaning of the statutes is erroneous. We address these arguments in order.

## 1) *Did Guidry Oppose Union Leadership?*

Case 4:22-cv-00430-Y   Document 28-1   Filed 09/08/22   Page 75 of 444   PageID 1180

The district court found that "Guidry [had] a long history of opposing incumbent Union officers." 669 F.Supp. at 772. The defendants challenge this finding as clearly erroneous and unsupported by the evidence and assert that Guidry failed to show either that he actually opposed Union leadership or that his opposition of that leadership was known. They characterize the evidence as demonstrating that Guidry opposed the Union leadership only until 1972,[4] and as failing to show — aside from Guidry's own testimony that he had opposed every administration since 1956 — that his opposition continued beyond 1972. The defendants cite *Chapa v. Local 18*, 737 F.2d 929, 932 (11th Cir.1984), for the proposition that a plaintiff's "bald assertion" that he opposed union leadership and that the union retaliated is insufficient to support a verdict for the plaintiff on an LMRDA wrongful discipline claim.

We begin by noting that the defendants are urging us to review the district court's factfinding. Our review is limited by Federal Rule of Civil Procedure 52(a), which provides that we may not set aside such findings unless "clearly erroneous." This standard of review has been interpreted to mean:

> [that] [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Applying this standard, we conclude that the district court's factfinding is not clearly erroneous. The defendants' characterization of the record is incomplete. Far from simply containing Guidry's conclusory assertions that he generally opposed Union management, the record contains Guidry's specific testimony of particular instances of his opposition to the Union.

Guidry described in detail the circumstances of his decision in 1979 to go to the Federal Bureau of Investigation ("FBI") with evidence of Union corruption. Guidry made that decision after discussing his position with fellow Union members. Guidry testified that when Carlock and Laird discovered that he had gone to the FBI, they came on the job site at which Guidry was *936 employed as master mechanic and sought to force his employer to discharge him. Guidry ultimately filed charges against Carlock with the Union's executive board. Although these events occurred outside the one-year prescriptive period applicable to Guidry's LMRDA claim, *see infra* at section IV.A, they are not too remote in time to have been found by the district court to have triggered Union retaliation.

Guidry's testimony is replete with examples of challenges he levelled against the Union leadership's operation of the hiring hall. These include a challenge to the hiring methods on a job for which he was asked to steward — Guidry openly complained that men who had never worked for the company before were hired as "regular employees." Guidry also challenged the hiring hall when he discovered that his name had been left off the out-of-work list as a result of a new rule that required him to choose between the building trades and the pipeline lists.

According to Guidry's testimony, as well as that of Union members, Guidry's opposition to the Union leadership was hardly a secret. Charles Lovett, a member of the Union who was called to testify for the plaintiffs, noted that Guidry had been "bucking the system" at the Union for twenty-five years and had gained nothing.

The Union challenges this testimony as inadequate because it fails to show that Guidry either sought a Union office after 1972 or openly campaigned against the Union leadership in an election after 1972. The defendants argue that all of Guidry's political activity in the Union is too remote in time to support a claim of retaliation occurring in 1980-83. The flaw in the defendants' argument is their assumption that in order to assert a violation of section 101(a)(2) of the LMRDA, a plaintiff must show that he or she spoke out in opposition to Union leadership in the context of an election. We read the statute to contain a much broader protection of speech.

The statute itself speaks of the right of every union member to "express any views, arguments or opinions," 29 U.S.C. § 411(a)(2), *supra* n. 2, and does not limit such expression to one occurring in the context of a union election. In fact, the statute refers separately to a union member's right to express his views upon candidates running for union office. *Id.*

The Supreme Court has characterized the LMRDA as "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The "Bill of Rights" portion of that legislation was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Id.* at 435, 102 S.Ct. at 1870. Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sheet*

_Metal Workers' Intern. Ass'n v. Lynn,_ 488 U.S. 347, ___, 109 S.Ct. 639, 645, 102 L.Ed.2d 700 (1989) (quoting _United Steelworkers of Am. v. Sadlowski,_ 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed.2d 707 (1982)).

The defendants do not cite, nor have we found, any cases that limit the free speech rights protected by the LMRDA's Bill of Rights to speech relating directly to an election within the union. While we agree with the defendants' position that the evidence adduced at trial does not support the conclusion that Guidry formally opposed Union leadership after 1972 in the context of a Union election, we conclude that the district court was not clearly erroneous in its finding that Guidry openly opposed Union leadership at least up to the time that he filed this suit.

## 2) *Did the Union Act to Retaliate Against Guidry for Exercising Free Speech Rights?*

The district court found generally that hiring hall procedures were abused and threats of retaliation in the form of economic and physical injury were used to control Union members and to enrich those members who supported the leadership. 669 F.Supp. at 769. The court also enumerated the instances of such reprisals *937 that specifically related to Guidry. In addition to discrimination in the hiring hall, the district court found that the Union retaliated against Guidry for his opposition to leadership by denying him a gold Union membership card recognizing his thirty years of service. Also, the district court found that Union economic pressure forced Guidry to violate Union rules and cross a picket line. The court found that when Guidry faced charges for having crossed the picket line, Laird telephoned supporters of the leadership to ensure that they would attend the meeting at which the membership was to vote on Guidry's fate — thus, making his expulsion almost certain.

The defendants challenge these factfindings as clearly erroneous. They argue that even if Guidry did show that he had been discriminated against in hiring hall referrals, he failed to show that such discrimination was connected to his exercise of rights protected under the LMRDA. They argue that the other union acts found by the district court to have been discriminatory were justified by long-standing Union rules.

The record contains abundant evidence, both in the form of testimony and documentation, of the procedures followed by Union leadership in referring applicants to jobs through the hiring hall. The court found twenty-one specific instances in which Union leadership manipulated the hiring hall procedure by employing one of the means outlined above. This resulted in direct harm to Guidry. See _Taliaferro,_ 669 F.Supp. at 781-86 (Appendix). The district court concluded that each improper referral had been used to penalize Guidry (and the other plaintiffs) for their refusal to support the defendants. _Id._ at 776.[5] We do not find clear error in this conclusion.

The defendants argue that Guidry failed to show in each case of hiring hall discrimination that the intent of Union leadership was discriminatory. We disagree. Guidry (and the other plaintiffs) provided substantial evidence, particularly in the testimony of Laird, of the attitude of Carlock toward those members who had "voted wrong" in prior elections, and of the control Carlock exercised over the out-of-work list. This evidence, coupled with the clear evidence of Guidry's dissent from Union leadership, is sufficient to support a conclusion that the discrimination was intentional. Even though the evidence is largely circumstantial, it is sufficient to support the verdict. _See Vandeventer v. Local 513 of Int'l Union of Op. Eng.,_ 579 F.2d 1373, 1380 (8th Cir.) (holding that primarily circumstantial evidence was sufficient to support verdict that union had taken retaliatory action), _cert. denied,_ 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

Additionally, the plaintiffs introduced testimony and exhibits regarding the specifics of each wrongful referral found by the district court. After reviewing the evidence supporting each of the twenty-one wrongful referrals, which involved jumping over Guidry's name on the out-of-work list, this court is convinced that the district court's factfinding is correct and supported by substantial evidence. We, therefore, do not disturb the district court's conclusion that discrimination in the hiring hall referrals took place and was used in retaliation for Guidry's failure to support Union leadership.

## 3) *Does the Manipulation of Hiring Hall Procedures Constitute Discipline within the Meaning of Sections 101(a)(5) and 609 of the LMRDA?*

Case 4:22-cv-00430-Y   Document 28-1   Filed 09/08/22   Page 76 of 487   PageID 1332

The defendants challenge the district court's holding that the wrongful hire hall referrals constitute "discipline" within the
938 meaning of sections 101(a)(5) *938 and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5) and 529. They argue that according to
*Finnegan v. Leu, supra,* the term "discipline" in section 609 refers to actions taken by the union that diminish the
membership rights of a union member. Hiring hall discrimination does not qualify, according to the defendants, because
hiring hall referrals must be made available to non-union members. *United Ass'n of Journeymen, Local 198 v. NLRB,* 747
F.2d 326 (5th Cir.1984); National Labor Relations Act, § 8(b)(1)(A), (b)(2), 29 U.S.C. § 158(b)(1)(A), (b)(2).

The issue presented here — whether proof that a union has retaliated against one of its members for his exercise of a right
protected under section 101 of the LMRDA constitutes "discipline" within the meaning of section 609 of that act — has been
addressed by a number of courts with apparently contradictory results. We conclude, however, that the cases can be
harmonized, and we hold that under the facts presented here, Guidry has made out a proper claim for wrongful discipline in
violation of the LMRDA.

In *Miller v. Holden,* we held:

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of
> the union's right to control the member's conduct in order to protect the interests of the union or its
> membership, and (2) it directly penalizes him in a way which separates him from comparable members in
> good standing.

535 F.2d 912, 915 (5th Cir.1976). We decided that the claim brought in *Miller* — that the plaintiff's discharge from his
employment by a trust established by, but separate from, his union — did not state a cause of action under the LMRDA
because the discharge did not constitute "discipline" under the statute. In determining the meaning of discipline we looked
first to the statute and its legislative history, *id.* at 914 n. 5 (citing 1 Legislative History of LMRDA of 1959, 338, 516, 619,
687, 858 (NLRB ed. 1959)), but concluded that neither was enlightening on the issue. We, therefore, applied the principal of
statutory construction of *ejusdem generis* and construed the general term discipline to conform to the essential character of
the three specific types of discipline listed in the statute: fine, expulsion, and suspension. *Id.* at 914-15. Our result required,
as quoted above, that the union action separate the plaintiff from other union members in good standing to constitute
discipline.

We followed the holding in *Miller* to find that manipulation of hiring hall referrals to the detriment of the plaintiff constituted
discipline within the meaning of LMRDA in *Keene v. International Union of Op. Eng., Local 624,* 569 F.2d 1375 (5th
Cir.1978). In that case, the plaintiff had unsuccessfully run for union office. He showed that after his loss in the election he
received virtually no referrals through the union's hiring hall and that over two hundred people with less priority on the out-
of-work list received referrals in preference to him. We held that a jury could reasonably conclude that such discrimination in
referrals constituted discipline for exercising rights protected under the LMRDA.

The question, however, is not so easily resolved. The Supreme Court addressed the issue of what constitutes "discipline"
under section 609 of the LMRDA in a different, but related, context in *Finnegan v. Leu, supra.* In that case, the plaintiffs
sued under the LMRDA after they were discharged from their employment as union business agents following the election
of Leu as president of the union. The plaintiffs had openly supported Leu's rival, the incumbent president, in the campaign.
At trial, Leu explained that he had discharged the plaintiffs because he felt that they were loyal to the incumbent and would
be unable to implement his policies. The Court held that the term discipline in section 609 "refers only to retaliatory actions
that affect a union member's rights or status *as a member* of the union." 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis
added). It concluded that the discharge of the plaintiffs from their appointive union positions was not within the scope of
939 "other discipline" contemplated by section 609. *Id.* at *939 439, 102 S.Ct. at 1872.[6] The Court reasoned that the LMRDA
was intended to protect rank-and-file union members, rather than union officers or employees. Therefore, while the plaintiffs'
right to campaign against a candidate for union president was protected, such campaigning did not immunize them from
discharge at the pleasure of the new president from their jobs as union employees.

In cases not involving the loss of employment within the union itself, an apparent conflict in interpreting *Finnegan* has
arisen. In *Hackenburg v. International Bhd. of Boilermakers, Local 101,* 694 F.2d 1237 (10th Cir.1982), the court followed
*Finnegan* to hold that union members who were "benched" — that is they received no referrals — following a wildcat strike
had not been "otherwise disciplined" within the meaning of the LMRDA.

Case 4:22-cv-00430-Y    Document 28-1 Filed 08/09/22    Page 657 of 497    PageID 733

In *Hackenburg*, the union, following the terms of its collective bargaining agreement with an employer, deprived the plaintiffs of any job assignments for ninety days as a result of their involvement in a wildcat strike. The plaintiffs sued, arguing that they had been "otherwise disciplined" within section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), without the procedural protections afforded by that section. The court determined that the "sanctions imposed were employment related rather than internal union related," 694 F.2d at 1240, and, relying on *Finnegan*, held that the procedural safeguards of section 101(a)(5) were not available because the punishment was not related to the union members' rights or status as members. *Id.* at 1239.

*Turner v. Local Lodge # 455 of the Int'l Bhd. of Boilermakers*, 755 F.2d 866 (11th Cir.1985), involves circumstances very similar to those in *Hackenburg*. The plaintiffs in *Turner* also suffered a ninety-day benching pursuant to the terms of a collective bargaining agreement as a result of their refusal to cross an illegal picket line. The court first noted that the plaintiffs' contention that the benching had actually occurred in retaliation for their exercise of rights protected by sections 101(a)(1) and (2) of the LMRDA had been properly taken away from the jury because of the lack of evidentiary support. It then addressed the plaintiffs' contention — which was identical to that in *Hackenburg* — that the benching had violated section 101(a)(5) because proper procedures had not been followed before the union imposed the sanction.

The court considered the broad language in section 101(a)(5) and stated that "the sweeping language ... cannot be read out of context, but must be taken as backing and support for union members exercising their `Bill of Rights' and that any union disciplinary measure unrelated to the `Bill of Rights' is not covered." *Turner*, 755 F.2d at 869. Therefore, the absence of any claim of retaliation by the union was fatal to the plaintiffs' LMRDA claim. The court then went on to state that under the interpretation *940 of "discipline" found in *Finnegan,* the benching in the case before it did not constitute discipline, because it did not affect the plaintiffs' rights as members of the union in as much as union membership is not a requirement in order for one to be carried on the out-of-work list and receive employment referrals. *Id.* In concluding, however, the court noted that "the case might be different" if there had been evidence of, for example, "retaliation for exercise of a protected right." *Id.* at 870.

940

Such a different result was reached by the Sixth Circuit in *Murphy v. International Union of Op. Eng., Local 18*, 774 F.2d 114 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), in which the court found that a denial of work assignments through a hiring hall to a union member in retaliation for his opposition of union leadership could be considered "discipline" within the meaning of section 101(a)(5). *Murphy,* 774 F.2d at 122. The court went on to uphold the district court's conclusion that although the union's actions were not "discipline," they were nevertheless actionable as violative of sections 101(a)(1) and (2). The court distinguished *Finnegan* on the ground that the *Finnegan* court had been concerned with union employees and the right of a union leader to choose people to help him run the union. *Id.* at 123. The court stated: "Plainly, the Supreme Court in *Finnegan* did not intend to rule out [29 U.S.C.] section 411 as a protection against manipulative discrimination on behalf of an ordinary union member seeking to exercise his right of expression at union meetings." *Id.* The court also distinguished *Turner* and *Hackenburg* simply by noting that the unions involved in both had acted pursuant to collective bargaining agreements. Id. at 122 n. 5. The court did not address the question of whether the language in *Turner,* which states that a refusal to refer a member to employment does not affect his rights as a member, 755 F.2d at 869, precluded a determination that such a refusal could constitute discipline in any circumstances.

In *Moore v. Local 569 of the Int'l Bhd. of Elec. Workers*, 653 F.Supp. 767 (S.D.Cal.1987), the court directly addressed the problem avoided in *Murphy* — that *Turner* appears to preclude a holding that discriminatory referral procedures affect union members' *rights* as a member of the union. The court began by analyzing the reasoning in the problematic dicta from *Turner* that because non-members could take advantage of a union hiring hall, membership rights are not affected by a discriminatory hiring hall. *Moore*, 653 F.Supp. at 770. The *Moore* court decided that this language did not preclude a determination that membership rights were ever affected by such discrimination for two reasons. First, the court inferred that in *Turner,* the plaintiffs no longer had a right to be referred to work because of their involvement in wildcat strikes prohibited under the collective bargaining agreement. *Id.* Second, and more importantly, the court reasoned that one of the rights of a union member was to receive nondiscriminatory referrals from the union hiring hall. The court concluded that the ability of non-members to place their names on the out-of-work list did not diminish and, in fact, had no relationship to that right. The court, therefore, rejected the union's contention in the case before it that the dicta in *Turner* regarding the issue of whether benching could constitute discipline should control. It found instead that the plaintiffs' allegations stated a cause of action under section 609 of the LMRDA. *Id.* at 770-71.

We agree with the *Moore* court's rejection of this dicta from *Turner* in circumstances such as those before us. It is apparent from the evidence that Guidry's name was repeatedly skipped over on the out-of-work list in retaliation for his outspoken opposition to Union leadership. Here, as in *Murphy,* and as distinguished from *Turner* and *Hackenburg,* there was evidence

Case 4:22-cv-00430-Y   Document 28-1   Filed 09/08/22   Page 79 of 444   PageID 1387

or a reprisal for exercise of rights protected under the LMRDA. The *Turner* court itself noted that if there is evidence of union retaliation the case might be different. We also point out that here, as distinguished from *Finnegan,* the question involves

941    the right to fair treatment of a union member by his union. In *Finnegan,* *941 the plaintiffs were seeking to retain their employment by the union, not something to which every union member is entitled. Here, on the other hand, the plaintiff simply seeks not to be singled out for unfair treatment by his union. We simply cannot agree with the defendants' contention that the discriminatory administration of the hiring hall does not represent the kind of discipline covered by the LMRDA.

## B. Exhaustion of Union Remedies

The defendants challenge the district court's ruling on the ground that Guidry failed to exhaust his internal union remedies, and, as a result, they argue that his suit should have been dismissed. In his complaint, as well as on brief to this court, Guidry asserts that pursuit of his internal union remedies would have been futile, and therefore, he is not required to exhaust that avenue before filing this suit. The district court did not directly address this question, although it clearly did not find that Guidry's failure to exhaust internal union remedies precluded this suit.

Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts in their discretion to require that a union member exhaust his internal remedies before filing suit. *See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982).

Before a union member may bring suit against his union for breach of the duty of fair representation under section 301 of the LMRA, 29 U.S.C. § 185, the member must either exhaust union remedies or show an adequate reason for not doing so. *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). Here too, courts have discretion to decide whether to require such exhaustion. *Id.* at 689, 101 S.Ct. at 2095. Factors relevant to the inquiry of whether to require exhaustion are: (1) whether union officials are so hostile to the member that he cannot hope to obtain a fair hearing; (2) whether the union procedures are adequate; and (3) whether requiring exhaustion would unreasonably delay the member in pursuing his rights. *Id.* Guidry asserts that the first of these exceptions is applicable here.

The Union Constitution and Bylaws, admitted into evidence in the court below, provide simply that the local union's determination of any grievance shall be final and binding. Neither provides specific grievance procedures for the type of complaint Guidry asserts. In such absence of procedural requirements, an employee may proceed to file suit after pursuing his contractual remedies. *Hammons,* 783 F.2d at 602. Additionally, where it is clear, as here, that because the complaint is directed at those officials who would hear Guidry's complaint, the member should be excused for his failure to exhaust internal remedies. *Hayes v. Brotherhood of Ry. and Airline Clerks/Allied Servs. Div.,* 734 F.2d 219 (5th Cir.), *cert. denied,* 469 U.S. 935, 105 S.Ct. 336, 83 L.Ed.2d 272 (1984).

## IV. THE DAMAGE AWARDS

## A. The Statute of Limitations

The district court, following *Local 1397, United Steelworkers of Am. v. United Steelworkers of Am.,* 748 F.2d 180 (3d Cir.1984), applied a six-month statute of limitations to the plaintiffs' LMRDA claims. It therefore looked back six months prior to the date of filing of the suit to determine the amount of damages. After the district court rendered its decision, and after oral argument on this case, the Supreme Court overruled *Local 1397. Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). The Court held in *Reed* that, unlike claims brought under section 301 of the LMRA, *see DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), claims brought under section 101(a)(2) of the LMRDA are more akin to civil rights claims than to unfair labor practice charges. Therefore, the Court reasoned under the rule established in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the

942    state general or residual personal injury statute of *942 limitation should apply to actions brought under section 101(a)(2). Therefore, we look to Louisiana state law to determine the appropriate statute of limitations for the LMRDA claims. The claims under section 301 of the LMRA are, however, still subject to the six-month limitation.

Article 3492 of the Louisiana Civil Code provides a one-year limitations period for delictual actions, which include personal injury actions. La.Civ.Code Ann. art. 3492 (West Supp.1989). Therefore, the limitations period that should be applied to Guidry's claims under the LMRDA is one year.[7] Because the damages amount must be based in part on facts not found by

the district court, we must remand the damages portion of this cause for a redetermination of the amount of damages to be awarded. However, we can and will address the legal issues raised by the parties regarding the types of damages awarded.

# 1) *Punitive Damages*

The district court awarded punitive damages to be paid both by the Union and Babin, relying on *International Bhd. of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968), and *Parker v. Local Union No. 1466, United Steelworkers of Am.*, 642 F.2d 104, 106 (5th Cir.1981), for the proposition that punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." *Braswell*, 388 F.2d at 199.

On appeal, the defendants urge us to overrule this Circuit's precedent and rule that punitive damages are unavailable in LMRDA cases. Alternatively, they argue that the evidence does not support the finding of malice on which the punitive damage award depends. We find neither argument convincing.

As to the first argument, we simply point out that as a panel of this court, we are not free to overrule the precedent of prior Fifth Circuit cases. Only the *en banc* court has the necessary power to do so. *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir.1978). As to the defendants' second argument, we point to our discussion *supra* at parts III A. 1 and 2 of the sufficiency of the evidence. We conclude that the evidence adduced at trial supports the district court's finding of malice, and therefore we uphold the court's decision to award punitive damages,

943    although, *943 for the reason noted below, we vacate the amount of the award.

On cross-appeal, Guidry argues that the amount of punitive damages awarded was insufficient and he seeks enhancement of the amount to $250,000. The only argument Guidry advances for this position asserts essentially that because the Union can afford more, this award is not sufficiently punitive. Because we remand this case for a redetermination of the damage award, we decline to address this issue. Because the district court may have been influenced in its decision on punitive damages by the amount of actual damages, we vacate the punitive damage award and leave it to the district court, in its discretion, to fix once again the amount of punitive damages when the amount of actual damages has been recomputed.

# 2) *Emotional Distress*

The defendants also contest the award of damages for emotional distress, arguing that because the plaintiffs failed to present evidence of any physical manifestations of that distress, such an award is unavailable under the LMRDA. We agree that emotional distress "standing alone does not constitute a sufficient basis for the awarding of damages under the [LMRDA]." *Bise v. International Bhd. of Elec. Workers, Local 1969*, 618 F.2d 1299 (9th Cir.1979) (quoting *International Bhd. of Boilermakers v. Rafferty*, 348 F.2d 307, 315 (9th Cir.1965)), *cert. denied*, 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). In order to protect against spurious claims for emotional distress that might drain union coffers and thereby deprive other members of effective representation, some courts have required LMRDA claimants who seek damages for emotional distress also to adduce some evidence of actual injury. *See id.* Other courts do not impose an actual injury requirement. Compare *Bise, supra* with *Bradford v. Textile Workers of Am.*, 563 F.2d 1138, 1144 (4th Cir.1977). Whether to impose an actual injury requirement, as well as what such a requirement entails, are issues of first impression for this Circuit.

We conclude, as the district court did, that LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury. The environment in which LMRDA claims arise — discipline and termination by both unions and employers — is emotionally charged at the outset and, thus, one in which claims for emotional distress are likely to be the rule rather than the exception. Moreover, the subjective nature of these claims makes it particularly difficult to dismiss meritless actions at early stages in the litigation — before the union has gone to considerable expense in defending the action. Hence, we agree with the Ninth Circuit that an actual injury requirement should be imposed in order to protect unions in their representative capacities from malice from within.

A further issue to be resolved, however, is what type of evidence will suffice to establish "actual injury." Despite professed agreement, the two circuit courts that have addressed this problem construe "actual injury" in different ways. In *Rodonich v. House Wrecker's Union Local 95*, 817 F.2d 967, 977 (2d Cir.1987), the Second Circuit upheld the following jury instruction: "[y]ou must find such mental or emotional distress based upon the particular plaintiff's physical condition or medical evidence." *Id.* The Second Circuit then declared that "[t]he qualification that claims of emotional distress be supported by a

Case 4:22-cv-00430-Y   Document 28-1 Filed 08/08/22   Page 160 of 447   PageID 1386

physical manifestation of injury is an appropriate safeguard against the award of excessive and speculative damages." *Id.; see also Petramale v. Local 17, Laborers' Int'l Union of North Am.,* 847 F.2d 1009, 1012 (2d Cir.1988). The Ninth Circuit, however, construes "actual injury" more broadly. In *Bise* and its progeny,[9] lost wages, as well as physical manifestations of emotional distress, served as sufficient indication of actual injury. In the case before us, the district court awarded damages for emotional distress to those plaintiffs who could *944 demonstrate actual injury through lost wages.

944

We adopt the Ninth Circuit's approach. We fail to see why physical manifestations of injury should be the sole guarantor of genuineness; financial distress may well be the most reliable and frequent cause of mental distress. Moreover, whatever the indicia of actual injury used, plaintiffs who seek damages for emotional distress must present credible evidence of that distress. District courts should not be hidebound to antiquated notions about the nature of mental injury and suffering in order to determine whether an LMRDA claim is genuine. We therefore affirm the district court's interpretation of the actual injury requirement. We vacate the award, however, for reconsideration along with the other components of damages to be awarded.

## 3) *Attorneys' Fees*

The district court awarded to Guidry and the other plaintiffs "reasonable" attorneys' fees. The court looked to *Hall v. Cole,* 412 U.S. 1, 4-5, 93 S.Ct. 1943, 1945-46, 36 L.Ed.2d 702 (1973) to determine the standards for an award of reasonable attorneys' fees. *Hall* allows an award of attorneys' fees to a successful party even in the absence of statutory or contractual authority when his opponent has acted in bad faith or when his success in the litigation confers a benefit on members of an ascertainable class, and where the court's award of attorneys' fees will make it possible to spread the cost of litigation over the class of beneficiaries of the suit. The court below held that, in this case, attorneys' fees were available under both theories.

On appeal, the defendants argue that the district court's application of these two theories was an error of law. We agree.

The bad faith exception to the general rule — that absent contractual or statutory authority, attorneys' fees are not recoverable — is set out in detail in *Shimman v. International Union of Op. Eng., Local 18,* 744 F.2d 1226, 1228-34 (6th Cir.1984) (en banc), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). *Shimman* makes clear that the focus of the bad faith inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense, or abuses the process so as to create an inquiry separate from the underlying claim. *Id.* at 1231. This court has adopted the same reasoning. *See, e.g., Batson v. Neal Spelce Assoc.,* 805 F.2d 546, 550 (5th Cir.1986).

There is no evidence that the defendants in this case have either brought a frivolous defense or pursued the litigation in a vexatious manner. For that reason, we disagree with the district court's holding that the bad faith exception is applicable here.

The common benefit theory is also unavailable to Guidry. The *Shimman* court discussed this theory as well. In *Shimman,* as in the instant case, the underlying litigation resulted in a damage award benefitting only the plaintiffs personally. The plaintiffs contended in *Shimman,* as they do here, that although the money awards do not benefit the union membership as a whole, an incidental benefit of the awards — dispelling the chill on free speech created by union leadership — does inure to the benefit of all union members.

The court in *Shimman* explicitly rejected this theory. 744 F.2d at 1235. The court reasoned that the idea of the common benefit theory is to shift the costs of litigation to those who would have had to pay if they had brought the suit. *Id.* In *Shimman,* as here, other members of the union could not have brought suit to redress the injuries of an individual union member. Further, an award of attorneys' fees here would not spread the costs of litigation proportionate to the common benefit. Guidry would have to pay no more for the cost of litigation than any fellow union member, but he would receive substantially greater benefits in the form of cash awards.

We therefore hold that on remand, the district court should not include an award of attorneys' fees in its damages award.

945

*945 **4) *Lost Wages***

Guidry argues in his cross-appeal that the amount of lost wages awarded was inadequate to compensate him. Once again, we are not in a position to review the district court's damage determination because we are remanding that portion of the holding. We note, however, that the district court's method of determining the lost wages due — comparing Guidry's actual wages to the average amount earned by union members during the limitations period — is a sound and fair method of making that determination.

## V.

For all the foregoing reasons, we AFFIRM the judgment as to the defendants' liability, and we VACATE the award of damages and REMAND for redetermination of the proper amount. Costs shall be borne by the defendants.

[1] The district court held trial on five related cases simultaneously and found for the plaintiff in each of the cases. _Taliaferro v. Schiro_, 669 F.Supp. 763 (W.D.La.1987). The defendants appeal the judgment in this case only.

[2] Sections 411(a)(1), (2), and (5) read as follows:

(1) Equal Rights

Every member of a labor organization shall have equal rights and privileges within such an organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of Speech and Assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(5) Safeguards Against Improper Disciplinary Action

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Section 101, 29 U.S.C. Sec. 411, is often referred to as the union members'"Bill of Rights."

[3] Section 529 ("Prohibition on certain discipline by labor organization") reads as follows:

It shall be unlawful for any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

[4] It is clear from the evidence that the last time Guidry ran for Union office was in 1972.

[5] The district court also concluded that each improper refusal constituted a breach of the duty of fair representation under 29 U.S.C. § 159(a). 669 F.Supp. at 775-76. The defendants dispute this conclusion, solely on the ground that the evidence is insufficient to support the factfinding that intentional discrimination in hiring hall referrals had occurred. We therefore conflate their arguments under the LMRDA and the duty of fair representation to the extent they concern the sufficiency of the evidence. That is, we address only once the issue of whether the finding that the operation of the hiring hall was intentionally discriminatory was clearly erroneous.

[6] The Court went on to address the question of whether section 102 of the LMRDA, 29 U.S.C. § 412, provided independent authority for the suit. Section 102 provides that:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

The Court noted that the intended relationship between this provision and section 609 was "not entirely clear," 456 U.S. at 439, 102 S.Ct. at 1872, but indicated that a litigant could maintain an action under section 102 without necessarily stating a violation of section 609. However, it concluded that in the circumstances before it no "rights secured" by the subchapter had been infringed, holding that whatever limits the subchapter placed on the union's authority to use dismissal to suppress dissent, it did not restrict union leaders from choosing a staff with views compatible with their own. _Id._ at 440-41, 102 S.Ct. at 1872-73. In _Sheet Metal Workers' Inter. Ass'n v. Lynn_, 488 U.S. 347, 109 S.Ct.

Case 4:22-cv-00430-Y   Document 28-1   Filed 08/02/22   Page 83 of 97   PageID 1338

699, 102 L.Ed.2d 700 (1989), the Court recently limited this portion of the holding in *Finnegan* to cases in which the union employment was appointive, rather than elective. The Court reasoned in *Lynn* that when an elective official is removed from his post, the union members are denied their chosen representative, and the chilling effect on free speech is more widespread. *Id.* 109 S.Ct. at 645.

Because we find that a violation of section 609 has occurred here, it is clear that this suit could also be maintained under section 102. That does not, however, affect the result here.

[7] A subsidiary issue is whether *Reed* should be afforded retroactive effect in this case. We believe that it should.

The general rule is that federal cases should be decided according to the law existing at the time of the decision. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 105-09, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), however, the Supreme Court declined to apply retroactively a limitations period that would have time barred a litigant's lawsuit. The Court refined a three-part nonretroactivity test: (1) the supervening decision must establish an unforeseen and unforeshadowed principle of law, as where the Court has overruled clear circuit precedent on which the litigants may have relied; (2) the purposes of the substantive law upon which the limitations period operates would not be served by retroactivity; and (3) retroactive application would produce inequitable results. *Id.* at 106-07, 92 S.Ct. at 355-56. These factors provide no basis for refusing retroactive application of *Reed* to this case.

Prior to *DelCostello*, the established precedent in the Fifth Circuit specified application of an appropriate state statute of limitations in section 101(a)(2) cases. *Sewell v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 445 F.2d 545, 548-50 (5th Cir.1971), *cert. denied*, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972) (applying a one-year Alabama statute of limitations for tort actions). No post-*DelCostello* Fifth Circuit decision definitively altered this rule until the district court below adopted the Third Circuit's *Local 1397* interpretation of a six-month limitations period. Thus, *Chevron* `s first factor clearly is not satisfied: Fifth Circuit precedent was not overruled by, but in fact supported, the *Reed* decision; at most, the limitations issue was unsettled after *DelCostello*. Likewise, the remaining two *Chevron* factors cannot be met. Applying Louisiana's one-year limitations period to determine damages in this case would further the remedial goals of section 101(a)(2) of the LMRDA without substantially frustrating any federal policy of repose, and would not be inequitable, as litigants in this Circuit could not have justifiably relied on a six-month limitations period prior to *Reed*. *See Goodman*, 482 U.S. at 662-64, 107 S.Ct. at 2621-22.

[8] *See, e.g.*, *Bloom v. International Bhd. of Teamsters*, 752 F.2d 1312, 1315 (9th Cir.1984).

Save trees - read court opinions online on Google Scholar.

**907 F.2d 1491 (1990)**

# Robert GUIDRY, Plaintiff-Appellee Cross-Appellant,

## v.

# INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants Cross-Appellees.

No. 87-4733.

**United States Court of Appeals, Fifth Circuit.**

May 22, 1990.

As Modified on Petition for Rehearing July 25, 1990.[*]

1492   *1492 Robert H. Urann and Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants, cross-appellees.

Maurice L. Tynes, Lake Charles, La. and Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for plaintiff-appellee, cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

# ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

PER CURIAM:

On March 19, 1990, the Supreme Court ___ U.S. ___, 110 S.Ct. 1465, 108 L.Ed.2d 603, vacated our judgment in *Guidry v. International Union of Operating Engineers*, 882 F.2d 929 (5th Cir.1989), and remanded for further proceedings in light of *Breininger v. Sheet Metal Workers International Association*, ___ U.S. ___, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). We, in turn, remand to the district court.

In *Breininger*, the Court held that the phrase "otherwise discipline" under sections 101(a)(5) and 609 of the Labor Management Reporting and Disclosures *1493 Act of 1959 (LMRDA) denotes only that punishment "authorized by the union as a collective entity to enforce its rules." *Id.* 110 S.Ct. at 439. In other words, an action must be "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." *Id.* (*quoting Miller v. Holden*, 535 F.2d 912, 915 (5th Cir.1976)). The union need not, however, invoke formal proceedings, and discipline can entail informal or summary penalties as long as adverse action against a union member is not purely "ad hoc retaliation by individual union officers." *Id.*, 110 S.Ct. at 439 n. 15. "Discipline `must be done in the name of or on behalf of the union as an organizational entity.'" *Id.* The petitioner in *Breininger* "alleged only that [certain union officers] failed to refer him to employment because he supported one of their political rivals." *Id.* at 440. Thus, the petitioner failed to allege acts constituting discipline by the union as a collective entity.

The Supreme Court's interpretation of the phrase "otherwise discipline" in determining whether hiring hall discrimination gives rise to a claim under sections 101(a)(5) and 609 of the LMRDA does not affect that portion of our panel opinion affirming liability and damages based on Guidry's claim that the Union breached its duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 159(a). *See Guidry*, 882 F.2d at 937 & n. 5. Therefore, this portion of our prior opinion is reinstated.

On the issue of LMRDA liability, we need remand only with respect to those claims potentially impacted by the Supreme Court's decision in *Breininger*, that is, Guidry's unlawful discipline claims based on sections 101(a)(5) and 609 of the Act.[1] *Breininger* does not alter the district court's judgment regarding the defendants' violations of Guidry's equal rights under section 101(a)(1) and right to free speech under section 101(a)(2). A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful "discipline" is shown. *Finnegan v. Leu*, 456 U.S. 431, 439, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982); *Murphy v. International Union of Operating Engineers, Local 18*, 774 F.2d 114, 122 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986).

Case 4:22-cv-00430-Y   Document 28-1   Filed 09/08/22   Page 85 of 497   PageID 1370

If Guidry wishes to pursue his unlawful discipline claims on remand, the district court must determine, in view of *Breininger,* whether the Union as a collective entity was responsible for hiring hall discrimination against him. The court should make new findings, taking additional evidence if needed, and render its judgment accordingly.

In our previous opinion in this case, we vacated the district court's award of LMRDA damages, holding that, due to an intervening Supreme Court case, _Reed v. United Transportation Union_, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), the district court erred in applying a six-month statute of limitations to Guidry's LMRDA claims. *See Guidry*, 882 F.2d at 941-42. We remanded for a redetermination of damages based on violations occurring within one year of filing suit, applying Louisiana's one-year limitations period for delictual actions. *Id.* at 941-45. This holding is unaffected by *Breininger,* and we therefore remand for a reassessment of damages consistent with the discussion contained in our previous opinion. *Id.*

REMANDED.

# ON PETITION FOR REHEARING

PER CURIAM:

In our opinion dated August 29, 1989, this court affirmed a district court judgment in favor of plaintiff Robert Guidry (Guidry) as to the liability of the International Union of Operating Engineers, Local 406 and former and current Union leaders (the
1494   defendants) for violations of the Labor *1494 Management Relations Act (LMRA), 29 U.S.C. § 159(a), and the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(1), (2), (5), and 529. _Guidry v. International Union of Operating Engineers, Local 406_, 882 F.2d 929 (5th Cir.1989), *vacated,* \_\_\_\_ U.S. \_\_\_\_, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990). We remanded, however, for a reassessment of damages. *Id.* at 941-45. The Supreme Court subsequently vacated our judgment and remanded for further consideration in light of its decision in _Breininger v. Sheet Metal Workers International Association Local Union No. 6_, \_\_\_\_ U.S. \_\_\_\_, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), a case that addressed the issue of whether hiring hall discrimination constituted "discipline" within the meaning of sections 101(a)(5) and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5), 529. We, in turn, remanded to the district court for further proceedings in light of *Breininger,* to the extent that *Breininger* affected our panel's prior opinion. *Guidry,* 902 F.2d 335 (1990). Of course, for the reasons explained in our prior opinion, a remand to the district court was necessary, in any event, to reassess Guidry's damages. *See Guidry*, 882 F.2d at 941-45 (holding that actual and punitive damages based on Guidry's LMRDA claims should be reassessed under a one-year limitations period).

Guidry now petitions this court for panel rehearing and for rehearing en banc. Guidry argues that a remand on the liability issue is required only as to those claims potentially affected by the *Breininger* decision — i.e., those claims based on sections 101(a)(5) and 609 of the LMRDA[2] — and that our mandate erroneously instructs the district court to make new determinations of liability on all of his claims. He contends that *Breininger* in no way impacts the district court's finding of liability based on the defendants' breach of the duty of fair representation under the LMRA, 29 U.S.C. § 159(a). He also argues that the district court's finding of liability under the LMRDA may be affirmed on the alternative grounds of Guidry's LMRDA equal rights and free speech claims, 29 U.S.C. §§ 411(a)(1), (2) — theories of recovery that were not addressed by the Supreme Court in *Breininger,* and that are not affected by the Court's decision in that case.

Having considered Guidry's motion for rehearing, we conclude that his complaint is well taken. Although it was not our intention to require the district court to reevaluate the defendants' liability for breach of the duty of fair representation, 29 U.S.C. § 159(a), or for violation of Guidry's rights to equal union member rights and free speech, 29 U.S.C. §§ 411(a)(5), 529, we admit that our mandate is not completely clear on this point. We therefore modify our prior order, by deleting the last full paragraph and substituting in its place the following four paragraphs.[\*\*]

[\*] Editor's Note: This opinion was originally published at 902 F.2d 335 and is republished here incorporating the ordered modifications.

[1] Guidry's expulsion and the district court's reinstatement of Guidry to the Union are not at issue as expulsion is explicitly set out in the LMRDA as a form of discipline. *See* 29 U.S.C. §§ 411(a)(5), 529.

[2] Guidry correctly notes that the Supreme Court's holding regarding a plaintiff's burden of pleading and proof under the LMRDA looks only to sections 101(a)(5) and 609 of the Act, 29 U.S.C. §§ 411(a)(5), 529, and is based on its construction of the term "discipline" contained in those sections.

Case 4:22-cv-00430-Y   Document 28-1   Filed 09/07/22   Page 665 of 497   PageID 1371

[_] Editor's Note: These paragraphs have been incorporated at the end of the opinion at 1489.

Save trees - read court opinions online on Google Scholar.

Case 4:22-cv-00430-Y    Document 23-1 Filed 09/08/22    Page 766 of 997    PageID 1345

484 U.S. 29 (1987)

## UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.

### v.

## MISCO, INC.

No. 86-651.

**Supreme Court of United States.**

Argued October 13, 1987

Decided December 1, 1987

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

31    *31 *David Silberman* argued the cause for petitioners. With him on the briefs were *Lynn Agee, Michael Gottesman,* and *Laurence Gold.*

*A. Richard Gear* argued the cause and filed a brief for respondent.[*]

JUSTICE WHITE delivered the opinion of the Court.

The issue for decision involves several aspects of when a federal court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement.

## I

Misco, Inc. (Misco, or the Company), operates a paper converting plant in Monroe, Louisiana. The Company is a party to a collective-bargaining agreement with the United Paperworkers International Union, AFL-CIO, and its union local (the Union); the agreement covers the production and maintenance *32 employees at the plant. Under the agreement, the Company or the Union may submit to arbitration any grievance that arises from the interpretation or application of its terms, and the arbitrator's decision is final and binding upon the parties. The arbitrator's authority is limited to interpretation and application of the terms contained in the agreement itself. The agreement reserves to management the right to establish, amend, and enforce "rules and regulations regulating the discipline or discharge of employees" and the procedures for imposing discipline. Such rules were to be posted and were to be in effect "until ruled on by grievance and arbitration procedures as to fairness and necessity."[1] For about a decade, the Company's rules had listed as causes for discharge the bringing of intoxicants, narcotics, or controlled substances on to plant property or consuming any of them there, as well as reporting for work under the influence of such substances.[2] At the time of the events involved in this case, the Company was very concerned about the use of drugs at the plant, especially among employees on the night shift.

Isiah Cooper, who worked on the night shift for Misco, was one of the employees covered by the collective-bargaining agreement. He operated a slitter-rewinder machine, which uses sharp blades to cut rolling coils of paper. The arbitrator found that this machine is hazardous and had caused numerous injuries in recent years. Cooper had been reprimanded twice in a few months for deficient performance. *33 On January 21, 1983, one day after the second reprimand, the police searched Cooper's house pursuant to a warrant, and a substantial amount of marijuana was found. Contemporaneously, a police officer was detailed to keep Cooper's car under observation at the Company's parking lot. At about 6:30 p.m., Cooper was seen walking in the parking lot during work hours with two other men. The three men entered Cooper's car momentarily, then walked to another car, a white Cutlass, and entered it. After the other two men later returned to the plant, Cooper was apprehended by police in the backseat of this car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. Cooper was arrested and charged with marijuana possession.[3]

On January 24, Cooper told the Company that he had been arrested for possession of marijuana at his home; the Company did not learn of the marijuana cigarette in the white Cutlass until January 27. It then investigated and on February 7 discharged Cooper, asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs

31

32

33

on the plant premises.[4] Cooper filed a grievance protesting his discharge the same day, and the matter proceeded to arbitration. The Company was not aware until September 21, five days before the arbitration hearing was scheduled, that marijuana had been found in Cooper's car. That fact did not become known to the Union until the hearing began. At the hearing it was stipulated that the issue was whether the Company had "just cause to discharge *34 the Grievant under Rule II.1" and, "[i]f not, what if any should be the remedy." App. to Pet. for Cert. 26a.

34

The arbitrator upheld the grievance and ordered the Company to reinstate Cooper with backpay and full seniority. The arbitrator based his finding that there was not just cause for the discharge on his consideration of seven criteria.[5] In particular, the arbitrator found that the Company failed to prove that the employee had possessed or used marijuana on company property: finding Cooper in the backseat of a car and a burning cigarette in the frontseat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property. _Id.,_ at 49a-50a. The arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge.[6]

The Company filed suit in District Court, seeking to vacate the arbitration award on several grounds, one of which was that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The District Court agreed that the award must be set aside as contrary to public policy because it ran *35 counter to general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as to state criminal laws against drug possession. The Court of Appeals affirmed, with one judge dissenting. The court ruled that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The arbitrator had found that Cooper was apprehended on company premises in an atmosphere of marijuana smoke in another's car and that marijuana was found in his own car on the company lot. These facts established that Cooper had violated the Company's rules and gave the Company just cause to discharge him. The arbitrator did not reach this conclusion because of a "narrow focus on Cooper's procedural rights" that led him to ignore what he "knew was in fact true: that Cooper _did_ bring marijuana onto his employer's premises." _Ibid._ Even if the arbitrator had not known of this fact at the time he entered his award, "it is doubtful that the award should be enforced today in light of what is now known." _Ibid._

35

Because the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy,[7] we granted the Union's petition for a writ of certiorari, 479 U. S. 1029 (1987), and now reverse the judgment of the Court of Appeals.

36              *36 **II**

The Union asserts that an arbitral award may not be set aside on public policy grounds unless the award orders conduct that violates the positive law, which is not the case here. But in the alternative, it submits that even if it is wrong in this regard, the Court of Appeals otherwise exceeded the limited authority that it had to review an arbitrator's award entered pursuant to a collective-bargaining agreement. Respondent, on the other hand, defends the public policy decision of the Court of Appeals but alternatively argues that the judgment below should be affirmed because of erroneous findings by the arbitrator. We deal first with the opposing alternative arguments.

## A

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." _Steelworkers_ v. _Enterprise Wheel & Car Corp.,_ 363 U. S. 593, 596 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. _Id.,_ at 597.

37    The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation *37 to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." _Steelworkers_ v. _American Mfg. Co._, 363 U. S. 564, 567-568 (1960) (emphasis added; footnote omitted).

See also _AT&T Technologies, Inc._ v. _Communications Workers_, 475 U. S. 643, 649-650 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U. S. C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." See also _AT&T Technologies, supra_, at 650. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the

38    facts and of the meaning *38 of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. _Enterprise Wheel, supra_, at 599. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

39    *39 **B**

The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired. The parties bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose. Article VI of the agreement, entitled "Arbitration Procedure," did set some ground rules for the arbitration process. It forbade the arbitrator to consider hearsay evidence, for example, but evidentiary matters were otherwise left to the arbitrator. App.

19. Here the arbitrator ruled that in determining whether Cooper had violated Rule II.1, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the

40      practice *40 followed by other arbitrators.[8] And it was consistent with our observation in _John Wiley & Sons, Inc._ v. _Livingston_, 376 U. S. 543, 557 (1964), that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.

Under the Arbitration Act, the federal courts are empowered to set aside arbitration awards on such grounds only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U. S. C. § 10(c). See _Commonwealth Coatings Corp._ v. _Continental Casualty Co._, 393 U. S. 145 (1968).[9] If we apply that same standard here and assume that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad

41      faith or so gross as to amount to affirmative misconduct.[10] Finally, it is worth noting that putting *41 aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge.

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In _Enterprise Wheel_, for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. _This is especially true when it comes to formulating remedies._" 363 U. S., at 597 (emphasis added). The parties, of course, may limit the discretion of the arbitrator in this respect; and it may be, as the Company argues, that under the contract involved here, it was within the unreviewable discretion of management to discharge an employee once a violation of Rule II.1 was found. But the parties stipulated that the issue before the arbitrator was whether there was "just" cause for the

42      discharge, and the arbitrator, in the course of his opinion, cryptically observed that Rule II.1 *42 merely listed causes for discharge and did not expressly provide for immediate discharge. Before disposing of the case on the ground that Rule II.1 had been violated and discharge was therefore proper, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect.

## C

The Court of Appeals did not purport to take this course in any event. Rather, it held that the evidence of marijuana in Cooper's car required that the award be set aside because to reinstate a person who had brought drugs onto the property was contrary to the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. We cannot affirm that judgment.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. _W. R. Grace & Co._ v. _Rubber Workers_, 461 U. S. 757, 766 (1983); _Hurd_ v. _Hodge_, 334 U. S. 24, 34-35 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. _E. g._, _McMullen_ v. _Hoffman_, 174 U. S. 639, 654-655 (1899); _Twin City Pipe Line Co._ v. _Harding Glass Co._, 283 U. S. 353, 356-358 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

43      *43 In _W. R. Grace_, we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 U. S., at 766. We cautioned, however, that a court's refusal to enforce an arbitrator's _interpretation_ of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public

interests." *Ibid.* (quoting *Muschany v. United States*, 324 U. S. 49, 66 (1945)). In *W. R. Grace,* we identified two important public polices that were potentially jeopardized by the arbitrator's interpretation of the contract: obedience to judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964. We went on to hold that enforcement of the arbitration award in that case did not compromise either of the two public policies allegedly threatened by the award. Two points follow from our decision in *W. R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than on an assessment of "general considerations of supposed public interests." 461 U. S., at 766. At the very least, an alleged public policy must be properly framed under the approach set out in *W. R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

44    *44 As we see it, the formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Ibid.* (quoting *Muschany v. United States, supra,* at 66). The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W. R. Grace* that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.

Even if the Court of Appeals' formulation of public policy is to be accepted, no violation of that policy was clearly shown in this case. In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the work-place is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. A refusal to enforce an award must rest on more than speculation or assumption.

In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of *45 drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[11] In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.[12]

The judgment of the Court of Appeals is reversed.

*So ordered.*

46    *46 JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I join the Court's opinion, but write separately to underscore the narrow grounds on which its decision rests and to emphasize what it is *not* holding today. In particular, the Court does not reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. See *ante,* at 45, n. 12. Nor do I understand the Court to decide, more generally, in what way,

Case 4:22-cv-00430-Y   Document 28-1   Filed 08/08/22   Page 271 of 497   PageID 7347

if any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

I agree with the Court that the judgment of the Court of Appeals must be reversed, and I summarize what I understand to be the three alternative rationales for the Court's decision:

1. The Court of Appeals exceeded its authority in concluding that the company's discharge of Cooper was proper under the collective-bargaining agreement. The Court of Appeals erred in considering evidence that the arbitrator legitimately had excluded from the grievance process, in second-guessing the arbitrator's factual finding that Cooper had not violated Rule II.1, and in assessing the appropriate sanction under the agreement. See _Steelworkers_ v. _American Mfg. Co._, 363 U. S. 564, 567-568 (1960); _Steelworkers_ v. _Enterprise Wheel & Car Corp._, 363 U. S. 593, 596-597, 599 (1960). Absent its overreaching, the Court of Appeals lacked any basis for disagreeing with the arbitrator's conclusion that there was not "just cause" for discharging Cooper. See _ante,_ at 39-42.

47   *47 2. Even if the Court of Appeals properly considered evidence of marijuana found in Cooper's car and legitimately found a Rule II.1 violation, the public policy advanced by the Court of Appeals does not support its decision to set aside the award. The reinstatement of Cooper would not contravene the alleged public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The fact that an employee's car contains marijuana gleanings does not indicate that the employee uses marijuana on the job or that he operates his machine while under the influence of drugs, let alone that he will report to work in an impaired state in the future. See _ante,_ at 44. Moreover, nothing in the record suggests that the arbitrator's award, which gives the company the option of placing Cooper in a job equivalent to his old one, would require Cooper to operate hazardous machinery. See _ante,_ at 44-45.

3. The public policy formulated by the Court of Appeals may not properly support a court's refusal to enforce an otherwise valid arbitration award. In _W. R. Grace & Co._ v. _Rubber Workers_, 461 U. S. 757 (1983), we stated that the public policy must be founded on " `laws and legal precedents.' " _Id.,_ at 766, quoting _Muschany_ v. _United States_, 324 U. S. 49, 66 (1945). The Court of Appeals identified no law or legal precedent that demonstrated an "explicit public policy," 461 U. S., at 766, against the operation of dangerous machinery by persons under the influence of drugs. Far from being "well defined and dominant," as _W. R. Grace_ prescribed, the Court of Appeals' public policy was ascertained merely "from general considerations of supposed public interests." _Ibid._ See _ante,_ at 43. I do not understand the Court, by criticizing the company's public policy formulation, to suggest that proper framing of an alleged public policy under the approach set out in _W. R. Grace_ would be sufficient to justify a court's refusal to enforce an arbitration award on public policy grounds. Rather, I understand the *48 Court to hold that such compliance is merely a necessary step if an award is not to be enforced. See _ante,_ at 44.

48

It is on this understanding that I join the opinion of the Court.

[*] _David E. Feller_ and _William P. Murphy_ filed a brief for the National Academy of Arbitrators as _amicus curiae_ urging reversal.

_Philip A. Lacovara_ and _William R. Stein_ filed a brief for Northwest Airlines, Inc., et al. as _amici curiae_ urging affirmance.

[1] App. 20-21. The language quoted is from Article XI of the agreement, which concerns maintenance of discipline. Article VI of the agreement sets out the arbitration procedure. _Id.,_ at 18-20. The reserved rights of management are specified in Article IV of the agreement. _Id.,_ at 13-15.

[2] Rule II.1 lists the following as causes for discharge: "Bringing intoxicants, narcotics, or controlled substances into, or consuming intoxicants, narcotics, or controlled substances in the plant, or on plant premises. Reporting for duty under the influence of intoxicants, narcotics, or controlled substances." App. to Pet. for Cert. 31a.

[3] Cooper later pleaded guilty to that charge, which was not related to his being in a car with a lighted marijuana cigarette in it. The authorities chose not to prosecute for the latter incident.

[4] The Company asserted that being in a car with a lit marijuana cigarette was a direct violation of the company rule against having an illegal substance on company property. App. 23.

[5] These considerations were the reasonableness of the employer's position, the notice given to the employee, the timing of the investigation undertaken, the fairness of the investigation, the evidence against the employee, the possibility of discrimination, and the relation of the degree of discipline to the nature of the offense and the employee's past record.

[6] The arbitrator stated: "One of the rules in arbitration is that the Company must have its proof in hand before it takes disciplinary action against an employee. The Company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions. In addition, the use of the gleanings evidence prevented the Grievant from knowing the full extent of the charge against

Case 4:22-cv-00430-Y    Document 28-1 Filed 09/08/22    Page 372 of 497    PageID 1343

him. Who knows what action the Grievant or the Union would have taken if the gleanings evidence had been made known from the outset of the Company's investigation." App. to Pet. for Cert. 47a.

[7] The decision below accords with the broader view of the courts' power taken by the First and Seventh Circuits. See, *e. g., United States Postal Service v. American Postal Workers Union, AFL-CIO*, 736 F. 2d 822 (CA1 1984); *E. I. DuPont de Nemours and Co. v. Grasselli Employees Independent Assn. of East Chicago, Inc.*, 790 F. 2d 611 (CA7), cert. denied, 479 U. S. 853 (1986). A narrower view has been taken by the Ninth and District of Columbia Circuits. See, *e. g., Bevles Co. v. Teamsters Local 986*, 791 F. 2d 1391 (CA9 1986); *Northwest Airlines, Inc. v. Air Line Pilots Assn. International*, 257 U. S. App. D. C. 181, 808 F. 2d 76 (1987); *American Postal Workers Union v. United States Postal Service*, 252 U. S. App. D. C. 169, 789 F. 2d 1 (1986).

[8] Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," see, *e. g., West Va. Pulp & Paper Co.*, 10 Lab. Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge. O. Fairweather, Practice and Procedure in Labor Arbitration 303-306 (2d ed. 1983); F. Elkouri & E. Elkouri, How Arbitration Works 634-635 (3d ed. 1973).

[9] The Arbitration Act does not apply to "contracts of employment of . . . workers engaged in foreign or interstate commerce," 9 U. S. C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, empowers the federal courts to fashion rules of federal common law to govern "[s]uits for violation of contracts between an employer and a labor organization" under the federal labor laws. *Textile Workers v. Lincoln Mills*, 353 U. S. 448 (1957) (construing 29 U. S. C. § 185). See, *e. g., Ludwig Honold Mfg. Co. v. Fletcher*, 405 F. 2d 1123 (CA3 1969); *Pietro Scalzitti Co. v. International Union of Operating Engineers, Local No. 150*, 351 F. 2d 576 (CA7 1965).

[10] Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate. See, *e. g., Amalgamated Food & Allied Workers Union, Local 56 v. Great A&P Tea Co.*, 415 F. 2d 185 (CA3 1969) (vacating and remanding to the arbitrators for decision after finding that the arbitrators declined to arbitrate the issues submitted). See also 9 U. S. C. § 10(e) ("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators").

[11] The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger. That is not a problem here, for the arbitrator recognized that being under the influence of marijuana while operating slitter-rewinder machinery was indeed dangerous, and no one disputed this point.

[12] We need not address the Union's position that a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law.

Save trees - read court opinions online on Google Scholar.

**532 U.S. 504 (2001)**

# MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

**v.**

# GARVEY

No. 00-1210.

**United States Supreme Court.**

Decided May 14, 2001.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

506     *506 Per Curiam.

The Court of Appeals for the Ninth Circuit here rejected an arbitrator's factual findings and then resolved the merits of the parties' dispute instead of remanding the case for further arbitration proceedings. Because the court's determination conflicts with our cases limiting review of an arbitrator's award entered pursuant to an agreement between an employer and a labor organization and prescribing the appropriate remedy where vacation of the award is warranted, we grant the petition for a writ of certiorari and reverse. The motions for leave to file briefs *amicus curiae* of the National Academy of Arbitrators and the Office of the Commissioner of Baseball are granted.

In the late 1980's, petitioner Major League Baseball Players Association (Association) filed grievances against the Major League Baseball Clubs (Clubs), claiming the Clubs had colluded in the market for free-agent services after the 1985, 1986, and 1987 baseball seasons, in violation of the industry's collective-bargaining agreement. A free agent is a player who may

506     contract with any Club, rather than one whose right to contract is restricted to a particular Club. In a *506 series of decisions, arbitrators found collusion by the Clubs and damage to the players. The Association and Clubs subsequently entered into a Global Settlement Agreement (Agreement), pursuant to which the Clubs established a $280 million fund to be distributed to injured players. The Association also designed a "Framework" to evaluate the individual player's claims, and, applying that Framework, recommended distribution plans for claims relating to a particular season or seasons.

The Framework provided that players could seek an arbitrator's review of the distribution plan. The arbitrator would determine "`only whether the approved Framework and the criteria set forth therein have been properly applied in the proposed Distribution Plan.' " *Garvey* v. *Roberts*, 203 F. 3d 580, 583 (CA9 2000) *(Garvey I)*. The Framework set forth factors to be considered in evaluating players' claims, as well as specific requirements for lost contract-extension claims. Such claims were cognizable "`only in those cases where evidence exists that a specific offer of an extension was made by a club prior to collusion only to thereafter be withdrawn when the collusion scheme was initiated.' " *Id.,* at 584.

Respondent Steve Garvey, a retired, highly regarded first baseman, submitted a claim for damages of approximately $3 million. He alleged that his contract with the San Diego Padres was not extended to the 1988 and 1989 seasons due to collusion. The Association rejected Garvey's claim in February 1996, because he presented no evidence that the Padres actually offered to extend his contract. Garvey objected, and an arbitration hearing was held. He testified that the Padres offered to extend his contract for the 1988 and 1989 seasons and then withdrew the offer after they began colluding with other teams. He presented a June 1996 letter from Ballard Smith, Padres' President and CEO from 1979 to 1987, stating

507     that,before the end of the 1985 season, Smith offered to extend Garvey's contract through *507 the 1989 season, but that the Padres refused to negotiate with Garvey thereafter due to collusion.

The arbitrator denied Garvey's claim, after seeking additional documentation from the parties. In his award, he explained that "`[t]here exists . . . substantial doubt as to the credibility of the statements in the Smith letter.' " *Id.,* at 586. He noted the "stark contradictions" between the 1996 letter and Smith's testimony in the earlier arbitration proceedings regarding collusion, where Smith, like other owners, denied collusion and stated that the Padres simply were not interested in extending Garvey's contract. *Ibid.* The arbitrator determined that, due to these contradictions, he "`must reject [Smith's] more recent assertion that Garvey did not receive [a contract] extension' " due to collusion, and found that Garvey had not shown a specific offer of extension. *Ibid.* He concluded:

The shadow cast over the credibility of the Smith testimony coupled with the absence of any other corroboration of the claim submitted by Garvey compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the clubs but rather as a baseball judgment founded upon [Garvey's] age and recent injury history.' " *Ibid.*

Garvey moved in Federal District Court to vacate the arbitrator's award, alleging that the arbitrator violated the Framework by denying his claim. The District Court denied the motion. The Court of Appeals for the Ninth Circuit reversed by a divided vote. The court acknowledged that judicial review of an arbitrator's decision in a labor dispute is extremely limited. But it held that review of the merits of the arbitrator's award was warranted in this case, because the arbitrator "'dispensed his own brand of industrial justice.' " *Id.,* at 589. The court recognized that Smith's prior testimony with respect to collusion

508    conflicted with the statements in his 1996 letter. But in the court's view, the arbitrator's *508 refusal to credit Smith's letter was "inexplicable" and "border[ed] on the irrational," because a panel of arbitrators, chaired by the arbitrator involved here, had previously concluded that the owners' prior testimony was false. *Id.,* at 590. The court rejected the arbitrator's reliance on the absence of other corroborating evidence, attributing that fact to Smith and Garvey's direct negotiations. The court also found that the record provided "strong support" for the truthfulness of Smith's 1996 letter. *Id.,* at 591-592. The Court of Appeals reversed and remanded with directions to vacate the award.

The District Court then remanded the case to the arbitration panel for further hearings, and Garvey appealed. The Court of Appeals, again by a divided vote, explained that *Garvey I* established that "the conclusion that Smith made Garvey an offer and subsequently withdrew it because of the collusion scheme was the only conclusion that the arbitrator could draw from the record in the proceedings." No. 00-56080, 2000 WL 1801383, *1 (CA9, Dec. 7, 2000) (unpublished), judgt. order reported at 243 F. 3d 547 *(Garvey II).* Noting that its prior instructions might have been unclear, the court clarified that *Garvey I* "left only one possible result—the result our holding contemplated—an award in Garvey's favor." 2000 WL 1801383, at *1. The Court of Appeals reversed the District Court and directed that it remand the case to the arbitration panel with instructions to enter an award for Garvey in the amount he claimed.[1]

509    *509 The parties do not dispute that this case arises under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185(a), as the controversy involves an assertion of rights under an agreement between an employer and a labor organization. Although Garvey's specific allegation is that the arbitrator violated the Framework for resolving players' claims for damages, that Framework was designed to facilitate payments to remedy the Clubs' breach of the collective-bargaining agreement. Garvey's right to be made whole is founded on that agreement.

Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers* v. *Misco, Inc.,* 484 U. S. 29, 36 (1987). We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that `a court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Associated Coal Corp.* v. *Mine Workers,* 531 U. S. 57, 62 (2000) (quoting *Misco, supra,* at 38). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco,* 484 U. S., at 39.

In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that "'courts . . . have no
510    business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.' " *510 Id.,* at 37 (quoting *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 568 (1960)). When the judiciary does so, "it usurps a function which . . . is entrusted to the arbitration tribunal." *Id.,* at 569; see also *Enterprise Wheel & Car Corp., supra,* at 599 ("It is the arbitrator's construction [of the agreement] which was bargained for . . ."). Consistent with this limited role, we said in *Misco* that "[e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." 484 U. S., at 40-41, n. 10. That step, we explained, "would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for" in their agreement. *Ibid.* Instead, the court should "simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement." *Ibid.*

To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling. The substance of the court's discussion reveals that it overturned the arbitrator's decision because it disagreed with the arbitrator's factual findings, particularly those with respect to credibility. The Court of Appeals, it appears, would have credited Smith's 1996 letter, and found the arbitrator's refusal to do so at worst "irrational" and at best "bizarre." _Garvey I,_ 203 F. 3d, at 590-591. But even "serious error" on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority. _Misco, supra,_ at 38.

511    In _Garvey II,_ the court clarified that _Garvey I_ both rejected the arbitrator's findings and went further, resolving the merits of the parties' dispute based on the court's assessment of the record before the arbitrator. For that reason, the court found further arbitration proceedings inappropriate. *511 But again, established law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. _Misco, supra,_ at 40, n. 10; see also _American Mfg. Co., supra,_ at 568. Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings. _Misco, supra,_ at 40, n. 10. The dissent suggests that the remedy described in _Misco_ is limited to cases where the arbitrator's errors are procedural. _Post,_ at 512 (opinion of Stevens, J.). _Misco_ did involve procedural issues, but our discussion regarding the appropriate remedy was not so limited. If a remand is appropriate _even_ when the arbitrator's award has been set aside for "procedural aberrations" that constitute "affirmative misconduct," it follows that a remand ordinarily will be appropriate when the arbitrator simply made factual findings that the reviewing court perceives as "irrational." The Court of Appeals usurped the arbitrator's role by resolving the dispute and barring further proceedings, a result at odds with this governing law.[2]

512    For the foregoing reasons, the Court of Appeals erred in reversing the order of the District Court denying the motion to vacate the arbitrator's award, and it erred further in directing that judgment be entered in Garvey's favor. The petition for a writ of certiorari is granted, the judgment of *512 the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

_It is so ordered._

Justice Ginsburg, concurring in part and concurring in the judgment.

I agree with the Court that in _Garvey_ v. _Roberts,_ 203 F. 3d 580 (CA9 2000), the Ninth Circuit should not have disturbed the arbitrator's award. Correction of that error sets this case straight. I see no need to say more.

Justice Stevens, dissenting.

It is well settled that an arbitrator "does not sit to dispense his own brand of industrial justice." _Steelworkers_ v. _Enterprise Wheel & Car Corp.,_ 363 U. S. 593, 597 (1960). We have also said fairly definitively, albeit in dicta, that a court should remedy an arbitrator's "procedural aberrations" by vacating the award and remanding for further proceedings. _Paperworkers_ v. _Misco, Inc.,_ 484 U. S. 29, 40-41, n. 10 (1987). Our cases, however, do not provide significant guidance as to what standards a federal court should use in assessing whether an arbitrator's behavior is so untethered to either the agreement of the parties or the factual record so as to constitute an attempt to "dispense his own brand of industrial justice." Nor, more importantly, do they tell us how, having made such a finding, courts should deal with "the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." _Garvey_ v. _Roberts,_ 203 F. 3d 580, 590 (CA9 2000) (case below). Because our case law is not sufficiently clear to allow me to conclude that the case below was wrongly decided—let alone to conclude that the decision

513    was so wrong as to require the extraordinary remedy of a summary *513 reversal—I dissent from the Court's disposition of this petition.

Without the benefit of briefing or argument, today the Court resolves two difficult questions. First, it decides that even if the Court of Appeals' appraisal of the merits is correct—that is to say, even if the arbitrator did dispense his own brand of justice untethered to the agreement of the parties, and even if the correct disposition of the matter is perfectly clear—the only course open to a reviewing court is to remand the matter for another arbitration. That conclusion is not compelled by any of our cases, nor by any analysis offered by the Court. As the issue is subject to serious arguments on both sides, the Court should have set this case for argument if it wanted to answer this remedial question.

Second, without reviewing the record or soliciting briefing, the Court concludes that, in any event, "no serious error on the arbitrator's part is apparent in this case." _Ante,_ at 511, n. 2. At this stage in the proceedings, I simply cannot endorse that conclusion. After examining the record, obtaining briefing, and hearing oral argument, the Court of Appeals offered a

reasoned explanation of its conclusion. See 203 F. 3d, at 589-592; see also *Id.,* at 593-594 (Hawkins, J., concurring). Whether or not I would ultimately agree with the Ninth Circuit's analysis, I find the Court's willingness to reverse a fact bound determination of the Court of Appeals without engaging that court's reasoning a troubling departure from our normal practice.[*]

Accordingly, I respectfully dissent.

[1] Garvey contends that, because the Association's petition was filed more than 90 days after *Garvey I,* we cannot consider a challenge raising issues resolved in that decision. But there is no question that the Association's petition was filed in sufficient time for us to review *Garvey II,* and we have authority to consider questions determined in earlier stages of the litigation where certiorari is sought from the most recent of the judgments of the Court of Appeals. *Mercer* v. *Theriot,* 377 U. S. 152 (1964) *(per curiam); Hamilton-Brown Shoe Co.* v. *Wolf Brothers & Co.,* 240 U. S. 251, 258 (1916).

[2] In any event, no serious error on the arbitrator's part is apparent in this case. The fact that an earlier panel of arbitrators rejected the owners' testimony as a whole does not compel the conclusion that the panel found Smith's specific statements with respect to Garvey to be false. The arbitrator's explanation for his decision indicates that he simply found Smith an unreliable witness and that, in the absence of corroborating evidence, he could only conclude that Garvey failed to show that the Padres had offered to extend his contract. The arbitrator's analysis may have been unpersuasive to the Court of Appeals, but his decision hardly qualifies as serious error, let alone irrational or inexplicable error. And, as we have said, any such error would not justify the actions taken by the court.

[*] The Court's opinion is somewhat ambiguous as to its reasons for overturning the portion of the Court of Appeals' decision setting aside the arbitration. It is unclear whether the majority is saying that a court may never set aside an arbitration because of a factual error, no matter how perverse, or whether the Court merely holds that the error in this case was not sufficiently severe to allow a court to take that step. If it is the latter, the Court offers no explanation of what standards it is using or of its reasons for reaching that conclusion.

Save trees - read court opinions online on Google Scholar.

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/09/22   Page 87 of 497   PageID 1356

383 U.S. 715 (1966)

# UNITED MINE WORKERS OF AMERICA

## v.

## GIBBS.

No. 243.

### Supreme Court of United States.

Argued January 20, 1966.

Decided March 28, 1966.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

717    *717 *Willard P. Owens* argued the cause for petitioner. With him on the brief were *E. H. Rayson* and *R. R. Kramer.*

*Clarence Walker* argued the cause for respondent. With him on the brief was *William Ables, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondent Paul Gibbs was awarded compensatory and punitive damages in this action against petitioner United Mine Workers of America (UMW) for alleged violations of § 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as

718    amended,[1] and of the common law of *718 Tennessee. The case grew out of the rivalry between the United Mine Workers and the Southern Labor Union over representation of workers in the southern Appalachian coal fields. Tennessee Consolidated Coal Company, not a party here, laid off 100 miners of the UMW's Local 5881 when it closed one of its mines in southern Tennessee during the spring of 1960. Late that summer, Grundy Company, a wholly owned subsidiary of Consolidated, hired respondent as mine superintendent to attempt to open a new mine on Consolidated's property at nearby Gray's Creek through use of members of the Southern Labor Union. As part of the arrangement, Grundy also gave respondent a contract to haul the mine's coal to the nearest railroad loading point.

On August 15 and 16, 1960, armed members of Local 5881 forcibly prevented the opening of the mine, threatening

719    respondent and beating an organizer for the rival union.[2] The members of the local believed Consolidated *719 had promised them the jobs at the new mine; they insisted that if anyone would do the work, they would. At this time, no representative of the UMW, their international union, was present. George Gilbert, the UMW's field representative for the area including Local 5881, was away at Middlesboro, Kentucky, attending an Executive Board meeting when the members of the local discovered Grundy's plan;[3] he did not return to the area until late in the day of August 16. There was uncontradicted testimony that he first learned of the violence while at the meeting, and returned with explicit instructions from his international union superiors to establish a limited picket line, to prevent any further violence, and to see to it that the strike did not spread to neighboring mines. There was no further violence at the mine site; a picket line was maintained there for nine months; and no further attempts were made to open the mine during that period.[4]

720    *720 Respondent lost his job as superintendent, and never entered into performance of his haulage contract. He testified that he soon began to lose other trucking contracts and mine leases he held in nearby areas. Claiming these effects to be the result of a concerted union plan against him, he sought recovery not against Local 5881 or its members, but only against petitioner, the international union. The suit was brought in the United States District Court for the Eastern District of Tennessee, and jurisdiction was premised on allegations of secondary boycotts under § 303. The state law claim, for which jurisdiction was based upon the doctrine of pendent jurisdiction, asserted "an unlawful conspiracy and an unlawful boycott aimed at him and [Grundy] to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage."[5]

The trial judge refused to submit to the jury the claims of pressure intended to cause mining firms other than Grundy to cease doing business with Gibbs; he found those claims unsupported by the evidence. The jury's verdict was that the UMW had violated both § 303 and state law. Gibbs was awarded $60,000 as damages under the employment contract and $14,500 under the haulage contract; he was also awarded $100,000 punitive damages. On motion, the trial court set aside the award of damages with respect to the haulage contract on the ground that damage was unproved. It also held that union

Case 4:22-cv-00430-Y   Document 28-1 Filed 09/08/22   Page 99 of 444   PageID 1754

pressure on Grundy to discharge respondent as supervisor would constitute only a primary dispute with Grundy, as
respondent's employer, and hence was not cognizable as a claim under § 303. Interference with the *721 employment
relationship was cognizable as a state claim, however, and a remitted award was sustained on the state law claim.[6] 220 F.
Supp. 871. The Court of Appeals for the Sixth Circuit affirmed. 343 F. 2d 609. We granted certiorari. 382 U. S. 809. We
reverse.

## I.

A threshold question is whether the District Court properly entertained jurisdiction of the claim based on Tennessee law.
There was no need to decide a like question in *Teamsters Union* v. *Morton*, 377 U. S. 252, since the pertinent state claim
there was based on peaceful secondary activities and we held that state law based on such activities had been pre-empted
by § 303. But here respondent's claim is based in part on proofs of violence and intimidation. "[W]e have allowed the States
to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and
imminent threats to the public order. *United Automobile Workers* v. *Russell*, 356 U. S. 634; *United Construction Workers* v.
*Laburnum Corp.*, 347 U. S. 656. . . . State jurisdiction has prevailed in these situations because the compelling state
interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly
expressed congressional direction." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247.

*722 The fact that state remedies were not entirely pre-empted does not, however, answer the question whether the state
claim was properly adjudicated in the District Court absent diversity jurisdiction. The Court held in *Hurn* v. *Oursler*, 289 U. S.
238, that state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief
also sought in a substantial claim based on federal law. The Court distinguished permissible from nonpermissible exercises
of federal judicial power over state law claims by contrasting "a case where two distinct grounds in support of a single cause
of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of
action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly
wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and
dispose of the case upon the non-federal *ground; in the latter it may not do so upon the non-federal *cause of action*." 289 U.
S., at 246. The question is into which category the present action fell.

*Hurn* was decided in 1933, before the unification of law and equity by the Federal Rules of Civil Procedure. At the time, the
meaning of "cause of action" was a subject of serious dispute;[7] the phrase might "mean one thing for one purpose and
something different for another." *723 *United States* v. *Memphis Cotton Oil Co.*, 288 U. S. 62, 67-68.[8] The Court in *Hurn*
identified what it meant by the term by citation of *Baltimore S. S. Co.* v. *Phillips*, 274 U. S. 316, a case in which "cause of
action" had been used to identify the operative scope of the doctrine of *res judicata.* In that case the Court had noted that "
`the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.'
" 274 U. S., at 320. It stated its holding in the following language, quoted in part in the *Hurn* opinion:

> "Upon principle, it is perfectly plain that the respondent [a seaman suing for an injury sustained while working
> aboard ship] suffered but one actionable wrong and was entitled to but one recovery, whether his injury was
> due to one or the other of several distinct acts of alleged negligence or to a combination of some or all of
> them. In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff,
> namely, the right of bodily safety, whether the acts constituting such invasion were one or many, simple or
> complex.

> "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The
> number and variety of the facts alleged do not establish more than one cause of action so long as their
> result, whether they be considered severally or in combination, is the violation of but one right by a single
> legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not
> result in multiplying the causes of action. `The facts are merely the means, *724 and not the end. They do
> not constitute the cause of action, but they show its existence by making the wrong appear.' " *Id.,* at 321.

Had the Court found a jurisdictional bar to reaching the state claim in *Hurn,* we assume that the doctrine of *res judicata*
would not have been applicable in any subsequent state suit. But the citation of *Baltimore S. S. Co.* shows that the Court
found that the weighty policies of judicial economy and fairness to parties reflected in *res judicata* doctrine were in

themselves strong counsel for the adoption of a rule which would permit federal courts to dispose of the state as well as the federal claims.

With the adoption of the Federal Rules of Civil Procedure and the unified form of action, Fed. Rule Civ. Proc. 2, much of the controversy over "cause of action" abated. The phrase remained as the keystone of the *Hurn* test, however, and, as commentators have noted,[9] has been the source of considerable confusion. Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.[10] Yet because the *Hurn* question involves issues of jurisdiction as well as convenience, there has been some tendency to limit its application to cases in which the state and federal claims are, as in *Hurn*, "little more than the equivalent of different epithets to characterize the same group of circumstances." 289 U. S., at 246.[11]

725    *725 This limited approach is unnecessarily grudging Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."[12] The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.[13]

726    *726 That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.[14] Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.[15] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.[16] Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the

727    comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and *727 left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre-emption; while this interrelationship does not create statutory federal question jurisdiction, *Louisville & N. R. Co.* v. *Mottley,* 211 U. S. 149, its existence is relevant to the exercise of discretion. Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ. Proc. 42 (b). If so, jurisdiction should ordinarily be refused.

The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

728    *728 We are not prepared to say that in the present case the District Court exceeded its discretion in proceeding to judgment on the state claim. We may assume for purposes of decision that the District Court was correct in its holding that the claim of pressure on Grundy to terminate the employment contract was outside the purview of § 303. Even so, the § 303 claims based on secondary pressures on Grundy relative to the haulage contract and on other coal operators generally were substantial. Although § 303 limited recovery to compensatory damages based on secondary pressures, *Teamsters Union* v. *Morton, supra,* and state law allowed both compensatory and punitive damages, and allowed such damages as to both secondary and primary activity, the state and federal claims arose from the same nucleus of operative fact and

reflected alternative remedies. Indeed, the verdict sheet sent in to the jury authorized only one award of damages, so that recovery could not be given separately on the federal and state claims.

It is true that the § 303 claims ultimately failed and that the only recovery allowed respondent was on the state claim. We cannot confidently say, however, that the federal issues were so remote or played such a minor role at the trial that in effect the state claim only was tried. Although the District Court dismissed as unproved the § 303 claims that petitioner's secondary activities included attempts to induce coal operators other than Grundy to cease doing business with respondent, the court submitted the § 303 claims relating to Grundy to the jury. The jury returned verdicts against petitioner on those § 303 claims, and it was only on petitioner's motion for a directed verdict and a judgment *n. o. v.* that the verdicts on those

729    claims were set aside. The District Judge considered the claim as to the haulage *729 contract proved as to liability, and held it failed only for lack of proof of damages. Although there was some risk of confusing the jury in joining the state and federal claims—especially since, as will be developed, differing standards of proof of UMW involvement applied— the possibility of confusion could be lessened by employing a special verdict form, as the District Court did. Moreover, the question whether the permissible scope of the state claim was limited by the doctrine of pre-emption afforded a special reason for the exercise of pendent jurisdiction; the federal courts are particularly appropriate bodies for the application of pre-emption principles. We thus conclude that although it may be that the District Court might, in its sound discretion, have dismissed the state claim, the circumstances show no error in refusing to do so.

## II.

This Court has consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes, sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation. _Allen-Bradley Local_ v. _Wisconsin Board_, 315 U. S. 740; _United Construction Workers_ v. _Laburnum Construction Corp._, 347 U. S. 656; _United Automobile Workers_ v. _Wisconsin Board_, 351 U. S. 266; _Youngdahl_ v. _Rainfair, Inc._, 355 U. S. 131; _United Automobile Workers_ v. _Russell_, 356 U. S. 634. Petitioner concedes the principle, but argues that the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity. We agree.

730    Our opinions on this subject, frequently announced over weighty arguments in dissent that state remedies *730 were being given too broad scope, have approved only remedies carefully limited to the protection of the compelling state interest in the maintenance of domestic peace. Thus, in _San Diego Building Trades Council_ v. _Garmon_, 359 U. S. 236, we read our prior decisions as only allowing "the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order," *id.,* at 247, and noted that in _Laburnum_

> "damages were restricted to the `damages directly and proximately caused by wrongful conduct chargeable to the defendants . . .' as defined by the traditional law of torts. . . . Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct." *Id.,* 248, n. 6. at 249.

In _Russell,_ we specifically observed that the jury had been charged that to award damages it must find a proximate relation between the violence and violence complained of, on the one hand, and the loss of wages allegedly suffered, on the other. 356 U. S., at 638, n. 3. In the two _Wisconsin Board_ cases it was noted that the State's administrative-injunctive relief was limited to prohibition against continuation of the unlawful picketing, not all picketing. 315 U. S., at 748; 351 U. S., at 269-270, n. 3. And in _Youngdahl,_ the Court held that a state court injunction which would have prohibited all picketing must be modified to permit peaceful picketing of the premises. We said, "[t]hough the state court was within its discretionary power in enjoining future acts of violence, intimidation and threats of violence by the strikers and the union, yet

731    it is equally clear that such court entered the pre-empted domain *731 of the National Labor Relations Board insofar as it enjoined peaceful picketing . . . ." 355 U. S., at 139.[17]

It is true that in _Milk Wagon Drivers Union_ v. _Meadowmoor Dairies_, 312 U. S. 287, the Court approved sweeping state injunctive relief barring any future picketing in a labor dispute, whether peaceful or not. That case, however, was decided only on a constitutional claim of freedom of speech. We did not consider the impact of federal labor policy on state regulatory power. Moreover, as we recognized in _Youngdahl, supra,_ at 139, the case was decided in the context of a strike marked by extreme and repeated acts of violence—"a pattern of violence . . . which would inevitably reappear in the event picketing were later resumed." The Court in _Meadowmoor_ had stated the question presented as "whether a state can

choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneous violent conduct which is concededly outlawed," 312 U. S., at 292, and had reasoned that

> "acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." *Id.,* at 294.

732     Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred, *732 might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered.[18] Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter.

In the present case, petitioner concedes that violence which would justify application of state tort law within these narrow bounds occurred during the first two days of the strike. It is a separate issue, however, whether the pleadings, the arguments of counsel to the jury, or the instructions to the jury adequately defined the compass within which damages could be awarded under state law. The tort claimed was, in essence, a "conspiracy" to interfere with Gibbs' contractual relations. The tort of "conspiracy" is poorly defined, and highly susceptible to judicial expansion; its relatively brief history is colored by use as a weapon against the developing labor movement.[19] Indeed, a reading of the record in this case gives the

733     impression that the notion of "conspiracy" was employed here to expand the application of state law substantially *733 beyond the limits to be observed in showing direct union involvement in violence.

Thus, respondent's complaint alleged "an unlawful conspiracy and an unlawful boycott . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." No limitation to interference *by violence* appears. Similarly, counsel in arguing to the jury asserted, not that the conspiracy in which the union had allegedly participated and from which its liability could be inferred was a conspiracy of violence but that it was a conspiracy to impose the UMW and the UMW's standard contract on the coal fields of Tennessee.[20] Under the state law, it would not have been relevant that the union had not actually authorized, participated in or ratified the particular violence involved or even the general use of violence. It would only be necessary to show a conspiracy in which the union had a part, and to show also that those who engaged in the violence were members of the conspiracy and their acts were related to the conspiracy's purpose.[21]

The instructions to the jury also appear not to have kept the conspiracy concept within any proper bounds. The charge instructed the jury separately on the § 303 and conspiracy claims, characterizing each as predicated on an assertion that there had been "unlawful" picketing action, and distinguishing one from the other on the basis that in the conspiracy claim

734     "the lawfulness of the means rather than the lawfulness of the object or the purpose *734 of the picketing . . . is controlling." But in charging the conspiracy claim, the court stressed that the "unlawfulness" of the picketing, rather than violence as such, would be controlling. Thus, in characterizing respondent's claim of a conspiracy intentionally to interfere with his contractual relations with Grundy, the trial judge said respondent asserted the interference to be "wrongful in that it was accomplished by unlawful means, including violence and threats of violence." Turning to the question of the international union's responsibility, he said this depended on a showing that it "was a party to a conspiracy pursuant to which the interference was committed." He defined conspiracy as

> "an agreement between two or more . . . to do an unlawful thing, or to do a lawful thing by unlawful means. . . . . It is not essential to the existence of a conspiracy that the agreement between the conspirators be formally made between the parties at any one time, if, for example, two persons agreed to pursue an unlawful purpose or pursue a lawful purpose by unlawful means, then later a third person with knowledge of the existence of the conspiracy assents to it either impliedly or expressly and participates in it, then all three are conspirators in the same conspiracy. . . . [A]ll that is required is that each party to the conspiracy know of the existence of the conspiracy and that each agrees to assist in some manner in the furtherance of the unlawful purpose . . . or any unlawful means of accomplishing an unlawful purpose."

The trial judge then charged, in accordance with the Tennessee common law on conspiracy,[22] that the union, if a member

735     of a conspiracy, would be liable for all acts "done in concert . . . with the common purpose, and to effect *735 a common design," whether or not it had authorized, participated in, or ratified the particular acts. The jury was told it might award "only

such damages as ". . . he has sustained as a proximate and direct result of the action of the defendant," and that "[n]o award of damages can be made . . . on the basis of losses sustained . . . as a result of lawful activity upon the part of the defendant or its agents." Such instructions do not focus the jury's attention upon violence or threats of violence as the essential predicate of any recovery it might award.

## III.

Even assuming the conspiracy concept could be and was kept within limits proper to the application of state tort law under the pre-emption doctrine, reversal is nevertheless required here for failure to meet the special proof requirements imposed by § 6 of the Norris-LaGuardia Act:[23]

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

Petitioner vigorously contends that § 6 applied to the state claims in this case; that, on this record, it cannot be charged with having participated in or authorized the violence of August 15-16; and that its acts once it learned of the violence fell short of what would be necessary to show either ratification of the violence or any intent to build its picketing campaign upon the fears the violence engendered. We agree.

736    *736 We held in _Brotherhood of Carpenters_ v. _United States_, 330 U. S. 395, 403, that

> "whether § 6 should be called a rule of evidence or one that changes the substantive law of agency . . . its purpose and effect was to relieve organizations. . . and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

Shortly thereafter, Congress passed the Labor Management Relations Act, which expressly provides that for the purposes of that statute, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6.[24] Yet although the legislative history indicates that Congress was well aware of the _Carpenters_ decision,[25] it did not repeal § 6 outright, but left it applicable to cases not arising under the new Act. This selectivity is not surprising, for on state claims, though not on § 303 claims, punitive damages may be recovered. The driving force behind § 6[26] and the opposition to § 303, even in its limited

737    form,[27] was the fear that unions might be destroyed *737 if they could be held liable for damage done by acts beyond their practical control. Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply.[28]

Although the statute does not define "clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof." Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with "more than a bare preponderance of the evidence to prevail." _Schneiderman_ v. _United States_, 320 U. S. 118, 125. In our view, that burden was not met.[29]

738    *738 At the outset, it is clear that the requisite showing was not made as to possible union authorization of or participation in the violence of August 15 and 16. Although it is undoubtedly true that the officers and members of Local 5881 were present in force at the mine site on those days, neither the Local nor they are parties to this suit. Mr. Gilbert, the UMW representative, had left the area for a business meeting before the series of events culminating in the violence, and immediately upon his return, the violence subsided. The Sixth Circuit conceded that "[t]he proofs were sketchy as to defendant's responsibility for the [first two days' violence]." This view accurately reflects the state of the record. Petitioner was not even aware of Grundy's plan to open the Gray's Creek mine until after the violence had occurred.

The remaining issue is whether there was clear proof that the union ratified the violence which had occurred. Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on some normal union functions, such as provision of strike relief. A union would ordinarily *739 undertake these tasks during the course of a lawful strike. National labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations; and when they seek to do so, they should not for these activities be made to risk liability for such harm as may already have been done. The fact that ripples of the earlier violence may still be felt should not be permitted, and under § 6 is not permitted, to impose such liability. Because the dispute which sparked the violence will often continue, the union will feel a responsibility to take up the dispute as well as to curb its excesses. There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred. Cf. *ILGWU* v. *Labor Board,* 237 F. 2d 545. What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

739

The record here is persuasive that the petitioner did what it could to stop or curtail the violence. There was repeated and uncontradicted testimony that when news of the violence reached the meeting that Gilbert was attending, he was given firm instructions to return to the scene, to assume control of the strike, to suppress violence, to limit the size of the picket line, and to assure that no other area mines were affected.[30] He *740 succeeded. Although the day after his return two Consolidated officers were harassed by a large and unruly mob in a nearby town, this incident was unrelated to respondent, and was not repeated. There was no further violence at the mine site, and the number of pickets was reduced to a very few. Other mines in the immediate area, including two worked on lease by Gibbs, continued to operate, although strenuous effort was required to accomplish this; one union official testified, "I thought I was going to get whipped two or three times [by members of the Local who opposed this policy]."[31]

740

To be sure, there was testimony that Gilbert and, through him, the international union were not pleased with respondent's role in the abortive venture to open the Gray's Creek mines with members of the Southern Labor Union. A company officer testified that when the mines finally opened respondent was not hired, because "Had I hired Mr. Paul Gibbs none of these mines would be open today." Respondent testified that Gilbert had told him, shortly after assuming control of the strike, "I want you to keep your damn hands off of that Gray's Creek area over there, and tell that Southern Labor Union that we don't intend for you to work that mine." To another, Gilbert is alleged to have said, "Hell, we can't let that *741 go on . . . Paul was trying to bring this other union in there, and [Gilbert said] he ain't going to get by with it." A third witness reported remarks of a similar tenor. Respondent testified that fear for his own safety caused him not to visit his mine leases after the events of August 15 and 16. His foreman testified to minor acts of violence at the mine site, never connected to any person or persons.

741

The relevant question, however, is whether Gilbert or other UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute. The Sixth Circuit's answer was that they had. Its view of the record gave it

> "the impression that the threat of violence remained throughout the succeeding days and months. The night and day picketing that followed this spectacular beginning was but a guaranty and warning that like treatment would be accorded further attempts to open the Gray's Creek area. The aura of violence remained to enhance the effectiveness of the picketing. Certainly there is a threat of violence when the man who has just knocked me down my front steps continues to stand guard at my front door." 343 F. 2d, at 616.

An "impression" is too ephemeral a product to be the result of "clear proof." As we have said, the mere fact of continued picketing at the mine site is not properly relied upon to show ratification. But even accepting the passage as a holding that "clear proof" of UMW involvement is present, we do not so read the record.

If there was a remaining threat of violence here, it was a threat which arose from the context of the dispute, and not from the manner in which the international union was shown to have handled it. This dispute began when unemployed miners in the Appalachian hills discovered *742 that jobs they believed had been promised to them were being given to others behind their backs. In considering the *vicarious* liability of the international union, accommodation must be made for that fact. The record here clearly bears the construction that the international union exerted pressure to assure that respondent would lose his present jobs and obtain no more. But the record fails to rebut petitioner's contention that it had been unwilling to see its ends accomplished through violence, and indeed had sought to control the excesses which had occurred. Since the

742

record establishes only peaceful activities in this regard on the part of petitioner, respondent was limited to his § 303 remedy. _Teamsters Union v. Morton, supra_. Although our result would undoubtedly be firmer if the petitioner had assured respondent that, having assumed control of the strike, it would prevent further violence, in the circumstances of this case the crucial fact of petitioner's participation in or ratification of the violence that occurred was not proved to the degree of certainty required by § 6.

_Reversed_

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring.

I agree with and join in Part I of the Court's opinion relating to pendent jurisdiction. As to Part II, I refrain from joining the Court's speculations about the uses to which it may put the pre-emption doctrine in similar future cases. The holding in Part III that the Norris-LaGuardia Act requires reversal here seems to me correct, but my interpretation of the statute is different and somewhat narrower than that of the Court.

743    The statutory requirement for union liability in this case is "clear proof of actual participation in, or actual *743 authorization of . . . [the unlawful acts], or of ratification of such acts after actual knowledge thereof."[1] The Court construes this provision as fixing a new test of the quantum of proof, somewhere between ordinary civil and criminal standards. I do not think the admittedly vague legislative history imports this reading, and I believe it introduces a revealing inconsistency since the new test could not be applied to criminal cases, concededly governed by the same statutory language, without standing the statute on its head by having it _reduce_ present quantum-of-proof requirements in criminal cases, that is, proof "beyond a reasonable doubt." The best reading I can give the statute, absent more light than has been shed upon it in this case, is one directing it against a particular type of inferential proof of authority or ratification unacceptable to those who framed the law. For me, the gist of the statute is that in the usual instance a union's carrying on of its normal strike functions and its failure to take affirmative action to dispel misconduct are not in themselves proof of authorization or ratification of the wrongdoing.[2]

744    *744 In the present case, apart from a few quite ambiguous episodes, there was nothing to bring the violence home to the union except, as the Sixth Circuit stressed (see p. 741, _ante_), that the union continued through its picketing the threat that the earlier violence would be renewed and did not repudiate the violence or promise to oppose its renewal. Whatever arguments could be made for imposing liability in such a situation, I think it approximates what the statute was designed to forbid. On this basis, I concur in the reversal.

[1] Section 303 of the Labor Management Relations Act, 1947 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b) (4) of this title.

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 29 U. S. C. § 187 (1964 ed.).

Section 158 (b) (4) of Title 29 U. S. C. (1964 ed.), § 8 (b) (4) of the National Labor Relations Act, as amended, 73 Stat. 542, provides, in relevant part, that:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.....

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.....

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as

the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ."

[2] These events were also the subject of two proceedings before the National Labor Relations Board. In one, the Board found that Consolidated had unlawfully assisted the Southern Labor Union in violation of § 8 (a) (2) of the National Labor Relations Act, as amended, 49 Stat. 452, 29 U. S. C. § 158 (a) (2) (1964 ed.), *Tennessee Consolidated Coal Co.,* 131 N. L. R. B. 536, enforcement denied *sub nom. Labor Board* v. *Tennessee Consolidated Coal Co.,* 307 F. 2d 374 (C. A. 6th Cir. 1962). In the other, it found that Local 5881 had engaged in coercive picketing in violation of § 8 (b) (1) (A), 61 Stat. 141, 29 U. S. C. § 158 (b) (1) (A) (1964 ed.), *Local 5881, UMWA,* 130 N. L. R. B. 1181. The International itself was not charged in this proceeding, and the Board's consideration focused entirely on the events of August 16.

[3] The only testimony suggesting that Gilbert might have been at the mine site on August 15-16 was Gibbs' statement that "Well, everything happened so fast there, I'm thinking that I seen Mr. Gilbert drive up there, but where he went, I don't know." Whether such testimony could ever be sufficient to establish presence we need not decide, since respondent effectively conceded in the Sixth Circuit and here that Gilbert was in Middlesboro when the violence occurred.

[4] Immediately after the Board's order in the proceedings against it, note 2, *supra,* Consolidated reopened the mine it had closed during the spring of 1960, and hired the men of Local 5881. Later, and while this litigation was awaiting trial, that mine was closed as the result of an accident. At this point, the Gray's Creek mine was opened using members of Local 5881.

[5] See *Dukes* v. *Brotherhood of Painters, Local No. 437,* 191 Tenn. 495, 235 S. W. 2d 7 (1950); *Brumley* v. *Chattanooga Speedway & Motordrome Co.,* 138 Tenn. 534, 198 S. W. 775 (1917); *Dale* v. *Temple Co.,* 186 Tenn. 69, 208 S. W. 2d 344 (1948).

[6] The questions had been submitted to the jury on a special verdict form. The suggested remittitur from $60,000 to $30,000 for damages on the employment contract and from $100,000 to $45,000 punitive damages was accepted by respondent. In view of our disposition, we do not reach petitioner's contentions that the verdict must be set aside in toto for prejudicial summation by respondent's counsel, or because the actual damages awarded substantially exceeded the proof, and the punitive damage award may have rested in part on the award of actual damages for interference with the haulage contract, which was vacated as unproved.

[7] See Clark on Code Pleading 75 *et seq.* (1928); Clark, The Code Cause of Action, 33 Yale L. J. 817 (1924); McCaskill, Actions and Causes of Actions, 34 Yale L. J. 614 (1925); McCaskill, One Form of Civil Action, But What Procedure, for the Federal Courts, 30 Ill. L. Rev. 415 (1935); Gavit, A "Pragmatic Definition" of the "Cause of Action"? 82 U. Pa. L. Rev. 129 (1933); Clark, The Cause of Action, *id.,* at 354 (1934); Gavit, The Cause of Action—a Reply, *id.,* at 695 (1934).

[8] See also *American Fire & Cas. Co.* v. *Finn,* 341 U. S. 6, 12; *Musher Foundation, Inc.* v. *Alba Trading Co.,* 127 F. 2d 9, 12 (C. A. 2d Cir. 1942) (dissenting opinion of Clark, J.).

[9] Shulman & Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 397-410 (1936); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 232 (1948); Barron & Holtzoff, Federal Practice and Procedure § 23 (1965 Supp.).

[10] See, *e. g.,* Fed. Rules Civ. Proc. 2, 18-20, 42.

[11] *E. g., Musher Foundation* v. *Alba Trading Co., supra;* Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Col. L. Rev. 1018, 1029-1030 (1962).

[12] The question whether joined state and federal claims constitute one "case" for jurisdictional purposes is to be distinguished from the often equally difficult inquiry whether any "case" at all is presented, *Gully* v. *First National Bank,* 299 U. S. 109, although the issue whether a claim for relief qualifies as a case "arising under . . . the Laws of the United States" and the issue whether federal and state claims constitute one "case" for pendent jurisdiction purposes may often appear together, see *Dann* v. *Studebaker-Packard Corp.,* 288 F. 2d 201, 211-215 (C. A. 6th Cir. 1961); *Borak* v. *J. I. Case Co.,* 317 F. 2d 838, 847-848 (C. A. 7th Cir. 1963), aff'd on other grounds, 377 U. S. 426.

[13] Cf. *Armstrong Co.* v. *Nu-Enamel Corp.,* 305 U. S. 315, 325. Note, Problems of Parallel State and Federal Remedies, 71 Harv. L. Rev. 513, 514 (1958). While it is commonplace that the Federal Rules of Civil Procedure do not expand the jurisdiction of federal courts, they do embody "the whole tendency of our decisions. . . to require a plaintiff to try his . . . whole case at one time," *Baltimore S. S. Co.* v. *Phillips, supra,* and to that extent emphasize the basis of pendent jurisdiction.

[14] *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.,* 183 F. 2d 497 (C. A. 1st Cir. 1950); *Moynahan* v. *Pari-Mutuel Employees Guild,* 317 F. 2d 209, 211-212 (C. A. 9th Cir. 1963); *op. cit. supra,* notes 9 and 11.

[15] Some have seen this consideration as the principal argument against exercise of pendent jurisdiction. Thus, before *Erie,* it was remarked that "the limitations [on pendent jurisdiction] are in the wise discretion of the courts to be fixed in individual cases by the exercise of that statesmanship which is required of any arbiter of the relations of states to nation in a federal system." Shulman & Jaegerman, *supra,* note 9, at 408. In his oft-cited concurrence in *Strachman* v. *Palmer,* 177 F. 2d 427, 431 (C. A. 1st Cir. 1949), Judge Magruder counseled that "[f]ederal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in

state court litigation," at 453. See also Wechsler, supra, note 3, at 232-233; Note, 74 Harv. L. Rev. 1066, 1067 (1961); Note, supra, note 3, at 1043-1044.

[16] Note, supra, note 11, at 1025-1026; Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F. 2d 748, 752-754 (C. A. 9th Cir. 1964).

[17] In Teamsters Union v. Morton, supra, a similar analysis was applied to permit recovery under § 303 of damages suffered during a strike characterized by proscribed secondary activity only to the extent that the damages claimed were the proximate result of such activity; damages for associated primary strike activity could not be recovered.

[18] It would of course be relevant if the Board had already intervened and as here, note 2, supra, issued an order which permitted the continuance of peaceful picketing activity.

[19] On the flexibility of "conspiracy" as a tort, see Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F. 2d 187, 189 (C. A. 2d Cir. 1943); Riley v. Dun & Bradstreet, Inc., 195 F. 2d 812 (C. A. 6th Cir. 1952); Charlesworth, Conspiracy as a Ground of Liability in Tort, 36 L. Q. Rev. 38 (1920); Burdick, Conspiracy as a Crime, and as a Tort, 7 Col. L. Rev. 229 (1907); Burdick, The Tort of Conspiracy, 8 Col. L. Rev. 117 (1908). The anti-labor uses of the doctrine are well illustrated in Sayre, Labor and the Courts, 39 Yale L. J. 682, 684-687 (1930). Similar dangers are presented by the tort of malicious interference with contract, id., at 691-695, a doctrine equally young which in its origins required a showing of interference by force, threats, or fraud, but does so no more, Sayre, Inducing Breach of Contract, 36 Harv. L. Rev. 663 (1923); Comment, 56 Nw. U. L. Rev. 391 (1961).

[20] Respondent's attorney argued in summation:

". . . and here is the conspiracy. Mr. Pass [an official of petitioner's] testified, we want that contract all over this nation. That contract or better. I don't guess at that, there is his testimony. There is no deviation from that contract, Mr. Turnblazer so says, unless it is approved in Washington. They impose a nationwide contract all over this nation, all over. I don't care whether it is in Canada or West Virginia or California or Tennessee."

[21] Note 5, supra.

[22] Ibid.

[23] 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.).

[24] National Labor Relations Act, as amended, § 2 (13), 61 Stat. 139, 29 U. S. C. § 152 (13) (1964 ed.); Labor Management Relations Act, 1947, §§ 301 (e), 303 (b), 61 Stat. 157, 159, 29 U. S. C. §§ 185 (e), 187 (b) (1964 ed.).

[25] See, e. g., S. Rep. No. 105, 80th Cong., 1st Sess., p. 21.

[26] The fullest statement of the basis for § 6 appears in S. Rep. No. 163, 72d Cong., 1st Sess., pp. 19-21.

[27] The present § 303 was introduced on the floor of the Senate by Senator Taft, in response to a more severe proposal which would have permitted injunctive relief as well as damages against secondary activity. 93 Cong. Rec. 4769-4770, 4833-4847, 4858-4875 (1947). The tenor of the opposition may be seen in those pages, and also at 93 Cong. Rec. 4765-4766 (remarks of Senator Thomas); 93 Cong. Rec. 6451-6452 (remarks of Senator Morse); 93 Cong. Rec. 6520-6521 (remarks of Senator Pepper).

[28] The argument might be made that if there were "clear proof" that the local union was responsible, the responsibility of the international union vis-a-vis its local would be governed by a less demanding standard than that applicable for determining the responsibility of a labor organization or its officers on the basis of the acts of "individual officers, members, or agents" of the organization. Since the local was not a party here, we have no occasion to assess this issue. Liability of the international union is premised on the acts of Gilbert and the UMW's other agents, or not at all.

[29] In charging the jury, the trial judge first instructed the jury at length that the plaintiff's burden was to prove his case by a preponderance of the evidence, and that "if the plaintiff carries the burden of proof by a preponderance of the evidence, however slight that preponderance might be, he has done all that is required of him and is entitled to a verdict." In connection with substantive discussion of the state claim, he then remarked:

"Before the defendant may be held responsible for the acts of its agents in entering into a conspiracy during the course of a labor dispute, there must be clear proof that the particular conspiracy charged or the act generally of that nature had been expressly authorized or necessarily followed from a granted authority by the defendant, or that such conspiracy was subsequently ratified by the defendant after actual knowledge thereof."

The phrase "clear proof," referred to just this once, was never explained. The possibility is strong that the jury either did not understand the phrase or completely overlooked it in the context of the lengthy charge given. No challenge is directly made to the charge, however, and it does not appear whether an objection was entered. Accordingly, we do not rest judgment on this point.

[30] Other international union personnel were also later sent, perhaps in part because the union wanted to put its best foot forward in the NLRB proceedings, note 2, supra, which ensued. One such person testified,

Case 4:22-cv-00430-Y   Document 28   Filed 09/04/22   Page 108 of 447   PageID 1536

". . . I explained to them that the labor board was there investigating and that certainly any mass picketing would only cause them a great deal of trouble, and instructed them that they should limit the number of their pickets and under no circumstances have any violence or any threats of violence to any person coming into or near that area."

[31] About six days after the violence, an earthmoving equipment salesman driving by the entrance to the mine site stopped to ask how he might get to another mine. Gilbert was present among the picketers, and gave him instructions. Gilbert told the salesman that he "couldn't get through" the road chosen, and should approach by another route; he said the salesman should tell any union men he met that he had spoken to Gilbert. A sinister cast can be put on this incident, but it shows clearly only that Gilbert was in control of the strike and that operations unrelated to Gray's Creek were not being interfered with. It is significant that the salesman did not claim to have been stopped by force or threatened in any way; it appears he did no more than seek directions, and received no more in return.

[1] Norris-LaGuardia Act, § 6, 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.). The section is quoted in full at p. 735, *ante.*

[2] The principal legislative document, S. Rep. No. 163, 72 Cong., 1st Sess., pp. 19-21, is not very illuminating but it does at the end of its discussion of the section make reference to Frankfurter & Greene, The Labor Injunction 74-75 (1930). At these pages, to illustrate rulings on union responsibility that are deemed improper, that book states: " `Authorization' has been found as a fact where the unlawful acts `have been on such a large scale, and in point of time and place so connected with the admitted conduct of the strike, that it is impossible on the record here to view them in any other light than as done in furtherance of a common purpose and as part of a common plan'; where the union has failed to discipline the wrong-doer; where the union has granted strike benefits." (Footnotes omitted.) See also *id.,* at 220-221, n. 42; *United Brotherhood of Carpenters v. United States,* 330 U. S. 395, 418-419 and n. 2 (Frankfurter, J., dissenting).

Save trees - read court opinions online on Google Scholar.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS** | § | |
| **Plaintiff/Counterclaim Defendant** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | **Case No. 4:22-cv-00430-O** |
| **V.** | § | |
| | § | |
| | § | |
| **ASSOCIATION OF** | § | |
| **PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS, JULIE** | § | |
| **HEDRICK, ERIK HARRIS** | § | |
| **Defendants/Counterclaim Plaintiff.** | § | |
| | § | |

---

### PLAINTIFFS' RESPONSE TO DEFENDANT'S
### MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF
### AND BRIEF IN SUPPORT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff, EUGENIO VARGAS, and files this, his Response to Defendants', ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS (hereinafter "APFA"), JULIE HEDRICK, AND ERIK HARRIS, 12(b)(6) and 12(b)(1) Motion to Dismiss, and as grounds for support herein would show this Honorable Court the following:

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief, brought pursuant to Federal Rules Civil Procedure §§ 12(b)(1) and 12(b)(6).

## I. <u>INTRODUCTION</u>

Eugenio Vargas (hereinafter referred to as "Plaintiff" or "Vargas"), is a member in good standing of the Association of Professional Flight Attendants union (hereinafter "APFA") and the Former National Treasurer.  Plaintiff was charged with violations of the APFA policy after enduring three days of arbitration hearings, and an award being issued against him declaring he breached his fiduciary duty to the union.  Plaintiff filed his complaint against APFA, the National President, Julie Hedrick, and National Treasurer, Erik Harris, to vacate the arbitration award after discovering APFA and the National Officers withheld documents and pertinent facts from Plaintiff, the APFA Board of Directors, the APFA Executive Committee members, and Arbitrator Ruben Armendariz in order to acquire an unfavorable arbitration award.  Vargas contends this violated his rights under the "Member's Bill of Rights" afforded by the Labor Management Reporting and Disclosure Act, as well as breached the APFA Constitution, and breached the two officer's common-law fiduciary duties to the Plaintiff.  Plaintiff asserts Defendants' motivation was Plaintiff's affiliation with and support of Robert "Bob" Ross, the National President during Vargas's term as National Treasurer, and Plaintiff's opposition to a proposed merger of APFA with the Association of Flight Attendants-CWA, AFL-CIO (hereinafter "AFA").

On or about July 14, 2022, Defendants filed a Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support (hereinafter "Motion to Dismiss").  (*Ex. A, Defendant's Motion to Dismiss Plaintiff 's Claims for Relief and Brief in Support*).  Defendants assert the following arguments in their Motion to Dismiss:

(1) Plaintiff's claims fail to meet subject matter jurisdiction,

(2) LMRDA provisions no longer govern any internal union matters, and

(3) all remaining claims asserted by Plaintiff are unfounded either

    (a) due to lack of jurisdictional basis,

    (b) due to lack of meeting Plaintiff's legal obligation "to exhaust the mandatory internal union remedies 'prior to taking any legal action'",

    (c) Plaintiff failed to meet the statutory pre-requisite to filing a claim under §501(a) of the Labor Management Reporting and Disclosure Act, and

    (d) all other claims are preempted by the Arbitration Award. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, 5-10*).

Defendants' Motion to Dismiss have provided misleading interpretations of the law, as well as inconsistent interpretations of Plaintiff's claims asserted in this case before the court. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, 5-10*). A clear understanding of both the law and Plaintiff's position clearly show that Defendant's motion to dismiss should be denied.

## II. <u>STATEMENT OF THE CASE</u>

Plaintiff, EUGENIO VARGAS ("Plaintiff") seeks damages alleging unlawful violations of the Labor Management Reporting and Disclosure Act, <u>29 U.S.C. § 411</u>, et seq. ("LMRDA"), the Association of Professional Flight Attendants Union Constitution, and Breach of Fiduciary Duty as provided for under Texas Common Law by Defendants APFA, JULIE HEDRICK, AND ERIK HARRIS ("hereinafter Defendants").

APFA is a labor organization covered under the LMRDA, <u>29 U.S.C. §401</u> et seq, and <u>29 U.S.C. § 158</u>, et seq. Plaintiff is a member in good standing of APFA as defined under the LMRDA

and 29 U.S.C. § 158. On or about January of 2016, the Plaintiff ran for office within the APFA local union elections. For clarification, Robert "Bob" Ross ran for National President Nena Martin ran for National Vice-President, and Eugenio Vargas ran for National Treasurer.

The Plaintiff won the election, with Robert "Bob" Ross being elected President, Nena Martin elected Vice-President, and Eugenio Vargas Treasurer ("Ross Administration"). The Ross Administration opposed a merger of the union with AFA—another multi-airline flight attendants' union. This created two political factions within APFA competing for power: Pro-APFA/AFA and Anti-APFA/AFA. The individuals comprising the Pro-APFA/AFA faction undertook a course of conduct of retaliation and suppression to thwart the efforts of Plaintiff, as well as others within the local union, to silence the opposition, supplement leadership, and effectuate a merger of the two unions. In 2020, the Hedrick Administration (a Pro-APFA/AFA Administration) was elected to National Office.

Plaintiff was subjected to retaliatory and oppressive actions by their union opponents and were subjected to deliberate attempts to suppress their dissent within in the union. Specifically, but not limited to, Plaintiff Vargas was investigated, charged, coerced into signing a promissory note for an alleged over-payment made for Meal Expense Allowance and Special Assignment Fee. It was only **after** Plaintiff repaid his alleged over-payment and he thought the harassment had ended that the union then charged him as well as others in the Ross Administration with multiple frivolous violations including violations for over-payments made to the Ross Administration. However, Plaintiff's union opponents were not satisfied and unlawfully re-charged Plaintiff and forced him to go to Arbitration, where an Award was issued that found he violated APFA Policy, declared he breached his fiduciary duty, suspended his right to run for union office, and found damages in excess of $10,000.

After the award was issued, Plaintiff discovered that APFA officers and officials had withheld pertinent documentation from Plaintiff during the arbitration hearings and presented false testimony to the Executive Committee and the Board of Directors. Furthermore, tactics of intimidation were used to pressure witnesses to not testify in the arbitration proceedings, which altered the results of the award and inhibited Plaintiff's right to a fair and impartial hearing.

Plaintiff was not provided the safeguards against improper disciplinary action provided under the LMRDA. After issuance of the arbitration award against Plaintiff, he discovered documents publicly filed in a lawsuit against Robert "Bob" Ross that contradicted statements the union made prior to and throughout his arbitration that were withheld. Withholding documentation and misrepresenting the facts is an unconscionable violation to Plaintiff's right to a fair hearing and goes beyond any rational explanation that could meet a reasonableness standard. The result of this conduct is that Plaintiff is now forced to repay money that has already been repaid, and is now prohibited from running for office. Plaintiff seeks to have the arbitration award rescinded, as this hearing was clearly fraudulent and was an over-reach of the power of the arbitrator.

### III.  ARGUMENTS AND AUTHORITIES

#### A.    Standards For Dismissal

An FRCP 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction seeks the dismissal of the lawsuit because the court lacks the authority to hear the dispute. *See generally U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984). A claim must be dismissed, pursuant to Rule 12(b)(1), "when the Court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010

(5th Cir. 1998). 29 U.S.C. § 412 clearly states:

> "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

If a FRCP 12(b)(1) motion simply challenges the Court's subject-matter jurisdiction based on the sufficiency of the pleading's allegations, then the motion is a facial attack. *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In a facial attack, the District Court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Ritchie*, 15 F.3d at 598; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

In resolving the question of subject-matter jurisdiction, the District Court can refer to evidence outside the pleadings. *Luckett v. Bure*, 290 F.3d, 496-97 (2d Cir. 2002); *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of the statement of claim for relief in the Plaintiff's complaint. *Doe v. Hillsboro ISD*, 81 F.3d 1395, 1401 (5th Cir. 1996). The motion cannot be used to resolve factual issues or the merits of the case, and is not appropriate unless the Plaintiff's pleadings on their face show, beyond a doubt, that the Plaintiff cannot prove any set of facts that would entitle it to relief. *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Hickey v. Obannon*, 287 F.3d 656, 657 (7th Cir. 2002).

Rule 12(b)(6) motions are disfavored in the law, and a Court will rarely encounter circumstances that justify granting them. *Mahone v. Addicks Utility District of Harris County*,

836 F.2d 921, 926 (5th Cir. 1998). A Court may dismiss a claim only when it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations found in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A motion to dismiss should not be granted unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him or her to relief. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

The claimant is not required to set out in detail the facts upon which the claim is based, rather the Rules require that the claim simply give the Defendant "fair notice." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993). Further, a Court may not look beyond the pleadings. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). The Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. *See Mahone*, 836 F.2d at 926. The Rules also dictate that the pleadings be liberally construed "as to substantial justice." *Id.*

**B.** **Plaintiffs Have Stated Claims Upon Which Relief May Be Granted**.

(1). Plaintiff properly brought his causes of action pursuant to the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*, and provided Defendant "fair notice" therein pursuant to Federal Rule of Civil Procedure § 8(a).

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720, 725 (5th Cir. 2002). The complaint must be liberally construed in favor of the Plaintiff,

and all facts pleaded in the complaint must be taken as true. *Id.* Recent decisions by the Supreme Court have elaborated on the pleading standards for civil litigation *See Ashcroft v Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Supreme Court noted two "working principles" in the *Iqbal* and *Twombly* decisions. First, while a Court must accept all factual allegations in the complaint as true, the court need not accept a complaint's legal conclusions as true; and second, a complaint must state a "plausible claim for relief" to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949-50. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id,* at 1949. The court presumes factual allegations to be true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Lindquist v. City of Pasedena*, 525 F.3d 383, 386 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a). As the Supreme Court has emphasized, Rule 8 does not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, or "detailed factual allegations," *Iqbal*, 129 S. Ct. at 1949.

Defendants allege that Plaintiff has not stated a claim upon which relief can be granted under the LMRDA. (*Ex. A, Def 's Motion to Dismiss Pl's Claims for Relief, 6*). However, Defendants have wholly failed to provide any legal or factual basis supporting their allegations that Plaintiff cannot state a claim upon which relief can be granted under the LMRDA. Defendants argue that LMRDA does not govern disputes between members as these disputes do not classify as a disciplinary measure by the union. Plaintiff would note that the APFA Const. Art. VII— entitled "Hearings and Disciplinary Procedures"—spells out that members are subject

to fine, suspension or expulsion, or suspension from or removal from office for an enumerated list of violations. (APFA Const. Art. VII, Sec. 1 *et. seq.).* Furthermore, Art. VII, Sec. 2 creates the right for any member in good standing to file charges against another member. (*Id.* at Sec. 2 *et. seq.).* The charges are then presented to the APFA Executive Committee, who vote on whether the charges are timely, valid and specific. The accused is then referred to an arbitrator for an arbitration hearing, which ultimately results an award. If the award stipulates the accused member must pay damages, those damages are collected on by the union. In this case, The APRA National President issued a public announcement to all membership on March 24 ,2022 announcing the arbitrations as a result of the unions publications of financial documentation by the union; furthermore, the arbitration awards were adopted by resolution by the APFA Board on March 8, 2022. (*Ex. D Resolution by Board of Directors March 8, 2022; Ex. E, Presidential Hotline to Membership, March 24, 2022*).

C.    <u>**Subject Matter Jurisdiction**</u>

(1) <u>The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act</u>.

The issue of federal subject matter jurisdiction "concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." (13 Wright & Miller § 3522, p. 125). Subject matter jurisdiction is a threshold question for any federal court and one that must be answered in the affirmative before any matter can be heard before the court. It is within the authority of Congress to confer subject matter jurisdiction onto the federal district courts.

While the Federal Arbitration Act does not confer subject matter jurisdiction since the recent Supreme Court decision of *Badgerow v. Walters* was issued on March 31, 2022 reversing

the 5th Circuit Court of Appeals application of the look-through test. (*Badgerow v. Walters*, Docket No. 20-1143 (U.S. Supreme Court, Decided March 31, 2022)). However, in the instant case, the Plaintiff seeks Federal Subject Matter jurisdiction based on its claims stemming from the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

    (2)   Subject Matter Jurisdiction is Conferred based on Labor Management Reporting
           and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

Subject matter jurisdiction exists when a federal question exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. § 1331). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'" (*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 807 (1986) quoting *Franchise Tax Board* v. *Construction Laborers Vacation Trust,* 463 U. S. 1, 8-9 (1983)). An action "arises under" federal law if: (1) "federal law creates the cause of action[,]" or (2) "the vindication of a right under state law necessarily turn[s] on some construction of federal law." (*Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 808-09 (1986) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.,* 463 U.S. 1, 9 (1983)); *see also, Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).

In the matter before this Court, the cause of action at the heart of the case are those claims falling under the LMRDA § 411, *et seq.* Grounds for a cause of action are created by the federal legislation under LMRDA, 29 U.S.C. § 412 which grants:

        "[a]ny person whose rights secured by the provisions of this title have been
        infringed by any violation of this title may bring a civil action in a district
        court of the United State for such relief (including injunctions) as may be
        appropriate. Any such action against a labor organization shall be brought

in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." (29 U.S.C. § 412).

The cause of action for the unfair hearing and violation of Plaintiff's rights arise from the federal Labor Management Reporting and Disclosure Act, thus subject matter jurisdiction is clearly established.

## D.    **Arbitrator's Decision is Subject to Review**

(1) The Arbitrator's Decision Is Subject to Judicial Review

Defendants contend that Plaintiff's basis for setting aside the arbitration award is grounded in LMRDA § 411. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, p. 6*). Plaintiff filed the motion to vacate the arbitration award based on the well-established law that arbitration awards where fraud, corruption, misconduct, or where arbitrators exceeded their authority shall be vacated by the court.  (9 U.S.C. § 10). The cause of action under LMRDA §411, *et seq.* is rooted in the Plaintiff's cause of action for damages as a result of the violation of his rights as a union member granted thereunder.  Defendants seem to confuse the two laws—one is a means to vacate an invalid award, the other is a means to recover for damages suffered.

Plaintiff's claim under LMRDA are valid and properly asserted claims.  The *Supreme* Court coined LMRDA "the product of congressional concern with widespread abuses of power by union leadership." *(Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, (1982)).  The *Breininger* Court reviews a steel worker's claim brought against his union denial of referrals at the hiring halls.  The question before the Supreme Court was whether the union's actions were considered disciplinary actions that required notice and a fair hearing under LMRDA 101(a)(5). (*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989)).  The *Breininger*  Court found that "[t]he fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper

disciplinary action,' indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members." (*Id.* at 92). The case addresses the term "otherwise discipline" in the language of LMRDA § 411 for purposes of when a union must give notice and a hearing and when it should not. (*Id*). The Supreme Court holds that "otherwise discipline" indicates "'Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." (*Id*. at 91). At no point does the *Breininger* Court address subject matter jurisdiction. Nor does the *Breininger* Court ever hold that subject matter jurisdiction did not extended to union disciplinary arbitrations.

The *Guidry* Court also did not address subject matter jurisdiction issues, nor did it address arbitration awards regarding union procedures. (*Guidry v. Int'l Union Of Operating Eng*., *406*, 882 F. 2d 929 (5th Cir. 1989)). This Court, instead, addressed a union members complaint regarding hiring hall procedures between a union and an employer that allowed the union to hire within and outside the union at its discretion. (*Id at* 933-934). Hiring procedures of one of the Business Agent illustrated that he was exploiting and disregarding the hiring hall procedures to enrich those union members loyal to him—detrimentally to his opponents to silence and compel obedience. (*Id).* Here the Court held that under 101(a)(5) you cannot define depriving job referrals as "discipline" in which notice, and a fair hearing is required. However, when it is done as an imposition on a union member's free speech, it can be prohibitive in its effective under 101(a)(1 and 101(a)(2). (*Guidry v. Int'l Union Of Operating Eng*., 907 F. 2d 1491, 1493 (5th Cir. Ct App. 1990)).

Plaintiff can only assume that Defendants' counsel intended to argue that APFA

disciplinary procedures are conducted by a third-party. If this is Defendants' argument, then this notion disregards the procedures spelled out in the APFA Constitution. The APFA Constitution provides that the National Secretary "shall administer Article VII procedures." (*Ex. B, APFA Const Art. III Sec. 6D(8), pg. 22*). The National Treasurer oversees all financial records, production of all financial documents, maintain computerization of financial documents, oversee all daily activities of the APFA headquarters office and staff, and assist the National Secretary in the discharge of his duties. (*Ex. B, APFA Const Art. III Sec. 6E et seq., pg. 23-24*). The National President acts as the chairperson for the Board of Directors, and the Executive Committee, appoints the members on the Executive Committee, and has the authority to retain and hire legal counsel for the union. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 20-21*). The Vice-President is empowered to hire counsel for members in arbitrations and grievances and assist the National President in the discharge of all duties. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 21-22*). The Executive Committee, comprised of all four national officers and appointees made by the National President, review and vote on whether charges are timely, specific, and valid prior to any referral of charges to arbitration (*Ex. B, APFA Const Art. VII Sec. 3 et seq., pg. 42-43*). The Board of Directors, which includes all four national officers, appoint an arbitrator to preside over the arbitration. (*Ex. B, APFA Const Art. VII Sec. 5 et seq., pg. 44-45*).

A quick review of the APFA Constitution will illustrate that the only means to bring about a disciplinary action is to file charges by an individual member against another individual member through the arbitration process. There are no provisions outlined in Art. VII of the APFA Constitution or APFA Policy that provide for APFA to bring charges against a member on behalf of the union—the drafters of the APFA Constitution sought to ensure all members were

empowered to implement discipline against one another for violations. Furthermore, there is no provisions or measure for a member to file charges and bring an action against an officer as an officer. The only means to file charges outlined in Art. VII of the APFA Constitution provides for only one member to file charges against another member. Thus to read the Article VII Arbitration Procedures of the APFA Constitution as anything other than a disciplinary proceeding falling within the scope of LMRDA would undermine the statute and its purpose—to protect members from unfair treatment and intimidation tactics.

    (2) <u>Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order Comports with Well-Settled Federal Labor Law Principles.</u>

Defendants argue that the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is final and not subject for review by the judiciary, therefore the arbitrator's award in the case at issue should stand as final and binding. The review of arbitration awards in labor cases was described by the *Misco* Court as "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." (*United Paper Workers International Union v. Misco, Inc.,* 484 U.S. 29, 36-37 108 S.Ct. 364, 371, (1987)). Application of these ordinary contract principles falls squarely within an arbitrator's wide discretion to interpret and apply a collective bargaining agreement. Relying on this interpretation for this case at issue poses three problems: (1) there is not a Collective Bargaining Agreement at issue between Plaintiff and Defendants, (2) this interpretation frustrates the policy and purpose behind the LMRDA and the Member's Bill of Rights as forged by Congress, and (3) labor law principles regarding arbitration still favor vacating arbitration awards in certain circumstances.

The first problem with extending the arbitrator's authority within the case-at-issue is that no Collective Bargaining Agreement is at issue in the current case between Plaintiff and Defendants. "A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301 (a) for breach of that contract." (*Wooddell v. International Bhd. of Elec. Workers,* 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 619-27, 101 S.Ct. 2546, 2549-53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of* 1477*1477 *Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981)). A Collective Bargaining Agreement is one typically defined by "contracts between an employer and a labor organization representing employees. . . ." (29 U. S. C. § 185(a)).

In the case before the court, the employer, American Airlines, Inc., is not a party to the Union Constitution, nor were they a party to the charges filed or the union's disciplinary procedures, or the arbitration hearing. This is governed solely by the union constitution—which is a contract between the members and APFA. Therefore, application of the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is not appropriate here.

The second problem with Defendants' argument is that this approach frustrates the policy interest behind LMRDA. The LMRDA policy interest was clear upon Congress's enactment of the legislation: "[t]he legislative history and the extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. (*Local Union No. 38 v. Pelella*, 350 F.3d 73, 83-84 (2nd Cir. 2003) (citing *Salzhandler v. Caputo,* 316 F.2d 445, 449 (2d Cir.1963))). The Second Circuit Court spells out the policy behind the Union Member's "Bill of Rights" in saying

that "Section 101 of Title I of the LMRDA represents '[o]ne of the most significant remedial provisions of the LMRDA.' (*Pelella*, 350 F. 3d 73, 84 (citing *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation,* 590 F.2d 1139, 1149 (D.C.Cir.1978))). The Union Member's "Bill of Rights," protects members from the abusive or coercive practices of the union's leadership. (*Franza v. International Brotherhood of Teamsters, Local 671,* 869 F.2d 41, 44 (2d Cir.1989)).

In the case before the court, expansion of an arbitrator's interpretations of a Collective Bargaining Agreement to union disciplinary arbitrations would simply stifle and limit the protections afforded to members from abuse of power by union officials and leadership under LMRDA.

The third problem with Defendants' arguments in support of non-judicial review of the arbitrator's award within a Union's disciplinary proceeding is that it ignores those instances in which the courts have vacated arbitration awards even interpreting a collective bargaining agreement. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960))). The Supreme Court in *Garvey,* goes on to state that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award." Here, the court makes clear that when dishonesty has occurred, vacating the arbitration award is

the proper recourse. Again this case applies to those where the arbitration occurs as a result of a collective bargaining agreement. In the case before the court, dishonesty *has* been asserted, if not clearly established by the documents attached to Plaintiff's Original Complaint. (*Ex. C, Pl's Original Compl.).* Therefore, the arbitrator's award should be vacated per the labor law principles.

## E. Plaintiff's Remaining Claims Have Merit

### (1) Jurisdictional Basis for Remaining Claims is rests in *Gibbs* Supplement Jurisdiction

As previously discussed, the Supreme Court has held that "[a] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). Furthermore, 28 U.S.C. §1331 requirements are met when a case generally arises under federal law when that federal law creates the cause of action. (*Grable & Sons*, 545 U.S. 308, 312).

State law claims asserted between the same parties, based on the same nucleus of facts that gave rise to the cause of action which forms the basis of subject matter jurisdiction, may be heard based on supplemental or pendent jurisdiction. In *Finley,* the Supreme Court reaffirmed what it previously held in *Gibbs* finding that "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [which] comprises but one constitutional 'case.'"" (*Finley* v. *United States,* 490 U. S. 545, 548 (1989) quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966)).

In the case before the court, subject matter jurisdiction is conferred based on federal question because the cause of action *arises out of* the LMRDA, 29 U.S.C. § 412. Supplemental jurisdiction over state law claims can be founded on the *Gibbs* case and its progeny of broadly interpreting jurisdictional authority over state law claims within an action properly embedded in federal question jurisdiction.

(2) Exhaustion of Internal Remedies was not Required Prior to Filing Suit.

Plaintiff is not required to exhaust internal remedies as a pre-requisite to filing suit against the Defendants. Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts the discretion to hear a union member claim or require a union member to exhaust his internal remedies before filing suit. (*See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982). *Guidry v. Operating Engineers Local 406*, 882 F. 2d 1491, (5th Cir. 1990)).

However, Plaintiff did exhaust his internal remedies prior to filing suit, as Plaintiff pursued arbitration and attended the hearings. Plaintiff called witnesses that were not required to appear or that were intimidated and discouraged from testifying on behalf of the Plaintiff during the Arbitration. Plaintiff only brought this lawsuit after discovering that the Union and the National Officers conspired to withhold documents and mis-informed APFA officials to achieve a guilty result.

(3) Common Law Breach of Fiduciary Duty Claims require compliance with LMRDA § 501(b).

The Breach of Fiduciary Duty claims brought against the officers were asserted under

Texas Common Law, similar to the counterclaim asserted by Defendant. LMRDA § 501(a) clearly asserts a cause of action against an officer that spends union funds or for purposes of pecuniary or personal gain.  Plaintiff's Complaint never asserted any facts regarding the officers' conduct pertaining to their spending of union funds, rather Plaintiff's complaints clearly focus on the withholding of documents, the presentation of false facts, defamation of his character, and conspiring to defame his character.  Consequently, any pre-requisite need to comply with LMRDA § 501(b) is moot, as no claim under LMRDA § 501(a) have been asserted.

(4) <u>Preemption of the Breach of Union Constitution and Breach of Fiduciary Duty claims cannot exist based on the Fraudulent Arbitration Award.</u>

Preemption of the remaining claim cannot be based on an Arbitration that were not based on any claims brought by the Plaintiff and did not address any of the grievances or damages Defendants imposed on the Plaintiff.  The Supreme Court find preemption of state law claims only when the claim is dependent on interpretation of a Collective Bargaining Agreement.  (*Hawaiian Airlines v. Norris*, 512 U.S. 246 (1994); *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004)).  Consequently, since no Collective Bargaining Agreement is at issue in the case before the Court, then there is no preemption of the state law claims brought against the Defendants.

**F.    Plaintiff Has Satisfied the "Fair Notice" Pleading Requirements Pursuant to Federal Rule of Civil Procedure 8(a).**

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. (Fed. R. Civ. P. 8(a)). As the Supreme Court has emphasized, Rule 8 does not require "heightened fact pleading of specifics," or "detailed

factual allegations," (*Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949). Plaintiff has provided

an extremely detailed pleading outlining specific violations of the LMRDA by Defendants.

(*Ex. C, Pl's Original Compl.*).

The law clearly states that the Claimant is not required to set out in detail the facts upon

which the claim is based, rather the Rules require that the claim simply give the Defendants "fair

notice." (*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168

(1993)). Further, the Court must accept as true the allegations in the complaint and must view the

allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the

claim need only give the Defendant fair notice of the nature of the claim and the grounds on which

it rests. (*See Mahone*, 836 F.2d at 926). The Rules also dictate that the pleadings be liberally

construed "as to substantial justice." (*Id).*

Plaintiff has met his burden of providing a detailed factual basis and specific statutory

protections along with specific relief. (*Ex. C, Pl's Original Compl.*).


## IV. CONCLUSION AND PRAYER

In conclusion, Plaintiff clearly plead, and sought protection and relief, pursuant to his

rights as a member of a labor organization under the LMRDA. Plaintiff alleged and asserted a

detailed factual background demonstrating how Defendants violated his rights. Plaintiff has

provided Defendant with fair notice of the allegations and facts of his claims pursuant to Federal

Rule of Civil Procedure 8(a) and the local rules of this Court. Plaintiff cited specific clauses under

the LMRDA under which their rights are protected, and relief is available. Further, Plaintiff has

also demonstrated that Plaintiff has only plead relief sought from this Court in its

official capacity, and that sound case law exists to protect his rights. For the reasons state herein,

Plaintiff requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By: /s/ Heather Abreu
Heather Abreu
Texas Bar No. 24122577
Phone: (972) 327-5800
Email: heather@KDphillipslaw.com

By: /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com

5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing and Facsimile **on this the** 4th **Day of August, 2022.**

William Osborne
Margot Nikitas
Sanford Denison

/s/
Heather Abreu

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| EUGENIO VARGAS, | § | |
| | § | |
| Plaintiff/Counterclaim Defendant, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00430-O |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | |
| FLIGHT ATTENDANTS, JULIE | § | |
| HEDRICK, AND ERIK HARRIS, | § | |
| | § | |
| Defendants/Counterclaim Plaintiffs. | § | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF AND BRIEF IN SUPPORT

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214

MARGOT A. NIKITAS*
Illinois Bar No. 6309782
General Counsel
Association of Professional
 Flight Attendants
1004 W. Euless Boulevard
Euless, TX 76040

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015

*Admitted *Pro Hac Vice*

*Counsel for Defendant Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*

Dated: July 14, 2022

Exhibit A

## I.     **INTRODUCTION**

Defendants Julie Hedrick, Erik Harris and Defendant/Counterclaim Plaintiff Association of Professional Flight Attendants ("APFA") (collectively, "Union Defendants") by their undersigned counsel, respectfully submit this Motion to Dismiss Plaintiff Eugenio Vargas's ("Vargas") claims for relief in their entirety for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, as a matter of law, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure ("FRCP").[1]  In support of their Motion, the Union Defendants submit this Memorandum of Law.

## II.    **STATEMENT OF THE CASE**

Plaintiff Vargas, a member and former National Treasurer of APFA, has brought this lawsuit against APFA and two of its current officers, National President Julie Hedrick and National Treasurer Erik Harris, in an attempt to vacate and annul the arbitration decision and order,[2] and supplemental decision clarifying that decision[3] issued against him by Arbitrator Ruben Armendariz (collectively, "Arbitrator's Decision and Order"). The facts of the case are plain from the Complaint and attached Arbitrator's Decision and Order:

Based upon internal union charges filed by two APFA members, Melissa Chinery-Burns and Sandra Lee ("Charging Parties"), against Vargas under Article VII of the APFA

---

[1] This motion seeks dismissal of all of Plaintiff Vargas's claims against all Defendants herein as asserted in his Complaint (doc.1), leaving pending APFA's Counterclaim against Vargas asserted in the Union Defendants' Answer and Counterclaim (doc. 11, at pgs. 20-30, PAGE ID 106-116). As individual defendants Julie Hedrick and Erik Harris are not parties to APFA's counterclaim against Vargas, upon dismissal of Vargas's claims against the Defendants, Hedrick and Harris should be dismissed as parties to this action.

[2] Attached as Exhibit A to the Complaint (doc. 1-1, PAGE ID 13-51) and Exhibit A to the Union Defendants' Answer and Counterclaim (doc. 11-1, PAGE ID 119-157).

[3] Attached as Exhibit B to the Union Defendants' Answer and Counterclaim (doc. 11-2, PAGE ID 158-159).

1

Exhibit A

Constitution, reviewed by the APFA Executive Committee and then referred for resolution to

Arbitrator Armendariz, pursuant to Article VII of the APFA Constitution, a three-day hearing

was held on the record on September 14-16, 2022. The issues as presented to the Arbitrator were

whether Vargas, when acting as the APFA National Treasurer, violated the APFA Constitution[4]

and Policy Manual by:

    (1)    Violating the Meal Expense Policy;

    (2)    Failing to maintain an inventory thereby violating Article III, Section 6.E. of the APFA Constitution by failing to maintain union assets;

    (3)    Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such;

    (4)    Allowing the payment to former National President Bob Ross of thousands of dollars in Meal Expense Allowance and Special Assignment Fee when he was no longer working at APFA;

    (5)    Violating the credit card policy by charging a rental car and meals for a trip to Spain;

    (6)    And, if so, what should be the appropriate remedy.

Arbitrator's Decision and Order at 2-3.

During the three-day hearing, the Charging Parties called nine (9) witnesses to testify in

support of their charges against Vargas and Vargas called seven (7) witnesses in his defense.

Arbitrator's Decision and Order at 2.  Following the close of the hearing and the filing of briefs

by the parties, the Arbitrator issued a decision on February 18, 2022, and a supplemental

decision on March 10, 2022, which clarified certain aspects of the remedy.

Regarding the Meal Expense Policy allegation, the Arbitrator directed APFA to retain an

independent auditor to review Vargas's records during his tenure as National Treasurer to

determine the extent of the alleged violations. The Arbitrator sustained the allegations regarding

Vargas's alleged failure to maintain proper inventory of union assets, dismissed the allegation of

---

[4] The relevant provisions of the APFA Constitution and Policy Manual are restated in the Arbitrator's Decision and Order at 4-7.

Exhibit A

his allegedly allowing then National President Bob Ross to receive excessive meal allowances and dismissed the rental car allegations against Vargas as moot. Arbitrator's Decision and Order at 30-35.

For his remedy, the Arbitrator ordered Vargas to reimburse APFA for any personal meal expenses unrelated to union business, found to be due after the independent auditor's review and to pay for one half of the Arbitrator's expenses. Arbitrator's Decision and Order at 39. He also prohibited Vargas from serving in any official position within the APFA organization for life and ordered Vargas to repay the APFA for one quarter of the independent auditor's fee. Supplemental Decision and Order at 2.

Plaintiff Vargas then filed this lawsuit against Defendants APFA and its National President and National Treasurer—*none* of whom were parties to the Vargas arbitration proceeding—alleging that the Arbitrator's Decision and Order should be vacated as violative of the Federal Arbitration Act ("FAA") (Complaint, Paragraph 1, 7) and Section 101(a)(5) of the Labor-Management Reporting and Disclosure Act ("LMRDA") (Complaint, Paragraphs 1, 7, 41). He also alleged breach of the APFA Constitution (Complaint, Paragraphs 45-51), and breach of fiduciary duty, which the Union Defendants assume refers to an alleged violation of Section 501(a) of the LMRDA. (Complaint, Paragraphs 52-57).

In its answer to the Complaint, APFA filed a Counterclaim[5] against Vargas for enforcement of the Arbitrator's Decision and Order and for breach of his fiduciary duties as APFA National Treasurer as determined by the Arbitrator in his Decision and Order.[6]

---

[5] Doc. 11 at pgs. 20-30, PAGE ID 106-116.

[6] See Exhibits A and B to the Union Defendants' Answer and Counterclaim (doc. 11, PAGE ID 119-159) and Exhibit A to the Complaint (doc 1-1, PAGE ID 13-51.)

Exhibit A

As we now show, Vargas's claims for relief should all be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Under well settled precedent there is *no* subject matter jurisdiction for Vargas's claims under either the FAA or Section 101(a)(5) of the LMRDA, and *none* of the allegations in the Complaint asserts a claim upon which relief can be granted as a matter of law. Dismissal of Vargas's baseless claims against the Union Defendants will leave APFA's Counterclaim against Vargas for enforcement of the Arbitrator's Decision and Order and breach of fiduciary duty to be resolved by the Court.

## III. STANDARD OF REVIEW

FRCP 12(b)(1) requires dismissal of any claim over which federal courts lack subject matter jurisdiction. If the court determines that it lacks subject matter jurisdiction, it must dismiss the action. FRCP 12(h)(3). A court may find subject matter jurisdiction is lacking from "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (*per curiam*).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (citation omitted). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id.* (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977) (*per curiam*)).

With regard to dismissal under Rule 12(b)(6), this Court recently summarized the relevant precedents in *Oliver v. Univ. of Texas Sw. Med Sch.*, 2019 U.S. Dist. LEXIS 21289, 2019 WL 536376 at *16-17 (2019) (J. Boyle):

4

Exhibit A

In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve **[*17]** this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

In addition, the court may consider documents attached to the complaint in considering a motion under Rule 12(b)(6) if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## IV.    ARGUMENT

### A.    The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act

The first of Vargas's two asserted bases for subject matter jurisdiction for review and vacation of the Arbitrator's Decision and Order (Complaint, Paragraph 1, 7)—that the FAA provides subject matter jurisdiction to review and vacate the Arbitrator's Decision and Order—is in error as a matter of law. Precedent is well settled to the contrary: the FAA does not provide subject matter jurisdiction to review arbitration awards. *Smith v. Rush Retail Ctr., Inc.,* 291 F. Supp. 2d 479, 487 (W.D. Tex. 2003) (citing authorities), *aff'd* 360 F. 3d 504, 505 (5th Cir. 2004); *Mellado v. MBNA Am. Bank,* 2004 U.S. Dist. LEXIS 25471, 2004 WL 2937224 at *3-4 (N.D. Tex. 2004) (J. Lynn); *Judd v. Texakoma Fin., Inc.,* No. 3:96-CV-26 04-P, 1996 WL 734940, at *4 (N.D. Tex. Dec. 11, 1996) (J. Solis).

Exhibit A

### B. The Arbitrator's Decision Is Not Subject to Judicial Review Under LMRDA Section 101(a)(5)

The second of Vargas's two asserted bases for subject matter jurisdiction—the contention that the Arbitrator's Decision and Order violated LMRDA Section 101(a)(5) (Complaint, Paragraph 1, 7)—is likewise erroneous as a matter of law. To the contrary, it is well settled that while LMRDA Section 101(a)(5) does provide subject matter jurisdiction for judicial review of internal, *union-conducted* disciplinary proceedings, it does *not* provide or confer subject matter jurisdiction for judicial review of other union-related administrative or legal matters such as the third-party arbitration award in this case. *Breininger v. Sheet Metal Workers Local 6*, 493 U.S. 67, 92-94 (1989); *Guidry v. Operating Engineers Local 406*, 907 F.2d 1491, 1492 (5th Cir. 1990); *Webster v. United Auto Workers Local 5*, 394 F. 3d 436, 441 (6th Cir. 2005); *Hackenburg v. Boilermakers*, 694 F. 2d 1237, 1239 (10th Cir. 1982); *Bass v. Int'l Bro. of Boilermakers*, 630 F. 2d 1058, 1066 (6th Cir. 1980); *Kirk v. Transport Workers Union*, 934 F. Supp. 775, 785 (S.D. Tex. 1995); *Ryals v. ILA Local 1771*, 33 F. Supp. 3d 634, 639-40 (D.S.C. 2014).

In other words, because there is no subject matter jurisdiction under either the FAA or LMRDA Section 101(a)(5), which are the only two jurisdictional bases cited in the Complaint as support for Vargas's challenge to the Arbitrator's Decision and Order, the Complaint must be dismissed for lack of jurisdiction. *See* FRCP 12(b)(1).

### C. Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order Violates Settled Federal Labor Law Principles

Even assuming, for purposes of argument *only*, that Vargas has asserted a viable jurisdictional basis in the Complaint to support his challenge to the Arbitrator's Decision and Order, the Complaint fails to state a claim for which relief can be granted because, on its face, the claim *violates* the federal labor law axiom requiring judicial deferral to final and binding labor arbitration decisions, *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363

Exhibit A

U.S. 593, 597-99 (1960); *Delek Ref. Ltd. v. Local 202 Steelworkers*, 891 F. 3d 566, 570 (5th Cir. 2018); *Weber Aircraft v . IBT  Local 767*, 253 F.3d 821, 824 (5th Cir. 2001); *Refresco Bevs.v. Teamsters Local 997*, 2021 U.S. Dist. LEXIS 238421, 2021 WL 5908988 at *7-8 (N.D. Tex. 2021) (J. O'Connor); *Teamsters Gen. Drivers Warehousemen v. Greif Packaging, LLC*, 2010 WL 1417889, at *7 (S.D. Tex. Apr. 7, 2010) (J. Atlas); *Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 (N.D. Tex. 2007) (J. Means).[7]

The Fifth Circuit recently summarized the restrictive standard of judicial review of labor arbitration decisions in its unpublished decision in *Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) [*Attachment 1*]:

> "Judicial review of arbitration awards is severely limited." "The standard for this review is 'among the narrowest known to the law.'" When an arbitration award settles a labor dispute, judicial review is "particularly constrained." "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."

> Under this unusually deferential standard of review, "courts are not authorized to reconsider the merits of an award." "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits. Instead of assessing how well the arbitrator interpreted the contract, [*8] we ask if the arbitrator acted within the contract's bounds. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."

> To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'" "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end." In these

---

[7] Vargas's attempt to vacate the Arbitrator's Decision and Order likewise violates the settled doctrine of judicial noninterference in internal union governance. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953); *Carr v. ALPA*, 866 F.3d 597, 602-03 and n.16 (5th Cir. 2017); *O'Neill v. Air Line Pilots Ass'n*, 939 F.2d 1199, 12Ci06 (5th Cir. 1991); *Newell v. IBEW*, 789 F.2d 1186, 1189 (5th Cir. 1986).

Exhibit A

situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award. "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority,'" however, "'that ambiguity must be resolved in favor of the arbitrator.'" (Footnotes and citations omitted).

*See also Allied Waste, supra*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *19-21 (J. Means) (awarding attorneys fees as remedy for baseless attempt to vacate arbitration award).[8]

Nowhere in the Complaint does Vargas allege, much less provide specific citation for, any contention that the Arbitrator exceeded his authority or violated the express terms of his jurisdiction under the governing provisions of Article VII of the APFA Constitution. Indeed, his objections are entirely limited to the merits of the charges and the procedural conduct of the hearing. Complaint, Paragraphs 20-25, 30-35. Nor did Vargas make any such jurisdictional argument to the Arbitrator during or after the hearing. Arbitrator's Decision and Order at 26-30. Vargas's attempt to persuade the Court to vacate the Arbitrator's Decision and Order thus fails on this additional legal basis.

As the Tenth Circuit Court of Appeals put it well, "[b]ecause arbitration presents such a 'narrow standard of review,' [28 U.S.C.] Section 1927 sanctions are warranted if the arguments presented are 'completely meritless' [citation omitted] [and] to underscore the point that unjustified, protracted attempts to vacate arbitration awards. . .will not be tolerated [one] does so at the risk of being sanctioned." *DMA Inter., Inc. v. Qwest Comm. Inter., Inc.*, 585 F.3d 1341,1345-46 (10th Cir. 2009).

### D.    Plaintiff's Remaining Claims Are Without Merit

The remaining claims in the Complaint—breach of the APFA Constitution and breach of

---

[8] The same "exceedingly deferential" standard of review of arbitration awards applies to cases which, unlike the instant case, are reviewable under the FAA. *Lalo LLC v. Hawk Apparel, Inc.*, 2022 U.S. Dist. LEXIS 72218, 2022 WL 1173801 at *5-7 (N.D. Tex. 2022) (J. Lindsay).

Exhibit A

fiduciary duty, which the Union Defendants assume refers to an alleged violation of LMRDA Section 501—are also subject to dismissal.

First, Vargas has neglected to even assert *any* jurisdictional basis for either claim.

Second, relief is precluded, again as a matter of law, because, under the APFA Constitution and settled precedent, Vargas was legally obligated to exhaust the mandatory internal union remedies "prior to taking any legal action." *Clayton* v. *International Union*, 451 U.S. 679, 692 (1981); *Hayes* v. *Brotherhood of Ry. & Airline Clerks*, 727 F.2d 1383, 1385-86 (5th Cir.), *cert*. *denied* 469 U.S. 953 (1984). In other words, if he had any valid claims against National President Hedrick or National Treasurer Harris, he could have brought them internally under Article VII of the APFA Constitution, but he did no such thing and his failure to do so is grounds for dismissal of his claims under FRCP 12(b)(6).[9]

Third, before filing his Section 501(a) claim in court, Vargas was required by Section 501(b) to make a demand for remedial action by the APFA. *Adams-Lundy v. Ass'n of Prof. Flight Attendants*, 844 F. 2d 245, 248-49 (5th Cir. 1988); *Van Elder v. Amalgamated Transit Union Local 1338*, 2014 U.S. Dist. Lexis 63202, 2014 WL 1808079 at *10-11 (N.D. Tex. 2014) (J. Horan). Once again, Vargas did not even attempt to comply with this mandatory statutory prerequisite and his Section 501 claim fails to state a claim for relief on its face.

Finally, the breach of APFA Constitution and LMRDA Section 501 claims in Vargas's Complaint fail, again as a matter of law, on preemption grounds: the underlying allegations are all directly and entirely related to Vargas's challenge to the Arbitrator's Decision and Order and

---

[9] Likewise, as a matter of law, as Union officers National President Hedrick and National Treasurer Harris are not proper Defendants in any case. *Atkinson v. Sinclair Refining Co*., 370 U.S. 238, 247-49 (1962); *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 406-07 (1981); *Universal Communications Corp. v. Burns*, 499 F.2d 691, 693-94 (5th Cir. 1971).

Exhibit A

are therefore preempted. *Woodcock v. Marathon Petroleum*, 2019 U.S. Dist. LEXIS 66447, 2019 WL167618187 at *5-6 (S.D. Tex. 2019) ("Preemption occurs when a decision on the [nonlabor] claim is inextricably intertwined with consideration of the terms of the labor contract or when the application of state law to a dispute requires interpretation of the collective-bargaining agreement." *Thomas v. LTV Corp.*, 39 F. 3d 611, 615-16 (5th Cir. 1994). *See also Blanks v UAW*, 837 F. Supp. 2d 609, 616 (N.D, Tex. 2011), (J. Means), *aff'd* 464 Fed. Appx. 284 (5th Cir. 2012).

Here, the governing "labor contract" under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. §185(a), is the APFA Constitution, not a collective bargaining agreement. *United Ass'n of Journeymen v. Local 334*, 452 U.S. 615, 622 (1981); *Wooddell v. Int'l Bhd. of Elec. Workers*, 502 U.S. 93, 99, 101 (1991); *Hampton v. Int'l Longshoreman's Ass'n*, 2017 U.S. Dist. LEXIS 218154 at *5-6 (S.D. Tex. 2007) [*Attachment 2*]. But the legal principle of federal preemption and the outcome are the same.

**V.      CONCLUSION**

For the reasons stated, the Union Defendants respectfully submit that all of Plaintiff Vargas's claims for relief in the Complaint must be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1) and also for their failure to state a claim for relief as a matter of law under FRCP 12(b)(6), leaving APFA's Counterclaim for enforcement of the Arbitrator's Decision and Order and for Vargas's breach of fiduciary duty as an APFA officer to be resolved by the Court. Individual defendants Julie Hedrick and Erik Harris, upon dismissal of all claims against them by Plaintiff Vargas, should also be dismissed as parties to this action as they are not parties to the remaining counterclaim by APFA against Vargas.

Exhibit A

Date: July 14, 2022                          Respectfully Submitted,


  /s/ Sanford R. Denison
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

MARGOT A. NIKITAS*
Illinois Bar No. 6309782
General Counsel
Association of Professional
  Flight Attendants
1004 W. Euless Boulevard
Euless, TX 76040
Tel. (817) 540-0108 ext. 8108
Fax. (817) 355-1919
Email: MNikitas@apfa.org

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015
Tel.: (202) 243-3200
Fax.: (202) 686-2977
Email: b.osborne@osbornelaw.com

*Counsel for Defendant Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*

*Admitted *Pro Hac Vice*

11

Exhibit A

## CERTIFICATE OF SERVICE

I certify that on this 14th day of July 2022 a true and correct copy of the foregoing document was served on the below listed counsel of record for Plaintiff/Counterclaim Defendant Vargas by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

KERRI PHILLIPS
HEATHER ABREU
K.D. Phillips Law Firm, PLLC
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com
Email: Heather@KDphillipslaw.com

Date: July 14, 2022                    _/s/ Sanford R. Denison_____
                                        SANFORD R. DENISON

Exhibit A

*Ball Metal Container Corp. v. United Auto Workers Local 129*,
2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022)

*Attachment 1*

Exhibit A

**Ball Metal Beverage Container
Corporation, Plaintiff-Appellee,
v.
Local 129, United Automobile, Aerospace,
and Agricultural Implement Workers of
America, Defendant-Appellant.**

**No. 21-10755**

**United States Court of Appeals, Fifth
Circuit**

**February 4, 2022**

Appeal from the United States District Court
for the Northern District of Texas USDC 4:20-CV-
797

Before Owen, Chief Judge, and Clement and
Engelhardt, Circuit Judges.

Per Curiam [*]

This labor dispute concerns an ==arbitrator's
decision. We uphold the award and reverse the
contrary judgment of the district court.== The
parties

1

may present their arguments regarding back pay
and benefits from the date that the employee was
prepared to return to work for arbitration.

**I**

Ball Metal Beverage Container Corporation
(Ball Metal) operates a beverage can plant in Fort
Worth, Texas. Local 129, United Automobile,
Aerospace, and Agricultural Implement Workers
of America (Local 129) is a labor union that serves
as the exclusive bargaining representative for
some Ball Metal employees.

Ball Metal and Local 129 are parties to a
collective bargaining agreement (CBA) that
governs the terms of employment for employees
represented by the union. The version of the CBA
pertinent to this dispute contains a management
rights provision that includes this provision:

Except as otherwise expressly
limited by this Agreement, all
functions of management not
otherwise relinquished or limited
shall remain vested exclusively in
the Company, including, but not
limited to . . . hire, discipline, or
discharge employees for just cause; .
. . provided that these rights shall
not be exercised in any manner
which would constitute a breach of
any other Article of this Agreement.

Another article of the agreement, titled
"Disciplinary Actions and Discharge," provides:
"The right of the Company to discipline or
discharge employees for good cause including
violations of this Agreement or Company rules is
hereby acknowledged." Aside from these
provisions, the CBA does not describe what
constitutes just or good cause.

The CBA also outlines procedures for
addressing grievances, including arbitration
procedures. When the parties submit a dispute for
arbitration, the arbitrator's decision "shall be final
and binding on all parties." The arbitrator's
authority, however, is constrained. The

2

agreement states that "[t]he jurisdiction of the
arbitrator shall be limited to interpreting or
determining compliance with the terms of this
Agreement. The arbitrator shall have no power to
add to or subtract from, to disregard or modify
any part or all of the terms of this Agreement."

Ball Metal has rules and policies that govern
misconduct. There is a plant rule against
harassment as well as a company policy that
prohibits discrimination, harassment, and
retaliation. The plant rule defines harassment as
activity "of a sexual nature, racial nature, a
religious nature or any activity that can be
construed as harassment." Employee training
materials describe harassment as including
"behavior towards another person which is
unwelcome and personally offensive to [the]



Exhibit A

recipient and . . . creates an intimidating, offensive or hostile work environment."

Ball Metal does not prescribe any particular sanction for a harassment violation. The harassment policy provides only that violations "will subject th[e] employee to appropriate disciplinary action, up to and including termination." More generally, for violations of plant rules and company policies, "progressive discipline is to be followed except that steps for discipline 'may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.'" The procedure is different for selected rules not at issue here whose violation "will result in automatic suspension for purpose of discharge."

Shawn Allen, a Ball Metal employee, was a member and an elected shop chairman of the union. He had worked at Ball Metal since 2006. In 2019, Allen was accused of harassing a coworker. Specifically, he was accused of yelling at the coworker and calling him a "f ------ g scab" after learning that the coworker had left the union. Allen had been accused of similar conduct in the past. He had not otherwise been disciplined for behavioral or productivity issues.

3

After an investigation, Ball Metal terminated Allen in late June 2019. Local 129 filed a grievance contesting the termination decision, which proceeded to arbitration. The parties presented these questions to the arbitrator: "Whether or not the Grievant, Shawn Allen, was terminated for proper cause and, if not, what is the appropriate remedy?"[1]

On July 6, 2020, the arbitrator issued an opinion and award. In the "DISCUSSION AND FINDINGS" section of the decision, the arbitrator determined that, "[u]nder the parties['] CBA, . . . the Company had proper cause to discipline the Grievant for violation of" Ball Metal's harassment policy and plant rule. The arbitrator also determined that, "[b]esides the CBA and Company Policy, the Grievant's conduct violated

the Preamble of the CBA," which urged "promot[ing] a cooperative and progressive industrial and economic relationship between the Company and its employees." The arbitrator further explained that "while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service." He concluded that "based upon all the previous discussion the termination decision is modified in the following AWARD."

On the following page, under the heading "AWARD," the arbitrator wrote: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority."

4

The award provided that, instead of termination, Allen would be suspended from the date of his discharge to the date of his return to work; he would be offered immediate reinstatement without back pay or benefits; and he would retain his seniority. In essence, the arbitrator reduced the sanction to a roughly yearlong unpaid suspension.

The day after the arbitrator issued the decision, Local 129 informed Ball Metal that Allen wanted to return to work and was prepared to do so immediately. The company declined to reinstate him. Instead, on July 30, 2020, Ball Metal filed suit under § 301 of the Labor Management Relations Act seeking vacatur of the arbitrator's award. Local 129 counterclaimed seeking enforcement of the arbitrator's award, attorneys' fees, and back pay and benefits for the period of noncompliance since the award. The parties filed cross motions for summary judgment.

The district court granted summary judgment in favor of Ball Metal and vacated the arbitrator's award. The court held that the arbitrator exceeded his authority under the CBA by modifying Allen's sanction after stating that there was just cause for termination. The court



Exhibit A

did not discuss the portion of the award in which the arbitrator stated that Allen "was not terminated for proper cause." The court also denied attorneys' fees. On appeal, Local 129 challenges the vacatur and attorneys' fees rulings.

## II

### A

We begin with the challenge to the vacatur ruling. "We review a district court's grant of summary judgment in a suit to vacate an arbitration award *de novo*."[2] Summary judgment is appropriate "if the movant shows

5

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

"Judicial review of arbitration awards is severely limited."[4] "The standard for this review is 'among the narrowest known to the law.'"[5] When an arbitration award settles a labor dispute, judicial review is "particularly constrained."[6] "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."[7]

Under this unusually deferential standard of review, "courts are not authorized to reconsider the merits of an award."[8] "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."[9] Instead of assessing how well the arbitrator interpreted the contract, we ask if the arbitrator acted within the contract's bounds.[10] "[A]n arbitrator is confined to interpretation and

6

application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."[11]

To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'"[12] "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end."[13] In these situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award.[14] "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority, '" however, "'that ambiguity must be resolved in favor of the arbitrator.'"[15]

### B

Our decisions in *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103*[16] and *Weber Aircraft Inc. v. General Warehouseman and Helpers Union Local 767*[17] are instructive, if not dispositive. In *Albemarle*, an arbitration award ordered suspension instead of termination for employees

7

who had violated safety rules. We reversed the district court's vacatur of that award.[18] The management rights clause in the CBA provided that "the suspending, disciplining and discharging employees for cause . . . are all rights solely of the COMPANY."[19] We understood the clause to "contemplate[] situations in which a finding of 'cause' could support lesser sanctions than termination."[20] We drew a distinction between this clause and clauses in other CBAs that provided only for discharge, from which "authority to impose a lesser alternative sanction cannot be arguably inferred."[21]

Because the CBA in *Albemarle* did not "make clear that any violation of safety rules is an



Exhibit A

offense requiring discharge," we accepted the interpretation of the arbitrator, who determined that the employees' violations were cause only for discipline, not termination.[22] We acknowledged that "an arbitrator could quite naturally read the CBA to specify that Albemarle employees' jobs are contingent on strict adherence to safety rules," but we concluded that was "not the only arguable reading."[23] It was also permissible to read the CBA as the arbitrator had done and "infer degrees of punishment for infractions based on the egregiousness of

8

employee conduct," rather than "assume[] that all safety violations mandate the same, harsh penalty of termination."[24]

Similarly, in *Weber*, we reversed the district court's vacatur of an arbitration award that ordered suspension instead of termination for an employee who had committed sexual harassment.[25] The employee had worked at the company for over twenty-five years.[26] The CBA reserved for the employer "the right to . . . suspend, and/or discharge for just cause."[27] For the harassment rule specifically, the CBA categorized violations as grounds for "Immediate Suspension for investigation/Possible Discharge."[28] Although the arbitrator determined that the employee had engaged in sexual harassment, he decided that termination was "excessive, given the facts of the case and [the employee's] prior record of service."[29]

We held that the arbitrator was within "the ambit of his authority under the CBA by determining that, while there was not just cause to fire [the employee], there was just cause to suspend him without backpay for some eleven months."[30] We accepted the arbitrator's interpretation of the CBA as "authorizing a range of punishment" for harassment violations.[31] We deemed this reading "plausible because the CBA provides that [the] . . . violation calls for suspension and possible, not certain, discharge; and

9

because the CBA does not establish a fixed definition of 'just cause,' plainly indicating that the standard varies with the level of punishment."[32] Given the flexibility within the provisions, "to find in favor of Weber's suspension or discharge of an employee, the arbitrator has to find that Weber had just cause *for the particular disciplinary action taken*."[33]

Like the CBAs in *Albermarle* and *Weber*, the CBA here "contemplates situations in which a finding of 'cause' could support lesser sanctions than termination."[34] The management rights clause provides that Ball Metal could "hire, discipline, or discharge employees for just cause." As in *Weber*, this provision suggests that "just cause" means "just cause for the particular disciplinary action taken."[35] Indeed, when the parties framed the issue for the arbitrator, they did so in terms of the sanction and asked whether Allen "was terminated for proper cause."

We have determined "that explicating broad CBA terms like 'cause,' when left undefined by contract, is the arbitrator's charge."[36] In addition to assessing the nature of the violations, an arbitrator may under our precedents take account of employee tenure in determining whether just cause for

10

discipline exists rather than for dismissal.[37] Had Ball Metal wished to remove consideration of any mitigating factors, it could have required termination for all harassment violations in the CBA or in company rules.[38] In fact, Ball Metal did designate violations of other rules as mandating "automatic suspension for purpose of discharge." The company did not place harassment violations like Allen's within that category, providing instead that they warranted "appropriate disciplinary action, up to and including termination." The flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination. The penalty



selected- unpaid suspension for over a year-was well within the arbitrator's discretion.[39]

In light of our precedents, we conclude that the arbitrator could construe the CBA to mean that Allen's violations were just cause for discipline, rather than just cause for termination, given the character of the violations and his tenure. We hold only that this interpretation is an

11

"arguable reading" of the CBA, not that it is the best or even a good one.[40] "The correctness of the arbitrator's interpretation is irrelevant so long as it was an *interpretation*."[41]

### C

The arbitrator stated both that there was just cause for termination and that there was not. Given our especially deferential standard of review, we are bound to resolve the ambiguity in the arbitrator's favor.[42]

In declining to terminate Allen, the arbitrator explained his reasoning as follows:

> Under the parties['] CBA, the Arbitrator concludes that the Company had proper cause to discipline the Grievant for violation of the Company's Discrimination, Harassment, and Retaliation Policy (CX-4) and Plant Rules No. 21 . . . . The Grievant's conduct created the violations and he alone must bear the repercussions. Besides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA . . . .

> The Arbitrator is of the opinion, however, that while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service. Accordingly, based upon all the

previous discussion the termination decision is modified in the following award.

On the following page, labeled "AWARD," the arbitrator continued: "The Grievant, Shawn Allen was not terminated for proper cause, as the

12

Company failed to give proper consideration to the Grievant's seniority." The award then set forth the terms of Allen's modified suspension sanction.

Ball Metal argues that the arbitrator exceeded his jurisdiction under the CBA because he impermissibly altered the sanction after he determined that there was just cause for termination. In Ball Metal's view, the arbitrator recognized that there was just cause to terminate Allen but then went on to factor in tenure, which he had no authority to consider at that point. Local 129 takes another view, emphasizing the arbitrator's later conclusion that there was not just cause for termination. The union reads the arbitrator's earlier reasoning to mean that Ball Metal had just cause to discipline, and could have had just cause for termination, but in the last analysis did not, because of Allen's seniority.

The arbitrator plainly stated that "the Company's decision to terminate the Grievant was for just cause," and then just as plainly stated that "the Grievant, Shawn Allen was not terminated for proper cause." Neither party has persuaded us that its interpretation stressing one rather than the other of these statements is the only possible



Exhibit A

reading. When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, we must enforce the award. As the Supreme Court has explained, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."[43] "Unless the

13

arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,' a court is bound to enforce the award . . . even when the basis for the arbitrator's decision may be ambiguous."[44]

Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. "It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award."[45] Although explanations of arbitration awards are not mandatory, they are desirable.[46] To encourage justification, the Supreme Court has advised against "overturning awards based on ambiguities that can be identified in the explanations arbitrators choose to give," since that "would discourage them from providing those reasons in the first place."[47] So long as "[w]e can discern a possible rationale from the arbitrator's actions, . . . his decision 'must stand.'"[48]

We deem possible the rationale that the union suggests: the arbitrator could have determined that the

offense was not in fact just cause for termination in light of Allen's tenure. A Seventh Circuit case involving similar facts supports our conclusion. In *Arch of Illinois, Division of Apogee Coal Corp. v. District 12, United Mine Workers*,[49] the Seventh Circuit affirmed an arbitration award that ordered suspension instead of termination for an

14

employee who had violated a rule against sleeping at work.[50] Similar to the Ball Metal CBA, the Arch of Illinois CBA provided that covered employees could not be "disciplined or discharged except for just cause."[51] Early in the opinion, the arbitrator observed that "sleeping is sufficient just cause to trigger a discharge" and described other concerns with the employee's conduct, concluding that, "[f]or all of those reasons therefore the grievant should be terminated."[52] Later in the opinion, however, the arbitrator decided that the employee should be suspended rather than terminated, reasoning that "the senior person's length of service must be recognized when that individual is dealt with by way of termination."[53]

The company argued that the arbitrator had exceeded his authority by modifying the penalty after already determining that there was just cause for termination.[54] The Seventh Circuit considered the company's interpretation reasonable but not inevitable.[55] That was insufficient because the company "must do more than merely show that its interpretation of the opinion is reasonable; it must demonstrate that the opinion cannot reasonably be interpreted in any other way."[56] The company did not make that showing.[57] The alternative interpretation



Exhibit A

that the company "lacked just cause to discharge [the employee] because of its failure to consider his seniority is not

15

so far-fetched as to lead us to deduce that the arbitrator relied on a noncontractual basis for the award."[58] The court explained that, "before we reject an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based his decision on noncontractual grounds."[59]

For similar reasons, we uphold the arbitrator's award in Allen's case. Because the opinion does not unambiguously reflect that the arbitrator exceeded his authority, we must enforce his award.

**III**

We next address the union's challenge to the attorneys' fees ruling. We review the district court's denial of attorneys' fees for abuse of discretion.[60] "For the same reason that judicial review of arbitration awards is limited, a party may be awarded attorneys' fees if it has to fight back a court challenge to the award it obtained in the parties' chosen forum."[61] "This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dilatory tactics that lead to wasteful and unnecessary litigation."[62]

Courts award fees when the challenge to the arbitrator's decision is "without justification."[63] "'Without justification' refers not to the strength

16

of the challenge but to the type."[64] Challenges to an arbitrator's jurisdiction or authority do not result in fee awards, whereas challenges to the "intrinsic merits" of a dispute justify fee awards even if the challenges are not frivolous.[65] "[W]hen parties have agreed to arbitrate a dispute, a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the

parties' agreement to be bound by the arbitrator's decision."[66]

Ball Metal challenged the arbitrator's authority, so a fee award is unwarranted. Throughout its brief, Ball Metal framed its challenge in jurisdictional terms. The company consistently characterized the arbitrator's modified sanction as an action "exceeding his authority," rather than as a misreading of the contract's terms.[67] Ball Metal did not contest the arbitrator's interpretation of "just cause for termination."[68] Instead, Ball Metal assumed that the arbitrator had recognized just cause for termination and argued that he defied the limits on his authority that determination imposed.[69] Because Ball Metal's challenge was jurisdictional, the district court did not abuse its discretion in denying a fee award.

17

**IV**

Finally, we address the parties' joint request for clarification about the award during the period of the company's noncompliance. Specifically, the parties request a remand to the arbitrator to determine whether to award back pay and benefits for this period.

The arbitrator's decision does not make clear what the award would be in the event of noncompliance. The award states that "[t]he Grievant will be offered immediate reinstatement without back pay and benefits," but it does not address whether back pay or benefits would be warranted if Allen was not offered immediate reinstatement. When, as here, an arbitrator's decision does not specify the award during a period of noncompliance, "the court is authorized to remand to the arbitrator" for clarification.[70] Since both parties have requested a remand for this purpose, we will order one.

We REVERSE the award of summary judgment in favor of Ball Metal and RENDER judgment in favor of Local 129. We AFFIRM the denial of attorneys' fees. We REMAND to



Exhibit A

determine whether to award backpay and benefits during Ball Metal's period of noncompliance.

18

---------

Notes:

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

[1] As noted, the CBA uses the terms "just cause" and "good cause," and the parties framed the issue for the arbitrator using a third term, "proper cause." The record shows no distinction in the meaning of the terms, and neither party argues for one. For ease of reading, we use the terms interchangeably. *Cf. Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989) (observing that the phrases "proper cause" and "just cause" "carr[y] no talismanic significance in labor jurisprudence" but rather are merely "term[s] of art that define[] the many unrelated, independent acts that serve as grounds for employee discipline").

[2] *Beaird Indus., Inc. v. Local 2279*, 404 F.3d 942, 944 (5th Cir. 2005).

[3] Fed.R.Civ.P. 56(a).

[4] *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union*, 831 F.2d 72, 74 (5th Cir. 1987).

[5] *Cont'l Airlines v. Air Line Pilots Ass'n, Int'l*, 555 F.3d 399, 405 (5th Cir. 2009) (quoting *E. Air Lines, Inc. v. Transp. Workers Union, Local 533*, 580 F.2d 169, 172 (5th Cir. 1978)).

[6] *Teamsters Local No. 5 v. Formosa Plastics Corp.*, 363 F.3d 368, 371 (5th Cir. 2004).

[7] *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 37 (1987).

[8] *Id.* at 36.

[9] *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quoting *E. Assoc. Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)).

[10] *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *see also Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989) ("We have interpreted Supreme Court jurisprudence as requiring vacation of arbitral decisions that reinstate discharged employees when such arbitral action is deemed to be an ultra vires act.").

[11] *Id.*

[12] *Commc'ns Workers v. Sw. Bell Tel. Co.*, 953 F.3d 822, 826-27 (5th Cir. 2020) (quoting *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994)).

[13] *Delta Queen*, 889 F.2d at 602.

[14] *Delek Refin., Ltd. v. Local 202, United Steel*, 891 F.3d 566, 570 (5th Cir. 2018).

[15] *Quezada v. Bechtel OG & C Const. Servs. Inc.*, 946 F.3d 837, 844 (5th Cir. 2020).

[16] 703 F.3d 821 (5th Cir. 2013).

[17] 253 F.3d 821 (5th Cir. 2001).

[18] *Albemarle*, 703 F.3d at 824, 828.

[19] *Id.* at 823.

[20] *Id.* at 825.

[21] *Id.* (quoting *Weber*, 253 F.3d at 825) (first citing *E.I. DuPont de Nemours & Co. v. Local 900 of Intern. Chem. Workers Union*, 986 F.2d 456, 459 (5th Cir. 1992); then citing *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 601, 603-04 (5th Cir. 1989)).

[22] *Id.*



[23] *Id.* at 826.

[24] *Id.*

[25] *Weber*, 253 F.3d at 823-24.

[26] *Id.* at 823.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 824.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 823 (emphasis added).

[34] *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103*, 703 F.3d 821, 825 (5th Cir. 2013).

[35] *Weber*, 253 F.3d at 823.

[36] *Albemarle*, 703 F.3d at 826 (citing *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc.*, 481 F.2d 817, 820 (5th Cir. 1973)); *see also Delek Refin., Ltd. v. Local 202, United Steel*, 891 F.3d 566, 571 (5th Cir. 2018) (the amount of discretion involved makes it difficult to see how an arbitrator's assessment of judgment-laden terms like "extreme" and "excessive" can amount to the direct conflict with the CBA that is necessary for judicial override).

[37] *Weber*, 253 F.3d at 823; *see also Gulf States Tel. Co. v. Local 1692, Int'l Bhd. of Elec. Workers*, 416 F.2d 198, 200, 202 (5th Cir. 1969) (affirming the enforcement of an arbitration award in which the arbitrator determined that the employee's "previous record and seniority count for something in arguing against the extreme penalty in industrial relations").

[38] *Albemarle*, 703 F.3d at 826 ("Had the Company wished to remove doubt as to whether safety violations like the Grievants' met the criteria for cause to terminate, it had only 'to bargain for a specific list of violations that will be considered sufficient grounds for discharge' in the CBA.") (quoting *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc.*, 481 F.2d 817, 820 (5th Cir. 1973)).

[39] *See United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations."); *Gulf States*, 416 F.2d at 202 n.10 ("Arbitral determination not only of the existence of misconduct but of the fitness of the punishment is routinely grist for the arbitral mill.").

[40] *Albemarle*, 703 F.3d at 826.

[41] *Sun Coast Res., Inc. v. Conrad*, 956 F.3d 335, 337 (5th Cir. 2020).

[42] *Quezada v. Bechtel OG & C Const. Servs., Inc.*, 946 F.3d 837, 844 (5th Cir. 2020).

[43] *Enter. Wheel*, 363 U.S. at 598; *see also Wireglass Metal Trades Council v. Shaw Env't & Infrastructure Inc.*, 837 F.3d 1083, 1091-92 (11th Cir. 2016) ("The rule of *Enterprise Wheel* is that, when it is 'not apparent' from the arbitrator's stated reasoning (or lack thereof) whether she permissibly interpreted a collective bargaining agreement or impermissibly modified it, and one can plausibly read the award either way, the court must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it.").

[44] *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum, & Plastic Workers*, 461 U.S. 757, 764 (1983)



Exhibit A

(internal citation omitted) (quoting *Enter. Wheel*, 363 U.S. at 597 (1960)).

[45] *See Antwine v. Prudential Bache Sec., Inc.*, 899 F.2d 410, 412 (5th Cir. 1990).

[46] *Delek Refin., Ltd. v. Local 202, United Steel*, 891 F.3d 566, 572 (5th Cir. 2018).

[47] *Id.* at 572-73.

[48] *Commc'ns Workers of Am. v. Sw. Bell Tel. Co.*, 953 F.3d 822, 828 (5th Cir. 2020) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)).

[49] 85 F.3d 1289 (7th Cir. 1996).

[50] *Id.* at 1291, 1294.

[51] *Id.* at 1291.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 1293.

[55] *Id.*

[56] *Id.* (citing *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597-98 (1960)).

[57] *Id.*

[58] *Id.* at 1294.

[59] *Id.* at 1293.

[60] *Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 301 (5th Cir. 2021).

[61] *Delek Refin., Ltd. v. Local 202, United Steel*, 891 F.3d 566, 573 (5th Cir. 2018).

[62] *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tex. Steel Co.*, 639 F.2d 279, 283 (5th Cir. 1981).

[63] *Bruce Hardwood Floors v. UBC, S. Council of Indus. Workers, Local Union No. 2713*, 103 F.3d 449, 453 (5th Cir. 1997).

[64] *Delek*, 891 F.3d at 573.

[65] *Id.*

[66] *Id.* at 573-74.

[67] *See id.* at 574 ("[A] party cannot avoid paying attorneys' fees by making only a conclusory assertion that it is challenging the arbitrator's 'power to make the award.'") (quoting *Tex. Steel Co.*, 639 F.2d at 283).

[68] *See id.* (holding that a challenge to an arbitrator's interpretation of a contract is a merits inquiry and awarding attorneys' fees); *Tex. Steel Co.*, 639 F.2d at 283-84 (holding that a challenge to an arbitrator's interpretation of a contract warranted attorneys' fees).

[69] *See Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1331 (5th Cir. 1994) (holding that a challenge to an award "upon a matter not submitted" to the arbitrator is a jurisdictional inquiry and denying attorneys' fees).

[70] *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union v. Excelsior Foundry Co.*, 56 F.3d 844, 849 (7th Cir. 1995); *see also United Steelworkers, Dist. 36, Local 8249 v. Adbill Mgmt. Corp.*, 754 F.2d 138, 141-42 (3d Cir. 1985); *Marshall Durbin Cos., Inc. v. United Food & Comm. Workers Union, Local 1991*, 254 F.3d 1081, 2001 WL 563907, at *1 (5th Cir. 2001) (unpublished) (per curiam).

---------

*Hampton v. Int'l Longshoreman's Ass'n*, <u>2017 U.S. Dist. LEXIS 218154 at *5-6</u> (S.D. Tex. 2007)

*Attachment 2*

Exhibit A


Neutral
As of: July 11, 2022 5:59 PM Z

## *Hampton v. Int'l Longshoreman's Ass'n, Local 24*

United States District Court for the Southern District of Texas, Houston Division

October 27, 2017, Decided; October 27, 2017, Filed, Entered

Civil Action No. H-16-2103

**Reporter**

2017 U.S. Dist. LEXIS 218154 *

ANTHONY C. HAMPTON, EDWARD J. RICHARDS, and RICKY HENDERSON, Plaintiffs, v. INTERNATIONAL LONGSHOREMAN'S ASSOCIATION, LOCAL 24, Defendant.

**Prior History:** *Hampton v. Mar. Ass'n Int'l Longshoreman Ass'n Pension Ret. Welfare & Vacation Funds, 2017 U.S. Dist. LEXIS 62726 (S.D. Tex., Apr. 25, 2017)*

## Core Terms

fee agreement, summary judgment, nonmovant, genuine, abide, declaratory judgment, contractual, funds, allegations, hire

**Counsel:** [*1] For Anthony C. Hampton, Edward J. Richards, Ricky Henderson, Plaintiffs: Reginald E McKamie, Sr, LEAD ATTORNEY, Attorney at Law, Houston, TX.

For ILA Local 24, Defendant: Eric H Nelson, Attorney at Law, Houston, TX; Billy Bruce Johnson, Jr, Berg Feldman Johnson Bell, LLP, Houston, TX.

**Judges:** DAVID HITTNER, United States District Judge.

**Opinion by:** DAVID HITTNER

## Opinion

ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (Document No. 20). Having considered the motion, submissions, and applicable law, the Court determines the motion should be granted.

I. BACKGROUND

This is a suit for declaratory judgment. Plaintiffs Anthony C. Hampton ("Hampton"), Edward J. Richards ("Richards"), and Ricky Henderson ("Henderson") (collectively, "Plaintiffs") are members of Defendant International Longshoreman's Association, Local 24 ("Local 24"). Local 24 is a labor union for maritime workers, located in Houston, Texas. The parties are bound by the International Longshoremen's Constitution (the "Constitution"). This dispute arises from a Local 24 general union meeting, held on November 6, 2013 (the "Meeting"). At the Meeting, a motion was passed by a vote of union members to hire a lawyer to investigate a longshoremen's [*2] fund called the CR5[1] (the "Vote"). In connection with the Vote, Henderson located Reginald McKamie, Sr.

_____

[1] The nature and details regarding the CR5 fund are not relevant in this dispute.

Exhibit A

("McKamie"), an attorney. McKamie provided Henderson a fee agreement for Local 24 to hire McKamie as Local 24's attorney (the "Fee Agreement"). Henderson provided a copy of the Fee Agreement to Local 24's President, T.L. Simon ("Simon"), to sign on behalf of Local 24. Simon did not sign the Fee Agreement. Despite Simon's failure to sign the Fee Agreement, McKamie represented Plaintiffs in an action, connected with the CRS fund, in Galveston, Texas, in the United States District Court for the Southern District of Texas (the "Underlying Suit"). Final Judgment in the Underlying Suit was entered against Plaintiffs on July 14, 2017. Plaintiffs contend Local 24 breached its contractual obligation under the Constitution to abide by the Vote because Simon did not sign the Fee Agreement or discuss the Fee Agreement with McKamie or Local 24 members.

Based on the foregoing, on July 15, 2016, Plaintiffs filed suit seeking a declaratory judgment that the Vote requires Local 24 to pay the legal fees incurred in bringing the Underlying Suit. On August 31, 2017, Local 24 moved for summary judgment. **[*3]**

## II. STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The court must view the evidence in a light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997)*. Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine dispute of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden then shifts to the nonmovant to come forward with

specific facts showing there is a genuine dispute for trial. *See Fed. R. Civ. P. 56(c)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 956 (5th Cir. 1993)* (citation omitted).

But the nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Moreover, conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, 40 F.3d 698, 713 (5th Cir. 1994)*. If a reasonable jury could not return a **[*4]** verdict for the nonmoving party, then summary judgment is appropriate. *Liberty Lobby, Inc., 477 U.S. at 248*. The nonmovant's burden cannot be satisfied by "conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007)* (quoting *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994))*. Furthermore, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992)*. Therefore, "[a]lthough we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for

Exhibit A

Case 4:22-cv-00407-Y Document 124 Filed 05/24/22 Page 28 of 40 PageID 2825
Page 4 of 6
Hampton v. Int'l Longshoreman's Ass'n, Local 24

trial." *Goodson v. City of Corpus Christi, 202 F.3d 730, 735 (5th Cir. 2000)*.

## III. LAW & ANALYSIS

Plaintiffs seek a declaratory judgment that the Vote requires Local 24 to pay the legal fees incurred in the Underlying Suit. A declaratory action does not create a cause of action. *Collin Cty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, 915 F.2d 167, 171-72 (5th Cir. 1990)*. Thus, Plaintiffs must raise a genuine dispute of material fact on a cognizable breach of contract claim in order to sustain their request for declaratory judgment. *Id.* Local 24 contends there is no contractual basis for requiring Local 24 to pay the legal fees incurred in the Underlying Suit and moves for summary **[*5]** judgment on Plaintiffs' suit for declaratory judgment.

In support of Plaintiffs' request for declaratory relief, Plaintiffs contend Local 24 breached its contractual duty under the Constitution because Local 24 failed to abide by the Vote when Simon did not sign the Fee Agreement and did not discuss the Fee Agreement with McKamie and Local 24 members. Local 24 contends it did not breach a contractual duty because the Constitution does not require Local 24 to abide by a union meeting vote to hire a lawyer. An international union's constitution is a binding contract between a local union and its members. *United Ass'n of Journeyman v. Local 334, United Ass'n of Journeyman, 452 U.S. 615, 622, 101 S. Ct. 2546, 69 L. Ed. 2d 280 (1981)*. Contract interpretation is a matter of law. *United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1256 (5th Cir. 1990)*. Traditional rules of contract interpretation are applied when interpreting a union constitution, as long as their application is consistent with federal labor policies. *Id.* If a contract is susceptible to two reasonable interpretations, there is a genuine issue of fact as to the

parties' intent and summary judgment is inappropriate. *Id.* However, a contract is not ambiguous "merely because the parties to an agreement proffer conflicting interpretations of a term." *Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004)*. Thus, the Court must determine whether the Constitution could reasonably **[*6]** be interpreted to bind Local 24 to the Vote.

The only provision at issue is provision five of Part I of the Code of Ethics in the Constitution ("Provision Five"), which reads:

> The [International Longshoremen's Association] and local unions shall ensure that their operations are conducted in a democratic and fair manner. Regularly scheduled local union elections shall be conducted by secret ballot. Corruption, discrimination or anti-democratic practices shall not be tolerated.[2]

The parties' contentions turn on the meaning and applicability of the phrase "democratic and fair manner" in Provision Five. "Democratic and fair manner" is not defined in the Constitution. Plaintiffs contend that because the Vote was passed by a member vote at a general union meeting, and Provision Five requires Local 24 to conduct its operations in a democratic and fair manner, Provision Five requires Local 24 to abide by the Vote and thus Simon's failure to sign the Fee Agreement breached Local 24's obligation. Local 24 contends Provision Five cannot reasonably require Local 24 to abide by the Vote because other provisions in the Constitution govern Local 24's financial practices, including requiring Local 24 **[*7]** officers to act within their fiduciary roles when making decisions to expend Local 24 funds.[3]

_____

[2] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 2.

[3] Local 24 also contends (1) Local 24 was not authorized to sign the Fee Agreement because it concerned individual

Exhibit A

Case 4:22-cv-00437-Y Document 24 Filed 06/24/22 Page 5 of 6 PageID 2338
Page 5 of 6
Hampton v. Int'l Longshoreman's Ass'n, Local 24

When interpreting a contractual provision, "courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." *Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004).* Thus, the Court must look at the entire Constitution to determine whether Provision Five could reasonably be interpreted to require Local 24 to abide by the Vote. The Constitution expressly states that Provision Five is meant to "supplement the obligations already imposed on [Local 24]."[4] Part III of the Code of Ethics in the Constitution ("Part III"), entitled "Financial Practices," instructs in relevant part that Local 24 "should not permit any of its funds to be invested or expended in a manner which results in the personal profit or advantage of any officer or representative of the union."[5] Part III also states that union members are to be reasonably informed on how Local 24's funds are used. Further, Part V of the Code of Ethics in the Constitution ("Part V"), entitled "Business and Financial Activities of Union Officials," specifically addresses that service providers for Local 24 **[*8]** are to be "selected solely on the basis of cost, quality, timeliness, location, convenience and whether the [provider] is unionized. Knowingly paying excessive amounts for goods or services is a breach of fiduciary duty."[6] Part III and Part V instruct Local 24 officers how and when Local 24 funds may be expended and impose duties on Local 24 officers when making decisions

regarding hiring a service provider, such as a lawyer. Thus, when making a decision to expend Local 24 funds, Simon is required to ensure Local 24 funds will not be used for the personal advantage of any union officer or representative. Specifically, when Simon was presented with the Fee Agreement, Simon had a duty to ensure that the Fee Agreement was in compliance with Local 24's financial practices and that McKamie was properly selected based solely on cost, quality, timeliness, location, and convenience.

Plaintiffs' interpretation that Provision Five requires Local 24 to abide by the Vote solely because the Vote was held at a union meeting would render Part III and Part V meaningless because such an **[*9]** interpretation would not allow Local 24 to make the financial decision to hire a lawyer based on the duties imposed in Part III and Part V. The Court thus finds that Provision Five cannot reasonably be interpreted to bind Local 24 to the Vote. Therefore, the Court finds, as a matter of law, Local 24 did not breach its contractual obligation under the Constitution.[7] Accordingly, Local 24's motion for summary judgment on Plaintiffs' suit for declaratory judgment is granted.

## IV. CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Defendant's Motion for Summary Judgment (Document No. 20) is **GRANTED**.

---

members' financial interests; (2) that Plaintiffs' declaratory relief is wasteful and futile; and (3) that Local 24 is not obligated to pay the litigation costs in the Underlying Suit because the litigation costs were incurred voluntarily by Plaintiffs. In light of the Court's holding, however, the Court need not address these contentions.

[4] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 1.

[5] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 2.

[6] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 3.

[7] The Court notes it is undisputed that Local 24's standard procedure requires an expenditure of Local 24 funds to be approved by both Local 24's Executive Board and members. It is also undisputed that neither the Fee Agreement nor the litigation costs in the Underlying Suit was approved by Local 24's Executive Board or members. Thus, even if Provision Five could reasonably be interpreted to bind Local 24 to the Vote, the Vote does not require Local 24 to pay the litigation costs in the Underlying Suit because the expenditure was not approved pursuant to Local 24's standard procedure.

Exhibit A

Case 4:22-cv-00430-Y Document 24 Filed 06/02/22 Page 36 of 40 PageID 304
Case 4:22-cv-00430-Y Document 24 Filed 06/02/22 Page 36 of 40 PageID 304

Page 6 of 6
Hampton v. Int'l Longshoreman's Ass'n, Local 24

The Court will issue a separate Final Judgment.

SIGNED at Houston, Texas, on this 27 day of October, 2017.

/s/ David Hittner

DAVID HITTNER

United States District Judge

FINAL JUDGMENT

Because the Court has granted summary judgment for Defendant International Longshoreman's Association, Local 24 on all claims asserted in this lawsuit by Plaintiffs Anthony C. Hampton, Edward J. Richards, and Ricky Henderson (collectively, "Plaintiffs"), the Court hereby

**ORDERS** that Plaintiffs' case is **DISMISSED**.

**THIS IS A FINAL JUDGMENT**.

SIGNED at Houston, Texas, on this 27 day of October, 2017.

/s/ David Hittner **[*10]**

DAVID HITTNER

United States District Judge

---

**End of Document**

Exhibit A



# THE
# CONSTITUTION
## OF THE
# ASSOCIATION
### OF
# PROFESSIONAL
# FLIGHT
# ATTENDANTS

*As amended by the APFA Membership*
JUNE 18, 2014



RATIFIED BY THE
## APFA Membership on

*January 3, 1980*

## Amended by the
## APFA Membership on

*February 23, 1981*

*July 21, 1982*

*October 30, 1985*

*April 3, 1989*

*September 11, 1991*

*October 24, 1994*

*June 13, 1995*

*January 7, 2010*

# APFA CONSTITUTION

## TABLE OF CONTENTS

**ARTICLE I** *GENERAL* ........................................................ **1**
 **SECTION 1** **NAME** .......................................................... 1
 **SECTION 2** **OBJECTIVES OF THE APFA** ............................. 1
 **SECTION 3** **INSIGNIA** ..................................................... 2
 **SECTION 4** **OFFICE LOCATIONS** ....................................... 2
 **SECTION 5** **DURATION** .................................................... 2
 **SECTION 6** **PARLIAMENTARY LAW** .................................... 2
 **SECTION 7** **DEFINITIONS** ................................................ 3
 **SECTION 8** **REQUIREMENTS** ............................................. 5

**ARTICLE II** *MEMBERSHIP* ................................................. **6**
 **SECTION 1** **ELIGIBILITY FOR MEMBERSHIP** ......................... 6
 **SECTION 2** **OBLIGATIONS OF MEMBERS** ............................. 6
 **SECTION 3** **BILL OF RIGHTS OF MEMBERS** ......................... 6
 **SECTION 4** **CLASSIFICATION OF MEMBERSHIP – ACTIVE** ...... 6
 **SECTION 5** **CLASSIFICATION OF MEMBERSHIP – INACTIVE** ... 8
 **SECTION 6** **MEMBERSHIP CREDENTIALS** ............................. 8

**ARTICLE III** *GOVERNMENT OF THE APFA* ......................... **9**
 **SECTION 1** **THE APFA CONSTITUTION** ............................. 9
 **SECTION 2** **GOVERNING BODIES AND POLICIES** ................... 9
 **SECTION 3** **BOARD OF DIRECTORS** ................................... 10
 **SECTION 4** **EXECUTIVE COMMITTEE** ................................. 14
 **SECTION 5** **TELECONFERENCE MEETINGS** ........................... 18
 **SECTION 6** **OFFICERS** ..................................................... 20
 **SECTION 7** **BASE COUNCILS / BASE REPRESENTATIVES** ..... 24
 **SECTION 8** **OAL OPERATION ADVISORY PANEL** ............... 26

**ARTICLE IV** *FINANCES* ................................................... **28**
 **SECTION 1** **DUES AND ASSESSMENTS** ................................ 28
 **SECTION 2** **INITIATION FEE** ............................................. 29
 **SECTION 3** **DELINQUENT DUES, ASSESSMENTS OR**
  **INITIATION FEE(S)** ........................................ 29
 **SECTION 4** **FINANCIAL PROCEDURES** ................................ 29
 **SECTION 5** **BONDING** ...................................................... 31
 **SECTION 6** **SAVINGS / RESERVES** ..................................... 31
 **SECTION 7** **RETENTION OF RECORDS** ................................ 31

**ARTICLE V** *EXPENSES AND SALARIES* ............................. **32**
 **SECTION 1** **EXPENSES** ..................................................... 32
 **SECTION 2** **COMPENSATION FOR NATIONAL OFFICERS**
  **AND DIVISION REPRESENTATIVES** ................... 32
 **SECTION 3** **OTHER COMPENSATION** ................................. 32

**ARTICLE VI** *NOMINATIONS AND ELECTIONS* ..................... **33**
 **SECTION 1** **NOMINATIONS** ............................................... 33
 **SECTION 2** **WILLINGNESS TO SERVE** ................................. 33
 **SECTION 3** **TERMS OF OFFICE** ......................................... 34
 **SECTION 4** **ELIGIBILITY TO VOTE** .................................... 34
 **SECTION 5** **BALLOTING** ................................................... 34

**SECTION 6** ELECTION CONTEST FOR OFFICE ................... 36
**SECTION 7** VACANCY IN OFFICE, NATIONAL OFFICERS .... 37
**SECTION 8** VACANCY IN OFFICE, BASE
REPRESENTATIVES ........................................... 38

**ARTICLE VII** *HEARINGS AND DISCIPLINARY*
*PROCEDURES* ............................................... **41**
**SECTION 1** GROUNDS FOR CHARGES ............................... 41
**SECTION 2** FILING OF CHARGES ..................................... 41
**SECTION 3** REVIEW OF CHARGES ..................................... 42
**SECTION 4** SUSPENSION FROM OFFICE ............................ 43
**SECTION 5** APPOINTMENT OF THE ARTICLE VII
ARBITRATOR ................................................... 44
**SECTION 6** JURISDICTION AND AUTHORITY OF
THE ARTICLE VII ARBITRATOR ....................... 44
**SECTION 7** COSTS .......................................................... 45
**SECTION 8** INTERNAL REMEDIES ..................................... 46

**ARTICLE VIII** *REMOVAL OF OFFICERS AND*
*REPRESENTATIVES* ....................................... **47**
**SECTION 1** REMOVAL OF NATIONAL OFFICERS ................ 47
**SECTION 2** REMOVAL OF A BASE REPRESENTATIVE .......... 47
**SECTION 3** REMOVAL OF AN ELECTED MEMBER OF A
NEGOTIATING COMMITTEE ............................. 48
**SECTION 4** REMOVAL PETITION ....................................... 48
**SECTION 5** RETENTION OF RECORDS ............................... 49
**SECTION 6** APPEAL ........................................................ 49

**ARTICLE IX** *ADMINISTRATIVE AND COMMITTEE*
*POSITIONS* ................................................... **50**
**SECTION 1** ELIGIBILITY .................................................. 50
**SECTION 2** NOMINATION AND APPROVAL PROCEDURE .... 50
**SECTION 3** DURATION OF APPOINTMENT ......................... 51
**SECTION 4** DIVISION REPRESENTATIVES ............................ 52
**SECTION 5** NATIONAL COORDINATORS ............................. 52
**SECTION 6** NATIONAL BALLOTING COMMITTEE (NBC) .... 53
**SECTION 7** BUDGET COMMITTEE ..................................... 53
**SECTION 8** OTHER APPOINTMENTS ................................... 53
**SECTION 9** VACANCY ..................................................... 54
**SECTION 10** REMOVAL ..................................................... 54

**ARTICLE X** *NEGOTIATING COMMITTEES* ........................... **55**
**SECTION 1** ELIGIBILITY .................................................. 55
**SECTION 2** DEFINITION AND DUTIES ................................. 55
**SECTION 3** TERMS .......................................................... 55
**SECTION 4** CHAIR OF THE NEGOTIATING COMMITTEE ..... 56
**SECTION 5** COMPOSITION OF NEGOTIATING
COMMITTEES ................................................. 56
**SECTION 6** VACANCY ..................................................... 57
**SECTION 7** REMOVAL ..................................................... 57

**ARTICLE XI** *CONTRACT RATIFICATION AND*
*STRIKE PROCEDURES* ..................................... **58**
**SECTION 1** RATIFICATION PROCESS ................................. 58
**SECTION 2** STRIKE PROCEDURES ..................................... 59

**ARTICLE XII** *AFFILIATIONS, MERGERS, FEDERATIONS OR CHARTERS* ...................... **60**

**SECTION 1** ......................................................60
**SECTION 2** ......................................................60
**SECTION 3** ......................................................60

**ARTICLE XIII** *SAVINGS CLAUSE* ....................................... **61**

**SECTION 1** ......................................................61
**SECTION 2** ......................................................61

  
# A R T I C L E   I

## *G E N E R A L*

### Section 1.  NAME:

The name of the organization shall be the Association of Professional Flight Attendants.   Whenever the acronym "APFA" is used, it shall refer to and mean the Association of Professional Flight Attendants.   Whenever the words "union" or "association" are used in this Constitution, they shall refer to and mean the Association of Professional Flight Attendants.

### Section 2.  OBJECTIVES OF THE APFA:

A. To operate a non-profit employee-representing association.

B. To protect the individual and collective rights of the members of the APFA and to promote their professional interest and image.

C. To establish and to exercise the right of collective bargaining for the purpose of making and maintaining employment agreements covering rates of pay, rules and working conditions for the members of the APFA.

D. To promptly settle disputes and grievances which may arise between members and their employer.

E. To determine and negotiate, and continue to seek to improve rates of pay, rules and working conditions, and to maintain uniform principles of seniority and the perpetuation thereof.

F. To sponsor and support passage of legislation and appropriate regulations which may be beneficial to the Flight Attendant profession.

G. To sponsor and support regular training and continuing education programs to enhance the professional skills of officers and representatives of the APFA.

H. To disseminate information to enhance the professional status of the membership.

I. To levy dues and assessments upon the membership with which to provide the funds necessary to carry on the business and objectives of the APFA provided however, that increases in dues and the levying of assessments shall be made only in accordance with this Constitution and applicable Federal law.

J. To purchase, hold, acquire, lease, mortgage and convey real estate and personal property of every kind, nature and description, in any state, the District of Columbia, any territory or possession of the United States and any country for the convenient conduct and execution of the

Association's business, including the purchasing, leasing and maintaining of equipment, buildings, and improvements which may be necessary, directly or indirectly, in connection with any of the business and objectives of the Association, with the approval of the Executive Committee, subject to approval by the Board of Directors.

K. To do any and all other acts consistent with and in furtherance of the objectives and purposes herein.

## Section 3. INSIGNIA:

The official insignia of the APFA shall be:



## Section 4. OFFICE LOCATIONS:

The location(s) of the office(s) and headquarters of the APFA shall be determined by the Board of Directors and shall only be changed by a two-thirds (2/3) majority of the Voting Board of Directors.

## Section 5. DURATION:

The duration of the APFA shall be perpetual, or until it is dissolved as provided for in this Constitution. In the event of dissolution of the APFA, the National Officers of the Association shall act as agents for the membership and shall dispose of all of the physical assets of the APFA upon directive from the Board of Directors consistent with Federal and State law. All of the liquid assets shall be prorated to the membership on record in good standing of the APFA at the time of such dissolution in proportion to the monies being paid by such members, less any indebtedness; provided that any amounts that may be paid to the APFA for insurance or other benefits shall be dealt with separately and prorated only to those members who contributed to such funds and in proportion to their individual contributions.

## Section 6. PARLIAMENTARY LAW:

All questions on parliamentary law and rules of order shall be decided according to the principles set forth in the most current published edition of Robert's Rules of Order, revised, except for those which are expressly modified by this Constitution.

## Section 7.   DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

A. **"Annual Convention"** or **"Special Convention"** means a meeting of the APFA Board of Directors wherein the elected Delegates are empowered to elect and/or remove Ad Hoc Members of the Executive Committee.

B. **"Base"** means one or more airports or co-terminals located within a commonly recognized metropolitan area to which APFA members have been assigned by their employer(s) for administrative purposes and to which members' flying assignments have been allocated.

   (1) A base may include a military operation, a charter operation, and/or a satellite for representational purposes.

   (2) A base may also include one or more "Other Airline (OAL) Operation(s)" for representational purposes. An OAL Operation shall be assigned to a base(s) by action of the Executive Committee, subject to approval by the Board of Directors.

C. **"Delegate"** means a Base President who has been elected by secret ballot by the membership of a base, or who has been duly elected by virtue of running unopposed, as a representative to the Annual or Special Conventions for the specific purpose of electing and/or removing Ad Hoc Members of the Executive Committee; or a Vice President who has been elected by secret ballot by the membership of a base, or who has been duly elected by virtue of running unopposed, to serve as such a representative in the absence of the Base President.

D. **"Duly Designated Member"** means an active member in good standing of the APFA at a meeting or session of the Board of Directors for the purpose of representing for that meeting or session, or for part of that meeting or session, one of the regular Voting Board Members.

E. **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

F. **"Insignia"** means the official emblem of the APFA.

G. "Majority of the Voting Board of Directors" means fifty percent (50%) plus one (1) of the total "Voting Board of Directors" as defined in Article III, Section 3,B,(2) of this Constitution.

H. **"May"** or **"Should"** means a discretionary or permissive act or directive.

I. **"Meeting"** means an assembly of APFA members or officers or representatives for a common purpose. A meeting may consist of one or more sessions.

J. **"Must"** or **"Shall"** or **"Will"** means a word of command which always has a compulsory meaning denoting obligation; imperative and mandatory.

K. **"Operation"** means a type of flying shared by members of the APFA. This Constitution provides for and the APFA Board of Directors shall recognize the following types of "operations":

   (1) **"American Airlines (AAL) Operation"** means an operation where APFA members are covered by a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by American Airlines (AAL).

   (2) **"Other Airline (OAL) Operation"** means an operation wherein flying is performed by a subsidiary or affiliated airline owned and/or operated by American Airlines Group, and/or flying is performed for or on behalf of American Airlines or American Airlines Group by an independently-owned airline. The Flight Attendant employees of an OAL Operation may be represented by the APFA, but are not covered by a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by AAL.

L. **"Petition"** means a written document stating a purpose and carrying the printed names, bases, employee numbers and the corresponding signatures of members in good standing of the APFA.

M. **"Privilege"** means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

N. **"Proxy"** means a written authorization from one member of the Board of Directors to another, or from one member of the Executive Committee to another, for the purpose of exercising a vote at any meeting.

O. **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

P. **"Resume"** means a summary of a member's achievements or qualifications offered in support of such member's request to be considered for appointment to a position with the APFA.

Q. **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

R. **"Satellite"** means a location where an airport or co-terminals serve a city outside of, or distanced from, any commonly recognized metropolitan area that is served by an APFA base as defined by this Constitution. For representational purposes, a satellite shall be considered part of a base as determined by the Board of Directors.

S. **"Session"** means a period of time within any one day during which APFA members are assembled and engaged in the transaction of the business of the APFA.

T. **"Subject to"** means that a decision is effective when made and will be deemed approved unless and until reversed by the designated body.

U. **"Vacancy in the office"** or **"Vacancy in the position"** means the death, resignation, removal or incapacitation of an officer or representative that renders him/her unable to perform the duties of the office or the position.

V. **"Willingness to Serve (WTS)"** means written notification that a member uses for self-nomination for any elected position or to nominate another member for any elected position.

## Section 8. REQUIREMENTS:

A. In order to be elected or appointed to any office or any position with the APFA, any member must be an active member in good standing as defined in Article II, Sections 4,A and 4,B of this Constitution.

B. All APFA officers and representatives shall be required to remain active members in good standing.

C. All APFA officers and representatives shall enforce this Constitution and Collective Bargaining Agreement(s) negotiated by the APFA.

D. All APFA officers and representatives shall carry out the resolutions and/or policy decisions as set forth and established by the Board of Directors.

E. All APFA officers and representatives shall be required to attend and participate in training and continuing education programs to improve the quality of representation for the members of the APFA.

# ARTICLE II

## *MEMBERSHIP*

**Section 1.**  ELIGIBILITY FOR MEMBERSHIP:

   A. Any person in the craft and class of Flight Attendant at an airline at which the APFA is the recognized Bargaining Agent for the Flight Attendant employee group at that airline shall be eligible to join and maintain membership in the APFA as hereinafter provided.

   B. A Flight Attendant who accepts a paid position with the employer outside the craft and class of Flight Attendant shall no longer be eligible for membership in the APFA. If the person returns to the position of Flight Attendant, he or she shall be eligible to rejoin the union, upon payment of APFA's re-initiation fee.

**Section 2.**  OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein.   Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

**Section 3.**  BILL OF RIGHTS OF MEMBERS:

   A. All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

   B. All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

   C. All members of the APFA shall have the right to individual privacy.

   D. All members of the APFA shall have the right to due process and equal representation.

   E. All members of the APFA shall have full equality of rights and shall not be discriminated against because of national origin, race, religion, creed, age, disability, sex, sexual orientation or gender identity.

**Section 4.**  CLASSIFICATION OF MEMBERSHIP:
       – ACTIVE:

A. An Active Member is a Flight Attendant who has a dues obligation to the APFA in accordance with this Constitution, except as provided herein.

B. Membership Status-- Good Standing

    (1) The rights and privileges of a member in good standing shall include, but not be limited to:

        a. attending union meetings;

        b. voting on all matters brought before the membership;

        c. voting in elections for officers or base representatives of the APFA; and

        d. running for an elected position, or holding an elected or appointed position with the APFA.

    (2) A member, regardless of flight status, shall be considered in good standing and shall maintain all rights and privileges of the APFA so long as financial obligations are met pursuant to this Article II and Article IV of this Constitution.

    (3) Subject to Section 4.B(4), below, and beginning on the effective date of this provision, a member in good standing will remain in good standing and will be exempt from his / her dues obligation to the APFA when the member is in an unpaid status from his / her employer in excess of thirty (30) consecutive days by:

        a. termination by the employer and the member is seeking reinstatement as provided for in the applicable Collective Bargaining Agreement or through an administrative or judicial proceeding;

        b. suspension/withhold by the employer and the member is seeking reinstatement;

        c. unpaid sick status;

        d. unpaid Injury on Duty (IOD);

        e. hardship as approved by the Executive Committee or by the Board of Directors;

        f. approved military leave of absence; and/or

        g. furlough by the employer.

    (4) If a member is exempt from his / her dues obligation under Section 4.B(3), above, in order to exercise any of the rights, privileges, duties and responsibilities of members in good standing while in unpaid status, in addition to any other dues owing he / she must pay the dues that otherwise would have accrued during the unpaid status, with no dues in arrears for more than sixty (60) days.

    (5) Once a member who is exempt from his / her dues obligation under Section 4.B(3) returns to a dues-

obligated status, no dues shall be owed for the dues-exempt period.

C. Membership Status -- Bad Standing: A member in good standing shall lose the rights, privileges, duties and responsibilities of good standing membership status and shall be considered in bad standing:

   (1) should his/her dues obligation be in arrears for more than sixty (60) days; and/or

   (2) after a final and binding determination by the Article VII Arbitrator pursuant to the procedures of Article VII of this Constitution, whereby the member's status has been changed to bad standing.

## Section 5.   CLASSIFICATION OF MEMBERSHIP:
### – INACTIVE:

A. An Inactive Member is a person who has no dues obligation to the APFA in accordance with this Constitution, by virtue of the following:

   (1) Retired Members:  Those members who are retired from a position as a Flight Attendant with an airline represented by the APFA, and who were members in good standing at the time of their retirement.

   (2) Honorary Members:  Those members upon whom Honorary Membership has been conferred by the Board of Directors.

B. Inactive members shall have the right to attend Association meetings and participate in Association activities except as provided in (1) and (2) below:

   (1) Inactive members shall not have the right to vote in any Association balloting, be appointed to any Association position, run for any Association office, or inspect the APFA records.

   (2) Honorary members may be restricted from participation in Association sponsored programs where specific requirements prohibit such participation.

## Section 6.   MEMBERSHIP CREDENTIALS:

A membership card and pin shall be available to every member.  The card shall contain space for the name of the member; shall carry the signature of an officer or officers; and shall bear the official insignia of the APFA.

# A R T I C L E   I I I

## *G O V E R N M E N T   O F   T H E   A P F A*

### Section 1.  THE APFA CONSTITUTION:

This Constitution shall be the supreme law of the APFA.

- A. This Constitution may be recommended to the membership for alteration, addition, deletion or amendment by:
    - (1) a two-thirds (2/3) majority of the Voting Board of Directors, or
    - (2) a petition(s) submitted in accordance with the provisions of this Constitution carrying signatures numbering twenty-five percent (25%) or more of active members in good standing.  The office of the National Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.
- B. An affirmative vote by a majority of those active members in good standing who return valid ballots shall be required for the passage of any proposed alteration, addition, deletion or amendment.

### Section 2.  GOVERNING BODIES AND POLICIES:

- A. The governmental powers of the APFA shall be vested in the Board of Directors, and the officers and representatives of the APFA in accordance with the provisions of this Constitution.  The final control of the APFA shall be vested in the membership.
- B. The APFA shall establish an Executive Committee.  This Constitution shall confer and vest in the Executive Committee the rights, privileges, duties and responsibilities to act as agent for the Board of Directors in accordance with the provisions of this Constitution.
- C. The APFA shall establish a Policy Manual to incorporate those policies, procedures, rules and regulations affecting the governing bodies, officers, representatives and members of the APFA in accordance with this Constitution.  The Policy Manual shall include but not be limited to the following:  trip removal policy, expense policy, officer salaries, budget policy, headquarters policy, and policies governing conventions and meetings of the Board of Directors and the Executive Committee.

## Section 3.   BOARD OF DIRECTORS:

A. The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA.  The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as required for the direction and management of the affairs of the APFA.

B. Organization

   (1) The Board of Directors shall consist of the National President, National Vice President, National Secretary, National Treasurer, and each Base President.

   (2) The Voting Board of Directors shall consist of each Base President.

       a. The National President, National Vice President, National Secretary and National Treasurer shall have a voice but no vote at a Board of Directors meeting, except that:

       b. when all voting members are present, and when a vote on an issue by the voting members results in a tie, with no abstentions, the National President must cast the deciding vote.

   (3) The Delegate(s) shall be those Base Presidents (or in their absence, the Vice Presidents) who have been elected by the membership of their bases, or duly elected by virtue of running unopposed, to serve as delegates to the Annual or Special Convention(s) with the authority to elect or remove Ad Hoc Members of the Executive Committee.

C. Annual Training:  The Board of Directors shall participate in an annual training session.

D. Annual Convention:   The Board of Directors shall convene once a year as the Annual Convention of the APFA on a date and at a location determined by the National President. The Annual Convention shall be held no earlier than ninety (90) days and no later than fifteen (15) days prior to the expiration of the current fiscal year.

E. Special Meetings/Special Conventions:  The Board of Directors may convene for special meetings or special conventions.

   (1) A Special Meeting or a Special Convention may be called by the National President or by four (4) members of the Executive Committee, or by a

majority of the Voting Board of Directors by written request to the National Secretary.

    (2)  The Special Meeting or the Special Convention must convene no later than fourteen (14) days following receipt by the National Secretary of such request.

F.  Quorum:  In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present. A quorum of the Board of Directors shall consist of two-thirds (2/3) of the total Board of Directors.

G.  Agenda:  There shall be no restrictions on business conducted at any convention or meeting of the Board of Directors provided however, that no business shall be acted upon without:

    (1)  ten (10) days notice of the agenda in writing to the total Board of Directors prior to such meetings, or

    (2)  approval by a majority of the Voting Board of Directors who are present at the meeting.

H.  When more than a quorum is present at any convention or meeting of the Board of Directors, all issues shall be decided by a majority of the Voting Board of Directors, except as provided for in this Constitution. In the event that only a quorum is present, all issues shall be decided by a two-thirds (2/3) majority vote of the quorum, except as provided for in this Constitution.

I.  At any convention or meeting , except as provided for in Section J below, each Base President shall be entitled to:

    (1)  one (1) vote;

    (2)  issue his/her proxy in writing to another Board member, provided:

        a.  The member must be present at the meeting before giving a proxy to another member,

        b.  A proxy shall not be exercised when the member is present at the table;

        c.  A proxy shall not be exercised in a secret ballot; and

        d.  A proxy shall be valid until the conclusion of the day's business;

    (3)  hold one (1) written proxy.

    (4)  Each Base President may duly designate.

        a.  In the event that a Base President cannot attend all or part of a Board meeting, the Vice President shall attend in his/her absence. Should there be no Vice President available to fill the seat of the Base President at the Board meeting, the Base

President shall first designate from the Base Council, then from the base at large.

b. Such designation shall be in writing, signed by the Base President, and given to the National Secretary prior to any vote by the designee.

(5) The Vice President or designee shall have the same powers as the Base President at any convention or meeting except as provided in J of this Section 3.

J. Only for the purposes of electing or removing an Ad Hoc Member of the Executive Committee at the Annual or Special Convention(s), each Delegate, as defined in Article I, Section 7,C of this Constitution and Section 3,B,(3) of this Article III, shall be entitled to:

(1) one (1) vote;

(2) issue his/her proxy in writing to another Delegate, provided that such proxy shall not be exercised when the Delegate is present at the table;

(3) hold one (1) written proxy; and

(4) in this instance only:

a. the Delegate issuing the proxy need not be present at the Annual or Special Convention to issue the proxy; and

b. the proxy may be used only for the secret ballot vote to elect or remove Ad Hoc Members of the Executive Committee.

K. Minority Report: Whenever two or more members of the total Board of Directors do not agree with the opinion of the majority on any matter, they shall have the right to submit a written report concerning that matter to the National Secretary. The National Secretary must then append that minority report to the minutes of the appropriate Board of Directors convention or meeting.

L. Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

(1) set policy for the APFA;

(2) modify the APFA Policy Manual as it deems appropriate;

(3) approve the annual budget;

(4) set annual goals for the APFA as it deems appropriate;

(5) assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;

(6) determine the number of administrative, committee, and support positions as may be required under

Article IX of this Constitution to meet the needs of the membership;

(7) nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;

(8) review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments;

While not limited to the following, the Board of Directors may:

(9) review the dues structure of the Association;

(10) override the Executive Committee rejection of a proposed Collective Bargaining Agreement;

(11) establish the Regions, and the National Vice President will assign the Regional Representatives;

(12) establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;

(13) direct special mailings to the membership;

(14) recognize the accomplishments and achievements of members of the APFA;

(15) give annual awards;

(16) confer Honorary membership;

(17) approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;

(18) appoint special committees;

(19) appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);

(20) approve Article VII administrative changes;

(21) suspend officers or representatives pursuant to Article VII;

(22) take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.B of this Constitution.

M. The Delegates at the Annual Convention shall nominate and elect Ad Hoc Members of the Executive Committee as terms expire or when a vacancy occurs. At the Annual

or Special Convention(s), Delegates may remove Ad Hoc Members and may nominate and elect Ad Hoc Members to fill a vacancy for the balance of the unexpired term.

## Section 4.    EXECUTIVE COMMITTEE:

A. The Executive Committee shall act as the agent for and on behalf of the Voting Board of Directors, and shall interpret this Constitution, subject to the approval of the Board of Directors.

B. Organization:  The Executive Committee shall consist of the National President, National Vice President, National Secretary, National Treasurer and five (5) Ad Hoc Members.

C. Quarterly Meetings:   The Executive Committee shall convene for the transaction of business at least once each quarter on a date and at a location determined by the National President.

D. Special Meetings:    The Executive Committee may convene for special meetings.
   (1)  A Special Meeting of the Executive Committee may be called by the National President or by four (4) members of the Executive Committee by request to the National Secretary.
   (2)  The Special Meeting must convene within seven (7) days following receipt by the National Secretary of such request.

E.  Quorum:  In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present.  Seven (7) members of the Executive Committee shall constitute a quorum.

F. Agenda: There shall be no restrictions on business conducted at any meeting of the Executive Committee provided however, that no business shall be acted upon without:
   (1)  three (3) days notice of the agenda in writing to the Executive Committee prior to such meeting, or
   (2)  approval by a majority of the members of the Executive Committee who are present at the meeting.

G. All issues shall be decided by five (5) or more members of the Executive Committee voting in the affirmative except as provided for in this Constitution.

H. Each member of the Executive Committee shall be entitled to:
   (1)  one (1) vote;

    (2)   issue his/her proxy in writing to another member of the Executive Committee, provided:

        a.  the member must be present at the meeting before giving a proxy to another member,

        b.  a proxy shall not be exercised when the member is present at the table;

        c.  a proxy shall not be exercised in a secret ballot;

        d.  a proxy shall be valid until the conclusion of the agenda's business;

        e.  hold one (1) written proxy.

I.  A member of the Executive Committee shall not be entitled to duly designate another person to act for such member at any meeting of the Executive Committee except as provided for in Article VII, Section 4.C of this Constitution.

J.  Ad Hoc Members of the Executive Committee:

    (1)   At least sixty (60) days prior to the Annual Convention, the National Secretary, via the official publication of the APFA, shall issue a Willingness-to-Serve (WTS) notification to advise the membership that the Delegates will elect Ad Hoc Member(s) of the Executive Committee. A WTS notification may be returned to the National Secretary at any time prior to the Annual Convention for distribution to the Board of Directors.

    (2)   Prior to the secret ballot election or removal of Ad Hoc Members at the Annual or Special Convention(s), the National Secretary shall read the names of those Base Presidents or Vice Presidents who have been elected as Delegates to the Annual or Special Convention(s) as certified by the National Balloting Committee. The National Secretary shall record the names of those Delegates present and/or the names of those Delegates issuing or holding a proxy, as provided for in Section 3.J of this Article III. Only those Delegates recorded by the Secretary may participate in the vote to elect or remove the Ad Hoc Members at that Convention.

    (3)   Any member of the Board of Directors may nominate an individual to serve as an Ad Hoc Member. In nominating and electing Ad Hoc Members, the Board shall not be limited to those individuals nominated by WTS notifications.

    (4)   Nominations shall be put forward during the first day of the Annual Convention, and elections shall be the last agenda item for the Annual Convention. At a Special Convention, nominations and elections may take place on the same day. In no event may a

Convention adjourn with a vacancy remaining in any position of Ad Hoc Member.

(5) Ad Hoc Members shall be elected to serve staggered three (3) year terms by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot. If no candidate receives a two-thirds (2/3) majority vote in the initial balloting, Delegates may nominate additional candidates in accordance with J,(3) above.

(6) The balloting process for the election or removal of Ad Hoc Members at the Annual or Special Convention(s) shall be conducted by members of the National Balloting Committee.

(7) Acceptance of a position as an Ad Hoc Member shall constitute acceptance of a position with the APFA for the purposes of this Constitution. An Ad Hoc Member may perform additional duties as deemed appropriate by the National Officers, the Board of Directors or the Executive Committee so long as such duties do not constitute acceptance of an additional position with the APFA as defined in Section 6 or Section 7 of this Article III, or in Article IX, Sections 4, 5, 6 or 7 of this Constitution.

(8) Ad Hoc Members shall not be full time salaried positions, but shall be compensated for expenses, pay continuance and/or trip removal in accordance with applicable provisions contained in Article V of this Constitution and in the APFA Policy Manual.

(9) An Ad Hoc Member may be removed from his/her position only at a Convention by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot, with or without cause.

(10) In the event of a vacancy in the position of Ad Hoc Member, or in the event an individual declines the position after the Annual Convention has adjourned, the Executive Committee shall function with a vacancy so long as at least a quorum of the Executive Committee exists until the next Annual or Special Convention. At that Convention, the recorded Delegates shall elect a new Ad Hoc Member to fill the vacancy and complete the balance of the unexpired term.

(11) Ad Hoc Members shall function, when necessary, as the APFA Grievance Appeal Panel to review decisions of the Grievance Review Committee.

   a. When the Grievance Review Committee decides to withdraw a grievance, such decision may be

> appealed by the grievant to the Grievance Appeal Panel.
>
> b. The decision of the Grievance Appeal Panel shall be final and binding and not subject to reversal by the Executive Committee or the Board of Directors.

K. Jurisdiction and Duties:  The Executive Committee shall be charged with the rights, privileges, duties, and responsibilities to:

(1) assure compliance with the policies as set forth and established by the Board of Directors;

(2) act on business or matters presented to the Executive Committee by any member of the Board of Directors or by administrative or committee personnel;

(3) communicate on a regular and consistent basis with members of the Board of Directors;

(4) determine the content of annual training for members of the Board of Directors;

(5) confirm or reject the nomination of individuals to serve in the administrative and committee positions as provided in Article IX of this Constitution;

(6) establish special committees and/or task forces which may be deemed necessary to the best interest of the membership;

(7) confirm or reject the nominations of members to other committees as established by this Constitution or as may be established by the Board of Directors;

(8) confirm the National Treasurer's recommendation of the accounting firm to prepare the annual audit;

(9) approve the initiation of litigation prior to commencement of a lawsuit;

(10) take any and all appropriate action deemed necessary by the Executive Committee and in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the National Officers or other representatives, except as provided in this Article III, Section 4.J.11.

While not limited to the following, the Executive Committee may:

(11) recommend changes to the APFA Policy Manual;

(12) accept a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee for referral to the membership for ratification;

(13) reject a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee;

(14) adjust the budget to meet the unexpected needs of the membership, provided that:

    a. such budget adjustment shall require that the Board of Directors be notified of the adjustment within forty-eight (48) hours following the adjournment of the Executive Committee meeting wherein the budget was adjusted, and

    b. such adjustment may not reduce any base budget without prior approval by a majority of the Voting Board of Directors;

(15) direct that a special mailing be sent to the membership;

(16) recognize the accomplishments and/or contributions of members and/or representatives of the APFA;

(17) approve hardship dues forgiveness and review other hardship requests that may be brought before the Executive Committee.

(18) order a special Base/Delegate election should a convention be scheduled to convene and there exists at such base a dual vacancy in the positions of Base President and Vice President, or in the event the base does not have an elected Delegate to the convention. Such special election shall be held in accordance with the procedures provided for in the APFA Policy Manual.

## Section 5.  TELECONFERENCE MEETINGS:

When it becomes necessary for the Board of Directors and/or the Executive Committee to act on urgent or emergency business through the use of a Teleconference Meeting, the following procedures shall apply:

A. The National President, or four (4) members of the Executive Committee, or a majority of the Voting Board of Directors may advise the National Secretary that a Teleconference Meeting of the Board of Directors is required to conduct the business of the APFA.

B. The National President, or four (4) members of the Executive Committee may advise the National Secretary that a Teleconference Meeting of the Executive Committee is required to conduct the business of the APFA.

C. The purpose of the Teleconference Meeting must be submitted to the National Secretary in writing and any resolution(s) shall include the names of the maker and second.

D. Upon receipt of the request for a Teleconference Meeting, the National Secretary shall provide written notification to the Board of Directors or the Executive Committee, as appropriate, that a Teleconference Meeting is to be conducted. Such notification shall include the name(s) of those individual(s) calling the Teleconference Meeting and the complete text of any proposed resolution(s) with the names of the maker and the second. The National Secretary shall also specify the date and time when the National President will convene the Teleconference Meeting.

E. The National Secretary must request written verification of receipt of the notification.

F. The Teleconference Meeting may be conducted as soon as a quorum can be established, but no sooner than all reasonable efforts have been made to notify all Board members or Executive Committee members, as appropriate, that a Teleconference Meeting is to be conducted.

G. The Teleconference Meeting must be conducted no later than the urgent or emergency circumstances dictate, but in no event later than ten (10) days following receipt by the National Secretary of the request for the meeting.

H. The Teleconference Meeting shall commence at the time and date specified, provided that a quorum or more must be participatory throughout the meeting. Should the quorum be failed at any time during the course of the Teleconference Meeting, the meeting shall be considered to be adjourned and shall be rescheduled as provided in D of this Section 5.

I. At a Teleconference Meeting of the Board of Directors when more than a quorum is participatory, all issues shall be decided by a majority of the Voting Board of Directors except as provided for in this Constitution. In the event that only a quorum is participatory, all issues shall be decided by a two-thirds (2/3) majority vote of the quorum except as provided for in this Constitution.

J. At a Teleconference Meeting of the Executive Committee five (5) or more members voting in the affirmative shall be required to decide an issue, except as provided for elsewhere in this Constitution.

K. The vote tabulation shall be conducted by the National Secretary.

L. Once the vote is completed, the National Secretary shall forward to each member of the Board of Directors and the Executive Committee a copy of the tally sheet attached to the resolution(s).

M. All business conducted by a Teleconference Meeting shall become a part of the permanent record of the APFA.

N. Any business conducted by a Teleconference Meeting is subject to reconsideration at the next meeting of the Executive Committee or Board of Directors, as appropriate.

## Section 6. OFFICERS:

A. Definitions: The National Officers shall be the National President, National Vice President, National Secretary and National Treasurer.

B. Duties of the National President shall include but not be limited to the following:

(1) The National President shall be the chief executive officer of the APFA, and shall conduct the affairs of the APFA in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors and/or the Executive Committee.

(2) The National President shall sign any agreements, supervise the activities of the APFA and carry out any duties the Board of Directors and/or the Executive Committee may request, in accordance with this Constitution.

(3) The National President shall convene any convention or meeting of the Board of Directors and the Executive Committee. S/he must convene the Board to review any proposed Collective Bargaining Agreement between the APFA and AAL.

(4) The National President shall convene any meeting of the OAL Operation Advisory Panel. S/he must convene the Panel to review any proposed Collective Bargaining Agreement between the APFA and an airline other than AAL whose Flight Attendant employees are represented by the APFA.

(5) The National President shall act as Chairperson for the Board of Directors, the Executive Committee, the Negotiating Committee and the OAL Operation Advisory Panel. The National President shall oversee all other national committees, unless otherwise provided for in this Constitution or by resolution or policy of the Board of Directors or the Executive Committee.

(6) The National President shall recommend to the Executive Committee all changes in employment and staff requirements and, subject to the approval of the Executive Committee, fix compensation for all agents and employees of the APFA. The National

President shall be responsible for the employment, supervision and discharge of all agents and employees of the APFA.

(7) The National President may address an Annual Report to the membership.

(8) The National President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as National Chairs.

(9) The National President shall appoint Negotiating Committee members in accordance with Article X, Section 5, A(1)b of this Constitution.

(10) The National President shall have the authority to hire, retain or employ general counsel and/or other legal counsel for the APFA, subject to the approval of the Executive Committee.

(11) The National President shall direct and coordinate legislative and political initiatives and any lobbying efforts on behalf of the Association to further the objectives of the APFA.

C. Duties of the National Vice President shall include but not be limited to the following:

(1) The National Vice President shall assist the National President in the discharge of all duties. In the absence of the National President, or should a vacancy occur in the office of National President, the National Vice President shall perform the duties of the National President.

(2) The primary responsibility of the National Vice President shall be to oversee the grievance and arbitration process provided for in the Railway Labor Act and the Collective Bargaining Agreement(s) entered into between the APFA and employers.

(3) The National Vice President shall serve as the APFA's permanent Chairperson of the Flight Attendant System Board(s) of Adjustment.

(4) The National Vice President shall coordinate activities of the System Board(s) of Adjustment with other departments within the APFA.

(5) The National Vice President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as Regional Representatives.

(6) The National Vice President shall determine the specific base assignments of each Region and assign and coordinate the activities of the members appointed to serve as Regional Representatives.

(7) The National Vice President shall be authorized to hire, retain and employ legal counsel as may be required to provide members with representation in the grievance and arbitration process, subject to the approval of the Executive Committee.

(8) The National Vice President shall ensure the training and continuing education of all representatives involved in the grievance and arbitration process.

(9) The National Vice President shall coordinate and chair a Grievance Review Committee to oversee the disposition of grievances.

D. Duties of the National Secretary shall include but not be limited to the following:

(1) The National Secretary shall be responsible for all administrative records of the Association.

(2) The National Secretary shall cause to be kept an administrative record of all officers, representatives and appointees.

(3) The National Secretary shall notify the Board of Directors, the Executive Committee and the OAL Operation Advisory Panel of any convention or meeting.

(4) The National Secretary shall cause to be kept a record of all proceedings at any convention or meeting of the Board of Directors, or at any meeting of the Executive Committee and the OAL Operation Advisory Panel.

(5) The National Secretary shall submit a written report of all meetings of the Executive Committee and the OAL Operation Advisory Panel to the Board of Directors within fifteen (15) days following such meeting.

(6) The National Secretary shall oversee the National Balloting Committee.

(7) The National Secretary shall assist the National President in the preparation of any Annual Report to the members of the APFA.

(8) The National Secretary shall administer Article VII procedures.

(9) The National Secretary shall update and ensure distribution of the APFA Policy Manual.

(10) The National Secretary shall assist in establishing regular training and continuing education programs for representatives of the APFA, and shall maintain the APFA training records of all representatives.

(11) The National Secretary shall ensure that training and reference materials and Association publications and manuals are maintained.

(12) The National Secretary shall be responsible for the library of the Association.

(13) The National Secretary shall establish and maintain lines of communication between members of the Executive Committee, Base Representatives and all administrative departments and committees.

(14) The National Secretary shall assist the National Treasurer in the discharge of all duties. Should there be a temporary absence in the office of the National Treasurer; the National Secretary may perform the duties of the National Treasurer.

E. Duties of the National Treasurer shall include but not be limited to the following:

(1) The National Treasurer shall be responsible for the care and custody of the funds and securities of the APFA, receiving all dues, fees and special assessments assigned to the APFA.

(2) The National Treasurer shall be responsible for all financial records of the APFA.

(3) The National Treasurer shall cause to be kept a record of the APFA's membership so as to show at all times the number of members in each membership status or classification, their respective places of residence, their post office addresses, their base locations and the date when each person became a member of the APFA and/or changed membership status or classification.

(4) The National Treasurer shall cause to be kept an individual record of all dues and assessments for each member.

(5) The National Treasurer shall oversee the APFA Budget Committee and shall assist in the preparation of the annual budget.

(6) The National Treasurer shall submit the annual budget to the Board of Directors for approval at the Annual Convention.

(7) The National Treasurer shall advise the Board of Directors and the Executive Committee of any significant change in the financial standing of the APFA.

(8) The National Treasurer shall submit a monthly financial report to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4.C of this Constitution.

(9) The National Treasurer shall submit a quarterly financial review to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4.D of this Constitution.

(10) The National Treasurer shall submit with his/her signature all Federal and State Reports required by law.

(11) The National Treasurer shall oversee and coordinate ongoing computerization of the APFA headquarters files, records and systems.

(12) The National Treasurer shall oversee the daily activities of the APFA headquarters office staff.

(13) The National Treasurer shall coordinate the headquarters office staff to ensure assistance is provided to administrative, committee and support personnel.

(14) The National Treasurer shall assist the National Secretary in the discharge of all duties. Should there be a temporary absence in the office of the National Secretary; the National Treasurer may perform the duties of the National Secretary.

**Section 7.** BASE COUNCILS / BASE REPRESENTATIVES:

A. Organization: The Base Council shall consist of the Base President, Vice President, and Base Council Representatives (BCRs). When a base contains both an American Airlines Operation and one or more OAL Operations (as defined in Article I, Section 7,K,2 of this Constitution), the Base Council shall also include an OAL Operation Advisory Panel Representative (APR). The members of a Base Council hold positions with the APFA as Base Representatives.

B. Base Representatives shall hold such positions only at the base where they are stationed.

C. The Base President and Vice President shall be elected by the membership of the base at large.

D. Base Council Representatives (BCRs) shall be elected by the membership of the American Airlines base at which they are stationed. BCRs shall hold such positions only at the base at which they are stationed.

(1) Each base shall be entitled to one BCR for each one hundred (100) members or fraction thereof who are stationed at the base.

E. The Advisory Panel Representative (APR) shall be elected by the membership of the OAL Operation base at which he/she is stationed. The APR shall hold such position only from the OAL Operation base at which he/she is stationed.

F.  A Base President may appoint an active member in good standing to fill a vacancy on the Base Council to complete the balance of an unexpired term, pursuant to the provisions of Article VI, Section 8 of this Constitution.

G.  A Base President may appoint additional individuals to assist the Base Council to meet the needs of the membership, however such individuals may not exercise a vote on matters brought before the Base Council.

H.  Duties of the Base President shall include but not be limited to the following:

(1)  The President shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

(2)  The President shall represent the membership of the base at any other meeting of the Board of Directors.

(3)  The President shall have the right to investigate all grievances and to take such action at the base as may be necessary for the operation of the APFA.

(4)  The President shall maintain the base office in order to represent the members at the base and to supervise the activities of the APFA at the base.

(5)  The President shall have the responsibility for calling, posting notice of and conducting all base meetings, and shall keep the respective members informed of the actions of the APFA.

(6)  The President shall maintain the APFA bulletin board(s) at the base.

(7)  The President may establish all local base committees not otherwise established by the Board of Directors, the Executive Committee and/or the National Officers.

(8)  The President shall provide the Board of Directors and/or the Executive Committee with any information which may be requested and shall carry out all resolutions and/or policy decisions of the Board of Directors and/or Executive Committee.

(9)  The President should provide a quarterly report to the Executive Committee.

I.  Duties of the Vice President shall include but not be limited to the following:

(1)  The Vice President shall assist the President, the Base Council Representatives and the Advisory

Panel Representative in the discharge of their duties and responsibilities.

    (2) In the absence of the Base President, or should a vacancy occur in the position of Base President, the Vice President shall perform the duties of the President.

    (3) In the absence of the Base President, the Vice President shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

J. Duties of the Advisory Panel Representative (APR) shall include but not be limited to the following:

    (1) The APR shall assist the Base President, Vice President and Base Council Representatives in the discharge of their duties and responsibilities.

    (2) The APR shall assist the Base President with those aspects of base representation unique to the OAL Operation of the base.

    (3) The APR shall represent the OAL Operation of a base at all meetings of the OAL Operation Advisory Panel.

K. Duties of the Base Council Representative (BCR) shall include but not be limited to the following:

    (1) The BCR shall assist the Base President, Vice President and Advisory Panel Representative in the discharge of their duties and responsibilities.

    (2) The BCR shall coordinate with the Base President in the investigation and filing of grievances.

    (3) The BCR shall endeavor to provide expertise in any or all areas of grievance, safety, health, scheduling, contract language and interpretation, professional standards, uniforms, hotel, membership records or other areas deemed appropriate by the Base President and/or the Board of Directors and/or Executive Committee.

    (4) The BCR shall coordinate activities with appropriate APFA administrative and committee personnel and departments.

## Section 8. OAL OPERATION ADVISORY PANEL:

A. Organization: The OAL Operation Advisory Panel shall consist of the Advisory Panel Representatives from the OAL Operation(s) at each base.

B. The Advisory Panel shall meet at least once a year with the National Officers of the APFA to evaluate those

issues related to flying performed by APFA members who are part of the OAL Operation(s).

## Section 1.   DUES AND ASSESSMENTS:

A. A member's obligation for dues and assessments shall commence as of the date of his/her eligibility for active membership.  All members shall be required to pay dues except as provided in Article II, Section 4,B(3), Section 4,B(4), Section 4,B(5), Section 5,A,(1) and Section 5,A,(2) of this Constitution.

B. Active members shall be required to pay monthly dues by employer's dues check-off or by individual payment. Dues payment must be received by the National Treasurer no later than the end of each calendar month.

C. The Association's dues year shall run concurrently with the fiscal year.

D. In the American Airlines (AAL) Operation, Active Members, including those on probation, shall pay monthly dues at the rate of forty-one dollars ($41.00) per month.

   In an Other Airlines (OAL) Operation, Active Members, including those on probation, shall pay dues at the rate of forty-one dollars ($41.00) per month.

   Twenty-five (25) percent of any dues increase ratified by the membership shall be placed in a negotiations, and negotiations-related fund.  However, this shall not apply to dues received from Flight Attendants who are represented by APFA as a result of its being certified as the exclusive representative of the combined Flight Attendant work group created by the merger of American Airlines and US Airways.  This exemption shall expire when the Maintenance Agreement between APFA and the Association of Flight Attendants ends.

E. The Board of Directors may conduct an annual review of the dues structure of the Association to determine if the structure should be revised, provided that no increase in dues shall be put into effect unless ratified by an affirmative vote by a majority of those active members in good standing who return valid ballots.

F. Assessments may be levied on all active members and to provide for extraordinary expenses, contingencies and reserves, provided such assessments are first approved by a two-thirds (2/3) majority of the Voting Board of Directors, and subsequently ratified by an affirmative vote by a majority of those active members in good standing who return valid ballots.

## Section 2.  INITIATION FEE:

A. New members shall pay an initiation fee as determined by the Board of Directors.
B. Honorary members will not be subject to the initiation fee.

## Section 3.  DELINQUENT DUES, ASSESSMENTS OR INITIATION FEE(S):

A. Required dues, assessments and initiation fee(s) not paid within sixty (60) days of the established billing date will cause a member to be placed in bad standing.  The established billing date of said dues and/or assessments shall be noted on all APFA correspondence referencing this subject.
B. Members are subject to discharge for non-payment of dues and/or initiation fee(s), when employed by an airline having a Collective Bargaining Agreement with the APFA that requires the payment of dues and/or initiation fee(s) as a condition of employment.
C. Members returning from an unpaid leave status may set up a payment plan to satisfy their obligation for back dues, initiation fee(s) and/or assessments.
   (1) The member must execute and sign a promissory note and therein agree to pay all back dues, initiation fee(s) and/or assessments within a period of time not to exceed twice the number of months of back dues owed.
   (2) Upon execution of such promissory note, the member shall be considered to be in good standing status, and shall remain in good standing status unless the member fails to pay the monthly installment, or unless the member incurs an additional back dues obligation.
   (3) All notes must be executed at least thirty (30) days prior to the balloting date of any APFA election or referendum for the member to be eligible to vote in such election or referendum.
D. Should the APFA establish a bank card acceptance program for the payment of dues, initiation fee(s) and/or assessments, all members shall be eligible to pay dues by this method.

## Section 4.  FINANCIAL PROCEDURES:

A. The fiscal year of the APFA shall be from April 1 to the following March 31.
B. The financial records of the Association shall be audited annually by a Certified Public Accountant (CPA) from an

---

accounting firm recommended by the National Treasurer and confirmed by the Executive Committee.

C. The National Treasurer shall prepare a monthly financial report that contains:

    (1) a statement of all assets, liabilities and fund balance(s);

    (2) a statement of income and expenses;

    (3) a record of expenditures; and

    (4) a record of pay continuance.

D. The National Treasurer shall prepare a quarterly financial review that shall include, but not be limited to:

    (1) the budget analysis for the present and immediate past quarter, and projections for the remainder of the fiscal year;

    (2) a statement of all assets, liabilities and fund balance(s); and

    (3) the status of reserves and savings.

E. An accountant shall be employed by the APFA and shall report directly to the National Treasurer. S/he shall keep an accurate record of all receipts and expenditures of the APFA, and prepare and submit to the National Treasurer the following:

    (1) all Federal and State reports as required by law;

    (2) monthly financial statements; and

    (3) the APFA's books for the annual audit by the accounting firm.

F. All bills payable, notes, checks or other negotiable instruments of the APFA shall be made in the name of the Association of Professional Flight Attendants and shall bear the actual signature of two (2) of the following: the National President; the National Vice President; the National Secretary or the National Treasurer. At least two (2) of the following: the National President; the National Vice President; the National Secretary or the National Treasurer; may from time to time, transfer such sums of money to administrative accounts, payroll accounts, petty cash accounts, savings/reserve accounts and such other accounts as may be necessary to meet administrative and current obligations of the APFA.

G. No officer, agent or employee of the APFA, acting singly or jointly with others shall have the power to make any bills payable, notes, checks, drafts, warrants or negotiable instruments of any description or nature or endorse the same in the name of the APFA or contract or cause to be contracted any debt or liability in the name of or on behalf of the APFA except as expressly prescribed and provided in this Constitution.

**Section 5.** BONDING:

All officers and employees of the APFA shall be bonded in the amounts not less than those provided for and required by applicable Federal law.

**Section 6.** SAVINGS / RESERVES:

The APFA shall adopt a reasonable savings and reserves plan in the name of the Association of Professional Flight Attendants, and such savings/reserves shall be maintained at a reasonable level. The National Treasurer shall be charged with administration of financial and fiscal policies as set forth herein, or as may be established by the Board of Directors.

**Section 7.** RETENTION OF RECORDS:

All financial records of the APFA shall be retained in their original form as required by State or Federal law.

# ARTICLE V

## *EXPENSES AND SALARIES*

### Section 1. EXPENSES:

Authorized normal expenses incurred by any officer, representative or member while on APFA business shall be reimbursed by the APFA. Allowable expenses shall be established by the Board of Directors and set forth in the APFA Policy Manual.

### Section 2. COMPENSATION FOR NATIONAL OFFICERS:

The rate or method of compensation for the National Officers of the APFA shall be established by the Board of Directors and set forth in the APFA Policy Manual, and may be subject to membership ratification.

### Section 3. OTHER COMPENSATION:

The rate or method of other compensation, if any, and/or the policy regarding pay continuance for other APFA representatives shall be established by the Board of Directors and set forth in the APFA Policy Manual.

# A R T I C L E   V I

## *N O M I N A T I O N S   A N D   E L E C T I O N S*

### Section 1. NOMINATIONS:

A. Any active member in good standing may self-nominate for any office or elected position with the APFA.

B. Any active member in good standing may nominate another active member in good standing for any office or elected position with the APFA.

C. Any active member in good standing may be nominated by another active member in good standing for any office or elected position with the APFA.

### Section 2. WILLINGNESS TO SERVE:

A. The National Secretary shall direct the National Ballot Committee (NBC) to mail to each member and/or to post on the APFA website Willingness-to-Serve notifications:

   (1) at least one hundred and thirty-five (135) days prior to the end of the term for National Officers; or

   (2) at least ninety-five (95) days prior to the end of the term for Base Representatives; or

   (3) at least ninety-five (95) days prior to the balloting date for the Elected Members of the Negotiating Committee;

   (4) at least forty-five (45) days prior to the balloting date for a vacant Elected Member(s) of the Negotiating Committee position, or

   (5) more than fifteen (15) days following the directive of the National Secretary when a dual vacancy exists at a base, pursuant to Section 8,C of this Article VI.

B. The Willingness-to-Serve notification for the position of Base President shall indicate that a Base President will be authorized, by his/her election:

   (1) to serve as a Delegate to the Annual or Special Convention(s) for the purpose of electing Ad Hoc Members of the Executive Committee, and

   (2) to exercise a vote to remove an individual from the position of Ad Hoc Member of the Executive Committee, should such action be deemed necessary.

   The Willingness-to-Serve notification for the position of Vice President shall indicate that a Vice President will be authorized, by his/her election, to serve as a Delegate pursuant to (1) and (2) above only in the absence of the Base President.

C. Willingness-to-Serve notifications must be returned to the APFA by the time and date specified and will be

retrieved on that date from the appropriate post office box by members of the NBC or from an email address designated by the NBC for the receipt of Willingness-to-Serve notifications.  There shall be a thirty (30) day time period to submit Willingness-to-Serve notifications. Willingness-to-Serve notifications received after the time and date specified will not be considered.

## Section 3.  TERMS OF OFFICE:

A. The term of office for the National Officers shall be for a forty-eight (48) month period.

B. The term of office for the Base Representatives shall be for a twenty-four (24) month period.

C. The terms of office shall commence on the first day of the APFA fiscal year, as appropriate, for all elected officers and representatives, except for elected members of the Negotiating Committee who assume office pursuant to the provisions of Article X, Section 3 of this Constitution.

## Section 4.  ELIGIBILITY TO VOTE:

A. All active members in good standing of the APFA shall be eligible to vote in the election of the National President, National Vice President, National Secretary and National Treasurer.

B. All active members in good standing at each base shall be eligible to vote in the election of their Base Representatives, pursuant to Article III, Section 7 of this Constitution.

C. All active members in good standing shall be eligible to vote for the Elected Members of the Negotiating Committee, pursuant to Article X of this Constitution.

D. Any active member in bad standing must arrange to become an active member in good standing not later than the close of business on the fifth (5th) day prior to the time limit for the return of ballots (the balloting date) of any election or referendum.

E. The National Treasurer shall provide the NBC with the appropriate list of active members in good standing for any election or referendum three (3) days prior to the balloting date of any election or referendum, and only members whose names appear on such list shall be deemed eligible to vote.

## Section 5.  BALLOTING:

A. All balloting of the membership provided for in this Constitution shall be conducted by secret ballot, except that during a strike or lockout, a Collective Bargaining

Agreement may be ratified as provided in Article XI, Section 2.E of this Constitution.

B. The NBC shall prepare the official ballot with the names of the candidates or the issue(s) to be decided, and shall indicate thereon a place to vote for any candidate or issue.

C. The ballot for the position of Base President shall indicate that a Base President will be authorized, by his/her election:

    (1) to serve as a Delegate to the Annual or Special Convention(s) for the purpose of electing Ad Hoc Members of the Executive Committee, and

    (2) to exercise a vote to remove an individual from the position of Ad Hoc Member of the Executive Committee, should such action be deemed necessary.

The ballot for the position of Vice President shall indicate that a Vice President will be authorized, by his/her election, to serve as a Delegate pursuant to (1) and (2) above only in the absence of the Base President.

D. No later than twenty (20) days after the deadline for the receipt of the Willingness-to-Serve notifications, the ballot containing the names of the candidate(s) to be voted upon shall be sent to the membership under the supervision of the NBC. The balloting date for candidates and/or issues, including run-off elections, shall be thirty (30) days after the sending of the ballots to the membership.

E. Ballots must be returned to the APFA in mail ballot elections, and votes must be cast in electronic ballot elections, by the time and date specified. Ballots received or cast, as appropriate, after the time and date specified shall be considered void.

F. Ballots shall be counted in the metropolitan area where the APFA headquarters is located. Ballots may be handled and counted by an independent accounting or balloting firm which has been approved by the Executive Committee and the NBC shall oversee all such balloting for accuracy of procedures.

G. At the conclusion of the vote count, the NBC shall certify the results of the vote for each position. The date of such certification shall be the canvassing date. The NBC shall submit this certification in writing to the National Secretary. The National Secretary shall notify the candidate(s) and/or the membership of the balloting results by the APFA "Hotline", by posting on all APFA bulletin boards and on the official APFA website.

H. In any balloting for National Officer, the candidate receiving the majority of the valid votes cast for an office shall be deemed elected to that office and shall be so notified by the National Secretary.

    (1) If no candidate receives a majority of the valid votes cast for a national office, the NBC shall, within ten (10) days following the Canvassing Date, prepare and send to the membership a run-off ballot containing the names of the two (2) candidates receiving the highest number of valid votes cast.

    (2) The candidate receiving the majority of valid votes cast for an office in the runoff election shall be deemed elected to that office and be so notified by the National Secretary.

I. In any balloting for Base Representative, the candidate receiving the highest number of valid votes cast for a position shall be deemed elected to that position and be so notified by the National Secretary.

J. In the event that a tie exists in the balloting for a Base Representative, a runoff balloting shall be accomplished pursuant to the procedures in H of this Section 5.

K. An issue will be considered ratified by the membership if it receives a plurality of the valid votes cast.

L. All ballots and other election materials, notes and records shall be sealed after being counted and certified as provided for herein, and shall remain in the possession of the National Secretary for at least one (1) year from the balloting date in accordance with all appropriate time limits required by Federal law.

M. Should the margin of victory in a ballot count be ten percent (10%) or less and in the event a candidate challenges the accuracy of such ballot count in writing to the National Secretary within fourteen (14) days following the Canvassing Date, a recount shall occur and the APFA shall assume all related costs. Should the margin of victory be greater than ten percent (10%), the cost related to any such recount shall be borne by the candidate challenging the accuracy of the ballot count.

## Section 6. ELECTION CONTEST FOR OFFICE:

A. Only candidates may contest an election for office.

B. The contestant must file a written complaint with the National Secretary, directed to the NBC, within fifteen (15) days following the Canvassing Date of the ballots.

C. The NBC shall investigate such complaint, and must render its decision concerning the disposition of such complaint no later than thirty (30) days following the Canvassing Date of the ballots.

D. The contestant may appeal any decision rendered by the NBC to the Executive Committee no later than forty-five (45) days following the Canvassing Date of the ballots.

E. The Executive Committee shall consider such appeal and must render its decision concerning such appeal no later than sixty (60) days following the Canvassing Date of the ballots.

F. Should the NBC or the Executive Committee fail to respond to the contestant in the designated time periods, the contestant will be free to pursue his/her LMRDA rights. In any event, the contestant will have satisfied the internal remedies provisions of the LMRDA following the sixty (60) day period provided for in this Section 6.

## Section 7. VACANCY IN OFFICE, NATIONAL OFFICERS:

A. In the event of a vacancy in the office of the National President, the National Vice President shall assume the office for the balance of the unexpired term.

B. In the event of a vacancy in the office of the National Vice President, if the unexpired term from the date of the vacancy is more than eighteen (18) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim National Vice President to serve until the result of the election is known. If the unexpired term of the National Vice President is eighteen (18) months or less, the office shall be filled by appointment by the Board of Directors.

C. In the event of a simultaneous vacancy in the office of the National President and National Vice President, if the unexpired terms from the date of the vacancies are more than eighteen (18) months, a membership election shall be held to fill the vacancies in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim National President and an interim National Vice President to serve until the results of the elections are known. If the unexpired terms are eighteen (18) months or less, the offices shall be filled by appointments by the Board of Directors.

D. In the event of a vacancy in the offices of National Secretary or National Treasurer, if the unexpired term from the date of the vacancy is more than eighteen (18) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim National Secretary or

National Treasurer to serve until the result of the election is known. If the unexpired term of the National Secretary or National Treasurer is eighteen (18) months or less, the office shall be filled by appointment by the Board of Directors.

E. The term of office of the National President, National Vice President, National Secretary or National Treasurer, if elected or appointed under the provisions of B,C or D of this Section 7, shall commence immediately upon election or appointment and, except for the interim appointments, shall be to complete the balance of the unexpired term.

## Section 8. VACANCY IN OFFICE, BASE REPRESENTATIVES:

A. In the event of a vacancy in the position of the Base President, the Vice President shall assume the position for the balance of the unexpired term.

B. In the event of a vacancy in the position of Vice President, if the unexpired term from the date of the vacancy is for more than six (6) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. If the unexpired term is for six (6) months or less, the position shall be filled for the balance of the unexpired term by an election by the Base Council from among their members.

C. In the event of a simultaneous vacancy in the positions of both the Base President and the Vice President, creating therefore a dual vacancy, the following procedures shall apply:

(1) Within fifteen (15) days of having been made aware of the dual vacancy, the National Secretary shall direct the NBC to mail to all members at the base and/or to post on the APFA website Willingness-to-Serve notifications for the positions of Base President and Vice President, provided that the unexpired terms from the date of the vacancy are for more than six (6) months.

(2) In the event of a new base opening, within fifteen (15) days following the first official report date for Flight Attendants assigned to that base by the employer, the National Secretary shall direct the NBC to mail to all members at the base and/or post on the APFA website Willingness-to-Serve notifications for the positions of Base President, Vice President, Advisory Panel Representative (if applicable), and Base Council Representatives to

all members at the base, provided that the unexpired terms from the date of the vacancy are for more than six (6) months.

(3) A membership election shall be held to fill the positions in accordance with the time limits provided in Section 2 and Section 5 of this Article VI.

(4) The Executive Committee shall appoint an interim Base President until such time as the election process is completed for the Base Representative position(s), or to complete the balance of an unexpired Base President term of six (6) months or less.

(5) The term of the Base Representatives, if elected in accordance with the provisions of (1), (2) and (3) above, shall commence immediately upon election and shall be to complete the balance of the unexpired term.

D. In the event that there are no candidates for the position of Base President, the Executive Committee may appoint an active member in good standing from that base to be the Base President to complete the balance of the unexpired term.

E. In the event a new OAL operation or satellite is opened and assigned to a base, a membership election shall be held to fill the positions of Base Council Representative(s) and, if applicable, the Advisory Panel Representative (APR) in accordance with the time limits provided in Section 2 and Section 5 of this Article VI, provided that the unexpired terms from the opening of the OAL operation or satellite will be for more than six (6) months. The Base President shall appoint interim Base Council Representatives and, if applicable, an interim APR to complete the balance of the unexpired term(s) of six (6) months or less.

F. In any case, if the unexpired term of any Base Representative is six (6) months or less, the interim appointee shall complete the balance of the unexpired term.

G. If any individual holds a position as Base President or Vice President other than by either secret ballot vote of the base membership or by having been duly elected by virtue of running unopposed, such individual shall not be considered a Delegate as defined in Article I, Section 7,C and Article III, Section 3,B,(3) of this Constitution. Such Base President or Vice President shall not be eligible to vote at any convention to elect or remove Ad Hoc Members of the Executive Committee.

---

H. In the event a convention is scheduled to convene and there exists at a base a dual vacancy in the positions of Base President or a Vice President, or in the event the base does not have a Base President and Vice President who is an elected Delegate to the Convention, all reasonable measures shall be taken to afford the members of that base the opportunity to elect a Delegate to the convention.

I. When the Company combines international and domestic operations/bases into a single base, or where the Company combines two bases:

(1) If the unexpired terms of the incumbent Base Presidents and Vice Presidents are for six (6) months or less, those Base Presidents and Vice Presidents shall continue to serve, as Co-Base Presidents and Co-Vice Presidents, for the balance of the unexpired terms.

(2) If the unexpired terms of the incumbent Base Presidents and Vice Presidents are for more than six (6) months, membership elections for the President and Vice President of the combined base shall be held in accordance with this Article VI. The incumbent Base Presidents and Vice Presidents shall continue to serve, as Co-Base Presidents and Co-Vice Presidents, until the NBC certifies the results of those elections, or a candidate(s) is duly elected by virtue of being unopposed. The Base President and Vice President of the combined base shall take office immediately upon election, for the balance of the unexpired terms.

(3) If the unexpired terms of the incumbent Operation Council Representatives (OCRs) are for six (6) months or less, those OCRs shall serve, as Co-Base Council Representatives (BCRs), for the balance of the unexpired terms.

(4) If the unexpired terms of the incumbent Operation Council Representatives (OCRs) are for more than six (6) months, elections for BCRs at the combined base shall be held in accordance with Article III, Section 7. The incumbent OCRs shall continue to serve, as Co-BCRs, until the elections are completed. The BCRs shall serve for the balance of the unexpired terms.

# ARTICLE VII

## *HEARINGS AND DISCIPLINARY*
## *PROCEDURES*

### Section 1. GROUNDS FOR CHARGES:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

A. Failure to pay dues, assessments or penalties levied by the Association;

B. Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

C. Willfully acting as a strike breaker during any work stoppage duly authorized by the Association;

    (1) Notwithstanding Section 1.C, above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

D. Willful violation of a Flight Attendant's Collective Bargaining Agreement;

E. Theft or embezzlement of Association monies or property;

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

G. Willfully acting in a manner that causes the Association to violate its legal obligations; or

H. Willfully bringing charges without reasonable basis against another member, officer or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

### Section 2. FILING OF CHARGES:

A. A charge may be filed by any member in good standing. All charges shall be filed with the National Secretary and shall be proffered in writing and shall be specific as to the alleged act(s) and/or the Article(s) of this Constitution

allegedly violated which constitute the basis of the charge(s).

B. The National Secretary shall cause a copy of the charges to be served upon the accused and the accuser within seven (7) days following receipt of the charges. Such notification shall be by registered mail, return receipt requested to their last known addresses, and shall furnish the accused and the accuser a description of all relevant procedures.

C. The National Secretary shall send a copy of all charges to the Executive Committee and to the Board of Directors within seven (7) days following his/her receipt of the charges.

D. Time Limits:

(1) Charges based on Section 1.A through Section 1.F of this Article VII must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the alleged offense.

(2) Charges based on Section 1.G of this Article VII may not be filed unless and until it has been determined, in a separate legal proceeding (such as a lawsuit), that the Association has violated its legal obligations, or unless and until the Association settles a legal proceeding brought against it by furnishing substantial relief to an opposing party. Charges based on Section 1.G above must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the completion or settlement of the legal proceeding.

(3) Charges based on Section 1.H of this Article VII must be filed within sixty (60) days following the Article VII Arbitrator's decision which gives rise to such charge(s).

E. The accused and accuser may be represented during Article VII proceedings by any individual; however, the APFA will not compensate either party for attorney's fees.

## Section 3. REVIEW OF CHARGES:

At the first regularly scheduled meeting of the Executive Committee following receipt of charges by the National Secretary, the Executive Committee shall review the charges for timeliness, specificity and validity.

A. Should the charges be determined to be timely, specific and valid, such charges shall then be forwarded by the National Secretary via registered mail, return receipt requested to the Article VII Arbitrator designated herein

within seven (7) days following such Executive Committee meeting.

B. Charges deemed untimely by the Executive Committee will be dismissed without appeal.

C. Charges deemed non-specific by the Executive Committee shall be referred back to the accuser. The accuser may resubmit, one time only, such charges to the National Secretary for review by the Executive Committee at its next regularly scheduled meeting without affecting the time limits of Section 2.D of this Article VII.

D. Charges may be deemed invalid and dismissed if the Executive Committee determines that the charges address conduct protected by this Constitution and/or by law (including the LMRDA Bill of Rights). Charges may also be deemed invalid and dismissed if they fail to state a proper claim under Section 1 of this Article VII. Should such charges be dismissed as invalid, the accuser may, within seven (7) days following receipt of notification of dismissal by the Executive Committee, appeal to the Article VII Arbitrator designated herein. If the Article VII Arbitrator determines that the charges are valid, s/he shall so advise the National Secretary, the accused and the accuser, and the charges will be processed in accordance with this Article VII.

## Section 4. SUSPENSION FROM OFFICE:

A. If charges are filed against a national officer or elected representative based on Section 1.B, Section 1.C or Section 1.E of this Article VII, the Board of Directors may determine at any time during the pendency of the charges that the alleged conduct giving rise to the charges threatens the APFA's vital interests. The Voting Board of Directors may then, by two-thirds (2/3) vote, suspend the accused's authority as national officer or elected representative until the threat is removed or the Article VII Arbitrator designated herein resolves the charges, whichever occurs sooner.

B. A national officer or elected representative suspended pursuant to this section shall be entitled, upon demand, to an expedited resolution of the charges, with a decision rendered within thirty (30) days following the Board of Directors Meeting where the officer or elected representative was suspended.

C. If the charges are filed by or against a member of the Executive Committee or the Board of Directors, such member must appoint an alternate member of the Association to participate in the review of the charges as

provided in Section 3 of this Article VII and, when necessary, to participate in the vote regarding the suspension of the member of the Executive Committee or Board of Directors as provided in this Section 4.

## Section 5. APPOINTMENT OF THE ARTICLE VII ARBITRATOR:

A. The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII. The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator.

B. The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available.

C. C. The Article VII Arbitrator and any alternate Article VII Arbitrator(s) shall be a person expert in labor law who is a neutral (such as an academic or professional labor arbitrator), who has experience as a neutral in adjudicating internal labor organization disputes, and who has no other prior or current involvement with the APFA.

## Section 6. JURISDICTION AND AUTHORITY OF THE ARTICLE VII ARBITRATOR:

A. The Article VII Arbitrator shall have power to resolve all charges referred to him/her during his/her tenure.

B. The administrative procedures for handling Article VII charges shall be included in the APFA Policy Manual. The Article VII Arbitrator may from time to time propose changes in these administrative procedures, and such changes shall become effective and included in the Policy Manual if they are approved by the Board of Directors. The administrative procedures to be adopted shall be in general compliance with American Arbitration Association rules where practicable, but may not conflict in any respect with the provisions of this Constitution.

C. The Article VII Arbitrator may, on his/her own motion or upon motion filed by the accused, declare that charges are untimely or do not allege a violation cognizable as charges under this Article VII and thus are dismissed without the need for hearing.

D. The Article VII Arbitrator may, on his/her own motion, or upon motion filed by the accused, determine that charges are not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

E. The accused may move for summary dismissal of the charges on the ground that the accuser does not have evidence sufficient to sustain the charges and thus there is no need for a full hearing. On receipt of such a motion, the Article VII Arbitrator shall afford the accuser an opportunity to identify evidence that would sustain the charges. If the Article VII Arbitrator concludes, following that opportunity, that the accuser does not have evidence sufficient to sustain the charges, the Article VII Arbitrator may grant summary dismissal of the charges.

F. If at any time during the pendency of the charges, the Article VII Arbitrator determines (whether on his/her own motion or the motion of the accused) that the conduct furnishing the basis for the charges is protected by this Constitution and/or by law (including the LMRDA Bill of Rights), the Article VII Arbitrator shall have the authority to dismiss the charges addressed to such protected conduct.

G. No ex-parte communication may be had with the Article VII Arbitrator either by the accused, the accuser or by the APFA, or any member of the APFA except with respect to scheduling, location and like administrative matters.

H. The decision of the Article VII Arbitrator shall be final and binding upon the accused and the accuser.

## Section 7.   COSTS:

A. Initial costs of the Article VII proceedings shall be borne by the APFA in accordance with the provisions of Article V of this Constitution.

B. In the event a charge is dismissed by the Article VII Arbitrator, or in the event the Article VII Arbitrator does not sustain a charge, up to one-half (1/2) of the fees and expenses of the Article VII Arbitrator and all administrative costs to the APFA relative to that charge may be levied against the accuser by the APFA upon completion of charge proceedings brought under Section 1.H of this Article VII.

C. In the event the Article VII Arbitrator sustains a charge, costs of the proceedings shall be paid by the APFA and may be offset by a fine levied against the accused in an amount determined by the Arbitrator, if a fine was requested by the accuser.

D. In the event that it becomes necessary to enforce an Article VII Arbitration award through judicial proceedings, attorney's fees for those judicial proceedings may be paid or reimbursed by the APFA to the appropriate party seeking such enforcement.

## Section 8. INTERNAL REMEDIES:

Members, officers and representatives shall exhaust internal remedies under this Article VII for a period not to exceed four months prior to taking any legal action against members, officers or representatives of the APFA with respect to matters cognizable as charges under this Article VII.

# ARTICLE VIII

## *REMOVAL OF OFFICERS BASE*
## *REPRESENTATIVES AND ELECTED*
## *NEGOTIATING COMMITTEE MEMBERS*

### Section 1. REMOVAL OF NATIONAL OFFICERS:

The National President, National Vice President, National Secretary or National Treasurer may be removed from office by action of the membership.

A. A removal balloting shall be caused to be taken:

  (1) within thirty (30) days following a two-thirds (2/3) majority vote of the Voting Board of Directors, or

  (2) by a petition(s) carrying signatures numbering thirty percent (30%) or more of active members in good standing. The office of the National Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.

B. The time limit for the return of the ballots (the balloting date) shall be thirty (30) days after the sending of the ballots.

C. In the event that the removal request is for the National Secretary, the National Treasurer shall assume the duties of the National Secretary for the purposes of this Article VIII. In the event that the removal request is for the National Treasurer, the National Secretary shall assume the duties of the National Treasurer for the purposes of this Article VIII. In the event the removal request is for both the National Secretary and the National Treasurer, the Executive Committee shall appoint a person or persons to oversee the procedures pursuant to A of this Section 1.

D. In any removal balloting, an affirmative two-thirds (2/3) majority vote by those active members in good standing who return valid ballots shall be required to remove a National Officer.

### Section 2. REMOVAL OF A BASE REPRESENTATIVE:

A. A Base Representative may be removed from office by action of the membership at his/her base.

B. A removal petition(s) carrying signatures numbering two-thirds (2/3) or more of the active members in good

standing stationed at the base may be submitted to the National Secretary.

C. The office of the National Treasurer must, within thirty (30) days following receipt of such petition, verify that the names on the petition are of active members in good standing stationed at the base.

D. Eligibility of the membership to sign the removal petition shall be in accordance with eligibility requirements as defined in Article III, Sections 7,C, 7,D or 7,E of this Constitution.

E. Upon verification of a sufficient number of valid signatures on the petition, the Base Representative shall be removed from the position.

## Section 3. REMOVAL OF AN ELECTED MEMBER OF A NEGOTIATING COMMITTEE:

An elected member of a negotiating committee may be removed from office by action of the membership.

A. The removal balloting shall be caused to be taken as provided in Section 1 of this Article VIII, except that:

(1) the removal petition must carry signatures numbering thirty percent (30%) of active members in good standing assigned to the Operation being represented by the negotiating committee member (AAL Operation or OAL Operation), and

(2) the removal balloting shall be taken only within the Operation being represented by the negotiating committee member (AAL Operation or OAL Operation).

B. Eligibility of the membership to vote in the removal balloting shall be limited to those members assigned to the Operation being represented by the negotiating committee member (AAL Operation or OAL Operation), as provided in Article X, Section 5 of this Constitution.

## Section 4. REMOVAL PETITION:

A. The removal petition must clearly state the name of the officer, base representative or negotiating committee member to be removed at the top of each page of the petition. The words "THIS IS A PETITION TO REMOVE (Name of officer, base representative or negotiating committee member) FROM OFFICE" must be made clearly visible by the use of capital letters at the top and bottom of each page.

B. Each member signing a petition must include the date of signature, and his/her printed name, base, and employee number.

C. A petition to remove a National Officer shall be considered valid for one (1) year from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

D. A petition to remove a Base Representative shall be considered valid for six (6) months from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

E. A petition to remove an elected member of a negotiating committee shall be considered valid for one (1) year from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

## Section 5.  RETENTION OF RECORDS:

All removal petitions, ballots, balloting materials, notes and records shall be sealed after being verified, counted and certified as provided in this Article VIII. This material shall remain in the possession of the office of the National Secretary for at least one (1) year after the removal balloting is conducted in accordance with all appropriate time limits required by Federal law.

## Section 6.  APPEAL:

An officer, base representative or negotiating committee member removed pursuant to the provisions in this Article shall have no right of appeal, except as to the procedure utilized in the removal balloting.

A. An Appeal may be made to the Executive Committee through the office of the National Secretary.

B. The Executive Committee shall investigate such appeal and the decision of the Executive Committee with respect to procedure and remedy, if any, shall be legal and binding and not subject to reversal by the Board of Directors.

# ARTICLE IX

## *ADMINISTRATIVE AND COMMITTEE*
## *POSITIONS*

### Section 1. ELIGIBILITY:
A. Only active members in good standing shall be considered eligible for nomination under the provisions of this Article.
B. A member nominated for a position as a Regional Representative pursuant to Section 4 of this Article IX must have been a member of the APFA for a period of two (2) or more years, and must previously have served in at least one (1) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual.
C. A member nominated for a position as a National Chair pursuant to Section 5 of this Article IX must have been a member of the APFA for a period of one (1) or more years, and must previously have served in at least one (1) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual.
D. The APFA Policy Manual may include provisions concerning credit toward meeting the requirements in B and C of this Section for service with a flight attendant union at a carrier other than American Airlines but within American Airlines Group.

### Section 2. NOMINATION AND APPROVAL PROCEDURE:
When it is necessary to fill administrative or committee positions as provided for in this Article IX, the following procedures shall apply:
A. Membership Notification:
  (1) At least sixty (60) days prior to the Annual Convention, the National Treasurer, via the official publication of the APFA, shall advise the membership of the number and type of administrative and committee positions within the APFA contained in the proposed budget for the upcoming fiscal year. Resumes for those positions may be returned to the National Secretary at any time prior to the Annual Convention.
  (2) The National Secretary shall forward to the Executive Committee the names and resumes of those members interested in being considered for the positions of Regional Representative or National Chair.

(3) The National Secretary shall forward to the Board of Directors the names and resumes of those members interested in being considered for positions on the National Balloting Committee (NBC) or the Budget Committee.

B.   Nomination and Appointment:

(1) At the Annual Convention, following approval of the budget, the Board of Directors shall nominate and appoint members to serve on the NBC and the Budget Committee. The Board shall not be limited to nominating and appointing members who returned resumes.

(2) Following the Annual Convention, the National Treasurer shall notify the Executive Committee and, if applicable, the newly elected officers, of the number and type of administrative and committee positions approved in the budget for the upcoming fiscal year.

(3) Not later than fifteen (15) days following the start of the fiscal year, the appropriate National Officer shall submit to the Executive Committee for confirmation the name(s) of the nominee(s) for each available position. The officer shall not be limited to nominating members who returned resumes.

(4) Confirmation or rejection of the nomination shall be made by the Executive Committee at its first meeting following the start of the fiscal year. Such confirmation shall be subject to approval by the Board of Directors.

(5) In the event the Executive Committee rejects the nomination of an individual for a given position, the appropriate officer shall submit the name of another nominee for confirmation or rejection by the Executive Committee.

## Section 3.  DURATION OF APPOINTMENT:

A. Once appointed by the Board of Directors or confirmed by the Executive Committee, as appropriate, a member appointed to an administrative or committee position as provided in this Article IX shall serve for not less than two (2) years in conjunction with the terms of the National Officers, or until his/her successor is appointed, whichever is later.

B. The duration of appointment is subject to elimination of or a reduction in the number of administrative or committee positions caused by action of the Board of Directors at the Annual Convention, except as provided in C below.

C. Once a member has been appointed to a position as a Regional Representative, unless appointed as a replacement Regional Representative pursuant to Section 9,A of this Article IX, such position may not be eliminated unless and until the individual serving in such position resigns or is removed, or has served a minimum of two (2) years whichever is sooner.

## Section 4.   REGIONAL REPRESENTATIVES:
A. The duties of the Regional Representative shall include but shall not be limited to the following:
   (1) The Regional Representative shall coordinate with each President in his/her Region and assist with those activities as deemed necessary by the President which affect interpretation of the Collective Bargaining Agreement(s), grievance procedures and local policies for all operations at the base.
   (2) The Regional Representative is responsible for representation of all first level dismissal cases involving Flight Attendants.
   (3) The Regional Representative shall assist in the preparation of and/or presentation of cases before the System Board of Adjustment at the direction of the National Vice President.
   (4) The Regional Representative shall initiate and maintain communication with Company personnel in his/her Region.
   (5) The Regional Representative may assist in the training of base representatives when deemed necessary by the National Vice President.
   (6) The Regional Representative must coordinate all of his/her duties with the National Vice President and/or National President of the Association.
B. Number:  In no case shall there be less than one (1) Regional Representative for each four thousand (4,000) members, or fraction thereof, on the combined system seniority list(s) of all airlines whose Flight Attendant employees are represented by the APFA.
C. Nomination:  The National Vice President shall nominate members to serve in the positions of Regional Representatives.

## Section 5.   NATIONAL CHAIRS:
A. Definition and Duties:  National Chairs shall organize and oversee the activities of the respective departments and/or committees as established and defined by this Constitution and/or the Board of Directors.

B. National Chair positions may include, but shall not be limited to Scheduling, Safety and Security, Health, Injury-on-Duty, Communications, Hotel, Training, Strike and Contract.

C. Nomination: The National President shall nominate members to serve in the positions of National Chairs.

### Section 6. NATIONAL BALLOTING COMMITTEE (NBC):

A. Definition and Duties: The National Balloting Committee (NBC) shall oversee all facets of all elections and balloting in accordance with the APFA Constitution and Federal law. The duties of the NBC shall include but not be limited to:

(1) supervising election and balloting procedures;
(2) determining eligibility of nominees;
(3) overseeing the preparation of ballots;
(4) determining ballot validity; and
(5) certifying results of the balloting to the National Secretary, with the exception of the contract ratification procedures provided in Article XI, Section 2.E of this Constitution.

B. Number: In no case shall there be fewer than four (4) members of the NBC.

C. Restriction: Members of the NBC may not hold or run for any other position within the APFA, as defined in this Article IX, Article III, or Article X of this Constitution.

### Section 7. BUDGET COMMITTEE:

A. Definition and Duties: The Budget Committee shall, under the authority of the National Treasurer, annually review the financial status of the APFA, its goals as established by the Board of Directors, and the projected expenditures for the coming fiscal year. Based on its findings, the Budget Committee shall, with the assistance of the National Treasurer, prepare the annual budget pursuant to the Policy Manual of the APFA.

B. Number: In no case shall there be fewer than three (3) members of the Budget Committee.

C. Requirements:

(1) At least one (1) member of the Budget Committee must be a member of the Voting Board of Directors. The National Treasurer may fill one (1) of the remaining positions on the Budget Committee.

(2) The proposed budget must be completed not less than sixty (60) days prior to the scheduled date of the Annual Convention.

### Section 8. OTHER APPOINTMENTS:

A. Nothing in this Article shall limit the ability of the Board of Directors or the Executive Committee to establish other special or temporary committees and/or positions as may be deemed necessary to administer the business of the APFA.

B. National Officers may establish and appoint members to special or temporary committees and/or positions as may be deemed necessary to administer the business of the APFA subject to approval by the Executive Committee.

C. Administrative personnel may be authorized by a National Officer to appoint and utilize additional member(s) to act in a special or temporary capacity to support the activities of the various departments and/or committees of the Association.

D. The provisions of Section 2 and Section 3 of this Article IX shall not apply to these special or temporary positions.

## Section 9. VACANCY:

A. In the event of a vacancy in the position of Regional Representative or National Chair, the designated officer shall nominate a replacement to fill the vacant position. Confirmation or rejection of the appointment shall be made by the Executive Committee. Once confirmed, the replacement shall serve until his/her successor is confirmed.

B. In the event of a vacancy on the NBC or the Budget Committee, the Executive Committee shall nominate and appoint an interim replacement member. The interim replacement member shall serve until the next Annual Convention. At that time, the Board shall nominate and appoint a replacement to fill the vacancy and complete the balance of the unexpired appointment.

C. Interim appointments as provided in this Section 9 shall not be subject to the membership notification procedures as provided in Section 2 of this Article IX.

## Section 10. REMOVAL:

Any member appointed to a position or committee shall be subject to removal by a two-thirds (2/3) vote of the Executive Committee; except that members of the National Balloting Committee (NBC) and members of the Budget Committee may only be removed by a majority of the Voting Board of Directors.

# A R T I C L E  X

## *N EGOTIATING  C OMMITTEES*

### Section 1.  ELIGIBILITY:

A. Only active members in good standing shall be eligible to serve as appointed or elected members of any Negotiating Committee.

B. Appointed members of the Negotiating Committee for a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendant employees of AAL must have been a member of the APFA for a period of two (2) or more years, and must previously have served in at least two (2) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual. The APFA Policy Manual may include provisions concerning credit toward meeting these requirements for service with a flight attendant union at a carrier other than American Airlines but within American Airlines Group.

C. Appointed members of a Negotiating Committee for a Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL shall meet the eligibility requirements as defined in the APFA Policy Manual.

D. The members of a Negotiating Committee representing a particular operation (AAL Operation or OAL Operation) must be assigned to that operation (AAL Operation or OAL Operation).

### Section 2.  DEFINITION AND DUTIES:

The APFA Negotiating Committee(s) shall be considered standing committee(s) for the purpose of negotiating Collective Bargaining Agreement(s) and further, may be called upon to assist in the resolution of disputes arising from the interpretation of such agreements.

### Section 3.  TERMS:

A. Members of any Negotiating Committee, both elected and appointed, shall assume their duties simultaneously, no earlier than twelve (12) months and no later than six (6) months prior to the amendable date of the respective Collective Bargaining Agreement.

B. Members of a Negotiating Committee appointed and elected to negotiate an initial Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL, shall assume office on a date designated by the Executive Committee, and necessary

C. Members of a Negotiating Committee shall continue to
hold such positions until their successors have been
elected and/or appointed as applicable.

## Section 4. CHAIR OF THE NEGOTIATING COMMITTEE:

A. The National President of the APFA shall be the
recognized Chair of all APFA Negotiating Committees.
The National President is empowered to delegate the
responsibilities of chairing a meeting of the Negotiating
Committee to another individual.

B. The National President shall sign and tentatively accept
all Collective Bargaining Agreements on behalf of the
APFA provided however, that such acceptance shall be
confirmed by the Executive Committee or Board of
Directors, and ratified by the affected membership as
provided for in Article XI, Section 1,D or Section 2,E of
this Constitution.

## Section 5. COMPOSITION OF NEGOTIATING COMMITTEES:

A. The Composition of the Negotiating Committee for a
Collective Bargaining Agreement negotiated by the
APFA on behalf of Flight Attendants employed by AAL
shall be as follows:
   (1) Seven (7) members consisting of:
      a. The National President;
      b. Six (6) representatives, two (2) who shall be
         elected by the membership at large, two (2) who
         shall be appointed by the APFA National
         President, and two (2) who shall be appointed by
         the APFA Board of Directors by a two-thirds (2/3)
         affirmative vote of the Voting Board of Directors.

B. In the event that an OAL operation, as defined in Article
I, Section 7,K,2 of this Constitution, is covered or is to be
covered by a Collective Bargaining Agreement
negotiated by the APFA on behalf of the Flight
Attendants employed by AAL, the composition of the
Negotiating Committee for that Collective Bargaining
Agreement, as provided for in A of this Section 5 shall
also include:
   (1) Two (2) additional permanent members consisting
       of: one (1) OAL Operation representative who shall
       be elected by the membership of the OAL
       Operation at large, and one (1) who shall be
       appointed by a two-thirds (2/3) affirmative vote of
       the Voting Board of Directors.

C. The composition of the Negotiating Committee for any Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL, shall be as follows:

    (1)   Three (3) or more permanent members consisting of:

        a.   The National President or his/her designee;

        b.   One (1) elected representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement, who shall be elected by the membership of that airline at large; and

        c.   One (1) representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement. This representative shall be appointed by the National President.

## Section 6.   VACANCY:

A vacancy in the position of a Negotiating Committee member shall be filled using the same procedures described in Article X, Section 5.A(1)(b) of this Constitution. If the vacancy is for an elected negotiator, an election for that position shall be held in accordance with Article VI of this Constitution. The National President shall appoint an interim negotiator to serve until the election is completed.

## Section 7.   REMOVAL:

    A.   An appointed member of a Negotiating Committee may be removed from his/her position by the appointing person or body. A removal by the Board of Directors shall be by an affirmative two-thirds (2/3) vote of the Voting Board of Directors.

    B.   An elected member of a Negotiating Committee may be removed from his/her position by the membership as provided in Article VIII, Section 3 of this Constitution, or following the completion of the procedures provided for in Article VII of this Constitution.

# A R T I C L E   X I

## *C ONTRACT  R ATIFICATION*
## *AND  S TRIKE  P ROCEDURES*

### Section 1.  RATIFICATION PROCESS:

A. A proposed Collective Bargaining Agreement will be submitted to the affected membership for approval only after it has been accepted by a majority vote of the Negotiating Committee and presented to the Executive Committee.

    (1) Should the Executive Committee reject a proposed agreement, the Negotiating Committee shall present the proposed agreement to the Board of Directors.

    (2) The Board of Directors may decide to submit the proposed agreement to the membership for approval

B. A decision by the Executive Committee, or the Board of Directors of the APFA, to submit a proposed agreement to the membership for approval should not necessarily be construed to be an endorsement of the merits of the proposed agreement.

C. The affected membership shall be given the complete changes to a Collective Bargaining Agreement prior to or at the start of the balloting period.

D. A proposed Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those active members in good standing covered by the applicable Agreement who cast valid ballots. Members may vote only on those agreements which apply to their respective airline(s), unless covered under a master agreement.

E. Balloting:

    (1) The sole issue to appear on the secret ballot shall be the ratification of the Collective Bargaining Agreement.

    (2) The time limit for the return of ratification ballots (the Ballot Date) shall be not less than thirty (30) days after the sending of the ballots to the respective membership.

F. Any letters of agreement or side letters entered into between an employer and the APFA during or outside of the Collective Bargaining negotiations which alter the rates of pay, rules, or working conditions for covered Flight Attendant employees shall be subject to ratification by the Executive Committee. If the Executive Committee

determines that the alteration is substantial, such letter of agreement or side letter shall be submitted for ratification to the membership covered by the applicable Agreement pursuant to the procedures outlined in this Article XI.

G. Upon ratification by the membership, a Collective Bargaining Agreement and/or letters of agreement shall be deemed binding.

## Section 2.    STRIKE PROCEDURES:

A. The Executive Committee or Negotiating Committee may recommend a balloting of the membership to authorize a strike. Any such balloting must be approved by the Board of Directors.

B. A strike shall be authorized only by an affirmative vote by a majority of those active members in good standing covered by the applicable Collective Bargaining Agreement who cast valid ballots.

C. Such strike authorization shall empower the Board of Directors to authorize the National President to call a strike in accordance with the Railway Labor Act.

D. Once a strike has commenced, it may be called off by the Board of Directors.

E. During a strike, the procedures for voting on a proposed Collective Bargaining Agreement shall be as follows:

(1) The National President shall call system-wide membership meetings for the purpose of voting on a proposed Collective Bargaining Agreement.

(2) The affected membership shall be presented with the complete changes to a Collective Bargaining Agreement prior to the balloting.

(3) The Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those members in good standing covered by the Agreement present at the membership meetings who cast valid ballots.

(4) The vote shall be accomplished by secret ballot.

(5) Upon ratification of the Collective Bargaining Agreement, the National President shall notify the membership of the conclusion of the strike, and the complete language of the new Agreement shall be provided to the membership.

# A R T I C L E   X I I

## *A F F I L I A T I O N S ,   M E R G E R S ,*

## *F E D E R A T I O N S   O R   C H A R T E R S*

## Section 1.

Any action to affiliate, merge or federate the APFA with any other labor organization; or to issue a charter; or to organize an employee group (except as provided in Section 2 of this Article XII) to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors, and

C. an affirmative vote by a majority of those active members in good standing who return valid ballots.

## Section 2.

Any action to organize a Flight Attendant employee group that is employed by a subsidiary or affiliated airline owned and/or operated by American Airlines Group, or that is employed by an independently-owned airline that performs flying for or on behalf of American Airlines or American Airlines Group, to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors.

## Section 3.

Any agreement to affiliate, merge, federate, issue a charter, or to represent another employee group shall protect and preserve the APFA's right to autonomy in all of its actions; and shall protect and preserve the collective bargaining relationship between American Airlines and the Flight Attendant employees of American Airlines represented by the APFA.

# A R T I C L E   X I I I

## *S A V I N G S   C L A U S E*

### Section 1.

Should any part, section, provision or Article of this Constitution be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any final decree of a court of competent jurisdiction, such invalidation of such part, section, provision or Article of this Constitution shall not invalidate any remaining portions, which shall continue in full force and effect.

### Section 2.

If any part, section, provision or Article of this Constitution is invalidated as described above, the Executive Committee is empowered, subject to the approval of the Board of Directors, to promptly amend the invalidated part, section, provision or Article to the limited extent necessary to conform to the enacted legislation or final judicial decree which resulted in the invalidation. Any such amendment shall preserve, as nearly as possible consistent with the law, the invalidated part, section, provision or Article.

A. Such amendment shall become effective when adopted by the Executive Committee and shall remain in effect until the Board of Directors acts as described in B. below.

B. At the next Annual Convention or at an earlier special meeting of the Board of Directors if one is convened, the Board of Directors shall consider the amendment and shall either:

   (1) decide that the amendment or an alternative amendment be submitted to the APFA membership for approval, or

   (2) determine that there should be no amendment and that the Constitution shall remain as is, minus the invalidated part, section, provision or Article.

C. In the event an amendment is sent to the APFA membership for approval, the proposed amendment shall be in effect until the membership approves or rejects it unless the Board of Directors expressly provides otherwise.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FT. WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS**<br>**Plaintiff,** | § § § § § § § § § | |
| | § | **Case No. 4:22-CV00430** |
| **V.** | § § | |
| **ASSOCIATION OF PROFESSIONAL**<br>**FLIGHT ATTENDANTS, JULIE**<br>**HEDRICK AND ERIK HARRIS**<br>**Defendant.** | § § § § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND
## MOTION TO VACATE ARBITRATION AWARD

**NOW COMES** Eugenio Vargas, Plaintiff, in the above-entitled and numbered cause, and files this Plaintiff's Original Complaint, and shows the Court:

## I.

## INTRODUCTION

1.     This action seeks redress for unlawful union practices of the Labor Management Reporting and Disclosure Act, 29 U.S.C. 412, Section 102 (hereinafter "LMRDA"), and damages resulting thereto and moves the court to vacate the award of arbitration issued on February 18, 2022 based under the Federal Arbitration Act violations under § 10(a).

Exhibit C

## II.

## PARTIES

2.  Plaintiff, Eugenio Vargas ("Vargas") was employed with Association of Professional Flight Attendants in the state of Texas and a citizen of Texas during his employment. His current primary residence is in the State of California; however, all events pertinent to the claims contained herein occurred within the state of Texas. His primary residence is 4701 Hayloft Ct., El Dorado Hills, CA 95762.

3.  Defendant, Association of Professional Flight Attendants ("APFA") was the Plaintiff's employer and his labor union, for which he is a member in good standing. That claim gave rise to this lawsuit and may be served by and through its current National President, Julie Hedrick at APFA headquarters at 1004 W. Euless Blvd, Euless, Texas 76040.

4.  Defendant, Julie Hedrick, ("Hedrick") is the National President of APFA and can be served at his place of employment at APFA headquarters 1004 W. Euless Blvd, Euless, Texas 76040.

5.  Defendant, Erik Harris ("Harris") is the National Treasurer of APFA and can be served at his place of employment at APFA headquarters 1004 W. Euless Blvd, Euless, Texas 76040.

## III.

## JURISDICTION AND VENUE

6.  Plaintiff files with this Complaint in the Northern District Federal Court - Fort Worth Division based on Federal Question.

Exhibit C

7.     Plaintiff brings claims under jurisdiction of this action which is conferred on this court by virtue of the Labor Management Reporting and Disclosure Act, 29 U.S.C. 412, §102 and the Federal Arbitration Act 9 U.S.C. § 10(a).

8.     The amount in controversy is more than $75,000, exclusive of interest and costs.


## IV.

## CONDITIONS PRECEDENT

9.     All conditions precedent to Plaintiff's recovery against Defendants have been fully performed.

## V.

## FACTUAL BACKGROUND

10.     Bob Ross was elected by the Membership in April of 2016 to serve as President of the Association of Professional Flight Attendants' Union.

11.     Vargas was elected National Treasurer shortly after American Airlines and US Airways merged.

12.     Vargas was elected to a four-year term, took office in April of 2016.  He supported the National President—Bob Ross ("Ross")—as he was part of his administration.

13.     On or about March of 2019, APFA members Melissa Chinery-Burns ("Chinery-Burns") and Sandra Lee ("Lee") launched an investigation into Ross and his administration, which included Vargas as the APFA National Treasurer.  With the assistance of Harris, the APFA National Treasurer, Chinery-Burns and Lee began to scour all financial records from his presidency in search of any impropriety.

14.     That the APFA National Officers granted Chinery-Burns and Lee access to Ross and Vargas's private personal financial documents, credit card documents and rental car invoices.  Among

Exhibit C

the disclosure of these documents made to the members included personal documents containing his social security number and bank account information as well as other personally identifiable information.

15.    In September of 2019, charges against Vargas were filed, but found to be untimely. In November of 2020, Chinery-Burns and Lee filed the same charges previously found untimely, including additional charges,  against Vargas.  Attached hereto and incorporated herein for all purposes is a true and correct copy of the Arbitration Award marked as Exhibit A.

16.    Under the terms of the APFA Policy and Constitution, Ross and those in his administration charged by Chinery-Burns and Lee, could either fight the charges in arbitration or retire their career from American Airlines as flight attendants.

17.    The charges brought by Chinery-Burns and Lee against Vargas included charges for having paid Ross under a contract between Ross and APFA for his resignation as National President. Vargas was charged with "Allowing the payment to former National President Bob Ross thousands of dollars in Meal Expenses Allowance (MEA) and Special Assignment Fee ("SAF") when he was no longer working for APFA." (*See* Arbitration Award, Ex. A).

18.    That as part of this investigation, APFA hired an independent accounting firm to look into the accounts and confirm how much was overpaid to Ross and the national officers under his administration, which found, as a result of their investigation, that Ross was paid correctly *(See* "Confidential Memorandum", Ex. B).

19.    That this independent accounting review was not produced as part of the arbitration, nor ever produced to the APFA Executive Committee and APFA Board of Directors, while the APFA National Officers under the Hedrick Administration cited this review as grounds to pursue charges

Exhibit C

against Ross because the Accounting Firm found he was overpaid, despite its obvious relevance because it was not supportive of the APFA's position.

### Article VII Arbitration

20.     That under Article VII charge is filed by a member, at the first regularly scheduled meeting of the APFA Executive Committee ("APFA EC"), the EC reviews the charges for its timeliness, specificity, and validity.

21.      Charges brought within sixty (60) days from the date that the member knew or should have known those acts that gave rise to the violation are found timely filed.  The APFA EC evaluates timeliness based on *all* charges filed.  If any one of the charges are found to be filed within sixty (60) days from the date the member knew the acts that gave rise to the violation, then *all* charges are found timely.  If the charges are found to be timely, valid, and specific, the charged party is then served notice and the matter proceeds to arbitration. Furthermore, the arbitration procedures state that the National Secretary shall set the time, place, and location for the hearing.

22.     Chinery-Burns and Lee filed charges against Vargas outside the timeframe to meet the timeliness standard. Initially, Chinery-Burns and Lee filed these charges against Vargas in September of 2019. These initial charges were filed for violations relating to over-payments to the officers, including Ross, for the guaranteed monthly compensation for MEA and SAF.  The APFA EC found these charges were untimely and did not proceed to Article VII Arbitration proceedings. Chinery-Burns and Lee filed a second set of charges in November of 2020 for these same charges encompassed in the first set of charges as well as additional charges.  These charges were found timely and proceeded to an Art. VII Arbitration.

23.     During the Art. VII Arbitration for Vargas, the National Treasurer, Erik Harris, failed to produce all pertinent documents to Vargas pertaining to his charges.  This includes Harris's failure

Exhibit C

to produce the Confidential Memorandum which would have shown that Vargas's payments to Ross under his Transition Agreement were correct despite including the MEA and SAF.

24.     Furthermore, Melissa Chinery and Sandra Lee failed to turn over all pertinent documentation to Vargas, and arbitrated charges against Vargas and Ross they had evidence were not valid.

25.     The Arbitrator in Vargas's arbitration refused to hear evidence, which was pertinent and material to the controversy, and exhibited behavior which prejudiced the respondent.

26.     The award was obtained by corruption, fraud, or undue means.

27.     The arbitrator exceeded his powers or so imperfectly executed them that they did not make a mutual, final, and definite award on the subject matter submitted. (9 U.S.C. § 10(a).)

## VI.

## MOTION TO VACATE ARBITRATION AWARD

**Plaintiff moves to vacate the award for Arbitration issued on March 19, 2022 based on fraud, misconduct, evidence partiality and refusal by the Arbitrator to hear evidence material and pertinent to the controversy.**

28.     Plaintiff incorporates all preceding paragraphs above.

29.     Under the Federal Arbitration Act §10 (a) an award of arbitration may be set aside or vacated upon any one of the following grounds: (1) where the award was procured by corruption, fraud, or undue means, (2) where there was evidence partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or if any other misbehavior by which the rights to any party have

Exhibit C

been prejudiced; or (4) where arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

30. The Vargas award was procured through means of fraud on behalf of APFA through Erik Harris's conduct in failing to provide all pertinent documentation.

31. These documents were not produced because of their exculpatory nature; thus, the award was procured with fraudulent misrepresentations due to the concealment of documents and lack of evidence.

32. The Arbitrator relied on fraudulent misrepresentations by APFA leadership and the charging parties to render the award.

33. The Arbitrator denied Vargas due process because he disallowed evidence that would have absolved Vargas of many of these charges.

34. The Arbitrator is guilty of misconduct in rendering the arbitration award because he excluded evidence that was pertinent and material to the charges asserted by Chinery-Burns and Lee. This evidence includes a notarized statement from LaDonna Casey, the office manager who maintained the inventory regarding the furniture owned by APFA.

35. Whereas the Arbitrator exceeded their powers or so imperfectly executed them that they did not make a mutual, final, and definite award on the subject matter submitted, Plaintiff hereby requests that this honorable court grant its motion to vacate the arbitration decision.

Exhibit C

## VII.

## CLAIM:  LABOR MANAGEMENT REPORTING DISCLOSURE ACT VIOLATIONS

37.     Plaintiff incorporates all preceding paragraphs above.

38.     Under 29 U.S.C. 412, Section 102 states that "[a]ny person whose rights secured

by the provisions of this title have been infringed by any violation of this title may

bring a civil action in a district court of the United States for such relief (including

injunctions) as may be appropriate. Any such action against a labor organization

shall be brought in the district court of the United States for the district where the

alleged violation occurred, or where the principal office of such labor organization

is located."  This act provides that no member of any labor organization may be

fined in any way except for nonpayment of dues, unless notice, an opportunity to

prepare a defense and a full and fair hearing is given to the person (29 U.S.C. 411,

§101(a)(5)).

38.     The APFA arbitration award found Vargas, breached his fiduciary duty by failing

to maintain inventory lists for APFA furniture that he, in fact, did maintain, and for

calculating and making over-payments under Ross's Transition Agreement with

APFA.

39.      The APFA Arbitrator disallowed evidence of Vargas's procedures to maintain

inventory, then found him guilty of a breach of fiduciary duty for failing to maintain

inventory.

40.      That insufficient evidence was presented regarding Vargas's alleged violations

Exhibit C

41. That APFA's arbitration proceedings violate the Labor Management Reporting Disclosure Act §101(a)(5) ("LMRDA"), as Plaintiff never a full and fair hearing before being assessed with a fine or fee.

42. There is no requirement and no means to sanction anyone for failure to comply with a subpoena as long as he or she live outside of 150 miles of the arbitration site. The witnesses in this case are mostly flight attendants—many live outside the Dallas-Fort Worth area, and even outside the state of Texas. Furthermore, the charged party has no means to compel or demand sanctions against a witness or a party that fails to produce documents from a subpoena.

43. It is a violation of LMRDA §101(a)(5) to not offer a full and fair hearing on the matter, and yet a charged party is not entitled to compel the evidence needed to absolve oneself.

44. Further, it is a violation of LMRDA to conceal the financial documents by the charging party or by the union—a party that should be neutral through this process.

## VIII.

## CLAIM: BREACH OF UNION CONSITUTION

45. Plaintiff incorporates all preceding paragraphs above.

46. The APFA Constitution provides in Art. II §3 (C)-(D) provides that all members shall have the right to individual privacy, due process, and equal representation.

47. Defendants violated Plaintiff's due process rights intentionally when it withheld evidence from the accounting firm that its opinion was that he did not owe the debt under his Transition Agreement.

Exhibit C

48.     APFA further violated due process by misrepresenting the facts to Plaintiff and the union BOD and EC to charge and collect monies and disparage Plaintiff.

49.     Defendant, APFA, violated Plaintiff's due process rights in denying him access to documentation Plaintiff subpoenaed and had a duty to disclose as a neutral party required to ensure the fairness of the arbitration proceedings, as it never gave him a copy of the Confidential Memorandum.

50.     Defendants, Hedrick and Harris, violated Plaintiff's due process by concealing documents that would have exonerated Vargas from the charges in the proceedings.

51.     Defendants, APFA, disclosed his personally identifiable information including his social security number.

## IX.

## CLAIM:  BREACH OF FIDUCIARY DUTY

52.     Plaintiff incorporates all preceding paragraphs above.

53.     Defendant, APFA officers, in-house and outside counsel for APFA all violated their fiduciary duty because they made false statements to a third-party regarding debt that Plaintiff paid to Ross that he was owed under the Transition Agreement.

54.     The APFA officers, in-house and outside counsel all failed to disclose the Confidential Memorandum to the APFA BOD, and APFA EC. The APFA officers statements made to the APFA BOD were defamatory and false.  Based on the elected positions of APFA National President and APFA National Treasurer, both Julie Hedrick and Erik Harris had a duty to disclose this document and explain the results of the review, but issued and informed people that the accounting firm stated the opposite.

Exhibit C

55.     Defendant, APFA, acted with the intent to injure Plaintiff's reputation.

56.     In so acting, the APFA officers have breached their fiduciary duty to the APFA
        Board of Directors, the Executive Committee, and the APFA membership—but
        most importantly to Vargas, a member of APFA in good standing.

57.     Defendant, APFA, did, in fact, intentionally interfere with a contract and breach of
        Plaintiff's fiduciary duty to Ross as a member in good standing by causing
        damages, injuring his reputation, causing him to terminate his position from APFA
        leadership and causing great emotional distress to Plaintiff as a result.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant hereby prays as follows:

    i.  For injunctive relief for unlawful collection activity, labor practices and
defamation, and violations of the non-disparagement clause in Plaintiff's
Transition Agreement.

    ii.  For a judgment of vacatur of the Arbitration Award of the basis of fraud,
lack of authority to issue this award and misconduct,

    iii.  That Defendant recover a judgment against Defendants, jointly and
severally, for monetary damages and violations which resulted in damages
of $50,000, all additional court costs and all attorney's fees incurred in this
cause or upon appeal;

    iv.  That Plaintiff recover a judgment against Defendants jointly and severally
for punitive damages; and

Exhibit C

v.  Such other and further relief, at law or in equity, to which Defendant may

be justly entitled to receive.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By: /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Heather Abreu*
Texas Bar No. 24122577
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com
**ATTORNEY FOR PLAINTIFF**

*Application of Admission *Pro Hac Vice* Forthcoming

Exhibit C

**In the Matter of Arbitration Between**

Melissa Chinery       )
Sandra Lee        )  **RE: Article VII Charges**
             )  **Violations of APFA Constitution**
  **APFA Charging Party Members** )  **and APFA Policy Manual**
    **(Plaintiff)**      )
             )
**And**           )
             )
**Eugenio Vargas, Former APFA**  )
**National Treasurer**      )
             )
  **APFA Charged Party Member** )
    **(Defendant)**     )
             )

**Before:**        **Alternate Article VII Arbitrator Ruben R.**
             **Armendariz**

**Place and Dates of Hearing:**  **The Westin Irving Convention Center at Las**
             **Colinas, 400 West Las Colinas Boulevard,**
             **located in the City of Irving, Texas.**

             **September 14, 15 and 16, 2021**

**Appearances:**

  **For Charging Party Members:**  **Melissa Chinery, Representative**
              **Sandra Lee, Representative**
              **Heather Olenjack, Representative**

  **For Charged Party Member:**  **Heidi Morgan, Representative**
              **Nena Martin, Representative**
              **Eugenio Vargas, Former National Treasurer**

# Exhibit A

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

## *INTRODUCTION*

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on September 14, 15 and 16, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Eugenio Vargas, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Former Treasurer and Retired Flight Attendant Cathy Lukensmeyer, Business Owner Michael Trapp, Former Boston Base President and Flight Attendant Jennifer McCauley, DFW Base President and Flight Attendant Michael Truan, Flight Attendant Heather Olenjack, Los Angeles Base President and Flight Attendant John Nikides, Flight Attendant and National Treasurer Erik Harris, Flight Attendant Christopher Thedford, Flight Attendant Debbie Hoover, Flight Attendant and National Secretary Josh Black, Flight Attendant Sandra Lee and Flight Attendant Melissa Chinery.

Defendant presented for testimony Former Base Council Representative and Flight Attendant Shane Staples, Flight Attendant Chuck Ransdale, Budget Committee person Yvonne Johnston, Former National Treasurer Craig Gunter, Former APFA President Marcus Gluth, Former Board of Director and Miami Base President Randy Trautman and Former National Treasurer Eugenio Vargas.

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined. The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

## *THE ISSUES*

The issues presented in the Article VII grievance and heard in this proceeding are described as follows:

**The Plaintiff**

Plaintiff submits the issue to be determined by the Article VII arbitrator is stated as follows:

Whether Eugenio Vargas, the Charged Party herein violated the terms of the APFA Constitution and Policy Manual by;

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on November 16, 2021 and requested an extended to December 31, 2021 and was granted. The post-hearing briefs were timely emailed and received, thus, the arbitrator finds the record in this matter closed on December 31, 2021.

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

    (1) Violating the Meal Expense Policy?

    (2) Failing to maintain an inventory thereby violating Article III, Section 6.E. of the APFA Constitution by failing to maintain union assets?

    (3) Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such?

    (4) Allowing the payment to former National President Bob Ross thousands of dollars in Meal Expenses Allowance (MEA) and SAF when he was no longer working for APFA?

    (5) Violating the credit card policy by charging a rental car and meals for a trip to Spain?

    (6) And, if so, what should be the appropriate remedy?

**The Defendant**

Defendant submits the only issue to be determined by the Article VII arbitrator is stated as follows;

    (1) Whether Former APFA National Treasurer Eugenio Vargas committed the following act(s) was "**WILLFUL**" violation of an expressed Article of the APFA Policy Manual, the APFA Constitution, or of a proper and express written resolution or policy of the Board of Directors or Executive Committee of the APFA Constitution, as it is set forth in Article VII, Section 1.F.

    (2) And if not, what is the appropriate remedy?

### *THE FACTS*

It is undisputed the charges herein arose from an internal filing of an Article VII grievance filed by Plaintiff Members Melissa Chinery and Sandra Lee against Defendant Member Eugenio Vargas, Former National Treasurer.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. Vargas charged meals in his city of residence, Dallas Fort Worth (DFW), when he had no right to meals in his home location, double-dipped when he was receiving per diem out of base, and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA officers who were committing similar violations of the meal expense policy.

Plaintiff alleged Former National Treasurer Eugenio Vargas failed to maintain an inventory and violated Article III Section 6.E. of the APFA Constitution by failing to maintain union assets. Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands

Exhibit C

Case 4:22-cv-00883-O Document 49-1 Filed 08/04/22 Page 146 of 435 PageID 1934
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

of dollars of furniture that he had no right to take, concealing the fact from the APFA leadership and members.

Plaintiff alleged Former National Treasurer Eugenio Vargas allowed himself and his fellow National Officers to receive inflated sick and vacation payouts that they were not entitled to. Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

Plaintiff alleged Former National Treasurer Eugenio Vargas was paying former National Officer Bob Ross thousands of dollars in Meal Expense Allowance (MEA) and SAF when he was no longer working for APFA. Vargas allowed Bob Ross to be paid expense allowances when he was no longer working for APFA. This payment was not specified in Ross' exit package.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the credit card policy by charging a rental car and meals for a trip to Spain. Vargas used the union credit card for a rental car while on vacation in Spain as well as charging a meal while also on per diem.

The APFA Board of Directors could not resolve this matter internally and pursuant to the provisions set forth in Article VII of the APFA Constitution, the undersigned Alternate Article VII arbitrator was selected solely to conduct an evidentiary hearing and decide this matter on its merits.

### THE RELEVANT PROVISIONS OF THE APFA CONSTITUTION AND POLICY MANUAL CITED IN THE CHARGES

### *APFA CONSTITUTION*

### Article I. Section 7. DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

**E.** **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

**M.** **"Privilege"** means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

**O.** **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

**Q** **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

### Article II. Section 2. OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties, and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties, and responsibilities.

## Section 3. BILL OF RIGHTS OF MEMBERS

**B.** All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

## Article III, GOVERNMENT OF THE APFA
## Section 3 Board of Directors

A. The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights and privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this constitution and to establish, prescribe and adopt such other policies which may be consistent with this constitution as required for the direction and management of the affairs of the APFA.

**L.** Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

1. Set policy for the APFA;
2. Modify the APFA Policy Manual as it deems appropriate;
3. Approve the annual budget;
4. Set annual goals for the APFA as it deems appropriate;
5. Assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;
6. Determine the number of administrative, committee, and support positions as may be required under Article IX of this Constitution to meet the needs of the membership;
7. Nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;
8. Review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments.
   While not limited to the following, the Board of Directors may:
9. Review the dues structure of the Association;
10. Override the Executive Committee rejection of a proposed Collective Bargaining Agreement;
11. Establish the Regions and the National Vice President will assign the Regional Representatives;

Exhibit C

Case 4:22-cv-00080-O Document 49-1 Filed 03/04/22 Page 16 of 45 PageID 1036
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

12. Establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;
13. Direct special mailings to the membership;
14. Recognize the accomplishments and achievements of members of the APFA;
15. Give annual awards;
16. Confer Honorary membership;
17. Approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;
18. Appoint special committees;
19. Appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);
20. Approve Article VII administrative changes;
21. Suspend officers or representatives pursuany to Article VII;
22. Take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.Bof this Constitution.

## Article VII. Section 1. Grounds For Charges:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

**A.** Failure to pay dues, assessments or penalties levied by the Association.

**B.** Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

**C.** Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section 1.C., above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

**D.** Willful violation of a Flight Attendant's Collective Bargaining Agreement

**E.** Theft or embezzlement of Association monies or property

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

**F.** Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee

**G.** Willfully acting in a manner that causes the Association to violate its legal obligations; or

**H.** Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

*APFA POLICY MANUAL*

## Section 5.G.1. Trip Removal and Expense Policy – Other Expenses

**1.** Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

## Section 5.F.5.a. Trip Removal and Expense Policy–Meal Expense/Allowance

**a.** Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

**(1)** Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

**(2)** The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

### *PLAINTIFF TESTIMONY*

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as stated herein.

**Cathy Lukensmeyer**

7

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Ms. Lukensmeyer is a retired 30-year American Airlines Flight Attendant. She is a member of the APFA. She has held several APFA positions in Chicago, Illinois as a Council Representative, Vice Chair, Chairperson, negotiations member in 1986 and National Treasurer for the APFA for 4-years from 2004 to 2008. She testified she had received training as a National Treasurer for only one transitional month. She stated she is familiar with the APFA Policy Manual and Constitution as it relates to financial matters and the role of the National Treasurer. The APFA Policy Manual dictates the day-to-day operations of the APFA and is approved by the Board of Directors. She further said, Article II, Section 2 states ignorance of the Constitution is not a proper excuse for any violation of the provisions. She further explained the duties of the National Treasurer to include the care of the office, the staff, all of the assets of the Union. They inventory the assets and are in charge of expense reports and the monitoring of expense reports, questioning expense reports, prepare government filings and to provide to the Board monthly financials. And making sure all meals have proper receipts in accordance with the policy manual, which is a part of the expense report. Only the Board of Directors (BOD) can modify the policy manual. Additionally, she testified that she was familiar with the Meal Expense Allowance (MEA) and per diem. When working for the Union, flight attendants would receive an expense, a per diem and an MEA. The Officers and the people on full time would lose out on that source of income. You have actual and you have guaranteed up to a certain point as defined by the policy manual as to how much you get. MEA is for persons away from their base and the per diem is also away from the base. The Officer's would receive a guaranteed base because they weren't flying and that is what would make them whole. And that is put on the weekly expense report. When asked, 'should one be getting the Union credit card to buy meals and getting guaranteed MEA for the …. same days?" She answered "No" it is double dipping. They are already getting paid, meals do not go on the credit card. The per diem is a daily allowance and was negotiated for the Flight Attendant and then copied the CBA and it would cover those expenses. Per diem's away from the base. National Officers are assumed to be living within a radius of Dallas per the policy manual and for purposes of expenses and other policies regardless of where their permanent residence is located. A hosting exception is when there is an arbitration for example with lawyers and witnesses, the Vice President would order a meal and everyone would be included. Lunch does not qualify for a hosting exception. She was asked if one should be getting guaranteed MEA while getting per diem and she said "No." She was asked, "if all Union officers are receiving meal allowance, should they be charging a meal to the Union when everyone is on MEA and she said, "No."

She further testified that under the APFA Constitution, the National Treasurer is responsible for assuring accurate receipts, the purpose of the expense and who was present. She was provided Exhibit (CP-2) and reviewed some of the credit card and receipts related to Vargas expenses. She said Officers are not allowed to take guaranteed and actual meal expense.

Lukensmeyer additionally testified that in 5h 3 deals with electing an apartment or a paid move. She said that when you get elected to office, you have a choice. You can either move, or transfer totally to Dallas. The Union will cover the expenses, $10,000.00 will be given or you could choose to have an apartment in Dallas that is furnished, no smaller than one bedroom. The Officers get two bedrooms that has an office. She explained that when she came into office, her apartment was from the preceding Treasurer and it was already furnished with towels and sheets, you name it, it was there, except for one room, the office. She had to get a couch and table because no furniture was there, but the rest of the apartment was fully furnished. The Treasurer's Office

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

takes care of corporate apartments. The Treasurer would obtain the apartments and take care of furnishing them if there was no furniture. The furniture should already be there. She said she put into place a policy 5.22, No. 7, for incoming National Officers and other representatives shall normally be able to use outgoing National Officers or Representatives furniture and furnishings rather than replace these items with each change of National Officer or Representative, subject to the right to reasonably refuse furniture and furnishings. This policy was in place before October 2016 and the policy requires that there be a silent auction of furniture. These are assets of the Union and we have to consider the depreciation value and the fair market value. It's not possible for an item to be depreciated to zero. The Bylaws do not provide for rental cars in the city of residence. So once a National Officer takes office, they are not entitled to a car in DFW or Dallas. The expense reports are supposed to have two signatures, so there should be another person who is overseeing what the Treasurer is doing or spending, whomever signs the other half of that expense report. It is not normal for a Treasurer to repeatedly have to pay back the organization for erroneous charges.

On cross-examination, Defendant presented Resolution No. 14 into the record and was identified as APFA Apartments Board of Directors Resolution No. 14 dated March 9, 2016. She testified it is a new policy on apartments and furnishings. Equipment in need, furnishings in need of replacement, replace as needed and they talk about damaged, worn out, depreciated, not useful and that replacement items may be purchased in accordance with the table. Surplus furnishings shall be sold through a public online market, Craigslist and it must be stored and inventoried. It also says, Outgoing National Officers or Representatives shall have the option of purchasing at Fair Market Value the furniture, furnishings, appliances, equipment that were provided in their APFA accommodations. Lukensmeyer said she was not aware of this new policy.

**Michael Trapp**

Mr. Trapp is the owner of Trapp's Residential Services, and Trapp's construction. He testified that he has performed work for the APFA from 2014 until he became sick. He performed maintenance, electrical, plumbing, painting, moving stuff and remodeling. He said he would clean the apartment and move all of that stuff. Ms. LaDonna Casey would let him know where to go and they would pack up everything. Take it to the office or other apartments. After Mr. Gunter, former National Treasurer passed away, he moved his furniture from Corporate APFA apartments to the back room of the APFA since there was no room to store the furniture at Uncle Bob's storage place. Trapp identified Exhibit (CL-13) as being his invoices for work performed. There were three storage lockers full at the time. After the elections Greg's stuff was moved to Mr. Vargas apartment.

On Cross-examination, Trapp stated that between 2016 and June 2017 he picked up furniture at the APFA storage units and dropped them off at donation. He said he dealt with Ms. LaDonna for him to pick up items, take it, put it back together

**Jennifer McCauley**

Ms. McCauley is a Flight Attendant for American Airlines and based in Boston, MA. She has been employed with American Airlines for over 30 years. She has held Union positions such

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing**

as Base President (1997-2012) for the Boston International and Domestic domiciles. From 2012 to 2016 she was appointed to the SBA department as a Regional Representative. And from 2016 to 2019 she was elected to the Executive Committee as an ad hoc by the APFA Board of Directors. She testified that she attended the Executive meeting on September 8 or 9, 2016 regarding furniture but was told by Eugenio Vargas the furniture was in storage and had not been inventoried because it was too hot to go to the storage area Exhibit (CL-14). Exhibits CL-14, Cl-15 and CL-16 were offered and received into the record without objection.

## Michael Truan

Mr. Truan is a 23-year Flight Attendant with American Airlines. He has held several positions with the APFA. In 2004 he worked in the communications department and moved on to be a DFW Base Representative and then became a full-time Dallas Base Representative. He worked in contract scheduling as well in the safety department. He was elected to the position of a domestic negotiator with the negotiating Team back in 2013 and DFW base president in 2019. Truan testified that at a Board of Directors meeting, it was discovered that Mr. Vargas, Ms. Martin and Mrs. Dunaway received large payouts at the end of their term for unused vacation and sick leave and it wasn't calculated correctly. Two Special BOD meetings were held on August 26, 2019 and via resolution the BOD passed to have these former Officers pay back the money owed to the Union. Payout is supposed to be calculated per APFA policy and National Officers salary. The former Treasurer had calculated additional income into that calculation which is not part of the policy at APFA. Exhibit (CLX-18) is the Executive Meeting that transpired on December 5-7, 2019 and Resolution No. 2 was passed on August 29, 2019. In this resolution, if the payouts were not paid back no later than January 26, 2020, the APFA Attorney was directed to file a civil lawsuit to collect these funds. Truan stated that from August to December, the money had not been paid back. Exhibit (CLX-17) is the second meeting of the BOD. National Treasurer Craig Gunter and BOD voted pretty much unanimously on Resolution No. 2 (Ms. Martin was on the Board of Directors and abstained), where it directed Mr. Vargas, Ms. Martin and Ms. Dunaway to make APFA whole to recover the overpayment. Both CLX-17 and 18 were received into the record without objection. On cross-examination, Truan was asked how is the Officer salary calculated and he said through APFA policy. The officers (President, Vice President and Secretary) are paid the highest international purser rates. As far as vacation, sick, or any other items included in their monthly salary. Truan said that according to their attorney's at the time, MEA, SAF was not additional income to be added to the payout. The officer's salary should only include the highest international rate, purser premiums per APFA policy. Charged Party Exhibit (CL-99) was introduced into the record and is a string of emails requesting an explanation of the formula used for the calculation. The formula should not have included MEA and SAF. The former National Officers were disputing the APFA calculation of the amount of overpayment owed back to the APFA in Resolution No. 2 (CL-99). Truan stated in the Executive Committee meeting, he became aware that the recalculation was based on a 1987 payout formula, Exhibit (CP-99) and Exhibit (CP-1) were received into the record. On re-direct, Truan stated a power point presentation was given of the formula that should have been used for payout.

Truan stated the elevated overpayment was included in the Bob Ross exit package. Truan said that they had a Base President call with Attorney Bruce Lerner and several BOD's where he asked Vargas if he wanted an attorney to be present as this could possibly become criminal charges. In

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

the e-mail chain from Patrick Hancock, he told Ms. Martin the original formula has been used for
over 30 years and has been included in 30 plus audits and multiple DOL reviews and is a long-
standing established practice. This is the appropriate starting point. The amount you owe APFA is
calculated by taking what you should have been paid, original formula, and subtracting what you
were actually paid. On further re-direct, Exhibit (CL-99) Truan was asked to further read it into
the record as follows,

> A. "APFA does not and should not have to decipher what was wrong with
> the new formulas and try and fix it for you. The fully functional original
> formula defines what you should have been paid. Your overpayment is
> easy to calculate using that number. The EC has now established the
> deadline of January 6, 2020 for you to reimburse the Union. I look
> forward to hearing that APFA has been reimbursed and we can move on
> to addressing the many challenges facing our Union. Patrick Hancock
> Ad hoc 5."

On re-cross-examination Truan was again asked, "isn't it true the original formula is a
formula that has nothing to do with MEA and SAF and he said "yes."

**Heather Olenjack**

Ms. Olenjack has been an American Airlines Flight Attendant for over 24 years. She has
been Base Council Representative and Health Representative from 2014-2015 at National
Headquarters. Laura Glading was the National President from 2014 and 2015. In the summer of
2016, she had concerns over APFA furniture and spoke with National Treasurer Vargas on
September 21, 2016. She had concerns of moving expenses, furniture. Vargas had a book of
financials that he showed her. She discovered several APFA apartments were vacant. She
discovered that Bob Ross and Nena Martin had used their whole allotment and was concerned that
it may have gone over that amount. She asked about moving expenses and he showed her receipts
of Bob Ross and Nena Martin. Vargas said Ross was about $2500.00 as he moved with nothing
and that he actually purchased Greg Gunter's furniture. Vargas said Ross wrote a personal check
to the Union. In the meeting of June 2017, Vargas said that he had paid $219.00. She further stated
APFA policy was not used for the handling of this furniture. It could have been reused, given to
another representative or National Officer in a corporate apartment. If not used, should have been
placed into storage until needed and if it was deemed unusable, then it was to be placed on the
silent auction at APFA for Flight Attendants to bid on or a staff member. She further said she was
looking into furniture. Gaby Harty was the Health Chair and she had purchased quite a bit of new
furniture. Harty resigned 8 months later and that furniture was sent to a consignment store for
resale and not stored. Vargas said he was following the policy. She told him that he made a policy
change in October to include it. The APFA took a big loss on reselling the furniture as they
purchased a couch for $800.00 and listed it at the consignment store for $300.00. APFA would
only receive 50% of the retail cost. On cross-examination Ms. Olenjack said the policy said
$5000.00 one way move and $10,000.00 for a round trip. She was given Exhibit (CP-10),
Resolution No. 12 dated October 5-6 as to the disposition of furniture of outgoing National Officers
or Representatives. She also said she was aware Ms. Harty resigned in January and there was a
lease on that apartment until May. The furniture remained in that apartment for the duration and a

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

representative was moved in. She said she was aware of this Resolution. She said she was aware
Vargas presented a change for the disposition of the furniture that passed where Outgoing National
Officers or Representatives shall have the option of purchasing furniture at fair market value. If
not, it shall be sold through a consignment store and if not sold within 6 months, it shall be donated
to charity. And four months later the consignment store gave a check for $1,159.00 for the items
submitted.

**John Nikides**

Mr. Nikides has been employed with American Airlines for 37½ years. He is the Los
Angeles Base President. He has been a Rafety representative with LaGuardia, San Francisco Vice
Chair, Assistant to the President, American Eagle liaison, LAX International Vice Chairperson,
LAX Domestic Chairperson and LAX Base President since April 1, 2001. He testified that he was
on a BOD call with Vargas discussing the change of Formula for vacation payouts. Discussed at
this meeting was MEA and SAF. The MEA is the meal expense allowance. And SAF is Special
Activity fee. In the phone conversation MEA and SAF had come up as to whether were considered
wages. Vargas claimed MEA ands SAF are wages and that was based on certain payouts the
National Officers. Vargas said in this phone conversation that there would have been no reason to
exclude Bob ross from our actions, the actions we took to secure the monies from the other three
national officers. Attorney Bruce Lerner informed Vargas to get Legal Counsel. MEA and SAF
were never intended to be wages. He said he became aware of several moving resolutions in
September 2016 to October 16, 2016, that Bob Ross was in violation of the policy manual but had
been permitted by Vargas to first get an apartment, which he was entitled to under APFA Policy
Manual but then decided this wasn't working out for him and decided to move his family down
there and Vargas paid his moving expense. You get either an apartment or you get moving
expenses. You don't get both. This came up in the BOD meeting of what Bob Ross had been
permitted to do and that moving resolution was turned down. Ross had an exit package and Nikides
was one of the BOD members. Ross got paid MEA and SAF. MEA and SAF is intended for work
actually done. Ross wasn't working during that time period. Nikides stated he expected the
Treasurer to be the gate keeper. Nikides also said there was a BOD call and was informed that
Bob Ross had to pay back $3600 for the furniture. This furniture went to Ross residence and not
to the Corporate apartment. So, Ross paid it back two years later. Vargas also paid back some
money for a rental car. Vargas used the APFA credit card to rent a car in Spain.

Nikides also testified that once the formula was clarified using the 1987 formula calculation
Ms. Martin immediately paid off the owed debt. He stated that he is familiar with the Ross
Transition Agreement (CL-98), he also verified that was his signature on the last page. He said
they signed this page in the absence of a printed Transition Agreement. Nikides also stated you
cannot use a Union credit card to eat a meal when you are on MEA, that is double dipping. On re-
cross examination, Nikides was asked if any National Treasurer, the gatekeeper of the books, has
ever told him how to deduct MEA from your expenses because the secretary who sets up those
meetings are purchasing meals with an APFA credit card while you are on MEA, and he answered
"no." On further re-direct examination, Nikides was asked if it would be a violation to go to a golf
course 54 times when it's just the National Officers on the ticket and he answered "yes."

**Erik Harris**

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

Mr. Harris has been an American Airlines Flight Attendant since May 2014 and is currently the National Treasurer for APFA since April 1, 2020. He said the state of the Union financial records were bad. There were pay loss bills behind and lots of overspending. The books were not kept well. Harris was asked what is the obligation for Union Officers to substantiate credit card spending. He said prior to this year, the only requirement or obligation was that OLMS and that requirement was to provide receipts and substantiate credit card purchases and document those items with a receipt along with credit card statements. On the receipt, it should be the same date, the same charge amount and what was purchased and what department to charge it to for financials in the budget and who was there and who made the purchase, and this is done on a monthly report. Harris issued the Charging Party's an email in response to a subpoena request. It was discovered while retrieving documents, certain items were missing. In item #1, the box containing all accounts payable invoices, reports and documents for fiscal year ending 2017 beginning with the letter S through V was missing. This would contain all backup and support documents, receipts for Eugenio Vargas monthly reports during this time frame. In item #2, receipts for Eugenio Vargas purchases - purchase of Greg Gunter's APFA owned furniture. In item #3, we ended up locating the petty cash. Harris said they did not locate the record and receipts for letters S through V for fiscal year ending 2017 – April 1 through March 31. Harris also talked about an email from Liz Marko to Rachel Early regarding a rental car that was reserved in Eugenio's name to be driven by Ellen Eherts and charged to the General Administrative Account. (CL-1, 2, 3, 5, 6, 7, 8, 9,10 and 11) were introduced and received into the record. Harris also said the monthly and weekly's were missing from April 1, 2016 to March 31, 2017 (S through V). Harris also said the receipts for furniture purchased by Eugenio Vargas from April 2016 through March 31, 2017 could not be found. Harris also said APFA has a policy on keeping inventory, there are no specifics on how they are to be kept and this is the responsibility of the Treasurer. Harris also said he could not locate the inventory list for furniture from the Vargas Administration. Harris also talked about the issue related to the formula for the payout of vacation for former officers Vargas, Ms. Martin, Mrs. Dunaway and Bob Ross. There was a disagreement on the formula whether it included the MEA and SAF payments. For calculating the payout, the annual payout takes your annual salary and it's a formula based on that. The MEA and SAF are payments above and beyond the salary and those amounts were included in the formula. Harris also said Vargas is currently making payments as well as Dunaway and Ms. Martin has paid her debt in full. Bob Ross has not paid back the money ($5400.00) owed. Harris did state Bob Ross received an exit package when he left office as National President and it paid him from March through July. Ross was paid a guaranteed meal expense during the time he was no longer working for APFA. Bob Ross did not fill out a weekly report. Payment is approved by two National Officers who would sign off on a weekly report. The weekly report would substantiate the meal allowances or the MEA and the SAF. Harris said they sponsored a set of Resolutions related to financial matters, financial reform. It was a cleaning up policy related to Section 5 and 6 of the Policy Manual. Section 5 is the trip removal and expense policy and Section 6 is the National Officers' salaries and benefits. Resolution No. 8 was APFA credit cards basically aligning APFA policy with OLMS and the OLMS standards for corporate cards for unions because there was no policy. Resolution No. 9 is creating policy or creating and cleaning up policy related to apartments and furnishings, relocations, determining limits, things that were not really defined. Harris said they saw a need to create parameters and boundaries concerning apartments and furnishings. Resolution No.10 deals with business related meals realigning the credit card policy with OLMS, but to also further clarify what business related meals

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

and expenses are and what the procedure is for seeking reimbursement or use of the APFA credit card. Harris said there was no policy in place for credit card expenses, name, nature of business, etc. but it was in place with OLMS, because it is the law. Resolution No. 10, business related meals and this new policy is for group meals to be incompliance with LMRDA regarding meal purchases using an APFA credit card. All meal charges must be accompanied with a written explanation of the specific union business conducted during the meal and the full name of and title of all attendees, created policy to reinforce what the law states. On Resolution No. 11, the policy language in the manual had very minimal language on parameters around rental cars. It only allowed officers to just authorize it, but we wanted to further clarify the procedures over rental cars. We don't provide rental cars for your home base as you are a resident. Resolution No. 12 deals with officer relocation and speaks of $10,000.00 round trip move to Dallas. We clarified what is round trip versus one way. Resolution No. 13 deals with the collection of non-dues owed to APFA. Resolution No. 14 deals with resignation or recall of a National Officer. This eliminated the need for an exit agreement in the future. Harris said that they realized the policy manual was not clear enough and were receiving a lot of questions about certain policy and it left areas open for interpretation. This is the reason for so many resolutions to be created to clarify policy.

On cross-examination, Ms. Morgan asked Harris, did the charging party's ever request to review documents from any other administration outside of the Ross Administration and he said "no." He also said they would have working lunches for the budget committee team. Harris also said that prior to March, the APFA did not have a set policy on the handling of receipts in Section 5 of the Policy Manual. Plaintiff objected to Ms. Morgan introduction of several documents into the record to reveal their conclusive proof these documents received disclosed a past practice and were shared with the Plaintiff through email as soon as Harris provided it to them. The arbitrator overruled the objection and allowed these documents into the record. Harris said no Article VII charges were ever filed against him for not having receipts. Harris said the Treasurer before him was Craig Gunter. He took office in 2018. Harris said that he was on Vargas budget committee in the administration prior. Harris further said APFA's finances were strong when Vargas left office on July 1, 2018. Harris said they went from a strong financial position to dire state October 31, 2019 due to rampant overspending. The prior administration brought in their own outside opinion and they advised the administration and the BOD that there needed to be some oversight. The BOD then created the budget oversight committee. Harris also said that it appeared from the depreciation schedule that two persons share the Ashley furniture. Harris also said that he has had to rent cars when additional representatives are in town and are rented under the National Officers name for the representative. Harris said Section 5 of the policy manual governs trip removals, which is a pay loss, representative salaries, reimbursements and meal expenses. National Officers are paid in accordance with Section 6. As an officer, Harris said he receives guaranteed MEA and SAF in Section 6 and stipend for maintaining an office outside of his home. Section 6 covers four officer salaries including him. Section 5 applies to all representatives. Defendant's Exhibit (V-44) was introduced and received into the record. Harris also said that in his email that he had read previously into the record that "there are individuals, who have seen these documents in the recent past; however, they have inexplicably disappeared from my custody." Defendant Exhibit (V-98), the Ross Transition Agreement was introduced into the record and discussed. Harris confirmed this was the document given to the Plaintiff. Harris read into the record Item No. 4, the economic terms of the Ross Transition Agreement, "APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time from April 1, 2016 through July 31, 2018.

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

On cross-examination, Harris testified to Laura Glading's administration was not providing receipts for year ending 2013. Harris testified that Marcus Gluth was not providing receipts for year ending 2014. Harris testified that based upon what he has seen the practices in the past are not the same as the present. The reason is, we have a different system and put in place policy procedures on how to use the corporate card to correct deficiencies and to be in alliance with the law. On re-direct, Harris said that Ross was overpaid on his vacation by 35 days. Vargas made this mistake and the check went to Ross. Vargas did not benefit from this error. Harris also said they got overpaid on their 401K, it was inflated wrong by the amount used to calculate that was based on that formula. Vargas made this mistake.

**Christopher Thedford**

Thedford testified that he has been employed with the APFA since November 2019 as a Staff Member and Senior Accountant. He does general ledger entries, credit card entries to the general ledger including invoicing and payments. He is very familiar with the standard accounting procedures. He says that it is important for a business or an organization to maintain proper inventory control of furniture. You need to know what you have in the building, the cost you paid for it and the current market value. There are different ways, different accounting methods that you can do it, one is just a simple depreciation where you recognize the initial value of it and then depreciate it over a certain time span, at a straight-line method, that's the most common method. So, each item, such as furniture, it needs to be accounted for until it's taken off the books. He says he has viewed APFA records, and seen the entries but that he really does not know their standards. He is not aware how long Union's are required to keep financial records. He explained book value is what you initially purchased an item. Market value is essentially the same thing but the price is now is set at a certain time period. And then the depreciated value is after a certain time period how much it's worth after depreciation. As to the APFA vans, they are paid off. After seven years in possession, the vans would have depreciated to zero for accounting purposes, but it would still have a fair market value and a salvage value. Exhibit (CL-6) was introduced, the APFA's General Ledger October 2016. He was asked to see the reference to Greg Gunter's furniture being written off. He said he doesn't recognize if it's normal or not and did not see a reason to write off the full value of the furniture with the information here. He was asked in terms of meal receipts, what should be on a receipt for a business meal. He said it would be an itemized receipt listing every item. What is needed on the receipt is the item, the amount and then a signature for payment. He said, the treasurer deals with policy and the accountant deals with accounting. He also said that he assisted in locating documents in response to the subpoenas and there were a few credit card receipts missing between fiscal year 2016 -2018. On cross-examination he said the missing credit card receipts for 2018 – 2020 were from National Officer Lori Bassani.

**Debbie Hoover**

Ms. Hoover has been employed with APFA for 22 years as an accountant. She does payroll, trip removal stuff and flight attendant expenses. She said she was familiar with the issue related to former National Officers during the Ross Administration changing their vacation formula for their vacation payout at the end of their term in June 2018. She said National Officer Eugenio Vargas approached her about changing the formula. She said she was told to add SAF and MEA. This did

Exhibit C

Case 4:22-cv-00343-Y   Document 29-1   Filed 08/04/22   Page 28 of 59   PageID 1946
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

raise a red flag to her because this has never been done before, it wasn't past practice. This was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they are included in box 1.

**Josh Black**

Black is employed with American Airlines and is currently, the National Secretary for APFA. He maintains files related to the Executive Board and BOD's meetings. And he oversees the Article VII process. At the August 4, 2020 meeting Melissa Chinery, Sandra Lee, Josh Black, Margot were present to view the Ross Transition Agreement. Union Attorney Bill Osborne provided a copy of the Ross Transition Agreement to the APFA.

**Sandra Lee**

Ms. Lee has been employed with American Airlines for 36 years as a Flight Attendant. She has never held a position with the Union. Her concern for looking into the Union's finances was the Bob Ross exit package. She had requested to see the Union's finances at APFA headquarters. She had a meeting with Liz Geiss APFA Vice President and Craig Gunter, the APFA National Treasurer in a conference room. The monthlies were spread out for each month of the year. It had a breakdown of payroll, fixed costs in the building, secretary's salaries, etc. Several months were missing of payroll for Bob Ross and Nena Martin. Chinery asked about furniture, an inventory list and she was told there was no inventory list. Exhibit (CL-2) is the furniture receipt purchased from Ashley Furniture. We were able to review the Ross Transition Agreement under Julie Hedrick's Administration. Bill Osborne was the attorney who allowed us access. Ms. Lee stated they also learned that MEA and SAF were included in the payout to the four National Officers. It was included in the Bob Ross exit agreement. Bob Ross was paid five months after he exited the building as President. The five months of pay included MEA and SAF. Also learned was that Ross had received extra vacation.

**Michele Chinery**

Ms. Chinery has been a Flight Attendant with American Airlines for 25 years. She stated she supported Bob Ross, Eugenio Vargas, Nena Martin and Marcy Dunaway. But, could no longer support Ross because he promised to do a lot for the merger with Legacy US. Air and Legacy American and unite us. Ross ignored the U.S. Airway Flight Attendants. She stated per the constitution, they initiated a recall for all four of them. It lasted about a year and they had enough signatures on the petition to trigger an election. Thirty percent is all that is required to trigger a recall and they presented the petitions at the National Convention but they were not validated and there was no recall vote. She also stated she was allowed to view financials from the Bassani Administration. She also asked for credit card receipts of the Ross Administration. Chinery stated they looked at the Ross exit package first and then looked at Laura Glading's exit package. We then looked at credit cards. We looked at mileage. We looked at monthlies, and weeklies receipts. The financial records were a mess. We only saw the records that were provided to us as some were missing. The receipts for Vargas monthlies were missing. We were also informed of missing boxes

Exhibit C

of financial documents. Harris said the box S to Z was missing for fiscal year 2017. She also said
there were a hundred and fifty restaurant charges. It could be Vargas charged those for other
individuals, reps.. She also stated she prepared a document using Exhibit (CL-1 and 2) and
compared this information against the receipts. The first entry was May 9, 2016 to May 25, 2018
and $10,945.28 was spent with the Union credit card on food. Vargas was receiving guaranteed
MEA. The food chart exhibit mentioned includes meals purchased on Vargas credit card and
equates 150 meals for a total cost of $10, 945.28. Vargas loved Taco Cabana and he went 52-54
times to the Raven's Grill & Golf course. Some of these receipts were filled out properly and some
were not. Most of them were not. For example, June 30, 2016, it does not list the reason or who
was there with him. Most of the receipts are undocumented. There were receipts where Officers
were purchasing meals for one or two other Officers and they were listed on the receipt. She said
the policy manual does not allow an Officer to take both guaranteed meal expense and actual meal
expense. When Vargas actually charged a meal, he did not reduce guaranteed meals for the day.

## DEFENDANT TESTIMONY

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as
stated herein.

**Shane Staples**

Mr. Staples has been employed with American Airlines for over 30 years as a Flight
Attendant. He served in the APFA Bob Ross Administration starting in March 2016 in
Communications. APFA provided furniture to be used at the Bear Creek apartment he was given.
He stayed in a hotel for a month prior to being accommodated. When his term ended in July 2018,
he moved out of the apartment. This occurred after Vargas left office. He said it is standard practice
for the Coordinators or the National Chairs to stay on with the new administration. When he moved
out, he did an inventory of the items in the apartment. Exhibit (V-32) is an email of his inventory
list.

**Chuck Ransdale**

Ransdale has worked as a Flight Attendant for American Airlines for over 33 years. With
the APFA, he was the Vice President for the Baltimore domicile as well as the National Contract
Chair. He served in the Bob Ross administration as a contract chair. APFA provided
accommodations and he provided documentation in support. Maddie was the attorney for the
APFA at the time. He did go to a garage in the Bear Creek complex but all the furnishings were
tagged using to other apartments. He said he was on a flight to Madrid doing a time study.
Vargas was working the flight and we did have a working dinner to talk about the time study.
Vargas picked up the dinner tab and he picked up the wine tab. And they were all on MEA and
SAF and getting per diem. He paid for the wine with his personal credit card. On re-direct,
Ransdale was asked if he knew of Melissa Dyer. He said Dyer worked on policies and
procedures for American Airlines under Michelle Morenas.

**Yvonne Johnston**

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Johnston has been employed with American Airlines for 34 years. She has a Bachelor's Degree in Behavioral Science and Health and Economics. She also has a Master's Degree in Forensic Accounting. She has served on APFA Budget Committee and served under National Treasurer(s) Eugenio Vargas, Craig Hunter, Erik Harris and Greg Gunter. She states that she helped streamline the way the taxes are taken out of APFA representative paychecks and unemployment insurance. On the budget committee she worked with Kimberly Smedley, Russ Reed, Erik Harris, Amy Milinkovich, Todd Breckenridge, Robert Norvell and Beth Flannery. She said usually the Treasurer would have lunch brought in so we could continue to work. The group would usually go out for dinner and the Treasurer would pay the bill with the APFA credit card. Some of them claimed MEA and SAF. Vargas would take them out and would pay using the Union credit card. Erik Harris, Craig Gunter, Greg Gunter would take her out and use the credit card to pay for the bill. She also said that she saw other officers in all other administrations have the practice of purchasing food and beverages for themselves and for others who were already receiving MEA and SAF. She stated it has been a standard practice across the board not only Treasurers but all other Officers to be permitted to use the APFA credit card for food purchases and beverage purposes when people are receiving MEA and SAF when they are at APFA. She resigned her position because she was not getting the proper financial documents in a timely manner in order to be able to do her job properly. She also stated that when Eugenio was in office, the state of the finances in her opinion looked good. She also said that if a personal purchase was made and it was corrected within the same billing cycle and repaid, the institution was not harmed. She also stated Vargas has an impeccable work ethic, he is fair, honest and reliable.

**Craig Gunter**

Gunter was treasurer of APFA and said that Ms. Chinery and Ms. Lee came to APFA to view documents four or five times. He stated he was the Chair of the Budget Committee and there were six persons on the budget committee. When the members of the budget committee came into town for their regularly scheduled meeting, he would order food for them to have a working lunch. The food was paid for on a APFA credit card and they were receiving MEA and SAF. This has been a past practice for many years. This was actually a cost savings to have the meetings continue. Ms. Lee and Ms. Chinery when examining Vargas documents never questioned him about similar expenditures. He said that when he took over from the Ross Administration the state of the APFA Treasury was in order.

On cross-examination, Gunter stated that he had prepared and presented a PowerPoint presentation showing in great detail how the payouts were calculated and determined the calculations were correct. Ms. Martin requested of him to set up a conference call with the BOD to talk to Eugenio Vargas because they did not trust the calculations he did. The attorneys and BOD members interviewed Vargas. Vargas admitted that he had calculated the amounts using additional salary, the additional income added into the salary amounts. And he admitted that he knew the past practice did not use this calculation. He admitted that he directed the accountant to use his calculations and the accountant was not comfortable in doing so. After verifying the calculations and interviewing Vargas, the Board passed a resolution demanding repayment. The attorney got involved as this was going on for over four months. In December the Executive Committee had to threaten to file a lawsuit if they did not pay it back within 30 days. The

Exhibit C

Resolution was passed by the Executive Committee and Ms. Martin paid the full amount and Vargas and Dunaway set up a repayment plan.

**Marcus Gluth**

Mr. Gluth has been employed with American Airlines for approximately 30 years as a Flight Attendant. He was the Southeastern Division Representative and had seven bases in his division dealing with upper-level grievances. A member of the National Committee from 2000-2002. In 2015 the APFA president resigned and he was elevated to the President until April 2016. The Bob Ross agreement was negotiated with a Non-Disclosure Agreement (NDA). He assisted the BOD as Lead Counsel in their representation when they were charged with violating the APFA Constitution by Julie Moyer.

Mr. Gluth discussed the Ross Agreement and the Laura Gladings Agreement. Admitted into the record as Exhibit (V-100) the amicus brief.

**Randy Trautman**

Trautman is the APFA Miami Base President. He has been employed for over 38 years. He has held positions such as National Scheduling Coordinator and International Negotiator. He was on the BOD on March 1, 2018. Attorney Mark Richards and the BOD were present regarding the Ross Transition Agreement. In the Laura Glading's exit agreement, it included full salary and SAF and related payments. He has been a member of the BOD for over 22 years. He represents the fiduciary responsibility of the Union, sets policy and interprets the Constitution. As a Board Member, he became aware at a Board meeting that Eugenio Vargas, Marcy Dunaway and Nena Martin had received an inflated formula for MEA and SAF.

Trautman admitted that at the last convention in March, the BOD passed several resolutions. Those resolutions passed by the BOD are to set policy on moving expenses, National Officers payouts, APFA apartments and furniture because there was no policy in place.

**Eugenio Vargas**

Vargas has been employed with American Airlines for 26 years. He has held the position of Boston International Vice Chair, Boston International Chairperson and APFA National Treasurer. He testified that on August 11, 2016 he was on vacation with his spouse in Madrid, Spain. He rented a car from Enterprise Car Rental. He walked over to the Enterprise counter but he had to go to the restroom and asked his spouse to handle it. When he came back the car rental agreement was ready for him to sign and he signed it. In early September when the bill for the credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit card was used. He brought the receipt back to APFA the following morning and when senior Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He has made one trip to Madrid on vacation and one trip to Madrid with APFA. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study. National Contract Chair Chuck Ransdale, AFPA Representative Neil Fernandez and Melissa Dyer. Exhibit (V-17) is Vargas (V-1) showing the dates on which he traveled to Madrid doing the time study as a working Flight Attendant where he displaced a Flight Attendant to work. He said he did have a working dinner with the group and he paid for the dinner and Chuck Ransdale paid for the alcohol tab. This was only time he charged meals in Madrid. He said he saw no issue for Flight Attendants who were receiving MEA. He also stated that he has working lunches with other officers. He said that he did order lunch for the budget committee. He took them to dinner and paid for it with the APFA credit card. He said that he has never used the APFA credit card for his personal use. He stated that in all of the years of eating food provided by APFA, no one from APFA has ever instructed him to deduct any amount from his MEA. Exhibit (V-28) is a document of purchased furniture. The three persons listed on the document of furniture purchase were National Chairs, Shane Staples, the Communication Chair, Gaby Harty, Health and Chuck Ransdale were on the contract. Vargas said the purchase was for the Coordinator's. He asked them to go over to the garage where Bob Ross' apartment and go through the furniture that was there and see what they could use prior to going out and getting new furniture. Exhibit (V-36) is an email from Bob Ross stating that Gaby Harty had resigned and Kim Coats Tuck would be the interim National Health Chair until it is filled with a permanent appointment. Gaby's apartment lease was up in May, five months away and APFA had to pay for it. Vargas decided to move one of the representatives in the back, that there was a full month removal into Gaby's apartment and that would be a net savings for APFA. She moved in until the May 15, 2017 and allowed enough time to take inventory of what was there because the lease was up at the end of the month. Rachel Early worked in the account department and dealt with apartments, took inventory and packed some stuff. Exhibit (V-29) is an email from LaDonna stating that she had contacted, Kiss it Good Buy, and set up a meeting for May 25. Mike Trapp would move the furniture to, Kiss it Good Buy. Exhibit (V-30) is an email from LaDonna Casey to Vargas informing him that the items had been sold and they would send a check to APFA for $1,159.00. Exhibit (V-33) is a check for $339.10. All three of the representatives furniture were accounted for and this documentation accounts for the record location of the Ashley furniture addressed in the charges totaling $8,753.89. Attorney Mark Richards showed him Items 3, 4 and 5 of Exhibit (V-100) the Bob Ross Transition Agreement. Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and Ross was paid this way. Laura Glading received the same as Ross and the BOD agreed. Vargas said that Patrick Hancock informed him that the formula used was a 1987 package formula. Vargas said he entered into a payment agreement to repay the overage debt. Vargas also said that it was his interpretation to change the formula for the MEA, SAF to be included in their payouts.

### THE PLAINTIFF'S ARGUMENTS

Plaintiff argues Vargas violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. Vargas charged

Exhibit C

meals in his city of residence, Dallas Fort Worth (DFW), when he had no right to meals in his home location, double-dipped when he was receiving per diem out of base, and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA officers who were committing similar violations of the meal expense policy.

Plaintiff argues Section 5.F of the policy manual provides the following.

1. Per Diem MEA Away From Residence
   a. Per Diem Rate (Accountable Plan)
      (i) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA when away from their residence for one (1) or more nights at the Collective Bargaining Agreement Domestic Per Diem rate while traveling domestically and the Collective Bargaining Agreement International Per Diem rates while traveling internationally, for each hour they are away from their residence.

2. Actual MEA at Residence
   a. On days s/he is not trip removed, the APFA will reimburse a representative actual meal expenses at his / her residence city to the limit provided in F.2.a.(1) below when it is necessary to conduct APFA business during such meal, or when a representative is required by the transaction of APFA business to meet during a normal meal time.

      (1) Allowable MEA at Residence City is as follows:
          Breakfast up to: $ 6.00
          Lunch up to: $10.00
          Dinner up to: $17.00
          Snack up to: $ 3.00

      (2) In addition to the required receipt, all such MEA reimbursements shall require the representative to note the name(s) of the other individual(s) meeting during the meal time and the nature of the APFA business being conducted.

3. Guaranteed MEA at Residence
   1. On days a representative is both trip removed by and performing work for the APFA at his / her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2. above.
   2. The "Guaranteed MEA at Residence" shall be paid at the rate of twenty-five dollars ($25) per day.
   3. The maximum "Guaranteed MEA at Residence" that will be paid to a member shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

Exhibit C

    4.  National Officers, Regional Representatives, National Chairs and other
representatives who are authorized a full month trip removal or the
equivalent shall receive a "Guaranteed MEA at Residence" of three hundred
dollars ($300) per month.

4. Calculation of MEA
  a.  National Officers, Regional Representatives, National Chairs and other
representatives who are authorized a full month trip removal or the
equivalent (e.g. "Payback" as provided in paragraph D. above) shall receive
a minimum MEA of three hundred dollars ($300) per month.
  b.  The combination of "Per Diem MEA Away from Residence" as provided
in f.1 above, "Actual MEA at Residence" as provided in F.2 above, and
"Guaranteed MEA at Residence" as provided in F.3 above shall not be
capped.
  c.  MEA expenses will be calculated and paid in the following order:
    (1) "Per Diem MEA Away from Residence," then the remaining balance
owed, if any, will be paid as
    (2) Actual MEA at Residence," then the remaining balance owed, if any,
will be paid as
    (3). "Guaranteed MEA at Residence."

5. Business Related Expenses
a.  Representatives are authorized to pay for and to be reimbursed for the meal,
snack or beverage of a guest(s) or other business associate(s) on those occasions
when the representative would reasonably be considered the host of an
authorized APFA function or meeting.
  i.  Discretion and good judgment should be used when exercising this privilege
and when incurring such legitimate and necessary Business- Related
Expense.
  ii.  Abuse, as determined by the Executive Committee, may lead to limitation
or revocation of this privilege.
  iii.  In no case may an individual who is otherwise receiving an APFA MEA in
any manner be considered the "guest" for the purposes of this provision.
The reimbursement of a Business-Related Expense shall not count against
a representative's maximum MEA.

    Plaintiff argues that Vargas spent thousands of dollars in DFW on meals not allowed by
the Policy Manual. The APFA Policy Manual does not permit National Officers to charge actual
meals in their City of Residence, except for narrow exceptions. The hosting exception is very
narrow. National Officers who travel away from DFW on Union business are paid at per diem at
the same rate as American Air Lines Flight Attendants and are not permitted to "Double Dip: and
receive actual meal expenses. There is no working lunch exception in the Policy Manual. APFA
Representatives are required to follow Provisions of the Policy manual. The Charged parties failed
to establish a practice of violating meal policy.

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

Plaintiff argues Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands of dollars of furniture he had no right to take, concealing the fact from the APFA leadership and members. The portion of the charges dealing with furniture reads as follows:

> Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for. As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property. On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture. There is no record or inventory of that furniture nor can the furniture be located. The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done.

> The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer: The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA.

> The specific charge was failure to maintain an inventory list but the charges also listed a violation of the broad duty as APFA Treasurer to "be responsible for the care and custody of the funds and securities of the APFA."

> Article VII, Section 2 of the APFA Constitution states members can file charges over "act(s) *and/or* the Article(s) of this Constitution allegedly violated which constitute the basis of the charge(s)." (emphasis added) Here Vargas is charged with both a specific act and a violation of an article of the Constitution.

Vargas did not maintain an inventory list. The Ashley furniture purchased by Vargas cannot be accounted for. The missing furniture from the prior administration. Vargas last minute objections should be rejected. Eugenio Vargas failed to safeguard the furniture of the prior administration.

Plaintiff argues Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

On his last days in office, Eugenio Vargas changed the longstanding formula on vacation payout to inflate the pay of himself and his fellow officers, Bob Ross, Nena Martin, and Marcy Dunaway. Rather than including just the salary in the payout of vacation, they included items from expenses such as Meal Expense Allowance and SAF.

23

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

The policy manual provides that officers may be paid out of unused sick and vacation. (Joint Ex
1.) This should be paid out at their rate of pay. Instead, Vargas inflated their pay to include
MEA, SAF and stipend which caused them to each be paid over $5000 above what they were
entitled to.

Section 6.B.1.c of the policy manual allows an outgoing National Officer to be paid out vacation
" at a rate prorated on the National Officer's annual salary, as defined in 6.A above..." Section
6.A provides the "The salary of the National Treasurer shall be equivalent to the highest purser

flight attendant pay rates, including international override pay, for a flight attendant based on 105
hours monthly." (Joint Ex 1) There is no ambiguity in the language whatsoever.

Vargas, along with his fellow national officers Marcy Dunaway and Nena Martin, inflated this
pay by adding in MEA, SAF and stipend. But nowhere in the policy does it provide that
expenses and other payments are included.

This was simply a money grab on their last days in office. Vargas admitted on cross examination
that this was his idea to do this and that he did not inform the BOD. (TR 656) Even worse they
broke the checks up into a series of four $4000 checks which they signed for each other three
days before they left office. (TR 213-214, 661.) While Vargas claims it was to avoid taxes that
makes no sense since lump sum distributions are always taxed the same.A member of the APFA
accounting department, Debbie Hoover was subpoenaed and testified in this hearing. Ms Hoover
testified that she was ordered to add the MEA, SAF and stipend to their pay. She testified it
raised red flags as it "just had not been done that way. It wasn't past practice."

In an exchange, Patrick Hancock, a longstanding member of the APFA leadership, explained to
Vargas and his cohorts that this policy had been in place since 1987 and was very simple. It was
based on their pay using their hourly rate. Hancock noted they had paid themselves based on a
new formula which added in "things like profit sharing, MEA/SAF, Grand Slam rewards, and
who knows what all. This New Formula was not approved by the BOD or EC...."

Plaintiff argues Vargas allowed Bob Ross to be paid expense allowances when he was no
longer working for APFA. This payment was not specified in Ross' exit package.

Bob Ross resigned office in March, 2018 receiving an exit package negotiated by outside
attorney Mark Richard. The validity of the Ross exit package is not in play in this arbitration. A
separate arbitration ruled the BOD was within their authority to sign that deal. Chinery and Lee
were not parties to that case.

Plaintiff argues this case does not challenge the exit package but rather charges Vargas
allowed Ross to receive thousands of dollars in payments not provided for in the policy manual
or the exit package. The exit package provides that Ross shall receive the following economic
items:

3.    Bob Ross will continue to receive from APFA his current full salary and benefits
       including his insurance through July 31,2018.

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

4.      APFA agrees to pay Ross all of his accrued and unused back vacation time from April 2016 through July 31 2018.

5.      APFA agrees to pay upon his request a one time lump sum in the total amount of ten thousand dollars ($10,000) which represents Ross's moving expenses. Ross shall present the moving expenses to APFA for payment through 2019.

Nowhere in the exit package language does it specify Ross should get paid expense payments for months he is not working. Yet Vargas paid Ross $1050 for five months from March through July 2018 for a total of $5250.

Plaintiff argues Vargas used the union credit card for a rental car while on vacation in Spain as well as charging a meal while also on per diem. Vargas was charged with violating policy by charging a rental car for the week at a cost of almost $700 when he was on vacation in Madrid, Spain. Additionally, Vargas was charged with violating meal policy by charging meals in Spain while on per diem. Here the record is undisputed that Vargas used the union credit card to purchase the rental car. Vargas claims that he was on vacation with his husband and used the restroom and somehow his credit card was signed. Vargas claims he paid it back on September 9 after discovering the mistake. The question then becomes was this an inadvertent mistake or did Vargas intentionally misuse the credit card and pay after he realized? Current treasurer Erik Harris testified that when Chinery and Lee originally filed the charges he could not find the receipt. (TR 378-382.) The receipt was provided by Vargas. So based on the information available at the time of charging, these charges were proper.

Plaintiff argues Article III, Section 6.E of the APFA Constitution places the responsibility on the APFA National Treasurer the duty to safeguard the assets of the union. Vargas, in fact, did the opposite, repeatedly violating the policy manual for the benefit of himself and others.

Plaintiff's request the following remedy:

1.  Vargas repay APFA for the following economic harm:

    a.  Vargas repay APFA for all meals charged to his card which lack a proper receipt containing itemized meal, business purpose, attendees and/or any meal which does not meet the hosting exception. Alternatively, Vargas should repay APFA the value of MEA he received during his term which is $7500.

    b.  Vargas repay APFA for the fair market value of Greg Gunther's furniture he embezzled.

    c.  Vargas repay APFA for the value of furniture he failed to protect, including from prior administrations.

2.  Vargas be prohibited from serving in any APFA position for life.
3.  We request that a fine be leveled against Vargas equal to the cost of this arbitration proceeding pursuant to Article, Section 7.C.

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

4. That APFA be instructed to conduct a full audit of Vargas' administration and assess Vargas any additional funds which are uncovered in the audit.
5. We ask that the arbitrator retain jurisdiction in case the parties cannot agree on any amounts due.

### THE DEFENDANT'S ARGUMENTS

Defendant argues the only issue to be determined is whether former APFA National Treasurer, Eugenio Vargas, committed the following act(s) was a "**willful** violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Executive Committee" of the APFA Constitution, Article VII, Section 1.F. and did Members Melissa Chinery and Sandra Lee (Plaintiff) willfully bring these charges against the former APFA National Treasurer, Eugenio Vargas (Defendant), without having evidence sufficiently sustain the charges.

Defendant argues that by definition, were the actions of the former APFA National Treasurer, Eugenio Vargas; deliberate, intentional, premeditated or calculated regardless of the consequences or effects? Or were they not accidental or done deliberately with disregard to the APFA Policy Manual or APFA Constitution.

Defendant argues the allegations raised by the Plaintiff against former National Treasurer Eugenio Vargas were not willful or deliberate, intentional, premeditated or calculated. Mr. Vargas however, takes full responsibility for his actions and has provided his full support in Defense of these charges.

Defendant argues the plaintiff has the burden of proof. There are three standards of the burden of proof, (1) preponderance of the evidence, (2) clear and convincing evidence and (3) beyond a reasonable doubt. This obligation has not been met by any the burden of proof standards.

Defendant argues the Plaintiff argued in the Article VII charges the credit card use and expenses, where the union credit card was used for personal use (rental car) in Madrid Spain.

Defendant argues the charging parties cite Policy Manual Section 5.G. in support of their Article VII charges, when the referenced section of the Policy Manual actually applies to "Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed." Not only was this an invalid citing of the APFA Policy Manual but an indication of their lack of understanding of said policy and it's interpretation, while arguing inaccurate and irrelevant points to support their charges. While on vacation with his spouse in Madrid, Spain, and while awaiting the keys for a rental car at the Enterprise car rental counter, Vargas handed his spouse his wallet to pay for the rental car while he went to the restroom. Upon his return to the car rental counter the rental agreement was ready for a signature and the car was ready for pick up. Not until early September did Vargas realized a mistake had been made with the payment for the rental car while in Madrid, Spain. Vargas realized his spouse had used the APFA Chase Credit Card from his wallet instead of his personal Chase Credit Card, when paying for the car rental in Madrid, Spain. The following day Vargas returned to APFA with the car rental receipt and explained to the APFA senior accountant, Rene Berthelot what had happened, to which he responded "don't worry, all

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

you have to do is pay it back. It happens." Vargas made a payment of $614.20 to APFA on September 9, 2016, for the personal rental car charge made to his union credit card. Former APFA National Treasurer, Craig Gunter, a licensed CPA, was also questioned on the record about any personal purchases he may have inadvertently made with his union credit card, stating "I could have, but I don't think I ever charged anything on it, but you know, they're all in your wallet so." He further stated, if I had done so "I would have gone to the accountant and said I accidentally did this. Here, let me write you a check". Former APFA National Treasurer, Craig Gunter, also stated for the record the process for personal purchases inadvertently made on a union credit card by other officers in his administration.

Defendant argues the Current APFA National Treasurer, Erik Harris, also confirmed that the personal car rental purchase inadvertently made by Mr. Vargas on his union credit card while on vacation in Madrid, Spain was reimbursed to APFA. Personal purchases made by other APFA National Officers using their union credit card were identified on the record. Former APFA National Secretary, Jeff Pharr's union credit card statements revealed multiple personal purchases. Mr. Pharr's union credit card statements also expose this practice as an acceptable habit, multiple personal credit card charges along with charges identified for other union representatives. Former APFA National Secretary, Jeff Pharr had approximately eight (8) identified personal charges to his union credit card along with personal charges made for other union representatives. Mr. Pharr was subpoenaed without acknowledgement.

Defendant argues that former APFA National Treasurer, Eugenio Vargas was charged with failing in his responsibility to act in accordance with the APFA Policy Manual Section 5.F., by citing "The policy is clear that meals may only be reimbursed on rare and limited occasions when entertaining outside guests and in no instance when all participates are already receiving meal expenses. This is to prevent double dipping by having APFA pay MEA for meal expenses and then also pay for a representative's meals."

Defendant argues APFA had no policy in place on how to differentiate or separate any amount from the guaranteed MEA/SAF totals when a National Officer, Regional Representative, National Chair, or another Representative, who are authorized a full month removal and receiving guaranteed payments of MEA/SAF, is considered a host of an authorized APFA meeting. APFA also had no policy in place until this year for a National Officer in relation to ones union credit card practice. Current APFA National Treasurer, Erik Harris clarified this fact on the record. APFA MIA Base President, Randy Trautman also confirmed no polices were in place for said issues. APFA National Treasurer, Erik Harris identified on the record, he himself was non-compliant with the "OLMS Law" by not providing the required information while receiving MEA/SAF and was never charged with Article VII. The Budget Committee meetings hosted by the APFA National Treasurer is one example of an authorized APFA meeting. It is an established practice that has been followed through the years for the APFA National Treasurer to provide lunches/dinners for their committee members. Yvonne Johnston, Craig Gunter and Erik Harris this practice.

Defendant argues that the APFA Board of Directors Annual Convention was held in March 2021, APFA National Vice President, Larry Salas, put forth Resolution No. 10, Business Related Meals, which provides a clear policy on reimbursement of business-related meals and group meals and entertainment expenditures. The APFA Board of Directors unanimously passed this resolution.

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

This resolution secures the established practice of an APFA Representatives authorization to pay for meals of a guest/business associate when the Representative would be considered the host of an authorized APFA function or meeting, while not counting against a Representatives MEA.

Defendant argues The APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs. The G/L Acct 1246 document for Furniture & Fixtures provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

Defendant argues that in January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck, as interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty apartment lease, and in a cost saving measure for the union, Mr. Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty. Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when leaving Dallas. Shane Staples, after being appointed to the position APFA National Communications Chair, testified he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used by APFA as storage. After these items were repurposed, the Ashley Furniture items were purchased. In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all his furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture.

Defendant argues Members Melissa Chinery and Sandra Lee have cited language from Section 8.I.3.b.(5) of the APFA Policy Manual which governs the inventory and transfer of Office Equipment only. The Charging Parties have once again quoted and used invalid language to substantiate their Article VII charges against former APFA National Treasurer, Eugenio Vargas.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

the APFA Policy Manual by citing *" Vargas failed to properly oversee Ross' payments and
allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all
which is not part of basic salary."* The APFA has an organizational structure that is two-tier,
consisting of Base Presidents, who are the voting members and the four (4) National Officers, who
are non-voting members collectively they make up the APFA Board of Director. In February 2018,
Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual
convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark
Richard, negotiated a Ross "Transition Agreement." The negotiations were solely between the
voting Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President,
Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations
of the Ross "Transition Agreement" nor was he present in the room or a signatory of said
agreement. In fact, APFA National Treasurer, Eugenio Vargas, had never viewed the Ross
"Transition Agreement" in its entirety, only the economic portions which encompassed covenants
#3, #4 and #5.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former
APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with
the APFA Policy Manual by citing " *Vargas failed to properly oversee Ross' payments and
allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all
which is not part of basic salary."*

Defendant argues the APFA has an organizational structure that is two-tier, consisting of
Base Presidents, who are the voting members and the four (4) National Officers, who are non-
voting members collectively they make up the APFA Board of Director. In February 2018,
Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual
convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark
Richard, negotiated a "Transition Agreement". The negotiations were solely between the **voting**
Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert
Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the
Ross "Transition Agreement" nor was he present in the room or a signatory of said agreement.
APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement"
in its entirety, only the economic portions which encompassed covenants #3, #4 and #5.

Defendant argues Covenant #3 of the Ross "Transition Agreement" states "APFA agrees
that Bob Ross will continue to receive from APFA his current full salary and benefits, including
full insurance coverage, through July 31, 2018. Former APFA National Treasurer, Eugenio
Vargas, stated for the record the difference between, "Basic Salary" and "Full Salary" regarding a
National Officers compensation. Former APFA National President, Laura Glading, also received
"Full Salary" upon her exit, per the terms of her "Transition Agreement." "Full Salary" for a
National Officer, per the APFA Policy Manual, Section 5, entitles them to receive guaranteed
MEA, SAF and Office Outside Residents payments. This guaranteed payment of $1050 is included
in the gross wages "Box 1" of the National Officers W-2 tax form. Marcus Gluth corroborates the
meaning of Basic Salary vs. Full Salary.

Defendant argues The NDAs on both the Glading "Transition Agreement" and the Ross
"Transition Agreement" were lifted at the same time by APFA National President, Julie Hedrick,

Exhibit C

Case 4:22-cv-00480-YDD Document 41-1 Filed 08/04/22 Page 30 of 45 PageID 5270
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

allowing Members Melissa Chinery and Sandra Lee, to view both agreements in their entirety for any language and payment comparisons. No article VII charges were filed against Laura Glading for her 'Transition Agreement."

Defendant argues the hearing in the Matter of Arbitration between Julie Moyer (charging party) and the 2018 APFA Board of Directors (charged party), before Article VII Arbitrator, Edward B. Valverde, Esq., was held on June 1-3, 2021, with a decision rendered on September 21, 2021. The Award clearly determined, in line with the charged party's defense, that Article III, Section 3.A authorizes the APFA Board of Directors to take any and all lawful action consistent with the Constitution to safeguard and protect APFA.

Defendant argues Former APFA National Treasurer, Eugenio Vargas used "Full Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office, which included MEA and SAF. After numerous requests for a meeting, the first written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on September 4, 2019, approximately 2 months after the original Facebook post on July 11, 2019. The letter confirms that certain payouts made in 2018, incorrectly included MEA and SAF in the calculation. The letter continues to request that the "Union be made whole" but still no specific dollar amount owed had been established. Not until September 18, 2019, was the three (3) members of the Ross administration noticed of a dollar amount owed, supported by a single sheet of paper and without documents to substantiate the claim. Patrick Hancock revealed that APFA believed their calculations were correct based on a 1987 formula invented by former APFA National President, Patti Gibbs. Former APFA National Treasurer, Eugenio Vargas, stated for the record that he did include "Full Salary" which included MEA and SAF in the calculations of vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office. He has **never** disputed that fact. Mr. Vargas used the same "Full Salary" logic that was used in the calculation of the Ross "Transition Agreement" and the Glading "Transition Agreement." He used the one and only number identified on the officers W-2 as gross wages, which include MEA and SAF in his calculations, but in actuality this calculation was irrelevant due to the fact that a "1987 formula" should have been used.

Defendant requests the Article VII charges against Eugenio Vargas be dismissed in its entirety.

## DISCUSSION AND OPINION

The arbitrator finds the allegations raised by Plaintiff against Defendant, the former National Treasurer Eugenio Vargas must be a *willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee.* (See Article VII, Section 1) The definition of "willful" has many meanings, its construction often influenced by its context. It often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal context it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. It may also be construed to mean an act or omission is willfully done, if done voluntarily and intentionally and with the specific intent to do something the law

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law. Additionally, a willful act may be described as done intentionally, knowingly, and purposely, without justifiable excuse as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently. (Black's Law Dictionary, 5th Edition, pg. 1434).

Additionally, the arbitrator is of the Opinion that in order for the Plaintiff to meet its' burden of proof, it must not only be a "willful" violation but such proof must be supported with clear and convincing evidence.

## Issue No. 1: – Violating the Meal Expense Policy

The arbitrator finds the scope of Section 5.F. of the Policy Manual deals with Meal Expenses/Meal Expense Allowance (MEA); Per diem MEA Away from Residence; Actual MEA at Residence; Guaranteed MEA at Residence; Calculation of MEA and Business Related Expenses.

Plaintiff argued that Former National Treasurer Eugenio Vargas spent thousands of dollars in DFW on meals that are not allowed by the policy manual. Vargas spent $10,945.28 on his APFA Union credit card on meals during his two-year term of office. Plaintiff submits that many of the meals lacked the proper documentation; by failing to provide an itemized receipt, the purpose, and/or the attendees of the meal. At the same time, Vargas was receiving a guaranteed meal expense allowance of $300.00 per month for his National Officer position and was therefore double-dipping at the expense of the membership. Thus, for his 25-month tour as National Treasurer, Vargas received $7,500.00.

The arbitrator finds and the record evidence supports the fact that APFA maintained a check and balance system to insure the proper disposition of these expenses. Lukenmeyer testified expenses are reported on an expense report and are supposed to have two signatures, so there should be another person who is overseeing what the Treasurer is doing or spending, whomever signs the other half of that expense report. Another National Officer is usually the person signing and affirming the expenses are true and accurate. The only way this could be accomplished is by having the proper documentation to include an itemized receipt, the purpose of the meal expense and the name of the attendees. Plaintiff argued Vargas and his fellow National Officers frequented Raven's Grill Country Club. Vargas spent $1,727.00 on his APFA credit card for several meals at Raven's Grill but other National Officers took turns buying meals for each other on their own APFA credit card. This raises the question as to whether or not the check and balance system had failed. We however have to consider that the person who is approving these expenses was knowledgeable of the policy manual and what was required for it to be a true and accurate expense report was submitted with the proper documentation. Defendant argued this Check and balance procedure is a past practice of prior administrations. Record evidence revealed that this has been a frequent ongoing past practice in several administrations prior to and after the Ross Administration. Plaintiff filed an Article VII charge against Vargas when they could have filed charges on other National Officers as well. Plaintiff' represented that these meal expenses lacked the proper documentation. Record evidence revealed there were missing files of the Vargas administration, then it could be conceivable that these missing files contained the rest of the

Exhibit C

Case 4:22-cv-00430-YGR Document 29-1 Filed 06/03/22 Page 42 of 59   PageID 342
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

documentation. Thus, the check and balance system in place may or may not have failed to catch the meal purchases lacked the proper documentation, as we are unsure.  Record evidence revealed other National  Officers were also taking turns in buying meals on their APFA credit card. They too may not have been aware of this activity could be viewed as "double dipping" to uphold an inappropriate use of the APFA Union credit card. So, when a weekly expense report is submitted to whomever for signature from Vargas, the individual signing it did not foresee a problem and signed off affirming the expenses were true and accurate. Present day National Treasurer Erik Harris testified there has been a lot of interpretation and no definitive policy was in place on the use of the APFA Union credit card. He also said the Union was aware of these shortcomings and the BOD recently took affirmative action and passed Resolution No. 10 - Business Related Meals, Exhibit (V-15) to correct and clarify. Without a clear policy in place, this arbitrator cannot affirm the expenses Vargas submitted for payment was proper.

Thus, the arbitrator is of the Opinion the evidence Plaintiff submitted is their interpretation of what they believe should be considered improper use of an APFA Union credit card. This arbitrator is not persuaded with the evidence presented. Additionally, no questions were asked of Vargas regarding all of these expenses. Plaintiff argued that the APFA Constitution states, "Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein." Without a definitive explanation or proper documentation from Vargas over each expense, we would be guessing if Vargas engaged in improper use of the APFA Union credit card!

It is the arbitrator's Opinion an independent auditor be hired to audit Vargas APFA credit card usage as to whether proper documentation was provided with the expense reports. Additionally, such auditor shall audit Vargas Tenure as National Treasurer and inspect his APFA credit card statements, expense reports, and whether two signatures were provided and whether it documented the purpose of the meal and with the names of the attendees.  Thus, the evidence presented does not establish Vargas' behavior at this juncture was "willful" in violation of Article VII, Section 1, but  if the audit conducted finds Vargas purchased meals for himself only then it would be found that his conduct was "willful" and would require him to repay APFA. This audit would reveal whether Defendant failed in his fiduciary duty as National Treasurer. Moreover, the record evidence at this point is not clear and convincing enough to establish Vargas expenses were inappropriate at this juncture. Only an independent audit will determine whether the evidence compiled is clear and convincing.

Moreover, the arbitrator finds in Exhibit (V-13, dated March 8-10, 2021) Resolution No. 8 where the BOD adopted a new credit card policy for APFA issued credit cards. Under "**Documentation of usage**" it states,

    a.  Each National Officer shall submit an electronic report to the accounting department within thirty (30) days of the end of the month in which the charges were made. The report to be sent to the accounting department shall include:

        (1) The month and year must clearly be denoted on the report.
        (2) A copy of the itemized receipts for all purchases made.
        (3) The department(s)/budgets to which the charges are being made.

Exhibit C

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

     b. Each report must be signed by two (2) National Officers, one of whom must
      be the National Officer who submitted the report.

Resolution No. 8 also provides for the "Maintenance of Records", "Payment of statements should
be paid as soon as possible so as to avoid unnecessary interest charges", "Policy Compliance",
"Training" and all credit card holders are required to sign the APFA Card-Holder Agreement. The
National Treasurer will maintain a copy of all signed agreements.

Under these given circumstances Issue No.1 is remanded to the BOD or EC to hire an
Independent Auditor to audit Vargas credit card charges during his term as National Treasurer.
Additionally, if the missing files are in the position of the Defendant, it is hereby Ordered that they
be turned over to Erik Harris, the National Treasurer for the independent auditor's audit. In the
hearing, Plaintiff argued that some of Defendant's evidence were part of the missing documents.
If not provided, an adverse inference may be drawn.

**Issue No. 2: - Failing to Maintain an Inventory list thereby violating Article 11, Section 6.E.
of the APFA Constitution by failing to maintain Union assets?**

Plaintiff argued that Vargas handling of APFA furniture is unaccounted for. Plaintiff
stated,

> *"Finally, thousands of dollars of furniture, including furniture purchased
> by Vargas, is unaccounted for. As Treasurer Vargas had an obligation
> under the APFA constitution and federal labor law to safeguard union
> property. On one receipt dated 5/18/16 under Vargas's union credit card
> charges we found a purchase for $8733.89 at Ashley furniture. There is no
> record or inventory of that furniture nor can the furniture be located. The
> APFA policy manual requires that the National Treasurer inventory
> equipment and monitor the transfer of equipment between representatives.
> This was never done.*
>
> *The Treasurer has the responsibility to safeguard the funds of the APFA
> union members as outlined in Article III Section 6.E. of the APFA
> Constitution: Duties of the Treasurer: The Treasurer shall be responsible
> for the care and custody of the funds and securities of the APFA."*

Plaintiff argued Vargas is charged with an act of omission, the failure to maintain an
inventory of furniture. Vargas is also charged with a violation of a specific Article of the
Constitution, which is his duty "to safeguard the funds of the APFA union members as outlined in
Article III, Section 6.E. of the APFA Constitution."

Plaintiff requested of then National Treasurer Craig Gunther to supply the inventory lists
and Craig Gunther testified the APFA has no records of furniture from Vargas' tenure as National
Treasurer. This is corroborated by present National Treasurer Erik Harris who also stated there is
no record of inventory from the Vargas Administration.

Record evidence revealed the Defendant submitted a depreciation list which referenced the
furniture but according to Erik Harris' testimony, a depreciation list does not constitute a proper

Exhibit C

Case 4:22-cv-00430-YGR Document 1-19 Filed 05/04/22 Page 36 of 39 PageID 1954
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

inventory list. Defendant argued the Ashley Furniture has been accounted for as Vargas purchased the furniture for three committee chairs, Gaby Harty, Chuck Ransdale and Shane Staples.

Defendant argued the APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs. The General Ledger Account 1246 document for Furniture & Fixtures provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

Defendant argued that in January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck, as interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty apartment lease, and in a cost saving measure for the union, Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty. Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when he left Dallas. Shane Staples, after being appointed to the position APFA National Communications Chair, testified he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used by APFA as storage. After these items were repurposed, the Ashley Furniture items were purchased. In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all his furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture.

Plaintiff argued Vargas violated his duty as National Treasurer of APFA to safeguard union property as required in Article III, Section 6.E.

Plaintiff argued the APFA Constitution, Article VII, Section 6.D specifies the procedure a charged party can utilize if they want to narrow the scope of charges, stating:

> D.     The Article VII Arbitrator may, on his/her own motion, or upon motion filed by the accused, determine that charges are

Exhibit C

not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

Here, Defendant objected at hearing for Plaintiff broadening the scope of this charge over questions asked of Vargas regarding Greg Gunter's furniture that he had purchased it for his own personal use. Defendant states the charges were deemed valid, timely and specific before the EC and it only raised issues with Ashley furniture. Defendant agrees Vargas needs to answer to the charge of the Ashley furniture of $8,733.95 that he purchased as the Treasurer of APFA. Plaintiff however argues Defendant failed to follow proper procedure in raising objections and in doing so failed to follow the APFA Policy Manual and Constitution. By failing to follow proper procedure, Defendant raised an objection in a manner which does not protect the rights of the charging parties. This arbitrator does not agree, the Ashley Furniture is the only issue that is valid, specific and timely in the grievance charges. It does not say anything else about Greg Gunter's furniture. Plaintiff failed to amend the grievance charge to include Greg Gunter's furniture. By Plaintiff raising this additional issue at hearing for the first time, this is an attempt by Plaintiff to engage in an "ambush through arbitration." Thus, the objection raised by Defendant is correct and is hereby sustained.

Plaintiff argued that Section 8.I.3.b.(5) of the Policy Manual deals with the National Treasurer duty to maintain a procedure to monitor the transfer of equipment, when appropriate, between representatives in the field. The arbitrator finds no evidence was presented to support this allegation.

The arbitrator finds Vargas failed to prepare an inventory list. This arbitrator is of the Opinion that all of the Ashley furniture has been fully explained and accounted for. Record evidence however revealed there was no inventory list prepared and Harris testified there was no inventory list. Under these circumstances, Vargas did fail in his fiduciary duty as National Treasurer to prepare an inventory list to maintain Union assets and violated Article 1, Section 2.J, Section 7.E.O.Q and Article 1II, Section 6.E. of the APFA Constitution.

Thus, it is the arbitrator's Opinion Issue #2 has merit by Vargas failing to prepare an inventory list to maintain Union assets.

**Issue No. 3**  **Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such, and**

**Issue No. 4**  **Allowing the payment to former National President Bob Ross thousands of dollars in Meal Expenses Allowance (MEA) and SAF when he was no longer working for APFA?**

The arbitrator has consolidated Issue No. 3 and Issue No. 4 as it involves the same issue.

Plaintiff argued that Vargas changed the longstanding formula on vacation payout for himself and fellow officers Bob Ross, Nena Martin and Marcy Dunaway. Vargas included expense items such as Meal Expense Allowance (MEA) and SAF.

Exhibit C

Case 4:22-cv-00343-YGR Document 129-1 Filed 05/04/22 Page 36 of 45   PageID 1936
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Plaintiff argued the Policy Manual provides that officers may be paid out of unused sick and vacation. This should be paid at their rate of pay. Vargas inflated their pay to include MEA, SAF and stipend, which created an overpayment of $5,000.00 above what they were entitled.

Plaintiff argued Section 6.B.1.c of the Policy Manual allows an outgoing National Officer to be paid out vacation "at a rate prorated on the National Officer's annual salary, as defined in 6.A above…" Section 6.A provides, "The salary of the National Treasurer shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for flight attendant based on 105 hours monthly." Plaintiff argued this was simply a money grab on their last days in office. Vargas admitted on cross-examination that this was his idea to do this and that he did not inform the BOD. Even worse they broke the checks up into a series of four $4000.00 checks which they signed for each other three days before they left office. Vargas claimed it was to avoid taxes.

Plaintiff presented accountant Debbie Hoover who testified that National Officer Eugenio Vargas approached her about changing the formula.  She said she was also told to add SAF and MEA. This did raise a red flag with her because this has never been done before, it wasn't past practice and this was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they were all included in box 1.

Defendant Vargas testified that Attorney Mark Richards showed him only the economic Items 3, 4 and 5 of the Bob Ross Transition Agreement, Exhibit (V-100). Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Vargas stated that Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and this is what Ross was paid.  Laura Glading in her exit agreement received the same as Ross and the BOD agreed.

Defendant Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination he created to be used for "Full Salary" vs "Basic Salary" for said payments. The Ross "Transition Agreement" has been deemed valid  by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross "Transition Agreement".

Defendant Vargas takes full responsibility for his actions involving his changing of the mathematical formula when using "Full Salary" vs "Basic Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross Administration when leaving office. Vargas said that Patrick Hancock informed him that the formula always used was a 1987 package formula. Vargas has provided his full support in these charges, including months of

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

correspondence between the three former officers, APFA National Officers, APFA Board of Directors, APFA In-House Counsel, APFA Executive Committee and Members Melissa Chinery and Sandra Lee, by providing a clear picture of his willingness to repay the overage, once established from the "**1987**" formula that was exposed months after the July 11, 2019, Facebook post by Member Sandra Lee. Eugenio Vargas never stated he would not pay an amount if owed, but expected the calculation to be accurate and accounted for.

The arbitrator finds Vargas interpretation of the Ross Transition Agreement to not only include MEA and SAF but he included a stipend. Vargas had instructed Hoover to change the formula to include MEA and SAF and the stipend in the payouts of National Officers Ross, Martin, Dunaway and himself. Thereafter, written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on November 8, 2019, stating *"After the meeting held on October 30, 2019, to allow you to review the independent auditor's calculations, it is our understanding that you take issue with how the calculations were made. We researched the issue again and believe our initial calculation is correct".*

Defendant argued in the calculations provided at the October 30, 2019, meeting, simple math was used to determine the alleged monies owed by taking "**Full Salary**" minus "**Basic Salary**", then stating the difference was MEA and SAF. Calculating MEA and SAF in this manner was incorrect due to other income being included in the "**Full Salary**", like the UAL Arbitration payout, which provided a pay increase with retroactive pay.

The arbitrator finds in the APFA Executive Committee meeting dated December 5-7, 2019 Resolution #69 where the EC resolved this matter by stating, "that if the repayment plan is not received, the APFA Attorney is directed to file a State Civil lawsuit no later than January 6, 2020 to collect these funds," and any settlement agreements be approved by the Executive Committee prior to APFA acceptance.

Defendant Vargas said he has since entered into a payment agreement to repay the overage debt. Vargas admitted that it was his interpretation of the Ross Transition agreement to change the formula for the MEA, SAF to be included in their payouts and this is what created the overage.

It is this arbitrators Opinion, Vargas attempted to benefit monetarily and thus failed in his fiduciary duty as National Treasurer by willfully changing the formula for the payouts for Bob Ross, Nena Martin and Marcy Dunaway as well as himself.

It is therefore the Opinion of this arbitrator, Issue No. 3 has merit as Vargas violated his fiduciary duty as National Treasurer.

With respect to Issue No. 4, the arbitrator finds Vargas admitted that he had changed the formula, this has been established in Issue No. 3. But in Issue No. 4, Plaintiff argued that Vargas paid Ross MEA and SAF when he was not working. Under item No. 3 of the Ross Transition Agreement, it clearly states, *"APFA agrees that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018."* The Ross agreement is binding as stated by Arbitrator Edward B. Valverde. Vargas did include MEA

Exhibit C

Case 4:22-cv-00430-YGR Document 1-1 Filed 08/02/22 Page 36 of 39 PageID 5953
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

and SAF in Ross's salary in accord with Item No. 3 as well as Item No. 4. *"APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018*." But Ross too received an overage because Vargas had changed the formula and he too is required to pay the debt owed.

In Issue No. 4, Ross did receive an overpayment because Vargas admittedly changed the formula. It is my understanding Ross has an outstanding debt with the APFA. It is clear Vargas manipulated the payout formula. In the Bob Ross Transition Agreement, MEA and SAF were included. The issue with MEA and SAF has been resolved as well as the overpayment to Ross, Nena Martin, Eugenio Vargas and Marcy Dunaway. Dunaway and Vargas have agreed to a payment plan and Martin has paid her debt in full. Only Ross has not paid. Thus, Issue No. 4 has been resolved and is now moot.

### Issue No. 5    Violating the credit card policy by charging a rental car and meals for a trip to Spain?

Here, Vargas made two trips to Madrid Spain. One was for vacation and the other was work related for the APFA where he engaged in a time study aboard a 787 airplane. On the vacation trip, he approached the Enterprise Rental Car counter to rent a car. He told his spouse he needed to go to the restroom and gave his spouse his wallet. Upon his return was the rental agreement and he signed it. He did not notice the charge was on the APFA Union credit card and not on his Chase Visa card. In early September when the bill for the credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit card was used. He brought the receipt back to APFA the following morning and when senior Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study.

The arbitrator finds Vargas in this instance recognized the charge of the rental car he rented in Spain while on vacation. The charge was on his APFA credit card statement. Vargas paid back the APFA $614.29. This reveals Vargas recognized that he had made an error and rectified it. As to the meal alleged this was a work-related meal when he conducted the time study on a trip to Madrid. It is therefore, the Opinion of this arbitrator this matter is now moot. Thus Issue No. 5 has no merit.

### Conclusion

The arbitrator having found no merit to Issue # 4, #5 are hereby dismissed. Issue #2, #3 have merit. Issue No.1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Additionally, if there are missing files in the possession of the Defendant, it is hereby Ordered that they be turned over to Erik Harris,

Exhibit C

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

the National Treasurer for the independent auditor's audit. If not, an adverse inference may be drawn.

**Remedy**

Vargas is to repay APFA for the following:

1. If after the Independent Auditors audit is completed and he/she determines that Vargas had used the APFA credit card for his own personal use on meals during his tenure as National Treasurer, Vargas is hereby Ordered to repay APFA for all meals he charged to the APFA credit card.
2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.
3. Vargas is hereby fined and Ordered to repay the APFA for half of the Arbitrator's Fee for this arbitration.
4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Vargas, that will be the amount to be assessed or due and the BOD or EC shall Order said repayment from Vargas.

**AWARD**

The grievance is sustained in part and dismissed in part as stated above.

**Issued in San Antonio, Texas, the 18th day of February, 2022.**

Ruben R. Armendariz, Arbitrator

Exhibit C

Case 4:22-cv-00343-O Document 49-1 Filed 08/24/22 Page 2 of 85 PageID 5370

# Wood, Stephens & O'Neil, L.L.P.

## Certified Public Accountants

6300 Ridglea Place, Suite 318
Fort Worth, TX 76116
Tele. 817-377-1700
Fax 817-377-1870

## CONFIDENTIAL MEMORANDUM

MEMO TO: APFA Board of Directors and the Executive Committee

FROM: Hal O'Neil, CPA, Pam Bush
SUBJECT: Review of officer disbursements and the Bob Ross transition agreement
DATE: October 22, 2020

The current APFA officers, in consultation with the APFA staff attorney and outside counsel, requested that our firm review specific former officer expense reimbursements and payroll disbursements, as well as the payments arising from the Bob Ross confidential transition agreement. This informal engagement is substantially less in scope than an audit engagement, the objective of which would be the expression of an opinion regarding these specific disbursements. Accordingly, we do not express an opinion or any form of assurance regarding these disbursements. Our task under this informal engagement, was as follows:

1. To review the backup for the former officers' salary disbursement amounts from 2016 - 2018 and to determine these base salaries were calculated correctly and in compliance with the guidelines and pay rates stipulated in the APFA policy manual. Please see the enclosed schedule A for each officer.

2. To prepare an overpayment schedule of the accrued and unused sick, and accrued and unused vacation time payments made to Bob Ross in 2018, similar to the overpayment schedules we prepared previously for the other three officers. Please see the enclosed schedules B and C for each officer. These overpayment schedules for the other officers were previously provided to the Board of Directors. Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick, and accrued and unused vacation time. This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement. This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses. His moving expense reimbursement payments did not exceed this amount.

3. To assist the APFA accounting department staff in reviewing and organizing the various requested documents, as set forth in the flight attendants Chinery and Lee financial document request.

Please contact us should the Board of Directors or the Executive Committee have questions regarding our limited engagement.

Sincerely,

*Hal O'Neil, CPA*

EXHIBIT
tables' "*B*"

**Exhibit B**

Exhibit C

| | | C | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **National Officer:** | **Bob Ross** | | **Overpayment Calculation** | | | | | |
| | | | | | | | | |
| | | Annual | Daily amount | Eligible | | | | |
| | | Salary | (divide by 365) | Days to pay | Payment | | | |
| Vacation Pay - 2017 | | | | | | | | |
| | Original amount | $ 101,031.36 | 276.80 | 14 | $ 3,875.20 | OK *(paid 3/31/17)* | | |
| | | | | Overpayment | $ - | | $ - | |
| | | | | | | | | |
| Sick Pay - 2017 | | | | | | | | |
| | Original amount | $ 101,031.36 | 276.80 | 12 | $ 3,321.60 | OK *(paid 3/31/17)* | | |
| | | | | Overpayment | $ - | | $ - | |
| | | | | | | | | |
| Vacation & Sick Pay - 2017 - (adjustment paid in 2018....all paid in error) | | | | Overpayment | $ 968.76 | | $ 968.76 | |
| Vacation Pay - 2017 (remaining unused days per agreement) | | | | | | | | |
| | Original amount - paid in error (a) | $ 114,632.67 | 314.06 | 17 | $ 5,339.02 | *(paid 3/29/2018)* | | |
| | Correct calculation amount | $ 101,031.36 | 276.80 | 17 | $ 4,705.60 | | | |
| | | | | Overpayment | $ 633.42 | | $ 633.42 | |
| | | | | | | | | |
| Vacation Pay - 2018 (remaining unused days per agreement) | | | | | | | | |
| | Original amount - paid in error (a) | $ 122,121.70 | 334.58 | 29 | $ 9,702.82 | *(paid 3/29/2018)* | | |
| | Correct calculation amount | $ 107,893.92 | 295.60 | 29 | $ 8,572.40 | | | |
| | | | | Overpayment | $ 1,130.42 | | $ 1,130.42 | |
| | | | | | | | | |
| Sick Pay - 2018 | | | | | | | | |
| | Original amount - paid in error (a) | $ 122,121.69 | 334.58 | 12 | $ 4,014.96 | *(paid 3/29/2018)* | | |
| | Correct calculation amount | $ 107,893.92 | 295.60 | 12 | $ 3,547.20 | | | |
| | | | | Overpayment | $ 467.76 | | $ 467.76 | |
| | | | | | | | | |
| End of term payout - 2017 (January 1 - December 31, 2017) | | | | | | | | |
| | Original amount - paid in error (a) | $ 118,046.02 | 334.58 | 35 | $ 11,710.30 | *(paid 3/29/2018)* | | |
| | Correct calculation amount | $ 107,893.92 | 295.60 | 35 | $ 10,346.00 | | | |
| | | | | Overpayment | $ 1,364.30 | | $ 1,364.30 | |
| | | | | | | | | |
| End of Term Payout - 2018 (January 1 - July 31, 2018) | | | | | | | | |
| | Original amount - paid in error (a) | $ 118,046.02 | 334.58 | 20.44 | $ 6,838.82 | *(paid 3/29/2018)* | | |
| | Correct calculation amount | $ 107,893.92 | 295.60 | 20.44 | $ 6,042.06 | | | |
| | | | | Overpayment | $ 796.75 | | $ 796.75 | |
| | | | | | | | | |
| | | | | Overpayment subtotal | | | $ 5,361.41 | ** |
| | | | | | | | | |
| | Add 2018 profit-sharing contribution paid (3/8/2019) on excess amount above ** | | | | | | $ 75.06 | *(based on 1.4%)* |
| | | | | | | | | |
| | | Total overpayment - due to APFA | | | | | $ 5,436.47 | |

**Exhibit B**

Exhibit C

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Eugenio Vargas

**(b)** County of Residence of First Listed Plaintiff  Eldorado County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Kerri Phillips, K.D. Phillips Law Firm, PLLC, 5700 Tennyson Pkwy, Ste 300

Plano, Texas 75024 (972) 327-5800

## DEFENDANTS

Association of Professional Flight Attendants, Julie Hedrick and Erik Harris

County of Residence of First Listed Defendant   Tarrant County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | |
| ☐ 2 | U.S. Government Defendant | |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* | |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☒ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

Brief description of cause:
Seks redress for various torts in the area of labor management practices, unfair credit reporting, and various torts in the area of labor management

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U,S,C § 412 Labor Management Disclosure Act and various others

Brief description of cause
Seeks redress for various torts in the area of labor management

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 05/17/2022 | /s/ Kerri Phillips |

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

Exhibit C

Case 4:22-cv-04030 Document 1-8 Filed 08/22/22 Page 3 of 5 PageID 573

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Exhibit C

# APFA

## ANNUAL BOARD OF DIRECTORS CONVENTION



## March 8-10, 2022

*Westin Irving Convention Center at Las Colinas*

| Resolution Information | | BOS Milenkovic | CLT Hazlewood | DCA Pennel | DFW De Roxtra | LAX Nikides | LGA Santana | MIA Trautman | ORD Wroble | PHL Kaswinkel | PHX Agee | SFO Ross | Pres Hedrick |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Resolution #:** 10 | YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ | ☐ | ☐ |
| **Resolution Name:** Chinery-Lee v Vargas Arbitration Remedy | NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| **Status:** Pass | ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Maker:** Hedrick | N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Second:** Nikides
**Date:** 03/10/2022
**Time:** 2:55 p.m.
**Affects PM:** ☐
**Comments:**

**Yes:** 10 **No:** 1 **Abstain:** 0 **Absent:** 0 **Show of Hands:** ☐

---

**WHEREAS**, APFA Constitution, Article VII provides APFA members a mechanism to hold their representatives accountable through internal hearing procedures facilitated by a neutral third-party arbitrator; and

**WHEREAS**, two such members, Melissa Chinery & Sandra Lee, filed Article VII Charges against previous APFA National Treasurer, Eugenio Vargas, on November 24, 2020; and

**WHEREAS**, these Article VII charges were referred to the designated Article VII Arbitrator, Ruben Armendariz, in accordance with APFA Constitution Article VII, Section 3; and

**WHEREAS**, the Chinery-Lee v Vargas charges were heard on September 14-16, 2021 in Irving, Texas; and

**WHEREAS**, Arbitrator Armendariz rendered a decision in the matter of Chinery-Lee v Vargas on February 18, 2022; and

**WHEREAS**, the remedy states:

"Vargas is to repay APFA for the following:

1. If after the Independent Auditors audit is completed and he/she determines that Vargas had used the APFA credit card for his own personal use on meals during his

---

Exhibit D

tenure as National Treasurer, Vargas is hereby Ordered to repay APFA for all meals he charged to the APFA credit card.

2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.

3. Vargas is hereby fined and ordered to repay the APFA for half of the Arbitrator's Fee for this arbitration.

4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Vargas, that will be the amount to be assessed or due and the BOD or EC shall Order said repayment from Vargas."

; and

**WHEREAS**, the APFA Board of Directors is authorized and empowered to take any and all lawful action consistent with the Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA.

**BE IT THEREFORE RESOLVED**, the APFA affirms the APFA Article VII Arbitrator's decision and remedy and hereby sanctions the following actions:

1. The APFA Board of Directors hereby orders APFA National Treasurer, Erik Harris, to retain an independent auditor to investigate if Vargas had used the APFA credit card for his own personal use on meals during his tenure as National Treasurer. Within 30 days of completion, the results of this investigation shall be remitted to the Board of Directors for review. After this review, the APFA Board of Directors shall order Eugenio Vargas to repay APFA for any monies deemed owed by the independent auditor.

2. The APFA Board of Directors hereby orders the NBC to maintain a record of the Chinery-Lee v Vargas Article VII award to ensure Eugenio Vargas name is removed from any Willingness-to-Serve that he may submit for life.

3. The APFA Board of Directors hereby orders Eugenio Vargas to repay APFA $8,623.17 for the Article VII Arbitrator's fees. The National Treasurer shall be charged with collecting from Vargas consistent with the APFA Constitution, Policy Manual, and any applicable Federal, State, and local laws.

4. Notwithstanding, should any further fees be incurred by the Article VII Arbitrator as it relates to the issuance and implementation of the remedy, fifty percent (50%) of such fees shall be remitted to Eugenio Vargas for repayment.

Exhibit D

(https://www.apfa.org/)

Account (/my-account/)  |  Log In (/account/login/)

| Search here... | 🔍 |

☰

## 3.24.22 – APFA Receives Article VII Arbitration Awards



**Thursday, March 24, 2022**

On March 19th, Arbitrator Ruben R. Armendariz issued a decision in Article VII charges brought under the APFA Constitution and Policy Manual against former APFA National President Bob Ross. Arbitrator Armendariz barred Ross from serving in any APFA position for life, ordered Ross to resign as San Francisco Base President, ordered Ross to repay APFA a substantial sum of money, and ordered an independent audit of certain expenses.

This decision follows a February 18th, 2022 decision that barred former APFA National Treasurer Eugenio Vargas from holding any APFA position for life and fined him half the cost of the arbitration, among other remedies.

Arbitrator Armendariz also ordered sweeping changes in the APFA financial policy, which requires training on allowable expenses, and instructed APFA to create a separate body of trained forensic accountants. This ruling demonstrates that this organization has spent years operating

💬

Exhibit E

Case 4:22-cv-00430-YDocument 129Filed 09/08/22 Page 2 of 444  PageID 5477

without proper financial controls. We have attached the decisions below and encourage all members to educate themselves on these issues.

These charges were brought by APFA members Melissa Chinery and Sandra Lee under Article VII of the APFA Constitution. We thank them for bringing these issues forward. The fact that we are in this place illustrates the need for more reform. You deserve to have your dues money spent according to the strictest financial standards. The dues dollars that allow our union to operate and provide our paychecks are your dollars, and we have a fiduciary responsibility to safeguard union finances.

When our administration took office, we supported financial transparency and committed to upholding the language that members have the right to review the financial information of the union under Article III of the APFA Constitution and federal labor law. Previously, this union has prevented members from reviewing all financial documents. Following prior legal advice, members were only allowed to view monthly financial reports and the LM-2 reports (our annual Department of Labor filing). We believe our past outside attorneys and advisors guided us improperly. We will continue to ensure members are not kept in the dark about dues spending.

To view the Chinery-Lee v Ross Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/7488c141-524c-97d2-1cd8-53b497ea5173/22_Corrected_Decision_Robert_Ross_1.pdf).

To view the Chinery-Lee v Vargas Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/2eb32bb3-8897-24c5-50a7-e8be520735c0/22_Decision_Eugenio_Vargas.pdf).

### Next Steps: Ensuring Financial Transparency and Accountability at APFA

These decisions are a wake-up call for our entire union. As an independent union, we have no parent body to scrutinize our actions and must hold ourselves to the strictest standards. In the coming months, we will be reviewing the APFA Policy Manual to further reform APFA's financial policies. We will fully cooperate with Arbitrator Armendariz's decisions and will draw on the expertise of legal and financial experts.

Financial accountability and transparency have been a priority for our administration. We have taken several steps to ensure that APFA is handling your dues dollars responsibly, including:

- Increasing membership visibility into our financial reports, including audits, LM-2 filings, monthly financial reports, expense and mileage reports, credit card statements, signed contracts and agreements, and payroll registers.

Exhibit E

Case: 4:22-cv-00430-YD Document 129 Filed 06/08/24 Page 3 of 4 PageID 5478

- PA/AR removals (flat rate of 5 hours per day) used for all known meetings (such as Board of Director's Meetings and Executive Committee Meetings). PA/AR days are pre-planned absences placed onto a union Representative's schedule before PBS processes and count towards the Representative's PBS award max (**Policy Manual 5.C.1.g** (https://www.apfa.org/members/)).
- Enforcement of the Financial Reform Initiative resolutions passed at the March 2021 APFA Annual Convention, which included the following updates to the APFA Policy Manual:
  - **Resolution #8- APFA Issued Credit Cards** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/33410129-1e48-4d7f-9286-9085e19b3a86/2021_Conv_08_APFA_Issued_Credit_Cards.01.pdf) creates a new section 5.L in the Policy Manual and limits APFA credit card usage to National Officers. It also requires accountability by ensuring that another National Officer has to sign off on charges, requires strict documentation of all charges, and implements twice-yearly reviews of credit card activity by the Budget Committee. At least one (1) random audit will be performed by the Budget Committee every six (6) months to ensure proper spending, and training on the policy will be required by all incoming National Officers.
  - **Resolution #9- APFA Apartments** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/c4308b62-2a91-4601-ad04-cfb5a33d7e1a/2021_Conv_09_APFA_Apartments.01.pdf) puts more stringent guidelines on spending and inventory for APFA provided apartments. The Budget Committee shall maintain a table of the approved costs for purchasing new or replacement items. It adds a new inventory system to track all items belonging to APFA.
  - **Resolution #10- Business Related Meals** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/ce5361e7-6fd8-4da8-8b5c-17d7420fab2d/2021_Conv_10_Business_Related_Meals.01.pdf) adds policy for group meals to ensure compliance with the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) regarding meals purchased using an APFA credit card. All meal charges must be accompanied by a written explanation of the specific union business conducted during the meal and the full names and titles of all attendees.
  - **Resolution #11- Rental Car Policy & APFA Provided Transportation** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/3f9e49a6-7fe8-421b-aaed-2a21da0f9494/2021_Conv_11_Rental_Car_Polilcy_APFA_Provided_Transportion.01.pdf) adds language that any APFA Representative on union business in DFW should make every effort to utilize APFA-owned vehicles before using a taxi, rental cars, or other paid forms of transportation. This resolution also revises, further defines, and limits APFA Policy Manual Section 5.H.4 by limiting rental car usage by incoming

**Exhibit E**

Case: 22-cv-00430-YD Document 129 Filed 08/24/22 Page 4 of 47 PageID 5479

National Officers to thirty (30) days, except in extenuating circumstances and only upon approval from the APFA Executive Committee.

- ○ **Resolution #12- National Officer Relocation**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/f2c34cd8-f670-44fd-b288-741a6b9fac5f/2021_Conv_12_National_Officer_Relocation.01.pdf) updates the amount allowed for a National Officer to move to DFW. Instead of offering $10,000 round trip for a move to DFW, the Budget Committee shall maintain a table of approved relocation costs. Relocation reimbursement may be provided in accordance with the table.This resolution also limits the time in which a National Officer must decide to move to DFW or take an APFA provided apartment. This change allows the National Officer three (3) months from the election date to make their decision.
  This resolution also limits the amount of time a National Officer may reside in a hotel while deciding to move to DFW or take an APFA apartment. If a National Officer elects to live in an APFA apartment while in DFW, they will not be paid moving expenses if they suddenly change their mind and decide to relocate to DFW.

- ○ **Resolution #13- Collection of Non-Dues Related Monies Owed by APFA Representatives**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/82664914-049c-4ad0-92a7-580d909aa465/2021_Conv_13_Collection_of_Funds_from_APFA_Representatives.01.pdf) adds a new section to the APFA Policy Manual, Section 7.J. It states that Representatives owing non-dues related monies to APFA will receive written notification from the National Treasurer and ensures payment or a payment plan within thirty (30) days of receipt of such notification. If no payment is received, the monies will be sent to a collection agency.

- ○ **Resolution #14- Resignation or Recall of a National Officer**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/901dadb6-fdd1-4990-bd05-b639a67cb8d1/2021_Conv_14_Resignation_or_Recall_of_a_National_Officer.01.pdf) adds new language. Before this resolution, APFA had no written policy or procedure outlining pay and benefits for a resigning or recalled National Officer. This resolution adds a new Section 6.E to the APFA Policy Manual outlining the pay and benefits for a resigning or recalled National Officer and will remove the possibility of any future National Officer exit agreements.

Exhibit E

We will continue to review policies that have been in place for many years and make the changes necessary to ensure APFA is compliant with the Office of Labor-Management Standards (OLMS), the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), and the Internal Revenue Service (IRS) standards for labor unions.

In Solidarity,

*Julie*

**Julie Hedrick**
*APFA National President*

---

*Posted in Hotlines - 2022 (https://www.apfa.org/category/hotline-archives/hotlines-2022/) and tagged National President (https://www.apfa.org/tag/national-president/)*

1004 West Euless Boulevard
Euless, Texas 76040

Phone: (817) 540-0108 (tel:817-540-0108)
Fax: (817) 540-2077 (tel:817-540-2077)

**Headquarters**
M-F: 9:00AM - 5:00PM (CT)

**APFA Phone Reps**
M-F: 7:00AM - 7:00PM (CT)

**After-Hours Live Chat**
M-F: 3:00PM - 11:00 PM (CT)
Sat-Sun: 9:00AM - 5:00PM (CT)

## APFA Events

**2022 Fall Board of Directors Meeting
(https://www.apfa.org/event/2022-fall-board-of-directors-meeting/)**


Exhibit E

**October 25 @ 9:00 am - October 27 @ 5:00 pm**

### Employee Number

95108

### Password

•••••••

Log In

Register (https://www.apfa.org/account/register-
reset-password/)

(https://www.facebook.com/APFAunity) 

(https://twitter.com/APFAunity) 

(http://www.linkedin.com/company/associatio
n-for-professional-flight-attendants) 

(http://www.youtube.com/user/AAflightattend
ants)

(https://www.instagram.com/apfaunity)

Site Map (/sitemap/)
Privacy Policy (https://www.apfa.org/privacy-
policy/)
Terms of Use (/terms-of-use/)
Jobs (/jobs/)

Wings Foundation
(http://www.wingsfoundation.com/)
Airline Ambassadors (http://www.airlineamb.org/)
UNICEF/Change for Good
(http://www.unicefusa.org/campaigns/changeforg
ood/)
APA (http://www.alliedpilots.org/)

Exhibit E 

TWU (http://www.twu.org/)/IAM
(https://www.goiam.org/)
CWA (https://www.cwa-union.org/)-IBT
(https://teamster.org/)

© 2022 APFA | Powered by Beaver Builder (http://www.wpbeaverbuilder.com/?utm_medium=bb-pro&utm_source=bb-
theme&utm_campaign=theme-footer)



Exhibit E

# Exhibit B

# IN THE UNITED STATES DISTRICT
## COURT FOR THE NORTHERN DISTRICT
## OF TEXAS FT. WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS**<br>**Plaintiff/Counterclaim Defendant** | § <br> § <br> § <br> § <br> § | |
| **V.** | § <br> § <br> § <br> § | **Case No. 4:22-cv-00430-Y** |
| **ASSOCIATION OF**<br>**PROFESSIONAL FLIGHT**<br>**ATTENDANTS, JULIE HEDRICK,**<br>**ERIK HARRIS**<br>**Defendants/Counterclaim Plaintiff.** | § <br> § <br> § <br> § <br> § <br> § | |

---

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF AND BRIEF IN SUPPORT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief, brought pursuant to Federal Rules Civil Procedure §§ 12(b)(1) and 12(b)(6).

## I. INTRODUCTION

Eugenio Vargas (hereinafter referred to as "Plaintiff" or "Vargas"), is a member in good standing of the Association of Professional Flight Attendants union (hereinafter "APFA") and the Former National Treasurer. Plaintiff was charged with violations of the APFA policy after enduring three days of arbitration hearings, and an award being issued against him declaring he breached his fiduciary duty to the union. Plaintiff filed his complaint against APFA, the National President, Julie Hedrick, and National Treasurer, Erik Harris, to vacate the arbitration award after

discovering APFA and the National Officers withheld documents and pertinent facts from Plaintiff, the APFA Board of Directors, the APFA Executive Committee members, and Arbitrator Ruben Armendariz in order to acquire an unfavorable arbitration award. Vargas contends this violated his rights under the "Member's Bill of Rights" afforded by the Labor Management Reporting and Disclosure Act, as well as breached the APFA Constitution, and breached the two officer's common-law fiduciary duties to the Plaintiff. Plaintiff asserts Defendants' motivation was Plaintiff's affiliation with and support of Robert "Bob" Ross, the National President during Vargas's term as National Treasurer, and Plaintiff's opposition to a proposed merger of APFA with the Association of Flight Attendants-CWA, AFL-CIO (hereinafter "AFA").

On or about July 14, 2022, Defendants filed a Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support (hereinafter "Motion to Dismiss"). (*See generally, Ex. A, Def's Motion to Dismiss Pl's Claims for Relief and Brief in Support*). Defendants assert the following arguments in their Motion to Dismiss:

(1) Plaintiff's claims fail to meet subject matter jurisdiction,

(2) LMRDA provisions no longer govern any internal union matters, and

(3) all remaining claims asserted by Plaintiff are unfounded either

    (a) due to lack of jurisdictional basis,

    (b) due to lack of meeting Plaintiff's legal obligation "to exhaust the mandatory internal union remedies 'prior to taking any legal action'",

    (c) Plaintiff failed to meet the statutory pre-requisite to filing a claim under §501(a) of the Labor Management Reporting and Disclosure Act, and

    (d) all other claims are preempted by the Arbitration Award. (*See generally, Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, 5-10*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

2

Defendants' Motion to Dismiss provides misleading interpretations of the law, as well as inconsistent interpretations of Plaintiff's claims asserted in this case before the court. A clear understanding of both the law and Plaintiff's position clearly show that Defendant's motion to dismiss should be denied.

## II. <u>STATEMENT OF THE CASE</u>

Plaintiff, EUGENIO VARGAS ("Plaintiff") seeks damages alleging unlawful violations of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, et seq. ("LMRDA"), the Association of Professional Flight Attendants Union Constitution, and Breach of Fiduciary Duty as provided for under Texas Common Law by Defendants APFA, JULIE HEDRICK, AND ERIK HARRIS ("hereinafter Defendants").

APFA is a labor organization covered under the LMRDA, 29 U.S.C. §401 et seq, and 29 U.S.C. § 158, et seq. Plaintiff is a member in good standing of APFA as defined under the LMRDA and 29 U.S.C. § 158. On or about January of 2016, the Plaintiff ran for office within the APFA local union elections. For clarification, Robert "Bob" Ross ran for National President Nena Martin ran for National Vice-President, and Eugenio Vargas ran for National Treasurer.

The Plaintiff won the election, with Robert "Bob" Ross being elected President, Nena Martin elected Vice-President, and Eugenio Vargas Treasurer ("Ross Administration"). The Ross Administration opposed a merger of the union with AFA—another multi-airline flight attendants' union. This created two political factions within APFA competing for power: Pro-APFA/AFA and Anti-APFA/AFA. The individuals comprising the Pro-APFA/AFA faction undertook a course of conduct of retaliation and suppression to thwart the efforts of Plaintiff, as well as others within the local union, to silence the opposition, supplement leadership, and effectuate a merger of the

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

3

two unions.  In 2020, the Hedrick Administration (a Pro-APFA/AFA Administration) was elected to National Office.

Plaintiff was subjected to retaliatory and oppressive actions by their union opponents and were subjected to deliberate attempts to suppress their dissent within in the union. Specifically, but not limited to, Plaintiff Vargas was investigated, charged, coerced into signing a promissory note for an alleged over-payment made for Meal Expense Allowance and Special Assignment Fee. It was only **after** Plaintiff repaid his alleged over-payment and he thought the harassment had ended that the union then charged him as well as others in the Ross Administration with multiple frivolous violations including violations for over-payments made to the Ross Administration. However, Plaintiff's union opponents were not satisfied and unlawfully re-charged Plaintiff and forced  him to go to Arbitration, where an Award was issued that found he violated APFA Policy, declared he breached his fiduciary duty, suspended his right to run for union office, and found damages in excess of $10,000.

After the award was issued, Plaintiff discovered that APFA officers and officials had withheld pertinent documentation from Plaintiff during the arbitration hearings and presented false testimony to the Executive Committee and the Board of Directors.  Furthermore, tactics of intimidation were used to pressure witnesses to not testify in the arbitration proceedings, which altered the results of the award and inhibited Plaintiff's right to a fair and impartial hearing.

Plaintiff was not provided the safeguards against improper disciplinary action provided under the LMRDA. After issuance of the arbitration award against Plaintiff, he discovered documents publicly filed in a lawsuit against Robert "Bob" Ross that contradicted statements the union made prior to and throughout his arbitration that were withheld.  Withholding documentation and misrepresenting the facts is an unconscionable violation to Plaintiff's right to a fair hearing

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                                   4

and goes beyond any rational explanation that could meet a reasonableness standard. The result of this conduct is that Plaintiff is now forced to repay money that has already been repaid and is now prohibited from running for office. Plaintiff seeks to have the arbitration award rescinded, as this hearing was clearly fraudulent and was an over-reach of the power of the arbitrator.

## III. ARGUMENTS AND AUTHORITIES

### A. Standards For Dismissal

An FRCP 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction seeks the dismissal of the lawsuit because the court lacks the authority to hear the dispute. *See generally U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984) [*Attachment 1*]. A claim must be dismissed, pursuant to Rule 12(b)(1), "when the Court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). 29 U.S.C. § 412 clearly states:

> "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

If a FRCP 12(b)(1) motion simply challenges the Court's subject-matter jurisdiction based on the sufficiency of the pleading's allegations, then the motion is a facial attack. *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In a facial attack, the District Court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Ritchie*, 15 F.3d at 598; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

Plaintiff's Response to Defendants' 
Motion to Dismiss Plaintiff's Claims for 
Relief and Brief in Support

5

In resolving the question of subject-matter jurisdiction, the District Court can refer to evidence outside the pleadings. *Luckett v. Bure*, 290 F.3d, 496-97 (2d Cir. 2002); *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002). A motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of the statement of claim for relief in the Plaintiff's complaint. *Doe v. Hillsboro ISD*, 81 F.3d 1395, 1401 (5th Cir. 1996). The motion cannot be used to resolve factual issues or the merits of the case and is not appropriate unless the Plaintiff's pleadings on their face show, beyond a doubt, that the Plaintiff cannot prove any set of facts that would entitle it to relief. *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Hickey v. Obannon*, 287 F.3d 656, 657 (7th Cir. 2002).

Rule 12(b)(6) motions are disfavored in the law, and a Court will rarely encounter circumstances that justify granting them. *Mahone v. Addicks Utility District of Harris County,* 836 F.2d 921, 926 (5th Cir. 1998). A Court may dismiss a claim only when it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations found in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A motion to dismiss should not be granted unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him or her to relief. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

The claimant is not required to set out in detail the facts upon which the claim is based, rather the Rules require that the claim simply give the Defendant "fair notice." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993). Further, a Court may not look beyond the pleadings. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). The Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

6

only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. *See Mahone*, 836 F.2d at 926. The Rules also dictate that the pleadings be liberally construed "as to substantial justice." *Id.*

**B.** **Plaintiffs Have Stated Claims Upon Which Relief May Be Granted**.

    (1).   Plaintiff properly brought his causes of action pursuant to the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*, and provided Defendant "fair notice" therein pursuant to Federal Rule of Civil Procedure § 8(a).

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720, 725 (5th Cir. 2002). The complaint must be liberally construed in favor of the Plaintiff, and all facts pleaded in the complaint must be taken as true. *Id.* Recent decisions by the Supreme Court have elaborated on the pleading standards for civil litigation *See Ashcroft v Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Supreme Court noted two "working principles" in the *Iqbal* and *Twombly* decisions. First, while a Court must accept all factual allegations in the complaint as true, the court need not accept a complaint's legal conclusions as true; and second, a complaint must state a "plausible claim for relief" to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949-50. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id,* at 1949. The court presumes factual allegations to be true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Lindquist v. City of Pasedena*, 525 F.3d 383, 386 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a). As the Supreme Court has

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

7

emphasized, Rule 8 does not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, or "detailed factual allegations," *Iqbal*, 129 S. Ct. at 1949.

Defendants allege that Plaintiff has not stated a claim upon which relief can be granted under the LMRDA. (*Ex. A, Def 's Motion to Dismiss Pl's Claims for Relief, 6*). However, Defendants have wholly failed to provide any legal or factual basis supporting their allegations that Plaintiff cannot state a claim upon which relief can be granted under the LMRDA. Defendants argue that LMRDA does not govern disputes between members as these disputes do not classify as a disciplinary measure by the union. Plaintiff would note that the APFA Const. Art. VII—entitled "Hearings and Disciplinary Procedures"—spells out that members are subject to fine, suspension or expulsion, or suspension from or removal from office for an enumerated list of violations. (APFA Const. Art. VII, Sec. 1 *et. seq.).* Furthermore, Art. VII, Sec. 2 creates the right for any member in good standing to file charges against another member. (*Id.* at Sec. 2 *et. seq.).* The charges are then presented to the APFA Executive Committee, who vote on whether the charges are timely, valid and specific. The accused is then referred to an arbitrator for an arbitration hearing, which ultimately results an award. If the award stipulates the accused member must pay damages, those damages are collected on by the union. In this case, The APRA National President issued a public announcement to all membership on March 24 ,2022 announcing the arbitrations as a result of the unions publications of financial documentation by the union; furthermore, the arbitration awards were adopted by resolution by the APFA Board on March 8, 2022. (*Ex. D Resolution by Board of Directors March 8, 2022; Ex. E, Presidential Hotline to Membership, March 24, 2022*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

8

**C.     Subject Matter Jurisdiction**

(1) The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act.

The issue of federal subject matter jurisdiction "concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." (13 Wright & Miller § 3522, p. 125). Subject matter jurisdiction is a threshold question for any federal court and one that must be answered affirmatively before any matter can be heard before the court. It is within the authority of Congress to confer subject matter jurisdiction onto the federal district courts.

While the Federal Arbitration Act does not confer subject matter jurisdiction since the recent Supreme Court decision of *Badgerow v. Walters* was issued on March 31, 2022 reversing the 5th Circuit Court of Appeals application of the look-through test. (*Badgerow v. Walters*, Docket No. 20-1143 (U.S. Supreme Court, Decided March 31, 2022)). However, in the instant case, the Plaintiff seeks Federal Subject Matter jurisdiction based on its claims stemming from the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

(2)   Subject Matter Jurisdiction is Conferred based on Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

Subject matter jurisdiction exists when a federal question exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. § 1331). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'" (*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 807 (1986) quoting *Franchise Tax Board* v. *Construction Laborers Vacation Trust,* 463 U. S. 1, 8-9 (1983)). An action "arises under" federal law if: (1) "federal law creates the cause of action[,]" or (2) "the vindication of a right under state law necessarily turn[s] on some construction of federal law." (*Merrell Dow Pharm. Inc. v.*

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                    9

*Thompson,* 478 U.S. 804, 808-09 (1986) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.,* 463 U.S. 1, 9 (1983)); *see also, Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312 (2005)).

In the matter before this Court, the cause of action at the heart of the case are those claims falling under the LMRDA § 411, *et seq.* Grounds for a cause of action are created by the federal legislation under LMRDA, 29 U.S.C. § 412 which grants:

> "[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United State for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." (29 U.S.C. § 412).

The cause of action for the unfair hearing and violation of Plaintiff's rights arise from the federal Labor Management Reporting and Disclosure Act, thus subject matter jurisdiction is clearly established.

**D.     Arbitrator's Decision is Subject to Review**

(1) The Arbitrator's Decision Is Subject to Judicial Review

Defendants contend that Plaintiff's basis for setting aside the arbitration award is grounded in LMRDA § 411. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, p. 6*). Plaintiff filed the motion to vacate the arbitration award based on the well-established law that arbitration awards where fraud, corruption, misconduct, or where arbitrators exceeded their authority shall be vacated by the court. (9 U.S.C. § 10). The cause of action under LMRDA §411, *et seq.* is rooted in the Plaintiff's cause of action for damages as a result of the violation of his rights as a union member granted thereunder. Defendants seem to confuse the two laws—one is a means to vacate an invalid award, the other is a means to recover for damages suffered.

Plaintiff's claim under LMRDA are valid and properly asserted claims. The *Supreme* Court

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                    10

coined LMRDA "the product of congressional concern with widespread abuses of power by union leadership." *(Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, (1982)). The *Breininger* Court reviews a steel worker's claim brought against his union denial of referrals at the hiring halls. The question before the Supreme Court was whether the union's actions were considered disciplinary actions that required notice and a fair hearing under LMRDA 101(a)(5). (*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989)) [*Attachment 2*]. The *Breininger* Court found "[t]he fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper disciplinary action,' indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members." (*Id.* at 92). The case addresses the term "otherwise discipline" in the language of LMRDA § 411 for purposes of when a union must give notice and a hearing and when it should not. (*Id).* The Supreme Court holds that "otherwise discipline" indicates "'Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." (*Id.* at 91). At no point does the *Breininger* Court address subject matter jurisdiction. Nor does the *Breininger* Court ever hold that subject matter jurisdiction did not extended to union disciplinary arbitrations.

The *Guidry* Court also did not address subject matter jurisdiction issues, nor did it address arbitration awards regarding union procedures. (*Guidry v. Int'l Union Of Operating Eng.*, *406*, 882 F. 2d 929 (5th Cir. 1989)) [*Attachment 3*]. This Court, instead, addressed a union member's complaint regarding hiring hall procedures between a union and an employer that allowed the union to hire within and outside the union at its discretion. (*Id.* at 933-934). Hiring procedures of one of the Business Agent illustrated that he was exploiting and disregarding the hiring hall procedures to enrich those union members loyal to him—detrimentally to his opponents to silence

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for          11
Relief and Brief in Support

and compel obedience. (*Id*). Here, the Court held that under 101(a)(5) you cannot define depriving job referrals as "discipline" in which notice, and a fair hearing is required. However, when it is done as an imposition on a union member's free speech, it can be prohibitive in its effective under 101(a)(1 and 101(a)(2). (*Guidry v. Int'l Union Of Operating Eng*., 907 F. 2d 1491, 1493 (5th Cir. Ct App. 1990)) [*Attachment 4*]. Furthermore, the *Guidry* Court held that the discipline requirement does not have to be done in the union's name, but if done on behalf of the union as a whole, rather than ad hoc retaliation committed by one union leader, would still fall within the scope of 101(a)(5). (*Id*. at 1492-93).

The discipline complained of by the Plaintiff includes damage to his reputation, fines, expulsion from his position as Base President, and suspension from his ability to serve as an elected official. Furthermore, the charges were brought on behalf of and for the benefit of the union, not for the benefit of the members that brought the charges. Plaintiff can only assume that Defendants' counsel intended to argue that APFA disciplinary procedures are brought conducted by a third-party in that a third party is brought in to conduct the arbitration. If this is Defendants' argument, then this notion disregards the procedures spelled out in the APFA Constitution. The APFA Constitution provides that the National Secretary "shall administer Article VII procedures." (*Ex. B, APFA Const Art. III Sec. 6D(8), pg. 22*). The National Treasurer oversees all financial records, production of all financial documents, maintain computerization of financial documents, oversee all daily activities of the APFA headquarters office and staff, and assist the National Secretary in the discharge of his duties. (*Ex. B, APFA Const Art. III Sec. 6E et seq., pg. 23-24*). The National President acts as the chairperson for the Board of Directors, and the Executive Committee, appoints the members on the Executive Committee, and has the authority to retain and hire legal counsel for the union. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 20-21*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support
12

The Vice-President is empowered to hire counsel for members in arbitrations and grievances and assist the National President in the discharge of all duties. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 21-22*). The Executive Committee, comprised of all four national officers and appointees made by the National President, review and vote on whether charges are timely, specific, and valid prior to any referral of charges to arbitration (*Ex. B, APFA Const Art. VII Sec. 3 et seq., pg. 42-43*). The Board of Directors, which includes all four national officers, appoint an arbitrator to preside over the arbitration. (*Ex. B, APFA Const Art. VII Sec. 5 et seq., pg. 44-45*).

A quick review of the APFA Constitution will illustrate that the only means to bring about a disciplinary action is to file charges by an individual member against another individual member through the arbitration process, which is overseen and conducted by the National Officers. There are no provisions outlined in Art. VII of the APFA Constitution or APFA Policy that provide for APFA to bring charges against a member on behalf of the union—the drafters of the APFA Constitution sought to empower all members to implement discipline against one another for violations. Furthermore, there is no provisions or measure for a member to file charges and bring an action against an officer as an officer. The only means to file charges outlined in Art. VII of the APFA Constitution provides for only one member to file charges against another member. Therefore, the only possible reading of the Article VII Arbitration Procedures of the APFA Constitution is as a disciplinary proceeding falling within the scope of LMRDA otherwise this interpretation would undermine the statute and frustrate the purpose in Congress creating the statute—to protect members from unfair treatment and intimidation tactics.

(2) <u>Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order</u> <u>Comports with Well-Settled Federal Labor Law Principles.</u>

Defendants argue that the labor law principle that an arbitrator's interpretation of a

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

13

collective bargaining agreement is final and not subject for review by the judiciary, therefore the arbitrator's award in the case at issue should stand as final and binding. The review of arbitration awards in labor cases was described by the *Misco* Court as "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." (*United Paper Workers International Union v. Misco, Inc.,* 484 U.S. 29, 36-37 108 S.Ct. 364, 371, (1987)) [*Attachment 5*]. Application of these ordinary contract principles falls squarely within an arbitrator's wide discretion to interpret and apply a collective bargaining agreement. Relying on this interpretation for this case at issue poses three problems: (1) there is not a Collective Bargaining Agreement at issue between Plaintiff and Defendants, (2) this interpretation frustrates the policy and purpose behind the LMRDA and the Member's Bill of Rights as forged by Congress, and (3) labor law principles regarding arbitration still favor vacating arbitration awards in certain circumstances.

The first problem with extending the arbitrator's authority within the case-at-issue is that no Collective Bargaining Agreement is at issue in the current case between Plaintiff and Defendants. "A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301 (a) for breach of that contract." (*Wooddell v. International Bhd. of Elec. Workers,* 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 619-27, 101 S.Ct. 2546, 2549-53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of* 1477*1477 *Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981)). A Collective Bargaining Agreement is one typically defined by "contracts between an employer and a labor organization representing employees. . . ." (29 U.S.C. § 185(a)).

In the case before the court, the employer, American Airlines, Inc., is not a party to the

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

14

Union Constitution, nor were they a party to the charges filed or the union's disciplinary procedures, or the arbitration hearing. This is governed solely by the union constitution—which is a contract between the members and APFA. Therefore, application of the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is not appropriate here.

The second problem with Defendants' argument is that this approach frustrates the policy interest behind enacting LMRDA. The LMRDA policy interest was clear upon Congress's enactment of the legislation: "[t]he legislative history and the extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. (*Local Union No. 38 v. Pelella*, 350 F.3d 73, 83-84 (2nd Cir. 2003) (citing *Salzhandler v. Caputo,* 316 F.2d 445, 449 (2d Cir.1963))). The Second Circuit Court spells out the policy behind the Union Member's "Bill of Rights" in saying that "Section 101 of Title I of the LMRDA represents '[o]ne of the most significant remedial provisions of the LMRDA.' (*Pelella*, 350 F. 3d 73, 84 (citing *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation,* 590 F.2d 1139, 1149 (D.C.Cir.1978))). The Union Member's "Bill of Rights," protects members from the abusive or coercive practices of the union's leadership. (*Franza v. International Brotherhood of Teamsters, Local 671,* 869 F.2d 41, 44 (2d Cir.1989)).

In the case before the court, expansion of the labor law axiom from the limited a Collective Bargaining Agreement to union disciplinary arbitrations would simply stifle and limit the protections afforded to members from abuse of power by union officials and leadership under LMRDA. Congress enacted this statute to safeguard union members from abuses of powers, this interpretations tolerates abuses of power provided a third party arbitrator rules over the disciplinary

proceeding—without regard as to the conduct or integrity of the disciplinary proceedings.

The third problem with Defendants' arguments in support of non-judicial review of the arbitrator's award within a Union's disciplinary proceeding is that it ignores those instances in which the courts have vacated arbitration awards even interpreting a collective bargaining agreement. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960))) [*Attachment 6*]. The Supreme Court in *Garvey,* goes on to state that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award." Here, the court makes clear that when dishonesty has occurred, vacating the arbitration award is the proper recourse. Those "decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced." *Misco*, 484 U.S. 29 at 38-39. Again, these cases apply to those where the arbitration occurs as a result of a collective bargaining agreement. In the case before the court, dishonesty *has* been asserted, if not clearly established by the documents attached to Plaintiff's Original Complaint. (*Ex. C, Pl's Original Compl.*). Therefore, even if a heightened standard to vacate the union's disciplinary action were applied, the arbitrator's award at issue should still be vacated per the labor law principles due to the Defendants' fraud—however, at the very least, Plaintiff's motion to dismiss should be denied.

**E.    Plaintiff's Remaining Claims Have Merit**

(1)  Jurisdictional Basis for Remaining Claims is rests in *Gibbs* Supplement Jurisdiction

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

16

As previously discussed, the Supreme Court held that "[a] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). Furthermore, 28 U.S.C. §1331 requirements are met when a case generally arises under federal law when that federal law creates the cause of action. (*Grable & Sons*, 545 U.S. 308, 312).

State law claims asserted between the same parties, based on the same nucleus of facts that gave rise to the cause of action which forms the basis of subject matter jurisdiction, may be heard based on supplemental or pendent jurisdiction. In *Finley*, the Supreme Court reaffirmed what it previously held in *Gibbs* finding that "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [which] comprises but one constitutional 'case.'" (*Finley* v. *United States,* 490 U. S. 545, 548 (1989) quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966)) [*Attachment 7*].

In the case before the court, subject matter jurisdiction is conferred based on federal question because the cause of action *arises out of* the LMRDA, 29 U.S.C. § 412. Supplemental jurisdiction over state law claims can be founded on the *Gibbs* case and its progeny of broadly interpreting jurisdictional authority over state law claims within an action properly embedded in federal question jurisdiction.

(2) <u>Exhaustion of Internal Remedies was not Required Prior to Filing Suit</u>.

Plaintiff is not required to exhaust internal remedies as a pre-requisite to filing suit against

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

17

the Defendants. Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts the discretion to hear a union member claim or require a union member to exhaust his internal remedies before filing suit. (*See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982). *Guidry v. Operating Engineers Local 406*, 882 F. 2d 1491, (5th Cir. 1990)).

However, Plaintiff *did* exhaust his internal remedies prior to filing suit; Plaintiff pursued arbitration and attended the hearings. Plaintiff called witnesses that were not required to appear or that were intimidated and discouraged from testifying on behalf of the Plaintiff during the arbitration. Plaintiff brought this lawsuit after discovering that the Union and the National Officers conspired to withhold documents and mis-informed APFA officials to achieve a guilty result.

### (3) Common Law Breach of Fiduciary Duty Claims require compliance with LMRDA § 501(b).

The Breach of Fiduciary Duty claims brought against the officers were asserted under Texas Common Law, similar to the counterclaim asserted by Defendant. LMRDA § 501(a) clearly asserts a cause of action against an officer that spends union funds or for purposes of pecuniary or personal gain. Plaintiff's Complaint never asserted any facts regarding the officers' conduct pertaining to their spending of union funds, rather Plaintiff's complaints clearly focus on the withholding of documents, the presentation of false facts, defamation of his character, and conspiring to defame his character. Consequently, any pre-requisite needed to comply with LMRDA § 501(b) is moot, as no claim under LMRDA § 501(a) have been asserted.

### (4) Preemption of the Breach of Union Constitution and Breach of Fiduciary Duty claims cannot exist based on the Fraudulent Arbitration Award.

Preemption of the remaining claim cannot be based on an Arbitration that were not based

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

18

on any claims brought by the Plaintiff and did not address any of the grievances or damages Defendants imposed on the Plaintiff. The Supreme Court finds preemption of state law claims only when the claim is dependent on interpretation of a Collective Bargaining Agreement. (*Hawaiian Airlines v. Norris*, 512 U.S. 246 (1994); *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004)). Consequently, since no Collective Bargaining Agreement is at issue in the case before the Court, then there is no preemption of the state law claims brought against the Defendants.

### F. Plaintiff Has Satisfied the "Fair Notice" Pleading Requirements Pursuant to Federal Rule of Civil Procedure 8(a).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. (Fed. R. Civ. P. 8(a)). As the Supreme Court has emphasized, this rule does not require "heightened fact pleading of specifics," or "detailed factual allegations," (*Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949). Plaintiff provided an extremely detailed pleading outlining specific violations of the LMRDA by Defendants. (*Ex. C, Pl's Original Compl.*).

The law clearly states that the Claimant is not required to set out in detail the facts upon which the claim is based, rather the Rules require that the claim simply give the Defendants "fair notice." (*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993)). Further, the Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. (*See Mahone*, 836 F.2d at 926). The Rules also dictate that the pleadings be liberally construed "as to substantial justice." (*Id).* Plaintiff has met his burden of providing a detailed factual basis and specific statutory protections along with specific relief. (*Ex. C, Pl's Original*

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

19

*Compl.*).

## IV. CONCLUSION AND PRAYER

In conclusion, Plaintiff clearly plead, and sought protection and relief, pursuant to his rights as a member of a labor organization under the LMRDA. Plaintiff alleged and asserted a detailed factual background demonstrating how Defendants violated his rights. Plaintiff has provided Defendant with fair notice of the allegations and facts of his claims pursuant to Federal Rule of Civil Procedure 8(a) and the local rules of this Court. Plaintiff cited specific clauses under the LMRDA under which their rights are protected, and relief is available. Further, Plaintiff has also demonstrated that Plaintiff has only plead relief sought from this Court in its official capacity, and that sound case law exists to protect his rights. For the reasons state herein, Plaintiff requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By:  /s/ Heather Abreu
    Heather Abreu
    Texas Bar No. 24122577
    Phone: (972) 327-5800
    Email: heather@KDphillipslaw.com

By:  /s/ Kerri Phillips
    Kerri Phillips
    Texas Bar No. 24065906
    Phone: (972) 327-5800
    Email: kerri@KDphillipslaw.com

5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com
**ATTORNEYS FOR PLAINTIFF**

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

20

## <u>CERTIFICATE OF</u>
## <u>SERVICE</u>

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing and Facsimile **on this the 10<u>th</u> Day of August 2022.**

William Osborne
Margot Nikitas
Sanford Denison

/s/ _____

Heather Abreu

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

21

(Slip Opinion)      OCTOBER TERM, 2021      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BADGEROW *v.* WALTERS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–1143. Argued November 2, 2021—Decided March 31, 2022

The Federal Arbitration Act authorizes a party to an arbitration agreement to petition a federal court for various forms of relief. But the Act's authorization of such petitions does not itself create the subject-matter jurisdiction necessary for a federal court to resolve them. Rather, the federal court must have an "independent jurisdictional basis" to do so. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582. In *Vaden* v. *Discover Bank*, 556 U. S. 49, this Court assessed whether there was a jurisdictional basis to decide an FAA Section 4 petition to compel arbitration by means of examining the parties' underlying dispute. The Court reasoned that specific language in Section 4 instructed a federal court to "look through" the petition to the "underlying substantive controversy." *Id.,* at 62. If the dispute underlying a Section 4 petition falls within the court's jurisdiction—for example, by presenting a federal question—then the court may rule on the petition to compel arbitration.

In this case, the question presented is whether that same "look-through" approach to jurisdiction applies to applications to confirm or vacate arbitral awards under Sections 9 and 10 of the FAA. Petitioner Denise Badgerow initiated an arbitration proceeding against her employer's principals (collectively, Walters), alleging that she was unlawfully terminated. After arbitrators dismissed Badgerow's claims, she filed suit in Louisiana state court to vacate the arbitral award. Walters removed the case to Federal District Court and applied to confirm the award. Badgerow then moved to remand the case to state court, arguing that the federal court lacked jurisdiction to resolve the parties' requests—under Sections 10 and 9 of the FAA, respectively—to vacate or confirm the award. The District Court applied *Vaden*'s look-through approach, finding jurisdiction in the federal-law claims contained in

2                 BADGEROW *v.* WALTERS

Syllabus

Badgerow's underlying employment action. The District Court acknowledged that Sections 9 and 10 of the FAA lack the distinctive text on which *Vaden* relied, but it applied the look-through approach anyway so that "consistent jurisdictional principles" would govern all kinds of FAA applications. The Fifth Circuit affirmed.

*Held*: *Vaden*'s "look-through" approach to determining federal jurisdiction does not apply to requests to confirm or vacate arbitral awards under Sections 9 and 10 of the FAA. Pp. 4–16.

(a) Congress has granted federal district courts jurisdiction over two main kinds of cases: suits between citizens of different States as to any matter valued at more than $75,000 (diversity cases), 28 U. S. C. §1332(a), and suits "arising under" federal law (federal-question cases), §1331. Normally, a court has federal-question jurisdiction whenever federal law authorizes an action. But because this Court has held that the FAA's provisions do not themselves support federal jurisdiction, a federal court must find an independent basis for jurisdiction to resolve an arbitral dispute. In this case, neither application reveals a jurisdictional basis on its face. So to find an independent basis for jurisdiction, the District Court had to look through the Section 9 and 10 applications to the underlying substantive dispute, where a federal-law claim satisfying §1331 indeed exists.

In *Vaden*, this Court approved the look-through approach for a Section 4 petition by relying on that section's express language. That language provides that a party to an arbitration agreement may petition for an order to compel arbitration in a "United States district court which, save for [the arbitration] agreement, would have jurisdiction" over "the controversy between the parties." "The phrase 'save for [the arbitration] agreement,'" the Court stated, "indicates that the district court should assume the absence of the arbitration agreement and determine whether [the court] 'would have jurisdiction . . .' without it" by looking through to the "underlying substantive controversy" between the parties. 556 U. S., at 62.

Sections 9 and 10 of the FAA contain none of the statutory language on which *Vaden* relied. So under ordinary principles of statutory construction, the look-through method should not apply. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act," this Court generally takes the choice to be deliberate. *Collins* v. *Yellen*, 594 U. S. ___, ___. That holds true for jurisdictional questions, as federal "district courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 552. Because a statutory basis for look-through jurisdiction is lacking in Sections 9 and 10, the Court cannot reach the same result here as in *Vaden*. Pp. 4–9.

Attachment 1

Syllabus

(b) Walters presents a two-part argument to justify exercising jurisdiction here. Walters first claims that Section 4's language does not authorize look-through jurisdiction, but is only a capacious venue provision designed to give applicants a broad choice among federal courts possessing jurisdiction. Walters next construes Section 6—which requires any FAA application to "be made and heard in the manner provided by law for the making and hearing of motions"—to provide the basis for an FAA-wide look-through rule.

Walters's reading of Section 4 does not comport with how *Vaden* understood Section 4 or with the actual text of that provision, which never mentions venue, and refers only to jurisdiction. And Walters's Section 6 argument fares no better. Courts do not possess jurisdiction to decide ordinary motions by virtue of the look-through method. So Congress would not have prescribed that method by telling courts, as Section 6 does, to treat FAA applications like motions. Pp. 9–12.

(c) Walters also makes several policy arguments preaching the virtues of adopting look-through as a uniform jurisdictional rule. Walters claims that a uniform rule will promote "administrative simplicity"; that the look-through approach will be "easier to apply" than a test grounding jurisdiction on the face of the FAA application itself; and that the look-through rule will provide federal courts with more comprehensive control over the arbitration process. Brief for Respondents 27, 28. But "[e]ven the most formidable policy arguments cannot overcome a clear statutory directive." *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. ___, ___. And anyway, Walters oversells the superiority of his proposal. First, uniformity in and of itself provides no real advantage here because courts can easily tell whether to apply look-through or the normal jurisdictional rules. Second, the use of those ordinary rules, in the context of arbitration applications, is hardly beyond judicial capacity. And third, there are good reasons why state, rather than federal, courts should handle applications like these in this case. Pp. 12–16.

975 F. 3d 469, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, SOTOMAYOR, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. BREYER, J., filed a dissenting opinion.

Attachment 1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 20–1143

—————

## DENISE A. BADGEROW, PETITIONER *v.* GREG WALTERS, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 31, 2022]

JUSTICE KAGAN delivered the opinion of the Court.

The Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*, authorizes a party to an arbitration agreement to seek several kinds of assistance from a federal court. Under Section 4, for example, a party may ask the court to compel an arbitration proceeding, as the agreement contemplates. And under Sections 9 and 10, a party may apply to the court to confirm, or alternatively to vacate, an arbitral award.

Yet the federal courts, as we have often held, may or may not have jurisdiction to decide such a request. The Act's authorization of a petition does not itself create jurisdiction. Rather, the federal court must have what we have called an "independent jurisdictional basis" to resolve the matter. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582 (2008).

In *Vaden* v. *Discover Bank*, 556 U. S. 49 (2009), we assessed whether there was a jurisdictional basis to decide a Section 4 petition to compel arbitration by means of examining the parties' underlying dispute. The text of Section 4, we reasoned, instructs a federal court to "look through" the

petition to the "underlying substantive controversy" be-
tween the parties—even though that controversy is not be-
fore the court. *Id.*, at 62. If the underlying dispute falls
within the court's jurisdiction—for example, by presenting
a federal question—then the court may rule on the petition
to compel. That is so regardless whether the petition alone
could establish the court's jurisdiction.

The question presented here is whether that same "look-
through" approach to jurisdiction applies to requests to con-
firm or vacate arbitral awards under the FAA's Sections 9
and 10. We hold it does not. Those sections lack Section 4's
distinctive language directing a look-through, on which
*Vaden* rested. Without that statutory instruction, a court
may look only to the application actually submitted to it in
assessing its jurisdiction.

## I

This case grows out of the arbitration of an employment
dispute. Petitioner Denise Badgerow worked as a financial
advisor for REJ Properties, a firm run by respondents Greg
Walters, Thomas Meyer, and Ray Trosclair. (For ease of
reference, we refer from now on only to Walters.)
Badgerow's contract required her to bring claims arising
out of her employment to arbitration, rather than to court.
So when she was (in her view, improperly) fired, she initi-
ated an arbitration action against Walters, alleging unlaw-
ful termination under both federal and state law. The ar-
bitrators sided with Walters, dismissing Badgerow's
claims.

What happened afterward—when Badgerow refused to
give up—created the jurisdictional issue we address today.
Believing that fraud had tainted the arbitration proceeding,
Badgerow sued Walters in Louisiana state court to vacate
the arbitral decision. Walters responded by removing the
case to Federal District Court—and, once there, applying to
confirm the arbitral award. Finally, Badgerow moved to

Opinion of the Court

remand the case to state court, arguing that the federal court lacked jurisdiction over the parties' requests—under Sections 10 and 9, respectively—to vacate or confirm the award.

The District Court assessed its jurisdiction under the look through approach this Court adopted in *Vaden* v. *Discover Bank*. See 2019 WL 2611127, *1 (ED La., June 26, 2019). That approach, as just noted, allows a federal court to exercise jurisdiction over an FAA application when the parties' underlying substantive dispute would have fallen within the court's jurisdiction. See *supra*, at 1–2. The District Court acknowledged that *Vaden* involved a different kind of arbitration dispute: It concerned a petition to compel arbitration under the FAA's Section 4, rather than an application to confirm or vacate an arbitral award under Section 9 or 10. And *Vaden*'s "reasoning was grounded on specific text" in Section 4 that Sections 9 and 10 "do[] not contain." 2019 WL 2611127, *2. But the court thought it should apply the look-through approach anyway, so that "consistent jurisdictional principles" would govern all kinds of FAA applications. *Ibid.* And under that approach, the court had jurisdiction because Badgerow's underlying employment action raised federal-law claims. The court thus went on to resolve the dispute over whether fraud had infected the arbitration proceeding. Finding it had not, the court granted Walters's application to confirm, and denied Badgerow's application to vacate, the arbitral award.

The United States Court of Appeals for the Fifth Circuit affirmed the District Court's finding of jurisdiction, relying on a just-issued Circuit precedent. See 975 F. 3d 469, 472–474 (2020) (citing *Quezada* v. *Bechtel OG&C Constr. Servs., Inc.*, 946 F. 3d 837, 843 (2020)). In that decision, the Fifth Circuit had echoed the reasoning of the District Court here. Yes, the language of Section 4 directing use of the look-through approach "is in fact absent in" the FAA's other sec-

tions. 946 F. 3d, at 842. But, the court continued, a "principle of uniformity" applying to the FAA "dictates using the same approach for determining jurisdiction under each section of the statute." *Ibid.*; but see *id.*, at 845–846 (Ho, J., dissenting) (rejecting that asserted principle in favor of "[f]idelity to text"). As applied to this case, that analysis meant that the district court had jurisdiction over Walters's Section 9 and Badgerow's Section 10 applications.

Courts have divided over whether the look-through approach used in *Vaden* can establish jurisdiction in a case like this one—when the application before the court seeks not to compel arbitration under Section 4 but to confirm, vacate, or modify an arbitral award under other sections of the FAA.[1] We granted certiorari to resolve the conflict, 593 U. S. ___ (2021), and now reverse the judgment below.

## II

The district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute. See, *e.g.*, *Kokkonen* v. *Guardian Life Ins. Co. of America*, 511 U. S. 375, 377 (1994). Congress has granted those courts jurisdiction over two main kinds of cases. District courts have power to decide diversity cases—suits between citizens of different States as to any matter valued at more than $75,000. See 28 U. S. C. §1332(a). And they have power to decide federal-question cases—suits "arising under" federal law. §1331. Typically,

──────────

[1] Compare *Quezada* v. *Bechtel OG&C Constr. Servs., Inc.*, 946 F. 3d 837, 843 (CA5 2020) (holding that the look-through approach applies to applications to confirm, vacate, or modify an arbitral award); *Ortiz-Espinosa* v. *BBVA Securities of P. R., Inc.*, 852 F. 3d 36, 47 (CA1 2017) (same); *Doscher* v. *Sea Port Group Securities, LLC*, 832 F. 3d 372, 381–388 (CA2 2016) (same); *McCormick* v. *America Online, Inc.*, 909 F. 3d 677, 680–684 (CA4 2018) (same), with *Goldman* v. *Citigroup Global Markets Inc.*, 834 F. 3d 242, 252–255 (CA3 2016) (holding that the look-through approach does not apply to those applications); *Magruder* v. *Fidelity Brokerage Servs.*, 818 F. 3d 285, 287–289 (CA7 2016) (same).

Opinion of the Court

an action arises under federal law if that law "creates the cause of action asserted." *Gunn* v. *Minton*, 568 U. S. 251, 257 (2013). So when federal law authorizes the action, the party bringing it—once again, typically—gets to go to federal court.

But that is not necessarily true of FAA-created arbitration actions. As noted above, the FAA authorizes parties to arbitration agreements to file specified actions in federal court—most prominently, petitions to compel arbitration (under Section 4) and applications to confirm, vacate, or modify arbitral awards (under Sections 9 through 11). See *supra*, at 1. But those provisions, this Court has held, do not themselves support federal jurisdiction. See *Hall Street*, 552 U. S., at 581–582; *Vaden*, 556 U. S., at 59. (Were it otherwise, every arbitration in the country, however distant from federal concerns, could wind up in federal district court.) A federal court may entertain an action brought under the FAA only if the action has an "independent jurisdictional basis." *Hall Street*, 552 U. S., at 582. That means an applicant seeking, for example, to vacate an arbitral award under Section 10 must identify a grant of jurisdiction, apart from Section 10 itself, conferring "access to a federal forum." *Vaden*, 556 U. S., at 59. If she cannot, the action belongs in state court. The FAA requires those courts, too, to honor arbitration agreements; and we have long recognized their "prominent role" in arbitral enforcement. *Ibid.*; see *id.,* at 71; *Southland Corp.* v. *Keating*, 465 U. S. 1, 12–16 (1984).[2]

───────────

[2] This Court has held that the FAA's core substantive requirement—Section 2's command to enforce arbitration agreements like other contracts—applies in state courts, just as it does in federal courts. See *Southland Corp.*, 465 U. S., at 12–16. We have never decided whether the FAA's more procedural provisions, including Sections 4 and 9 through 11, also apply in state courts. See *Vaden*, 556 U. S., at 71, n. 20; see also *post,* at 7 (BREYER, J., dissenting) (expressing concern that they do not). But we have made clear that Section 2 "carries with it" a duty for States to provide certain enforcement mechanisms equivalent to the

Opinion of the Court

The issue here is about where a federal court should look to determine whether an action brought under Section 9 or 10 has an independent jurisdictional basis. An obvious place is the face of the application itself. If it shows that the contending parties are citizens of different States (with over $75,000 in dispute), then §1332(a) gives the court diversity jurisdiction. Or if it alleges that federal law (beyond Section 9 or 10 itself) entitles the applicant to relief, then §1331 gives the court federal-question jurisdiction. But those possibilities do Walters no good. He and Badgerow are from the same State. And their applications raise no federal issue. Recall that the two are now contesting not the legality of Badgerow's firing but the enforceability of an arbitral award. That award is no more than a contractual resolution of the parties' dispute—a way of settling legal claims. See *Vaden*, 556 U. S., at 63. And quarrels about legal settlements—even settlements of federal claims—typically involve only state law, like disagreements about other contracts. See *Kokkonen*, 511 U. S., at 378–382. So the District Court here, as Walters recognizes, had to go beyond the face of the Section 9 and 10 applications to find a basis for jurisdiction. See Brief for Respondents 26–27. It had to proceed downward to Badgerow's employment action, where a federal-law claim satisfying §1331 indeed exists. In other words, the court had to look through the Section 9 and 10 applications to the underlying substantive dispute, although that dispute was not before it. Could the court do so?

———————

FAA's. See *Vaden*, 556 U. S., at 71 (referring specifically to Sections 3 and 4). And most, if not all, States in fact provide procedural vehicles, similar to those in the FAA, to enforce arbitration agreements—including, as here, to resolve post-arbitration disputes by means of confirming, modifying, or vacating arbitral awards. See, *e.g.,* Revised Uniform Arbitration Act of 2000 §§22–24, 7 U. L. A. 26 (2009) (adopted in 21 States and the District of Columbia); Cal. Civ. Proc. Code Ann. §§1285–1287.6 (West 2022); N. Y. Civ. Prac. Law Ann. §§7510–7511 (West 2022).

Opinion of the Court

In *Vaden,* this Court approved the look-through approach for a Section 4 petition, relying on that section's express language. Under Section 4, a party to an arbitration agreement may petition for an order to compel arbitration in a "United States district court which, save for [the arbitration] agreement, would have jurisdiction" over "the controversy between the parties."[3] That text, we stated, "drives our conclusion that a federal court should determine its jurisdiction by 'looking through' a §4 petition to the underlying substantive controversy"—to see, for example, if that dispute "'arises under' federal law." 556 U. S., at 62.

To show why that is so, we proceeded methodically through Section 4's wording. "The phrase 'save for [the arbitration] agreement,'" we began, "indicates that the district court should assume the absence of the arbitration agreement and determine whether [the court] 'would have jurisdiction . . .' without it." *Ibid.* (first alteration in original). But "[j]urisdiction over what?" *Ibid.* "The text of Section 4," we continued, "refers us to 'the controversy between the parties.'" *Ibid.* And that "controversy," we explained, could not mean the dispute before the court about "the existence or applicability of an arbitration agreement"; after all, the preceding save-for clause had just "direct[ed] courts" to assume that agreement away. *Id.*, at 63. The "controversy between the parties" instead had to mean their "underlying substantive controversy." *Id.*, at 62 (internal quotation marks omitted). "Attending to the language" of

_____

[3] In full, the relevant sentence of Section 4 reads: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

Opinion of the Court

Section 4 thus required "approv[ing] the 'look through' approach" as a means of assessing jurisdiction over petitions to compel arbitration. *Ibid.* The opposite view was not merely faulty; it was "textual[ly] implausib[le]." *Id.*, at 65.

But Sections 9 and 10, in addressing applications to confirm or vacate an arbitral award, contain none of the statutory language on which *Vaden* relied. Most notably, those provisions do not have Section 4's "save for" clause. They do not instruct a court to imagine a world without an arbitration agreement, and to ask whether it would then have jurisdiction over the parties' dispute. Indeed, Sections 9 and 10 do not mention the court's subject-matter jurisdiction at all.[4] So under ordinary principles of statutory construction, the look-through method for assessing jurisdiction should not apply. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act," we generally take the choice to be deliberate. *Collins* v. *Yellen*, 594 U. S. ___, ___ (2021) (slip op., at 23) (internal quotation marks omitted). We have no warrant to redline the FAA, importing Section 4's consequential language into provisions containing nothing like it. Congress could have replicated Section 4's look-through instruction in Sections 9 and 10. Or for that matter, it could have drafted a global look-through provision, applying the approach throughout the FAA. But Congress did neither. And its decision governs.

_____

[4] Section 9 provides, in relevant part, that if an arbitration agreement states "that a judgment of the court shall be entered upon the [arbitral] award," then a "party to the arbitration may apply" within a year to the federal court located where the award was made (or any other court specified) "for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected" as the Act otherwise prescribes.

Section 10 provides, in relevant part, that a United States court "may make an order vacating the award upon the application of any party to the arbitration" if the award is tainted in any of four specified ways.

Opinion of the Court

Nothing in that conclusion changes because a jurisdictional question is before us. The federal "district courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 552 (2005). And the jurisdiction Congress confers may not "be expanded by judicial decree." *Kokkonen*, 511 U. S., at 377. Those bedrock principles prevent us from pulling look-through jurisdiction out of thin air—from somehow finding, without textual support, that federal courts may use the method to resolve various state-law-based, non-diverse Section 9 and 10 applications. The look-through rule is a highly unusual one: It locates jurisdiction not in the action actually before the court, but in another controversy neither there nor ever meant to be. We recognized that rule in *Vaden* because careful analysis of Section 4's text showed that Congress wanted it applied to petitions brought under that provision. See 556 U. S., at 62–65. But Congress has not so directed in Sections 9 and 10. Congress has not authorized a federal court to adjudicate a Section 9 or 10 application just because the contractual dispute it presents grew out of arbitrating different claims, turning on different law, that (save for the parties' agreement) could have been brought in federal court. And because a statutory basis for look-through jurisdiction is lacking here, we cannot reach the same result as in *Vaden*: That would indeed be jurisdictional "expan[sion] by judicial decree." *Kokkonen*, 511 U. S., at 377.

Walters contests that view of the statute. Unlike the Courts of Appeals to have adopted his position, including the Fifth Circuit below, see *supra*, at 3–4, he offers a reading of the FAA's text to justify exercising jurisdiction here.[5]

───────────

[5] By contrast, the dissenting opinion reads, from start to finish, more like the decisions of the courts below: Even when that opinion finally turns to the FAA's text, it emphasizes something much like the lower courts' uniformity principle. See *post,* at 9–11; *supra,* at 3–4. Because, the dissent says, all the FAA's sections "describe connected components

Opinion of the Court

Walters's argument comes in two parts. First, Walters says, the language in Section 4 that *Vaden* construed does not in fact authorize the use of the look-through jurisdictional method. In his view, that sentence is only a capacious "*venue* provision," serving to "expand[] venue to the limits of [federal] jurisdiction" (and thus to give an applicant a broad choice *among* federal courts possessing jurisdiction). Brief for Respondents 12, 23. Second, Walters claims that Section 6 provides the basis for an FAA-wide look-through jurisdictional rule. Under Section 6, any FAA application "shall be made and heard in the manner provided by law for the making and hearing of motions." That provision, Walters claims, requires use of the look-through approach because "[f]ederal courts have jurisdiction over motions when they have jurisdiction over the underlying action." Brief for Respondents 19 (internal quotation marks omitted). So to recap Walters's theory: Section 4 does not establish any jurisdictional rule for applications to compel in particular, while Section 6 establishes the look-through jurisdictional rule for all kinds of FAA applications.

But Walters's understanding of Section 4 does not comport with what it says. The language of that provision never mentions "venue"; it refers only to "jurisdiction." That is a signal, sharp and clear, that the section provides a jurisdictional rule. And even suppose (against all odds) that Congress had meant to state the venue rule Walters proposes without ever using the word "venue." In that

---

of a single matter" (namely, a "court's arbitration-related enforcement power"), and because those provisions serve the same "general purpose[]," the statute "permits" a court to hold that "Section 4's jurisdictional rule should apply throughout." *Post,* at 9–12. But the (nigh-inevitable) connection among a statute's diverse provisions does not give a court carte blanche to move rules or concepts from any one section to any or all others. For the reasons already stated, we cannot read this nonuniform statute—setting out a jurisdictional rule in one section but conspicuously omitting it in all others—as though it applied a single rule throughout. See *supra,* at 8–9.

Opinion of the Court

event, Congress could have simply permitted filing the petition in any district court with jurisdiction (or even more simply—because a court can never act without jurisdiction—in any district court). Given that (in Walters's view) the jurisdictional rule comes from another provision, Congress would not have needed to (again) spell out its content. But spelling out the rule's content—by describing the look-through method—is exactly what Section 4 does. That description can serve one purpose only: to establish jurisdiction where it would otherwise not exist.

And that is how *Vaden* understood Section 4. Our decision, like the relevant text, never once referred to venue. Instead, we spoke, throughout the opinion, of the way Section 4 provides for jurisdiction. We formulated the question presented as whether the district court could "exercise jurisdiction over [the party's] §4 petition." 556 U. S., at 53; see *id.*, at 57 (stating that "[w]e granted certiorari" to decide whether district courts could use the look-through method "to determine whether federal-question jurisdiction exists over [a] §4 petition"). And we framed our holding as about jurisdiction: "[A] federal court should determine its jurisdiction by 'looking through' a §4 petition." *Id.*, at 62; see *id.*, at 72 (ROBERTS, C. J., dissenting) (differing about the rule's application, but agreeing that a court presented with a Section 4 petition should use the look-through method "in determining whether it has jurisdiction"). In short, Section 4's "save for" text "dr[ove] our conclusion" not about venue, but about "jurisdiction." *Id.*, at 62. And so that text, as shown above, contradicts Walters's position—for it appears in Section 4 alone, rather than also in Sections 9 and 10. See *supra*, at 8–9.

Walters's theory fares no better in construing Section 6's mention of motions to prescribe a look-through rule for the whole FAA. Here, Walters commits the opposite of his fault in reading Section 4: He now reads a provision containing

no express reference to jurisdiction in fact to set out a juris-
dictional rule. There may be rare contexts in which courts
can, without such a reference, "infer that Congress has ex-
panded our jurisdiction"—but this is not one. *Welch* v.
*Texas Dept. of Highways and Public Transp.*, 483 U. S. 468,
474 (1987) (plurality opinion). The look-through method, as
noted before, is a jurisdictional outlier. See *supra*, at 9. For
Congress to prescribe it by telling courts, a la Section 6, to
treat FAA applications like motions in other kinds of litiga-
tion would be not just oblique but simply bizarre. Courts,
after all, do not possess jurisdiction to decide ordinary mo-
tions by virtue of the look-through method. A motion (un-
like a typical FAA application) is part of a case actually in
court. Jurisdiction to decide the case includes jurisdiction
to decide the motion; there is no need to "look through" the
motion in search of a jurisdictional basis outside the court.
And if the look-through rule does not apply to motions, then
Section 6's reference to motions cannot direct the look-
through rule. We have formerly described that provision's
function as something different: Section 6, we said, ensures
that FAA applications "get streamlined treatment"—a kind
of "expedited review," as compared to what a party would
receive if she brought a normal contract suit. *Hall Street*,
552 U. S., at 582, and n. 3. However hard we squint, we
cannot also discern in Section 6 an FAA-wide look-through
rule; the only such rule in the FAA, applying only to peti-
tions to compel, resides in Section 4.

Walters's more thought-provoking arguments sound not
in text but in policy. Here, Walters—now joined by the dis-
sent—preaches the virtues of adopting look-through as a
"single, easy-to-apply jurisdictional test" that will produce
"sensible" results. Brief for Respondents 28 (internal quo-
tation marks omitted); see *post*, at 4–9 (opinion of BREYER,
J.) (lauding the "advantages" of look-through's "practical
consequences"). First, Walters says, a uniform jurisdic-

Attachment 1

Opinion of the Court

tional rule, applying to all FAA applications alike, will necessarily promote "administrative simplicity" because a court will not have to figure out which rule to apply. Brief for Respondents 27. Second, he claims, the look-through rule is "easier to apply" than a test that would ground jurisdiction on the face of the FAA application itself. *Id.,* at 28 (internal quotation marks omitted). In particular, he says, the latter approach confronts courts with "hard questions" about how to determine diversity jurisdiction (including its amount-in-controversy component) across a range of settings—for the Section 9 and 10 applications at issue here, as well as for Section 5 and 7 petitions (obviously not at issue) to appoint arbitrators or compel the presence of witnesses. *Id.,* at 41. (The dissent's vaunted practical "advantages" also mostly concern avoiding those diversity issues. *Post,* at 4; see *post*, at 4–7.)[6] Finally, Walters contends that only the look-through rule will provide federal courts with comprehensive control over the arbitration process, including the period after the award. The opposite position, he says, will "close the federal courthouse doors to many" post-arbitration motions, even when they grow out of disputes raising "*exclusively* federal claims." Brief for Respondents 37, 46.

Walters himself quotes back to us the topline answer to those theories, reflecting its obviousness: "Even the most formidable policy arguments cannot overcome a clear statutory directive." *Id.,* at 44 (quoting *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. ___, ___ (2021) (slip op., at 12); alteration omitted). Walters's (and the dissent's) what-makes-best-sense assertions rest on the view that

---

[6]The dissent's lead item in this vein concerns a Section 5 petition to appoint an arbitrator that is made "in tandem with" a Section 4 petition over which a federal court has jurisdiction. *Post*, at 5. Because Section 5 is not at issue here, we do not express any view about whether the relationship that the dissent hypothesizes would give the court jurisdiction over the appointment request.

Opinion of the Court

"the FAA contains no" such clear "directive" limiting look-through jurisdiction to Section 4.  Brief for Respondents 44–45; see *post,* at 10.  Having rejected that view, we cannot find much relevance in his ideas, even if plausible, about the optimal jurisdictional rule for the FAA.  "It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction." *Whitmore* v. *Arkansas,* 495 U. S. 149, 161 (1990).  However the pros and cons shake out, Congress has made its call.  We will not impose uniformity on the statute's non-uniform jurisdictional rules.

And anyway, we think Walters oversells the superiority of his proposal.  First, uniformity in and of itself provides no real advantage in this sphere.  A court can tell in an instant whether an application arises under Section 4 or, as here, under Section 9 or 10; so it can also tell in an instant whether to apply the look-through method or the usual jurisdictional rules.  Second, the use of those ordinary rules—most notably, relating to diversity jurisdiction—is hardly beyond judicial capacity.  Federal courts have faced, and federal courts have resolved, diversity questions for over two centuries, in diverse and ever-changing legal contexts.  Throughout, they have developed workable rules; and we see no reason to think they will do differently here.  Indeed, past practice belies Walters's and the dissent's gloomy predictions.  Although they spin out hypotheticals designed to make the project look ultra-confusing, they fail to identify any actual problems that have arisen from courts' longstanding application of diversity standards to FAA applications (without using look-through).  And Walters's solution does not even avoid the (purported) difficulty of which he complains.  For he does not claim (nor could he) that look-through is the exclusive means of establishing federal jurisdiction.  Even if the underlying action does not fall within a district court's jurisdiction, the application still might do so—say, because the parties have changed, and

Opinion of the Court

are now diverse. See *supra,* at 6. So courts, on Walters's own view, will still have to resolve questions about—and develop rules for—determining diversity in the FAA context. The difference is only one of degree—and too small, under any plausible theory of statutory interpretation, to adopt Walters's proposal to rewrite the law.

Finally, we can see why Congress chose to place fewer arbitration disputes in federal court than Walters wishes. The statutory plan, as suggested above, makes Section 9 and 10 applications conform to the normal—and sensible—judicial division of labor: The applications go to state, rather than federal, courts when they raise claims between non-diverse parties involving state law. See *supra,* at 5–6. As Walters notes, those claims may have originated in the arbitration of a federal-law dispute. But the underlying dispute is not now at issue. Rather, the application concerns the contractual rights provided in the arbitration agreement, generally governed by state law. And adjudication of such state-law contractual rights—as this Court has held in addressing a non-arbitration settlement of federal claims—typically belongs in state courts. See *Kokkonen*, 511 U. S., at 381–382; *supra*, at 6. To be sure, Congress created an exception to those ordinary jurisdictional principles for Section 4 petitions to compel. But it is one thing to make an exception, quite another to extend that exception everywhere. See *post,* at 8 (disregarding this point). As this Court has often said, the "preeminent" purpose of the FAA was to overcome some judges' reluctance to enforce arbitration agreements when a party tried to sue in court instead. *E.g., Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 221 (1985). We have never detected a similar congressional worry about judges' willingness to enforce arbitration awards already made. So Congress might well have thought an expansion of federal jurisdiction appropriate for petitions to compel alone. Applications about arbitral decisions could and should follow the normal rules.

Attachment 1

BADGEROW *v.* WALTERS

Opinion of the Court

The result, as Walters laments, is to give state courts a significant role in implementing the FAA. But we have long recognized that feature of the statute. "[E]nforcement of the Act," we have understood, "is left in large part to the state courts." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 25, n. 32 (1983); see *Vaden*, 556 U. S., at 59; *Hall Street*, 552 U. S., at 582. As relevant here, Congress chose to respect the capacity of state courts to properly enforce arbitral awards. In our turn, we must respect that evident congressional choice.

\*    \*    \*

For the reasons stated, we reverse the judgment of the Court of Appeals for the Fifth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Attachment 1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 20–1143

————

## DENISE A. BADGEROW, PETITIONER *v.* GREG WALTERS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 31, 2022]

JUSTICE BREYER, dissenting.

When interpreting a statute, it is often helpful to consider not simply the statute's literal words, but also the statute's purposes and the likely consequences of our interpretation. Otherwise, we risk adopting an interpretation that, even if consistent with text, creates unnecessary complexity and confusion. That, I fear, is what the majority's interpretation here will do. I consequently dissent.

I

The question presented arises in the context of the Federal Arbitration Act (FAA). 9 U. S. C. §1 *et seq.* The question is technical and jurisdictional: How does a federal court determine whether it has jurisdiction to consider a motion to confirm or vacate an arbitration award? The FAA contains several sections that seem to empower a federal court to take certain specified actions related to arbitration proceedings. These include Section 4, which gives "any United States district court" the power to "order" parties to a written arbitration agreement to "proceed" to arbitration; Section 5, which gives "the court" the power to "designate and appoint an arbitrator"; Section 7, which gives "the United States district court for the district" in which an arbitrator is sitting the power to "compel the attendance" of witnesses whom the arbitrator has "summoned"; Section 9, which

gives "the United States court in and for the district within which" an arbitration award "was made" the power to enter an "order confirming the award"; Section 10, which gives "the United States court in and for the district wherein the [arbitration] award was made" the power to "make an order vacating the award"; and Section 11, which gives "the United States court in and for the district wherein the [arbitration] award was made" the power to "modif[y] or correc[t] the award." 9 U. S. C. §§4, 5, 7, 9, 10, 11. (Here, as throughout, I have simplified the descriptions of the FAA's sections; the Appendix, *infra*, contains the full relevant statutory language.) This case directly concerns jurisdiction under Sections 9 and 10, but the Court's reasoning applies to all the sections just mentioned.

At first blush, one might wonder why there is *any* question about whether a federal court has jurisdiction to consider requests that it act pursuant to these sections. The sections' language seems explicitly to give federal courts the power to take such actions. Why does that language itself not also grant jurisdiction to act? The answer, as the Court notes, is that we have held that the FAA's "authorization of a petition does not itself create jurisdiction." *Ante*, at 1. "Rather, the federal court must have what we have called an 'independent jurisdictional basis' to resolve the matter." *Ibid.* (quoting *Hall Street Associates*, *L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 582 (2008)).

We made clear how this works in *Vaden* v. *Discover Bank*, 556 U. S. 49 (2009), a case involving Section 4. As just noted, Section 4 gives a district court the power to order parties (who have entered into a written arbitration agreement) to submit to arbitration. We held "that a federal court should determine its jurisdiction by 'looking through' a §4 petition to the parties' underlying substantive controversy." *Id.*, at 62. The court asks whether it would have jurisdiction over *that* controversy, namely, whether that

BREYER, J., dissenting

underlying substantive controversy involves a federal question or diversity (a dispute between parties from different States with a value of more than $75,000). See 28 U. S. C. §§1331, 1332. If so, then the federal court has jurisdiction over a Section 4 petition asking the court to order the parties to resolve that controversy in arbitration.

The *Vaden* Court gave two reasons for adopting this "look-through" approach. The first, as the majority today emphasizes, was textual. See 556 U. S., at 62. Section 4 says that a party seeking arbitration may petition for an order compelling arbitration from

> "any United States district court which, *save for [the arbitration] agreement*, would have jurisdiction . . . in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties." (Emphasis added.)

The words "save for [the arbitration] agreement," we reasoned, tell a court not to find jurisdiction by looking to the petition to enforce the agreement itself, but instead to the underlying controversy between the parties. See *id.*, at 62–63.

The second reason, which the majority today neglects, was practical. *Id.*, at 65. To find jurisdiction only where the petition to enforce an arbitration agreement itself established federal jurisdiction, we explained, would result in "curious practical consequences," including unduly limiting the scope of Section 4 and hinging jurisdiction upon distinctions that were "'totally artificial.'" *Ibid.* (quoting 1 I. MacNeil, R. Speidel, & T. Stipanowich, Federal Arbitration Law §9.2.3.3, p. 9:21 (1995) (hereinafter MacNeil)).

Today, the majority holds that this look-through approach does not apply to Section 9 or 10 because those sections lack Section 4's "save for" language. *Ante*, at 2. This reasoning necessarily extends to Sections 5, 7, and 11 as

Attachment 1

BADGEROW *v.* WALTERS

well, for those sections, too, lack Sections 4's "save for" language. *Ibid.* ("Without [Section 4's] statutory instruction, a court may look only to the application actually submitted to it in assessing its jurisdiction"). Although this result may be consistent with the statute's text, it creates what *Vaden* feared—curious consequences and artificial distinctions. See 556 U. S., at 65. It also creates what I fear will be consequences that are overly complex and impractical.

## II

I would use the look-through approach to determine jurisdiction under each of the FAA's related provisions—Sections 4, 5, 7, 9, 10, and 11. Doing so would avoid the same kinds of "curious practical consequences" that drove the *Vaden* Court to adopt the look-through approach in the first place. *Ibid.*; see also *Cortez Byrd Chips, Inc.* v. *Bill Harbert Constr. Co.*, 529 U. S. 193, 202 (2000) (rejecting interpretation of the FAA that "would create anomalous results"). Most notably, this approach would provide a harmonious and comparatively simple jurisdiction-determining rule—advantages that the majority's jurisdictional scheme seems to lack. Cf. *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010) (rejecting "[c]omplex jurisdictional tests" in favor of "straightforward" and "[s]imple jurisdictional rules").

Consider some of the likely consequences of the majority's reading, which applies the look-through approach only to Section 4 (where the "save for" language appears), but not to the FAA's other sections (where it does not appear).

*First*, consider Section 5. That section says that, upon application of one of the parties to an arbitration agreement, "*the* court shall designate and appoint an arbitrator." 9 U. S. C. §5 (emphasis added). What happens when the look-through approach shows that the underlying controversy raises a federal question, but the application to appoint an arbitrator raises no federal question and does not establish diversity? A party could ask a federal judge to

Attachment 1

BREYER, J., dissenting

*order* arbitration under Section 4, but they could not then ask that same (or any other) federal judge to *appoint* an arbitrator for that very same arbitration under Section 5. That does not seem to be what Congress had in mind for these neighboring provisions—provisions that appear to assume that a judge can appoint an arbitrator in tandem with ordering parties to arbitration. Moreover, how is a federal court to determine, for diversity jurisdiction purposes, the amount at stake in a motion to appoint an arbitrator without a look-through approach? Surely not by assessing the value of the arbitrator's request for pay.

*Second*, consider Section 7. It says that "upon petition the United States district court for the district in which" an arbitrator is sitting "may compel the attendance" of persons whom the arbitrator has "summoned." §7. Suppose that the underlying substantive controversy does not qualify for federal jurisdiction, meaning that a federal court would not have jurisdiction to order arbitration under Section 4. If arbitration proceeds by other means, can a federal judge nonetheless compel the attendance of a witness at that arbitration, based on diversity jurisdiction, if a request to do so shows that the summoned witness lives out of State? If there are two witnesses, one in State and one out of State, can the federal judge compel the attendance of the second, but not the first? Why would Congress have wanted parties to toggle between federal and state court when seeking judicial enforcement of summons issued during a single arbitration?

And at a more basic level, *who* are the relevant parties to a Section 7 request when determining, for diversity purposes, whether the Section 7 dispute is between citizens of different States? The arbitrator and summoned witness? The parties in arbitration? Only the "summoning" party and the witness? Compare *Washington National Insurance Co.* v. *OBEX Group LLC*, 958 F. 3d 126, 134 (CA2 2020)

BREYER, J., dissenting

(evaluating diversity based on summoning party and wit-
ness), with *Amgen, Inc.* v. *Kidney Center of Del. Cty. Ltd.*,
95 F. 3d 562, 567–568 (CA7 1996) (evaluating diversity
based on parties in arbitration). And assume that a federal
court finds it does have jurisdiction over a Section 7 request,
even though the underlying controversy involves neither a
federal question nor diversity. "Why would Congress have
wanted federal courts to intervene to enforce a subpoena
issued in an arbitration proceeding involving a controversy
that itself is not important enough, from a federalism
standpoint, to warrant federal-court oversight?" *Maine
Community Health Options* v. *Albertsons Cos.*, 993 F. 3d
720, 726 (CA9 2021) (Watford, J., concurring).

Moreover, diversity jurisdiction requires not only that the
relevant parties be from different States but also that the
amount in controversy exceed $75,000. See 28 U. S. C.
§1332(a). How does a federal judge determine whether
summoning a witness is itself worth $75,000? By examin-
ing the value of what the witness might say? By accounting
for travel expenses? See *Maine Community Health*, 993
F. 3d, at 723–724. As courts have recognized, there is "very
little case law to guide [them] in determining whether en-
forcement of an arbitration subpoena against a third party
will enable someone to recover more than $75,000 in an ar-
bitration dispute with a different party." *Id.*, at 726 (Wat-
ford, J., concurring). These and other jurisdiction-related
questions do not arise if a federal judge can simply follow
*Vaden*'s principle for all FAA motions: Look through the
motions and determine whether there is federal jurisdiction
over the underlying substantive controversy. See 556 U. S.,
at 62–63.

*Third*, consider now Sections 9 and 10, the FAA sections
directly before us, along with Section 11. Section 9 gives
"the United States court in and for the district within which
[an arbitration] award was made" the power to issue "an
order confirming the award." Section 10 gives the same

Attachment 1

BREYER, J., dissenting

court the power to "vacat[e]" the award for certain specified reasons. And Section 11 gives that court the power to "modif[y] or correc[t] the award." Where the parties' underlying dispute involves a federal question (but the parties are not diverse), the majority holds that a party can ask a federal court to order arbitration under Section 4, but it cannot ask that same court to confirm, vacate, or modify the order resulting from that arbitration under Section 9, 10, or 11. But why prohibit a federal court from considering the results of the very arbitration it has ordered and is likely familiar with? Why force the parties to obtain relief—concerning arbitration of an underlying *federal*-question dispute—from a state court unfamiliar with the matter?

Or suppose that a party asks a federal court to vacate an arbitration award under Section 10 because the arbitrator "refus[ed] to hear evidence pertinent and material to the controversy." §10(a)(3). To determine at least one important aspect of diversity jurisdiction—the amount in controversy—must the court not look to the underlying dispute? The same question arises with respect to a Section 11 motion to modify an arbitral award on the ground that it "is imperfect in matter of form not affecting the merits of the controversy." §11(c).

The majority says that these and other problems require only that the parties bring their FAA requests to state courts. *Ante*, at 15–16. But we cannot be sure that state courts have the same powers under the FAA that federal courts have. The FAA says nothing about state courts; it only explicitly mentions federal courts. See §7 ("United States district court"); §9 ("the United States court"); §10 (same); §11 (same). We have never held that the FAA provisions I have discussed apply in state courts, and at least one Member of this Court has concluded that they do not apply there. See, *e.g.*, *DIRECTV, Inc.* v. *Imburgia*, 577 U. S. 47, 59 (2015) (THOMAS, J., dissenting). State courts

have reached similar conclusions.  See, *e.g.*, *Cable Connection, Inc.* v. *DIRECTV, Inc.*, 44 Cal. 4th 1334, 1351, 190 P. 3d 586, 597 (2008) (holding that §§4, 10, and 11 apply only in federal court); *In re Beck's Superior Hybrids, Inc.*, 940 N. E. 2d 352, 362–363 (Ind. App. 2011) (same for §7); *Henderson* v. *Summerville Ford-Mercury Inc.*, 405 S. C. 440, 450, 748 S. E. 2d 221, 226 (2013) (same for §9).

Relatedly, the majority also notes, correctly, that Section 9, 10, and 11 disputes about the enforceability of arbitral awards "typically involve only state law." *Ante*, at 6.  It thus makes sense, the majority says, that these disputes would belong primarily in state court.  See *ante*, at 15.  But the same can be said for Section 4 disputes about the enforceability of arbitration agreements.  These, too, typically involve only questions of state law.  That the dispute does not implicate federal questions thus does not explain why Congress would have wanted more federal court involvement at the Section 4 stage than during the later stages.

It may be possible to eliminate some of these problems by using a federal-question lawsuit or Section 4 motion as a jurisdictional anchor.  If a party to an arbitration agreement files a lawsuit in federal court but then is ordered to resolve the claims in arbitration, the federal court may stay the suit and possibly retain jurisdiction over related FAA motions.  See §3; *Vaden*, 556 U. S., at 65.  Similarly, some courts have held that if a federal court adjudicates a Section 4 motion to order arbitration, the court retains jurisdiction over any subsequent, related FAA motions.  See *Maine Community Health*, 993 F. 3d, at 725 (Watford, J., concurring); see also *McCormick* v. *America Online, Inc.*, 909 F. 3d 677, 684 (CA4 2018).  But, as *Vaden* points out, to turn jurisdiction over these later motions on the presence or absence of a federal lawsuit or Section 4 motion is to turn jurisdiction on a "'totally artificial distinction'"—particularly when the very purpose of arbitration is to avoid litigation. 556 U. S., at 65 (quoting 1 MacNeil §9.2.3.3, at 9:21).

BREYER, J., dissenting

I relate these practical difficulties in part to illustrate a more fundamental point. The majority has tried to split what is, or should be, a single jurisdictional atom—a single statute with connected parts, which parts give federal judges the power to facilitate a single arbitration proceeding from start to finish: to order arbitration; appoint an arbitrator; summon witnesses; and confirm, vacate, or modify an arbitration award. The need for simplicity, comprehension, workability, and fairness all suggest that these interrelated provisions should follow the same basic jurisdictional approach, namely, as *Vaden* explains, the look-through approach.

## III

The majority's interpretation is also at odds with what this Court has said about the purposes underlying the FAA. We have recognized that the statute reflects a clear "'policy of rapid and unobstructed enforcement of arbitration agreements.'" *Cortez Byrd Chips*, 529 U. S., at 201 (quoting *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 23 (1983)); see also *id.*, at 22 ("Congress' clear intent, in the Arbitration Act, [was] to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible").

We have thus interpreted the FAA to avoid "unnecessarily complicating the law and breeding litigation from a statute that seeks to avoid it." *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 275 (1995). "Why," we asked, "would Congress intend a test that risks the very kind of costs and delay through litigation . . . that Congress wrote the Act to help the parties avoid?" *Id.*, at 278. In other words, the FAA *is* a "sphere" in which "uniformity in and of itself provides [a] real advantage." *Ante*, at 14.

## IV

The majority's main point is straightforward: The text of

the statute compels the result. As the majority rightly
points out, we cannot disregard the statutory text or "over-
come a clear statutory directive." *Ante*, at 13 (quoting Brief
for Respondents 44). A statute that says it applies only to
"fish" does not apply to turnips. The majority also rightly
points out that the "save for" language setting forth the
look-through approach appears only in Section 4, and does
not appear in any of the later sections.

That fact, however, does not produce the "clear statutory
directive" upon which the majority relies. Nothing in the
text prohibits us from applying Section 4's look-through ap-
proach to the succeeding sections. The statute does not say
that Section 4's jurisdictional rule applies *only* to Section 4,
or that the same look-through approach does *not* apply else-
where. Nor does any other section provide its own jurisdic-
tional rule that would suggest Section 4's rule should not
apply there.

Moreover, when we consider Section 4's text setting forth
the look-through approach, we "consider not only the bare
meaning of the word[s] but also [their] placement and pur-
pose in the statutory scheme." *Bailey* v. *United States*, 516
U. S. 137, 145 (1995), superseded by statute on other
grounds as stated in *Welch* v. *United States*, 578 U. S. 120,
133 (2016). Various aspects of the FAA's text and structure
suggest that Section 4's jurisdictional rule should apply
throughout. Section 5, for example, which grants the power
to appoint an arbitrator, simply refers to "the court." Those
words, most naturally read, refer to the same court to which
the immediately preceding section—Section 4—refers: a
"United States district court" with jurisdiction as deter-
mined by the look-through approach. Requests under the
FAA's various sections are also generally described in the
text as "applications" or "motions." See §4 ("application");
§5 (same); §9 (same); §10 (same); §11 (same); see also §6;
§12 ("motion to vacate, modify, or correct"); §13 ("applica-
tion to confirm, modify, or correct"). This implies that the

requests are all constituent parts of one broader enforcement proceeding, not standalone disputes meriting individual jurisdictional inquiries. See, *e.g.*, *In re Wild*, 994 F. 3d 1244, 1257 (CA11 2021) (en banc) ("the term 'motion' has *never* been commonly understood to denote a vehicle for initiating a new and freestanding lawsuit"); A Modern Dictionary of the English Language 446 (1911) ("motion in court" means "an application to a court . . . to have a rule or order made which is necessary to the progress of the action").

And, more importantly, all the sections describe connected components of a single matter: a federal court's arbitration-related enforcement power. One can read these sections as a single whole, with each section providing one enforcement tool, and one section—Section 4—providing both an enforcement tool and a jurisdictional rule applicable to the entire toolbox. Read this way, the FAA provides one set of complementary mechanisms through which a federal court might facilitate a single arbitration—but only when the underlying substantive controversy is one that, jurisdictionally speaking, could be brought in a federal court had the parties not agreed to arbitrate. There is no language in any of the sections that states, or suggests, that we cannot interpret the Act in this way.

In brief, the text does not prevent us from reading the statute in a way that better reflects the statute's structure and better fulfills the statute's basic purposes. See *Allied Bruce*, 513 U. S., at 279 (adopting interpretation of FAA that "the statute's language permits" and that is more consistent with "[t]he Act's history"); *Pierce* v. *Underwood*, 487 U. S. 552, 563 (1988) (adopting outcome "that the text of the statute permits, and sound judicial administration counsels").

## V

The FAA's legislative history reinforces the view of the

statute that I have just described. The Senate Report on the bill that became the FAA refers to the FAA's general purposes. It makes clear Congress' hope to avoid procedural complexity. It refers to parties' "desire to avoid the delay and expense of litigation." S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924). Proponents of the bill thought it would successfully serve that purpose because it would provide "very simple machinery"; "simplify legal matters"; offer "speedy" and "plain justice"; and allow "no opportunity for technical procedure." Joint Hearings on S. 1005 et al. before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 16, 26, 27, 36 (1924) (hereinafter Joint Hearings). These general purposes support a simplified jurisdictional rule.

The language of the House Report suggests more. It suggests that the bill created a *single* jurisdictional procedure, not a set of different procedures with distinct jurisdictional rules. The Report says that the bill "provides *a procedure* in the Federal courts for" enforcement of arbitration agreements. H. R. Rep. No. 96, 68th Cong., 1st Sess., 2 (1924) (emphasis added). "*The procedure*," the Report continues, "is very simple, . . . reducing technicality, delay, and expense . . . ." *Ibid.* (emphasis added). That singular procedure, the Report explains, encompasses not only the initial request for a federal court to order arbitration under Section 4, but subsequent requests to vacate or modify an arbitration award under Sections 10 and 11 as well. See *ibid.*

The principal drafter of the bill made the same point yet more explicitly. He testified that under the FAA, "Federal courts are given jurisdiction to enforce [arbitration] agreements *whenever . . . they would normally have jurisdiction of a controversy between the parties.*" Joint Hearings 34 (statement of Julius H. Cohen) (emphasis added). Immediately following, he said that "such enforcement" includes the power to appoint arbitrators under Section 5, which, of course, lacks Section 4's "save for" language. *Ibid.* And he

Breyer, J., dissenting

then proceeded to discuss the FAA's other sections, all without suggesting that their jurisdictional requirements were any different. *Ibid.*; see also *id.*, at 35–36.

Together, this history reinforces the interpretation of the statute that I would adopt. It suggests that Congress intended a single approach for determining jurisdiction of the FAA's interrelated enforcement mechanisms, not one approach for the mechanism provided in Section 4 and a different approach for the mechanisms provided in all other sections.

*          *          *

In this dissent I hope to have provided an example of what it means to say that we do not interpret a statute's words "in a vacuum." *Abramski* v. *United States*, 573 U. S. 169, 179 (2014). Rather, we should interpret those words "with reference to the statutory context, structure, history and purpose[,] . . . not to mention common sense." *Ibid.* (internal quotation marks omitted). Here, these considerations all favor a uniform look-through approach. And the statute's language permits that approach. Interpretation of a statute must, of course, be consistent with its text. But looking solely to the text, and with a single-minded focus on individual words in the text, will sometimes lead to an interpretation at odds with the statute as a whole. And I fear that is what has happened in this case.

I suggest that by considering not only the text, but context, structure, history, purpose, and common sense, we would read the statute here in a different way. That way would connect the statute more directly with the area of law, and of human life, that it concerns. And it would allow the statute, and the law, to work better and more simply for those whom it is meant to serve. With respect, I dissent.

BADGEROW *v.* WALTERS

## APPENDIX

9 U. S. C. §§4, 5, 7, 9, 10, 11

"§4. Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make

Appendix to opinion of BREYER, J.

an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

"§5. Appointment of arbitrators or umpire

   "If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator."

"§7. Witnesses before arbitrators; fees; compelling attendance

   "The arbitrators selected either as prescribed in this title or otherwise, or a majority of them, may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case. The fees for such attendance shall be the same as the fees of witnesses before masters of

Appendix to opinion of BREYER, J.

the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States district court for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner provided by law for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States."

"§9. Award of arbitrators; confirmation; jurisdiction; procedure

   "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion

Attachment 1

Appendix to opinion of BREYER, J.

in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court."

"§10. Same; vacation; grounds; rehearing
  "(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
  "(1) where the award was procured by corruption, fraud, or undue means;
  "(2) where there was evident partiality or corruption in the arbitrators, or either of them;
  "(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
  "(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
  "(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.
  "(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5."

18                    BADGEROW *v.* WALTERS

Appendix to opinion of BREYER, J.

"§11. Same; modification or correction; grounds; order

"In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

"(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

"(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

"(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties."

**493 U.S. 67 (1989)**

# BREININGER

v.

# SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION NO. 6

No. 88-124.

**Supreme Court of United States.**

Argued October 10, 1989

Decided December 5, 1989

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

70   *70 *Francis J. Landry* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Acting Solicitor General Bryson, Stephen L. Nightingale, Joseph E. DeSio, Robert E. Allen, Norton J. Come, Linda Sher, Jerry G. Thorn, Allen H. Feldman, Steven J. Mandel,* and *Anne P. Fugett.*

*Laurence Gold* argued the cause for respondent. With him on the brief were *Jeffrey I. Julius* and *Marsha Berzon.*[*]

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents two questions under the federal labor laws: first, whether the National Labor Relations Board (NLRB or Board) has exclusive jurisdiction over a union member's claims that his union both breached its duty of fair representation and violated the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 519, 29 U. S. C. § 401 *et seq.* (1982 ed.), by discriminating against him in job referrals made by the union hiring hall; and second, whether the union's alleged refusal to refer him to employment through the hiring hall as a result of his political opposition to the union's leadership gives rise to a claim under §§ 101(a)(5) and 609 of the LMRDA, 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.). The Court of Appeals for the Sixth Circuit held that petitioner's suit fell within the exclusive jurisdiction of the Board and that

71   petitioner had failed to state a claim *71 under the LMRDA. 849 F. 2d 997 (1988) *(per curiam).* We reverse the Court of Appeals' decision as to jurisdiction, but we affirm its holding that petitioner did not state a claim under LMRDA §§ 101(a)(5) and 609.

# I

Petitioner Lynn L. Breininger was at all relevant times a member of respondent, Local Union No. 6 of the Sheet Metal Workers International Association. Pursuant to a multiemployer collective-bargaining agreement, respondent operates a hiring hall through which it refers both members and nonmembers of the union for construction work. Respondent maintains an out-of-work list of individuals who wish to be referred to jobs. When an employer contacts respondent for workers, he may request certain persons by name. If he does not, the union begins at the top of the list and attempts to telephone in order each worker listed until it has satisfied the employer's request. The hiring hall is not the exclusive source of employment for sheet metal workers; they are free to seek employment through other mechanisms, and employers are not restricted to hiring only those persons recommended by the union.[1] Respondent also maintains a job referral list under the Specialty Agreement, a separate collective-bargaining agreement negotiated to cover work on siding, decking, and metal buildings.

Petitioner alleges that respondent refused to honor specific employer requests for his services and passed him over in
72   making job referrals. He also contends that respondent refused to process his internal union grievances regarding *72 these matters. Petitioner's first amended complaint contained two counts. First, he asserted a violation of the duty of fair representation, contending that respondent, "in its representation of [petitioner], has acted arbitrarily, discriminatorily, and/or in bad faith and/or without reason or cause." First Amended Complaint ¶ 13. Second, petitioner alleged that his union, "in making job referrals, . . . has favored a faction of members . . . who have been known to support . . . the present business manager," as "part of widespread, improper discipline for political opposition in violation of 29 U. S. C. [§ 411(a)(5)] and 29

Case 4:22-cv-00430-Y Document 181-1 Filed 09/30/22 Page 2 of 13 PageID 6043

U. S. C. § 529." *Id.,* ¶ 17. Respondent, in other words, "acting by and through its present business manager . . . and its present business agent [has] `otherwise disciplined' " petitioner within the meaning of LMRDA §§ 101(a)(5) and 609. *Id.,* ¶ 16.

The District Court held that it lacked jurisdiction to entertain petitioner's suit because "discrimination in hiring hall referrals constitutes an unfair labor practice," and "[t]he NLRB has exclusive jurisdiction over discrimination in hiring hall referrals." No. C 83-1126 (ND Ohio, Feb. 20, 1987), p. 6, reprinted in App. to Pet. for Cert. A9. The District Court determined that adjudicating petitioner's claims "would involve interfe[r]ing with the NLRB's exclusive jurisdiction." *Id.,* at 7, App. to Pet. for Cert. A10.

The Court of Appeals affirmed in a brief *per curiam* opinion. With respect to the fair representation claim, the court noted that "[c]ircuit courts have consistently held that . . . fair representation claims must be brought before the Board" and that "if the employee fails to affirmatively allege that his *employer* breached the collective bargaining agreement, which [petitioner] failed to do in the case at bar, he cannot prevail." 849 F. 2d, at 999 (emphasis in original). In regard to the LMRDA count, the Court of Appeals found that "[d]iscrimination in the referral system, because it does not breach the employee's union

73  membership rights, does not constitute `discipline' within the meaning of LMRDA" and *73 that "[h]iring hall referrals are not a function of union membership since referrals are available to nonmembers as well as members." *Ibid.* We granted certiorari. 489 U. S. 1009 (1989).

## II

## A

We have long recognized that a labor organization has a statutory duty of fair representation under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (1982 ed.), "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes,* 386 U. S. 171, 177 (1967); see also *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 203 (1944). In *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), the NLRB determined that violations of the duty of fair representation might also be unfair labor practices under § 8(b) of the NLRA, as amended, 29 U. S. C. § 158(b) (1982 ed.).[2] The Board held that the right of employees under § 7 of the NLRA, as amended, 29 U. S. C. § 157, to form, join, or assist labor organizations, or to refrain from such activities, "is a statutory

74  limitation on statutory bargaining representatives, and . . . that Section 8(b)(1)(A) of the Act *74 accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." 140 N. L. R. B., at 185. In addition, the Board reasoned that "a statutory bargaining representative and an employer also respectively violate Section 8(b)(2) and 8(a)(3) when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." *Id.,* at 186. While petitioner alleged a breach of the duty of fair representation, his claim might relate to conduct that under *Miranda Fuel* also constitutes an unfair labor practice. And, as a general matter, neither state nor federal courts possess jurisdiction over claims based on activity that is "arguably" subject to §§ 7 or 8 of the NLRA. See *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959).

Nevertheless, the District Court was not deprived of jurisdiction. In *Vaca* v. *Sipes, supra,* we held that *Garmon*'s pre-emption rule does not extend to suits alleging a breach of the duty of fair representation. Our decision in *Vaca* was premised on several factors. First, we noted that courts developed and elaborated the duty of fair representation before the Board even acquired statutory jurisdiction over union activities. Indeed, fair representation claims often involve matters "not normally within the Board's unfair labor practice jurisdiction," 386 U. S., at 181, which is typically aimed at "effectuating the policies of the federal labor laws, not [redressing] the wrong done the individual employee," *id.,* at 182, n. 8. We therefore doubted whether "the Board brings substantially greater expertise to bear on these problems than do the courts." *Id.,* at 181. Another consideration in *Vaca* for finding the fair representation claim judicially cognizable was the NLRB General Counsel's unreviewable discretion to refuse to institute unfair labor practice proceedings. "[T]he General Counsel will refuse to bring

75  complaints on behalf *75 of injured employees when the injury complained of is `insubstantial.' " *Id.,* at 183, n. 8. The right of the individual employee to be made whole is "[o]f paramount importance," *Bowen* v. *United States Postal Service,* 459 U. S. 212, 222 (1983), and "[t]he existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine,"

*Vaca, supra,* at 182-183. Consequently, we were unwilling to assume that Congress intended to deny employees their traditional fair representation remedies when it enacted § 8(b) as part of the Labor Management Relations Act, 1947 (LMRA). As JUSTICE WHITE described *Vaca* v. *Sipes* last Term in *Karahalios* v. *Federal Employees,* 489 U. S. 527, 535 (1989):

> "As we understood our inquiry, it was whether Congress, in enacting § 8(b) in 1947, had intended to oust the courts of their role enforcing the duty of fair representation implied under the NLRA. We held that the `tardy assumption' of jurisdiction by the NLRB was insufficient reason to abandon our prior cases, such as *Syres* [v. *Oil Workers,* 350 U. S. 892 (1955)]."

That a breach of the duty of fair representation might also be an unfair labor practice is thus not enough to deprive a federal court of jurisdiction over the fair representation claim. See *Communications Workers* v. *Beck,* 487 U. S. 735, 743 (1988).

We decline to create an exception to the *Vaca* rule for fair representation complaints arising out of the operation of union hiring halls. Although the Board has had numerous opportunities to apply the NLRA to hiring hall policies,[3] we *76 reject the notion that the NLRB ought to possess exclusive jurisdiction over fair representation complaints in the hiring hall context because it has had experience with hiring halls in the past.[4] As an initial matter, we have never suggested that the *Vaca* rule contains exceptions based on the subject matter of the fair representation claim presented, the relative expertise of the NLRB in the particular area of labor law involved, or any other factor. We are unwilling to begin the process of carving out exceptions now, especially since we *77 see no limiting principle to such an approach. Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals. [5] Furthermore, we have never indicated that NLRB "experience" or "expertise" deprives a court of jurisdiction over a fair representation claim. The Board has developed an unfair labor practice jurisprudence in many areas traditionally encompassed by the duty of fair representation. The Board, for example, repeatedly has applied the *Miranda Fuel* doctrine in cases involving racial discrimination. See *International Brotherhood of Painters, Local 1066 (W. J. Siebenoller, Jr., Paint Co.),* 205 N. L. R. B. 651, 652 (1973); *Houston Maritime Assn., Inc. (Longshoremen Local 1351),* 168 N. L. R. B. 615, 616-617 (1967), enf. denied, 426 F. 2d 584 (CA5 1970); *Cargo Handlers, Inc. (Longshoremen Local 1191),* 159 N. L. R. B. 321, 322-327 (1966); *United Rubber Workers, Local No. 12 (Business League of Gadsden),* 150 N. L. R. B. 312, 314-315 (1964), enf'd, 368 F. 2d 12 (CA5 1966), cert. denied, 389 U. S. 837 (1967); *Automobile Workers, Local 453 (Maremont Corp.),* 149 N. L. R. B. 482, 483-484 (1964); *Longshoremen, Local 1367 (Galveston Maritime Assn., Inc.),* 148 N. L. R. B. 897, 897-900 (1964), enf'd, 368 F. 2d 1010 (CA5 1966), cert. denied, 389 U. S. 837 (1967); *Independent Metal Workers, Local No. 1 (Hughes Tool Co.),* 147 N. L. R. B. 1573, 1574 (1964); see also *Handy Andy, Inc.,* 228 N. L. R. B. 447, 455-456 (1977). In addition, the Board has found gender discrimination by unions to be an unfair labor practice. See *Wolf Trap Foundation for the Performing Arts,* 287 N. L. R. B. 1040 (1988), 127 LRRM 1129, 1130 (1988); *Olympic S. S. Co.,* 233 N. L. R. B. 1178, 1189 (1977); *Glass Bottle Blowers Assn.,* *78 *Local 106 (Owens-Illinois, Inc.),* 210 N. L. R. B. 943, 943-944 (1974), enf'd, 520 F. 2d 693 (CA6 1975); *Pacific Maritime Assn. (Longshoremen and Warehousemen, Local 52),* 209 N. L. R. B. 519, 519-520 (1974) (Member Jenkins, concurring). In short, "[a] cursory review of Board volumes following *Miranda Fuel* discloses numerous cases in which the Board has found the duty of fair representation breached where the union's conduct was motivated by an employee's lack of union membership, strifes resulting from intraunion politics, and racial or gender considerations." *United States Postal Service,* 272 N. L. R. B. 93, 104(1984). Adopting a rule that NLRB expertise bars federal jurisdiction would remove an unacceptably large number of fair representation claims from federal courts.

Respondent calls to our attention language in some of our decisions recognizing that "[t]he problems inherent in the operation of union hiring halls are difficult and complex, and point up the importance of limiting initial competence to adjudicate such matters to a single expert federal agency." *Journeymen and Apprentices* v. *Borden,* 373 U. S. 690, 695 (1963) (citation omitted). For this reason, respondent contends that "[w]hether a hiring hall practice is discriminatory and therefore violative of federal law is a determination Congress has entrusted to the Board." *Farmer* v. *Carpenters,* 430 U. S. 290, 303, n. 12 (1977). The cases cited by respondent, however, focus not on whether unions have administered properly out-of-work lists as required by their duty of fair representation, but rather on whether exclusive hiring halls have encouraged union membership impermissibly as forbidden by § 8(b). Such exclusive arrangements are not illegal *per se* under federal labor law, but rather are illegal only if they in fact result in discrimination prohibited by the NLRA. See *Teamsters* v. *NLRB,* 365 U. S. 667, 673-677 (1961); see also *Woelke & Romero Framing, Inc.* v. *NLRB,* 456 U. S. 645, 664-665 (1982). We have found *state law* pre-empted on the ground that "Board approval *79 of various hiring hall practices would be meaningless if state courts could declare those procedures violative of the contractual rights implicit between a member and his union." *Farmer, supra,* at 300, n. 9. These state-law claims frequently involve tort, contract, and other

substantive areas of law that have developed quite independently of federal labor law." Cf. _Lingle v. Norge Division of Magic Chef, Inc.,_ 486 U. S. 399, 403-406 (1988); _Electrical Workers_ v. _Hechler,_ 481 U. S. 851, 855-859 (1987); _Allis-Chalmers Corp._ v. _Lueck,_ 471 U. S. 202, 211 (1985); _Teamsters_ v. _Lucas Flour Co.,_ 369 U. S. 95, 103-104 (1962).

The duty of fair representation is different. It has "judicially evolved," _Motor Coach Employees_ v. _Lockridge,_ 403 U. S. 274, 301 (1971), as part of federal labor law — predating the prohibition against unfair labor practices by unions in the 1947 LMRA. It is an essential means of enforcing fully the important principle that "no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers." _Ibid.;_ see also _United Parcel Service, Inc._ v. _Mitchell,_ 451 U. S. 56, 63 (1981) ("[T]he unfair representation claim made by an employee against his union . . . is more a creature of `labor law' as it has developed . . . than it is of general contract law"). The duty of fair representation, unlike state tort and contract law, is part of federal labor policy. Our "refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon our judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy." _Lockridge, supra,_ at 301; see also _Vaca,_ 386 U. S., at 180-181 ("A primary justification for the pre-emption doctrine — the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose — is not applicable to cases involving alleged *80 breaches of the union's duty of fair representation"). We therefore decline to interpret the state-law pre-emption cases as establishing a principle that hiring halls are somehow so different from other union activities that fair representation claims are not cognizable outside of the NLRB.

The Court of Appeals below also held that if an employee fails to allege that his _employer_ breached the collective-bargaining agreement, then he cannot prevail in a fair representation suit against his _union._ See 849 F. 2d, at 999. This is a misstatement of existing law. In _Vaca,_ we identified an "intensely practical consideratio[n]," _386 U. S., at 183,_ of having the same entity adjudicate a joint claim against both the employer and the union when a wrongfully discharged employee who has not obtained relief through any exclusive grievance and arbitration procedures provided in the collective-bargaining agreement brings a breach-of-contract action against the employer pursuant to § 301(a) of the LMRA, 61 Stat. 156, 29 U. S. C. § 185(a) (1982 ed.). We noted that where the union has control of the grievance and arbitration system, the employee-plaintiff's failure to exhaust his contractual remedies may be excused if the union has wrongfully refused to process his claim and thus breached its duty of fair representation. See _Vaca,_ 386 U. S., at 185-186. "[T]he wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as a bargaining agent breached its duty of fair representation in its handling of the employee's grievance." _Id.,_ at 186.

Our reasoning in _Vaca_ in no way implies, however, that a fair representation action _requires_ a concomitant claim against an employer for breach of contract. Indeed, the earliest fair representation suits involved claims against unions for breach of the duty in _negotiating_ a collective-bargaining agreement, a context in which no breach-of-contract action against an employer is possible. See _Ford Motor Co._ v. *81 _Huffman,_ 345 U. S. 330 (1953); _Steele_ v. _Louisville & Nashville R. Co.,_ 323 U. S. 192 (1944). Even after a collective-bargaining agreement has been signed, we have never required a fair representation plaintiff to allege that his _employer_ breached the agreement in order to prevail. See, _e. g., Communications Workers_ v. _Beck,_ 487 U. S., at 743; _Czosek_ v. _O'Mara,_ 397 U. S. 25, 29 (1970). "[A]n action seeking damages for injury inflicted by a breach of a union's duty of fair representation [is] judicially cognizable in any event, that is, even if the conduct complained of [is] arguably protected or prohibited by the National Labor Relations Act _and whether or not the lawsuit [is] bottomed on a collective agreement." Motor Coach Employees_ v. _Lockridge, supra,_ at 299 (emphasis added).

Respondent argues that the concern in _Vaca_ that suits against the employer and union be heard together in the same forum is applicable to the hiring hall situation, because any action by petitioner against an employer would be premised not on § 301 but rather on the contention that the employer had knowledge of the union conduct violating § 8(b)(1)(A) and acted on that knowledge in making an employment decision.[6] The employer would thereby violate *82 NLRA § 8(a)(3), 29 U. S. C. § 158(a)(3), see _Wallace Corp._ v. _NLRB,_ 323 U. S. 248, 255-256 (1944), and be held jointly and severally liable with the union, _but only in a suit before the Board._[7] In the hiring hall environment, permitting courts to hear fair representation claims against the union would create the danger of bifurcated proceedings before a court and the NLRB. The absence of a § 301 claim, according to respondent, requires that we hold that the NLRB possesses exclusive jurisdiction over petitioner's fair representation suit.

This argument misinterprets our reasoning in *Vaca.* Because a plaintiff must as a matter of logic prevail on his unfair representation allegation against the union in order to excuse his failure to exhaust contractual remedies before he can litigate the merits of his § 301 claim against his employer, we found it "obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions." 386 U. S., at 187. Moreover, because the union's breach may have enhanced or contributed to the employee's injury, permitting fair representation suits to be heard in court facilitates the fashioning of a remedy. *Ibid.* We concluded that it made little sense to prevent courts from adjudicating fair representation claims.

The situation in the instant case is entirely different. In the hiring hall context, the Board may bring a claim alleging a violation of § 8(b)(1)(A) against the union, and a parallel suit against the employer under § 8(a)(3), without implicating the duty of fair representation at all. Or, as in the instant case, an employee may bring a claim solely against the union based on

83     its wrongful refusal to refer him for work. While in *Vaca* *83 an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a legal claim against the union. The fact that an employee *may* bring his fair representation claim in federal court in order to join it with a § 301 claim does not mean that he *must* bring the fair representation claim before the Board in order to "join" it with a hypothetical unfair labor practice case against the employer that was never actually filed.

Federal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers. We have always assumed that independent federal jurisdiction exists over fair representation claims because the duty is implied from the grant of exclusive bargaining authority, and the claims therefore "arise under" the NLRA. See, *e. g.,* Tunstall v. Locomotive Firemen & Enginemen, 323 U. S. 210, 213 (1944). Lower courts that have addressed the issue have uniformly found that 28 U. S. C. § 1337(a), which provides federal jurisdiction for, *inter alia,* "any civil action or proceeding arising under any Act of Congress regulating commerce," creates federal jurisdiction over fair representation claims, because we held in Capital Service, Inc. v. NLRB, 347 U. S. 501, 504 (1954), that the NLRA is an "Act of Congress regulating commerce." See Chavez v. United Food & Commercial Workers Int'l Union, 779 F. 2d 1353, 1355, 1356 (CA8 1985); Anderson v. United Paper-workers Int'l Union, 641 F. 2d 574, 576 (CA8 1981); Buchholtz v. Swift & Co., 609 F. 2d 317, 332 (CA8 1979), cert. denied, 444 U. S. 1018 (1980); Mumford v. Glover, 503 F. 2d 878, 882-883 (CA5 1974); Retana v. Apartment, Motel, Hotel & Elevator Operators Local 14, 453 F. 2d 1018, 1021-1022 (CA9 1972); De Arroyo v. Sindicato

84     de Trabajadores Packinghouse, 425 F. 2d 281, 283, n. 1 (CA1), cert. denied, 400 *84 U. S. 877 (1970); Nedd v. United Mine Workers of America, 400 F. 2d 103, 106 (CA3 1968); see also Bautista v. Pan American World Airlines, Inc., 828 F. 2d 546, 549 (CA9 1987). We agree with this reasoning. Because federal-court jurisdiction exists over a fair representation claim regardless of whether it is accompanied by a breach-of-contract claim against an employer under § 301,[8] and because a fair representation claim is a separate cause of action from any possible suit against the employer, we decline to adopt a rule that exclusive jurisdiction lies in the NLRB over any fair representation suit whose hypothetical accompanying claim against the employer might be raised before the Board.

The concerns that animated our decision in *Vaca* are equally present in the instant case. The Court of Appeals erred in holding that the District Court was without jurisdiction to hear petitioner's fair representation claim.

## B

Respondent contends that even if jurisdiction in federal court is proper, petitioner has failed to allege a fair representation claim for two reasons.

85     *85 **1**

First, respondent notes that we have interpreted NLRA § 8(a)(3) to forbid employer discrimination in hiring only when it is intended to discriminate on a union-related basis. See, *e. g.,* NLRB v. Brown, 380 U. S. 278, 286 (1965). Respondent maintains that symmetry requires us to interpret § 8(b) (2) as forbidding only discrimination based on union-related criteria and not any other form of maladministration of a union job referral system.[9] Respondent contends that under this standard

86     it committed no unfair labor practice in this case. The LMRA, according to respondent, reflects a purposeful *86 congressional decision to limit the scope of § 8(b)(2) to instances where a union discriminates solely on the basis of union

membership or lack thereof. This decision would be negated if the duty of fair representation were construed as extending further than the unfair labor practice provisions of the NLRA.

We need not decide the appropriate scope of §§ 8(b)(1)(A) and 8(b)(2) because we reject the proposition that the duty of fair representation should be defined in terms of what is an unfair labor practice. Respondent's argument rests on a false syllogism: (a) because _Miranda Fuel Co., 140 N. L. R. B. 181 (1962)_, enf. denied, 326 F. 2d 172 (CA2 1963), establishes that a breach of the duty of fair representation is also an unfair labor practice, and (b) the conduct in this case was not an unfair labor practice, therefore (c) it must not have been a breach of the duty of fair representation either. The flaw in the syllogism is that there is no reason to equate breaches of the duty of fair representation with unfair labor practices, especially in an effort to _narrow_ the former category. The NLRB's rationale in _Miranda Fuel_ was precisely the opposite; the Board determined that breaches of the duty of fair representation were also unfair labor practices in an effort to _broaden,_ not _restrict,_ the remedies available to union members. See _140 N. L. R. B. at 184-186_.[10] Pegging the duty of fair representation to the Board's definition of unfair labor practices would make the two redundant, despite their different purposes, and would eliminate some of the prime virtues of the duty of fair representation — flexibility and adaptability. See _Vaca_, 386 U. S., at 182-183.

87 The duty of fair representation is not intended to mirror the contours of § 8(b); rather, it arises independently from *87 the grant under § 9(a) of the NLRA, 29 U. S. C. § 159(a) (1982 ed.), of the union's exclusive power to represent all employees in a particular bargaining unit. It serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." _Vaca, supra_, at 182; see also _NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 181 (1967)_ ("It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation"). Respondent's argument assumes that enactment of the LMRA in 1947 somehow limited a union's duty of fair representation according to the unfair labor practices specified in § 8(b). We have never adopted such a view, and we decline to do so today.

## 2

Second, respondent insists that petitioner has failed to state a claim because in the hiring hall setting a union is acting essentially as an employer in matching up job requests with available personnel. Because a union does not "represent" the employees as a bargaining agent in such a situation, respondent argues that it should be relieved entirely of its duty of fair representation.[11]

88 We cannot accept this proposed analogy. Only because of its status as a Board-certified bargaining representative *88 and by virtue of the power granted to it by the collective-bargaining agreement does a union gain the ability to refer workers for employment through a hiring hall. Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unit have entrusted the union with the task of representing them. That the particular function of job referral resembles a task that an employer might perform is of no consequence. The key is that the union is administering a provision of the contract, something that we have always held is subject to the duty of fair representation. "The undoubted broad authority of the union as exclusive bargaining agent in the negotiation _and administration_ of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." _Humphrey v. Moore, 375 U. S. 335, 342 (1964)_ (emphasis added). See _Communications Workers v. Beck, 487 U. S., at 739_; _Hines v. Anchor Motor Freight, Inc., 424 U. S., 554, 564 (1976)_; see also _Electrical Workers v. Hechler, 481 U. S., at 861-862_; _id.,_ at 865 (STEVENS, J., concurring in part and dissenting in part).

In _Vaca v. Sipes, supra,_ for example, we held that a union has a duty of fair representation in grievance arbitration, despite the fact that NLRA § 9(a) expressly reserves the right of "any individual employee or group of employees . . . to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." The union in _Vaca_ exercised power over grievances because the contract so provided, not because the NLRA required such an arrangement. Hence, the observation that a contract might provide for the operation of a hiring hall directly by a consortium of interested employers rather than a union is irrelevant; the same might have been said about the

89 system for processing grievances in _Vaca_. In *89 short, a union does not shed its duty of fair representation merely because

It is allocating job openings among competing applicants, something that might be seen as similar to what an employer does.

The union's assumption in the hiring hall of what respondent believes is an "employer's" role in no way renders the duty of fair representation inapplicable. When management administers job rights outside the hiring hall setting, arbitrary or discriminatory acts are apt to provoke a strong reaction through the grievance mechanism. In the union hiring hall, however, there is no balance of power. If respondent is correct that in a hiring hall the union has assumed the mantle of employer, then the individual employee stands alone against a single entity: the joint union/employer. An improperly functioning hiring hall thus resembles a closed shop, " `with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, members of union minority groups, and operation of a closed union.' " _Teamsters_ v. _NLRB_, 365 U. S., at 674 (quoting S. Rep. No. 1827, 81st Cong., 2d Sess., 14 (1947)); see also Note, Unilateral Union Control of Hiring Halls: The Wrong and the Remedy, 70 Yale L. J. 661, 674 (1961). In sum, if a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly _increases_ rather than _decreases._ That has been the logic of our duty of fair representation cases since _Steele_ v. _Louisville & Nashville R. Co._, 323 U. S., at 200.[12]

90   *90 We reject respondent's contention that petitioner's complaint fails to state a fair representation claim.

# III

The Court of Appeals rejected petitioner's LMRDA claim on the ground that petitioner had failed to show that he was "otherwise disciplined" within the meaning of LMRDA §§ 101(a)(5) and 609, 29 U. S. C. §§ 411(a)(5) and 529 (1982 ed.). These provisions make it unlawful for a union to "fin[e], suspen[d], expe[l], or otherwise disciplin[e]" any of its members for exercising rights secured under the LMRDA.[13] The Court of Appeals reasoned that because "[h]iring hall referrals . . . are available to nonmembers as well as to members," 849 F. 2d, at 999, and the hiring hall was not an exclusive source of employment for sheet metal workers, petitioner did not suffer discrimination on the basis of rights he held by virtue of his _membership_ in the union. We affirm the Court of Appeals' conclusion, although we do not adopt its reasoning.[14]

91   In _Finnegan_ v. _Leu_, 456 U. S. 431 (1982), we held that removal from appointive union employment is not within the scope of § 609's prohibitions, because that section was "meant to refer only to punitive actions diminishing membership rights, and not to termination of a member's status as an appointed union employee." _Id.,_ at 438 (footnote omitted). *91 Petitioner, joined by the United States as _amicus curiae,_ argues that the Court of Appeals misapplied our reasoning in _Finnegan,_ because Congress could not have intended to prohibit a union from expelling a member of the rank-and-file from a members-only hall for his political opposition to the union leadership, but to permit the leadership to impose the same sanction if the hiring hall included a few token nonmembers as well. Either way, the purpose of the Act would hardly be served if a union were able to coerce its members into obedience by threatening them with a loss of job referrals. Under the reading urged by the United States, _Finnegan_ held only that the LMRDA does not protect the positions and perquisites enjoyed exclusively by union leaders; it did not narrow the protections available to "nonpolicymaking employees, that is, rank-and-file member-employees." _Finnegan, supra,_ at 443 (BLACKMUN, J., concurring).

We need not decide the precise import of the language and reasoning of _Finnegan,_ however, because we find that by using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules. "Discipline is the criminal law of union government." Summers, The Law of Union Discipline, 70 Yale L. J. 175, 178 (1960). The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." _Miller_ v. _Holden_, 535 F. 2d 912, 915 (CA5 1976).

92   Our construction of the statute is buttressed by its structure. First, the specifically enumerated types of discipline — fine, expulsion, and suspension — imply some sort of established disciplinary process rather than ad hoc retaliation *92 by individual union officers.[15] See 2A C. Sands, Sutherland on Statutory Construction § 47.17, p. 166 (4th ed. 1984) _(ejusdem generis)._ Second, § 101(a)(5) includes procedural protections — "written specific charges" served before discipline is imposed, "a reasonable time" in which to prepare a defense, and a "full and fair hearing" — that would not apply to instances of unofficial, _sub rosa_ discrimination. These protections contemplate imposition of discipline through the type of procedure we encountered in _Boilermakers_ v. _Hardeman_, 401 U. S. 233, 236-237 (1971) (expulsion after trial before union

committee, with subsequent internal union review). The fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide "safeguards against improper disciplinary action," indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members. A hiring hall could hardly be expected to provide a hearing before every decision *not* to refer an individual to a job.

The legislative history supports this interpretation of "discipline." Early drafts of § 101(a)(5), for example, contained elaborate lists of "due process protections," such as the presumption of innocence, venue restrictions, the right to counsel, the right to confront and cross-examine witnesses, and *93 other guarantees typically found in the criminal context.[16] Congress envisioned that "discipline" would entail the imposition of punishment by a union acting in its official capacity. See 105 Cong. Rec. 5812 (1959) (remarks of Sen. McClellan) (referring to "safeguards . . . against improper disciplinary action" as procedures that must be followed before a union member can be "expelled or punished," "tried," or "suspend[ed]" by the union); *id.,* at 6023 (remarks of Sen. Kuchel) (noting that discipline may be imposed only on "the usual reasonable constitutional basis upon which [criminal] charges might be brought").

A forerunner of § 101(a)(5) in the Senate provided criminal penalties for *both* improper "discipline" by "any *labor organization,* its officers, agents, representatives, or employees" *and* the use by "*any person* . . . of force or violence, or . . . economic reprisal or threat thereof, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercising by such member of any right to which he is entitled under the provisions of this Act." S. 1555, as reported, 86th Cong., 1st Sess., 53 (1959) (emphasis added); see also S. Rep. No. 187, 86th Cong., 1st Sess., 53-54, 94 (1959); 105 Cong. Rec. 15120 (1959) (comments of Sen. Goldwater). Although S. 1555 was not passed in this form by the Senate,[17] the fact that even in an earlier bill improper *discipline by a labor organization* was listed separately from *economic coercion by any person* shows that the *94 Senate believed that the two were distinct, and that it did not intend to include the type of unauthorized "economic reprisals" suffered by petitioner in the instant case in its definition of "discipline." The bipartisan compromise bill introduced by Representatives Landrum and Griffin, which amended S. 1555 after its passage by the Senate, substituted civil remedies for the criminal penalties. Representative Griffin explained that the bill covered only the "denial of . . . rights through *union discipline,*" 105 Cong. Rec. 13091 (1959) (emphasis added), an apparent reference to penalties imposed by the union in its official capacity as a labor organization. Discipline "must be done in the name of or on behalf of the union as an organizational entity." Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969).

In the instant case, petitioner alleged only that the union business manager and business agent failed to refer him for employment because he supported one of their political rivals. He did not allege acts by the union amounting to "discipline" within the meaning of the statute. According to his complaint, he was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity,* however, was not visited upon petitioner. He was not punished by any tribunal, nor was he the subject of any proceedings convened by respondent. In sum, petitioner has not alleged a violation of §§ 101(a)(5) and 609, and the Court of Appeals correctly dismissed his claim under the LMRDA.[18]

95    *95 **IV**

We express no view regarding the merits of petitioner's claim. We hold only that the Court of Appeals erred when it determined that the District Court lacked jurisdiction over the suit, but that the Court of Appeals correctly found that petitioner failed to state a claim under §§ 101(a)(5) and 609 of the LMRDA. We remand the cause for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

When school officials inflict corporal punishment on a schoolchild, we speak of the child being "disciplined."[1] A prison inmate who is summarily deprived of "good time" credits is also subjected to "discipline."[2] So too is the soldier who as a result of misconduct is required by a superior to perform additional duties.[3] In none of these cases is the discipline imposed by a "tribunal" or as a result of a "proceeding convened by" the disciplinary official. *Ante,* at 94. Rather, what distinguishes the punishment as "discipline" is that it is imposed by one in control with a view to correcting behavior that is considered to be deviant. The Court today holds, however, that a union member who is deprived of work referrals as a

Case 4:22-cv-00430-Y Document 81-1 Filed 05/12/21 Page 9 of 113 PageID 2050

96 result of his intraunion political activities, conduct deemed by the union to be deviant, is nonetheless not being 96 subjected to discipline. Although I join the Court's analysis and disposition of petitioner's duty of fair representation claim in Parts I and II of its opinion, I cannot join this restrictive interpretation of the LMRDA.

Title I of the LMRDA, the "Bill of Rights" of labor organizations, "was the product of congressional concern with widespread abuses of power by union leadership." _Finnegan_ v. _Leu_, 456 U. S. 431, 435 (1982). These took at least two forms. First, many unions were run autocratically and did not accord their members the right of self-governance. See _Sheet Metal Workers_ v. _Lynn_, 488 U. S. 347, 356, n. 8 (1989); _Steelworkers_ v. _Sadlowski_, 457 U. S. 102, 112 (1982). Accordingly, Congress decreed that union members would have equal voting rights and the freedom of speech and assembly and provided in § 102, 29 U. S. C. § 412 (1982 ed.), a means of enforcing these rights through a civil cause of action in federal court. Second, there was evidence that unions imposed discipline on their members in violation of their members' civil rights or without adequate procedural safeguards.[4] See _Finnegan_, 456 U. S., at 442 (Congress was concerned with "protecting the rights of union members from arbitrary action by the union or its officers") (emphasis deleted); _Boilermakers_ v.

97 _Hardeman_, 401 U. S. 233, 243-245 (1971). The provisions which address these concerns, *97 LRMDA §§ 101(a)(5)[5] and 609,[6] 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.), are written in expansive language. They respectively prohibit the imposition of discipline by any labor "organization or any officer thereof," § 411(a)(5), and "any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof." § 529. And they refer not only to fines, suspension, and expulsion, the usual sanctions imposed by a union, but also to unspecified means by which the union "otherwise discipline[s]" its members.

As a matter of plain language, "discipline" constitutes "punishment by one in authority . . . with a view to correction or training." Webster's Third New International Dictionary 644 (1976); see also Random House Dictionary of the English Language 562 (2d ed. 1987) ("punishment inflicted by way of correction and training"); 4 Oxford English Dictionary 735 (2d ed. 1989) (same). Union discipline is thus punishment imposed by the union or its officers "to control the member's conduct in order to protect the interests of the union or its membership." _Miller_ v. _Holden_, 535 F. 2d 912, 915 (CA5 1976). It easily includes the use of a hiring hall system by one who is charged with administering it to punish a member for his political

98 opposition. Indeed, the express *98 reference in the Act to "fines," a form of discipline that traditionally was not imposed after a trial, suggests that Congress intended the Act to reach discipline that is both informal and affects only a member's economic rights.

Moreover, as a matter of the statute's purpose and policy, it would make little sense to exclude the abuse of a hiring hall to deprive a member of job referrals from the type of discipline against which the union member is protected. Congress intended the LMRDA to prevent unions from exercising control over their membership through measures that did not provide adequate procedural protection. "[I]nterference with employment rights constitute[s] a powerful tool by which union leaders [can] control union affairs, often in violation of workers' membership rights." _Vandeventer_ v. _Local Union No. 513, Int'l Union of Operating Engineers_, 579 F. 2d 1373, 1378 (CA8 1978); see also Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969) ("Since the prime motivation to join a union is concern about one's interests as an employee, it seems manifest that a very effective method of disciplining a union member would be to cause injury to those interests"). It is inconceivable that a statute written so broadly would not include such sanctions within its compass.

The Court nonetheless concludes that the denial of hiring hall referrals is not properly attributable to the union and does not constitute discipline within the meaning of the LMRDA. The Court errs in its construction of petitioner's complaint and in its interpretation of the LMRDA. At this pleading stage, petitioner's allegations must be accepted as true and his complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." _Hishon_ v. _King & Spaulding_, 467 U. S. 69, 73 (1984); _Conley_ v. _Gibson_, 355 U. S. 41, 45-46 (1957). Petitioner alleges "that in failing to refer him for employment . . . the defendant, acting by and through its present business manager,

99 David Williams, *99 and its present business agent, Michael Duffy, have `otherwise disciplined' plaintiff." The union's abuse of the hiring hall system is further said to have "been part of widespread, improper discipline for political opposition." App. to Pet. for Cert. A-21. The Court elsewhere acknowledges that "the ability to refer workers for employment through a hiring hall" is a power of the _union_ granted it by the collective-bargaining agreement, _ante_, at 88, and it properly concludes that petitioner's allegations are sufficient to support the imposition of liability upon the union for breaching its duty of fair representation. Petitioner's allegation that the union's officers used their union-granted authority over the hiring hall to punish him for his union activities should also be sufficient to support the claim that punishment was imposed "under color

of the union's right to control its membership and that the "opprobrium of the union *as an entity*" was "visited upon petitioner." *Ante,* at 94.

The Court states that the discriminatory use of the hiring hall to punish petitioner does not constitute discipline because it is not an "established disciplinary process" or imposed by "any tribunal" or as the result of "any proceeding." *Ante,* at 91, 94. But, as Congress was well aware,[7] discipline can be imposed informally as well as formally and pursuant to unwritten practices similar to those petitioner has alleged as well as to a formal established policy. The language and structure of the Act do not evince any intention to restrict its coverage to sanctions that are imposed by tribunals *100 or as the result of proceedings. That Congress specified detailed procedures to be followed in disciplinary proceedings does not mean that no procedures need be followed when discipline is imposed without any proceeding whatsoever. Nor does the legislative history, which reflects Congress' intention to prevent a wide range of arbitrary union action, support such a crabbed reading. [8] By holding that the informally imposed sanctions alleged here are not covered by the LMRDA, the Court ironically deprives union members of the protection of the Act's procedural safeguards at a time when they are most needed — when the union or its officers act so secretly and so informally that the member receives no advance notice, no opportunity to be heard, and no explanation for the union's action. This construction of the labor organization's "Bill of Rights" is perverse and cannot have been intended by Congress.

Finally, this case is not controlled, as the Court of Appeals concluded, by our decision in *Finnegan* v. *Leu,* 456 U. S. 431 (1982). In that case, we held that removal from appointive union employment did not constitute discipline within the meaning of § 609. *Id.,* at 437; see also *Sheet Metal Workers* v. *Lynn,* 488 U. S., at 353, n. 5. We stated that "it was rank-and-file union members — not union officers or employees, as such — whom Congress sought to protect," 456 U. S., at 437, and that "Congress [did not] inten[d] to establish a system of job security or tenure for appointed union employees," *id.,* at 438. In his brief for the United States as *101 *Amicus Curiae,* the Solicitor General has cogently explained why *Finnegan* is not controlling:

> "The question presented by this case is far different. Here, participation in the Union's job referral program is a benefit enjoyed by all members of the Union within the bargaining unit, and the issue is whether withdrawal of the benefit can be deemed `discipline' even though that benefit may also be extended to non-members of the Union. *Finnegan*'s emphasis on the distinction between union members and union leaders does not apply to this situation. In fact, the court of appeals' reliance on language in *Finnegan* that drew that distinction turns the Court's approach on its head. *Finnegan*'s conclusion that the Act did not protect the positions and perquisites enjoyed only by union leaders was surely not intended to narrow the class of benefits, enjoyed by the rank-and-file, that cannot be withdrawn in retaliation for the exercise of protected rights.

> "The court of appeals implicitly acknowledged (see Pet. App. A3) that participation in a job referral system limited to union members would be a part of `a union member's rights or status *as a member of the union*' (456 U. S. at 437). The fact that non-members may be included within the system should not alter that characterization. In either case, when a union member's removal from or demotion on an out-of-work list is based upon a violation of a union rule or policy, or political opposition to the union's leadership, the removal or demotion can fairly be characterized as a punitive action taken against the member *as a member* that sets him apart from other members of the rank-and-file. See *id.* at 437-438. Moreover, such an action bears enough similarity to the specific disciplinary actions referred to in Section 609 to fall within the residual category of *102 sanctions — encompassed by the phrase `otherwise disciplined' — that are subject to that provision."[9]

Today the Court correctly refuses to adopt the Court of Appeals' reasoning, but its rationale is just as flawed as that of the Court of Appeals. Retaliation effected through a union job referral system is a form of discipline even if the system is used by nonmembers as well as members and even if the sanction is the result of an *ex parte,* ad hoc, unrecorded decision by the union.

I respectfully dissent from the Court's disposition of petitioner's claim under the Labor-Management Reporting and Disclosure Act of 1959.

[*] Briefs of *amici curiae* urging reversal were filed for the Association for Union Democracy et al. by *Paul Alan Levy, Alan B. Morrison,* and *Arthur L. Fox II;* and for the National Right to Work Legal Defense Foundation by *Rossie D. Alston, Jr.,* and *Glenn M. Taubman.*

[1] The word "exclusive" when used with respect to job referral systems is a term of art denoting the degree to which hiring is reserved to the union hiring hall. Hiring is deemed to be "exclusive," for example, if the union retains sole authority to supply workers to the employer up to a designated percentage of the work force or for some specified period of time, such as 24 or 48 hours, before the employer can hire on his own. See *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B. 747, 754 (1986), enf'd, 811 F. 2d 149 (CA2), cert. denied, 484 U. S. 817 (1987).

[2] Section 8(b)(1)(A) provides that it is an unfair labor practice for a labor organization or its agents to restrain or coerce "employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the NLRA]: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U. S. C. § 158(b)(1)(A) (1982 ed.). Section 8(b)(2) makes it an unfair labor practice for a labor organization or its agents "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." § 158(b)(2).

[3] The Board has determined that a labor organization that is the statutory collective-bargaining representative of employees utilizing its exclusive hiring hall is barred from using unfair, irrelevant, or invidious considerations in making referrals of such employees. See *Journeymen Pipe Fitters, Local No. 392*, 252 N. L. R. B. 417, 421 (1980), enf. denied, 712 F. 2d 225 (CA6 1983) *(per curiam)*. The Board has held that "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2), unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function." *Operating Engineers, Local 406*, 262 N. L. R. B. 50, 51 (1982), enf'd, 701 F. 2d 504 (CA5 1983) *(per curiam)*; see also *Teamsters, Local No. 174 (Totem Beverages, Inc.)*, 226 N. L. R. B. 690, 698-700 (1976); *Boilermakers, Local Lodge 169 (Riley Stoker Corp.)*, 209 N. L. R. B. 140, 144-145 (1974). Deviation from clear and unambiguous standards in refusing to refer an employee for work establishes a prima facie violation of §§ 8(b)(1) (A) and 8(b)(2), irrespective of whether the deviation is related to discrimination based on union membership. See *NLRB v. International Association of Bridge, Structural and Ornamental Iron Workers*, 600 F. 2d 770, 776-777 (CA9 1979), cert. denied, 445 U. S. 915 (1980); *International Association of Heat and Frost Insulation, Local 22 (Rosendahl, Inc.)*, 212 N. L. R. B. 913 (1974). The Board in some cases has found unfair labor practices based on discriminatory referrals by nonexclusive hiring halls. See *Iron Workers, Local 577 (Tri-State Steel Erectors)*, 199 N. L. R. B. 37 (1972); *Hoisting and Portable Engineers, Local No. 4 (Carlson Corp.)*, 189 N. L. R. B. 366 (1971), enf'd, 456 F. 2d 242 (CA1 1972); *Chauffeurs' Union, Local 923, Teamsters (Yellow Cab Co.)*, 172 N. L. R. B. 2137, 2138 (1968); cf. *Teamsters, Local 17*, 251 N. L. R. B. 1248, 1256-1259 (1980). We intimate no views on the merits of any of the Board's decisions.

[4] That the Board has joined an *amicus* brief supporting petitioner shows that it does not share respondent's concern that its jurisdiction is being invaded in this case. See *Motor Coach Employees v. Lockridge*, 403 U. S. 274, 298, n. 8 (1971).

[5] "Complexity," for example, has never prevented us from holding that unions must arbitrate grievances fairly, see *Vaca v. Sipes*, 386 U. S. 171 (1967); *Conley v. Gibson*, 355 U. S. 41 (1957), despite the difficult tradeoffs in grievance processing between individual rights and collective welfare.

[6] We accept respondent's characterization of the employer's liability only for the purpose of argument. We note that the Board traditionally had imposed strict liability on an employer party to an exclusive hiring hall, solely on the basis of its being a party to the arrangement and even in the absence of proof that it had knowledge of the union's discriminatory practices. See *Frank Mascali Construction G. C. P. Co.*, 251 N. L. R. B. 219, 222 (1980), enf'd, 697 F. 2d 294 (CA2), cert. denied, 459 U. S. 988 (1982); *Longshoremen, Local 1351 (Galveston Marine Assn., Inc.)*, 122 N. L. R. B. 692, 696 (1958); *Operating Engineers Local 12 (Associated General Contractors)*, 113 N. L. R. B. 655, 661, n. 5 (1955), modified on other grounds, 237 F. 2d 670 (CA9 1956), cert. denied, 353 U. S. 910 (1957). The Board has recently abandoned the strict liability principle, holding instead that "no liability should be imposed when an employer does not have actual notice, or may not reasonably be charged with notice of a union's discriminatory operation of a referral system." *Wolf Trap Foundation for the Performing Arts*, 287 N. L. R. B. 1040, 1041 (1988), 127 LRRM 1129, 1130 (1988). We express no view regarding the standard for liability of any of the employers in the instant case.

[7] We need not determine whether plaintiffs in petitioner's position *could* make out a § 301 claim. We simply note that petitioner in his first amended complaint did not allege a breach of contract by any employer.

[8] The development of the law in the § 301 context is not to the contrary. We have recognized that although a § 301 suit against the employer and a fair representation claim against the union are "inextricably interdependent," *United Parcel Service, Inc. v. Mitchell*, 451 U. S. 56, 66-67 (1981) (Stewart, J., concurring in judgment), breach of the duty of fair representation is a cause of action separate from the claim against the employer. See *DelCostello v. Teamsters*, 462 U. S. 151, 164, 165 (1983) (noting that a hybrid fair representation/§ 301 suit "comprises two causes of action" and that "[t]he employee may, if he chooses, sue one defendant and not the other"); *United Parcel Service*, 451 U. S., at 66 (Stewart, J., concurring in judgment) (§ 301 and fair representation claim each has "its own discrete jurisdictional base"); *id.*, at 73, n. 2 (STEVENS, J., concurring in part and dissenting in part) ("[D]espite this close relationship, the two claims are not inseparable. Indeed, although the employee in this case chose to sue both the employer and the union, he was not required to do so; he was free to institute suit against either one as the sole defendant").

[9] Respondent contends that § 8(b)(1)(A) should be construed *in pari materia* with § 8(b)(2) as requiring a showing of union-related discrimination. See *Teamsters* v. *NLRB*, 365 U. S. 667, 676 (1961) (§ 8(b)(1) condemns a hiring hall "which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment"); *Local 357, Int'l Brotherhood of Painters* v. *NLRB*, 717 F. 2d 805, 808-809 (CA3 1983); *NLRB* v. *Local Union 633, United Assn. of Journeymen and Plumbers*, 668 F. 2d 921, 922-923 (CA6 1982) *(per curiam)*; *NLRB* v. *Local 143, Moving Picture and Projection Machine Operators Union*, 649 F. 2d 610, 612 (CA8 1981). The NLRB, however, has construed §§ 8(b)(1)(A) and 8(b)(2) more expansively to bar the use of unfair, irrelevant, or invidious considerations in employee referrals of employees, and to prohibit, absent sufficient justification by the union, any departure from established procedures. See n. 3, *supra*. We need not pass on the wisdom of the Board's interpretation, because we hold that whatever the proper reading of § 8(b), petitioner has stated a claim for breach of the duty of fair representation. We note, however, that respondent's arguments are inconsistent. On the one hand, respondent contends that courts should not entertain fair representation suits because to do so would disturb NLRB efforts to create a uniform unfair labor practice body of law governing hiring halls. On the other hand, respondent maintains that the NLRB rules with respect to hiring hall unfair labor practices are actually in excess of what the statute authorizes. If that is so, the NLRB does not seem particularly "expert" in this area. Moreover, if the NLRB's hiring hall rules are void because they are beyond what the statute permits, then there is no overlap between the duty of fair representation and the unfair labor practices developed by the Board, and there is in fact *less* reason to hold that courts lack jurisdiction over hiring hall fair representation claims.

[10] Similarly, in deciding not to enforce *Miranda Fuel*, the Second Circuit explicitly rejected a crabbed view of the duty of fair representation and juxtaposed a statement of the narrowness of § 8 with an acknowledgment that the duty of fair representation is a broader concept. See 326 F. 2d, at 176. No decision of this Court holds otherwise.

[11] Respondent's argument would require us to find that there is no duty of fair representation at all in the hiring hall context; this is a position which cannot be reconciled with numerous decisions of the Courts of Appeals and the NLRB. See, *e. g.*, *Lewis* v. *Local 100, Laborers' Int'l Union*, 750 F. 2d 1368, 1376 (CA7 1984); *Beriault* v. *Local 40, Super Cargoes & Checkers of Int'l Longshoremen's Union*, 501 F. 2d 258, 264-266 (CA9 1974); *Smith* v. *Local No. 25, Sheet Metal Workers Int'l Assn.*, 500 F. 2d 741, 748-749 (CA5 1974); *Operating Engineers, Local 406*, 262 N. L. R. B., at 51, 57; *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B., at 754-755; *Journeymen Pipe Fitters, Local No. 392*, 252 N. L. R. B., at 421-422; *Bricklayers' and Stonemasons' Int'l Union, Local No. 8*, 235 N. L. R. B. 1001, 1006-1008 (1978).

[12] It was for this reason that the Board sought in its decision in *Mountain Pacific Chapter, Associated General Contractors*, 119 N. L. R. B. 883, enf. denied, 270 F. 2d 425 (CA9 1959), to require an exclusive hiring hall to incorporate certain procedural safeguards in the agreement establishing the exclusive arrangement. Although we held in *Teamsters* v. *NLRB*, 365 U. S. 667 (1961), that the Board's approach in *Mountain Pacific* exceeded the mandate of the NLRA, our decision in that case was confined to the unfair labor practice context and did not purport to determine the proper scope of the duty of fair representation. In addition, we were careful to note that the Board retained authority "to determin[e] whether discrimination has in fact been practiced" and to "eliminat[e] discrimination" in the operation of hiring halls. 365 U. S., at 677. *Teamsters* held invalid only the Board's attempt to impose prophylactic safeguards on hiring halls in the absence of any particularized findings of discrimination. It has no bearing on the instant case — a suit by an individual member of the union alleging specific acts in violation of the duty of fair representation.

[13] The phrase "otherwise discplin[e]" appears in both §§ 101(a)(5) and 609, and we have already determined that it has the same meaning in both sections. See *Finnegan* v. *Leu*, 456 U. S. 431, 439, n. 9 (1982).

[14] The Court of Appeals clearly had jurisdiction over the LMRDA claim. See *Boilermakers* v. *Hardeman*, 401 U. S. 233, 238 (1971). To the extent the Court of Appeals held otherwise, it was in error.

[15] We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101 (a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. Even respondent acknowledges that a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules. Contrary to JUSTICE STEVENS' suggestion, *post*, at 99-100, and nn. 7, 8, we do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers.

[16] See, *e. g.*, H. R. 4473, 86th Cong., 1st Sess., 12-16 (1959); H. R. 7265, 86th Cong., 1st Sess., 19-20 (1959); S. 1137, 86th Cong., 1st Sess., 11 (1959).

[17] We traced the legislative history of §§ 101(a)(5) and 609 in *Hardeman*, 401 U. S., at 242-245, and *Finnegan*, 456 U. S., at 435-441. The relevant portion of S. 1555 as passed became LMRDA § 610, 29 U. S. C. § 530 (1982 ed.), which criminalizes the threat or use of force or violence to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of rights granted under the LMRDA. Section 610 does not by its terms extend to economic reprisals.

[18] We do not pass on petitioner's claim that certain of his rights secured by the LMRDA were "infringed" by respondent's conduct, in violation of § 102, 29 U. S. C. § 412 (1982 ed.), because the claim was neither presented to nor decided by the Court of Appeals below, and thus is not properly before us. See *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981). In addition, the § 102 issue is not

included within the relevant question on which we granted certiorari ("Whether a union's discriminatory refusal to refer its members to jobs constitutes `discipline' within the meaning of the [LMRDA]?").

[1] See, *e.g.,* Ingraham v. Wright, 430 U. S. 651 (1977) (use of corporal punishment, without predeprivation hearing, as means of disciplining schoolchildren); Goss v. Lopez, 419 U. S. 565, 580 (1975) (suspension from school without hearing as form of discipline).

[2] See, *e. g.,* Preiser v. Rodriguez, 411 U. S. 475, 478-481 (1973) (unauthorized deprivation of prison good time credits as form of discipline).

[3] See Manual for Courts-Martial, United States, 1968, Ch. 26 (detailing forms of nonjudicial disciplinary punishment for minor offenses).

[4] The Court is mistaken in suggesting that the predecessor to § 101 (a)(5), which distinguished between improper discipline imposed by a union and the use of economic reprisal by any person to interfere with the exercise of protected rights, signifies congressional intent that discipline not include economic reprisal. *Ante,* at 93-94. That provision, which was later embodied in § 610 of the Act, is addressed to attempts to interfere with rights protected by the substantive provisions of Title I and not to the arbitrary imposition of discipline at which the procedural provisions are aimed. It does not follow, as the Court seems to assume, that because Congress did not prohibit "all acts that deterred the exercise of rights protected under the LMRDA," *ante,* at 91, that it also intended to permit unions to employ this particularly powerful sanction without any procedural safeguards.

[5] Section 101(a)(5), as set forth in 29 U. S. C. § 411(a)(5) (1982 ed.), provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

[6] Section 609, as set forth in 29 U. S. C. § 529 (1982 ed.), provides:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section."

[7] Contemporaneous sources are replete with examples of discipline imposed informally and through summary procedures. See, *e. g.,* National Industrial Conference Board, Studies in Personnel Policy, No. 150, Handbook of Union Government Structure and Procedures 71-72 (1955) ("A few unions make specific statements in their constitutions that members are to be disciplined without trial for certain offenses. . . . These unions have a membership of 569,857"); Note, The Power of Trade Unions to Discipline Their Members, 96 U. Pa. L. Rev. 537, 541 (1948) ("[H]earings indicate the existence of physical violence and `goon squad' activity as a less formal means of disciplining opposing factions").

[8] Indeed, even union officials testified before Congress that union disciplinary methods were informal and discipline was imposed by workers. See, *e. g.,* Hearings on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., pt. 4, p. 1483 (1959) (testimony of George Meany, President of American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)); see also 105 Cong. Rec. App. 3294 (1959) (AFL-CIO Legislative Department Analysis of Provisions in Senator McClellan's Amendment) ("Often disciplinary proceedings are usually wholly informal").

[9] Brief for United States as *Amicus Curiae* 19-20 (footnote omitted). Most of the Courts of Appeals that have considered the issue have properly concluded that depriving a member of job referrals and other forms of economic reprisals can constitute discipline under the LMRDA. See Guidry v. International Union of Operating Engineers, Local 406, 882 F. 2d 929, 940-941 (CA5 1989); Murphy v. International Union of Operating Engineers, Local 18, 774 F. 2d 114, 122-123 (CA6 1985), cert. denied, 475 U. S. 1017 (1986); Keene v. International Union of Operating Engineers, 569 F. 2d 1375 (CA5 1978); see also Moore v. Local 569, Int'l Brotherhood of Electrical Workers, 653 F. Supp. 767 (SD Cal. 1987); T. Kheel, Labor Law § 43.06[4], 43-105 (1986); Beaird & Player, Union Discipline of its Membership Under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?, 9 Ga. L. Rev. 383, 392 (1975); Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 733 (1969). But see Comment, Applicability of LMRDA Section 101 (a)(5) to Union Interference with Employment Opportunities, 114 U. Pa. L. Rev. 700 (1966). Two Courts of Appeals have held that suspension of a member from a nonexclusive job referral system did not constitute discipline when such suspension was required by the terms of the collective-bargaining agreement. See Turner v. Local Lodge No. 455, Int'l Brotherhood of Boilermakers, 755 F. 2d 866, 869-870 (CA11 1985); Hackenburg v. International Brotherhood of Boilermakers, 694 F. 2d 1237, 1239 (CA10 1982); see also Figueroa v. National Maritime Union of America, 342 F. 2d 400 (CA2 1965) (although interference with employment opportunities is covered by Act, union's compliance with collective-bargaining agreement in refusing to refer seaman does not constitute discipline).

Case 4:22-cv-00430-Y Document 131-3 Filed 05/10/22 Page 71 of 112 PageID 6285

**882 F.2d 929 (1989)**

## Robert GUIDRY, Plaintiff-Appellee, Cross-Appellant,

v.

## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants, Cross-Appellees.

<u>No. 87-4733.</u>

**United States Court of Appeals, Fifth Circuit.**

August 29, 1989.
Rehearing and Rehearing Denied September 28, 1989.

931   *930 *931 Robert H. Urann, Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants cross-appellees.

Maurice L. Tynes, Lake Charles, La., for plaintiff-appellee cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

Rehearing and Rehearing En Banc Denied September 28, 1989.

932   *932 KING, Circuit Judge:

The plaintiff-appellee, Robert Guidry, sued the defendants-appellants, the International Union of Operating Engineers, Local 406 and former and current Union leaders, alleging denial of rights guaranteed by 29 U.S.C. § 411(a) (1985), unlawful discipline in violation of 29 U.S.C. § 529 (1985), and breach of the duty of fair representation. The United States District Court for the Western District of Louisiana found in favor of the plaintiff.[1] The court awarded damages for lost wages, emotional distress, punitive damages and attorneys' fees and ordered that Guidry be reinstated to Union membership. We affirm the judgment of liability, but we remand the award of damages for further findings.

# I. FACTS

The facts, as found by the district court, are summarized as follows:

# A. Background and Players

Plaintiff-appellee Robert Guidry ("Guidry") became a member of the International Union of Operating Engineers, Local 406 (the "Union") in 1949. The Union is a constituent division of the International Union of Operating Engineers and is an unincorporated labor organization with six districts in the state of Louisiana. There is an office within each district, and the statewide central office is in New Orleans.

The Union elects a statewide Business Manager and Financial Secretary who works out of the central New Orleans Office. Defendant Peter Babin III ("Babin") has served in this position since 1976. The Business Manager negotiates collective bargaining agreements in Louisiana, serves on a committee that negotiates the National Pipe Line Agreement, acts as a trustee of the Union's Health and Welfare Fund, and appoints and supervises assistant business managers in the various districts who oversee the day-to-day functioning of the Union. These assistant business managers are also known as "business agents" ("BAs") and they represent the Union at pre-job conferences, administer the hiring hall procedures, and appoint union stewards and master mechanics to act as representatives for the Union on the job.

Babin's predecessor as Business Manager appointed defendant Willard Carlock, Sr. ("Carlock") as BA for the Union's Lake Charles District. After he took office, Babin retained Carlock as BA until Carlock and his administration of the district came under criminal investigation. Babin fired Carlock on March 10, 1984. <u>Taliaferro v. Schiro</u>, 669 F.Supp. 763, 766 (W.D.La.1987).

Attachment 3

Babin appointed defendant Columbus J. Laird ("Laird") as BA for the Lake Charles District in 1976. Laird technically had as much authority as Carlock, but he considered Carlock his boss and followed Carlock's instructions. Laird was in office until January 15, 1985 when he resigned after an indictment was brought against him, Carlock, and others. *Id.*

Babin appointed Don Schiro ("Schiro") to be statewide Pipe Line Business Agent in March 1980. Schiro represented the Union in pipeline construction jobs controlled by the National Pipe Line Agreement and was responsible for attending pre-job conferences and appointing stewards and referring workers to pipeline jobs. However, Schiro generally left these details to BAs such as Carlock and Laird. *Id.*

The district court found that Babin's supervision of the BAs was "totally inadequate." Id. at 775-76. Upon appointing a BA, Babin instructed him to run the hiring hall on a non-discriminatory basis, but otherwise did very little to supervise him. He met with each BA semi-annually to discuss local problems. He had no formal evaluation procedure, but instead relied on his own re-election as evidence that Union members were satisfied with the performances of the BAs from their districts. *Id.* at 765.

933

*933 **B. The Lake Charles District Hiring Hall**

## 1) *Generally*

The Union, as the exclusive collective bargaining agent for operating engineers in its jurisdiction, signed two major collective bargaining agreements. The first agreement is between the Union and the Lake Charles District, Associated General Contractors of Louisiana, Inc. and governs the building and construction industry (the "Building Trades Agreement"). The National Pipe Line Agreement covers all transportation mainline pipeline and underground cable work. Both agreements specify that the Union will provide labor through an exclusive hiring hall. The method for registering applicants for referral is set out in the agreements and involves placing individuals in four groups according to their work experience. The Union has always disregarded this rule and it has, instead, grouped workers together, keeping only a separate group for oilers. The hiring hall maintains two separate lists for building trades projects and pipeline projects, and, since March 1984, a worker can keep his or her name on only one list at a time. Both lists contain names in the order in which the applicant notifies the Union that he or she is available for work.

## 2) *Departures from the Hiring Hall Procedure*

Both Agreements allow the contractor to hire some of its employees on any given job outside the structure of the hiring hall. The Building Trades Agreement allows the contractor to hire key personnel directly and to recall any worker who has been employed by that contractor for at least six of the previous twelve months. The National Pipe Line Agreement allows the contractor to hire half its workforce from a group of "regular employees." Regular employees have either been employed by the contractor in the prior six months or are customarily employed by that contractor whenever it has work. *Id.* at 767.

Additionally, the Union has developed informal departures from the regular hiring hall procedure of offering a referral to the first applicant on the list. The first of these exceptions is based on the fact that the Union can, according to the agreements, name stewards to pipeline projects and master mechanics to building trades jobs to act as Union representatives. The procedure for such appointment under the agreements is to name an individual from among the Union members already referred to the job. Carlock, Laird, and Schiro departed from this rule by naming stewards and master mechanics to jobs, regardless of their positions on the list. Schiro sometimes appointed individuals who were not yet even on the list to steward positions when the job they were working on at the time was nearing completion. *Id.* at 768.

Short-term jobs, which are expected to last one to three days, also were treated as exceptions to the hiring hall procedure. Referrals for these jobs are simply given to those applicants who were present at the Union hall at the time the referral was received, irrespective of the applicants' places on the list. Union leadership made a similar exception for temporary replacements of workers who were incapacitated or could not otherwise perform their jobs. *Id.* at 768.

Finally, the Union's collective bargaining agreement with Dolphin Construction Company required that the Union refer residents of Allen Parish to its construction project there. Allen Parish residents, therefore, received referrals to those jobs before non-residents whose names were higher on the list.

Case 4:22-cv-00430-Y Document 131 Filed 05/10/22 Page 369 of 444 PageID 6247

### 3) Manipulation of the Hiring Hall Procedures and the Exceptions

The district court found that Carlock "exploited[ed] and, at times, disregard [ed] entirely the hiring hall procedures to enrich his confederates to the detriment of the plaintiff and others." *Id.* at 769. The district court went on to explain specifically the various ways in which Carlock accomplished this: (1) appointing his confederates as stewards or master mechanics irrespective of their skills or their places on the list; (2) abusing the short-term referral exception to designate some jobs as

934  short-term that he knew to be substantially longer *934 than three days; (3) allowing contractors to employ as "regular employees" workers who did not meet the requirements of that group as outlined in the National Pipe Line Agreement; (4) designating a referral as a recall under the Building Trades Agreement regardless of the individual's eligibility for recall. *Id.* at 769.

The district court found that Carlock quelled opposition by means of "intimidation and threats of retaliation in the form of economic discrimination and physical injury." *Id.* Also, the court found that Union members feared voting against Carlock because the balloting was not secret and they feared retaliation. *Id.* Finally, the court noted that Carlock made it difficult for disgruntled or suspicious workers to check their positions on the out-of-work list by keeping possession of, or control over, that list. *Id.* at 769-70.

## II. PROCEDURAL BACKGROUND

After a bench trial, the district court held in favor of the plaintiffs. The court awarded Guidry — who is the only plaintiff against whom this appeal is brought — lost wages totalling $5,310.50, $20,000 for emotional distress, $10,000 in punitive damages. The court also awarded attorneys' fees in an amount to be agreed to by the parties, or in default of that, to be set by the court. All of the above awarded damages were to be paid by the Union. The court also ordered the reinstatement of Guidry as a Union member. Additionally, the court awarded Guidry $1000 in punitive damages to be paid by Babin. The defendants timely appealed the judgment of the district court, asserting that Guidry failed to prove liability and that the damage awards are improper or excessive. Guidry cross-appeals the amount of damages awarded for emotional distress, lost wages, and punitive damages — arguing that they are inadequate.

## III. THE QUESTIONS OF LIABILITY

The Union, Carlock, Babin, Schiro, and Laird (collectively the "defendants") argue on appeal that the district court erred in holding them liable under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401-531 (1985 and Supp.1986) ("LMRDA"). The defendants also challenge the district court's conclusion that Union hiring hall procedures violated the duty of fair representation under the Labor Management Relations Act section 9(a), 29 U.S.C. § 159(a) (1973) ("LMRA"). Further, the defendants argue that Guidry failed to exhaust his internal union remedies, and therefore, his case should have been dismissed.

## A. The LMRDA Claim

Guidry argued below, and the district court found, that his rights under sections 101(a)(1), (2) of the LMRDA had been abridged, 29 U.S.C. §§ 411(a)(1), (2), and that he had been wrongfully disciplined under sections 101(a)(5) and 609, 29

935  U.S.C. §§ 411(a)(5)[2] and 529.[3] The court concluded *935 that the defendants' manipulation of the hiring hall procedures to the detriment of Guidry and the other plaintiffs constituted violations of these provisions. It also concluded that Guidry's expulsion from the Union was violative of the LMRDA. The defendants assert that the evidence presented at trial does not support this portion of the verdict and that, therefore, the district court's factfinding is clearly erroneous for two reasons: (1) that there was no evidence to support the conclusion that Guidry exercised rights guaranteed him by the LMRDA, and (2) that there was no evidence to support the conclusion that the Union acted to retaliate against Guidry for having exercised those rights. Additionally, the defendants argue that even if the evidence supports the district court's underlying fact findings, its legal conclusion that the manipulation of hiring hall procedures constitutes "discipline" within the meaning of the statutes is erroneous. We address these arguments in order.

## 1) Did Guidry Oppose Union Leadership?

Case 4:22-cv-00430-Y Document 131 Filed 03/12/21 Page 370 of 444 PageID 6258

The district court found that "Guidry [had] a long history of opposing incumbent union officers." 669 F.Supp. at 772. The defendants challenge this finding as clearly erroneous and unsupported by the evidence and assert that Guidry failed to show either that he actually opposed Union leadership or that his opposition of that leadership was known. They characterize the evidence as demonstrating that Guidry opposed the Union leadership only until 1972,[4] and as failing to show — aside from Guidry's own testimony that he had opposed every administration since 1956 — that his opposition continued beyond 1972. The defendants cite *Chapa v. Local 18*, 737 F.2d 929, 932 (11th Cir.1984), for the proposition that a plaintiff's "bald assertion" that he opposed union leadership and that the union retaliated is insufficient to support a verdict for the plaintiff on an LMRDA wrongful discipline claim.

We begin by noting that the defendants are urging us to review the district court's factfinding. Our review is limited by Federal Rule of Civil Procedure 52(a), which provides that we may not set aside such findings unless "clearly erroneous." This standard of review has been interpreted to mean:

> [that] [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Applying this standard, we conclude that the district court's factfinding is not clearly erroneous. The defendants' characterization of the record is incomplete. Far from simply containing Guidry's conclusory assertions that he generally opposed Union management, the record contains Guidry's specific testimony of particular instances of his opposition to the Union.

Guidry described in detail the circumstances of his decision in 1979 to go to the Federal Bureau of Investigation ("FBI") with evidence of Union corruption. Guidry made that decision after discussing his position with fellow Union members. Guidry testified that when Carlock and Laird discovered that he had gone to the FBI, they came on the job site at which Guidry was *936 employed as master mechanic and sought to force his employer to discharge him. Guidry ultimately filed charges against Carlock with the Union's executive board. Although these events occurred outside the one-year prescriptive period applicable to Guidry's LMRDA claim, *see infra* at section IV.A, they are not too remote in time to have been found by the district court to have triggered Union retaliation.

Guidry's testimony is replete with examples of challenges he levelled against the Union leadership's operation of the hiring hall. These include a challenge to the hiring methods on a job for which he was asked to steward — Guidry openly complained that men who had never worked for the company before were hired as "regular employees." Guidry also challenged the hiring hall when he discovered that his name had been left off the out-of-work list as a result of a new rule that required him to choose between the building trades and the pipeline lists.

According to Guidry's testimony, as well as that of Union members, Guidry's opposition to the Union leadership was hardly a secret. Charles Lovett, a member of the Union who was called to testify for the plaintiffs, noted that Guidry had been "bucking the system" at the Union for twenty-five years and had gained nothing.

The Union challenges this testimony as inadequate because it fails to show that Guidry either sought a Union office after 1972 or openly campaigned against the Union leadership in an election after 1972. The defendants argue that all of Guidry's political activity in the Union is too remote in time to support a claim of retaliation occurring in 1980-83. The flaw in the defendants' argument is their assumption that in order to assert a violation of section 101(a)(2) of the LMRDA, a plaintiff must show that he or she spoke out in opposition to Union leadership in the context of an election. We read the statute to contain a much broader protection of speech.

The statute itself speaks of the right of every union member to "express any views, arguments or opinions," 29 U.S.C. § 411(a)(2), *supra* n. 2, and does not limit such expression to one occurring in the context of a union election. In fact, the statute refers separately to a union member's right to express his views upon candidates running for union office. *Id.*

The Supreme Court has characterized the LMRDA as "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The "Bill of Rights" portion of that legislation was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Id.* at 435, 102 S.Ct. at 1870. Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sheet*

Case 4:23-cv-00430-Y Document 131 Filed 08/31/23 Page 15 of 112 PageID 6269

*Metal Workers Intern. Ass'n v. Lynn,* 488 U.S. 347, ___, 109 S.Ct. 639, 645, 102 L.Ed.2d 700 (1989) (quoting *United Steelworkers of Am. v. Sadlowski,* 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed.2d 707 (1982)).

The defendants do not cite, nor have we found, any cases that limit the free speech rights protected by the LMRDA's Bill of Rights to speech relating directly to an election within the union. While we agree with the defendants' position that the evidence adduced at trial does not support the conclusion that Guidry formally opposed Union leadership after 1972 in the context of a Union election, we conclude that the district court was not clearly erroneous in its finding that Guidry openly opposed Union leadership at least up to the time that he filed this suit.

## 2) *Did the Union Act to Retaliate Against Guidry for Exercising Free Speech Rights?*

The district court found generally that hiring hall procedures were abused and threats of retaliation in the form of economic and physical injury were used to control Union members and to enrich those members who supported the leadership. 669 F.Supp. at 769. The court also enumerated the instances of such reprisals *937 that specifically related to Guidry. In addition to discrimination in the hiring hall, the district court found that the Union retaliated against Guidry for his opposition to leadership by denying him a gold Union membership card recognizing his thirty years of service. Also, the district court found that Union economic pressure forced Guidry to violate Union rules and cross a picket line. The court found that when Guidry faced charges for having crossed the picket line, Laird telephoned supporters of the leadership to ensure that they would attend the meeting at which the membership was to vote on Guidry's fate — thus, making his expulsion almost certain.

The defendants challenge these factfindings as clearly erroneous. They argue that even if Guidry did show that he had been discriminated against in hiring hall referrals, he failed to show that such discrimination was connected to his exercise of rights protected under the LMRDA. They argue that the other union acts found by the district court to have been discriminatory were justified by long-standing Union rules.

The record contains abundant evidence, both in the form of testimony and documentation, of the procedures followed by Union leadership in referring applicants to jobs through the hiring hall. The court found twenty-one specific instances in which Union leadership manipulated the hiring hall procedure by employing one of the means outlined above. This resulted in direct harm to Guidry. See *Taliaferro,* 669 F.Supp. at 781-86 (Appendix). The district court concluded that each improper referral had been used to penalize Guidry (and the other plaintiffs) for their refusal to support the defendants. *Id.* at 776.[5] We do not find clear error in this conclusion.

The defendants argue that Guidry failed to show in each case of hiring hall discrimination that the intent of Union leadership was discriminatory. We disagree. Guidry (and the other plaintiffs) provided substantial evidence, particularly in the testimony of Laird, of the attitude of Carlock toward those members who had "voted wrong" in prior elections, and of the control Carlock exercised over the out-of-work list. This evidence, coupled with the clear evidence of Guidry's dissent from Union leadership, is sufficient to support a conclusion that the discrimination was intentional. Even though the evidence is largely circumstantial, it is sufficient to support the verdict. See *Vandeventer v. Local 513 of Int'l Union of Op. Eng.,* 579 F.2d 1373, 1380 (8th Cir.) (holding that primarily circumstantial evidence was sufficient to support verdict that union had taken retaliatory action), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

Additionally, the plaintiffs introduced testimony and exhibits regarding the specifics of each wrongful referral found by the district court. After reviewing the evidence supporting each of the twenty-one wrongful referrals, which involved jumping over Guidry's name on the out-of-work list, this court is convinced that the district court's factfinding is correct and supported by substantial evidence. We, therefore, do not disturb the district court's conclusion that discrimination in the hiring hall referrals took place and was used in retaliation for Guidry's failure to support Union leadership.

## 3) *Does the Manipulation of Hiring Hall Procedures Constitute Discipline within the Meaning of Sections 101(a)(5) and 609 of the LMRDA?*

937

938  The defendants challenge the district court's holding that the wrongful hiring hall referrals constitute "discipline" within the meaning of sections 101(a)(5) *938 and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5) and 529. They argue that according to _Finnegan v. Leu, supra,_ the term "discipline" in section 609 refers to actions taken by the union that diminish the membership rights of a union member. Hiring hall discrimination does not qualify, according to the defendants, because hiring hall referrals must be made available to non-union members. _United Ass'n of Journeymen, Local 198 v. NLRB, 747 F.2d 326 (5th Cir.1984);_ National Labor Relations Act, § 8(b)(1)(A), (b)(2), 29 U.S.C. § 158(b)(1)(A), (b)(2).

The issue presented here — whether proof that a union has retaliated against one of its members for his exercise of a right protected under section 101 of the LMRDA constitutes "discipline" within the meaning of section 609 of that act — has been addressed by a number of courts with apparently contradictory results. We conclude, however, that the cases can be harmonized, and we hold that under the facts presented here, Guidry has made out a proper claim for wrongful discipline in violation of the LMRDA.

In _Miller v. Holden,_ we held:

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

535 F.2d 912, 915 (5th Cir.1976). We decided that the claim brought in _Miller_ — that the plaintiff's discharge from his employment by a trust established by, but separate from, his union — did not state a cause of action under the LMRDA because the discharge did not constitute "discipline" under the statute. In determining the meaning of discipline we looked first to the statute and its legislative history, _id._ at 914 n. 5 (citing 1 Legislative History of LMRDA of 1959, 338, 516, 619, 687, 858 (NLRB ed. 1959)), but concluded that neither was enlightening on the issue. We, therefore, applied the principal of statutory construction of _ejusdem generis_ and construed the general term discipline to conform to the essential character of the three specific types of discipline listed in the statute: fine, expulsion, and suspension. _Id._ at 914-15. Our result required, as quoted above, that the union action separate the plaintiff from other union members in good standing to constitute discipline.

We followed the holding in _Miller_ to find that manipulation of hiring hall referrals to the detriment of the plaintiff constituted discipline within the meaning of LMRDA in _Keene v. International Union of Op. Eng., Local 624, 569 F.2d 1375 (5th Cir.1978)._ In that case, the plaintiff had unsuccessfully run for union office. He showed that after his loss in the election he received virtually no referrals through the union's hiring hall and that over two hundred people with less priority on the out-of-work list received referrals in preference to him. We held that a jury could reasonably conclude that such discrimination in referrals constituted discipline for exercising rights protected under the LMRDA.

The question, however, is not so easily resolved. The Supreme Court addressed the issue of what constitutes "discipline" under section 609 of the LMRDA in a different, but related, context in _Finnegan v. Leu, supra._ In that case, the plaintiffs sued under the LMRDA after they were discharged from their employment as union business agents following the election of Leu as president of the union. The plaintiffs had openly supported Leu's rival, the incumbent president, in the campaign. At trial, Leu explained that he had discharged the plaintiffs because he felt that they were loyal to the incumbent and would be unable to implement his policies. The Court held that the term discipline in section 609 "refers only to retaliatory actions that affect a union member's rights or status _as a member_ of the union." 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis added). It concluded that the discharge of the plaintiffs from their appointive union positions was not within the scope of 

939  "other discipline" contemplated by section 609. _Id._ at *939 439, 102 S.Ct. at 1872.[6] The Court reasoned that the LMRDA was intended to protect rank-and-file union members, rather than union officers or employees. Therefore, while the plaintiffs' right to campaign against a candidate for union president was protected, such campaigning did not immunize them from discharge at the pleasure of the new president from their jobs as union employees.

In cases not involving the loss of employment within the union itself, an apparent conflict in interpreting _Finnegan_ has arisen. In _Hackenburg v. International Bhd. of Boilermakers, Local 101, 694 F.2d 1237 (10th Cir.1982),_ the court followed _Finnegan_ to hold that union members who were "benched" — that is they received no referrals — following a wildcat strike had not been "otherwise disciplined" within the meaning of the LMRDA.

Case 4:22-cv-00430-Y Document 131 Filed 08/30/24 Page 373 of 444 PageID 6281

In *Hackenburg,* the union, following the terms of its collective bargaining agreement with an employer, deprived the plaintiffs of any job assignments for ninety days as a result of their involvement in a wildcat strike. The plaintiffs sued, arguing that they had been "otherwise disciplined" within section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), without the procedural protections afforded by that section. The court determined that the "sanctions imposed were employment related rather than internal union related," 694 F.2d at 1240, and, relying on *Finnegan,* held that the procedural safeguards of section 101(a)(5) were not available because the punishment was not related to the union members' rights or status as members. *Id.* at 1239.

*Turner v. Local Lodge # 455 of the Int'l Bhd. of Boilermakers,* 755 F.2d 866 (11th Cir.1985), involves circumstances very similar to those in *Hackenburg.* The plaintiffs in *Turner* also suffered a ninety-day benching pursuant to the terms of a collective bargaining agreement as a result of their refusal to cross an illegal picket line. The court first noted that the plaintiffs' contention that the benching had actually occurred in retaliation for their exercise of rights protected by sections 101(a)(1) and (2) of the LMRDA had been properly taken away from the jury because of the lack of evidentiary support. It then addressed the plaintiffs' contention — which was identical to that in *Hackenburg* — that the benching had violated section 101(a)(5) because proper procedures had not been followed before the union imposed the sanction.

The court considered the broad language in section 101(a)(5) and stated that "the sweeping language ... cannot be read out of context, but must be taken as backing and support for union members exercising their `Bill of Rights' and that any union disciplinary measure unrelated to the `Bill of Rights' is not covered." *Turner,* 755 F.2d at 869. Therefore, the absence of any claim of retaliation by the union was fatal to the plaintiffs' LMRDA claim. The court then went on to state that under the interpretation *940 of "discipline" found in *Finnegan,* the benching in the case before it did not constitute discipline, because it did not affect the plaintiffs' rights as members of the union in as much as union membership is not a requirement in order for one to be carried on the out-of-work list and receive employment referrals. *Id.* In concluding, however, the court noted that "the case might be different" if there had been evidence of, for example, "retaliation for exercise of a protected right." *Id.* at 870.

Such a different result was reached by the Sixth Circuit in *Murphy v. International Union of Op. Eng., Local 18,* 774 F.2d 114 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), in which the court found that a denial of work assignments through a hiring hall to a union member in retaliation for his opposition of union leadership could be considered "discipline" within the meaning of section 101(a)(5). *Murphy,* 774 F.2d at 122. The court went on to uphold the district court's conclusion that although the union's actions were not "discipline," they were nevertheless actionable as violative of sections 101(a)(1) and (2). The court distinguished *Finnegan* on the ground that the *Finnegan* court had been concerned with union employees and the right of a union leader to choose people to help him run the union. *Id.* at 123. The court stated: "Plainly, the Supreme Court in *Finnegan* did not intend to rule out [29 U.S.C.] section 411 as a protection against manipulative discrimination on behalf of an ordinary union member seeking to exercise his right of expression at union meetings." *Id.* The court also distinguished *Turner* and *Hackenburg* simply by noting that the unions involved in both had acted pursuant to collective bargaining agreements. Id. at 122 n. 5. The court did not address the question of whether the language in *Turner,* which states that a refusal to refer a member to employment does not affect his rights as a member, 755 F.2d at 869, precluded a determination that such a refusal could constitute discipline in any circumstances.

In *Moore v. Local 569 of the Int'l Bhd. of Elec. Workers,* 653 F.Supp. 767 (S.D.Cal.1987), the court directly addressed the problem avoided in *Murphy* — that *Turner* appears to preclude a holding that discriminatory referral procedures affect union members' *rights* as a member of the union. The court began by analyzing the reasoning in the problematic dicta from *Turner* that because non-members could take advantage of a union hiring hall, membership rights are not affected by a discriminatory hiring hall. *Moore,* 653 F.Supp. at 770. The *Moore* court decided that this language did not preclude a determination that membership rights were ever affected by such discrimination for two reasons. First, the court inferred that in *Turner,* the plaintiffs no longer had a right to be referred to work because of their involvement in wildcat strikes prohibited under the collective bargaining agreement. *Id.* Second, and more importantly, the court reasoned that one of the rights of a union member was to receive nondiscriminatory referrals from the union hiring hall. The court concluded that the ability of non-members to place their names on the out-of-work list did not diminish and, in fact, had no relationship to that right. The court, therefore, rejected the union's contention in the case before it that the dicta in *Turner* regarding the issue of whether benching could constitute discipline should control. It found instead that the plaintiffs' allegations stated a cause of action under section 609 of the LMRDA. *Id.* at 770-71.

We agree with the *Moore* court's rejection of this dicta from *Turner* in circumstances such as those before us. It is apparent from the evidence that Guidry's name was repeatedly skipped over on the out-of-work list in retaliation for his outspoken opposition to Union leadership. Here, as in *Murphy,* and as distinguished from *Turner* and *Hackenburg,* there was evidence

Attachment 3

of a reprisal for exercise of rights protected under the LMRDA. The *Turner* court itself noted that if there is evidence of union retaliation the case might be different. We also point out that here, as distinguished from *Finnegan,* the question involves the right to fair treatment of a union member by his union. In *Finnegan,* *941 the plaintiffs were seeking to retain their employment by the union, not something to which every union member is entitled. Here, on the other hand, the plaintiff simply seeks not to be singled out for unfair treatment by his union. We simply cannot agree with the defendants' contention that the discriminatory administration of the hiring hall does not represent the kind of discipline covered by the LMRDA.

## B. Exhaustion of Union Remedies

The defendants challenge the district court's ruling on the ground that Guidry failed to exhaust his internal union remedies, and, as a result, they argue that his suit should have been dismissed. In his complaint, as well as on brief to this court, Guidry asserts that pursuit of his internal union remedies would have been futile, and therefore, he is not required to exhaust that avenue before filing this suit. The district court did not directly address this question, although it clearly did not find that Guidry's failure to exhaust internal union remedies precluded this suit.

Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts in their discretion to require that a union member exhaust his internal remedies before filing suit. *See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982).

Before a union member may bring suit against his union for breach of the duty of fair representation under section 301 of the LMRA, 29 U.S.C. § 185, the member must either exhaust union remedies or show an adequate reason for not doing so. *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). Here too, courts have discretion to decide whether to require such exhaustion. *Id.* at 689, 101 S.Ct. at 2095. Factors relevant to the inquiry of whether to require exhaustion are: (1) whether union officials are so hostile to the member that he cannot hope to obtain a fair hearing; (2) whether the union procedures are adequate; and (3) whether requiring exhaustion would unreasonably delay the member in pursuing his rights. *Id.* Guidry asserts that the first of these exceptions is applicable here.

The Union Constitution and Bylaws, admitted into evidence in the court below, provide simply that the local union's determination of any grievance shall be final and binding. Neither provides specific grievance procedures for the type of complaint Guidry asserts. In such absence of procedural requirements, an employee may proceed to file suit after pursuing his contractual remedies. *Hammons,* 783 F.2d at 602. Additionally, where it is clear, as here, that because the complaint is directed at those officials who would hear Guidry's complaint, the member should be excused for his failure to exhaust internal remedies. *Hayes v. Brotherhood of Ry. and Airline Clerks/Allied Servs. Div.,* 734 F.2d 219 (5th Cir.), *cert. denied,* 469 U.S. 935, 105 S.Ct. 336, 83 L.Ed.2d 272 (1984).

## IV. THE DAMAGE AWARDS

## A. The Statute of Limitations

The district court, following *Local 1397, United Steelworkers of Am. v. United Steelworkers of Am.,* 748 F.2d 180 (3d Cir.1984), applied a six-month statute of limitations to the plaintiffs' LMRDA claims. It therefore looked back six months prior to the date of filing of the suit to determine the amount of damages. After the district court rendered its decision, and after oral argument on this case, the Supreme Court overruled *Local 1397. Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). The Court held in *Reed* that, unlike claims brought under section 301 of the LMRA, *see DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), claims brought under section 101(a)(2) of the LMRDA are more akin to civil rights claims than to unfair labor practice charges. Therefore, the Court reasoned under the rule established in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the state general or residual personal injury statute of *942 limitation should apply to actions brought under section 101(a)(2). Therefore, we look to Louisiana state law to determine the appropriate statute of limitations for the LMRDA claims. The claims under section 301 of the LMRA are, however, still subject to the six-month limitation.

Article 3492 of the Louisiana Civil Code provides a one-year limitations period for delictual actions, which include personal injury actions. La.Civ.Code Ann. art. 3492 (West Supp.1989). Therefore, the limitations period that should be applied to Guidry's claims under the LMRDA is one year.[7] Because the damages amount must be based in part on facts not found by

the district court, we must remand the damages portion of this cause for a redetermination of the amount of damages to be awarded. However, we can and will address the legal issues raised by the parties regarding the types of damages awarded.

## 1) *Punitive Damages*

The district court awarded punitive damages to be paid both by the Union and Babin, relying on *International Bhd. of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968), and *Parker v. Local Union No. 1466, United Steelworkers of Am.*, 642 F.2d 104, 106 (5th Cir.1981), for the proposition that punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." *Braswell*, 388 F.2d at 199.

On appeal, the defendants urge us to overrule this Circuit's precedent and rule that punitive damages are unavailable in LMRDA cases. Alternatively, they argue that the evidence does not support the finding of malice on which the punitive damage award depends. We find neither argument convincing.

As to the first argument, we simply point out that as a panel of this court, we are not free to overrule the precedent of prior Fifth Circuit cases. Only the *en banc* court has the necessary power to do so. *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir.1978). As to the defendants' second argument, we point to our discussion *supra* at parts III A. 1 and 2 of the sufficiency of the evidence. We conclude that the evidence adduced at trial supports the district court's finding of malice, and therefore we uphold the court's decision to award punitive damages,

943 although, *943 for the reason noted below, we vacate the amount of the award.

On cross-appeal, Guidry argues that the amount of punitive damages awarded was insufficient and he seeks enhancement of the amount to $250,000. The only argument Guidry advances for this position asserts essentially that because the Union can afford more, this award is not sufficiently punitive. Because we remand this case for a redetermination of the damage award, we decline to address this issue. Because the district court may have been influenced in its decision on punitive damages by the amount of actual damages, we vacate the punitive damage award and leave it to the district court, in its discretion, to fix once again the amount of punitive damages when the amount of actual damages has been recomputed.

## 2) *Emotional Distress*

The defendants also contest the award of damages for emotional distress, arguing that because the plaintiffs failed to present evidence of any physical manifestations of that distress, such an award is unavailable under the LMRDA. We agree that emotional distress "standing alone does not constitute a sufficient basis for the awarding of damages under the [LMRDA]." *Bise v. International Bhd. of Elec. Workers, Local 1969*, 618 F.2d 1299 (9th Cir.1979) (quoting *International Bhd. of Boilermakers v. Rafferty*, 348 F.2d 307, 315 (9th Cir.1965)), *cert. denied*, 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). In order to protect against spurious claims for emotional distress that might drain union coffers and thereby deprive other members of effective representation, some courts have required LMRDA claimants who seek damages for emotional distress also to adduce some evidence of actual injury. *See id.* Other courts do not impose an actual injury requirement. *Compare Bise, supra* with *Bradford v. Textile Workers of Am.*, 563 F.2d 1138, 1144 (4th Cir.1977). Whether to impose an actual injury requirement, as well as what such a requirement entails, are issues of first impression for this Circuit.

We conclude, as the district court did, that LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury. The environment in which LMRDA claims arise — discipline and termination by both unions and employers — is emotionally charged at the outset and, thus, one in which claims for emotional distress are likely to be the rule rather than the exception. Moreover, the subjective nature of these claims makes it particularly difficult to dismiss meritless actions at early stages in the litigation — before the union has gone to considerable expense in defending the action. Hence, we agree with the Ninth Circuit that an actual injury requirement should be imposed in order to protect unions in their representative capacities from malice from within.

A further issue to be resolved, however, is what type of evidence will suffice to establish "actual injury." Despite professed agreement, the two circuit courts that have addressed this problem construe "actual injury" in different ways. In *Rodonich v. House Wrecker's Union Local 95*, 817 F.2d 967, 977 (2d Cir.1987), the Second Circuit upheld the following jury instruction: "[y]ou must find such mental or emotional distress based upon the particular plaintiff's physical condition or medical evidence." *Id.* The Second Circuit then declared that "[t]he qualification that claims of emotional distress be supported by a

Case 4:22-cv-00430-Y   Document 131-3   Filed 09/09/22   Page 376 of 442   PageID 8364

physical manifestation of injury is an appropriate safeguard against the award of excessive and speculative damages." *Id.; see also Petramale v. Local 17, Laborers' Int'l Union of North Am., 847 F.2d 1009, 1012 (2d Cir.1988).* The Ninth Circuit, however, construes "actual injury" more broadly. In *Bise* and its progeny,[8] lost wages, as well as physical manifestations of emotional distress, served as sufficient indication of actual injury. In the case before us, the district court awarded damages for emotional distress to those plaintiffs who could *944 demonstrate actual injury through lost wages.

944

We adopt the Ninth Circuit's approach. We fail to see why physical manifestations of injury should be the sole guarantor of genuineness; financial distress may well be the most reliable and frequent cause of mental distress. Moreover, whatever the indicia of actual injury used, plaintiffs who seek damages for emotional distress must present credible evidence of that distress. District courts should not be hidebound to antiquated notions about the nature of mental injury and suffering in order to determine whether an LMRDA claim is genuine. We therefore affirm the district court's interpretation of the actual injury requirement. We vacate the award, however, for reconsideration along with the other components of damages to be awarded.

## 3) *Attorneys' Fees*

The district court awarded to Guidry and the other plaintiffs "reasonable" attorneys' fees. The court looked to *Hall v. Cole, 412 U.S. 1, 4-5, 93 S.Ct. 1943, 1945-46, 36 L.Ed.2d 702 (1973)* to determine the standards for an award of reasonable attorneys' fees. *Hall* allows an award of attorneys' fees to a successful party even in the absence of statutory or contractual authority when his opponent has acted in bad faith or when his success in the litigation confers a benefit on members of an ascertainable class, and where the court's award of attorneys' fees will make it possible to spread the cost of litigation over the class of beneficiaries of the suit. The court below held that, in this case, attorneys' fees were available under both theories.

On appeal, the defendants argue that the district court's application of these two theories was an error of law. We agree.

The bad faith exception to the general rule — that absent contractual or statutory authority, attorneys' fees are not recoverable — is set out in detail in *Shimman v. International Union of Op. Eng., Local 18, 744 F.2d 1226, 1228-34 (6th Cir.1984) (en banc), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).* *Shimman* makes clear that the focus of the bad faith inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense, or abuses the process so as to create an inquiry separate from the underlying claim. *Id.* at 1231. This court has adopted the same reasoning. *See, e.g., Batson v. Neal Spelce Assoc., 805 F.2d 546, 550 (5th Cir.1986).*

There is no evidence that the defendants in this case have either brought a frivolous defense or pursued the litigation in a vexatious manner. For that reason, we disagree with the district court's holding that the bad faith exception is applicable here.

The common benefit theory is also unavailable to Guidry. The *Shimman* court discussed this theory as well. In *Shimman,* as in the instant case, the underlying litigation resulted in a damage award benefitting only the plaintiffs personally. The plaintiffs contended in *Shimman,* as they do here, that although the money awards do not benefit the union membership as a whole, an incidental benefit of the awards — dispelling the chill on free speech created by union leadership — does inure to the benefit of all union members.

The court in *Shimman* explicitly rejected this theory. 744 F.2d at 1235. The court reasoned that the idea of the common benefit theory is to shift the costs of litigation to those who would have had to pay if they had brought the suit. *Id.* In *Shimman,* as here, other members of the union could not have brought suit to redress the injuries of an individual union member. Further, an award of attorneys' fees here would not spread the costs of litigation proportionate to the common benefit. Guidry would have to pay no more for the cost of litigation than any fellow union member, but he would receive substantially greater benefits in the form of cash awards.

We therefore hold that on remand, the district court should not include an award of attorneys' fees in its damages award.

945

*945 4) *Lost Wages*

Guidry argues in his cross-appeal that the amount of lost wages awarded was inadequate to compensate him. Once again, we are not in a position to review the district court's damage determination because we are remanding that portion of the holding. We note, however, that the district court's method of determining the lost wages due — comparing Guidry's actual wages to the average amount earned by union members during the limitations period — is a sound and fair method of making that determination.

# V.

For all the foregoing reasons, we AFFIRM the judgment as to the defendants' liability, and we VACATE the award of damages and REMAND for redetermination of the proper amount. Costs shall be borne by the defendants.

[1] The district court held trial on five related cases simultaneously and found for the plaintiff in each of the cases. _Taliaferro v. Schiro_, 669 F.Supp. 763 (W.D.La.1987). The defendants appeal the judgment in this case only.

[2] Sections 411(a)(1), (2), and (5) read as follows:

(1) Equal Rights

Every member of a labor organization shall have equal rights and privileges within such an organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of Speech and Assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(5) Safeguards Against Improper Disciplinary Action

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Section 101, 29 U.S.C. Sec. 411, is often referred to as the union members'"Bill of Rights."

[3] Section 529 ("Prohibition on certain discipline by labor organization") reads as follows:

It shall be unlawful for any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

[4] It is clear from the evidence that the last time Guidry ran for Union office was in 1972.

[5] The district court also concluded that each improper refusal constituted a breach of the duty of fair representation under 29 U.S.C. § 159(a). 669 F.Supp. at 775-76. The defendants dispute this conclusion, solely on the ground that the evidence is insufficient to support the factfinding that intentional discrimination in hiring hall referrals had occurred. We therefore conflate their arguments under the LMRDA and the duty of fair representation to the extent they concern the sufficiency of the evidence. That is, we address only once the issue of whether the finding that the operation of the hiring hall was intentionally discriminatory was clearly erroneous.

[6] The Court went on to address the question of whether section 102 of the LMRDA, 29 U.S.C. § 412, provided independent authority for the suit. Section 102 provides that:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

The Court noted that the intended relationship between this provision and section 609 was "not entirely clear," 456 U.S. at 439, 102 S.Ct. at 1872, but indicated that a litigant could maintain an action under section 102 without necessarily stating a violation of section 609. However, it concluded that in the circumstances before it no "rights secured" by the subchapter had been infringed, holding that whatever limits the subchapter placed on the union's authority to use dismissal to suppress dissent, it did not restrict union leaders from choosing a staff with views compatible with their own. _Id._ at 440-41, 102 S.Ct. at 1872-73. In _Sheet Metal Workers' Inter. Ass'n v. Lynn_, 488 U.S. 347, 109 S.Ct.

659, 102 L.Ed.2d 700 (1989), the Court recently limited this portion of the holding in *Finnegan* to cases in which the union employment was appointive, rather than elective. The Court reasoned in *Lynn* that when an elective official is removed from his post, the union members are denied their chosen representative, and the chilling effect on free speech is more widespread. *Id.* 109 S.Ct. at 645.

Because we find that a violation of section 609 has occurred here, it is clear that this suit could also be maintained under section 102. That does not, however, affect the result here.

[7] A subsidiary issue is whether *Reed* should be afforded retroactive effect in this case. We believe that it should.

The general rule is that federal cases should be decided according to the law existing at the time of the decision. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 105-09, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), however, the Supreme Court declined to apply retroactively a limitations period that would have time barred a litigant's lawsuit. The Court refined a three-part nonretroactivity test: (1) the supervening decision must establish an unforeseen and unforeshadowed principle of law, as where the Court has overruled clear circuit precedent on which the litigants may have relied; (2) the purposes of the substantive law upon which the limitations period operates would not be served by retroactivity; and (3) retroactive application would produce inequitable results. *Id.* at 106-07, 92 S.Ct. at 355-56. These factors provide no basis for refusing retroactive application of *Reed* to this case.

Prior to *DelCostello,* the established precedent in the Fifth Circuit specified application of an appropriate state statute of limitations in section 101(a)(2) cases. *Sewell v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 445 F.2d 545, 548-50 (5th Cir.1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972) (applying a one-year Alabama statute of limitations for tort actions). No post-*DelCostello* Fifth Circuit decision definitively altered this rule until the district court below adopted the Third Circuit's *Local 1397* interpretation of a six-month limitations period. Thus, *Chevron* `s first factor clearly is not satisfied: Fifth Circuit precedent was not overruled by, but in fact supported, the *Reed* decision; at most, the limitations issue was unsettled after *DelCostello.* Likewise, the remaining two *Chevron* factors cannot be met. Applying Louisiana's one-year limitations period to determine damages in this case would further the remedial goals of section 101(a)(2) of the LMRDA without substantially frustrating any federal policy of repose, and would not be inequitable, as litigants in this Circuit could not have justifiably relied on a six-month limitations period prior to *Reed. See Goodman,* 482 U.S. at 662-64, 107 S.Ct. at 2621-22.

[8] *See, e.g., Bloom v. International Bhd. of Teamsters,* 752 F.2d 1312, 1315 (9th Cir.1984).

**907 F.2d 1491 (1990)**

## Robert GUIDRY, Plaintiff-Appellee Cross-Appellant,

v.

## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants Cross-Appellees.

<u>No. 87-4733.</u>

**United States Court of Appeals, Fifth Circuit.**

May 22, 1990.

As Modified on Petition for Rehearing July 25, 1990.[*]

1492 *1492 Robert H. Urann and Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants, cross-appellees.

Maurice L. Tynes, Lake Charles, La. and Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for plaintiff-appellee, cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

# ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

PER CURIAM:

On March 19, 1990, the Supreme Court ___ U.S. ___, <u>110 S.Ct. 1465, 108 L.Ed.2d 603,</u> vacated our judgment in <u>Guidry v. International Union of Operating Engineers,</u> 882 F.2d 929 (5th Cir.1989), and remanded for further proceedings in light of <u>Breininger v. Sheet Metal Workers International Association,</u> ___U.S. ___, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). We, in turn, remand to the district court.

1493 In <i>Breininger,</i> the Court held that the phrase "otherwise discipline" under sections 101(a)(5) and 609 of the Labor Management Reporting and Disclosures *1493 Act of 1959 (LMRDA) denotes only that punishment "authorized by the union as a collective entity to enforce its rules." <i>Id.</i> <u>110 S.Ct. at 439.</u> In other words, an action must be "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." <i>Id.</i> (quoting <u>Miller v. Holden,</u> 535 F.2d 912, 915 (5th Cir.1976)). The union need not, however, invoke formal proceedings, and discipline can entail informal or summary penalties as long as adverse action against a union member is not purely "ad hoc retaliation by individual union officers." <i>Id.,</i> <u>110 S.Ct. at 439 n. 15.</u> "Discipline `must be done in the name of or on behalf of the union as an organizational entity.'" <i>Id.</i> The petitioner in <i>Breininger</i> "alleged only that [certain union officers] failed to refer him to employment because he supported one of their political rivals." <i>Id.</i> at 440. Thus, the petitioner failed to allege acts constituting discipline by the union as a collective entity.

The Supreme Court's interpretation of the phrase "otherwise discipline" in determining whether hiring hall discrimination gives rise to a claim under sections 101(a)(5) and 609 of the LMRDA does not affect that portion of our panel opinion affirming liability and damages based on Guidry's claim that the Union breached its duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 159(a). <i>See</i> <u>Guidry,</u> 882 F.2d at 937 & n. 5. Therefore, this portion of our prior opinion is reinstated.

On the issue of LMRDA liability, we need remand only with respect to those claims potentially impacted by the Supreme Court's decision in <i>Breininger,</i> that is, Guidry's unlawful discipline claims based on sections 101(a)(5) and 609 of the Act.[1] <i>Breininger</i> does not alter the district court's judgment regarding the defendants' violations of Guidry's equal rights under section 101(a)(1) and right to free speech under section 101(a)(2). A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful "discipline" is shown. <u>Finnegan v. Leu,</u> 456 U.S. 431, 439, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982); <u>Murphy v. International Union of Operating Engineers, Local 18,</u> 774 F.2d 114, 122 (6th Cir.1985), <i>cert. denied,</i> <u>475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986).</u>

Attachment 4

If Guidry wishes to pursue his unlawful discipline claims on remand, the district court must determine, in view of *Breininger,* whether the Union as a collective entity was responsible for hiring hall discrimination against him. The court should make new findings, taking additional evidence if needed, and render its judgment accordingly.

In our previous opinion in this case, we vacated the district court's award of LMRDA damages, holding that, due to an intervening Supreme Court case, *Reed v. United Transportation Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), the district court erred in applying a six-month statute of limitations to Guidry's LMRDA claims. *See Guidry,* 882 F.2d at 941-42. We remanded for a redetermination of damages based on violations occurring within one year of filing suit, applying Louisiana's one-year limitations period for delictual actions. *Id.* at 941-45. This holding is unaffected by *Breininger,* and we therefore remand for a reassessment of damages consistent with the discussion contained in our previous opinion. *Id.*

REMANDED.

# ON PETITION FOR REHEARING

PER CURIAM:

In our opinion dated August 29, 1989, this court affirmed a district court judgment in favor of plaintiff Robert Guidry (Guidry) as to the liability of the International Union of Operating Engineers, Local 406 and former and current Union leaders (the

1494   defendants) for violations of the Labor *1494 Management Relations Act (LMRA), 29 U.S.C. § 159(a), and the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411(a)(1), (2), (5), and 529. *Guidry v. International Union of Operating Engineers, Local 406,* 882 F.2d 929 (5th Cir.1989), *vacated,* ____ U.S. ____, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990). We remanded, however, for a reassessment of damages. *Id.* at 941-45. The Supreme Court subsequently vacated our judgment and remanded for further consideration in light of its decision in *Breininger v. Sheet Metal Workers International Association Local Union No. 6,* ____ U.S. ____, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), a case that addressed the issue of whether hiring hall discrimination constituted "discipline" within the meaning of sections 101(a)(5) and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5), 529. We, in turn, remanded to the district court for further proceedings in light of *Breininger,* to the extent that *Breininger* affected our panel's prior opinion. *Guidry,* 902 F.2d 335 (1990). Of course, for the reasons explained in our prior opinion, a remand to the district court was necessary, in any event, to reassess Guidry's damages. *See Guidry,* 882 F.2d at 941-45 (holding that actual and punitive damages based on Guidry's LMRDA claims should be reassessed under a one-year limitations period).

Guidry now petitions this court for panel rehearing and for rehearing en banc. Guidry argues that a remand on the liability issue is required only as to those claims potentially affected by the *Breininger* decision — i.e., those claims based on sections 101(a)(5) and 609 of the LMRDA[2] — and that our mandate erroneously instructs the district court to make new determinations of liability on all of his claims. He contends that *Breininger* in no way impacts the district court's finding of liability based on the defendants' breach of the duty of fair representation under the LMRA, 29 U.S.C. § 159(a). He also argues that the district court's finding of liability under the LMRDA may be affirmed on the alternative grounds of Guidry's LMRDA equal rights and free speech claims, 29 U.S.C. §§ 411(a)(1), (2) — theories of recovery that were not addressed by the Supreme Court in *Breininger,* and that are not affected by the Court's decision in that case.

Having considered Guidry's motion for rehearing, we conclude that his complaint is well taken. Although it was not our intention to require the district court to reevaluate the defendants' liability for breach of the duty of fair representation, 29 U.S.C. § 159(a), or for violation of Guidry's rights to equal union member rights and free speech, 29 U.S.C. §§ 411(a)(5), 529, we admit that our mandate is not completely clear on this point. We therefore modify our prior order, by deleting the last full paragraph and substituting in its place the following four paragraphs.[**]

[*] Editor's Note: This opinion was originally published at 902 F.2d 335 and is republished here incorporating the ordered modifications.

[1] Guidry's expulsion and the district court's reinstatement of Guidry to the Union are not at issue as expulsion is explicitly set out in the LMRDA as a form of discipline. *See* 29 U.S.C. §§ 411(a)(5), 529.

[2] Guidry correctly notes that the Supreme Court's holding regarding a plaintiff's burden of pleading and proof under the LMRDA looks only to sections 101(a)(5) and 609 of the Act, 29 U.S.C. §§ 411(a)(5), 529, and is based on its construction of the term "discipline" contained in those sections.

Case: 4:22-cv-00437-YD Document 131 Filed 06/20/22 Page 3 of 44 PageID 62669

[*] Editor's Note: These paragraphs have been incorporated at the end of the opinion at 1493.5.

Attachment 4

Case 4:22-cv-00437-YD Document 131 Filed 09/16/22 Page 2 of 44 PageID 62070

**484 U.S. 29 (1987)**

## UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.

### v.

## MISCO, INC.

<u>No. 86-651.</u>

**Supreme Court of United States.**

Argued October 13, 1987

Decided December 1, 1987

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

31    *31 *David Silberman* argued the cause for petitioners. With him on the briefs were *Lynn Agee, Michael Gottesman,* and *Laurence Gold.*

*A. Richard Gear* argued the cause and filed a brief for respondent.[*]

JUSTICE WHITE delivered the opinion of the Court.

The issue for decision involves several aspects of when a federal court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement.

## I

Misco, Inc. (Misco, or the Company), operates a paper converting plant in Monroe, Louisiana. The Company is a party to a collective-bargaining agreement with the United Paperworkers International Union, AFL-CIO, and its union local (the Union);

32    the agreement covers the production and maintenance *32 employees at the plant. Under the agreement, the Company or the Union may submit to arbitration any grievance that arises from the interpretation or application of its terms, and the arbitrator's decision is final and binding upon the parties. The arbitrator's authority is limited to interpretation and application of the terms contained in the agreement itself. The agreement reserves to management the right to establish, amend, and enforce "rules and regulations regulating the discipline or discharge of employees" and the procedures for imposing discipline. Such rules were to be posted and were to be in effect "until ruled on by grievance and arbitration procedures as to fairness and necessity."[1] For about a decade, the Company's rules had listed as causes for discharge the bringing of intoxicants, narcotics, or controlled substances on to plant property or consuming any of them there, as well as reporting for work under the influence of such substances.[2] At the time of the events involved in this case, the Company was very concerned about the use of drugs at the plant, especially among employees on the night shift.

Isiah Cooper, who worked on the night shift for Misco, was one of the employees covered by the collective-bargaining agreement. He operated a slitter-rewinder machine, which uses sharp blades to cut rolling coils of paper. The arbitrator found that this machine is hazardous and had caused numerous injuries in recent years. Cooper had been reprimanded

33    twice in a few months for deficient performance. *33 On January 21, 1983, one day after the second reprimand, the police searched Cooper's house pursuant to a warrant, and a substantial amount of marijuana was found. Contemporaneously, a police officer was detailed to keep Cooper's car under observation at the Company's parking lot. At about 6:30 p.m., Cooper was seen walking in the parking lot during work hours with two other men. The three men entered Cooper's car momentarily, then walked to another car, a white Cutlass, and entered it. After the other two men later returned to the plant, Cooper was apprehended by police in the backseat of this car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. Cooper was arrested and charged with marijuana possession.[3]

On January 24, Cooper told the Company that he had been arrested for possession of marijuana at his home; the Company did not learn of the marijuana cigarette in the white Cutlass until January 27. It then investigated and on February 7 discharged Cooper, asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs

Attachment 5

on the plant premises.[2] Cooper filed a grievance protesting his discharge the same day, and the matter proceeded to arbitration. The Company was not aware until September 21, five days before the arbitration hearing was scheduled, that marijuana had been found in Cooper's car. That fact did not become known to the Union until the hearing began. At the hearing it was stipulated that the issue was whether the Company had "just cause to discharge *34 the Grievant under Rule II.1" and, "[i]f not, what if any should be the remedy." App. to Pet. for Cert. 26a.

34

The arbitrator upheld the grievance and ordered the Company to reinstate Cooper with backpay and full seniority. The arbitrator based his finding that there was not just cause for the discharge on his consideration of seven criteria.[5] In particular, the arbitrator found that the Company failed to prove that the employee had possessed or used marijuana on company property: finding Cooper in the backseat of a car and a burning cigarette in the frontseat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property. Id., at 49a-50a. The arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge.[6]

The Company filed suit in District Court, seeking to vacate the arbitration award on several grounds, one of which was that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The District Court agreed that the award must be set aside as contrary to public policy because it ran *35 counter to general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as to state criminal laws against drug possession. The Court of Appeals affirmed, with one judge dissenting. The court ruled that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The arbitrator had found that Cooper was apprehended on company premises in an atmosphere of marijuana smoke in another's car and that marijuana was found in his own car on the company lot. These facts established that Cooper had violated the Company's rules and gave the Company just cause to discharge him. The arbitrator did not reach this conclusion because of a "narrow focus on Cooper's procedural rights" that led him to ignore what he "knew was in fact true: that Cooper *did* bring marijuana onto his employer's premises." *Ibid.* Even if the arbitrator had not known of this fact at the time he entered his award, "it is doubtful that the award should be enforced today in light of what is now known." *Ibid.*

35

Because the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy,[7] we granted the Union's petition for a writ of certiorari, 479 U. S. 1029 (1987), and now reverse the judgment of the Court of Appeals.

36

*36 **II**

The Union asserts that an arbitral award may not be set aside on public policy grounds unless the award orders conduct that violates the positive law, which is not the case here. But in the alternative, it submits that even if it is wrong in this regard, the Court of Appeals otherwise exceeded the limited authority that it had to review an arbitrator's award entered pursuant to a collective-bargaining agreement. Respondent, on the other hand, defends the public policy decision of the Court of Appeals but alternatively argues that the judgment below should be affirmed because of erroneous findings by the arbitrator. We deal first with the opposing alternative arguments.

**A**

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 596 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.,* at 597.

37

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation *37 to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." _Steelworkers_ v. _American Mfg. Co._, 363 U. S. 564, 567-568 (1960) (emphasis added; footnote omitted).

See also _AT&T Technologies, Inc._ v. _Communications Workers_, 475 U. S. 643, 649-650 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U. S. C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." See also _AT&T Technologies, supra,_ at 650. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the

38

facts and of the meaning *38 of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. _Enterprise Wheel, supra,_ at 599. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

39

*39 **B**

The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired. The parties bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose. Article VI of the agreement, entitled "Arbitration Procedure," did set some ground rules for the arbitration process. It forbade the arbitrator to consider hearsay evidence, for example, but evidentiary matters were otherwise left to the arbitrator. App.

Case 4:22-cv-00343-YD DocumentAa131 Filed 04/22/25 Page 385 of 444 PageID 6073

19. Here the arbitrator ruled that in determining whether Cooper had violated Rule II. P, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the

40 practice *40 followed by other arbitrators.[8] And it was consistent with our observation in <u>John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 557 (1964),</u> that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.

Under the Arbitration Act, the federal courts are empowered to set aside arbitration awards on such grounds only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U. S. C. § 10(c). See <u>Commonwealth Coatings Corp. v. Continental Casualty Co.</u>, 393 U. S. 145 (1968).[9] If we apply that same standard here and assume that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad

41 faith or so gross as to amount to affirmative misconduct.[10] Finally, it is worth noting that putting *41 aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge.

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel,* for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.*" 363 U. S., at 597 (emphasis added). The parties, of course, may limit the discretion of the arbitrator in this respect; and it may be, as the Company argues, that under the contract involved here, it was within the unreviewable discretion of management to discharge an employee once a violation of Rule II.1 was found. But the parties stipulated that the issue before the arbitrator was whether there was "just" cause for the

42 discharge, and the arbitrator, in the course of his opinion, cryptically observed that Rule II.1 *42 merely listed causes for discharge and did not expressly provide for immediate discharge. Before disposing of the case on the ground that Rule II.1 had been violated and discharge was therefore proper, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect.

## C

The Court of Appeals did not purport to take this course in any event. Rather, it held that the evidence of marijuana in Cooper's car required that the award be set aside because to reinstate a person who had brought drugs onto the property was contrary to the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. We cannot affirm that judgment.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. <u>W. R. Grace & Co. v. Rubber Workers, 461 U. S. 757, 766 (1983)</u>; <u>Hurd v. Hodge, 334 U. S. 24, 34-35 (1948)</u>. That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *E. g.,* <u>McMullen v. Hoffman, 174 U. S. 639, 654-655 (1899)</u>; <u>Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 356-358 (1931)</u>. In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

43 *43 In *W. R. Grace,* we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." <u>461 U. S., at 766</u>. We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public

Case 4:22-cv-00430-YD Document 131-5 Filed 06/20/22 Page 386 of 444 PageID 62174

interests. *Ibid.* (quoting *Muschany v. United States,* 324 U. S. 49, 66 (1945)). In *W. R. Grace,* we identified two important public polices that were potentially jeopardized by the arbitrator's interpretation of the contract: obedience to judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964. We went on to hold that enforcement of the arbitration award in that case did not compromise either of the two public policies allegedly threatened by the award. Two points follow from our decision in *W. R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 U. S., at 766. At the very least, an alleged public policy must be properly framed under the approach set out in *W. R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

44   *44 As we see it, the formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Ibid.* (quoting *Muschany v. United States, supra,* at 66). The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W. R. Grace* that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.

Even if the Court of Appeals' formulation of public policy is to be accepted, no violation of that policy was clearly shown in this case. In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the work-place is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. A refusal to enforce an award must rest on more than speculation or assumption.

45   In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of *45 drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[11] In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.[12]

The judgment of the Court of Appeals is reversed.

*So ordered.*

46   *46 JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I join the Court's opinion, but write separately to underscore the narrow grounds on which its decision rests and to emphasize what it is *not* holding today. In particular, the Court does not reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. See *ante,* at 45, n. 12. Nor do I understand the Court to decide, more generally, in what way,

Case 4:22-cv-00430-YD-Document 131-5 Filed 08/20/22 Page 387 of 444 PageID 6275

If any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

I agree with the Court that the judgment of the Court of Appeals must be reversed, and I summarize what I understand to be the three alternative rationales for the Court's decision:

1. The Court of Appeals exceeded its authority in concluding that the company's discharge of Cooper was proper under the collective-bargaining agreement. The Court of Appeals erred in considering evidence that the arbitrator legitimately had excluded from the grievance process, in second-guessing the arbitrator's factual finding that Cooper had not violated Rule II.1, and in assessing the appropriate sanction under the agreement. See _Steelworkers v. American Mfg. Co._, 363 U. S. 564, 567-568 (1960); _Steelworkers v. Enterprise Wheel & Car Corp._, 363 U. S. 593, 596-597, 599 (1960). Absent its overreaching, the Court of Appeals lacked any basis for disagreeing with the arbitrator's conclusion that there was not "just cause" for discharging Cooper. See _ante_, at 39-42.

47    *47 2. Even if the Court of Appeals properly considered evidence of marijuana found in Cooper's car and legitimately found a Rule II.1 violation, the public policy advanced by the Court of Appeals does not support its decision to set aside the award. The reinstatement of Cooper would not contravene the alleged public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The fact that an employee's car contains marijuana gleanings does not indicate that the employee uses marijuana on the job or that he operates his machine while under the influence of drugs, let alone that he will report to work in an impaired state in the future. See _ante_, at 44. Moreover, nothing in the record suggests that the arbitrator's award, which gives the company the option of placing Cooper in a job equivalent to his old one, would require Cooper to operate hazardous machinery. See _ante_, at 44-45.

3. The public policy formulated by the Court of Appeals may not properly support a court's refusal to enforce an otherwise valid arbitration award. In _W. R. Grace & Co. v. Rubber Workers_, 461 U. S. 757 (1983), we stated that the public policy must be founded on " `laws and legal precedents.' " _Id._, at 766, quoting _Muschany v. United States_, 324 U. S. 49, 66 (1945). The Court of Appeals identified no law or legal precedent that demonstrated an "explicit public policy," 461 U. S., at 766, against the operation of dangerous machinery by persons under the influence of drugs. Far from being "well defined and dominant," as _W. R. Grace_ prescribed, the Court of Appeals' public policy was ascertained merely "from general considerations of supposed public interests." _Ibid._ See _ante_, at 43. I do not understand the Court, by criticizing the company's public policy formulation, to suggest that proper framing of an alleged public policy under the approach set out in _W. R. Grace_ would be

48    sufficient to justify a court's refusal to enforce an arbitration award on public policy grounds. Rather, I understand the *48 Court to hold that such compliance is merely a necessary step if an award is not to be enforced. See _ante_, at 44.

It is on this understanding that I join the opinion of the Court.

[*] _David E. Feller_ and _William M. Murphy_ filed a brief for the National Academy of Arbitrators as _amicus curiae_ urging reversal.

_Philip A. Lacovara_ and _William R. Stein_ filed a brief for Northwest Airlines, Inc., et al. as _amici curiae_ urging affirmance.

[1] App. 20-21. The language quoted is from Article XI of the agreement, which concerns maintenance of discipline. Article VI of the agreement sets out the arbitration procedure. _Id._, at 18-20. The reserved rights of management are specified in Article IV of the agreement. _Id._, at 13-15.

[2] Rule II.1 lists the following as causes for discharge: "Bringing intoxicants, narcotics, or controlled substances into, or consuming intoxicants, narcotics, or controlled substances in the plant, or on plant premises. Reporting for duty under the influence of intoxicants, narcotics, or controlled substances." App. to Pet. for Cert. 31a.

[3] Cooper later pleaded guilty to that charge, which was not related to his being in a car with a lighted marijuana cigarette in it. The authorities chose not to prosecute for the latter incident.

[4] The Company asserted that being in a car with a lit marijuana cigarette was a direct violation of the company rule against having an illegal substance on company property. App. 23.

[5] These considerations were the reasonableness of the employer's position, the notice given to the employee, the timing of the investigation undertaken, the fairness of the investigation, the evidence against the employee, the possibility of discrimination, and the relation of the degree of discipline to the nature of the offense and the employee's past record.

[6] The arbitrator stated: "One of the rules in arbitration is that the Company must have its proof in hand before it takes disciplinary action against an employee. The Company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions. In addition, the use of the gleanings evidence prevented the Grievant from knowing the full extent of the charge against

Case 4:22-cv-00034-YD Document 131 Filed 04/22/22 Page 388 of 444 PageID 6476

him. Who knows what action the Grievant or the Union would have taken if the gleanings evidence had been made known from the outset of the Company's investigation." App. to Pet. for Cert. 47a.

[7] The decision below accords with the broader view of the courts' power taken by the First and Seventh Circuits. See, *e. g.*, *United States Postal Service v. American Postal Workers Union, AFL-CIO*, 736 F. 2d 822 (CA1 1984); *E. I. DuPont de Nemours and Co. v. Grasselli Employees Independent Assn. of East Chicago, Inc.*, 790 F. 2d 611 (CA7), cert. denied, 479 U. S. 853 (1986). A narrower view has been taken by the Ninth and District of Columbia Circuits. See, *e. g.*, *Bevles Co. v. Teamsters Local 986*, 791 F. 2d 1391 (CA9 1986); *Northwest Airlines, Inc. v. Air Line Pilots Assn. International*, 257 U. S. App. D. C. 181, 808 F. 2d 76 (1987); *American Postal Workers Union v. United States Postal Service*, 252 U. S. App. D. C. 169, 789 F. 2d 1 (1986).

[8] Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," see, *e. g.*, *West Va. Pulp & Paper Co.*, 10 Lab. Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge. O. Fairweather, Practice and Procedure in Labor Arbitration 303-306 (2d ed. 1983); F. Elkouri & E. Elkouri, How Arbitration Works 634-635 (3d ed. 1973).

[9] The Arbitration Act does not apply to "contracts of employment of . . . workers engaged in foreign or interstate commerce," 9 U. S. C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, empowers the federal courts to fashion rules of federal common law to govern "[s]uits for violation of contracts between an employer and a labor organization" under the federal labor laws. *Textile Workers v. Lincoln Mills*, 353 U. S. 448 (1957) (construing 29 U. S. C. § 185). See, *e. g.*, *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F. 2d 1123 (CA3 1969); *Pietro Scalzitti Co. v. International Union of Operating Engineers, Local No. 150*, 351 F. 2d 576 (CA7 1965).

[10] Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate. See, *e. g.*, *Amalgamated Food & Allied Workers Union, Local 56 v. Great A&P Tea Co.*, 415 F. 2d 185 (CA3 1969) (vacating and remanding to the arbitrators for decision after finding that the arbitrators declined to arbitrate the issues submitted). See also 9 U. S. C. § 10(e) ("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators").

[11] The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger. That is not a problem here, for the arbitrator recognized that being under the influence of marijuana while operating slitter-rewinder machinery was indeed dangerous, and no one disputed this point.

[12] We need not address the Union's position that a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law.

**532 U.S. 504 (2001)**

# MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

v.

# GARVEY

No. 00-1210.

**United States Supreme Court.**

Decided May 14, 2001.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

506    *506 Per Curiam.

The Court of Appeals for the Ninth Circuit here rejected an arbitrator's factual findings and then resolved the merits of the parties' dispute instead of remanding the case for further arbitration proceedings. Because the court's determination conflicts with our cases limiting review of an arbitrator's award entered pursuant to an agreement between an employer and a labor organization and prescribing the appropriate remedy where vacation of the award is warranted, we grant the petition for a writ of certiorari and reverse. The motions for leave to file briefs *amicus curiae* of the National Academy of Arbitrators and the Office of the Commissioner of Baseball are granted.

In the late 1980's, petitioner Major League Baseball Players Association (Association) filed grievances against the Major League Baseball Clubs (Clubs), claiming the Clubs had colluded in the market for free-agent services after the 1985, 1986, and 1987 baseball seasons, in violation of the industry's collective-bargaining agreement. A free agent is a player who may
506    contract with any Club, rather than one whose right to contract is restricted to a particular Club. In a *506 series of decisions, arbitrators found collusion by the Clubs and damage to the players. The Association and Clubs subsequently entered into a Global Settlement Agreement (Agreement), pursuant to which the Clubs established a $280 million fund to be distributed to injured players. The Association also designed a "Framework" to evaluate the individual player's claims, and, applying that Framework, recommended distribution plans for claims relating to a particular season or seasons.

The Framework provided that players could seek an arbitrator's review of the distribution plan. The arbitrator would determine "'only whether the approved Framework and the criteria set forth therein have been properly applied in the proposed Distribution Plan.' " *Garvey v. Roberts*, 203 F. 3d 580, 583 (CA9 2000) *(Garvey I)*. The Framework set forth factors to be considered in evaluating players' claims, as well as specific requirements for lost contract-extension claims. Such claims were cognizable "'only in those cases where evidence exists that a specific offer of an extension was made by a club prior to collusion only to thereafter be withdrawn when the collusion scheme was initiated.' " *Id.,* at 584.

Respondent Steve Garvey, a retired, highly regarded first baseman, submitted a claim for damages of approximately $3 million. He alleged that his contract with the San Diego Padres was not extended to the 1988 and 1989 seasons due to collusion. The Association rejected Garvey's claim in February 1996, because he presented no evidence that the Padres actually offered to extend his contract. Garvey objected, and an arbitration hearing was held. He testified that the Padres offered to extend his contract for the 1988 and 1989 seasons and then withdrew the offer after they began colluding with other teams. He presented a June 1996 letter from Ballard Smith, Padres' President and CEO from 1979 to 1987, stating
507    that,before the end of the 1985 season, Smith offered to extend Garvey's contract through *507 the 1989 season, but that the Padres refused to negotiate with Garvey thereafter due to collusion.

The arbitrator denied Garvey's claim, after seeking additional documentation from the parties. In his award, he explained that "'[t]here exists . . . substantial doubt as to the credibility of the statements in the Smith letter.' " *Id.,* at 586. He noted the "stark contradictions" between the 1996 letter and Smith's testimony in the earlier arbitration proceedings regarding collusion, where Smith, like other owners, denied collusion and stated that the Padres simply were not interested in extending Garvey's contract. *Ibid.* The arbitrator determined that, due to these contradictions, he "'must reject [Smith's] more recent assertion that Garvey did not receive [a contract] extension' " due to collusion, and found that Garvey had not shown a specific offer of extension. *Ibid.* He concluded:

Attachment 6

Case 4:22-cv-00438-YD Document 131 Filed 10/22/22 Page 390 of 444 PageID 62578

The shadow cast over the credibility of the Smith testimony coupled with the absence of any other corroboration of the claim submitted by Garvey compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the clubs but rather as a baseball judgment founded upon [Garvey's] age and recent injury history.' " *Ibid.*

Garvey moved in Federal District Court to vacate the arbitrator's award, alleging that the arbitrator violated the Framework by denying his claim. The District Court denied the motion. The Court of Appeals for the Ninth Circuit reversed by a divided vote. The court acknowledged that judicial review of an arbitrator's decision in a labor dispute is extremely limited. But it held that review of the merits of the arbitrator's award was warranted in this case, because the arbitrator "'dispensed his own brand of industrial justice.' " *Id.,* at 589. The court recognized that Smith's prior testimony with respect to collusion

508    conflicted with the statements in his 1996 letter. But in the court's view, the arbitrator's *508 refusal to credit Smith's letter was "inexplicable" and "border[ed] on the irrational," because a panel of arbitrators, chaired by the arbitrator involved here, had previously concluded that the owners' prior testimony was false. *Id.,* at 590. The court rejected the arbitrator's reliance on the absence of other corroborating evidence, attributing that fact to Smith and Garvey's direct negotiations. The court also found that the record provided "strong support" for the truthfulness of Smith's 1996 letter. *Id.,* at 591-592. The Court of Appeals reversed and remanded with directions to vacate the award.

The District Court then remanded the case to the arbitration panel for further hearings, and Garvey appealed. The Court of Appeals, again by a divided vote, explained that *Garvey I* established that "the conclusion that Smith made Garvey an offer and subsequently withdrew it because of the collusion scheme was the only conclusion that the arbitrator could draw from the record in the proceedings." No. 00-56080, 2000 WL 1801383, *1 (CA9, Dec. 7, 2000) (unpublished), judgt. order reported at 243 F. 3d 547 *(Garvey II).* Noting that its prior instructions might have been unclear, the court clarified that *Garvey I* "left only one possible result—the result our holding contemplated—an award in Garvey's favor." 2000 WL 1801383, at *1. The Court of Appeals reversed the District Court and directed that it remand the case to the arbitration panel with instructions to enter an award for Garvey in the amount he claimed.[1]

509    *509 The parties do not dispute that this case arises under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185(a), as the controversy involves an assertion of rights under an agreement between an employer and a labor organization. Although Garvey's specific allegation is that the arbitrator violated the Framework for resolving players' claims for damages, that Framework was designed to facilitate payments to remedy the Clubs' breach of the collective-bargaining agreement. Garvey's right to be made whole is founded on that agreement.

Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers* v. *Misco, Inc.,* 484 U. S. 29, 36 (1987). We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that `a court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Associated Coal Corp.* v. *Mine Workers,* 531 U. S. 57, 62 (2000) (quoting *Misco, supra,* at 38). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco,* 484 U. S., at 39.

510    In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that "'courts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.' " *510 Id.,* at 37 (quoting *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 568 (1960)). When the judiciary does so, "it usurps a function which . . . is entrusted to the arbitration tribunal." *Id.,* at 569; see also *Enterprise Wheel & Car Corp., supra,* at 599 ("It is the arbitrator's construction [of the agreement] which was bargained for . . ."). Consistent with this limited role, we said in *Misco* that "[e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." 484 U. S., at 40-41, n. 10. That step, we explained, "would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for" in their agreement. *Ibid.* Instead, the court should "simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement." *Ibid.*

To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling. The substance of the court's discussion reveals that it overturned the arbitrator's decision because it disagreed with the arbitrator's factual findings, particularly those with respect to credibility. The Court of Appeals, it appears, would have credited Smith's 1996 letter, and found the arbitrator's refusal to do so at worst "irrational" and at best "bizarre." _Garvey I_, 203 F. 3d, at 590-591. But even "serious error" on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority. _Misco, supra,_ at 38.

In _Garvey II,_ the court clarified that _Garvey I_ both rejected the arbitrator's findings and went further, resolving the merits of the parties' dispute based on the court's assessment of the record before the arbitrator. For that reason, the court found 511 further arbitration proceedings inappropriate. *511 But again, established law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. _Misco, supra,_ at 40, n. 10; see also _American Mfg. Co., supra,_ at 568. Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings. _Misco, supra,_ at 40, n. 10. The dissent suggests that the remedy described in _Misco_ is limited to cases where the arbitrator's errors are procedural. _Post,_ at 512 (opinion of Stevens, J.). _Misco_ did involve procedural issues, but our discussion regarding the appropriate remedy was not so limited. If a remand is appropriate _even_ when the arbitrator's award has been set aside for "procedural aberrations" that constitute "affirmative misconduct," it follows that a remand ordinarily will be appropriate when the arbitrator simply made factual findings that the reviewing court perceives as "irrational." The Court of Appeals usurped the arbitrator's role by resolving the dispute and barring further proceedings, a result at odds with this governing law.[2]

For the foregoing reasons, the Court of Appeals erred in reversing the order of the District Court denying the motion to vacate the arbitrator's award, and it erred further in directing that judgment be entered in Garvey's favor. The petition for a 512 writ of certiorari is granted, the judgment of *512 the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

_It is so ordered._

Justice Ginsburg, concurring in part and concurring in the judgment.

I agree with the Court that in _Garvey_ v. _Roberts,_ 203 F. 3d 580 (CA9 2000), the Ninth Circuit should not have disturbed the arbitrator's award. Correction of that error sets this case straight. I see no need to say more.

Justice Stevens, dissenting.

It is well settled that an arbitrator "does not sit to dispense his own brand of industrial justice." _Steelworkers_ v. _Enterprise Wheel & Car Corp.,_ 363 U. S. 593, 597 (1960). We have also said fairly definitively, albeit in dicta, that a court should remedy an arbitrator's "procedural aberrations" by vacating the award and remanding for further proceedings. _Paperworkers_ v. _Misco, Inc.,_ 484 U. S. 29, 40-41, n. 10 (1987). Our cases, however, do not provide significant guidance as to what standards a federal court should use in assessing whether an arbitrator's behavior is so untethered to either the agreement of the parties or the factual record so as to constitute an attempt to "dispense his own brand of industrial justice." Nor, more importantly, do they tell us how, having made such a finding, courts should deal with "the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." _Garvey_ v. _Roberts,_ 203 F. 3d 580, 590 (CA9 2000) (case below). Because our case law is not sufficiently clear to allow me to conclude that the case below was wrongly decided—let alone to conclude that the decision 513 was so wrong as to require the extraordinary remedy of a summary *513 reversal—I dissent from the Court's disposition of this petition.

Without the benefit of briefing or argument, today the Court resolves two difficult questions. First, it decides that even if the Court of Appeals' appraisal of the merits is correct—that is to say, even if the arbitrator did dispense his own brand of justice untethered to the agreement of the parties, and even if the correct disposition of the matter is perfectly clear—the only course open to a reviewing court is to remand the matter for another arbitration. That conclusion is not compelled by any of our cases, nor by any analysis offered by the Court. As the issue is subject to serious arguments on both sides, the Court should have set this case for argument if it wanted to answer this remedial question.

Second, without reviewing the record or soliciting briefing, the Court concludes that, in any event, "no serious error on the arbitrator's part is apparent in this case." _Ante,_ at 511, n. 2. At this stage in the proceedings, I simply cannot endorse that conclusion. After examining the record, obtaining briefing, and hearing oral argument, the Court of Appeals offered a

Case 4:22-cv-00437-YD Document 131 Filed 08/20/22 Page 392 of 444 PageID 6480

reasoned explanation of its conclusion. See 203 F. 3d, at 589-592; see also *Id.*, at 593-594 (Hawkins, J., concurring). Whether or not I would ultimately agree with the Ninth Circuit's analysis, I find the Court's willingness to reverse a fact bound determination of the Court of Appeals without engaging that court's reasoning a troubling departure from our normal practice.[*]

Accordingly, I respectfully dissent.

[1] Garvey contends that, because the Association's petition was filed more than 90 days after *Garvey I*, we cannot consider a challenge raising issues resolved in that decision. But there is no question that the Association's petition was filed in sufficient time for us to review *Garvey II*, and we have authority to consider questions determined in earlier stages of the litigation where certiorari is sought from the most recent of the judgments of the Court of Appeals. *Mercer* v. *Theriot*, 377 U. S. 152 (1964) *(per curiam)*; *Hamilton-Brown Shoe Co.* v. *Wolf Brothers & Co.*, 240 U. S. 251, 258 (1916).

[2] In any event, no serious error on the arbitrator's part is apparent in this case. The fact that an earlier panel of arbitrators rejected the owners' testimony as a whole does not compel the conclusion that the panel found Smith's specific statements with respect to Garvey to be false. The arbitrator's explanation for his decision indicates that he simply found Smith an unreliable witness and that, in the absence of corroborating evidence, he could only conclude that Garvey failed to show that the Padres had offered to extend his contract. The arbitrator's analysis may have been unpersuasive to the Court of Appeals, but his decision hardly qualifies as serious error, let alone irrational or inexplicable error. And, as we have said, any such error would not justify the actions taken by the court.

[*] The Court's opinion is somewhat ambiguous as to its reasons for overturning the portion of the Court of Appeals' decision setting aside the arbitration. It is unclear whether the majority is saying that a court may never set aside an arbitration because of a factual error, no matter how perverse, or whether the Court merely holds that the error in this case was not sufficiently severe to allow a court to take that step. If it is the latter, the Court offers no explanation of what standards it is using or of its reasons for reaching that conclusion.

Case 4:22-cv-00430-Y Document 131-1 Filed 05/10/22 Page 331 of 444 PageID 6481

**383 U.S. 715 (1966)**

# UNITED MINE WORKERS OF AMERICA

## v.

## GIBBS.

No. 243.

**Supreme Court of United States.**

Argued January 20, 1966.

Decided March 28, 1966.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

717 *717 *Willard P. Owens* argued the cause for petitioner. With him on the brief were *E. H. Rayson* and *R. R. Kramer.*

*Clarence Walker* argued the cause for respondent. With him on the brief was *William Ables, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondent Paul Gibbs was awarded compensatory and punitive damages in this action against petitioner United Mine Workers of America (UMW) for alleged violations of § 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as

718 amended,[1] and of the common law of *718 Tennessee. The case grew out of the rivalry between the United Mine Workers and the Southern Labor Union over representation of workers in the southern Appalachian coal fields. Tennessee Consolidated Coal Company, not a party here, laid off 100 miners of the UMW's Local 5881 when it closed one of its mines in southern Tennessee during the spring of 1960. Late that summer, Grundy Company, a wholly owned subsidiary of Consolidated, hired respondent as mine superintendent to attempt to open a new mine on Consolidated's property at nearby Gray's Creek through use of members of the Southern Labor Union. As part of the arrangement, Grundy also gave respondent a contract to haul the mine's coal to the nearest railroad loading point.

719 On August 15 and 16, 1960, armed members of Local 5881 forcibly prevented the opening of the mine, threatening respondent and beating an organizer for the rival union.[2] The members of the local believed Consolidated *719 had promised them the jobs at the new mine; they insisted that if anyone would do the work, they would. At this time, no representative of the UMW, their international union, was present. George Gilbert, the UMW's field representative for the area including Local 5881, was away at Middlesboro, Kentucky, attending an Executive Board meeting when the members of the local discovered Grundy's plan;[3] he did not return to the area until late in the day of August 16. There was uncontradicted testimony that he first learned of the violence while at the meeting, and returned with explicit instructions from his international union superiors to establish a limited picket line, to prevent any further violence, and to see to it that the strike did not spread to neighboring mines. There was no further violence at the mine site; a picket line was maintained there for nine months; and no further attempts were made to open the mine during that period.[4]

720 *720 Respondent lost his job as superintendent, and never entered into performance of his haulage contract. He testified that he soon began to lose other trucking contracts and mine leases he held in nearby areas. Claiming these effects to be the result of a concerted union plan against him, he sought recovery not against Local 5881 or its members, but only against petitioner, the international union. The suit was brought in the United States District Court for the Eastern District of Tennessee, and jurisdiction was premised on allegations of secondary boycotts under § 303. The state law claim, for which jurisdiction was based upon the doctrine of pendent jurisdiction, asserted "an unlawful conspiracy and an unlawful boycott aimed at him and [Grundy] to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage."[5]

The trial judge refused to submit to the jury the claims of pressure intended to cause mining firms other than Grundy to cease doing business with Gibbs; he found those claims unsupported by the evidence. The jury's verdict was that the UMW had violated both § 303 and state law. Gibbs was awarded $60,000 as damages under the employment contract and $14,500 under the haulage contract; he was also awarded $100,000 punitive damages. On motion, the trial court set aside the award of damages with respect to the haulage contract on the ground that damage was unproved. It also held that union

Case 4:22-cv-00430-Y Document 131 Filed 05/10/22 Page 42 of 444 PageID 2482

721   pressure on Grundy to discharge respondent as supervisor would constitute only a primary dispute with Grundy, as respondent's employer, and hence was not cognizable as a claim under § 303. Interference with the *721 employment relationship was cognizable as a state claim, however, and a remitted award was sustained on the state law claim.[6] 220 F. Supp. 871. The Court of Appeals for the Sixth Circuit affirmed. 343 F. 2d 609. We granted certiorari. 382 U. S. 809. We reverse.

# I.

A threshold question is whether the District Court properly entertained jurisdiction of the claim based on Tennessee law. There was no need to decide a like question in _Teamsters Union v. Morton_, 377 U. S. 252, since the pertinent state claim there was based on peaceful secondary activities and we held that state law based on such activities had been pre-empted by § 303. But here respondent's claim is based in part on proofs of violence and intimidation. "[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. _United Automobile Workers v. Russell_, 356 U. S. 634; _United Construction Workers v. Laburnum Corp._, 347 U. S. 656. . . . State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." _San Diego Building Trades Council v. Garmon_, 359 U. S. 236, 247.

722   *722 The fact that state remedies were not entirely pre-empted does not, however, answer the question whether the state claim was properly adjudicated in the District Court absent diversity jurisdiction. The Court held in _Hurn v. Oursler_, 289 U. S. 238, that state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief also sought in a substantial claim based on federal law. The Court distinguished permissible from nonpermissible exercises of federal judicial power over state law claims by contrasting "a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the non-federal _ground; in the latter it may not do so upon the non-federal cause of action_." 289 U. S., at 246. The question is into which category the present action fell.

_Hurn_ was decided in 1933, before the unification of law and equity by the Federal Rules of Civil Procedure. At the time, the meaning of "cause of action" was a subject of serious dispute;[7] the phrase might "mean one thing for one purpose and

723   something different for another." *723 _United States v. Memphis Cotton Oil Co._, 288 U. S. 62, 67-68.[8] The Court in _Hurn_ identified what it meant by the term by citation of _Baltimore S. S. Co. v. Phillips_, 274 U. S. 316, a case in which "cause of action" had been used to identify the operative scope of the doctrine of _res judicata_. In that case the Court had noted that " `the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.' " 274 U. S., at 320. It stated its holding in the following language, quoted in part in the _Hurn_ opinion:

> "Upon principle, it is perfectly plain that the respondent [a seaman suing for an injury sustained while working aboard ship] suffered but one actionable wrong and was entitled to but one recovery, whether his injury was due to one or the other of several distinct acts of alleged negligence or to a combination of some or all of them. In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff, namely, the right of bodily safety, whether the acts constituting such invasion were one or many, simple or complex.

> "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not

724   result in multiplying the causes of action. `The facts are merely the means, *724 and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear.' " _Id._, at 321.

Had the Court found a jurisdictional bar to reaching the state claim in _Hurn_, we assume that the doctrine of _res judicata_ would not have been applicable in any subsequent state suit. But the citation of _Baltimore S. S. Co._ shows that the Court found that the weighty policies of judicial economy and fairness to parties reflected in _res judicata_ doctrine were in

Attachment 7

Case 4:22-cv-00430-Y Document 181 Filed 05/12/22 Page 53 of 111 PageID 2583

themselves strong counsel for the adoption of a rule which would permit federal courts to dispose of the state as well as the federal claims.

With the adoption of the Federal Rules of Civil Procedure and the unified form of action, Fed. Rule Civ. Proc. 2, much of the controversy over "cause of action" abated. The phrase remained as the keystone of the *Hurn* test, however, and, as commentators have noted,[9] has been the source of considerable confusion. Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.[10] Yet because the *Hurn* question involves issues of jurisdiction as well as convenience, there has been some tendency to limit its application to cases in which the state and federal claims are, as in *Hurn*, "little more than the equivalent of different epithets to characterize the same group of circumstances." 289 U. S., at 246.[11]

725    *725 This limited approach is unnecessarily grudging Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," U. S. Const., Art. III § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."[12] The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.[13]

726    *726 That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.[14] Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.[15] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.[16] Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and *727 left for

727    resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre-emption; while this interrelationship does not create statutory federal question jurisdiction, *Louisville & N. R. Co.* v. *Mottley,* 211 U. S. 149, its existence is relevant to the exercise of discretion. Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ. Proc. 42 (b). If so, jurisdiction should ordinarily be refused.

The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

728    *728 We are not prepared to say that in the present case the District Court exceeded its discretion in proceeding to judgment on the state claim. We may assume for purposes of decision that the District Court was correct in its holding that the claim of pressure on Grundy to terminate the employment contract was outside the purview of § 303. Even so, the § 303 claims based on secondary pressures on Grundy relative to the haulage contract and on other coal operators generally were substantial. Although § 303 limited recovery to compensatory damages based on secondary pressures, *Teamsters Union* v. *Morton, supra,* and state law allowed both compensatory and punitive damages, and allowed such damages as to both secondary and primary activity, the state and federal claims arose from the same nucleus of operative fact and

reflected alternative remedies. Indeed, the verdict sheet sent in to the jury authorized only one award of damages, so that recovery could not be given separately on the federal and state claims.

It is true that the § 303 claims ultimately failed and that the only recovery allowed respondent was on the state claim. We cannot confidently say, however, that the federal issues were so remote or played such a minor role at the trial that in effect the state claim only was tried. Although the District Court dismissed as unproved the § 303 claims that petitioner's secondary activities included attempts to induce coal operators other than Grundy to cease doing business with respondent, the court submitted the § 303 claims relating to Grundy to the jury. The jury returned verdicts against petitioner on those § 303 claims, and it was only on petitioner's motion for a directed verdict and a judgment *n. o. v.* that the verdicts on those claims were set aside. The District Judge considered the claim as to the haulage *729 contract proved as to liability, and held it failed only for lack of proof of damages. Although there was some risk of confusing the jury in joining the state and federal claims—especially since, as will be developed, differing standards of proof of UMW involvement applied— the possibility of confusion could be lessened by employing a special verdict form, as the District Court did. Moreover, the question whether the permissible scope of the state claim was limited by the doctrine of pre-emption afforded a special reason for the exercise of pendent jurisdiction; the federal courts are particularly appropriate bodies for the application of pre-emption principles. We thus conclude that although it may be that the District Court might, in its sound discretion, have dismissed the state claim, the circumstances show no error in refusing to do so.

## II.

This Court has consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes, sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation. *Allen-Bradley Local v. Wisconsin Board*, 315 U. S. 740; *United Construction Workers v. Laburnum Construction Corp.*, 347 U. S. 656; *United Automobile Workers v. Wisconsin Board*, 351 U. S. 266; *Youngdahl v. Rainfair, Inc.*, 355 U. S. 131; *United Automobile Workers v. Russell*, 356 U. S. 634. Petitioner concedes the principle, but argues that the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity. We agree.

Our opinions on this subject, frequently announced over weighty arguments in dissent that state remedies *730 were being given too broad scope, have approved only remedies carefully limited to the protection of the compelling state interest in the maintenance of domestic peace. Thus, in *San Diego Building Trades Council v. Garmon*, 359 U. S. 236, we read our prior decisions as only allowing "the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order," *id.*, at 247, and noted that in *Laburnum*

> "damages were restricted to the `damages directly and proximately caused by wrongful conduct chargeable to the defendants . . .' as defined by the traditional law of torts. . . . Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct." *Id.*, 248, n. 6. at 249.

In *Russell,* we specifically observed that the jury had been charged that to award damages it must find a proximate relation between the violence and threats of force and violence complained of, on the one hand, and the loss of wages allegedly suffered, on the other. 356 U. S., at 638, n. 3. In the two *Wisconsin Board* cases it was noted that the State's administrative-injunctive relief was limited to prohibition against continuation of the unlawful picketing, not all picketing. 315 U. S., at 748; 351 U. S., at 269-270, n. 3. And in *Youngdahl,* the Court held that a state court injunction which would have prohibited all picketing must be modified to permit peaceful picketing of the premises. We said, "[t]hough the state court was within its discretionary power in enjoining future acts of violence, intimidation and threats of violence by the strikers and the union, yet it is equally clear that such court entered the pre-empted domain *731 of the National Labor Relations Board insofar as it enjoined peaceful picketing . . . ." 355 U. S., at 139.[17]

It is true that in *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U. S. 287, the Court approved sweeping state injunctive relief barring any future picketing in a labor dispute, whether peaceful or not. That case, however, was decided only on a constitutional claim of freedom of speech. We did not consider the impact of federal labor policy on state regulatory power. Moreover, as we recognized in *Youngdahl, supra,* at 139, the case was decided in the context of a strike marked by extreme and repeated acts of violence—"a pattern of violence . . . which would inevitably reappear in the event picketing were later resumed." The Court in *Meadowmoor* had stated the question presented as "whether a state can

choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed," 312 U. S., at 292, and had reasoned that

> "acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." Id., at 294.

732   Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred, *732 might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered.[18] Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter.

In the present case, petitioner concedes that violence which would justify application of state tort law within these narrow bounds occurred during the first two days of the strike. It is a separate issue, however, whether the pleadings, the arguments of counsel to the jury, or the instructions to the jury adequately defined the compass within which damages could be awarded under state law. The tort claimed was, in essence, a "conspiracy" to interfere with Gibbs' contractual relations. The tort of "conspiracy" is poorly defined, and highly susceptible to judicial expansion; its relatively brief history is colored by use as a weapon against the developing labor movement.[19] Indeed, a reading of the record in this case gives the

733   impression that the notion of "conspiracy" was employed here to expand the application of state law substantially *733 beyond the limits to be observed in showing direct union involvement in violence.

Thus, respondent's complaint alleged "an unlawful conspiracy and an unlawful boycott . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." No limitation to interference by violence appears. Similarly, counsel in arguing to the jury asserted, not that the conspiracy in which the union had allegedly participated and from which its liability could be inferred was a conspiracy of violence but that it was a conspiracy to impose the UMW and the UMW's standard contract on the coal fields of Tennessee.[20] Under the state law, it would not have been relevant that the union had not actually authorized, participated in or ratified the particular violence involved or even the general use of violence. It would only be necessary to show a conspiracy in which the union had a part, and to show also that those who engaged in the violence were members of the conspiracy and their acts were related to the conspiracy's purpose.[21]

The instructions to the jury also appear not to have kept the conspiracy concept within any proper bounds. The charge instructed the jury separately on the § 303 and conspiracy claims, characterizing each as predicated on an assertion that there had been "unlawful" picketing action, and distinguishing one from the other on the basis that in the conspiracy claim

734   "the lawfulness of the means rather than the lawfulness of the object or the purpose *734 of the picketing . . . is controlling." But in charging the conspiracy claim, the court stressed that the "unlawfulness" of the picketing, rather than violence as such, would be controlling. Thus, in characterizing respondent's claim of a conspiracy intentionally to interfere with his contractual relations with Grundy, the trial judge said respondent asserted the interference to be "wrongful in that it was accomplished by unlawful means, including violence and threats of violence." Turning to the question of the international union's responsibility, he said this depended on a showing that it "was a party to a conspiracy pursuant to which the interference was committed." He defined conspiracy as

> "an agreement between two or more . . . to do an unlawful thing, or to do a lawful thing by unlawful means. . . . It is not essential to the existence of a conspiracy that the agreement between the conspirators be formally made between the parties at any one time, if, for example, two persons agreed to pursue an unlawful purpose or pursue a lawful purpose by unlawful means, then later a third person with knowledge of the existence of the conspiracy assents to it either impliedly or expressly and participates in it, then all three are conspirators in the same conspiracy. . . . [A]ll that is required is that each party to the conspiracy know of the existence of the conspiracy and that each agrees to assist in some manner in the furtherance of the unlawful purpose . . . or any unlawful means of accomplishing an unlawful purpose."

The trial judge then charged, in accordance with the Tennessee common law on conspiracy,[22] that the union, if a member
735   of a conspiracy, would be liable for all acts "done in concert . . . with the common purpose, and to effect *735 a common design," whether or not it had authorized, participated in, or ratified the particular acts. The jury was told it might award "only

Case 4:22-cv-00430-Y Document 131-1 Filed 05/12/22 Page 396 of 441 PageID 6586

such damages as . . . he has sustained as a proximate and direct result of the action of the defendant," and that "[n]o award of damages can be made . . . on the basis of losses sustained . . . as a result of lawful activity upon the part of the defendant or its agents." Such instructions do not focus the jury's attention upon violence or threats of violence as the essential predicate of any recovery it might award.

## III.

Even assuming the conspiracy concept could be and was kept within limits proper to the application of state tort law under the pre-emption doctrine, reversal is nevertheless required here for failure to meet the special proof requirements imposed by § 6 of the Norris-LaGuardia Act:[23]

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

Petitioner vigorously contends that § 6 applied to the state claims in this case; that, on this record, it cannot be charged with having participated in or authorized the violence of August 15-16; and that its acts once it learned of the violence fell short of what would be necessary to show either ratification of the violence or any intent to build its picketing campaign upon the fears the violence engendered. We agree.

736   *736 We held in _Brotherhood of Carpenters_ v. _United States_, 330 U. S. 395, 403, that

> "whether § 6 should be called a rule of evidence or one that changes the substantive law of agency . . . its purpose and effect was to relieve organizations. . . and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

Shortly thereafter, Congress passed the Labor Management Relations Act, which expressly provides that for the purposes of that statute, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6.[24] Yet although the legislative history indicates that Congress was well aware of the _Carpenters_ decision,[25] it did not repeal § 6 outright, but left it applicable to cases not arising under the new Act. This selectivity is not surprising, for on state claims, though not on § 303 claims, punitive damages may be recovered. The driving force behind § 6[26] and the opposition to § 303, even in its limited

737   form,[27] was the fear that unions might be destroyed *737 if they could be held liable for damage done by acts beyond their practical control. Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply.[28]

Although the statute does not define "clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof." Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with "more than a bare preponderance of the evidence to prevail." _Schneiderman_ v. _United States_, 320 U. S. 118, 125. In our view, that burden was not met.[29]

738   *738 At the outset, it is clear that the requisite showing was not made as to possible union authorization of or participation in the violence of August 15 and 16. Although it is undoubtedly true that the officers and members of Local 5881 were present in force at the mine site on those days, neither the Local nor they are parties to this suit. Mr. Gilbert, the UMW representative, had left the area for a business meeting before the series of events culminating in the violence, and immediately upon his return, the violence subsided. The Sixth Circuit conceded that "[t]he proofs were sketchy as to defendant's responsibility for the [first two days' violence]." This view accurately reflects the state of the record. Petitioner was not even aware of Grundy's plan to open the Gray's Creek mine until after the violence had occurred.

Attachment 7

The remaining issue is whether there was clear proof that the union ratified the violence which had occurred. Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on some normal union functions, such as provision of strike relief. A union would ordinarily *739 undertake these tasks during the course of a lawful strike. National labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations; and when they seek to do so, they should not for these activities be made to risk liability for such harm as may already have been done. The fact that ripples of the earlier violence may still be felt should not be permitted, and under § 6 is not permitted, to impose such liability. Because the dispute which sparked the violence will often continue, the union will feel a responsibility to take up the dispute as well as to curb its excesses. There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred. Cf. *ILGWU* v. *Labor Board,* 237 F. 2d 545. What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

The record here is persuasive that the petitioner did what it could to stop or curtail the violence. There was repeated and uncontradicted testimony that when news of the violence reached the meeting that Gilbert was attending, he was given firm instructions to return to the scene, to assume control of the strike, to suppress violence, to limit the size of the picket line, and to assure that no other area mines were affected.[30] He *740 succeeded. Although the day after his return two Consolidated officers were harassed by a large and unruly mob in a nearby town, this incident was unrelated to respondent, and was not repeated. There was no further violence at the mine site, and the number of pickets was reduced to a very few. Other mines in the immediate area, including two worked on lease by Gibbs, continued to operate, although strenuous effort was required to accomplish this; one union official testified, "I thought I was going to get whipped two or three times [by members of the Local who opposed this policy]."[31]

To be sure, there was testimony that Gilbert and, through him, the international union were not pleased with respondent's role in the abortive venture to open the Gray's Creek mines with members of the Southern Labor Union. A company officer testified that when the mines finally opened respondent was not hired, because "Had I hired Mr. Paul Gibbs none of these mines would be open today." Respondent testified that Gilbert had told him, shortly after assuming control of the strike, "I want you to keep your damn hands off of that Gray's Creek area over there, and tell that Southern Labor Union that we don't intend for you to work that mine." To another, Gilbert is alleged to have said, "Hell, we can't let that *741 go on . . . Paul was trying to bring this other union in there, and [Gilbert said] he ain't going to get by with it." A third witness reported remarks of a similar tenor. Respondent testified that fear for his own safety caused him not to visit his mine leases after the events of August 15 and 16. His foreman testified to minor acts of violence at the mine site, never connected to any person or persons.

The relevant question, however, is whether Gilbert or other UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute. The Sixth Circuit's answer was that they had. Its view of the record gave it

> "the impression that the threat of violence remained throughout the succeeding days and months. The night and day picketing that followed this spectacular beginning was but a guaranty and warning that like treatment would be accorded further attempts to open the Gray's Creek area. The aura of violence remained to enhance the effectiveness of the picketing. Certainly there is a threat of violence when the man who has just knocked me down my front steps continues to stand guard at my front door." 343 F. 2d, at 616.

An "impression" is too ephemeral a product to be the result of "clear proof." As we have said, the mere fact of continued picketing at the mine site is not properly relied upon to show ratification. But even accepting the passage as a holding that "clear proof" of UMW involvement is present, we do not so read the record.

If there was a remaining threat of violence here, it was a threat which arose from the context of the dispute, and not from the manner in which the international union was shown to have handled it. This dispute began when unemployed miners in the Appalachian hills discovered *742 that jobs they believed had been promised to them were being given to others behind their backs. In considering the *vicarious* liability of the international union, accommodation must be made for that fact. The record here clearly bears the construction that the international union exerted pressure to assure that respondent would lose his present jobs and obtain no more. But the record fails to rebut petitioner's contention that it had been unwilling to see its ends accomplished through violence, and indeed had sought to control the excesses which had occurred. Since the

Case 4:22-cv-00430-Y Document 31 Filed 05/12/22 Page 400 of 444 PageID 6558

record establishes only peaceful activities in this regard on the part of petitioner, respondent was limited to his § 303 remedy. _Teamsters Union v. Morton, supra._ Although our result would undoubtedly be firmer if the petitioner had assured respondent that, having assumed control of the strike, it would prevent further violence, in the circumstances of this case the crucial fact of petitioner's participation in or ratification of the violence that occurred was not proved to the degree of certainty required by § 6.

_Reversed_

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring.

I agree with and join in Part I of the Court's opinion relating to pendent jurisdiction. As to Part II, I refrain from joining the Court's speculations about the uses to which it may put the pre-emption doctrine in similar future cases. The holding in Part III that the Norris-LaGuardia Act requires reversal here seems to me correct, but my interpretation of the statute is different and somewhat narrower than that of the Court.

743    The statutory requirement for union liability in this case is "clear proof of actual participation in, or actual *743 authorization of . . . [the unlawful acts], or of ratification of such acts after actual knowledge thereof."[1] The Court construes this provision as fixing a new test of the quantum of proof, somewhere between ordinary civil and criminal standards. I do not think the admittedly vague legislative history imports this reading, and I believe it introduces a revealing inconsistency since the new test could not be applied to criminal cases, concededly governed by the same statutory language, without standing the statute on its head by having it _reduce_ present quantum-of-proof requirements in criminal cases, that is, proof "beyond a reasonable doubt." The best reading I can give the statute, absent more light than has been shed upon it in this case, is one directing it against a particular type of inferential proof of authority or ratification unacceptable to those who framed the law. For me, the gist of the statute is that in the usual instance a union's carrying on of its normal strike functions and its failure to take affirmative action to dispel misconduct are not in themselves proof of authorization or ratification of the wrongdoing.[2]

744    *744 In the present case, apart from a few quite ambiguous episodes, there was nothing to bring the violence home to the union except, as the Sixth Circuit stressed (see p. 741, _ante_), that the union continued through its picketing the threat that the earlier violence would be renewed and did not repudiate the violence or promise to oppose its renewal. Whatever arguments could be made for imposing liability in such a situation, I think it approximates what the statute was designed to forbid. On this basis, I concur in the reversal.

[1] Section 303 of the Labor Management Relations Act, 1947 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b) (4) of this title.

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 29 U. S. C. § 187 (1964 ed.).

Section 158 (b) (4) of Title 29 U. S. C. (1964 ed.), § 8 (b) (4) of the National Labor Relations Act, as amended, 73 Stat. 542, provides, in relevant part, that:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.....

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.....

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as

Attachment 7

Case 1:22-cv-00430-XY DGocument 131 FileEdile08/t0/02/21/2 Page 9 of 441 PageID 6569

the representative of such employees under the provisions of section 159 of this title. *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ."

[2] These events were also the subject of two proceedings before the National Labor Relations Board. In one, the Board found that Consolidated had unlawfully assisted the Southern Labor Union in violation of § 8 (a) (2) of the National Labor Relations Act, as amended, 49 Stat. 452, 29 U. S. C. § 158 (a) (2) (1964 ed.), *Tennessee Consolidated Coal Co.,* 131 N. L. R. B. 536, enforcement denied *sub nom. Labor Board* v. *Tennessee Consolidated Coal Co.,* 307 F. 2d 374 (C. A. 6th Cir. 1962). In the other, it found that Local 5881 had engaged in coercive picketing in violation of § 8 (b) (1) (A), 61 Stat. 141, 29 U. S. C. § 158 (b) (1) (A) (1964 ed.), *Local 5881, UMWA,* 130 N. L. R. B. 1181. The International itself was not charged in this proceeding, and the Board's consideration focused entirely on the events of August 16.

[3] The only testimony suggesting that Gilbert might have been at the mine site on August 15-16 was Gibbs' statement that "Well, everything happened so fast there, I'm thinking that I seen Mr. Gilbert drive up there, but where he went, I don't know." Whether such testimony could ever be sufficient to establish presence we need not decide, since respondent effectively conceded in the Sixth Circuit and here that Gilbert was in Middlesboro when the violence occurred.

[4] Immediately after the Board's order in the proceedings against it, note 2, *supra,* Consolidated reopened the mine it had closed during the spring of 1960, and hired the men of Local 5881. Later, and while this litigation was awaiting trial, that mine was closed as the result of an accident. At this point, the fall of 1962, the Gray's Creek mine was opened using members of Local 5881.

[5] See *Dukes* v. *Brotherhood of Painters, Local No. 437,* 191 Tenn. 495, 235 S. W. 2d 7 (1950); *Brumley* v. *Chattanooga Speedway & Motordrome Co.,* 138 Tenn. 534, 198 S. W. 775 (1917); *Dale* v. *Temple Co.,* 186 Tenn. 69, 208 S. W. 2d 344 (1948).

[6] The questions had been submitted to the jury on a special verdict form. The suggested remittitur from $60,000 to $30,000 for damages on the employment contract and from $100,000 to $45,000 punitive damages was accepted by respondent. In view of our disposition, we do not reach petitioner's contentions that the verdict must be set aside in toto for prejudicial summation by respondent's counsel, or because the actual damages awarded substantially exceeded the proof, and the punitive damage award may have rested in part on the award of actual damages for interference with the haulage contract, which was vacated as unproved.

[7] See Clark on Code Pleading 75 *et seq.* (1928); Clark, The Code Cause of Action, 33 Yale L. J. 817 (1924); McCaskill, Actions and Causes of Actions, 34 Yale L. J. 614 (1925); McCaskill, One Form of Civil Action, But What Procedure, for the Federal Courts, 30 Ill. L. Rev. 415 (1935); Gavit, A "Pragmatic Definition" of the "Cause of Action"? 82 U. Pa. L. Rev. 129 (1933); Clark, The Cause of Action, *id.,* at 354 (1934); Gavit, The Cause of Action—a Reply, *id.,* at 695 (1934).

[8] See also *American Fire & Cas. Co.* v. *Finn,* 341 U. S. 6, 12; *Musher Foundation, Inc.* v. *Alba Trading Co.,* 127 F. 2d 9, 12 (C. A. 2d Cir. 1942) (dissenting opinion of Clark, J.).

[9] Shulman & Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 397-410 (1936); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 232 (1948); Barron & Holtzoff, Federal Practice and Procedure § 23 (1965 Supp.).

[10] See, *e. g.,* Fed. Rules Civ. Proc. 2, 18-20, 42.

[11] *E. g., Musher Foundation* v. *Alba Trading Co., supra;* Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Col. L. Rev. 1018, 1029-1030 (1962).

[12] The question whether joined state and federal claims constitute one "case" for jurisdictional purposes is to be distinguished from the often equally difficult inquiry whether any "case" at all is presented, *Gully* v. *First National Bank,* 299 U. S. 109, although the issue whether a claim for relief qualifies as a case "arising under . . . the Laws of the United States" and the issue whether federal and state claims constitute one "case" for pendent jurisdiction purposes may often appear together, see *Dann* v. *Studebaker-Packard Corp.,* 288 F. 2d 201, 211-215 (C. A. 6th Cir. 1961); *Borak* v. *J. I. Case Co.,* 317 F. 2d 838, 847-848 (C. A. 7th Cir. 1963), aff'd on other grounds, 377 U. S. 426.

[13] Cf. *Armstrong Co.* v. *Nu-Enamel Corp.,* 305 U. S. 315, 325. Note, Problems of Parallel State and Federal Remedies, 71 Harv. L. Rev. 513, 514 (1958). While it is commonplace that the Federal Rules of Civil Procedure do not expand the jurisdiction of federal courts, they do embody "the whole tendency of our decisions. . . to require a plaintiff to try his . . . whole case at one time," *Baltimore S. S. Co.* v. *Phillips, supra,* and to that extent emphasize the basis of pendent jurisdiction.

[14] *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.,* 183 F. 2d 497 (C. A. 1st Cir. 1950); *Moynahan* v. *Pari-Mutuel Employees Guild,* 317 F. 2d 209, 211-212 (C. A. 9th Cir. 1963); *op. cit. supra,* notes 9 and 11.

[15] Some have seen this consideration as the principal argument against exercise of pendent jurisdiction. Thus, before *Erie,* it was remarked that "the limitations [on pendent jurisdiction] are in the wise discretion of the courts to be fixed in individual cases by the exercise of that statesmanship which is required of any arbiter of the relations of states to nation in a federal system." Shulman & Jaegerman, *supra,* note 9, at 408. In his oft-cited concurrence in *Strachman* v. *Palmer,* 177 F. 2d 427, 431 (C. A. 1st Cir. 1949), Judge Magruder counseled that "[f]ederal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in

state court litigation," at 453. See also Wechsler, *supra,* note 9, at 252-255; Note, 74 Harv. L. Rev. 1660, 1661 (1961); Note, *supra,* note 11, at 1043-1044.

[16] Note, *supra,* note 11, at 1025-1026; Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F. 2d 748, 752-754 (C. A. 9th Cir. 1964).

[17] In Teamsters Union v. Morton, supra, a similar analysis was applied to permit recovery under § 303 of damages suffered during a strike characterized by proscribed secondary activity only to the extent that the damages claimed were the proximate result of such activity; damages for associated primary strike activity could not be recovered.

[18] It would of course be relevant if the Board had already intervened and as here, note 2, *supra,* issued an order which permitted the continuance of peaceful picketing activity.

[19] On the flexibility of "conspiracy" as a tort, see Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F. 2d 187, 189 (C. A. 2d Cir. 1943); Riley v. Dun & Bradstreet, Inc., 195 F. 2d 812 (C. A. 6th Cir. 1952); Charlesworth, Conspiracy as a Ground of Liability in Tort, 36 L. Q. Rev. 38 (1920); Burdick, Conspiracy as a Crime, and as a Tort, 7 Col. L. Rev. 229 (1907); Burdick, The Tort of Conspiracy, 8 Col. L. Rev. 117 (1908). The anti-labor uses of the doctrine are well illustrated in Sayre, Labor and the Courts, 39 Yale L. J. 682, 684-687 (1930). Similar dangers are presented by the tort of malicious interference with contract, *id.,* at 691-695, a doctrine equally young which in its origins required a showing of interference by force, threats, or fraud, but does so no more, Sayre, Inducing Breach of Contract, 36 Harv. L. Rev. 663 (1923); Comment, 56 Nw. U. L. Rev. 391 (1961).

[20] Respondent's attorney argued in summation:

". . . and here is the conspiracy. Mr. Pass [an official of petitioner's] testified, we want that contract all over this nation. That contract or better. I don't guess at that, there is his testimony. There is no deviation from that contract, Mr. Turnblazer so says, unless it is approved in Washington. They impose a nationwide contract all over this nation, all over. I don't care whether it is in Canada or West Virginia or California or Tennessee."

[21] Note 5, *supra.*

[22] *Ibid.*

[23] 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.).

[24] National Labor Relations Act, as amended, § 2 (13), 61 Stat. 139, 29 U. S. C. § 152 (13) (1964 ed.); Labor Management Relations Act, 1947, §§ 301 (e), 303 (b), 61 Stat. 157, 159, 29 U. S. C. §§ 185 (e); 187 (b) (1964 ed.).

[25] See, *e. g.,* S. Rep. No. 105, 80th Cong., 1st Sess., p. 21.

[26] The fullest statement of the basis for § 6 appears in S. Rep. No. 163, 72d Cong., 1st Sess., pp. 19-21.

[27] The present § 303 was introduced on the floor of the Senate by Senator Taft, in response to a more severe proposal which would have permitted injunctive relief as well as damages against secondary activity. 93 Cong. Rec. 4769-4770, 4833-4847, 4858-4875 (1947). The tenor of the opposition may be seen in those pages, and also at 93 Cong. Rec. 4765-4766 (remarks of Senator Thomas); 93 Cong. Rec. 6451-6452 (remarks of Senator Morse); 93 Cong. Rec. 6520-6521 (remarks of Senator Pepper).

[28] The argument might be made that if there were "clear proof" that the local union was responsible, the responsibility of the international union *vis-a-vis* its local would be governed by a less demanding standard than that applicable for determining the responsibility of a labor organization or its officers on the basis of the acts of "individual officers, members, or agents" of the organization. Since the local was not a party here, we have no occasion to assess this issue. Liability of the international union is premised on the acts of Gilbert and the UMW's other agents, or not at all.

[29] In charging the jury, the trial judge first instructed the jury at length that the plaintiff's burden was to prove his case by a preponderance of the evidence, and that "if the plaintiff carries the burden of proof by a preponderance of the evidence, however slight that preponderance might be, he has done all that is required of him and is entitled to a verdict." In connection with substantive discussion of the state claim, he then remarked:

"Before the defendant may be held responsible for the acts of its agents in entering into a conspiracy during the course of a labor dispute, there must be clear proof that the particular conspiracy charged or the act generally of that nature had been expressly authorized or necessarily followed from a granted authority by the defendant, or that such conspiracy was subsequently ratified by the defendant after actual knowledge thereof."

The phrase "clear proof," referred to just this once, was never explained. The possibility is strong that the jury either did not understand the phrase or completely overlooked it in the context of the lengthy charge given. No challenge is directly made to the charge, however, and it does not appear whether an objection was entered. Accordingly, we do not rest judgment on this point.

[30] Other international union personnel were also later sent, perhaps in part because the union wanted to put its best foot forward in the NLRB proceedings, note 2, *supra,* which ensued. One such person testified,

". . . I explained to them that the labor board was there investigating and that certainly any mass picketing would only cause them a great deal of trouble, and instructed them that they should limit the number of their pickets and under no circumstances have any violence or any threats of violence to any person coming into or near that area."

[31] About six days after the violence, an earthmoving equipment salesman driving by the entrance to the mine site stopped to ask how he might get to another mine. Gilbert was present among the picketers, and gave him instructions. Gilbert told the salesman that he "couldn't get through" the road chosen, and should approach by another route; he said the salesman should tell any union men he met that he had spoken to Gilbert. A sinister cast can be put on this incident, but it shows clearly only that Gilbert was in control of the strike and that operations unrelated to Gray's Creek were not being interfered with. It is significant that the salesman did not claim to have been stopped by force or threatened in any way; it appears he did no more than seek directions, and received no more in return.

[1] Norris-LaGuardia Act, § 6, 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.). The section is quoted in full at p. 735, *ante.*

[2] The principal legislative document, S. Rep. No. 163, 72 Cong., 1st Sess., pp. 19-21, is not very illuminating but it does at the end of its discussion of the section make reference to Frankfurter & Greene, The Labor Injunction 74-75 (1930). At these pages, to illustrate rulings on union responsibility that are deemed improper, that book states: " `Authorization' has been found as a fact where the unlawful acts `have been on such a large scale, and in point of time and place so connected with the admitted conduct of the strike, that it is impossible on the record here to view them in any other light than as done in furtherance of a common purpose and as part of a common plan'; where the union has failed to discipline the wrong-doer; where the union has granted strike benefits." (Footnotes omitted.) See also *id.,* at 220-221, n. 42; *United Brotherhood of Carpenters v. United States,* 330 U. S. 395, 418-419 and n. 2 (Frankfurter, J., dissenting).

IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF TEXAS FT. WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS**<br>**Plaintiff/Counterclaim Defendant** | §<br>§<br>§<br>§<br>§ | |
| **V.** | §<br>§<br>§<br>§ | **Case No. 4:22-cv-00430-Y** |
| **ASSOCIATION OF**<br>**PROFESSIONAL FLIGHT**<br>**ATTENDANTS, JULIE HEDRICK,**<br>**ERIK HARRIS**<br>**Defendants/Counterclaim Plaintiff.** | §<br>§<br>§<br>§<br>§<br>§ | |

---

**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S CLAIMS FOR RELIEF AND BRIEF IN SUPPORT**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's

Claims for Relief, brought pursuant to Federal Rules Civil Procedure §§ 12(b)(1) and 12(b)(6).

## I. INTRODUCTION

Eugenio Vargas (hereinafter referred to as "Plaintiff" or "Vargas"), is a member in good

standing of the Association of Professional Flight Attendants union (hereinafter "APFA") and

the Former National Treasurer.  Plaintiff was charged with violations of the APFA policy after

enduring three days of arbitration hearings, and an award being issued against him declaring he

breached his fiduciary duty to the union.  Plaintiff filed his complaint against APFA, the National

President, Julie Hedrick, and National Treasurer, Erik Harris, to vacate the arbitration award after

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

1

discovering APFA and the National Officers withheld documents and pertinent facts from Plaintiff, the APFA Board of Directors, the APFA Executive Committee members, and Arbitrator Ruben Armendariz in order to acquire an unfavorable arbitration award. Vargas contends this violated his rights under the "Member's Bill of Rights" afforded by the Labor Management Reporting and Disclosure Act, as well as breached the APFA Constitution, and breached the two officer's common-law fiduciary duties to the Plaintiff. Plaintiff asserts Defendants' motivation was Plaintiff's affiliation with and support of Robert "Bob" Ross, the National President during Vargas's term as National Treasurer, and Plaintiff's opposition to a proposed merger of APFA with the Association of Flight Attendants-CWA, AFL-CIO (hereinafter "AFA").

On or about July 14, 2022, Defendants filed a Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support (hereinafter "Motion to Dismiss"). (*See generally, Ex. A, Def's Motion to Dismiss Pl's Claims for Relief and Brief in Support*). Defendants assert the following arguments in their Motion to Dismiss:

(1)    Plaintiff's claims fail to meet subject matter jurisdiction,

(2)    LMRDA provisions no longer govern any internal union matters, and

(3)    all remaining claims asserted by Plaintiff are unfounded either

    (a)    due to lack of jurisdictional basis,

    (b)    due to lack of meeting Plaintiff's legal obligation "to exhaust the mandatory internal union remedies 'prior to taking any legal action'",

    (c)    Plaintiff failed to meet the statutory pre-requisite to filing a claim under §501(a) of the Labor Management Reporting and Disclosure Act, and

    (d)    all other claims are preempted by the Arbitration Award. (*See generally, Ex. A, Def's Motion to Dismiss Pl's Claims for Relief,  5-10*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

2

Defendants' Motion to Dismiss provides misleading interpretations of the law, as well as inconsistent interpretations of Plaintiff's claims asserted in this case before the court. A clear understanding of both the law and Plaintiff's position clearly show that Defendant's motion to dismiss should be denied.

## II. <u>STATEMENT OF THE CASE</u>

Plaintiff, EUGENIO VARGAS ("Plaintiff") seeks damages alleging unlawful violations of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, et seq. ("LMRDA"), the Association of Professional Flight Attendants Union Constitution, and Breach of Fiduciary Duty as provided for under Texas Common Law by Defendants APFA, JULIE HEDRICK, AND ERIK HARRIS ("hereinafter Defendants").

APFA is a labor organization covered under the LMRDA, 29 U.S.C. §401 et seq, and 29 U.S.C. § 158, et seq. Plaintiff is a member in good standing of APFA as defined under the LMRDA and 29 U.S.C. § 158. On or about January of 2016, the Plaintiff ran for office within the APFA local union elections. For clarification, Robert "Bob" Ross ran for National President Nena Martin ran for National Vice-President, and Eugenio Vargas ran for National Treasurer.

The Plaintiff won the election, with Robert "Bob" Ross being elected President, Nena Martin elected Vice-President, and Eugenio Vargas Treasurer ("Ross Administration"). The Ross Administration opposed a merger of the union with AFA—another multi-airline flight attendants' union. This created two political factions within APFA competing for power: Pro-APFA/AFA and Anti-APFA/AFA. The individuals comprising the Pro-APFA/AFA faction undertook a course of conduct of retaliation and suppression to thwart the efforts of Plaintiff, as well as others within the local union, to silence the opposition, supplement leadership, and effectuate a merger of the

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

3

two unions. In 2020, the Hedrick Administration (a Pro-APFA/AFA Administration) was elected to National Office.

Plaintiff was subjected to retaliatory and oppressive actions by their union opponents and were subjected to deliberate attempts to suppress their dissent within in the union. Specifically, but not limited to, Plaintiff Vargas was investigated, charged, coerced into signing a promissory note for an alleged over-payment made for Meal Expense Allowance and Special Assignment Fee. It was only **after** Plaintiff repaid his alleged over-payment and he thought the harassment had ended that the union then charged him as well as others in the Ross Administration with multiple frivolous violations including violations for over-payments made to the Ross Administration. However, Plaintiff's union opponents were not satisfied and unlawfully re-charged Plaintiff and forced him to go to Arbitration, where an Award was issued that found he violated APFA Policy, declared he breached his fiduciary duty, suspended his right to run for union office, and found damages in excess of $10,000.

After the award was issued, Plaintiff discovered that APFA officers and officials had withheld pertinent documentation from Plaintiff during the arbitration hearings and presented false testimony to the Executive Committee and the Board of Directors. Furthermore, tactics of intimidation were used to pressure witnesses to not testify in the arbitration proceedings, which altered the results of the award and inhibited Plaintiff's right to a fair and impartial hearing.

Plaintiff was not provided the safeguards against improper disciplinary action provided under the LMRDA. After issuance of the arbitration award against Plaintiff, he discovered documents publicly filed in a lawsuit against Robert "Bob" Ross that contradicted statements the union made prior to and throughout his arbitration that were withheld. Withholding documentation and misrepresenting the facts is an unconscionable violation to Plaintiff's right to a fair hearing

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support
4

and goes beyond any rational explanation that could meet a reasonableness standard. The result of this conduct is that Plaintiff is now forced to repay money that has already been repaid and is now prohibited from running for office. Plaintiff seeks to have the arbitration award rescinded, as this hearing was clearly fraudulent and was an over-reach of the power of the arbitrator.

### III. ARGUMENTS AND AUTHORITIES

#### A. Standards For Dismissal

An FRCP 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction seeks the dismissal of the lawsuit because the court lacks the authority to hear the dispute. *See generally U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984) [*Attachment 1*]. A claim must be dismissed, pursuant to Rule 12(b)(1), "when the Court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). 29 U.S.C. § 412 clearly states:

> "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

If a FRCP 12(b)(1) motion simply challenges the Court's subject-matter jurisdiction based on the sufficiency of the pleading's allegations, then the motion is a facial attack. *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In a facial attack, the District Court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Ritchie*, 15 F.3d at 598; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

5

In resolving the question of subject-matter jurisdiction, the District Court can refer to evidence outside the pleadings. *Luckett v. Bure*, 290 F.3d, 496-97 (2d Cir. 2002); *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir. 2002). A motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of the statement of claim for relief in the Plaintiff's complaint. *Doe v. Hillsboro ISD*, 81 F.3d 1395, 1401 (5th Cir. 1996). The motion cannot be used to resolve factual issues or the merits of the case and is not appropriate unless the Plaintiff's pleadings on their face show, beyond a doubt, that the Plaintiff cannot prove any set of facts that would entitle it to relief. *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Hickey v. Obannon*, 287 F.3d 656, 657 (7th Cir. 2002).

Rule 12(b)(6) motions are disfavored in the law, and a Court will rarely encounter circumstances that justify granting them. *Mahone v. Addicks Utility District of Harris County,* 836 F.2d 921, 926 (5th Cir. 1998). A Court may dismiss a claim only when it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations found in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A motion to dismiss should not be granted unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him or her to relief. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

The claimant is not required to set out in detail the facts upon which the claim is based, rather the Rules require that the claim simply give the Defendant "fair notice." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993). Further, a Court may not look beyond the pleadings. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). The Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

6

only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. *See Mahone*, 836 F.2d at 926. The Rules also dictate that the pleadings be liberally construed "as to substantial justice." *Id.*

**B.**       **Plaintiffs Have Stated Claims Upon Which Relief May Be Granted**.

(1).       Plaintiff properly brought his causes of action pursuant to the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*, and provided Defendant "fair notice" therein pursuant to Federal Rule of Civil Procedure § 8(a).

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720, 725 (5th Cir. 2002). The complaint must be liberally construed in favor of the Plaintiff, and all facts pleaded in the complaint must be taken as true. *Id.* Recent decisions by the Supreme Court have elaborated on the pleading standards for civil litigation *See Ashcroft v Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Supreme Court noted two "working principles" in the *Iqbal* and *Twombly* decisions. First, while a Court must accept all factual allegations in the complaint as true, the court need not accept a complaint's legal conclusions as true; and second, a complaint must state a "plausible claim for relief" to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949-50. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id,* at 1949. The court presumes factual allegations to be true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Lindquist v. City of Pasedena*, 525 F.3d 383, 386 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a). As the Supreme Court has

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for                                    7
Relief and Brief in Support

emphasized, Rule 8 does not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, or "detailed factual allegations," *Iqbal*, 129 S. Ct. at 1949.

Defendants allege that Plaintiff has not stated a claim upon which relief can be granted under the LMRDA. (*Ex. A, Def 's Motion to Dismiss Pl's Claims for Relief, 6*). However, Defendants have wholly failed to provide any legal or factual basis supporting their allegations that Plaintiff cannot state a claim upon which relief can be granted under the LMRDA. Defendants argue that LMRDA does not govern disputes between members as these disputes do not classify as a disciplinary measure by the union. Plaintiff would note that the APFA Const. Art. VII— entitled "Hearings and Disciplinary Procedures"—spells out that members are subject to fine, suspension or expulsion, or suspension from or removal from office for an enumerated list of violations. (APFA Const. Art. VII, Sec. 1 *et. seq.*). Furthermore, Art. VII, Sec. 2 creates the right for any member in good standing to file charges against another member. (*Id.* at Sec. 2 *et. seq.*). The charges are then presented to the APFA Executive Committee, who vote on whether the charges are timely, valid and specific. The accused is then referred to an arbitrator for an arbitration hearing, which ultimately results an award. If the award stipulates the accused member must pay damages, those damages are collected on by the union. In this case, The APRA National President issued a public announcement to all membership on March 24 ,2022 announcing the arbitrations as a result of the unions publications of financial documentation by the union; furthermore, the arbitration awards were adopted by resolution by the APFA Board on March 8, 2022. (*Ex. D Resolution by Board of Directors March 8, 2022; Ex. E, Presidential Hotline to Membership, March 24, 2022*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

8

## C.    Subject Matter Jurisdiction

(1) The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act.

The issue of federal subject matter jurisdiction "concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." (13 Wright & Miller § 3522, p. 125). Subject matter jurisdiction is a threshold question for any federal court and one that must be answered affirmatively before any matter can be heard before the court. It is within the authority of Congress to confer subject matter jurisdiction onto the federal district courts.

While the Federal Arbitration Act does not confer subject matter jurisdiction since the recent Supreme Court decision of *Badgerow v. Walters* was issued on March 31, 2022 reversing the 5th Circuit Court of Appeals application of the look-through test. (*Badgerow v. Walters*, Docket No. 20-1143 (U.S. Supreme Court, Decided March 31, 2022)). However, in the instant case, the Plaintiff seeks Federal Subject Matter jurisdiction based on its claims stemming from the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

(2)   Subject Matter Jurisdiction is Conferred based on Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*

Subject matter jurisdiction exists when a federal question exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. § 1331). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'" (*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 807 (1986) quoting *Franchise Tax Board* v. *Construction Laborers Vacation Trust,* 463 U. S. 1, 8-9 (1983)). An action "arises under" federal law if: (1) "federal law creates the cause of action[,]" or (2) "the vindication of a right under state law necessarily turn[s] on some construction of federal law." (*Merrell Dow Pharm. Inc. v.*

Plaintiff's Response to Defendants'                                        9
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

*Thompson*, 478 U.S. 804, 808-09 (1986) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9 (1983)); *see also, Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).

In the matter before this Court, the cause of action at the heart of the case are those claims falling under the LMRDA § 411, *et seq.* Grounds for a cause of action are created by the federal legislation under LMRDA, 29 U.S.C. § 412 which grants:

> "[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United State for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." (29 U.S.C. § 412).

The cause of action for the unfair hearing and violation of Plaintiff's rights arise from the federal Labor Management Reporting and Disclosure Act, thus subject matter jurisdiction is clearly established.

**D.        Arbitrator's Decision is Subject to Review**

(1) The Arbitrator's Decision Is Subject to Judicial Review

Defendants contend that Plaintiff's basis for setting aside the arbitration award is grounded in LMRDA § 411. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, p. 6*). Plaintiff filed the motion to vacate the arbitration award based on the well-established law that arbitration awards where fraud, corruption, misconduct, or where arbitrators exceeded their authority shall be vacated by the court. (9 U.S.C. § 10). The cause of action under LMRDA §411, *et seq.* is rooted in the Plaintiff's cause of action for damages as a result of the violation of his rights as a union member granted thereunder. Defendants seem to confuse the two laws—one is a means to vacate an invalid award, the other is a means to recover for damages suffered.

Plaintiff's claim under LMRDA are valid and properly asserted claims. The *Supreme* Court

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                                    10

coined LMRDA "the product of congressional concern with widespread abuses of power by union leadership." *(Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, (1982)). The *Breininger* Court reviews a steel worker's claim brought against his union denial of referrals at the hiring halls. The question before the Supreme Court was whether the union's actions were considered disciplinary actions that required notice and a fair hearing under LMRDA 101(a)(5). (*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989)) *[Attachment 2]*. The *Breininger* Court found "[t]he fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper disciplinary action,' indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members." (*Id.* at 92). The case addresses the term "otherwise discipline" in the language of LMRDA § 411 for purposes of when a union must give notice and a hearing and when it should not. (*Id).* The Supreme Court holds that "otherwise discipline" indicates "'Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." (*Id.* at 91). At no point does the *Breininger* Court address subject matter jurisdiction. Nor does the *Breininger* Court ever hold that subject matter jurisdiction did not extended to union disciplinary arbitrations.

The *Guidry* Court also did not address subject matter jurisdiction issues, nor did it address arbitration awards regarding union procedures. (*Guidry v. Int'l Union Of Operating Eng.*, *406*, 882 F. 2d 929 (5th Cir. 1989)) *[Attachment 3]*. This Court, instead, addressed a union member's complaint regarding hiring hall procedures between a union and an employer that allowed the union to hire within and outside the union at its discretion. (*Id.* at 933-934). Hiring procedures of one of the Business Agent illustrated that he was exploiting and disregarding the hiring hall procedures to enrich those union members loyal to him—detrimentally to his opponents to silence

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support
11

and compel obedience. (*Id*). Here, the Court held that under 101(a)(5) you cannot define depriving job referrals as "discipline" in which notice, and a fair hearing is required. However, when it is done as an imposition on a union member's free speech, it can be prohibitive in its effective under 101(a)(1 and 101(a)(2). (*Guidry v. Int'l Union Of Operating Eng.*, 907 F. 2d 1491, 1493 (5th Cir. Ct App. 1990)) [*Attachment 4*]. Furthermore, the *Guidry* Court held that the discipline requirement does not have to be done in the union's name, but if done on behalf of the union as a whole, rather than ad hoc retaliation committed by one union leader, would still fall within the scope of 101(a)(5). (*Id*. at 1492-93).

The discipline complained of by the Plaintiff includes damage to his reputation, fines, expulsion from his position as Base President, and suspension from his ability to serve as an elected official. Furthermore, the charges were brought on behalf of and for the benefit of the union, not for the benefit of the members that brought the charges. Plaintiff can only assume that Defendants' counsel intended to argue that APFA disciplinary procedures are brought conducted by a third-party in that a third party is brought in to conduct the arbitration. If this is Defendants' argument, then this notion disregards the procedures spelled out in the APFA Constitution. The APFA Constitution provides that the National Secretary "shall administer Article VII procedures." (*Ex. B, APFA Const Art. III Sec. 6D(8), pg. 22*). The National Treasurer oversees all financial records, production of all financial documents, maintain computerization of financial documents, oversee all daily activities of the APFA headquarters office and staff, and assist the National Secretary in the discharge of his duties. (*Ex. B, APFA Const Art. III Sec. 6E et seq., pg. 23-24*). The National President acts as the chairperson for the Board of Directors, and the Executive Committee, appoints the members on the Executive Committee, and has the authority to retain and hire legal counsel for the union. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 20-21*).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                    12

The Vice-President is empowered to hire counsel for members in arbitrations and grievances and assist the National President in the discharge of all duties. (*Ex. B, APFA Const Art. III Sec. 6 et seq., pg. 21-22*). The Executive Committee, comprised of all four national officers and appointees made by the National President, review and vote on whether charges are timely, specific, and valid prior to any referral of charges to arbitration (*Ex. B, APFA Const Art. VII Sec. 3 et seq., pg. 42-43*). The Board of Directors, which includes all four national officers, appoint an arbitrator to preside over the arbitration. (*Ex. B, APFA Const Art. VII Sec. 5 et seq., pg. 44-45*).

A quick review of the APFA Constitution will illustrate that the only means to bring about a disciplinary action is to file charges by an individual member against another individual member through the arbitration process, which is overseen and conducted by the National Officers. There are no provisions outlined in Art. VII of the APFA Constitution or APFA Policy that provide for APFA to bring charges against a member on behalf of the union—the drafters of the APFA Constitution sought to empower all members to implement discipline against one another for violations. Furthermore, there is no provisions or measure for a member to file charges and bring an action against an officer as an officer. The only means to file charges outlined in Art. VII of the APFA Constitution provides for only one member to file charges against another member. Therefore, the only possible reading of the Article VII Arbitration Procedures of the APFA Constitution is as a disciplinary proceeding falling within the scope of LMRDA otherwise this interpretation would undermine the statute and frustrate the purpose in Congress creating the statute—to protect members from unfair treatment and intimidation tactics.

      (2) <u>Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order</u> <u>Comports with Well-Settled Federal Labor Law Principles.</u>

Defendants argue that the labor law principle that an arbitrator's interpretation of a

Plaintiff's Response to Defendants'  
Motion to Dismiss Plaintiff's Claims for  
Relief and Brief in Support      13

collective bargaining agreement is final and not subject for review by the judiciary, therefore the arbitrator's award in the case at issue should stand as final and binding. The review of arbitration awards in labor cases was described by the *Misco* Court as "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." (*United Paper Workers International Union v. Misco, Inc.,* 484 U.S. 29, 36-37 108 S.Ct. 364, 371, (1987)) [*Attachment 5*]. Application of these ordinary contract principles falls squarely within an arbitrator's wide discretion to interpret and apply a collective bargaining agreement. Relying on this interpretation for this case at issue poses three problems: (1) there is not a Collective Bargaining Agreement at issue between Plaintiff and Defendants, (2) this interpretation frustrates the policy and purpose behind the LMRDA and the Member's Bill of Rights as forged by Congress, and (3) labor law principles regarding arbitration still favor vacating arbitration awards in certain circumstances.

The first problem with extending the arbitrator's authority within the case-at-issue is that no Collective Bargaining Agreement is at issue in the current case between Plaintiff and Defendants. "A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301 (a) for breach of that contract." (*Wooddell v. International Bhd. of Elec. Workers,* 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 619-27, 101 S.Ct. 2546, 2549-53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of* 1477*1477 *Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981)). A Collective Bargaining Agreement is one typically defined by "contracts between an employer and a labor organization representing employees. . . ." (29 U.S.C. § 185(a)).

In the case before the court, the employer, American Airlines, Inc., is not a party to the

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

14

Union Constitution, nor were they a party to the charges filed or the union's disciplinary procedures, or the arbitration hearing. This is governed solely by the union constitution—which is a contract between the members and APFA. Therefore, application of the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is not appropriate here.

The second problem with Defendants' argument is that this approach frustrates the policy interest behind enacting LMRDA. The LMRDA policy interest was clear upon Congress's enactment of the legislation: "[t]he legislative history and the extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. (*Local Union No. 38 v. Pelella*, 350 F.3d 73, 83-84 (2nd Cir. 2003) (citing *Salzhandler v. Caputo,* 316 F.2d 445, 449 (2d Cir.1963))). The Second Circuit Court spells out the policy behind the Union Member's "Bill of Rights" in saying that "Section 101 of Title I of the LMRDA represents '[o]ne of the most significant remedial provisions of the LMRDA.' (*Pelella*, 350 F. 3d 73, 84 (citing *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation,* 590 F.2d 1139, 1149 (D.C.Cir.1978))). The Union Member's "Bill of Rights," protects members from the abusive or coercive practices of the union's leadership. (*Franza v. International Brotherhood of Teamsters, Local 671,* 869 F.2d 41, 44 (2d Cir.1989)).

In the case before the court, expansion of the labor law axiom from the limited a Collective Bargaining Agreement to union disciplinary arbitrations would simply stifle and limit the protections afforded to members from abuse of power by union officials and leadership under LMRDA. Congress enacted this statute to safeguard union members from abuses of powers, this interpretations tolerates abuses of power provided a third party arbitrator rules over the disciplinary

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

15

proceeding—without regard as to the conduct or integrity of the disciplinary proceedings.

The third problem with Defendants' arguments in support of non-judicial review of the arbitrator's award within a Union's disciplinary proceeding is that it ignores those instances in which the courts have vacated arbitration awards even interpreting a collective bargaining agreement. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960))) [*Attachment 6*]. The Supreme Court in *Garvey,* goes on to state that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award." Here, the court makes clear that when dishonesty has occurred, vacating the arbitration award is the proper recourse. Those "decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced." *Misco*, 484 U.S. 29 at 38-39. Again, these cases apply to those where the arbitration occurs as a result of a collective bargaining agreement. In the case before the court, dishonesty *has* been asserted, if not clearly established by the documents attached to Plaintiff's Original Complaint. (*Ex. C, Pl's Original Compl.).* Therefore, even if a heightened standard to vacate the union's disciplinary action were applied, the arbitrator's award at issue should still be vacated per the labor law principles due to the Defendants' fraud—however, at the very least, Plaintiff's motion to dismiss should be denied.

**E.** **Plaintiff's Remaining Claims Have Merit**

(1) Jurisdictional Basis for Remaining Claims is rests in *Gibbs* Supplement Jurisdiction

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

16

As previously discussed, the Supreme Court held that "[a] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). Furthermore, 28 U.S.C. §1331 requirements are met when a case generally arises under federal law when that federal law creates the cause of action. (*Grable & Sons*, 545 U.S. 308, 312).

State law claims asserted between the same parties, based on the same nucleus of facts that gave rise to the cause of action which forms the basis of subject matter jurisdiction, may be heard based on supplemental or pendent jurisdiction. In *Finley*, the Supreme Court reaffirmed what it previously held in *Gibbs* finding that "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [which] comprises but one constitutional 'case.'" (*Finley* v. *United States,* 490 U. S. 545, 548 (1989) quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966)) [*Attachment 7*].

In the case before the court, subject matter jurisdiction is conferred based on federal question because the cause of action *arises out of* the LMRDA, 29 U.S.C. § 412. Supplemental jurisdiction over state law claims can be founded on the *Gibbs* case and its progeny of broadly interpreting jurisdictional authority over state law claims within an action properly embedded in federal question jurisdiction.

(2) <u>Exhaustion of Internal Remedies was not Required Prior to Filing Suit</u>.

Plaintiff is not required to exhaust internal remedies as a pre-requisite to filing suit against

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

17

the Defendants. Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts the discretion to hear a union member claim or require a union member to exhaust his internal remedies before filing suit. (*See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982). *Guidry v. Operating Engineers Local 406*, 882 F. 2d 1491, (5th Cir. 1990)).

However, Plaintiff *did* exhaust his internal remedies prior to filing suit; Plaintiff pursued arbitration and attended the hearings. Plaintiff called witnesses that were not required to appear or that were intimidated and discouraged from testifying on behalf of the Plaintiff during the arbitration. Plaintiff brought this lawsuit after discovering that the Union and the National Officers conspired to withhold documents and mis-informed APFA officials to achieve a guilty result.

### (3) Common Law Breach of Fiduciary Duty Claims require compliance with LMRDA § 501(b).

The Breach of Fiduciary Duty claims brought against the officers were asserted under Texas Common Law, similar to the counterclaim asserted by Defendant. LMRDA § 501(a) clearly asserts a cause of action against an officer that spends union funds or for purposes of pecuniary or personal gain. Plaintiff's Complaint never asserted any facts regarding the officers' conduct pertaining to their spending of union funds, rather Plaintiff's complaints clearly focus on the withholding of documents, the presentation of false facts, defamation of his character, and conspiring to defame his character. Consequently, any pre-requisite needed to comply with LMRDA § 501(b) is moot, as no claim under LMRDA § 501(a) have been asserted.

### (4) Preemption of the Breach of Union Constitution and Breach of Fiduciary Duty claims cannot exist based on the Fraudulent Arbitration Award.

Preemption of the remaining claim cannot be based on an Arbitration that were not based

Plaintiff's Response to Defendants'  
Motion to Dismiss Plaintiff's Claims for                    18  
Relief and Brief in Support

on any claims brought by the Plaintiff and did not address any of the grievances or damages Defendants imposed on the Plaintiff. The Supreme Court finds preemption of state law claims only when the claim is dependent on interpretation of a Collective Bargaining Agreement. (*Hawaiian Airlines v. Norris*, 512 U.S. 246 (1994); *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004)). Consequently, since no Collective Bargaining Agreement is at issue in the case before the Court, then there is no preemption of the state law claims brought against the Defendants.

### F.     Plaintiff Has Satisfied the "Fair Notice" Pleading Requirements Pursuant to Federal Rule of Civil Procedure 8(a).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. (Fed. R. Civ. P. 8(a)). As the Supreme Court has emphasized, this rule does not require "heightened fact pleading of specifics," or "detailed factual allegations," (*Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949). Plaintiff provided an extremely detailed pleading outlining specific violations of the LMRDA by Defendants. (*Ex. C, Pl's Original Compl.*).

The law clearly states that the Claimant is not required to set out in detail the facts upon which the claim is based, rather the Rules require that the claim simply give the Defendants "fair notice." (*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993)). Further, the Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. (*See Mahone*, 836 F.2d at 926). The Rules also dictate that the pleadings be liberally construed "as to substantial justice." (*Id*). Plaintiff has met his burden of providing a detailed factual basis and specific statutory protections along with specific relief. (*Ex. C, Pl's Original*

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                          19

*Compl.).*

## IV. CONCLUSION AND PRAYER

In conclusion, Plaintiff clearly plead, and sought protection and relief, pursuant to his rights as a member of a labor organization under the LMRDA. Plaintiff alleged and asserted a detailed factual background demonstrating how Defendants violated his rights. Plaintiff has provided Defendant with fair notice of the allegations and facts of his claims pursuant to Federal Rule of Civil Procedure 8(a) and the local rules of this Court. Plaintiff cited specific clauses under the LMRDA under which their rights are protected, and relief is available. Further, Plaintiff has also demonstrated that Plaintiff has only plead relief sought from this Court in its official capacity, and that sound case law exists to protect his rights. For the reasons state herein, Plaintiff requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By:  /s/ Heather Abreu
Heather Abreu
Texas Bar No. 24122577
Phone: (972) 327-5800
Email: heather@KDphillipslaw.com

By:  /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com

5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com
**ATTORNEYS FOR PLAINTIFF**

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

20

# CERTIFICATE OF
# SERVICE

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing and Facsimile **on this the 10th Day of August 2022.**

William Osborne
Margot Nikitas
Sanford Denison

/s/_____
Heather Abreu

Plaintiff's Response to Defendants'                    21
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| **EUGENIO VARGAS,** | § | |
| | § | |
| Plaintiff/Counterclaim Defendant, | § | |
| | § | |
| v. | § | **Civil Action No. 4:22-cv-00430-O** |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, JULIE** | § | |
| **HEDRICK, AND ERIK HARRIS,** | § | |
| | § | |
| Defendants/Counterclaim Plaintiffs. | § | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF AND BRIEF IN SUPPORT

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214

MARGOT A. NIKITAS*
Illinois Bar No. 6309782
General Counsel
Association of Professional
 Flight Attendants
1004 W. Euless Boulevard
Euless, TX 76040

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015

*Admitted *Pro Hac Vice*

*Counsel for Defendant Counterclaim Plaintiff*
*Association of Professional Flight Attendants, and*
*Defendants Julie Hedrick and Erik Harris*

Dated: July 14, 2022

Exhibit A

## I.    <u>INTRODUCTION</u>

Defendants Julie Hedrick, Erik Harris and Defendant/Counterclaim Plaintiff Association of Professional Flight Attendants ("APFA") (collectively, "Union Defendants") by their undersigned counsel, respectfully submit this Motion to Dismiss Plaintiff Eugenio Vargas's ("Vargas") claims for relief in their entirety for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, as a matter of law, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure ("FRCP").[1]  In support of their Motion, the Union Defendants submit this Memorandum of Law.

## II.    <u>STATEMENT OF THE CASE</u>

Plaintiff Vargas, a member and former National Treasurer of APFA, has brought this lawsuit against APFA and two of its current officers, National President Julie Hedrick and National Treasurer Erik Harris, in an attempt to vacate and annul the arbitration decision and order,[2] and supplemental decision clarifying that decision[3] issued against him by Arbitrator Ruben Armendariz (collectively, "Arbitrator's Decision and Order"). The facts of the case are plain from the Complaint and attached Arbitrator's Decision and Order:

Based upon internal union charges filed by two APFA members, Melissa Chinery-Burns and Sandra Lee ("Charging Parties"), against Vargas under Article VII of the APFA

---

[1] This motion seeks dismissal of all of Plaintiff Vargas's claims against all Defendants herein as asserted in his Complaint (doc.1), leaving pending APFA's Counterclaim against Vargas asserted in the Union Defendants' Answer and Counterclaim (doc. 11, at pgs. 20-30, PAGE ID 106-116). As individual defendants Julie Hedrick and Erik Harris are not parties to APFA's counterclaim against Vargas, upon dismissal of Vargas's claims against the Defendants, Hedrick and Harris should be dismissed as parties to this action.

[2] Attached as Exhibit A to the Complaint (doc. 1-1, PAGE ID 13-51) and Exhibit A to the Union Defendants' Answer and Counterclaim (doc. 11-1, PAGE ID 119-157).

[3] Attached as Exhibit B to the Union Defendants' Answer and Counterclaim (doc. 11-2, PAGE ID 158-159).

Constitution, reviewed by the APFA Executive Committee and then referred for resolution to

Arbitrator Armendariz, pursuant to Article VII of the APFA Constitution, a three-day hearing

was held on the record on September 14-16, 2022. The issues as presented to the Arbitrator were

whether Vargas, when acting as the APFA National Treasurer, violated the APFA Constitution[4]

and Policy Manual by:

(1) Violating the Meal Expense Policy;
(2) Failing to maintain an inventory thereby violating Article III, Section 6.E. of the APFA Constitution by failing to maintain union assets;
(3) Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such;
(4) Allowing the payment to former National President Bob Ross of thousands of dollars in Meal Expense Allowance and Special Assignment Fee when he was no longer working at APFA;
(5) Violating the credit card policy by charging a rental car and meals for a trip to Spain;
(6) And, if so, what should be the appropriate remedy.

Arbitrator's Decision and Order at 2-3.

During the three-day hearing, the Charging Parties called nine (9) witnesses to testify in

support of their charges against Vargas and Vargas called seven (7) witnesses in his defense.

Arbitrator's Decision and Order at 2. Following the close of the hearing and the filing of briefs

by the parties, the Arbitrator issued a decision on February 18, 2022, and a supplemental

decision on March 10, 2022, which clarified certain aspects of the remedy.

Regarding the Meal Expense Policy allegation, the Arbitrator directed APFA to retain an

independent auditor to review Vargas's records during his tenure as National Treasurer to

determine the extent of the alleged violations. The Arbitrator sustained the allegations regarding

Vargas's alleged failure to maintain proper inventory of union assets, dismissed the allegation of

---

[4] The relevant provisions of the APFA Constitution and Policy Manual are restated in the Arbitrator's Decision and Order at 4-7.

2

his allegedly allowing then National President Bob Ross to receive excessive meal allowances and dismissed the rental car allegations against Vargas as moot. Arbitrator's Decision and Order at 30-35.

For his remedy, the Arbitrator ordered Vargas to reimburse APFA for any personal meal expenses unrelated to union business, found to be due after the independent auditor's review and to pay for one half of the Arbitrator's expenses. Arbitrator's Decision and Order at 39. He also prohibited Vargas from serving in any official position within the APFA organization for life and ordered Vargas to repay the APFA for one quarter of the independent auditor's fee. Supplemental Decision and Order at 2.

Plaintiff Vargas then filed this lawsuit against Defendants APFA and its National President and National Treasurer—*none* of whom were parties to the Vargas arbitration proceeding—alleging that the Arbitrator's Decision and Order should be vacated as violative of the Federal Arbitration Act ("FAA") (Complaint, Paragraph 1, 7) and Section 101(a)(5) of the Labor-Management Reporting and Disclosure Act ("LMRDA") (Complaint, Paragraphs 1, 7, 41). He also alleged breach of the APFA Constitution (Complaint, Paragraphs 45-51), and breach of fiduciary duty, which the Union Defendants assume refers to an alleged violation of Section 501(a) of the LMRDA. (Complaint, Paragraphs 52-57).

In its answer to the Complaint, APFA filed a Counterclaim[5] against Vargas for enforcement of the Arbitrator's Decision and Order and for breach of his fiduciary duties as APFA National Treasurer as determined by the Arbitrator in his Decision and Order.[6]

---

[5] Doc. 11 at pgs. 20-30, PAGE ID 106-116.

[6] See Exhibits A and B to the Union Defendants' Answer and Counterclaim (doc. 11, PAGE ID 119-159) and Exhibit A to the Complaint (doc 1-1, PAGE ID 13-51.)

As we now show, Vargas's claims for relief should all be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Under well settled precedent there is *no* subject matter jurisdiction for Vargas's claims under either the FAA or Section 101(a)(5) of the LMRDA, and *none* of the allegations in the Complaint asserts a claim upon which relief can be granted as a matter of law. Dismissal of Vargas's baseless claims against the Union Defendants will leave APFA's Counterclaim against Vargas for enforcement of the Arbitrator's Decision and Order and breach of fiduciary duty to be resolved by the Court.

## III.    STANDARD OF REVIEW

FRCP 12(b)(1) requires dismissal of any claim over which federal courts lack subject matter jurisdiction. If the court determines that it lacks subject matter jurisdiction, it must dismiss the action. FRCP 12(h)(3). A court may find subject matter jurisdiction is lacking from "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (*per curiam*).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (citation omitted). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.  *Id.* (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir.1977) (*per curiam*)).

With regard to dismissal under Rule 12(b)(6), this Court recently summarized the relevant precedents in *Oliver v. Univ. of Texas Sw. Med Sch.*, 2019 U.S. Dist. LEXIS 21289, 2019 WL 536376 at *16-17 (2019) (J. Boyle):

4

In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve **[\*17]** this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

In addition, the court may consider documents attached to the complaint in considering a motion under Rule 12(b)(6) if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## IV. ARGUMENT

### A. The Lack of Subject Matter Jurisdiction Under the Federal Arbitration Act

The first of Vargas's two asserted bases for subject matter jurisdiction for review and vacation of the Arbitrator's Decision and Order (Complaint, Paragraph 1, 7)—that the FAA provides subject matter jurisdiction to review and vacate the Arbitrator's Decision and Order—is in error as a matter of law. Precedent is well settled to the contrary: the FAA does not provide subject matter jurisdiction to review arbitration awards. *Smith v. Rush Retail Ctr., Inc.,* 291 F. Supp. 2d 479, 487 (W.D. Tex. 2003) (citing authorities), *aff'd* 360 F. 3d 504, 505 (5th Cir. 2004); *Mellado v. MBNA Am. Bank,* 2004 U.S. Dist. LEXIS 25471, 2004 WL 2937224 at *3-4 (N.D. Tex. 2004) (J. Lynn); *Judd v. Texakoma Fin., Inc.,* No. 3:96-CV-26 04-P, 1996 WL 734940, at *4 (N.D. Tex. Dec. 11, 1996) (J. Solis).

5

**B.     The Arbitrator's Decision Is Not Subject to Judicial Review Under LMRDA Section 101(a)(5)**

The second of Vargas's two asserted bases for subject matter jurisdiction—the contention that the Arbitrator's Decision and Order violated LMRDA Section 101(a)(5) (Complaint, Paragraph 1, 7)—is likewise erroneous as a matter of law. To the contrary, it is well settled that while LMRDA Section 101(a)(5) does provide subject matter jurisdiction for judicial review of internal, *union-conducted* disciplinary proceedings, it does *not* provide or confer subject matter jurisdiction for judicial review of other union-related administrative or legal matters such as the third-party arbitration award in this case. *Breininger v. Sheet Metal Workers Local 6*, 493 U.S. 67, 92-94 (1989); *Guidry v. Operating Engineers Local 406*, 907 F.2d 1491, 1492 (5th Cir. 1990); *Webster v. United Auto Workers Local 5*, 394 F. 3d 436, 441 (6th Cir. 2005); *Hackenburg v. Boilermakers*, 694 F. 2d 1237, 1239 (10th Cir. 1982); *Bass v. Int'l Bro. of Boilermakers*, 630 F. 2d 1058, 1066 (6th Cir. 1980); *Kirk v. Transport Workers Union*, 934 F. Supp. 775, 785 (S.D. Tex. 1995); *Ryals v. ILA Local 1771*, 33 F. Supp. 3d 634, 639-40 (D.S.C. 2014).

In other words, because there is no subject matter jurisdiction under either the FAA or LMRDA Section 101(a)(5), which are the only two jurisdictional bases cited in the Complaint as support for Vargas's challenge to the Arbitrator's Decision and Order, the Complaint must be dismissed for lack of jurisdiction. *See* FRCP 12(b)(1).

**C.     Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order Violates Settled Federal Labor Law Principles**

Even assuming, for purposes of argument *only*, that Vargas has asserted a viable jurisdictional basis in the Complaint to support his challenge to the Arbitrator's Decision and Order, the Complaint fails to state a claim for which relief can be granted because, on its face, the claim *violates* the federal labor law axiom requiring judicial deferral to final and binding labor arbitration decisions, *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363

6

U.S. 593, 597-99 (1960); *Delek Ref. Ltd. v. Local 202 Steelworkers*, 891 F. 3d 566, 570 (5th Cir. 2018); *Weber Aircraft v . IBT  Local 767*, 253 F.3d 821, 824 (5th Cir. 2001); *Refresco Bevs.v. Teamsters Local 997*, 2021 U.S. Dist. LEXIS 238421, 2021 WL 5908988 at *7-8 (N.D. Tex. 2021) (J. O'Connor); *Teamsters Gen. Drivers Warehousemen v. Greif Packaging, LLC*, 2010 WL 1417889, at *7 (S.D. Tex. Apr. 7, 2010) (J. Atlas); *Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 (N.D. Tex. 2007) (J. Means).[7]

The Fifth Circuit recently summarized the restrictive standard of judicial review of labor arbitration decisions in its unpublished decision in *Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) [*Attachment 1*]:

> "Judicial review of arbitration awards is severely limited." "The standard for this review is 'among the narrowest known to the law.'" When an arbitration award settles a labor dispute, judicial review is "particularly constrained." "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."

> Under this unusually deferential standard of review, "courts are not authorized to reconsider the merits of an award." "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits. Instead of assessing how well the arbitrator interpreted the contract, [*8]  we ask if the arbitrator acted within the contract's bounds. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."

> To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'" "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end." In these

---

[7] Vargas's attempt to vacate the Arbitrator's Decision and Order likewise violates the settled doctrine of judicial noninterference in internal union governance. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953); *Carr v. ALPA*, 866 F.3d 597, 602-03 and n.16 (5th Cir. 2017); *O'Neill v. Air Line Pilots Ass'n*, 939 F.2d 1199, 12Ci06 (5th Cir. 1991); *Newell v. IBEW,* 789 F.2d 1186, 1189 (5th Cir. 1986).

situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award. "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority,'" however, "'that ambiguity must be resolved in favor of the arbitrator.'" (Footnotes and citations omitted).

*See also Allied Waste, supra,* 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at \*19-21 (J. Means) (awarding attorneys fees as remedy for baseless attempt to vacate arbitration award).[8]

Nowhere in the Complaint does Vargas allege, much less provide specific citation for, any contention that the Arbitrator exceeded his authority or violated the express terms of his jurisdiction under the governing provisions of Article VII of the APFA Constitution. Indeed, his objections are entirely limited to the merits of the charges and the procedural conduct of the hearing. Complaint, Paragraphs 20-25, 30-35. Nor did Vargas make any such jurisdictional argument to the Arbitrator during or after the hearing. Arbitrator's Decision and Order at 26-30. Vargas's attempt to persuade the Court to vacate the Arbitrator's Decision and Order thus fails on this additional legal basis.

As the Tenth Circuit Court of Appeals put it well, "[b]ecause arbitration presents such a 'narrow standard of review,' [28 U.S.C.] Section 1927 sanctions are warranted if the arguments presented are 'completely meritless' [citation omitted] [and] to underscore the point that unjustified, protracted attempts to vacate arbitration awards. . .will not be tolerated [one] does so at the risk of being sanctioned." *DMA Inter., Inc. v. Qwest Comm. Inter., Inc.*, 585 F.3d 1341,1345-46 (10th Cir. 2009).

### D.     Plaintiff's Remaining Claims Are Without Merit

The remaining claims in the Complaint—breach of the APFA Constitution and breach of

---

[8] The same "exceedingly deferential" standard of review of arbitration awards applies to cases which, unlike the instant case, are reviewable under the FAA. *Lalo LLC v. Hawk Apparel, Inc*., 2022 U.S. Dist. LEXIS 72218, 2022 WL 1173801 at \*5-7 (N.D. Tex. 2022) (J. Lindsay).

fiduciary duty, which the Union Defendants assume refers to an alleged violation of LMRDA

Section 501—are also subject to dismissal.

First, Vargas has neglected to even assert *any* jurisdictional basis for either claim.

Second, relief is precluded, again as a matter of law, because, under the APFA

Constitution and settled precedent, Vargas was legally obligated to exhaust the mandatory

internal union remedies "prior to taking any legal action." *Clayton* v. *International Union*, 451

U.S. 679, 692 (1981); *Hayes* v. *Brotherhood of Ry. & Airline Clerks*, 727 F.2d 1383, 1385-86

(5th Cir.), *cert*. *denied* 469 U.S. 953 (1984). In other words, if he had any valid claims against

National President Hedrick or National Treasurer Harris, he could have brought them internally

under Article VII of the APFA Constitution, but he did no such thing and his failure to do so is

grounds for dismissal of his claims under FRCP 12(b)(6).[9]

Third, before filing his Section 501(a) claim in court, Vargas was required by Section

501(b) to make a demand for remedial action by the APFA. *Adams-Lundy v. Ass'n of Prof.*

*Flight Attendants*, 844 F. 2d 245, 248-49 (5th Cir. 1988); *Van Elder v. Amalgamated Transit*

*Union Local 1338*, 2014 U.S. Dist. Lexis 63202, 2014 WL 1808079 at *10-11 (N.D. Tex. 2014)

(J. Horan). Once again, Vargas did not even attempt to comply with this mandatory statutory

prerequisite and his Section 501 claim fails to state a claim for relief on its face.

Finally, the breach of APFA Constitution and LMRDA Section 501 claims in Vargas's

Complaint fail, again as a matter of law, on preemption grounds: the underlying allegations are

all directly and entirely related to Vargas's challenge to the Arbitrator's Decision and Order and

---

[9] Likewise, as a matter of law, as Union officers National President Hedrick and National
Treasurer Harris are not proper Defendants in any case. *Atkinson v. Sinclair Refining Co*., 370
U.S. 238, 247-49 (1962); *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 406-07 (1981);
*Universal Communications Corp. v. Burns*, 499 F.2d 691, 693-94 (5th Cir. 1971).

are therefore preempted. *Woodcock v. Marathon Petroleum*, 2019 U.S. Dist. LEXIS 66447, 2019 WL167618187 at \*5-6 (S.D. Tex. 2019) ("Preemption occurs when a decision on the [nonlabor] claim is inextricably intertwined with consideration of the terms of the labor contract or when the application of state law to a dispute requires interpretation of the collective-bargaining agreement." *Thomas v. LTV Corp.,* 39 F. 3d 611, 615-16 (5th Cir. 1994). *See also Blanks v UAW,* 837 F. Supp. 2d 609, 616 (N.D, Tex. 2011), (J. Means), *aff'd* 464 Fed. Appx. 284 (5th Cir. 2012).

Here, the governing "labor contract" under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. §185(a), is the APFA Constitution, not a collective bargaining agreement. *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 622 (1981); *Wooddell v. Int'l Bhd. of Elec. Workers*, 502 U.S. 93, 99, 101 (1991); *Hampton v. Int'l Longshoreman's Ass'n*, 2017 U.S. Dist. LEXIS 218154 at \*5-6 (S.D. Tex. 2007) [*Attachment 2*]. But the legal principle of federal preemption and the outcome are the same.

## V.    **CONCLUSION**

For the reasons stated, the Union Defendants respectfully submit that all of Plaintiff Vargas's claims for relief in the Complaint must be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1) and also for their failure to state a claim for relief as a matter of law under FRCP 12(b)(6), leaving APFA's Counterclaim for enforcement of the Arbitrator's Decision and Order and for Vargas's breach of fiduciary duty as an APFA officer to be resolved by the Court. Individual defendants Julie Hedrick and Erik Harris, upon dismissal of all claims against them by Plaintiff Vargas, should also be dismissed as parties to this action as they are not parties to the remaining counterclaim by APFA against Vargas.

10

Date: July 14, 2022                          Respectfully Submitted,


                                               /s/ Sanford R. Denison
                                             SANFORD R. DENISON
                                             Tex. Bar No. 05655560
                                             Baab & Denison, LLP
                                             6301 Gaston Ave., Suite 550
                                             Dallas, TX  75214
                                             Tel.: (214) 637-0750
                                             Fax.: (214) 637-0730
                                             Email: denison@baabdenison.com

                                             MARGOT A. NIKITAS*
                                             Illinois Bar No. 6309782
                                             General Counsel
                                             Association of Professional
                                               Flight Attendants
                                             1004 W. Euless Boulevard
                                             Euless, TX 76040
                                             Tel. (817) 540-0108 ext. 8108
                                             Fax. (817) 355-1919
                                             Email: MNikitas@apfa.org

                                             WILLIAM W. OSBORNE JR.*
                                             D.C. Bar No. 912089
                                             Osborne Law Offices P.C.
                                             5335 Wisconsin Avenue N.W., Suite 440
                                             Washington, D.C. 20015
                                             Tel.: (202) 243-3200
                                             Fax: (202) 686-2977
                                             Email: b.osborne@osbornelaw.com

                                             *Counsel for Defendant Counterclaim Plaintiff*
                                             *Association of Professional Flight Attendants, and*
                                             *Defendants Julie Hedrick and Erik Harris*

                                             *Admitted *Pro Hac Vice*

11

## CERTIFICATE OF SERVICE

I certify that on this 14th day of July 2022 a true and correct copy of the foregoing document was served on the below listed counsel of record for Plaintiff/Counterclaim Defendant Vargas by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

KERRI PHILLIPS
HEATHER ABREU
K.D. Phillips Law Firm, PLLC
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com
Email: Heather@KDphillipslaw.com

Date: July 14, 2022                     _/s/ Sanford R. Denison_____
                                        SANFORD R. DENISON

12

*Ball Metal Container Corp. v. United Auto Workers Local 129*,
2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022)

*Attachment 1*

## Ball Metal Beverage Container Corporation, Plaintiff-Appellee,

## v.

## Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America, Defendant-Appellant.

### No. 21-10755

### United States Court of Appeals, Fifth Circuit

### February 4, 2022

Appeal from the United States District Court for the Northern District of Texas USDC 4:20-CV-797

Before Owen, Chief Judge, and Clement and Engelhardt, Circuit Judges.

Per Curiam [*]

This labor dispute concerns an <mark>arbitrator's decision. We uphold the award and reverse the contrary judgment of the district court</mark>. The parties

1

may present their arguments regarding back pay and benefits from the date that the employee was prepared to return to work for arbitration.

### I

Ball Metal Beverage Container Corporation (Ball Metal) operates a beverage can plant in Fort Worth, Texas. Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America (Local 129) is a labor union that serves as the exclusive bargaining representative for some Ball Metal employees.

Ball Metal and Local 129 are parties to a collective bargaining agreement (CBA) that governs the terms of employment for employees represented by the union. The version of the CBA pertinent to this dispute contains a management rights provision that includes this provision:

Except as otherwise expressly limited by this Agreement, all functions of management not otherwise relinquished or limited shall remain vested exclusively in the Company, including, but not limited to . . . hire, discipline, or discharge employees for just cause; . . . provided that these rights shall not be exercised in any manner which would constitute a breach of any other Article of this Agreement.

Another article of the agreement, titled "Disciplinary Actions and Discharge," provides: "The right of the Company to discipline or discharge employees for good cause including violations of this Agreement or Company rules is hereby acknowledged." Aside from these provisions, the CBA does not describe what constitutes just or good cause.

The CBA also outlines procedures for addressing grievances, including arbitration procedures. When the parties submit a dispute for arbitration, the arbitrator's decision "shall be final and binding on all parties." The arbitrator's authority, however, is constrained. The

2

agreement states that "[t]he jurisdiction of the arbitrator shall be limited to interpreting or determining compliance with the terms of this Agreement. The arbitrator shall have no power to add to or subtract from, to disregard or modify any part or all of the terms of this Agreement."

Ball Metal has rules and policies that govern misconduct. There is a plant rule against harassment as well as a company policy that prohibits discrimination, harassment, and retaliation. The plant rule defines harassment as activity "of a sexual nature, racial nature, a religious nature or any activity that can be construed as harassment." Employee training materials describe harassment as including "behavior towards another person which is unwelcome and personally offensive to [the]


Exhibit A

recipient and . . . creates an intimidating, offensive or hostile work environment."

Ball Metal does not prescribe any particular sanction for a harassment violation. The harassment policy provides only that violations "will subject th[e] employee to appropriate disciplinary action, up to and including termination." More generally, for violations of plant rules and company policies, "progressive discipline is to be followed except that steps for discipline 'may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.'" The procedure is different for selected rules not at issue here whose violation "will result in automatic suspension for purpose of discharge."

Shawn Allen, a Ball Metal employee, was a member and an elected shop chairman of the union. He had worked at Ball Metal since 2006. In 2019, Allen was accused of harassing a coworker. Specifically, he was accused of yelling at the coworker and calling him a "f ------ g scab" after learning that the coworker had left the union. Allen had been accused of similar conduct in the past. He had not otherwise been disciplined for behavioral or productivity issues.

3

After an investigation, Ball Metal terminated Allen in late June 2019. Local 129 filed a grievance contesting the termination decision, which proceeded to arbitration. The parties presented these questions to the arbitrator: "Whether or not the Grievant, Shawn Allen, was terminated for proper cause and, if not, what is the appropriate remedy?"[1]

On July 6, 2020, the arbitrator issued an opinion and award. In the "DISCUSSION AND FINDINGS" section of the decision, the arbitrator determined that, "[u]nder the parties['] CBA, . . . the Company had proper cause to discipline the Grievant for violation of" Ball Metal's harassment policy and plant rule. The arbitrator also determined that, "[b]esides the CBA and Company Policy, the Grievant's conduct violated

the Preamble of the CBA," which urged "promot[ing] a cooperative and progressive industrial and economic relationship between the Company and its employees." The arbitrator further explained that "while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service." He concluded that "based upon all the previous discussion the termination decision is modified in the following AWARD."

On the following page, under the heading "AWARD," the arbitrator wrote: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority."

4

The award provided that, instead of termination, Allen would be suspended from the date of his discharge to the date of his return to work; he would be offered immediate reinstatement without back pay or benefits; and he would retain his seniority. In essence, the arbitrator reduced the sanction to a roughly yearlong unpaid suspension.

The day after the arbitrator issued the decision, Local 129 informed Ball Metal that Allen wanted to return to work and was prepared to do so immediately. The company declined to reinstate him. Instead, on July 30, 2020, Ball Metal filed suit under § 301 of the Labor Management Relations Act seeking vacatur of the arbitrator's award. Local 129 counterclaimed seeking enforcement of the arbitrator's award, attorneys' fees, and back pay and benefits for the period of noncompliance since the award. The parties filed cross motions for summary judgment.

The district court granted summary judgment in favor of Ball Metal and vacated the arbitrator's award. The court held that the arbitrator exceeded his authority under the CBA by modifying Allen's sanction after stating that there was just cause for termination. The court



did not discuss the portion of the award in which the arbitrator stated that Allen "was not terminated for proper cause." The court also denied attorneys' fees. On appeal, Local 129 challenges the vacatur and attorneys' fees rulings.

## II

### A

We begin with the challenge to the vacatur ruling. "We review a district court's grant of summary judgment in a suit to vacate an arbitration award *de novo*."[2] Summary judgment is appropriate "if the movant shows

5

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

"Judicial review of arbitration awards is severely limited."[4] "The standard for this review is 'among the narrowest known to the law.'"[5] When an arbitration award settles a labor dispute, judicial review is "particularly constrained."[6] "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."[7]

Under this unusually deferential standard of review, "courts are not authorized to reconsider the merits of an award."[8] "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."[9] Instead of assessing how well the arbitrator interpreted the contract, we ask if the arbitrator acted within the contract's bounds.[10] "[A]n arbitrator is confined to interpretation and

6

application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."[11]

To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if' not obviously drawn, from the letter or purpose of the collective bargaining agreement.'"[12] "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end."[13] In these situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award.[14] "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority, '" however, "'that ambiguity must be resolved in favor of the arbitrator.'"[15]

### B

Our decisions in *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103*[16] and *Weber Aircraft Inc. v. General Warehouseman and Helpers Union Local 767*[17] are instructive, if not dispositive. In *Albemarle*, an arbitration award ordered suspension instead of termination for employees

7

who had violated safety rules. We reversed the district court's vacatur of that award.[18] The management rights clause in the CBA provided that "the suspending, disciplining and discharging employees for cause . . . are all rights solely of the COMPANY."[19] We understood the clause to "contemplate[] situations in which a finding of 'cause' could support lesser sanctions than termination."[20] We drew a distinction between this clause and clauses in other CBAs that provided only for discharge, from which "authority to impose a lesser alternative sanction cannot be arguably inferred."[21]

Because the CBA in *Albemarle* did not "make clear that any violation of safety rules is an



offense requiring discharge," we accepted the interpretation of the arbitrator, who determined that the employees' violations were cause only for discipline, not termination.[22] We acknowledged that "an arbitrator could quite naturally read the CBA to specify that Albemarle employees' jobs are contingent on strict adherence to safety rules," but we concluded that was "not the only arguable reading."[23] It was also permissible to read the CBA as the arbitrator had done and "infer degrees of punishment for infractions based on the egregiousness of

9

because the CBA does not establish a fixed definition of 'just cause,' plainly indicating that the standard varies with the level of punishment."[32] Given the flexibility within the provisions, "to find in favor of Weber's suspension or discharge of an employee, the arbitrator has to find that Weber had just cause *for the particular disciplinary action taken*."[33]

8

employee conduct," rather than "assume[] that all safety violations mandate the same, harsh penalty of termination."[24]

Similarly, in *Weber*, we reversed the district court's vacatur of an arbitration award that ordered suspension instead of termination for an employee who had committed sexual harassment.[25] The employee had worked at the company for over twenty-five years.[26] The CBA reserved for the employer "the right to . . . suspend, and/or discharge for just cause."[27] For the harassment rule specifically, the CBA categorized violations as grounds for "Immediate Suspension for investigation/Possible Discharge."[28] Although the arbitrator determined that the employee had engaged in sexual harassment, he decided that termination was "excessive, given the facts of the case and [the employee's] prior record of service."[29]

We held that the arbitrator was within "the ambit of his authority under the CBA by determining that, while there was not just cause to fire [the employee], there was just cause to suspend him without backpay for some eleven months."[30] We accepted the arbitrator's interpretation of the CBA as "authorizing a range of punishment" for harassment violations.[31] We deemed this reading "plausible because the CBA provides that [the] . . . violation calls for suspension and possible, not certain, discharge; and

Like the CBAs in *Albemarle* and *Weber*, the CBA here "contemplates situations in which a finding of 'cause' could support lesser sanctions than termination."[34] The management rights clause provides that Ball Metal could "hire, discipline, or discharge employees for just cause." As in *Weber*, this provision suggests that "just cause" means "just cause for the particular disciplinary action taken."[35] Indeed, when the parties framed the issue for the arbitrator, they did so in terms of the sanction and asked whether Allen "was terminated for proper cause."

We have determined "that explicating broad CBA terms like 'cause,' when left undefined by contract, is the arbitrator's charge."[36] In addition to assessing the nature of the violations, an arbitrator may under our precedents take account of employee tenure in determining whether just cause for

10

discipline exists rather than for dismissal.[37] Had Ball Metal wished to remove consideration of any mitigating factors, it could have required termination for all harassment violations in the CBA or in company rules.[38] In fact, Ball Metal did designate violations of other rules as mandating "automatic suspension for purpose of discharge." The company did not place harassment violations like Allen's within that category, providing instead that they warranted "appropriate disciplinary action, up to and including termination." The flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination. The penalty



selected- unpaid suspension for over a year-was well within the arbitrator's discretion.[39]

In light of our precedents, we conclude that the arbitrator could construe the CBA to mean that Allen's violations were just cause for discipline, rather than just cause for termination, given the character of the violations and his tenure. We hold only that this interpretation is an

11

"arguable reading" of the CBA, not that it is the best or even a good one.[40] "The correctness of the arbitrator's interpretation is irrelevant so long as it was an *interpretation*."[41]

**C**

The arbitrator stated both that there was just cause for termination and that there was not. Given our especially deferential standard of review, we are bound to resolve the ambiguity in the arbitrator's favor.[42]

In declining to terminate Allen, the arbitrator explained his reasoning as follows:

> Under the parties['] CBA, the Arbitrator concludes that the Company had proper cause to discipline the Grievant for violation of the Company's Discrimination, Harassment, and Retaliation Policy (CX-4) and Plant Rules No. 21 . . . . The Grievant's conduct created the violations and he alone must bear the repercussions. Besides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA . . . .

> The Arbitrator is of the opinion, however, that while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service. Accordingly, based upon all the

previous discussion the termination decision is modified in the following award.

On the following page, labeled "AWARD," the arbitrator continued: "The Grievant, Shawn Allen was not terminated for proper cause, as the

12

Company failed to give proper consideration to the Grievant's seniority." The award then set forth the terms of Allen's modified suspension sanction.

Ball Metal argues that the arbitrator exceeded his jurisdiction under the CBA because he impermissibly altered the sanction after he determined that there was just cause for termination. In Ball Metal's view, the arbitrator recognized that there was just cause to terminate Allen but then went on to factor in tenure, which he had no authority to consider at that point. Local 129 takes another view, emphasizing the arbitrator's later conclusion that there was not just cause for termination. The union reads the arbitrator's earlier reasoning to mean that Ball Metal had just cause to discipline, and could have had just cause for termination, but in the last analysis did not, because of Allen's seniority.

The arbitrator plainly stated that "the Company's decision to terminate the Grievant was for just cause," and then just as plainly stated that "the Grievant, Shawn Allen was not terminated for proper cause." Neither party has persuaded us that its interpretation stressing one rather than the other of these statements is the only possible



Exhibit A

reading. When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, we must enforce the award. As the Supreme Court has explained, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."[43] "Unless the

13

arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,' a court is bound to enforce the award . . . even when the basis for the arbitrator's decision may be ambiguous."[44]

Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. "It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award."[45] Although explanations of arbitration awards are not mandatory, they are desirable.[46] To encourage justification, the Supreme Court has advised against "overturning awards based on ambiguities that can be identified in the explanations arbitrators choose to give," since that "would discourage them from providing those reasons in the first place."[47]So long as "[w]e can discern a possible rationale from the arbitrator's actions, . . . his decision 'must stand.'"[48]

We deem possible the rationale that the union suggests: the arbitrator could have determined that the

offense was not in fact just cause for termination in light of Allen's tenure. A Seventh Circuit case involving similar facts supports our conclusion. In *Arch of Illinois, Division of Apogee Coal Corp. v. District 12, United Mine Workers*, [49] the Seventh Circuit affirmed an arbitration award that ordered suspension instead of termination for an

14

employee who had violated a rule against sleeping at work.[50] Similar to the Ball Metal CBA, the Arch of Illinois CBA provided that covered employees could not be "disciplined or discharged except for just cause."[51] Early in the opinion, the arbitrator observed that "sleeping is sufficient just cause to trigger a discharge" and described other concerns with the employee's conduct, concluding that, "[f]or all of those reasons therefore the grievant should be terminated."[52] Later in the opinion, however, the arbitrator decided that the employee should be suspended rather than terminated, reasoning that "the senior person's length of service must be recognized when that individual is dealt with by way of termination."[53]

The company argued that the arbitrator had exceeded his authority by modifying the penalty after already determining that there was just cause for termination.[54] The Seventh Circuit considered the company's interpretation reasonable but not inevitable.[55] That was insufficient because the company "must do more than merely show that its interpretation of the opinion is reasonable; it must demonstrate that the opinion cannot reasonably be interpreted in any other way."[56] The company did not make that showing.[57]The alternative interpretation


Exhibit A