**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **EUGENIO VARGAS,** | § | |
| | § | |
| **Plaintiff/Counterclaim Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00430-Y** |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, JULIE** | § | |
| **HEDRICK, AND ERIK HARRIS,** | § | |
| | § | |
| **Defendants/Counterclaim Plaintiffs.** | § | |

**APPENDIX OF NON-PUBLISHED CASES CITED IN SUPPORT OF
UNION DEFENDANTS' REPLY (DOC.48) TO PLAINTIFF VARGAS'S SECOND
AMENDED RESPONSE (DOC. 41) TO DEFENDANTS' MOTION TO DISMISS (DOC. 24)**

The Union Defendants**[1]**, pursuant to Local Rules 7.1(i) and § C. of this Court's Case

Management Requirements, submit this appendix of non-published cases cited in, and in support

of, the "UNION DEFENDANTS' REPLY  TO "PLAINTIFF'S SECOND AMENDED

RESPONSE [DOC. 41]  TO DEFENDANTS' MOTION TO DISMISS [DOC. 24]

PLAINTIFF'S CLAIMS FOR RELIEF" (doc 48):

| <u>TAB</u> | NON-PUBLISHED CASE CITATION | |
|---|---|---|
| 1 | *Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *11-13, 19-21 (N.D. Tex. 2007) (J. Means) | |
| 2 | *Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) (unpublished). | |
| 3 | *Bldg. Materials Mfg. Co. v. Steelworkers,* 2020 U.S. Dist. LEXIS 37075, 2020 WL 1047895 at *7-8 (N.D. Tex. 2020) | |

---

[1] "Union Defendants" shall refer collectively to Defendant/Counterclaim Plaintiff Association of Professional Flight Attendants ("APFA") and to individual APFA officer Defendants Julie Hedrick and Erik Harris.

| 4 | *Hebert v. Gen. Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local 270*, 2004 U.S. Dist. LEXIS 13406 at *12-17 (E.D. La. 2004); | |
| 5 | *Lalo LLC v. Hawk Apparel, Inc.*, 2022 U.S. Dist. LEXIS 72218, 2022 WL 1173801 at *5-7 (N.D. Tex. 2022) (J. Lindsay). | |

Date: October 6, 2022                    Respectfully Submitted,


   */s/ Sanford R. Denison*
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX  75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015
Tel.: (202) 243-3200
Fax: (202) 686-2977
Email: b.osborne@osbornelaw.com

*Counsel for Defendant Counterclaim Plaintiff Association of Professional Flight Attendants, and Defendants Julie Hedrick and Erik Harris*

*Admitted Pro Hac Vice

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 6th day of October 2022 a true and correct copy of the foregoing document was served on the below listed counsel of record by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

KERRI PHILLIPS
HEATHER ABREU
K.D. Phillips Law Firm, PLLC
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com
Email: Heather@KDphillipslaw.com


_/s/ Sanford R. Denison_____
SANFORD R. DENISON

*Allied Waste Systems Inc. v. Teamsters Local 767*, 2007
U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *11-13,
19-21 (N.D. Tex. 2007) (J. Means)

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)
(Cite as: 2007 WL 1703634 (N.D.Tex.))

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Fort Worth Division.
ALLIED WASTE SYSTEMS, INC.
v.
INTERNATIONAL BROTHERHOOD OF TEAM-
STERS, LOCAL 767.
Civil Action No. 4:06-CV-328-Y.

June 13, 2007.

Celeste Yeager Winford, Michele C. Spillman,
Gardere Wynne Sewell, Dallas, TX, for Allied
Waste Systems, Inc.

G. William Baab, Baab & Denison, Dallas, TX, for
International Brotherhood of Teamsters, Local 767.

*ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND GRANTING DE-
FENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT*
TERRY R. MEANS, United States District Judge.

*1 This case involves the final and binding decision
of an arbitrator concluding that plaintiff Allied
Waste Systems, Incorporated ("Allied Waste"), vi-
olated the collective-bargaining agreement ("CBA")
when it terminated the employment of David Esco-
bar because he had not performed his regular job
duties for a period of six months. Allied Waste has
refused to abide by the arbitrator's decision and has
brought suit in this Court under section 301 of the
Labor Management Relations Act of 1947
("LMRA"), as amended, 29 U.S.C. § 151 *et seq.*,
requesting that the Court vacate the arbitrator's de-
cision and award. Defendant International Brother-
hood of Teamsters, Local 767 ("Local 767"), filed a
counterclaim requesting that the Court confirm the
arbitrator's decision and order the enforcement of
his award. Local 767 also counters that Allied
Waste's refusal to abide by the binding decision of

the arbitrator is without justification and requests
that the Court award it reasonable attorney's fees.

The Court has before it the parties' cross-motions
for summary judgment that call upon the Court to
decide: (1) whether it should vacate the arbitrator's
decision and award in favor of Local 767 or con-
firm it and order its enforcement; and, (2) whether
Allied Waste's refusal to abide by the arbitrator's
decision is unjustified and thus entitles Local 767 to
reasonable attorney's fees.

After review, the Court concludes that the arbitrator
acted within the scope of his authority and that his
decision and award in favor of Local 767 is ration-
ally inferable from the terms of the CBA and
should be enforced. Further, the Court concludes
that Allied Waste's refusal to abide by the arbitrat-
or's decision is without justification and in violation
of its obligation to honor federal labor policy favor-
ing the voluntary arbitration of labor disputes.

I. Factual Background

The material facts in this case are not in dispute.
Allied Waste and Local 767 are parties to a valid
CBA that includes a final and binding arbitration
procedure for settling grievances. It is undisputed
that the CBA covers the grievance at issue here.

Allied Waste provides a variety of trash-hauling
services in the greater Dallas-Fort Worth, Texas,
area. As part of its services, Allied Waste picks up
trash and garbage containers on regularly estab-
lished routes using "roll-off" trucks. Escobar
worked for Allied Waste as a driver of these roll-
off trucks at its Fort Worth, Texas, facility from
1982 until his termination on July 23, 2003.

Escobar's position involved heavy-duty work. He
worked alone and was required to lift amounts in
excess of twenty-five pounds, push and pull heavy
doors, and install and remove heavy tarpaulins. He
routinely worked ten-hour shifts on as many days a
week as was required by the volume of work to be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)
**(Cite as: 2007 WL 1703634 (N.D.Tex.))**

Page 2

completed.

On January 23, 2003, Escobar suffered an on-the-job injury. The next day, Escobar saw a physician selected by Allied Waste. The physician determined that Escobar had injured his right arm but that he could return to work with certain restrictions. The physician ordered that Escobar be restricted from lifting anything that weighed more than twenty-five pounds and from working longer than eight hours per day.

\*2 On February 3, Allied Waste sent Escobar a letter informing him that it had reviewed the medical report concerning his injury. Allied Waste indicated that it had identified an appropriate modified duty position for him based on the physician's assessment and stated that it was extending to Escobar "a bona fide offer of employment pursuant to [Rule § 129.6 of the Texas Administrative Code]." (App. in Supp. of Pl.'s Mot. Summ. J. at 36.) The letter, however, did not specify the position Allied Waste had identified for Escobar's modified duty.

The letter instructed Escobar to return to work on February 3. It informed him that his work schedule would be Monday through Friday from 5:00 a.m. until he completed his route and that he would be paid at the same rate as roll-off truck drivers. The letter then went on to state,

This position will entail these specific physical and time requirements: No lifting objects/carrying objects more than 25lbs for more than 8 hours per day .... Please be assured that [Allied] Waste will only assign you task [sic] consistent with your physical abilities, knowledge, and skills and will provide you training if necessary.

(*Id.*) Finally, the letter advised Escobar that he could contact Ruby Silva, Allied Waste's safety manager, if he had any questions. Escobar signed the letter indicating that he accepted Allied Waste's offer and returned to work on February 3.

When he returned to work, Escobar resumed his duties operating a roll-off truck. Allied Waste, however, did not immediately provide Escobar with

any accommodations consistent with the physician's restrictions. Thus, for approximately one week Escobar performed all of the regular duties including the heavy work despite his restrictions. About a week later, Allied Waste assigned Escobar an assistant, but the assistant failed to provide any help. He merely observed Escobar perform all of his duties.

Escobar complained to his supervisors but nothing happened. Then, in late February, Escobar and two of his union representatives met with his supervisors and again informed them that Escobar's assistant was not providing any help. Still, the situation remained unchanged. On March 4, 2003, Escobar's assistant failed to show up at work and was not seen again. Escobar never contacted Silva to inform her of the situation.

The next day, Escobar saw another physician approved by Allied Waste. He concluded that Escobar was physically incapable of performing his duties and removed Escobar from his job. The physician did not clear Escobar to return to work without any restrictions until August 22. Escobar never returned to work after March 5.

Under Article 16, Section 5 of the CBA,

An employee shall lose his seniority rights and the employment relationship shall cease under the following conditions .... Failing to perform duties of any regular position or classification for any reason for longer than six (6) months. Performing modified duties pursuant to Article 14, Section 4 of this agreement does not constitute "performing duties of any regular position or classification" under this provision.

\*3 (App. in Supp. of Pl.'s Mot. Summ. J. at 27.) In accordance with its interpretation of this article, Allied Waste determined that Escobar had not been performing the regular duties of a roll-off driver since January 23, 2003, the day the first physician placed Escobar on modified duty. On July 23, six months later, Allied Waste sent a letter to Escobar informing him that it was terminating his employment because he had not performed his regular du-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ties during the past six months.

Escobar timely filed a grievance under the CBA. In accordance with the CBA, the grievance was submitted to binding arbitration and the parties agreed on Bernard Marcus to serve as the arbitrator. According to the CBA,

> The arbitrator will be jointly contacted and asked to hold a hearing at which both parties may present evidence. The arbitrator shall decide only the grievance submitted by applying the express language of this agreement and shall have no authority to add to, subtract from, modify or amend this agreement, but shall be limited to determining whether or not a violation of the terms have been committed.
>
> The arbitrator's duly rendered decision shall be final and binding on the employer concerned, the union, and the employee(s) involved.

(App. in Supp. of Pl.'s Mot. Summ. J. at 22.)

The parties asked Marcus to answer the question,

> Did [Allied Waste] have just cause to terminate the employment of [Escobar] on the grounds that [Escobar] failed to perform the duties of any regular position or classification in the bargaining unit for a period longer than six months, as required in Article 16, Section 5, of the labor agreement?

(App. in Supp. of Pl.'s Mot. Summ. J. at 2.) In accordance with the CBA, Marcus held a hearing and received evidence. After the hearing, Marcus invited the parties to submit post-hearing briefs arguing their positions.

After review of the evidence and the parties' briefs, Marcus concluded that Allied Waste had breached the CBA. Marcus began his opinion discussing Article 16(5) of the CBA. He found that article to be "clear and unambiguous." (App. in Supp. of Pl.'s Mot. Summ. J. at 8.) The clear meaning, according to Marcus, was that Article 16(5) gave Allied Waste the right to terminate any employee who failed to perform the duties of any regular position or classification for any reason, including injury, for longer than six months. He stated that Allied

Waste had "the contractual obligation to establish that Escobar did not perform the regular duties of any bargaining unit job classification after January 23, 2003." (Id. at 9.) In other words, Marcus placed the burden on Allied Waste to prove that Escobar performed only modified duties between February 3 and March 5.

Based on the evidence, Marcus found that Escobar had performed his regular duties as a roll-off driver between February 3 and March 5, despite being placed on modified duty. Marcus rejected Allied Waste's argument that Escobar was obligated to inform its safety manager that his assistant failed to offer any help. Nevertheless, Marcus found that Escobar had, on two occasions, notified his supervisors that his assistant was not providing any help and that because no corrective action occurred, Escobar continued to perform his regular duties until March 5. Marcus also noted that Allied Waste had not produced any evidence to counter Escobar's assertion that he continued to perform his regular duties between February 3 and March 5 without modification. Marcus particularly noted that Allied Waste never called the assistant it assigned to Escobar to testify at the hearing.

*4 Because he found that Escobar did in fact perform the regular duties of a roll-off driver, Marcus concluded that the six-month clock under Article 16(5) did not begin to run until March 5, the day Escobar stopped performing his regular duties altogether due to his on-the-job injury. Marcus interpreted the plain language of Article 16(5) to mean that the question is whether in fact the employee is actually performing his regular duties or was performing modified duties—not whether that employee was technically placed on a modified duty by a physician. Since it wasn't until March 5 that Escobar ceased performing his regular duties, the six-month clock did not expire until September 5. And because Escobar was cleared to work without any restrictions on August 22, which was before the six-month period had expired, Allied Waste violated the CBA when it terminated his employment on Ju-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ly 23, which was also before the six-month period
had expired.

As a result, Marcus directed Allied Waste to offer
Escobar reinstatement to his former or equivalent
position with no interruption in benefits or senior-
ity. Further, Marcus directed Allied Waste to make
Escobar whole for any loss of wages and other be-
nefits between August 23, 2003, and the date he is
reinstated or advises Allied Waste that he does not
desire to return to work. Marcus allowed for an off-
set of any interim earnings, unemployment com-
pensation, or state or federal assistance Escobar re-
ceived after August 23.

II. Analysis

A. Standard

Summary judgment is proper when the record es-
tablishes "that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c).
As mentioned above, the material facts in this case
are not in dispute. What the parties dispute is the
conclusion of the arbitrator that Allied Waste viol-
ated the CBA when it terminated Escobar's employ-
ment because he had not performed his regular du-
ties for longer than six months.

Judicial review of an arbitration decision arising
from the terms of a CBA is narrowly limited, and
the Court is required to afford great deference to
the arbitral award. *See Beaird Industries, Inc. v.
Local 2297,* 404 F.3d 942, 944 (5th Cir.2005). The
Supreme Court has emphasized that

the question of interpretation of the collective
bargaining agreement is a question for the arbit-
rator. It is the arbitrator's construction which was
bargained for, and so far as the arbitrator's de-
cision concerns construction of the contract, the
courts have no business overruling him because
their interpretation of the contract is different
than his.
*United Steelworkers of America v. Enterprise
Wheel & Car Corp.,* 363 U.S. 593, 598-99, 80 S.Ct.

1358, 4 L.Ed.2d 1424 (1960). Of course, the arbit-
rator is not free to disregard the terms of the CBA
and impose "his own brand of industrial justice."
*Beaird,* 404 F.3d at 944. Accordingly, the Court
will affirm an arbitral award " 'as long as the arbit-
rator is even arguably construing or applying the
contract and acting within the scope of his authority
....' " *Id.* (quoting *United Paperworkers Int'l Union v.
Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98
L.Ed.2d 286 (1987)). If the arbitrator's decision
"draw[s] its essence from the [CBA] ... the fact a
court is convinced he committed serious error does
not suffice to overturn his decision." *Eastern Asso-
ciated Coal corp. v. United Mine Workers of Amer-
ica, District* 17, et al., 531 U.S. 57, 62, 121 S.Ct.
462, 148 L.Ed.2d 354 (2000) (internal quotations
and citations omitted).

*5 The Court has characterized the "essence test" as
"rather metaphysical." *Kergosien v. Ocean Energy,
Inc.,* 390 F.3d 346, 353 (5th Cir.2004) (internal
quotations and citations omitted). Thus, to draw its
essence from the CBA, the award must in some lo-
gical way be derived from the wording or purpose
of the contract, and "the single question is whether
the award, however arrived at, is rationally infer-
able from the contract." *Id.* at 353-54.

B. Discussion

Allied Waste begins its attack by arguing that Mar-
cus "fashioned his own brand of industrial justice
and rendered an award that does not draw its es-
sence from the contract." (Pl.'s Mot. for Summ. J. at
5.) It contends that Marcus "completely ignored
[the] plain language of the CBA." (*Id.*) Although
characterized in that fashion, as will be discussed
below, in reality Allied Waste's arguments invite
the Court to second-guess Marcus's interpretation
of Article 16(5) and his application of that article to
the facts of this case.

Allied Waste asseverates that,
The language of the CBA is clear--if a doctor re-
leases an employee to work with restrictions, the
employee is on modified duty and is not perform-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing the functions of his regular position.
(Pl.'s Mot. for Summ. J. at 6.) Allied Waste argues
that Marcus's construction of Article 16(5) is erro-
neous because it makes it impossible for Allied
Waste to place any of its employees on modified
duty under the CBA or to terminate any of its em-
ployees for failing to perform their regular duties
for six months. (Pl.'s Mot. for Summ. J. at 6.) Al-
lied Waste contends that his interpretation allows
its employees to simply claim that they performed
some of their regular duties while they were on
modified duty, and that any employee can just reset
the six-month clock by performing his regular du-
ties while placed on modified duty.

Allied Waste argues that the correct interpretation
of Article 16(5) is that any work an employee per-
forms while placed on modified duty by a physician
does not qualify as performing regular duties. It is
not until a physician removes the restrictions and
clears the employee to perform his regular duties
does the six-month clock end--according to Allied
Waste's interpretation. Thus, "the fact that Escobar
claims to have performed his regular duties for ap-
proximately one month ... is beside the point." (Pl.'s
Resp. to Def.'s Mot. for Summ. J. at 2.)

Further, Allied Waste argues that Marcus's inter-
pretation is erroneous because it allows for its em-
ployees to merely disregard the orders of physicians
placing them on modified duty. Allied Waste con-
tends that its termination of Escobar was justified
nonetheless because he violated the CBA and its
rules when he continued to perform his regular du-
ties despite a physician order to the contrary. Allied
Waste argues, "Escobar should not be able to uni-
laterally avoid the plain language of the CBA by
blatantly disregarding his doctor's orders and per-
forming work beyond his restrictions without noti-
fying the safety manager, Ruby Silva." (Pl.'s Mot.
for Summ. J. at 6.)

*6 Finally, Allied Waste contends that Marcus
erred when he concluded that Escobar was not re-
quired to report his situation to Silva. According to
Allied Waste, the February 3 letter to Escobar

clearly advised him to direct any questions or con-
cerns he had regarding his modified duty to Silva.
Under the CBA, Allied Waste contends that Esco-
bar had no authority to continue to perform his reg-
ular duties without informing Silva.

Marcus considered these arguments and rejected
them. He observed that Article 16(5) clearly and
unambiguously gave Allied Waste the right to ter-
minate the employment of any employee who was
not **performing** his regular duties, for whatever
reason, for longer than six months. He concluded,
however, that Article 16(5) speaks in terms of an
employee's actual performance and not in terms of
a physician's order placing an employee on modi-
fied duty. Thus, for Marcus, whether Escobar con-
tinued to perform his regular duties despite a physi-
cian order to the contrary was not "besides the
point," but was the critical question.

Based on the evidence, Marcus found, as fact, that
Escobar had been performing his regular duties
from February 3 until March 5 despite the physi-
cian order. Applying his interpretation of the CBA,
Marcus concluded that the six-month clock under
Article 16(5) did not begin to run until March 5, the
day Escobar actually stopped performing his regu-
lar duties.

Furthermore, Allied Waste did not discharge Esco-
bar because he continued to perform his regular du-
ties despite a physician order otherwise. And the
parties did not submit that issue to Marcus for arbit-
ration. According to the CBA, Marcus was strictly
. confined to adjudicating the issue the parties sub-
mitted to him, and that issue concerned Allied
Waste's decision to terminate Escobar's employ-
ment because he had not performed his regular du-
ties for more than six months under Article 16(5).
Thus, Marcus would have acted outside of his au-
thority if he determined that, because Allied Waste
could have terminated Escobar for alternative reas-
ons, it did not violate the CBA.

Moreover, Allied Waste fails to point to any provi-
sion in the CBA that required Escobar to report to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

its safety manager, Silva, that the conditions of his position required him to perform his regular duties beyond the physician-ordered restrictions. At best, Allied Waste points to the letter it sent Escobar on February 3. The CBA, however, provides that, "Employees shall immediately, or at the end of their shift, report all injuries to their immediate supervisor ...." (App. in Supp. of Pl.'s Mot. Summ. J. at 25.) Escobar twice reported to his immediate supervisors that his assistant failed to help him in any way and as a result, he was required to continue to perform his regular duties despite being injured.

The record shows that Marcus discharged his duties in accordance with the CBA and that he acted well within the scope of his authority. Following the terms of the CBA, Marcus held a hearing and gave both sides the opportunity to submit evidence. Additionally, a review of the language in Article 16(5) and in the CBA establishes that Marcus's interpretation and decision can be rationally inferred from it. Article 16(5) uses the words "perform" and "performing." Thus it is rational to infer that Article 16(5)'s primary concern is the actual work the employee is performing and not whether the employee was placed on modified duty by a physician. And the CBA provides that employees are to report their injuries to their immediate supervisors, not the safety manager. Thus, Marcus's conclusion that Escobar was not required to report his situation to Silva and that he fulfilled any obligations he had by reporting his situation to his immediate supervisors is also rationally based on the CBA.

*7 It is beyond the purview of this Court to review Marcus's findings of fact or to second-guess his interpretation and application of the CBA. As long as Marcus acted within the scope of his authority and his decision can be rationally inferred from the text and purpose of the CBA, this Court must confirm his decision and award. The Court's review is very narrow, and to the extent Allied Waste's arguments invite the Court to do otherwise, the Court must decline the invitation.

C. Attorney's Fees

Local 767 contends that Allied Waste's refusal to abide by and comply with the arbitrator's decision is without justification. Thus, Local 767 argues that it is entitled to reasonable attorney's fees.

As a starting point, the Supreme Court has repeatedly reaffirmed the "American Rule" holding that each party in a lawsuit ordinarily shall bear its own attorney's fees--"the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc., et al. v. West Virginia Dep't of Health & Human Res., et al.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Hensley, et al. v. Eckerhart, et al.,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Under this practice, a court will not award attorney's fees to a prevailing party "absent explicit statutory authority." *Buckhannon,* 532 U.S. at 602.

Section 301 of LMRA does not explicitly provide for attorney's fees in a suit brought to vacate an arbitrator's award or to order its enforcement. Nevertheless, under the law of this Circuit, "when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded." *Bell Production Engineers Association v. Bell Helicopter Textron,* 688 F.2d 997, 999 (5th Cir.1982). Of course, it is not enough simply to say that because the judicial challenge to the arbitration decision was unsuccessful, the refusal to abide by it, *a fortiori,* was without justification. *International Association of Machinists & Aerospace Workers, District 766 v. Texas Steel Company,* 639 F.2d 279, 283 (5th Cir.1981). On the other hand, merely asserting, as grounds for refusing to accept the binding arbitration decision, that the arbitrator exceeded his authority, ignored the express terms of the CBA, and fashioned his own brand of industrial justice, does not mean that the refusal was justified. *See Id.* **"Rather, the Court must look to the realities of the situation."** *Id.*

The reality of the situation here is that Allied

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Waste's objections to Marcus's decision go to his construction of Article 16(5) and its application to the facts of this case. Nothing in Allied Waste's arguments, although couched in that fashion, address whether Marcus acted outside the scope of his authority or that his decision cannot be rationally inferred from the text and purpose of the CBA. Just because there may be room to disagree with Marcus's interpretation and application of Article 16(5) does not mean that his interpretation and application cannot be rationally inferred from it. Allied Waste's objections to Marcus's decision, properly characterized, involve the intrinsic merits of the dispute.

*8 The Court has a duty to sanction

**frivolous and wasteful judicial challenges to conscientious and fair arbitration decisions .... The federal labor policy favoring voluntary arbitration dictates that when a refusal to abide by an arbitration decision is without justification, and judicial enforcement is necessary, the court should award the party seeking enforcement reasonable costs and attorney's fees incurred in that effort. This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dilatory tactics that lead to wasteful and unnecessary litigation.**

*Texas Steel Company,* **639 F.2d at 284** (holding district court abused discretion by not awarding attorney's fees).

III. Conclusion

For the foregoing reasons, Allied Waste's summary-judgment motion is DENIED (doc. # 12), and Local 767's summary-judgment motion is GRANTED (doc. # 15). The arbitration decision and award entered on March 27, 2006, by Bernard Marcus and attached as Exhibit A to Allied Waste's original complaint is HEREBY CONFIRMED. Local 767 is entitled to judicial enforcement of the arbitrator's decision and award. Further, Local 767 is entitled to costs and reasonable attorney's fees incurred in defending this action and seeking enforcement. Local 767 shall have fourteen days from the date of this order to submit affidavits in support of such costs and fees, after which time Allied Waste shall have seven days to file any objections to the reasonableness of the costs and fees claimed.

Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) (unpublished).

# *Ball Metal Bev. Container Corp. v. Local 129, UAW*

United States Court of Appeals for the Fifth Circuit

February 4, 2022, Filed

No. 21-10755

## Reporter

2022 U.S. App. LEXIS 3214 *; 2022 WL 340573

BALL METAL BEVERAGE CONTAINER CORPORATION, Plaintiff-Appellee, versus LOCAL 129, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Defendant-Appellant.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [*1] Appeal from the United States District Court for the Northern District of Texas. USDC 4:20-CV-797.

*Ball Metal Bev. Container Corp. v. United Auto., Aero. & Agric. Implement Workers, Local 129, 547 F. Supp. 3d 568, 2021 U.S. Dist. LEXIS 145414, 2021 WL 3277270 (N.D. Tex., July 6, 2021)*

## Core Terms

arbitrator, termination, just cause, harassment, Grievant, discipline, violations, arbitration award, suspension, parties, arbitral decision, employees, proper cause, attorney's fees, ambiguity, benefits, modified, terms, backpay, bargaining, seniority, exceeded, plant, disciplinary action, summary judgment, noncompliance, reasons, suspend, vacatur, rights

## Case Summary

### Overview

HOLDINGS: [1]-The employee's harassment violation warranted appropriate disciplinary action, up to and including termination, and the flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination; [2]-Because the arbitrator's opinion did not unambiguously reflect that the arbitrator exceeded his authority, the appellate court must enforce his award; [3]-Because the company's challenge was jurisdictional, the district court did not abuse its discretion in denying a fee award; [4]-When an arbitrator's decision did not specify the award during a period of noncompliance, the court was authorized to remand to the arbitrator for clarification.

### Outcome

Judgment reversed and remanded.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN1*[ ] **Arbitration, Arbitrability**

When the parties submit a dispute for arbitration, the arbitrator's decision shall be final and binding on all parties. The arbitrator's authority, however, is constrained.

Governments > Courts > Rule Application & Interpretation

*HN2*[⬇] **Courts, Rule Application & Interpretation**

More generally, for violations of plant rules and company policies, progressive discipline is to be followed except that steps for discipline may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Summary Judgment Review > Standards of Review

*HN3*[⬇] **Alternative Dispute Resolution, Judicial Review**

The appellate court reviews a district court's grant of summary judgment in a suit to vacate an arbitration award de novo. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

*HN4*[⬇] **Alternative Dispute Resolution, Judicial**

**Review**

Judicial review of arbitration awards is severely limited. The standard for this review is among the narrowest known to the law. When an arbitration award settles a labor dispute, judicial review is particularly constrained. The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations, which reflect a decided preference for private settlement of labor disputes without the intervention of government.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

Labor & Employment Law > ... > Labor Arbitration > Arbitrators > Authority

*HN5*[⬇] **Alternative Dispute Resolution, Judicial Review**

Under this unusually deferential standard of review, courts are not authorized to reconsider the merits of an award. Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits. Instead of assessing how well the arbitrator interpreted the contract, we ask if the arbitrator acted within the contract's bounds. An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > ... > Labor Arbitration > Arbitrators > Authority

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

*HN6*[⬇] **Alternative Dispute Resolution, Judicial Review**

To determine whether arbitrators have overstepped their authority, courts apply the essence test, evaluating whether the arbitration award has a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. Where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end. In these situations, an arbitrator is no longer applying or interpreting the agreement but rewriting it, and the appellate court will vacate the award. Where there is ambiguity as to whether an arbitrator is acting within the scope of his authority, however, that ambiguity must be resolved in favor of the arbitrator.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Wrongful Termination > Breach of Contract > For Cause Standard

*HN7*[⬇] **Labor Arbitration, Discipline, Layoffs & Terminations**

Explicating broad CBA terms like cause, when left undefined by contract, is the arbitrator's charge. In addition to assessing the nature of the violations, an arbitrator may under the precedents take account of employee tenure in determining whether just cause for discipline exists rather than for dismissal.

Business & Corporate Compliance > ... > Pretrial

Matters > Alternative Dispute Resolution > Judicial Review

*HN8*[⬇] **Alternative Dispute Resolution, Judicial Review**

The correctness of the arbitrator's interpretation is irrelevant so long as it was an interpretation.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

*HN9*[⬇] **Alternative Dispute Resolution, Judicial Review**

When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, the appellate court must enforce the award. As the Supreme Court has explained, a mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Unless the arbitral decision does not draw its essence from the collective bargaining agreement, a court is bound to enforce the award even when the basis for the arbitrator's decision may be ambiguous.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN10*[⬇] **Alternative Dispute Resolution, Judicial Review**

Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award. Although explanations of arbitration awards are not mandatory, they are desirable. To encourage justification, the Supreme Court has advised against overturning awards based on ambiguities that can be identified in the explanations arbitrators choose to give, since that would discourage them from providing those reasons in the first place. So long as the appellate court can discern a possible rationale from the arbitrator's actions, his decision must stand.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

**HN11**[🔻] **Alternative Dispute Resolution, Judicial Review**

Before the court rejects an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based his decision on noncontractual grounds.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Appellate Review

**HN12**[🔻] **Alternative Dispute Resolution, Judicial Review**

The appellate court reviews the district court's denial of attorneys' fees for abuse of discretion. For the same reason that judicial review of arbitration awards is limited, a party may be awarded attorneys' fees if it has to fight back a court challenge to the award it obtained in the parties' chosen forum.

Business & Corporate Compliance > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

**HN13**[🔻] **Arbitration, Arbitrability**

Courts award fees when the challenge to the arbitrator's decision is without justification. Without justification refers not to the strength of the challenge but to the type. Challenges to an arbitrator's jurisdiction or authority do not result in fee awards, whereas challenges to the intrinsic merits of a dispute justify fee awards even if the challenges are not frivolous. When parties have agreed to arbitrate a dispute, a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the parties' agreement to be bound by the arbitrator's decision.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

**HN14**[🔻] **Alternative Dispute Resolution, Judicial Review**

When an arbitrator's decision does not specify the award during a period of noncompliance, the court is authorized to remand to the arbitrator for clarification.

**Counsel:** For Ball Metal Beverage Container Corporation, Plaintiff - Appellee: onathan Gary Rector, Esq., Barbi McClennen Lorenz, Littler Mendelson, P.C., Dallas, TX.

For Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America, Defendant - Appellant: James Roddy Tanner, Esq., Jamie King Harrison, Tanner & Associates, P.C., Fort Worth, TX.

**Judges:** Before OWEN, Chief Judge, and CLEMENT and ENGELHARDT, Circuit Judges.

# Opinion

PER CURIAM:[*]

This labor dispute concerns an arbitrator's decision. We uphold the award and reverse the contrary judgment of the district court. The parties may present their arguments regarding back pay and benefits from the date that the employee was prepared to return to work for arbitration.

**I**

Ball Metal Beverage Container Corporation (Ball Metal) operates a beverage can plant in Fort Worth, Texas. Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America (Local 129) is a labor union that serves as the exclusive bargaining representative for some Ball Metal employees.

Ball Metal and Local 129 are parties to a collective bargaining agreement **[*2]** (CBA) that governs the terms of employment for employees represented by the union. The version of the CBA pertinent to this dispute contains a management rights provision that includes this provision:

> Except as otherwise expressly limited by this Agreement, all functions of management not otherwise relinquished or limited shall remain vested exclusively in the Company, including, but not limited to . . . hire, discipline, or discharge employees for just cause; . . . provided that these rights shall not be exercised in any manner which would constitute a breach of any other Article of this Agreement.

Another article of the agreement, titled "Disciplinary Actions and Discharge," provides: "The right of the Company to discipline or discharge employees for good cause including violations of this Agreement or Company rules is hereby acknowledged." Aside from these provisions, the CBA does not describe what constitutes just or good cause.

The CBA also outlines procedures for addressing grievances, including arbitration procedures. _HN1_[⬆] When the parties submit a dispute for arbitration, the arbitrator's decision "shall be final and binding on all parties." The arbitrator's authority, however, is **[*3]**

constrained. The agreement states that "[t]he jurisdiction of the arbitrator shall be limited to interpreting or determining compliance with the terms of this Agreement. The arbitrator shall have no power to add to or subtract from, to disregard or modify any part or all of the terms of this Agreement."

Ball Metal has rules and policies that govern misconduct. There is a plant rule against harassment as well as a company policy that prohibits discrimination, harassment, and retaliation. The plant rule defines harassment as activity "of a sexual nature, racial nature, a religious nature or any activity that can be construed as harassment." Employee training materials describe harassment as including "behavior towards another person which is unwelcome and personally offensive to [the] recipient and . . . creates an intimidating, offensive or hostile work environment."

Ball Metal does not prescribe any particular sanction for a harassment violation. The harassment policy provides only that violations "will subject th[e] employee to appropriate disciplinary action, up to and including termination." _HN2_[⬆] More generally, for violations of plant rules and company policies, "progressive discipline **[*4]** is to be followed except that steps for discipline 'may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.'" The procedure is different for selected rules not at issue here whose violation "will result in automatic suspension for purpose of discharge."

Shawn Allen, a Ball Metal employee, was a member and an elected shop chairman of the union. He had worked at Ball Metal since 2006. In 2019, Allen was accused of harassing a coworker. Specifically, he was accused of yelling at the coworker and calling him a "f------g scab" after learning that the coworker had left the union. Allen had been accused of similar conduct in the past. He had not otherwise been disciplined for behavioral or productivity issues.

After an investigation, Ball Metal terminated Allen in late June 2019. Local 129 filed a grievance contesting the termination decision, which proceeded to arbitration. The parties presented these questions to the arbitrator: "Whether or not the Grievant, Shawn Allen, was terminated for proper cause and, if not, what is the appropriate remedy?"[1]

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

[1] As noted, the CBA uses the terms "just cause" and "good cause," and the parties framed the issue for the arbitrator

On July 6, 2020, the arbitrator issued an opinion and award. In the "DISCUSSION **[*5]** AND FINDINGS" section of the decision, the arbitrator determined that, "[u]nder the parties['] CBA, . . . the Company had proper cause to discipline the Grievant for violation of" Ball Metal's harassment policy and plant rule. The arbitrator also determined that, "[b]esides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA," which urged "promot[ing] a cooperative and progressive industrial and economic relationship between the Company and its employees." The arbitrator further explained that "while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service." He concluded that "based upon all the previous discussion the termination decision is modified in the following AWARD."

On the following page, under the heading "AWARD," the arbitrator wrote: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority." The award provided that, instead of termination, Allen would be suspended from the date of his discharge to the date of his return to work; he would be offered immediate reinstatement **[*6]** without back pay or benefits; and he would retain his seniority. In essence, the arbitrator reduced the sanction to a roughly yearlong unpaid suspension.

The day after the arbitrator issued the decision, Local 129 informed Ball Metal that Allen wanted to return to work and was prepared to do so immediately. The company declined to reinstate him. Instead, on July 30, 2020, Ball Metal filed suit under *§ 301 of the Labor Management Relations Act* seeking vacatur of the arbitrator's award. Local 129 counterclaimed seeking enforcement of the arbitrator's award, attorneys' fees, and back pay and benefits for the period of noncompliance since the award. The parties filed cross motions for summary judgment.

The district court granted summary judgment in favor of

---

Ball Metal and vacated the arbitrator's award. The court held that the arbitrator exceeded his authority under the CBA by modifying Allen's sanction after stating that there was just cause for termination. The court did not discuss the portion of the award in which the arbitrator stated that Allen "was not terminated for proper cause." The court also denied attorneys' fees. On appeal, Local 129 challenges the vacatur and attorneys' fees rulings.

## II

## A

We begin with the challenge **[*7]** to the vacatur ruling. *HN3*[⬆] "We review a district court's grant of summary judgment in a suit to vacate an arbitration award *de novo*."[2] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

*HN4*[⬆] "Judicial review of arbitration awards is severely limited."[4] "The standard for this review is 'among the narrowest known to the law.'"[5] When an arbitration award settles a labor dispute, judicial review is "particularly constrained."[6] "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."[7]

*HN5*[⬆] Under this unusually deferential standard of

---

using a third term, "proper cause." The record shows no distinction in the meaning of the terms, and neither party argues for one. For ease of reading, we use the terms interchangeably. *Cf. Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 604 (5th Cir. 1989)* (observing that the phrases "proper cause" and "just cause" "carr[y] no talismanic significance in labor jurisprudence" but rather are merely "term[s] of art that define[] the many unrelated, independent acts that serve as grounds for employee discipline").

---

[2] *Beaird Indus. v. Local 2297, Int'l Union, UAW, 404 F.3d 942, 944 (5th Cir. 2005)*.

[3] *Fed. R. Civ. P. 56(a)*.

[4] *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union, 831 F.2d 72, 74 (5th Cir. 1987)*.

[5] *Cont'l Airlines v. Air Line Pilots Ass'n, Int'l, 555 F.3d 399, 405 (5th Cir. 2009)* (quoting *E. Air Lines, Inc. v. Transp. Workers Union, Local 533, 580 F.2d 169, 172 (5th Cir. 1978)*).

[6] *Teamsters Local No. 5 v. Formosa Plastics Corp., 363 F.3d 368, 371 (5th Cir. 2004)*.

[7] *United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 37, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)*.

review, "courts are not authorized to reconsider the merits of an award."[8] "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."[9] Instead of assessing how well the arbitrator interpreted the contract, **[*8]** we ask if the arbitrator acted within the contract's bounds.[10] "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."[11]

[HN6[↑]] To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'"[12] "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end."[13] In these situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award.[14] "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority,'" however, "'that ambiguity must be resolved in favor of the arbitrator.'"[15]

**B**

Our decisions in *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103*[16] and *Weber Aircraft Inc. v. General Warehouseman and Helpers Union Local 767*[17] are instructive, if not dispositive. In *Albemarle*, an arbitration award ordered suspension **[*9]** instead of termination for employees who had violated safety rules. We reversed the district court's vacatur of that award.[18] The management rights clause in the CBA provided that "the suspending, disciplining and discharging employees for cause . . . are all rights solely of the COMPANY."[19] We understood the clause to "contemplate[] situations in which a finding of 'cause' could support lesser sanctions than termination."[20] We drew a distinction between this clause and clauses in other CBAs that provided only for discharge, from which "authority to impose a lesser alternative sanction cannot be arguably inferred."[21]

Because the CBA in *Albemarle* did not "make clear that any violation of safety rules is an offense requiring discharge," we accepted the interpretation of the arbitrator, who determined that the employees' violations were cause only for discipline, not termination.[22] We acknowledged that "an arbitrator could quite naturally read the CBA to specify that Albemarle employees' jobs are contingent on strict adherence to safety rules," but we concluded that was

---

8 *Id.* at 36.

9 *Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)* (quoting *Eastern Associated Coal Corp. v. UMW, Dist. 17, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)*).

10 *United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)*; *see also* **Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989)** ("We have interpreted Supreme Court jurisprudence as requiring vacation of arbitral decisions that reinstate discharged employees when such arbitral action is deemed to be an ultra vires act.").

11 *Id.*

12 *Communs. Workers of Am., AFL-CIO v. Southwestern Bell Tel. Co., 953 F.3d 822, 826-27 (5th Cir. 2020)* (quoting *Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1325 (5th Cir. 1994)*).

13 **Delta Queen, 889 F.2d at 602**.

14 *Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 570 (5th Cir. 2018)*.

15 *Quezada v. Bechtel OG & C Constr. Servs., 946 F.3d 837, 844 (5th Cir. 2020)*.

16 *703 F.3d 821 (5th Cir. 2013)*.

17 *253 F.3d 821 (5th Cir. 2001)*.

18 *Albemarle, 703 F.3d at 824, 828*.

19 *Id. at 823*.

20 *Id. at 825*.

21 *Id.* (quoting *Weber, 253 F.3d at 825*) (first citing *E.I. DuPont de Nemours & Co. v. Local 900 of Intern. Chem. Workers Union, 968 F.2d 456, 459 (5th Cir. 1992)*; then citing **Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 601, 603-04 (5th Cir. 1989)**)).

22 *Id.*

"not the only arguable reading."[23] It was also permissible to read the CBA as the arbitrator had done and "infer degrees of punishment **[*10]** for infractions based on the egregiousness of employee conduct," rather than "assume[] that all safety violations mandate the same, harsh penalty of termination."[24]

Similarly, in *Weber*, we reversed the district court's vacatur of an arbitration award that ordered suspension instead of termination for an employee who had committed sexual harassment.[25] The employee had worked at the company for over twenty-five years.[26] The CBA reserved for the employer "the right to . . . suspend, and/or discharge for just cause."[27] For the harassment rule specifically, the CBA categorized violations as grounds for "Immediate Suspension for investigation/Possible Discharge."[28] Although the arbitrator determined that the employee had engaged in sexual harassment, he decided that termination was "excessive, given the facts of the case and [the employee's] prior record of service."[29]

We held that the arbitrator was within "the ambit of his authority under the CBA by determining that, while there was not just cause to fire [the employee], there was just cause to suspend him without backpay for some eleven months."[30] We accepted the arbitrator's interpretation of the CBA as "authorizing a range of punishment" **[*11]** for harassment violations.[31] We deemed this reading "plausible because the CBA provides that [the] . . . violation calls for suspension and possible, not certain, discharge; and because the CBA does not establish a fixed definition of 'just cause,' plainly indicating that the standard varies with the level of punishment."[32] Given

the flexibility within the provisions, "to find in favor of Weber's suspension or discharge of an employee, the arbitrator has to find that Weber had just cause *for the particular disciplinary action taken*."[33]

Like the CBAs in *Albermarle* and *Weber*, the CBA here "contemplates situations in which a finding of 'cause' could support lesser sanctions than termination."[34] The management rights clause provides that Ball Metal could "hire, discipline, or discharge employees for just cause." As in *Weber*, this provision suggests that "just cause" means "just cause for the particular disciplinary action taken."[35] Indeed, when the parties framed the issue for the arbitrator, they did so in terms of the sanction and asked whether Allen "was terminated for proper cause."

[**HN7**⬆️] We have determined "that explicating broad CBA terms like 'cause,' when left undefined by contract, is the **[*12]** arbitrator's charge."[36] In addition to assessing the nature of the violations, an arbitrator may under our precedents take account of employee tenure in determining whether just cause for discipline exists rather than for dismissal.[37] Had Ball Metal wished to remove consideration of any mitigating factors, it could have required termination for all harassment violations in the CBA or in company rules.[38] In fact, Ball Metal did

---

[23] *Id. at 826*.

[24] *Id.*

[25] *Weber, 253 F.3d at 823-24*.

[26] *Id. at 823*.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id. at 824*.

[31] *Id.*

[32] *Id.*

---

[33] *Id. at 823* (emphasis added).

[34] *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103, 703 F.3d 821, 825 (5th Cir. 2013)*.

[35] *Weber, 253 F.3d at 823*.

[36] *Albemarle, 703 F.3d at 826* (citing *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc., 481 F.2d 817, 820 (5th Cir. 1973)*); *see also Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 571 (5th Cir. 2018)* (the amount of discretion involved makes it difficult to see how an arbitrator's assessment of judgment-laden terms like "extreme" and "excessive" can amount to the direct conflict with the CBA that is necessary for judicial override).

[37] *Weber, 253 F.3d at 823*; *see also Gulf States Tel. Co. v. International Brotherhood of Electrical Workers, 416 F.2d 198, 200-202 (5th Cir. 1969)* (affirming the enforcement of an arbitration award in which the arbitrator determined that the employee's "previous record and seniority count for something in arguing against the extreme penalty in industrial relations").

[38] *Albemarle, 703 F.3d at 826* ("Had the Company wished to remove doubt as to whether safety violations like the

designate violations of other rules as mandating "automatic suspension for purpose of discharge." The company did not place harassment violations like Allen's within that category, providing instead that they warranted "appropriate disciplinary action, up to and including termination." The flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination. The penalty selected—unpaid suspension for over a year—was well within the arbitrator's discretion.[39]

In light of our precedents, we conclude that the arbitrator could construe the CBA to mean that Allen's violations were just cause for discipline, rather than just cause for termination, given the character of the violations and his tenure. We hold only [*13] that this interpretation is an "arguable reading" of the CBA, not that it is the best or even a good one.[40] *HN8*[↑] "The correctness of the arbitrator's interpretation is irrelevant so long as it was an *interpretation*."[41]

## C

The arbitrator stated both that there was just cause for termination and that there was not. Given our especially deferential standard of review, we are bound to resolve the ambiguity in the arbitrator's favor.[42]

---

Grievants' met the criteria for cause to terminate, it had only 'to bargain for a specific list of violations that will be considered sufficient grounds for discharge' in the CBA.") (quoting *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc., 481 F.2d 817, 820 (5th Cir. 1973)*).

[39] *See United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)* ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations."); *Gulf States, 416 F.2d at 202 n.10* ("Arbitral determination not only of the existence of misconduct but of the fitness of the punishment is routinely grist for the arbitral mill.").

[40] *Albemarle, 703 F.3d at 826*.

[41] *Sun Coast Res., Inc. v. Conrad, 956 F.3d 335, 337 (5th Cir. 2020)*.

[42] *Quezada v. Bechtel OG & C Constr. Servs., 946 F.3d 837, 844 (5th Cir. 2020)*.

In declining to terminate Allen, the arbitrator explained his reasoning as follows:

> Under the parties['] CBA, the Arbitrator concludes that the Company had proper cause to discipline the Grievant for violation of the Company's Discrimination, Harassment, and Retaliation Policy (CX-4) and Plant Rules No. 21 . . . . The Grievant's conduct created the violations and he alone must bear the repercussions. Besides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA . . . .
>
> The Arbitrator is of the opinion, however, that while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service. Accordingly, based upon all the previous discussion the termination decision **[*14]** is modified in the following award.

On the following page, labeled "AWARD," the arbitrator continued: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority." The award then set forth the terms of Allen's modified suspension sanction.

Ball Metal argues that the arbitrator exceeded his jurisdiction under the CBA because he impermissibly altered the sanction after he determined that there was just cause for termination. In Ball Metal's view, the arbitrator recognized that there was just cause to terminate Allen but then went on to factor in tenure, which he had no authority to consider at that point. Local 129 takes another view, emphasizing the arbitrator's later conclusion that there was not just cause for termination. The union reads the arbitrator's earlier reasoning to mean that Ball Metal had just cause to discipline, and could have had just cause for termination, but in the last analysis did not, because of Allen's seniority.

The arbitrator plainly stated that "the Company's decision to terminate the Grievant was for just cause," and then just as plainly stated that "the Grievant, Shawn Allen **[*15]** was not terminated for proper cause." Neither party has persuaded us that its interpretation stressing one rather than the other of these statements is the only possible reading. *HN9*[↑] When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, we must enforce the award. As the Supreme Court has explained, "[a] mere ambiguity in the opinion

accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."[43] "Unless the arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,' a court is bound to enforce the award . . . even when the basis for the arbitrator's decision may be ambiguous."[44]

_HN10_[⤒] Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. "It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award."[45] Although explanations of arbitration awards are not mandatory, they are desirable.[46] To encourage justification, the Supreme Court has advised against "overturning **[*16]** awards based on ambiguities that can be identified in the explanations arbitrators choose to give," since that "would discourage them from providing those reasons in the first place."[47] So long as "[w]e can discern a possible rationale from the arbitrator's actions, . . . his decision 'must stand.'"[48]

We deem possible the rationale that the union suggests: the arbitrator could have determined that the offense was not in fact just cause for termination in light of Allen's tenure. A Seventh Circuit case involving similar facts supports our conclusion. In _Arch of Illinois, Division of Apogee Coal Corp. v. District 12, United Mine Workers_,[49] the Seventh Circuit affirmed an arbitration award that ordered suspension instead of termination for an employee who had violated a rule against sleeping at work.[50] Similar to the Ball Metal CBA, the Arch of Illinois CBA provided that covered employees could not be "disciplined or discharged except for just cause."[51] Early in the opinion, the arbitrator observed that "sleeping is sufficient just cause to trigger a discharge" and described other concerns with the employee's conduct, concluding that, "[f]or all of those reasons therefore the grievant should **[*17]** be terminated."[52] Later in the opinion, however, the arbitrator decided that the employee should be suspended rather than terminated, reasoning that "the senior person's length of service must be recognized when that individual is dealt with by way of termination."[53]

The company argued that the arbitrator had exceeded his authority by modifying the penalty after already determining that there was just cause for termination.[54] The Seventh Circuit considered the company's interpretation reasonable but not inevitable.[55] That was insufficient because the company "must do more than merely show that its interpretation of the opinion is reasonable; it must demonstrate that the opinion cannot reasonably be interpreted in any other way."[56] The company did not make that showing.[57] The alternative interpretation that the company "lacked just cause to discharge [the employee] because of its failure to

---

[43] _Enter. Wheel, 363 U.S. at 598_; _see also_ _Wireglass Metal Trades Council v. Shaw Env't & Infrastructure Inc., 837 F.3d 1083, 1091-92 (11th Cir. 2016)_ ("The rule of _Enterprise Wheel_ is that, when it is 'not apparent' from the arbitrator's stated reasoning (or lack thereof) whether she permissibly interpreted a collective bargaining agreement or impermissibly modified it, and one can plausibly read the award either way, the court must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it.").

[44] _W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum, & Plastic Workers, 461 U.S. 757, 764, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)_ (internal citation omitted) (quoting _Enter. Wheel, 363 U.S. at 597 (1960)_).

[45] _See_ _Antwine v. Prudential Bache Sec., Inc., 899 F.2d 410, 412 (5th Cir. 1990)_.

[46] _Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 572 (5th Cir. 2018)_.

[47] _Id. at 572-73_.

[48] _Commc'ns Workers of Am. v. Sw. Bell Tel. Co., 953 F.3d 822, 828 (5th Cir. 2020)_ (quoting _Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)_).

[49] _85 F.3d 1289 (7th Cir. 1996)_.

[50] _Id. at 1291, 1294_.

[51] _Id. at 1291_.

[52] _Id._

[53] _Id._

[54] _Id. at 1293_.

[55] _Id._

[56] _Id._ (citing _United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597-98, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)_).

[57] _Id._

consider his seniority is not so far-fetched as to lead us to deduce that the arbitrator relied on a noncontractual basis for the award."[58] *HN11*[⬆] The court explained that, "before we reject an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based **[*18]** his decision on noncontractual grounds."[59]

For similar reasons, we uphold the arbitrator's award in Allen's case. Because the opinion does not unambiguously reflect that the arbitrator exceeded his authority, we must enforce his award.

### III

We next address the union's challenge to the attorneys' fees ruling. *HN12*[⬆] We review the district court's denial of attorneys' fees for abuse of discretion.[60] "For the same reason that judicial review of arbitration awards is limited, a party may be awarded attorneys' fees if it has to fight back a court challenge to the award it obtained in the parties' chosen forum."[61] "This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dilatory tactics that lead to wasteful and unnecessary litigation."[62]

*HN13*[⬆] Courts award fees when the challenge to the arbitrator's decision is "without justification."[63] "'Without justification' refers not to the strength of the challenge but to the type."[64] Challenges to an arbitrator's jurisdiction or authority do not result in fee awards, whereas challenges to the "intrinsic merits" of a dispute justify fee awards even if the challenges are not frivolous.[65] "[W]hen parties have agreed to arbitrate a dispute, **[*19]** a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the parties' agreement to be bound by the arbitrator's decision."[66]

Ball Metal challenged the arbitrator's authority, so a fee award is unwarranted. Throughout its brief, Ball Metal framed its challenge in jurisdictional terms. The company consistently characterized the arbitrator's modified sanction as an action "exceeding his authority," rather than as a misreading of the contract's terms.[67] Ball Metal did not contest the arbitrator's interpretation of "just cause for termination."[68] Instead, Ball Metal assumed that the arbitrator had recognized just cause for termination and argued that he defied the limits on his authority that determination imposed.[69] Because Ball Metal's challenge was jurisdictional, the district court did not abuse its discretion in denying a fee award.

### IV

Finally, we address the parties' joint request for clarification about the award during the period of the company's noncompliance. Specifically, the parties request a remand to the arbitrator to determine whether to award back pay and benefits for this period.

The arbitrator's **[*20]** decision does not make clear what the award would be in the event of noncompliance. The award states that "[t]he Grievant will be offered immediate reinstatement without back pay and benefits," but it does not address whether back pay or

---

[58] *Id. at 1294.*

[59] *Id. at 1293.*

[60] *Tercero v. Tex. Southmost Coll. Dist., 989 F.3d 291, 301 (5th Cir. 2021).*

[61] *Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 573 (5th Cir. 2018).*

[62] *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tex. Steel Co., 639 F.2d 279, 283 (5th Cir. 1981).*

[63] *Bruce Hardwood Floors v. UBC, S. Council of Indus. Workers, Local Union No. 2713, 103 F.3d 449, 453 (5th Cir. 1997).*

[64] *Delek, 891 F.3d at 573.*

[65] *Id.*

[66] *Id. at 573-74.*

[67] *See id. at 574* ("[A] party cannot avoid paying attorneys' fees by making only a conclusory assertion that it is challenging the arbitrator's 'power to make the award.'") (quoting *Tex. Steel Co., 639 F.2d at 283*).

[68] *See id.* (holding that a challenge to an arbitrator's interpretation of a contract is a merits inquiry and awarding attorneys' fees); *Tex. Steel Co., 639 F.2d at 283-84* (holding that a challenge to an arbitrator's interpretation of a contract warranted attorneys' fees).

[69] *See Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1331 (5th Cir. 1994)* (holding that a challenge to an award "upon a matter not submitted" to the arbitrator is a jurisdictional inquiry and denying attorneys' fees).

benefits would be warranted if Allen was not offered immediate reinstatement. *HN14*[↑] When, as here, an arbitrator's decision does not specify the award during a period of noncompliance, "the court is authorized to remand to the arbitrator" for clarification.[70] Since both parties have requested a remand for this purpose, we will order one.

* * *

We REVERSE the award of summary judgment in favor of Ball Metal and RENDER judgment in favor of Local 129. We AFFIRM the denial of attorneys' fees. We REMAND to determine whether to award backpay and benefits during Ball Metal's period of noncompliance.

---

**End of Document**

[70] *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 849 (7th Cir. 1995)*; *see also* *United Steelworkers, Dist. 36, Local 8249 v. Adbill Mgmt. Corp., 754 F.2d 138, 141-42 (3d Cir. 1985)*; **Marshall Durbin Cos., Inc. v. United Food & Comm. Workers Union, Local 1991, 254 F.3d 1081**, [published in full-text format at *2001 U.S. App. LEXIS 31738], 2001 WL 563907, at *1 (5th Cir. 2001)* (unpublished) (per curiam).

*Bldg. Materials Mfg. Co. v. Steelworkers,* 2020 U.S. Dist. LEXIS 37075, 2020 WL 1047895 at *7-8 (N.D. Tex. 2020)

# *Bldg. Materials Mfg. Corp. v. USW Int'l Union*

United States District Court for the Northern District of Texas, Dallas Division

March 3, 2020, Decided; March 3, 2020, Filed

Civil Action No. 3:18-cv-02606-X

**Reporter**
2020 U.S. Dist. LEXIS 37075 *; 2020 WL 1047895

BUILDING MATERIALS MANUFACTURING CORPORATION, Plaintiff, v. UNITED STEELWORKERS INTERNATIONAL UNION on behalf of its local 00759, Defendant.

## Core Terms

arbitrator, arbitrator's interpretation, summary judgment motion, attorney's fees, collective bargaining agreement, costs, contradicting, arbitration award, employees, merits, arbitral decision, express provision, argues, matter of law, express language, seniority, terminate, draws, summary judgment, Challenges, intrinsic

**Counsel:** **[*1]** For Building Materials Manufacturing Corporation, Plaintiff: Gavin S Martinson, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Dallas, TX; Christopher Murray, PRO HAC VICE, Ogletree Deakins Nash Smoak & Stewart PC, Indianapolis, IN.

For United Steelworkers International Union on Behalf of its Local 00759, Defendant, Counter Claimant: Joseph H Gillespie, LEAD ATTORNEY, Gillespie Sanford LLP, Dallas, TX; Bruce Fickman, United Steelworkers Legal Department, Pittsburgh, PA; Sasha Shapiro, PRO HAC VICE, United Steelworkers Legal Department, Pittsburgh, PA.

For Building Materials Manufacturing Corporation, Counter Defendant: Gavin S Martinson, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Dallas, TX; Christopher Murray, Ogletree Deakins Nash Smoak & Stewart PC, Indianapolis, IN.

**Judges:** BRANTLEY STARR, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BRANTLEY STARR

## Opinion

### MEMORANDUM OPINION AND ORDER

Building Materials Manufacturing Corporation ("Building Materials") alleges an arbitrator wrongly granted an arbitration award to one of defendant United Steelworkers International Union's ("United Steelworkers") members, Theresa Truesdell. Building Materials brings this action under *29 U.S.C. § 185*, which allows suits for a **[*2]** violation of a contract "between an employer and a labor organization representing employees in an industry affecting commerce" in a federal district court. Building Materials moves for summary judgment seeking to vacate the arbitration award [Doc. No. 21] while United Steelworkers moves for summary judgment seeking to enforce the award, along with requesting attorneys' fees and costs [Doc. No. 18]. The Court concludes that United Steelworkers has shown it is entitled to judgment as a matter of law.

Therefore, the Court **GRANTS** United Steelworkers's motion for summary judgment and request for attorneys' fees and costs and **DENIES** Building Materials's motion for summary judgment.

I.

Truesdell was hired by Building Materials, a roofing manufacturer, on October 14, 1992 to work at its Dallas facility. On October 21, 2016, Truesdell notified Building Materials that she would be out of work for several days. After informing Building Materials she would not be able to return because she needed to be in a less dusty environment, Truesdell was instructed to contact the administrator of leave under the *Family and Medical Leave Act ("FMLA")*, Liberty Mutual. Truesdell informed Liberty Mutual that **[*3]** her condition was caused by the working environment at the Dallas facility. Liberty Mutual subsequently approved Truesdell's claim for short-term benefits, which gave Truesdell a maximum of 26 weeks of income replacement benefits, applied retroactively as

of October 21, 2016.

On April 24, 2017, Building Materials contacted Truesdell asking about her return to work intentions and ability. Truesdell responded that she needed to be placed in a less dusty work area. After some back and forth, Building Materials concluded that all jobs at the Dallas plant Truesdell was working at, including those outside the manufacturing environment, involved some exposure to dust. Building Materials alleges that, given such circumstances, they had no choice but to terminate Truesdell and so they did on June 7, 2017.

In response, Truesdell filed a grievance under the parties' collective bargaining agreement (hereinafter "Agreement") on June 8, 2017. After completing the various grievance steps, the matter proceeded to arbitration. The parties stipulated the following question be put before the arbitrator: was Truesdell terminated for just cause? After reviewing the Agreement, the arbitrator concluded the **[*4]** answer was no. In coming to its decision, the arbitrator focused on section 4-11 of the Agreement, which states:

> Discharge for cause, voluntary resignation, lost time due to layoff exceeding twenty four (24) consecutive months, lost time due to reasons other than layoff exceeding twelve (12) months for employees with less than fifteen (15) years continuous service and eighteen (18) consecutive months for employees with more than fifteen (15) years continuous service, or absence without leave for more than four (4) consecutive days, shall terminate an Employee's continuous service record and seniority and if reemployed thereafter shall be considered a new Employee.[1]

The arbitrator interpreted the seniority termination deadlines in this provision as also setting tolling periods for when Building Materials could start discharging its employees. The arbitrator also interpreted "discharge for cause" to mean "other than for lost time covered hereinafter."[2] As a result of these moves, the arbitrator interpreted section 4-11 to mean that Building Materials could not discharge Truesdell, who had 15 years continuous service, until 18 months from presumably the date Truesdell notified Building Materials she would be out **[*5]** of work, October 21, 2016. As 18 months

had not passed (Truesdell was discharged on June 7, 2017), the arbitrator concluded Truesdell was not discharged for cause.

The arbitrator then fashioned a remedy that extended Truesdell's seniority for 30 days and sought to give Truesdell an opportunity to be reinstated in a way that would accommodate her health condition:

> 1. Truesdell's seniority will continue for 30 days from the date hereof.
> 2. Truesdell will promptly notify the Company in writing if she desires to be activated, any accommodation she will need, and will provide medical evidence in support of that request.
> 3. The Company will take prompt action on her request including seeking opportunities in areas other than Millwright work as Lienau testified he did prior to her 2016 termination. The Company may seek professional evaluation of Truesdell's current medical and physical condition and ability, and Truesdell will cooperate in that effort.
> 4. The Committee's [sic] mentioned in Article VIII-14 are encouraged to act if the Company's paragraph 3 actions do not result in Truesdell's activation.[3]

On September 28, 2018, Building Materials filed a complaint [Doc. No. 1] contending the arbitration **[*6]** award should be vacated because the arbitrator ignored the plain text of the Agreement. It makes this same argument in its motion for summary judgment filed on April 24, 2019. United Steelworkers filed its motion for summary judgment on the same day, alleging the arbitration award draws its essence from the Agreement and so should be enforced as written.

II.

Before the Court is Building Materials and United Steelworkers's motions for summary judgment. Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] "A fact is material if it 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[1] Exhibit B to Building Materials's Complaint at p.22 [Doc. No. 1, Ex. B].

[2] Exhibit A to Building Materials's Complaint at p.17 [Doc. No. 1, Ex. A].

[3] Exhibit A to Building Materials's Complaint at p.17-18 [Doc. No. 1, Ex. A].

[4] *Fed. R. Civ. P. 56(a)*.

party.'"[5]

The Court notes that the dispute between the parties in their motions for summary judgment concerns the arbitrator's interpretation, or lack thereof, of the Agreement and not the arbitrator's fact-finding. As such, the issue before the Court is which movant is entitled to judgment as a matter of **[*7]** law rather than whether there is a genuine dispute of material fact.

III.

Building Materials argues in its motion for summary judgment that the arbitrator exceeded his authority in ignoring the plain language of the Agreement by issuing his award and so, as a matter of law, Building Materials is entitled to have the arbitration award vacated. In contrast, United Steelworkers argues in its motion for summary judgment that the arbitrator's award draws its essence from the Agreement and so, as a matter of law, is entitled to have the award enforced. United Steelworkers also contends it is entitled to attorneys' fees and costs because Building Materials brought its challenge to the arbitration award without justification.

The Court agrees with United Steelworkers. In showing how the arbitrator's award draws its essence from the Agreement, United Steelworkers has shown how it is entitled to summary judgment as a matter of law under the *Rule of Civil Procedure 56(a)* summary judgment standard. The Court further agrees that Building Materials brought its challenge without justification and so United Steelworkers is entitled to attorneys' fees and costs.

In actions brought under *29 U.S.C. § 185* questioning an **[*8]** arbitrator's decision on a contract dispute, the Court may only look at whether the arbitrator's decision "draws its essence from the [collective bargaining agreement]."[6] This standard is interpreted "expansively."[7] Even if the arbitrator "seriously erred in his fact finding or contract interpretation," the Court must uphold a decision that draws from the essence of the collective bargaining agreement.[8] "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable."[9] An arbitrator dispenses "industrial justice" by acting contrary to the express provisions of the collective bargaining agreement or otherwise ignoring its plain language.[10] In such circumstances, the arbitrator is "no longer applying or interpreting the agreement but rewriting it."[11] An example of an arbitrator contradicting the express language of a collective bargaining agreement is *Southwest Airlines Co. v. Local 555, Transportation Workers Union of America AFL-CIO*, where the Fifth Circuit held an arbitrator's interpretation that the collective bargaining agreement's effective date was the signing **[*9]** date was contradicted by express language in the collective bargaining agreement stating the collective bargaining agreement shall "remain in full force and effect as of the date of ratification."[12] Lastly, in formulating any remedy, the arbitrator must be flexible "in meeting a wide variety of situations," as the "draftsman may never have thought of what specific remedy should be awarded to meet a particular contingency."[13] Even so, the arbitrator's award must ultimately draw its essence from the collective bargaining agreement.[14]

If the party fighting back the challenge to the arbitration decision in district court prevails, a subsequent question is whether that party is entitled to attorneys' fees and costs. The Fifth Circuit has made it clear that the party facing the challenge to the arbitration is entitled to attorneys' fees and costs if the challenge was brought "without justification."[15] "Without justification" refers to

5 *Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019)* (alteration in original) (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*.

6 *Delek Ref., Ltd. v. Local 202, United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFLCIO, 891 F.3d 566, 570 (5th Cir. 2018)*.

7 *Id.*

8 *Id.*

9 *Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509, 121 S. Ct. 1724, 149 L. Ed. 2d 740 (2001)* (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960))*.

10 *Delek Ref., Ltd., 891 F.3d at 570* (citations omitted).

11 *Id.*

12 *912 F.3d 838, 845-6 (5th Cir. 2019)*.

13 *United Steelworkers of Am., 363 U.S. at 597*.

14 *Id.*

15 *Delek Ref., Ltd., 891 F.3d at 573* (citation omitted); *Int'l*

the type of challenge and not to the strength of a challenge.[16] Challenges to an arbitrator's jurisdiction or authority are "justified" and so will not result in a fee award even if the challenge to the arbitration decision fails in court.[17] However, challenges **[*10]** that go to the intrinsic merits of a dispute are "without justification" and will result in fees even if not brought frivolously.[18] Challenges that go to the intrinsic merits of a dispute include challenges to an arbitrator's interpretation and application of a collective bargaining agreement and its discretion in fashioning a remedy.[19] Courts must also be wary of a challenging party attempting "to transform [a merits] claim into an excess-of-powers claim."[20] In other words, a party cannot in one breath argue "that the arbitrator transcended his authority" while in another assert that he "exercised his contractual authority . . . inconsistent with applicable principles of contractual construction, which 'necessarily touch[es] upon the 'intrinsic merits' of the case.'"[21]

Here, the arbitrator's decision and award draw from the essence of the Agreement. Regardless of the accuracy of the arbitrator's interpretation of section 4-11 of the Agreement, the arbitrator did not stray from "interpretation and application of the agreement" into dispensing "his own brand of industrial justice."[22] The arbitrator's interpretation of section 4-11 does not contradict any other express provisions of the Agreement or any express **[*11]** language in section 4-11 itself. In interpreting section 4-11, the arbitrator thought that an interpretation where an employee had seniority but was no longer employed did not make

sense and so understood section 4-11 as tying seniority and employment together. At bottom, the arbitrator focused on the text and what would constitute a reasonable interpretation in making his decision.

Regarding the award itself, it must draw from the essence of the Agreement but the arbitrator has flexibility to meet "a wide variety of situations."[23] Here, the arbitrator is seeking to balance the traditional remedy of reinstatement with the arbitrator's finding that Truesdell's fitness to work is at issue. To that end, the arbitrator includes provisions requiring Building Materials to accommodate her health condition and requiring Truesdell to cooperate with Building Materials to provide any requested health information. Insofar as the central issue of this dispute is whether Truesdell was properly discharged under the Agreement, this remedy, a tailored reinstatement, draws from the essence of the Agreement.[24]

In response, Building Materials raises several objections to the arbitrator's interpretation of the Agreement and to the remedy he issued. **[*12]** First, Building Materials argues that Article 8-1 of the Agreement expressly allows, without qualification, Building Materials to discharge employees for cause:

> 8-1 The management of the Company's Dallas Plant, and all of its subdivisions and departments, the direction of the working forces and the affairs of the Company including the right to hire, suspend, discharge, or discipline Employees for cause, the right to transfer or lay off Employees due to lack of work or curtailed production, the right to establish rules of conduct and penalties for violation of said rules, the right to establish, determine, maintain and enforce standards of production, the right to determine and control the number and the qualifications of Employees performing each operation at all times, the right to determine what shall be done and all methods and processes by which the work will be carried on, and the right to determine the number of shifts it shall work and the starting and stopping time of each shift are all

---

*Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Texas Steel Co., 639 F.2d 279, 284 (5th Cir. 1981)* (noting how the party seeking arbitration enforcement is entitled to attorneys' fees and costs if a challenge is brought without justification).

[16] *Delek Ref., Ltd., 891 F.3d at 573*.

[17] *Id.*

[18] *Id.* (citations omitted).

[19] *Delek Ref., Ltd., 891 F.3d at 573*; *Int'l Ass'n of Machinists, 639 F.2d at 284*.

[20] *Delek Ref., Ltd., 891 F.3d at 574* (quoting *Hous. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., 765 F.3d 396, 412 (5th Cir. 2014))*.

[21] *Delek Ref., Ltd., 891 F.3d at 574*.

[22] *United Steelworkers of Am., 363 U.S. at 597*.

---

[23] *United Steelworkers of Am., 363 U.S. at 597*.

[24] This explanation of how the arbitrator's remedy draws its essence from the CBA disposes of Building Materials's argument that, assuming the arbitrator's interpretation of the CBA is correct, the awarded remedy still has no basis in the CBA because Truesdell's reinstatement would occur over 5 months after the prescribed 18-month leave period.

vested solely and exclusively in the Company provided that in the exercise of any of said rights or any or all other not enumerated rights or powers or authority customarily exercised by Management, **[*13]** the Company shall not violate the express provisions of this Agreement.[25]

Building Materials contends that the arbitrator's interpretation of section 4-11, specifically its interpretation of "discharge for cause" to mean discharge for reasons other than lost time covered in section 4-11, contradicts this unqualified right. This objection misses the mark. Article 8-1 expressly gives Building Materials the "sole and exclusive right" to discharge an employee for cause but it does not define what "cause" means. The arbitrator is interpreting what "cause" means and is not contesting Building Materials's "sole and exclusive right" to discharge an employee for cause. Moreover, Article 8-1 expressly limits such "sole and exclusive right" when it states that exercising this right "shall not violate the express provisions of this Agreement." For these reasons, Building Materials has failed to show how the arbitrator's interpretation of Article 4-11 contradicts the express language of Article 8-11.

Second, Building Materials argues that the arbitrator ignored the plain language of the Agreement when it interpreted Article 4-11 to create a right for Truesdell to an 18-month leave of absence before she could be terminated. This objection **[*14]** begs the question. It assumes that the arbitrator's interpretation of Article 4-11, which this Court must defer to, is incorrect. Indeed, Building Materials discusses at length in its motion for summary judgment how Article 4-11 should not be interpreted to mandate leave but, when all is said and done, does not point to any express provisions in Article 4-11 or elsewhere that contradict the arbitrator's interpretation on 18-month leave. This is a far cry from *Southwest Airlines Co.*, where the arbitrator's decision that the effective date of the collective bargaining agreement was the signing date was contradicted by express language in the collective bargaining agreement stating the agreement shall "remain in full force and effect as of *the date of ratification* . . . ."[26] Thus, Building Materials has failed to show the arbitrator's interpretation of the 18-month language contradicts the express language of the Article 4-11 or any other Agreement provision.

For the reasons stated above, the Court holds that the arbitrator was not dispensing his own brand of industrial justice and that his award and decision draw from the essence of the Agreement. Given this holding, the Court must now **[*15]** decide whether United Steelworkers is entitled to attorneys' fees and costs.

United Steelworkers is entitled to attorneys' fees and costs because Building Materials brought this challenge without justification. As noted above, "without justification" means that the challenge goes to the merits of the dispute, which includes an arbitrator's interpretation of a contract.[27] Here, Building Materials at several points in its briefing on these motions for summary judgment contests the arbitrator's interpretation of the Agreement. For example, in its motion for summary judgment, Building Materials argues that the arbitrator's interpretation of Article 4-11 mandating 18-months of leave for employees is wrong because Article 4-11, properly interpreted, does not mandate leave. Additionally, in the same motion, Building Materials argues the arbitrator's interpretation of Article 4-11 makes no sense and would lead to absurd consequences. In another example, Building Materials, in its reply to United Steelworkers's motion for summary judgment, argues that the arbitrator's interpretation of "discharge for cause" in Article 4-11 is incorrect because it is inconsistent with the proper interpretation **[*16]** of Article 8-1, which gives Building Materials an unqualified right to discharge an employee for cause. As Building Materials's briefing illustrates that it is bringing this challenge on the merits, it must pay United Steelworkers's attorneys' fees and costs.

In response, Building Materials argues it is challenging the arbitrator's authority and not the intrinsic merits of the dispute. Building Materials contends that, in alleging that the arbitrator is ignoring the plain meaning of the Agreement and contradicting its express provisions, Building Materials is in fact arguing that the arbitrator is exceeding its authority and essentially rewriting the agreement. If this were true, then Building Materials would be correct. But it is not true. Although Building Materials is careful to cloak its arguments as being about the arbitrator ignoring the plain meaning of the Agreement and its express provisions, the substance of its arguments speaks for itself. As noted above, Building Materials's arguments focus on disputing the arbitrator's

---

[25] Exhibit B to Building Materials's Complaint at p.42-43 [Doc. No. 1, Ex. B].

[26] *912 F.3d 838, 845-46* (emphasis added).

[27] *Delek Ref., Ltd., 891 F.3d at 573*.

interpretation of the Agreement and do not cite to any express provision contradicting the arbitrator's decision. Indeed, this is a clear case of Building **[\*17]** Materials attempting to "transform [a merits] claim into an excess-of-powers-claim.[28]" As its briefing makes clear, Building Materials is in one breath arguing "that the arbitrator transcended his authority while in another it asserts" that he wrongly interpreted the contract which, "necessarily touch[es] upon the 'intrinsic merits' of the case."[29] Thus, Building Materials is bringing this challenge on the merits.

IV.

Because this Court has found, as a matter of law, that the arbitrator's decision and award flow from the essence of the Agreement and that Building Materials brought this challenge on the merits of the dispute, the Court hereby **GRANTS** United Steelworkers's motion for summary judgment and request for attorneys' fees and costs and **DENIES** Building Materials's motion for summary judgment.[30]

---

[28] *Delek Ref., Ltd., 891 F.3d at 574* (quoting *Houston Ref., L.P., 765 F.3d at 412*).

[29] *Delek Ref., Ltd., 891 F.3d at 574*.

[30] The Court notes Building Materials in its complaint also argues the award should be vacated under the *Texas Arbitration Act* and the Federal Arbitration Act. However, Building Materials does not raise these arguments in its motion for summary judgment or in any of its other briefing related to the motions for summary judgment filings. As such, the Court deems these arguments waived. Even if the Court were to consider these arguments, they both fall flat. The Texas Arbitration Act specifically excludes "a collective bargaining agreement between an employer and a labor union." *Tex. Civ. Prac. & Rem. § 171.002(a)(1)*. Regarding the *Federal Arbitration Act*, assuming it applies, "the Supreme Court has made clear that district courts' review of arbitrators' awards under [the Federal Arbitration Act] is limited to the 'sole question . . . [of] whether the arbitrator (even arguably) interpreted the parties' contract." *BNSF R. Co. v. Alstom Transp., Inc., 777 F.3d 785, 788 (5th Cir. 2015)* (quoting *Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013))* (alteration added). In answering this question, the district court must look to the arbitration award and consider at least three factors: "(1) whether the arbitrator identifies her task as interpreting the contract; (2) whether she cites and analyzes the text of the contract; and (3) whether her conclusions are framed in terms of the contract's meaning." *Id.* (citation omitted). This question is disposed of in Section III of this order, which makes clear that the arbitrator in his award was interpreting the Agreement.

United Steelworkers, if it seeks to recover attorneys' fees, must submit a motion pursuant to *Federal Rule of Civil Procedure 54(d)* within 14 days after the entry of judgment, which is being entered alongside this order. If United Steelworkers chooses to file this motion, the Court further requires United Steelworkers to submit evidence supporting its request for attorneys' fees and costs. For attorneys' fees, **[\*18]** United Steelworkers must itemize the hours spent with sufficient descriptive detail of the work conducted as to this particular case, as well as submit a proffered reasonable hourly rate based on the relevant experience of the attorney conducting the work. Upon the filing of the motion, Building Materials will have 5 days to file a response should it choose to do so. Upon the filing of the response, United Steelworkers will have 5 days to file a reply.[31]

**IT IS SO ORDERED** this 3rd day of March, 2020.

/s/ Brantley Starr

BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

---

---

[31] Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

*Hebert v. Gen. Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local 270*, 2004 U.S. Dist. LEXIS 13406 at *12-17 (E.D. La. 2004)

# *Hebert v. Gen. Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local 270*

United States District Court for the Eastern District of Louisiana

July 15, 2004, Decided ; July 16, 2004, Filed; July 16, 2004, Entered

CIVIL ACTION No. 03-1744 SECTION: I/1

**Reporter**

2004 U.S. Dist. LEXIS 13406 *; 175 L.R.R.M. 2403

ALEX HEBERT, JR., ET AL VERSUS GENERAL TRUCK DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL 270

**Disposition:** [*1] Motion of defendant, Local 270 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers, GRANTED and plaintiff's claims DISMISSED with prejudice.

## Core Terms

plaintiffs', seniority, Producers, referral, grievance, productions, fair representation, summary judgment, drivers, hire, discriminatory, arbitration, discipline, hiring hall, employees, continuing violation, concealment, bargaining, pertaining, limitations period, plaintiff's claim, demonstrates, rights, statute of limitations, pursued, material fact, Additionally, violations, diligence, lawsuit

## Case Summary

### Procedural Posture

Plaintiff union members sued defendant union for breaching its duty of fair representation by failing to (1) refer them for work in seniority order and (2) process their grievances pertaining to that work referral system, in violation of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), *29 U.S.C.S. §§ 401-531* and *§ 9(a)* of the Labor Management Relations Act (LMRA), *29 U.S.C.S. § 159(a)*. The union moved for summary judgment.

### Overview

The union members filed grievances with the union because they were not being referred for movie production work in seniority order. The union refused to process the grievances. The members claimed they were not referred because they had picketed the union,

verbally criticized union officials, and filed a lawsuit against the union. The court held, inter alia, that members failed to show the union had taken any official action referring the members for jobs which had directly penalized them in a way that separated them from other members or that the "producers preference" referral system was to control the members' conduct or to address union rules. Rather, the "producers preference" referral system was adopted by the union before the members' criticism and picketing and was the catalyst for the picketing and the subject of the grievances. Thus, the LMRDA claim failed. Moreover, the evidence showed only that the grievances were lodged and were not taken to arbitration or did not result in the plaintiffs being employed. Such evidence was insufficient to show the union's handling of the grievances was arbitrary, discriminatory, or in bad faith, so the LMRA claim failed.

### Outcome

The union's motion for summary judgment was granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal

Entitlement

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > Materiality of Facts

Civil Procedure > ... > Summary
Judgment > Supporting Materials > General
Overview

### HN1[⬇] Entitlement as Matter of Law, Genuine Disputes

Pursuant to *Fed. R. Civ. P. 56(c)*, summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56 (c)*.

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

### HN2[⬇] Summary Judgment, Burdens of Proof

On a motion for summary judgment, once the moving party carries its burden pursuant to *Fed. R. Civ. P. 56(c)*, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. That burden is not satisfied by creating merely some metaphysical doubt as to the material facts, by conclusory allegations, unsubstantiated assertions or by only a scintilla of evidence. The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. Therefore, a fact is material if it might affect the outcome of the suit under the governing law. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

Civil Procedure > ... > Justiciability > Case &
Controversy Requirements > Actual Controversy

Civil Procedure > ... > Discovery > Methods of
Discovery > General Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

### HN3[⬇] Case & Controversy Requirements, Actual Controversy

In order to demonstrate that summary judgment should not lie, the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. A court will resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. The court will not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

Civil Procedure > Judgments > Summary
Judgment > Partial Summary Judgment

### HN4[⬇] Summary Judgment, Burdens of Proof

The plain language of *Fed. R. Civ. P. 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

### HN5[⬇] Summary Judgment, Entitlement as Matter

of Law

A complete failure of proof as to one element requires summary judgment against the entirety of the claim.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

*HN6*[⤓] **Labor Arbitration, Discipline, Layoffs & Terminations**

Proof that a union has infringed a member's right of free speech protected by § 101 of the Labor-Management Reporting and Disclosure Act (LMRDA), *29 U.S.C.S. § 401 et seq.*, specifically *29 U.S.C.S. § 411*, may, under certain circumstances, be actionable pursuant to § 102 of the LMRDA, specifically *29 U.S.C.S. § 412*, even if no unlawful discipline is shown.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

*HN7*[⤓] **Labor Arbitration, Discipline, Layoffs & Terminations**

Sections 101(a)(5) and 609 of the Labor-Management Reporting and Disclosure Act (LMRDA), *29 U.S.C.S. § 401 et seq.* make it unlawful for a union to fine, suspend, expel, or otherwise discipline a union member for exercising any rights secured under the LMRDA. *29 U.S.C.S. §§ 411(1)(5)* and *529*.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

*HN8*[⤓] **Labor Arbitration, Discipline, Layoffs & Terminations**

Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

*HN9*[⤓] **Employer Violations, Interference With Protected Activities**

By using the phrase "otherwise discipline" in the Labor-Management Reporting and Disclosure Act (LMRDA), *29 U.S.C.S. § 401 et seq.*, Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules. The term refers only to actions undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership. The union need not, however, invoke formal proceedings, and discipline can entail informal or summary penalties as long as adverse action against a union member is not purely ad hoc retaliation by individual union officers.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

*HN10*[⤓] **Labor Arbitration, Discipline, Layoffs & Terminations**

Under the Labor-Management Reporting and Disclosure Act (LMRDA), *29 U.S.C.S. § 401 et seq.*, a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules. Congress' reference to punishments

typically imposed by the union as an entity through established procedures, i.e. fine, suspension, and expulsion, indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

### *HN11*[🔻] **Labor Arbitration, Discipline, Layoffs & Terminations**

A local union's action or inaction in the processing of a grievance is not "discipline" or punishment within the meaning of the Labor-Management Reporting and Disclosure Act, *29 U.S.C.S. § 401 et seq.*

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

### *HN12*[🔻] **Statute of Limitations, Extensions & Revivals**

The United States Court of Appeals for the Fifth Circuit applies a six-month limitations period to a plaintiff's claims against his union for breach of the duty of fair representation (DFR) claims. The limitations period begins to run when the plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, the acts that form the basis of their DFR claim.

Civil Rights Law > Protection of Rights > Procedural Matters > Continuing Violations

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Continuing Violations

Labor & Employment Law > Discrimination > Actionable Discrimination

### *HN13*[🔻] **Procedural Matters, Continuing Violations**

The continuing violation theory provides that where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred. However, the United States Court of Appeals for the Fifth Circuit has noted that courts are wary to use the continuing violation doctrine to save claims outside the area of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, discrimination cases.

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Labor & Employment Law > Discrimination > Actionable Discrimination

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

### *HN14*[🔻] **Statute of Limitations, Extensions & Revivals**

The continuing violation doctrine embraces two types of cases. The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation. The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations. In contrast if the discrimination alleged is solely the result of a single violation that occurred outside the statute of limitations, the later effect of this act does not constitute a continuing

violation of the statute.

Criminal Law & Procedure > Defenses > Statute of Limitations

Labor & Employment Law > Discrimination > Actionable Discrimination

**HN15**[⬇] **Defenses, Statute of Limitations**

The question of whether a particular course of conduct constitutes a continuing violation turns on whether the practice at issue is part of, or a repetition of, a past discriminatory act, in which case there is a continuing violation, or whether it is facially neutral, simply giving effect to prior discrimination, in which case there is no continuing violation. When there is a dispute about when the actual violation occurred, the key to that inquiry is whether the original discriminatory act had the degree of permanence that should trigger an employee's awareness of and duty to assert his or her rights.

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraud

Governments > Legislation > Statute of Limitations > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraudulent Concealment

Torts > ... > Fraud & Misrepresentation > Nondisclosure > General Overview

**HN16**[⬇] **Tolling of Statute of Limitations, Fraud**

Fraudulent concealment tolls the statute of limitations when a defendant knowingly conceals facts from a plaintiff that are necessary to support his claim. The focus of the inquiry is on whether the plaintiff has exercised due diligence in seeking to learn the facts which would disclose the fraud. As a matter of law, knowledge of facts which would have ignited an inquiry by a reasonably prudent person and if pursued with reasonable diligence would have resulted in the discovery of fraud, is equivalent to knowledge of the

fraud. That inquiry parallels the "inquiry notice" requirement applied by the United States Court of Appeals for the Fifth Circuit in the context of duty of fair representation claims.

Torts > ... > Fraud & Misrepresentation > Nondisclosure > General Overview

**HN17**[⬇] **Fraud & Misrepresentation, Nondisclosure**

According to the United States Court of Appeals for the Fifth Circuit, allegations of fraudulent concealment do not free plaintiffs of their obligation to exercise reasonable diligence to discover frauds perpetrated against them once they are on notice that such acts might have occurred. The requirement of a diligent inquiry imposes an affirmative duty on a plaintiff. Although a plaintiff will not be charged with knowledge of facts fraudulently concealed simply because he has had the opportunity or power to investigate, a plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed.

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Ignorance

Governments > Legislation > Statute of Limitations > Equitable Estoppel

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Tolling

**HN18**[⬇] **Tolling of Statute of Limitations, Ignorance**

The doctrines of equitable tolling and equitable estoppel embody similar principles. The party invoking the court's equitable power to toll a statute of limitation bears the burden of presenting facts which, if true, would require a court as a matter of law to estop the defendant from asserting the statute of limitations. Explaining the difference between equitable tolling and equitable

estoppel, the United States Court of Appeals for the Fifth Circuit has stated that equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights.

Labor & Employment Law > ... > Unfair Labor Practices > Union Violations > Breach of Duty of Fair Representation

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

### HN19[↓] Union Violations, Breach of Duty of Fair Representation

The duty of fair representation arises from the grant under § 9(a) of the National Labor Relations Act (NLRA) of the union's exclusive power to represent all employees in a particular bargaining unit. The duty serves as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law. Although a breach of the duty of fair representation is an unfair labor practice, the scope of protection afforded an employee by the duty encompasses a broader category of conduct than conduct that the NLRA explicitly defines as unfair labor practices.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Governments > Fiduciaries

Labor & Employment Law > Collective Bargaining & Labor Relations > Bargaining Units

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

### HN20[↓] Labor Arbitration, Discipline, Layoffs & Terminations

Pursuant to the doctrine of fair representation, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Additionally, analogizing the duty of fair representation to the duty owed by other fiduciaries to their beneficiaries, the United States Supreme Court has held that a union owes employees a duty to represent them adequately as well as honestly and in good faith. Accordingly, to sustain a claim for breach of the duty of fair representation, an employee must demonstrate that the union's conduct is arbitrary, discriminatory, or in bad faith, or that the union discharged its duties in a perfunctory manner. When acting in its representative capacity, a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational.

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN21[↓] Labor Arbitration, Judicial Review

Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Criminal Law & Procedure > Trials > Judicial Discretion

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

### HN22[↓] Alternative Dispute Resolution, Arbitration

A union retains substantial discretion to decide whether

and how far a grievance should be pursued. Although a union may not ignore a meritorious grievance or process it in perfunctory fashion, an individual employee does not have an absolute right to have a grievance taken to arbitration, or to any other level of the grievance process. A union's broad discretion in prosecuting grievance complaints includes not only the right to settle the dispute short of arbitration but also to refuse to initiate the first steps in the appeal procedure when it believes the grievance to be without merit. The duty of fair representation imposes an obligation on a union to investigate a grievance in good faith. Additionally, a union has an obligation to prosecute a grievance with reasonable diligence unless it decides in good faith that the grievance lacks merit or for some other reason should not be pursued. The critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process.

Contracts Law > Breach > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

Labor & Employment Law > Collective Bargaining & Labor Relations > Interpretation of Agreements

Labor & Employment Law > Employment Relationships > Employment Contracts > Breaches

**HN23**[⤓] **Contracts Law, Breach**

A court's analysis of a union's decision to change its referral system does not turn on whether the union was correct in its assessment of the impact of a judicial decision regarding the bargaining unit's contract, but only whether the union's action in response to that decision was arbitrary, discriminatory, or in bad faith. A union does not breach its duty of fair representation by rejecting an employee's interpretation of a collective bargaining agreement and failing to pursue an employee's grievance based on that interpretation unless the union's interpretation is itself arbitrary. The

issue in a case alleging a breach of the duty of fair representation based on the union's failure to process a grievance challenging the union's construction of a contract is not whether the union's interpretation of the contract was correct, but whether it was nonarbitrary. Moreover, it is well settled law that a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious.

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

**HN24**[⤓] **Collective Bargaining & Labor Relations, Duty of Fair Representation**

The United States Court of Appeals for the Fifth Circuit has recognized that the scope of the duty of fair representation is coextensive only with the union's statutory authority to act as the exclusive representative of all employees within the bargaining unit. If a union does not serve as the exclusive agent for the members of the bargaining unity with respect to a particular matter, there is no corresponding duty of fair representation.

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

**HN25**[⤓] **Collective Bargaining & Labor Relations, Duty of Fair Representation**

The duty of fair representation extends to union conduct in the context of operating a hiring hall. The union has a responsibility to exercise the authority it has to refer workers for employment in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unity have entrusted the union with the task of representing them. An improperly functioning hiring hall resembles a closed shop, with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, member of union minority groups, and operation of a closed union. Therefore, when a union wields the power of an employer in its operation of a hiring hall, the union has an increased responsibility to exercise its power fairly. If a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly increases rather than decreases.

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

HN26[↧] **Collective Bargaining & Labor Relations, Duty of Fair Representation**

The United States Court of Appeals for the Fifth Circuit has held that it is unlawful for a union to discriminate among employees for arbitrary and capricious reasons in its operation of an exclusive hiring hall. Referrals for employment made without reference to objective criteria or standards are invalid. Accordingly, a union has the duty to refrain from classifying applicants on an arbitrary basis where such arbitrary conduct affects the employment status of applicants whom the union is expected fairly to represent. Even absent an open manifestation of specific discriminatory intent, a union's departure from an established hiring hall practice may constitute a breach of the duty of fair representation if the union's conduct denied or interfered with an applicant's employment opportunities.

**Counsel:** For ALEX HEBERT, JR, LIONEL A JOHNSON, SR, CLARENCE DORSEY, ELLIOT BAILEY, IRELL WARREN, SR, NATHAN BRADLEY, plaintiffs: Suzette Peychaud Bagneris, Bagneris & LaFonta, LLC, New Orleans, LA.

For GENERAL TRUCK DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 270, defendant: Louis Leo Robein, Jr., Karen Maria Torre, Robein, Urann & Lurye, Metairie, LA.

**Judges:** LANCE M. AFRICK, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LANCE M. AFRICK

# Opinion

## <u>ORDER AND REASONS</u>

This matter is before the Court pursuant to a motion for summary judgment filed on behalf of defendant, Local 270 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers ("Union"). [1]

Plaintiffs, Alex Hebert, Jr., Lionel A. Johnson, Sr., Clarence Dorsey, Elliot Bailey, Irell Warren, Sr., and Nathan Bradley, oppose the motion. For the following reasons, defendant's motion for summary judgment is **GRANTED.**

## [*2] *FACTS AND PROCEDURAL HISTORY*

This matter arises out of a dispute between plaintiffs, six Union-represented truck drivers, and the Union pertaining to the Union's method of referring truck drivers for work on movie and television productions. The Union represents men and women in a wide variety of occupations in the greater New Orleans area, including truck drivers. The Union's business agent, Ovid P. Davis, is responsible for referring truck drivers for work on television and film productions, filming within the jurisdiction of the local, that are signatories to a collective bargaining agreement ("CBA") with the Union. [2] Davis is also responsible for handling and investigating grievances that arise from work pursuant to the CBAs. [3]

When film and television productions film in New Orleans, the producers may enter into a CBA with the Union in order to obtain qualified drivers for their productions. The productions [*3] and the Union use, subject to modifications, if any, a template referred to as the Area Standards Agreement, used nationwide for union truck driving production work. Additionally, productions filming in more than one union's jurisdiction may enter into, or agree to abide by, the Area Standards Agreement. With respect to multi-jurisdictional productions, the Union is required to adhere to the Area Standards Agreement even though a particular local may not have a written contract with the particular production. [4]

Prior to 1996, when the Area Standards Agreement was

---

judgment and motion to dismiss. *See* Rec. Doc. No. 11. Subsequent to the filing of the instant motion, the Court dismissed defendant's motion for partial summary judgment and motion to dismiss. *See* Rec. Doc. No. 47. The Court stated that the memoranda filed in connection with defendant's prior motions would be treated as supplemental memoranda to the instant motion for summary judgment. *Id.*

[2] Rec. Doc. No. 40, Ex. A., Declaration of Ovid P. Davis ("Decl. Davis"), P4.

[3] *Id.*

[1] Rec. Doc. No. 40. Prior to the instant motion for summary judgment, the Union filed a motion for partial summary

[4] *Id.* at P5.

in effect between the Union and a production, the Union referred members to the production in order of their seniority in the industry in accordance with a seniority list maintained by the Union. [5] **[*4]** Pursuant to that procedure, if a production requested five drivers, the Union sent out the five most senior available drivers. [6]

In 1996, one production company, Crescent City Pictures, Inc. ("Crescent City"), refused to hire drivers based on seniority notwithstanding the fact that they were referred to the production in seniority order. The Union, on behalf of one driver and pursuant to its agreement with Crescent City, grieved the refusal in binding arbitration [7] In connection with the arbitration proceedings, the Union argued that Crescent City was bound to hire the most senior qualified driver on the referral list and that Crescent City could only reject drivers for "just cause." [8] The arbitrator disagreed with the Union holding that there was no language in the CBA (which was modeled on the Area Standards Agreement) or related documents executed between Crescent City and the Union that obligated the production to hire the most senior driver. [9] The decision rested, in part, on language in the CBA pursuant to which a producer retained the right to reject any applicant referred by the Union. [10] Additionally, the arbitrator noted that the Union fulfilled its obligation to maintain a non-discriminatory referral **[*5]** procedure by maintaining a seniority list and providing it to productions that request job applicants. [11]

According to the Union, the Crescent City decision prompted the Union to adopt and implement a "producers preference" referral method. Pursuant to such referral method, instead of referring drivers to productions one by one in seniority order as had been done prior to 1996, the Union maintained and continues to maintain a list of its production drivers in seniority order and it provides the entire list to productions hiring

Union drivers. Upon receipt of the list, the production then selects any employees it wishes to hire from the Union list (hereinafter referred to as "Producers Preference"). [12]

 **[*6]** On June 17, 2003, plaintiffs filed the instant action claiming that the Union breached the Union's duty of fair representation by failing to refer them for production work in seniority order and failing to process their grievances pertaining to the non-seniority-based referral system, all in violation of the Labor-Management Reporting and Disclosure Act of 1959, *29 U.S.C. §§ 401-531* ("LMRDA") and section 9(a) of the Labor Management Relations Act, *29 U.S.C. § 159(a)*. [13] According to the complaint, sometime in 2002, the plaintiffs filed grievances with the Union because they were not being referred for work in seniority order and the Union refused to process their grievances. [14] The plaintiffs alleged that when they asked the Union why they were not receiving job assignments, the Union falsely informed them that the production managers of the productions had rejected them. [15] Plaintiffs claim that they were not referred to production work by the Union because they had picketed the Union, verbally criticized Union officials, and filed a lawsuit against the Union. [16] They assert that the Union's alleged failure to refer them in seniority **[*7]** order is designed to punish plaintiffs for exercising rights pursuant to the U.S. Constitution and other federal laws. [17] In briefs submitted to this Court, the plaintiffs have also raised the claim that the Producers Preference violates the Union Constitution, the Union by-laws, and internal Union rules.

On February 3, 2004, the Union filed this motion contending that (1) plaintiffs' LMRDA claims are not actionable because none of the Union's conduct complained of constitutes "discipline" within the meaning of the statute; (2) plaintiffs' claims based on the Union's breach of its duty of fair representation are time-

---

[5] *Id.* at P9.

[6] *Id.*

[7] Rec. Doc. No. 40, Ex. G., Crescent City Pictures Arbitration Decision ("Crescent Arb."), at 1.

[8] *Id.* at 4.

[9] *Id.* at 7.

[10] *Id.* at 6.

[11] *Id.* at 8.

[12] Decl. Davis, P12.

[13] *See* Rec. Doc. No. 1., Complaint ("Comp."). In the complaint, plaintiffs incorrectly cite the LMRDA as "*29 USC § 401-531*."

[14] *Id.* at P5.

[15] *Id.* at P6.

[16] *Id.* at P7.

[17] *Id.* at P9.

barred; (3) plaintiffs cannot maintain a claim for breach of the duty of fair representation with respect to productions that are not signatories to **[*8]** a CBA; and (4) plaintiffs cannot show that any of the Union's actions constitute a breach of the duty of fair representation.

## LAW AND ANALYSIS

### I. *Summary Judgment Standard*

*HN1*[↑] Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56 (c)*. *HN2*[↑] Once the moving party carries its burden pursuant to *Rule 56(c)*, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*. That burden is not satisfied by creating merely some metaphysical doubt as to the material facts, by conclusory allegations, unsubstantiated assertions or by only a scintilla of evidence. *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* **[*9]** (citations omitted). The materiality of facts is determined by "the substantive law's identification of which facts are critical and which facts are irrelevant." *Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. Therefore, a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356* (internal quotation omitted).

*HN3*[↑] In order to demonstrate that summary judgment should not lie, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*; *Auguster v. Vermillion Parish School Board, 249 F.3d 400, 402 (5th Cir. 2001).* **[*10]** A court will resolve factual controversies in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little, 37 F.3d at 1075*. The Court will not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990))*.

*HN4*[↑] The plain language of *Rule 56(c)* "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*; *Munoz v. Orr, 200 F.3d 291, 307 (5th Cir. 2000)* **[*11]** *HN5*[↑] ("A complete failure of proof as to one element requires summary judgment against the entirety of the claim")(citation omitted).

### II. *Plaintiffs' claims pursuant to the LMRDA*

The Union moves for summary judgment dismissing plaintiffs' claims pursuant to the LMRDA on the ground that plaintiffs have failed to allege acts constituting "discipline" that are actionable pursuant to *sections 101(a)(5)and 609* of the LMRDA. [18]

---

[18] The Court is cognizant that *HN6*[↑] proof that a union has infringed a member's right of free speech protected by section 101 of the LMRDA, *29 U.S.C. § 411*, may, under certain circumstances, be actionable pursuant to *section 102*, *29 U.S.C. § 412*, even if no unlawful discipline is shown. *See Guidry v. International Union of Operating Engineers, Local 406, 907 F.2d 1491, 1493 (5th Cir. 1990)*. However, in the course of at least three rounds of briefing with respect to the instant motion, plaintiffs have never disputed that, with respect to their LMRDA claims, they are proceeding solely pursuant to *sections 101(a)(5)and 609* of the Act. Therefore, the only issue presented to this Court is whether plaintiffs have sustained their summary judgment burden with respect to whether the Union's conduct constitutes unlawful "discipline."

[*12] *HN7*[⬆] *Sections 101(a)(5)and 609* of the LMRDA make it unlawful for a union to "fine, suspend, expel, or otherwise discipline" a union member for exercising any rights secured under the LMRDA. *29 U.S.C. §§ 411(a)(5)* and *529 (1998 ed.).* In *Miller v. Holden, 535 F.2d 912 (5th Cir. 1976)*, the Fifth Circuit held:

> *HN8*[⬆] ] Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

*Id. at 915.* Subsequently, in *Breininger v. Sheet Metal Workers Int'l Assn. Local No. 6, 493 U.S. 67, 90, 110 S. Ct. 424, 438, 107 L. Ed. 2d 388 (1989)*, the United States Supreme Court addressed the issue of whether the alleged failure of union officials to refer the plaintiff for employment in retaliation for the plaintiff's opposition to their leadership constituted "discipline" within the meaning of the LMRDA. The Court found that *HN9*[⬆] "by using the phrase 'otherwise discipline, [*13] ' Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *493 U.S. at 91, 110 S. Ct. at 438-39.* The Court held that "the term refers only to actions 'undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'" *Id. at 91, 110 S. Ct. at 493* (quoting *Miller v. Holden, 535 F.2d 912, 915 (5th Cir.).* "The union need not, however, invoke formal proceedings, and discipline can entail informal or summary penalties as long as adverse action against a union member is not purely 'ad hoc retaliation by individual union officers.'" *Guidry v. Int'l Union of Operating Eng'rs, Local 406 (Guidry II), 907 F.2d 1491, 1493 (5th Cir. 1990)*(citing *Breininger, 493 U.S. at 91-92, 110 S. Ct. at 439*).

In a footnote, the *Breininger* Court clarified its holding:

> We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able [*14] to circumvent *§§ 101(a)(5)and 609* by developing novel forms of penalties different from fines, suspensions, or expulsions. Even respondent acknowledges that *HN10*[⬆] ] a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules. . . . We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures[, i.e. fine, suspension, and expulsion,] indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers.

*Breininger, 493 U.S. at 92 n.15, 110 S. Ct. at 493 n.15.* (alteration supplied). The petitioner in *Breininger* "alleged only that [certain union officials] failed to refer him for employment" due to his opposition to the union leadership. *Id. at 94, 110 S. Ct. at 440.* Therefore, the petitioner failed to allege acts constituting discipline within the meaning of the Act. *Id.* In light of *Miller* and *Breininger*, the Court's task is to determine [*15] whether plaintiffs have carried their summary judgment burden by designating specific facts that demonstrate that the Union, as a collective entity and in its official capacity, penalized plaintiffs by failing to refer them for work in a way that other members in good standing were not penalized.

It is undisputed that the alleged "punishment" in this case, *i.e.,* the Union's failure to refer the plaintiffs for work in seniority order, did not result from an established union disciplinary process. Plaintiffs have failed to point to any specific facts in the record that demonstrate that the Union has taken any official action as a collective entity with respect to referring plaintiffs for production jobs which has directly penalized them in a way that separates them from other members. Similarly, plaintiffs have not presented any evidence that the Union's failure to refer them in seniority order pursuant to the Producers Preference was undertaken for the purpose of controlling plaintiffs' conduct or that it was adopted by the Union to address any violation of the union rules by plaintiffs. To the contrary, the summary judgment evidence demonstrates that the Producers Preference was [*16] adopted by the Union prior to plaintiffs' criticism and picketing and it was, in fact, the catalyst for their picketing and the subject of their grievances. [19]

---

[19] *See* Rec. Doc. No. 40, Ex. H, deposition of Alex Hebert, Jr. ("Dep. Hebert"), pp. 199-200; Ex. 1, deposition of Lionel A. Johnson, Sr. ("Dep. Johnson"), pp. 13-15, 23; Ex. J., deposition of Clarence Dorsey ("Dep. Dorsey"), pp. 14-16; Ex. K, deposition of Elliot Bailey ("Dep. Bailey"), p. 12; Ex. L., deposition of Irell Warren, Sr. ("Dep. Warren"), pp. 17-18, 28;

Plaintiffs' sole argument in support of their LMRDA claim is that *Breininger* does not apply to this case because, unlike the petitioner in that case, plaintiffs have also alleged that the Union punished them by its failure to process their grievances pertaining to the referral system. The plaintiffs argument is unavailing. *HN11*[⬆] A local union's action or inaction in the processing of a grievance is not "discipline" or punishment **[\*17]** within the meaning of the LMRDA. *Camporeale v. Airborne Freight Corp., 732 F. Supp. 358 (E.D.N.Y. 1990)* (concluding that "as a matter of law, Local 295's processing of the grievance and its determination not to pursue formal arbitration on behalf of [plaintiff] is not 'discipline' or punishment within the meaning of *section 101(a)(5)*). Accordingly, the Union is entitled to a judgment as a matter of law dismissing plaintiff's LMRDA claims.

### III. *Timeliness of Plaintiff's Duty of Fair Representation Claims*

*HN12*[⬆] The Fifth Circuit applies a six-month limitations period to a plaintiff's claims against his union for breach of the duty of fair representation ("DFR" claims). *Smith v. Int'l Org. of Masters, Mates and Pilots, 296 F.3d 380, 383 (5th Cir. 2002)*(extending the six-month limitation period applicable to "hybrid" *§ 301*/DFR claims to cases where a plaintiff only brings a DFR claim against his union); *Landry v. Air Line Pilots Ass'n Int'l, 901 F.2d 404, 411 (5th Cir. 1990)*("The six month limitation period is applicable whenever there is a DFR claim."). The limitations period begins to run when the plaintiffs discovered, **[\*18]** or in the exercise of reasonable diligence should have discovered, the acts that form the basis of their DFR claim. *See Barrow v. New Orleans Steamship Assoc. (Barrow I), 10 F.3d 292, 300 (5th Cir. 1994)*; *Wood v. Houston Belt & Terminal Ry., 958 F.2d 95, 97 (5th Cir. 1992)*; *Landry, 901 F.2d at 413*; *Barrett v. Ebasco Constructors, Inc., 868 F.2d 170, 171 (5th Cir. 1989)*.

The instant action was filed on June 17, 2003. Therefore, although there is a dispute about when plaintiffs' claims accrued, it is undisputed that claims which accrued subsequent to December 17, 2002, are timely. As discussed below, plaintiffs have argued that the Union has breached its duty of fair representation in two distinct ways, each requiring a separate timeliness analysis. First, plaintiffs claim that the Union's adoption of the Producers Preference violated the Union's duty of fair representation because it was adopted in

contravention of the Union Constitution, the Union by-laws, and the Union's local rules governing referrals. Second, plaintiffs claim that, even assuming that the Producers Preference is valid, the referral system is being **[\*19]** arbitrarily and discriminatorily applied to them in retaliation for their criticism of the Union.

### A. Plaintiffs' Claims Challenging the Producers Preference

With respect to productions dating back to 1997 and continuing until Spring, 2003, plaintiffs seek to recover damages for the Union's alleged failure to refer them in seniority order. Additionally, although plaintiffs have never amended their complaint, plaintiffs' submissions to this Court suggest that they also seek to recover damages pertaining to non-seniority based referrals occurring during the pendency of this litigation. Plaintiffs argue that since the Crescent City arbitration decision in 1996, the Union has been engaging in a continuing violation and, therefore, because some of plaintiffs' claims pertain to referrals that occurred within the limitations period, all of their claims are timely. Defendants argue that all of plaintiffs' claims are time-barred because, to the extent that plaintiffs' claims are challenging the adoption of the Producers Preference and are premised on repeated applications of that referral system, plaintiffs' claims accrued when the Union adopted that referral system in 1996.

*HN13*[⬆] "The continuing **[\*20]** violation theory provides that where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred." *McGregor v. Louisiana State Univ. Bd. of Supervisors, 3 F.3d 850, 866 (5th Cir. 1993)*. However, the Fifth Circuit has noted that "courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases." *Id.* at n.27. Assuming, *arguendo,* that the continuing violations could ever apply in the context of a DFR claim, the Court agrees with the Union that plaintiffs' claims premised on the alleged illegality of the adoption of the Producers Preference and subsequent applications of that non-seniority based referral system are untimely.

In the context of discrimination claims, the Fifth Circuit has explained the continuing violations doctrine as follows:

> *HN14*[⬆] The continuing violation doctrine embraces two types of cases. The first includes cases in which the original violation occurred

---

Ex. M. deposition of Nathan Bradley ("Dep. Bradley"), pp. 13-16.

outside the statute of limitations, but is closely related to other violations that are not time-barred. In **[\*21]** such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation.

The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations.

. . .

In contrast . . . if the discrimination alleged is solely the result of a single violation that occurred outside the statute of limitations, the later effect of this act does not constitute a continuing violation of the statute.

*Hendrix v. City of Yazoo City, Miss., 911 F.2d 1102, 1103-04 (5th Cir. 1990)*(footnotes and citations omitted). **HN15**[⬆] The question of whether a particular course of conduct constitutes a continuing violation turns on "whether the practice at issue is part of, or a repetition of, a past discriminatory act, in which case there is a continuing violation, or whether it is facially neutral, simply giving effect to prior discrimination, in which case there is no continuing violation." *Id. at 1104*. The **[\*22]** *Hendrix* Court concluded that when there is a dispute about when the actual violation occurred, the key to that inquiry is "whether the original discriminatory act had 'the degree of permanence that should trigger an employee's awareness of and duty to assert his or her rights.'" *Id.* (quoting *Berry v. Bd. of Supervisors, 715 F.2d 971, 981 (5th Cir. 1983)*; *Glass v. Petro-Tex Chem. Corp., 757 F.2d 1554, 1561 n.5 (5th Cir. 1985)*(noting that whether particular conduct had the degree of permanence sufficient to alert a plaintiff to assert his rights embodies the "core idea" of the continuing violations doctrine).

In *Barrow v. New Orleans Steamship Assoc., 932 F.2d 473 (5th Cir. 1991)*, the plaintiff brought an age discrimination claim and a DFR claim against his union based upon an allegedly discriminatory seniority system adopted in violation of a collective bargaining agreement that altered his seniority rights and affected his ability to secure work. *Id. at 475*. In the context of his discrimination claim, the Union argued that any claims based upon the allegedly unlawful adoption and subsequent applications of **[\*23]** a seniority system accrued when the system was adopted. *Id. at 477*. The Fifth Circuit agreed with the defendants holding that the adoption of a new seniority system triggers the limitations period "regardless of when the effects of such a system are actually felt." *Id. at 477-78*; *see also Lorance v. AT&T Tech., Inc., 490 U.S. 900, 909, 109 S. Ct. 2261, 2267, 104 L. Ed. 2d 961 (1989)*(holding that the limitations period for a Title VII claim challenging a discriminatory seniority system "will run from the date the system was adopted"); *Hendrix v. City of Yazoo City, Miss., 911 F.2d 1102, 1104 (5th Cir. 1990)*("The discriminatory adoption of a facially neutral seniority system [is] a single violation triggering the statute of limitations, rather than a continuing violation renewed with each [application]")(citing *Lorance, 490 U.S. at 909, 109 S. Ct. at 2266-67*). The *Barrow* court then held that plaintiffs' DFR claim based upon the seniority system was also untimely because plaintiff's own testimony demonstrated that the plaintiff knew two years prior to filing the lawsuit that the seniority system **[\*24]** would have an adverse effect on him. *See id. at 480*.

Applying these cases, the Court concludes that plaintiffs' claims challenging the validity of the adoption of the Producers Preference and all claims based upon subsequent applications of that referral procedure do not constitute a continuing violation. The original unlawful action, even according to plaintiffs' theory, is the Union's allegedly illegal adoption of the Producers Preference. Plaintiffs claims rests on the argument that, although the Producers Preference was arguably valid in the context of the Crescent City dispute, the Union was bound to put any change of referral procedure before the membership and allow the membership to vote on whether to adopt that system prior to applying the system to referrals for other productions.

Plaintiffs do not argue that the Producers Preference is independently arbitrary or discriminatory. Instead, the plaintiffs' theory rests on the illegality of the method by which the Producers Preference was initially adopted. Once the Union made its decision to implement the Crescent City decision without putting such a decision to a vote, the claimed breach of the duty of fair representation **[\*25]** was complete. As such, subsequent applications of the Producers Preference merely gave effect to the original violation.

Furthermore, the undisputed summary judgment evidence demonstrates that the adoption of the Producers Preference had the "degree of permanence" that not only should have, but did in fact, trigger

plaintiffs' awareness of and duty to assert their rights. Two of the plaintiffs, Hebert and Johnson, admitted explicitly that they knew of the Crescent City decision and that subsequent to that decision they were not being referred for work in seniority order. [20] Moreover, all the plaintiffs first picketed the Union over the referral issue in 1997 and, since 2000, have filed numerous grievances over the Union's failure to refer them in seniority order. [21] Furthermore, plaintiffs began consulting attorneys with respect to filing a lawsuit pertaining to the seniority referral issue in 2000. [22] In December, 2001, Hebert filed, on behalf of himself and the other named plaintiffs in this lawsuit, an unfair labor practice charge with the National Labor Relations Board raising precisely the same issues raised here with respect to how the Producers Preference allegedly violated [*26] various Union rules. [23] Accordingly, viewing the facts in the light most favorable to the plaintiffs, the Court concludes that even if plaintiffs were not aware of the facts necessary to support their claims when the Producers Preference was adopted, the very latest that plaintiffs' claims accrued was December, 2001, approximately a year and one-half prior to the filing of the instant lawsuit. Therefore to the extent that plaintiffs claim that the Producers Preference violates the Union Constitution, by-laws, and internal Union rules, those claims, as well as claims predicated upon subsequent applications of the Producers Preference, are untimely.

[*27] B. Plaintiffs' Claims of Arbitrary and Discriminatory Referrals

In their submissions to this Court, plaintiffs have also claimed that since 1997, the Union has not been including their names at all on the seniority list sent to producers and/or manipulating the referral procedure to their detriment. As alleged in the complaint, plaintiffs claim that the hiring hall procedures are being discriminatorily and arbitrarily applied to them due to their repeated criticism of Union leadership and the referral procedures employed by the Union. [24] This category of claims is distinct from a direct challenge to the alleged illegal adoption of the Producers Preference and its subsequent "neutral" applications. See Barrow, 932 F.2d at 479, 480 (distinguishing between claims directly challenging the discriminatory adoption of a seniority system and its subsequent facially neutral applications from claims alleging discriminatory application of that seniority system). Because such claims are not tied to a direct challenge to the validity of the Producers Preference, claims that the Producers Preference has been discriminatorily and arbitrarily applied to plaintiffs are not time-barred [*28] for those referrals occurring subsequent to December 17, 2002.

With respect to this category of claims, plaintiffs argue that their claims pertaining to referrals occurring prior to December 17, 2002, are timely pursuant to equitable tolling, equitable estoppel, and the doctrine of fraudulent concealment. They maintain that the statute of limitations should be tolled because the Union actively misled them about why they were not being hired for work. According to the plaintiffs' affidavit, the Union falsely told them that their names had been submitted to the producers, ostensibly pursuant to the Producers Preference, and that the producers had "rejected" them and selected other drivers on the list, many of whom had less seniority than plaintiffs. [25] Plaintiffs reason that all of their claims are timely because they relied on the Union's false statements that they were being referred pursuant to the Producers Preference and, therefore, all of their claims dating back to 1996 are timely.

[*29] HN16[↑] Fraudulent concealment tolls the statute of limitations when a defendant knowingly conceals facts from a plaintiff that are necessary to support his claim. See L.C.L. Theatres, Inc. v. Columbia Pictures Indus., 566 F.2d 494, 496 (5th Cir. 1978)(applying Texas law); Berry v. Allstate Ins. Co., 252 F. Supp.2d 336, 343 (E.D.Tex. 2003)(citing L.C.L Theatres in the context of an ERISA claim). The focus of the inquiry is on whether the plaintiff has exercised due diligence in seeking to learn the facts which would disclose the fraud. See L.C.L. Theatres, 566 F.2d at 496 ("As a matter of law, knowledge of facts which would have ignited an inquiry by a reasonably prudent person and if pursued with reasonable diligence would have resulted in the discovery of fraud, is equivalent to

---

20 Dep. Hebert, pp. 91-92; Rec. Doc. No. 52, Ex. E., Aff. Hebert, PP3-7; Ex. F., Aff. Johnson, PP3-7.

21 See id. at pp. 9-11, 200; Dep. Johnson, pp. 28, 50, 54-56; Dep. Warren, pp. 17, 20-24, 28-33; Dep. Bailey, pp. 5-10; Dep. Dorsey, pp. 24-27; Dep. Bradley, pp. 23-28. S Rec. Doc. No. 44, Ex. D, plaintiffs' group affidavit, p. 2;

22 Dep. Hebert, pp. 185-193.

23 Rec. Doc. No. 40, Ex. Q., NLRB charge and amendments.

24 Comp. PP7-9.

25 Rec. Doc. No. 44, Ex. D., Plaintiffs' collective affidavit, at p. 2.

knowledge of the fraud."). That inquiry parallels the "inquiry notice" requirement applied by the Fifth Circuit in the context of DFR claims. As stated by the Fifth Circuit, *HN17*[↑] "allegations of fraudulent concealment do not free plaintiffs of their obligation to exercise reasonable diligence to discover frauds perpetrated against them once they are on notice that [*30] such acts might have occurred." *Landry, 901 F.2d at 412-413*. The requirement of a diligent inquiry imposes an affirmative duty on a plaintiff. *Id. at 413 n.16* (quoting *Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir. 1988))*. Although a plaintiff will not be charged with knowledge of facts fraudulently concealed simply because he has had the opportunity or power to investigate, *L.C.L. Theatres, 566 F.2d at 497*, "[a] plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed." *Landry, 901 F.2d at 413 n.16* (citation omitted). Therefore, to defeat summary judgment, plaintiffs must come forward with specific facts demonstrating not only that the Union concealed that their names had not been submitted to the producers, but additionally, they must show that the Union's concealment was successful, *i.e.*, that the Union's concealment prevented plaintiffs from ascertaining facts which would put a reasonably prudent person on [*31] notice to investigate further.

*HN18*[↑] The doctrines of equitable tolling and equitable estoppel embody similar principles. The party invoking the Courts equitable power to toll a statute of limitation bears the burden of "presenting facts 'which, if true, would require a court as a matter of law to estop the defendant from asserting the statute of limitations.'" *McGregor, 3 F.3d at 865* (quoting *Begay v. Hodel, 730 F. Supp. 1001, 1011 (D.Ariz. 1990)*; *see Teemac v. Henderson, 298 F.3d 452, 457 (5th Cir. 2002)*; *Rhodes v. Guiberson Oil Tools Div., 927 F.2d 876, 879 (5th Cir. 1991)*. Explaining the difference between equitable tolling and equitable estoppel, the Fifth Circuit has stated that "'Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights." *Rhodes, 927 F.2d at 878*. Because plaintiffs' claims focus on the Union's alleged concealment of the reason that plaintiffs were not hired, the Court will [*32] analyze plaintiffs' claim pursuant to equitable estoppel principles. *See id. at 879* (applying the doctrine of equitable estoppel instead of equitable tolling where plaintiff claimed that his lawsuit was untimely because

defendant misled his about the reasons for discharge). To avoid summary judgment on claims pertaining to referrals occurring prior to December 17, 2002, plaintiffs must come forward with facts demonstrating that the Union misled them about the true reason they were not being hired. The statute of limitations is then tolled until the plaintiffs either knew or should have discovered the misrepresentation or concealment that caused the delay. *See id.*

As noted above, the plaintiffs attested that Davis, the Union business agent, affirmatively represented to them that they were being referred to the production companies and "rejected" by the producers. Assuming, *arguendo*, that plaintiffs can establish that the Union's representations were, in fact, untrue, and viewing the summary judgment evidence in the light most favorable to the plaintiff, the Court concludes that the plaintiffs were put on inquiry notice, if not actual notice, of their claims [*33] no later than sometime in the latter half of 2001. As noted above, plaintiffs filed a grievance with the National Labor Relations Board on July 30, 2001. [26] In that complaint, plaintiffs not only challenged the seniority referral system. They also alleged that the Union had applied the hiring hall system in a discriminatory manner by failing and/or refusing to refer plaintiffs for work. [27] Notwithstanding the NLRB's determination that plaintiffs had, in fact, been referred (and simply not selected), plaintiffs pursued their action by consulting at least two attorneys with respect to the claims presented here. [28] Given this undisputed evidence, even assuming that the Union's business agent had falsely represented to plaintiffs that they were being referred and "rejected", plaintiffs have failed to point to any evidence that even suggests that they were not aware of their legal rights or their ability to institute a legal action. The unrebutted summary judgment evidence clearly demonstrates that plaintiffs were aware that they were not being hired for jobs and that notwithstanding any representations the Union may have made regarding the reasons for their inability to secure employment, [*34] plaintiffs actively filed and pursued grievances with respect to referrals and took steps to pursue a legal action (short of timely filing a lawsuit) with respect to their claims.

Because plaintiffs' own actions are fatal to their claim

---

[26] Rec. Doc. No. 40, Ex. Q., NLRB charge and amendments.

[27] *Id.*

[28] *Id.*, Dep. Hebert, at pp. 185-93.

that they were induced to forego their legal rights by relying on the Union's alleged misrepresentation, there is no basis on which to estop the Union from asserting the statute of limitations. Accordingly, plaintiffs' claims that the Union failed or refused to refer them for employment and/or influenced producers to hire other drivers are time-barred to the extent that they implicate referrals made prior to December 17, 2002.

IV. *Duty of Fair Representation*

HN19[↑] The duty of fair representation arises from "the grant under *§ 9(a)* of the [*National Labor Relations Act ("NLRA")*] of the union's exclusive power to represent all employees in a particular bargaining [*35] unit." *Breininger, 493 U.S. at 87*; *110 S. Ct. at 436*; *Bache v. Am. Tel. & Tel., 840 F.2d 283, 287 (5th Cir. 1988)*(noting that an employee's cause of action is implied from the statutory scheme of federal labor law). The duty serves "as a 'bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.'" *Breininger, 493 U.S. at 87, 110 S. Ct. at 436* (quoting *Vaca v. Sipes, 386 U.S. 171, 182, 87 S. Ct. 903, 912, 17 L. Ed. 2d 842 (1966)*. Although a breach of the duty of fair representation is an unfair labor practice, *id.; Reed v. United Transp. Union, 488 U.S. 319, 328, 109 S. Ct. 621, 627, 102 L. Ed. 2d 665 (1989)*; *Hammons v. Adams, 783 F.2d 597, 601 (5th Cir. 1986)*, the scope of protection afforded an employee by the duty encompasses a broader category of conduct than conduct that the NLRA explicitly defines as unfair labor practices. *Breininger, 493 U.S. at 87, 110 S. Ct. at 436*.

HN20[↑] Pursuant to this doctrine, "the exclusive agent's statutory authority to represent all members [*36] of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca, 386 U.S. at 177, 87 S. Ct. at 910*; *see also Hammons, 783 F.2d at 601*. Additionally, analogizing the duty of fair representation to the duty owed by other fiduciaries to their beneficiaries, the Supreme Court has held that "a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Assoc., Int'l v. O'Neill, 499 U.S. 65, 75, 111 S. Ct. 1127, 1134, 113 L. Ed. 2d 51 (1991)*. Accordingly, to sustain a claim for breach of the duty of fair representation, an employee "must demonstrate that the union's conduct is 'arbitrary, discriminatory, or in bad faith,' or that the union discharged its duties in a perfunctory manner."

*Grovner v. Georgia-Pacific Corp., 625 F.2d 1289, 1290 (5th Cir. 1980)*(internal and final citation omitted). When acting in its representative capacity, "a union's actions are arbitrary only if, in light of the factual [*37] and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness', as to be irrational." *O'Neill, 499 U.S. at 67, 111 S. Ct. at 1130* (quoting *Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S. Ct. 681, 686, 97 L. Ed. 1048 (1953))*. In assessing the reasonableness of a union's representation of a bargaining unit, the Supreme Court has instructed:

> HN21[↑] Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.

*O'Neill, 499 U.S. at 78, 111 S. Ct. at 1135*.

A. Failure to process grievances

Plaintiffs claim that the Union breached its duty of fair representation by failing to process their grievances with respect [*38] to the seniority referral issue. Defendant argues that its decision to implement the Crescent City decision by referring members *en masse,* instead of one by one in seniority order, was reasonable and any attempt to re-arbitrate the decision would have been, in its estimation, fruitless. [29]

HN22[↑] A union retains substantial discretion to decide whether and how far a grievance should be pursued. *See Vaca, 386 U.S. at 191, 87 S. Ct. at 917*; *Landry v. Cooper/T.Smith Stevedoring Co., Inc., 880 F.2d 846, 852 (5th Cir. 1989)*; *Bache, 840 F.2d at 289-90*; *Hammons, 783 F.2d at 601*. Although a union may not ignore a meritorious grievance or process it in perfunctory fashion, *Vaca, 386 U.S. at 191, 87 S. Ct. at 917*; *Hammons, 783 F.2d at 601*, [*39] an individual employee does not have an absolute right to have a grievance taken to arbitration, *Vaca, 386 U.S. at 191, 87*

---

[29] The Union did not move for summary judgment on the ground that plaintiffs' DFR claims with respect to processing of grievances were untimely. Accordingly, the Court addresses those claims on the merits.

*S. Ct. at 917*, or to any other level of the grievance process. *Cooper/T.Smith Stevedoring, 880 F.2d at 852* (citation omitted); *Turner v. Air Transport Dispatchers Asso., 468 F.2d 297, 299 (5th Cir. 1972)*("A union's broad discretion in prosecuting grievance complaints includes not only the right to settle the dispute short of arbitration but also to refuse to initiate the first steps in the appeal procedure when it believes the grievance to be without merit."). The duty of fair representation imposes an obligation on a union to investigate a grievance in good faith. *Cooper/T.Smith Stevedoring, 880 F.2d at 852* (citing *Abilene Sheet Metal, Inc. v. N.L.R.B., 619 F.2d 332, 347 (5th Cir. 1980))*. Additionally, a union has "an obligation to prosecute a grievance 'with reasonable diligence unless it decide[s] in good faith that the grievance lack[s] merit or for some other reason should not be pursued.'" *Id.* (quoting *Hammons, 783 F.2d at 602*)(alteration supplied). **[*40]** "The critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process." *Id.* (citation omitted).

The Union contends that its decision not to pursue plaintiffs' grievances and rearbitrate the seniority referral issue was based on its determination, in light of the Crescent City decision, that it would not prevail on the matter a second time. The union business agent attested that the Union determined that contesting the issue again would have wasted resources and may have resulted in the loss of future productions coming to New Orleans by making the Union appear unduly contentious. [30]

In *Stanley v. Gen. Foods Corp., Maxwell House Div., 508 F.2d 274 (5th Cir. 1975)*(per curiam), the Fifth Circuit held that a union met its obligation of fair representation by pursuing a grievance pertaining to an employer's absentee procedure until the employer's procedure was upheld **[*41]** in a separate arbitration. *Id. at 275*. The Fifth Circuit concluded that because the union had pursued the grievance to a point that it determined further action would have been fruitless, the court could not say that the union's conduct was discriminatory or unfair. *Id.*

In the Crescent City arbitration, the Union pressed the arguments that plaintiffs raise in this case. Specifically, the Union argued that the producer had to accept potential employees for productions as referred by the Union in the order of their seniority and that any

rejection of the employees referred must be for "just cause." [31] The arbitrator clearly rejected those arguments. Plaintiffs imply that the Crescent City decision was not a reasonable basis for the Union's decision not to pursue their grievances because that decision only decided that the productions did not have to *hire* in seniority order. Although plaintiffs do not dispute that the producers are not obligated to hire in seniority order, they maintain that according to local union rules, the Union was always bound to *refer* them in seniority order and to require that the producers to reject them for "just cause." Notwithstanding **[*42]** the arbitrator's decision that a producer did not need to have "just cause" in order to decline to hire a union worker, [32] plaintiffs' argument simply misses the point. **HN23**[↑] This Court's analysis of the Union's decision to change its referral system does not turn on whether the Union was correct in its assessment of the impact of the Crescent City decision, but only whether the Union's action in response to that decision was arbitrary, discriminatory, or in bad faith. *Cf. Bache, 840 F.2d at 291* (holding that a union does not breach its duty of fair representation by rejecting an employee's interpretation of a collective bargaining agreement and failing to pursue an employee's grievance based on that interpretation unless the union's interpretation is itself arbitrary); *Tedford v. Peabody Coal Co., 533 F.2d 952, 957 (5th Cir. 1976)*(stating that the issue in a case alleging a breach of the duty of fair representation based on the union's failure to process a grievance challenging the union's construction of a contract is not whether the union's interpretation of the contract was correct, but whether it was nonarbitrary). Moreover, it is well settled law **[*43]** that a "breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." *Vaca, 386 U.S. at 195, 87 S. Ct. at 919*; *Freeman v. O'Neal Steel, Inc., 609 F.2d 1123, 1126 (5th Cir. 1980)*("It is settled law that a breach of the fair representation duty cannot be based on the trial court's view regarding the probability of success on the merits of the grievance."); *Turner, 486 F.2d at 299*.

Other than the fact that the Union failed to process their grievances, the plaintiffs' have submitted no summary judgment evidence demonstrating that the Union's decision to forego pursuing their grievances in light of the Crescent City decision constituted bad faith, arbitrary, discriminatory, or unreasonable action.

---

[30] Decl. Davis, P16-18.

[31] Crescent Arb., at pp. 3-5.

[32] *Id.* at 9.

Moreover, this Court cannot conclude that the Union's decision to apply the Crescent City decision as it did was unreasonable or arbitrary. To the extent **[*44]** that plaintiffs' claim that the Union failed to investigate their claims that the Union was refusing to refer them at all, those claims also fail for lack of proof. There is no summary judgment evidence before the Court demonstrating what decision the Union made with respect to those grievances or what, if any, investigation of those claims was undertaken by the Union. Absent such evidence, there is no factual basis on which this Court can analyze the Union's conduct. The sum total of plaintiffs' evidence is that the grievances were lodged and were not taken to arbitration or did not result in the plaintiffs being employed. Such evidence is insufficient to raise a genuine issue of material fact with respect to whether the Union's handling of their grievances was arbitrary, discriminatory, or in bad faith. *See Bache, 840 F.2d at 292* (holding that plaintiffs' conclusory statements that grievances have been presented to a union and that the union has failed to proceed with the grievance process are insufficient to create a genuine issue of material fact on summary judgment). Because plaintiffs have failed to meet their summary judgment burden with respect to their grievance-processing **[*45]** claims, the Union is entitled to a judgment as a matter of law with respect to those claims.

B. Plaintiffs' claims pertaining to *Spirit, Scoundrel's Wife, Behind the Sun, and Monster's Ball.*

*HN24*[⬆] The Fifth Circuit has recognized that "the scope of the duty of fair representation is coextensive only with the union's statutory authority to act as the exclusive representative of all employees within the bargaining unit. If a union does not serve as the exclusive agent for the members of the bargaining unity with respect to a particular matter, there is no corresponding duty of fair representation." *Barrett, 868 F.2d at 171*.

The Union's business agent attested that the Union did not refer anyone to the productions *Spirit, Scoundrel's Wife, Behind the Sun,* or *Monster's Ball* because those productions were not parties to a CBA with the Union or any other Teamster local. Plaintiffs have offered no evidence that these productions were signatory to a CBA such that the Union owed them a duty of fair representation with respect to those productions. Accordingly, there is no genuine issue for trial with respect to plaintiffs' claims based upon referrals for those productions.

**[*46]** C. Plaintiffs' Referral Claims

In *Breininger,* the Supreme Court held that *HN25*[⬆] the duty of fair representation extends to union conduct in the context of operating a hiring hall. *493 U.S. at 87-89, 110 S. Ct. at 436-38.* The union has a responsibility to exercise the authority it has to refer workers for employment "in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unity have entrusted the union with the task of representing them." *Id. at 88, 110 S. Ct. at 437.* "An improperly functioning hiring hall [] resembles a closed shop, 'with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, member of union minority groups, and operation of a closed union.'" *Id. at 89, 110 S. Ct. at 437.* Therefore, when a union wields the power of an employer in its operation of a hiring hall, the union has an increased responsibility to exercise its power fairly. *Id.* ("If a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly *increases* rather than *decreases.*")(italics **[*47]** in original).

*HN26*[⬆] The Fifth Circuit has held that it is unlawful for a union to discriminate among employees for arbitrary and capricious reasons in its operation of an exclusive hiring hall. *N.L.R.B. v. Gen. Truckdrivers, Warehousemen and Housemen and Helpers, 778 F.2d 207, 213 (5th Cir. 1985).* Referrals for employment made "without reference to objective criteria or standards are invalid." *Id.* (citing *Teamsters, Local 174 (Totem Beverages, Inc.), 226 N.L.R.B. 690 (1976)*. Accordingly, "a union has the duty to refrain from classifying applicants on an arbitrary basis where such arbitrary conduct affects the employment status of applicants whom the union is expected fairly to represent." *Id.* Even absent an open manifestation of specific discriminatory intent, a union's departure from an established hiring hall practice may constitute a breach of the duty of fair representation if the union's conduct denied or interfered with an applicant's employment opportunities. *See Int'l Union of Operating Eng'rs Local 406, AFL-CIO v. NLRB, 701 F.2d 504, 510 (5th Cir. 1983).*

As noted above, apart from their **[*48]** claims that they were not referred in seniority order pursuant to the Producers Preference, plaintiffs' claims that the Union manipulated the Producers Preference to deny plaintiffs' the opportunity to be fairly considered by prospective employers are timely to the extent that such claims

accrued subsequent to December 17, 2002. In their briefs submitted to this Court, the plaintiffs have identified *Playmaker, Unchain My Heart,* and *A Love Song for Bobby Long* as the productions upon which their timely claims are based. The Union admits that referrals were made for these productions. [33] [*49] Additionally, as explained above, the Union maintains that pursuant to the Producers Preference, the Union submitted a referral list, containing 72 names, to the productions and that the production companies selected the employees they wished to hire from that list. Further, the Union asserts that it did not recommend specific workers beyond supplying the referral list to the producers. [34]

Plaintiffs argue that a genuine issue of material fact exists with respect to whether the Union is, in fact, following the procedure the Union describes. William Pitts, the transportation coordinator for the production of *Playmaker,* testified that prior to going to a new location for a production, he routinely consults with other transportation coordinators to obtain recommendations for drivers in the area. [35] Pitts stated that he received a referral list from the Union's business agent, O.P. Davis, and selected three employees from that list for employment. [36] However, the summary judgment evidence demonstrates that the names of two of the employees that Pitts testified he hired do not appear on the official list that the Union contends it submitted. [37] [*51] Pitts further testified that he no longer has the

---

[33] *See* Rec. Doc. No. 44, Ex. E, deposition of William Pitts ("Dep. Pitts"), defendant's supplemental response to plaintiff's interrogatories ("Def. Ans. Interrog.") attached as Ex. 2.

[34] Decl. Davis, PP12-13.

[35] Dep. Pitts, pp. 58-60. A transportation coordinator is an individual who is hired by the producer or production company to oversee the transportation department of a particular production. The duties of the position include hiring union truck drivers. Although a transportation coordinator may be a member of a union, the transportation coordinator is not operating pursuant to a union contract. *See* Dep. Pitts, pp. 5, 56; Rec. Doc. No. 55, Ex. 5, deposition of Poland Perkins, pp. 29-30.

[36] Dep. Pitts, at pp. 24-29.

[37] The Union's answers to plaintiffs' interrogatories state that four individuals, Jack Daniels, Dan Sumner, Calvin Wetherspoon, and Kenneth Baraby, were selected by the producers of *Playmaker* for employment. Def. Ans. Interrog., at p. 3. Pitts testified that he did not know or hire Baraby as a driver on that production. Dep. Pitts., pp. 24-25. The Union

---

list provided to him for the production of *Playmakers.* [38] Plaintiffs argue that the "obvious" conclusion to be drawn from Pitts' testimony is that the Union submitted a list that did not contain the plaintiffs' names and, therefore, the Union has manipulated [*50] the hiring hall process and interfered with their employment opportunities.

The plaintiffs' argument is unpersuasive because it rests on false logic. Although Pitts' testimony would permit a rational trier of fact to conclude that the Union improperly *included* some names, Pitts' testimony does not support an inference that plaintiffs' were *excluded* from the list. Absent such evidence, even if plaintiffs' could prove that the Union derogated from the hiring hall procedure, plaintiffs cannot prove that the Union's conduct affected their employment status or denied them an employment opportunity.

Plaintiffs' claims with respect to *A Love Song for Bobby Long* and *Unchain My Heart* are also not supported by adequate summary judgment evidence. In support of these claims, plaintiffs submit the production crew rosters of eight productions dating back to 1996. [39] The rosters for six of the productions demonstrate that plaintiffs were not selected for employment for those productions. From this bare fact, plaintiffs argue that the Union must have manipulated the hiring hall procedure because (1) persons with less seniority were hired; and [*52] (2) absent suggestion or influence from the union, a production company would not automatically choose persons with less seniority in lieu of plaintiffs. From these two suppositions, plaintiffs reason that the Union must have breached its duty to represent them

---

movie referral list does not contain the names of Dan Sumner or Calvin Wetherspoon. Rec. Doc. No. 44, Ex. C., movie referral list dated December 30, 1996. It is uncontested that the December 30, 1996, list is the most current seniority list the Union uses.

[38] Dep. Pitts, p. 30.

[39] Rec. Doc. No. 52, Exs. H-O. Although the Court has found that the plaintiffs' claims with respect to several of these productions is time-barred, plaintiffs may nevertheless introduce evidence of time-barred conduct as "background evidence in support of a timely claim." *AMTRAK v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002)*(applying the principle in the context of a Title VII discrimination claim). Accordingly, for purposes of the instant motion, this Court may consider the Union's conduct with respect to those productions in assessing whether a genuine issue of material fact exists to preclude summary judgment on plaintiffs' timely claims.

fairly in making referrals.

In response, the **[*53]** Union offers the deposition testimony of Poland Perkins, the transportation coordinator for seven of the productions cited by plaintiffs in support of their claims. Perkins testified that as a transportation coordinator, he often hires drivers who he has hired in the past who have done a good job. [40] Furthermore, the summary judgment evidence demonstrates that all of the drivers hired to work on those productions were members of the Union whose names appear on the referral list. Plaintiffs have not come forward with any evidence that would permit a reasonable trier of fact to infer that the Union did not submit the seniority referral list containing their names to any of the productions nor have plaintiffs come forward with any evidence to support their contention that the Union recommended other drivers.

 **[*54]** Plaintiffs have offered no evidence that they were denied any employment opportunities. Instead, they offer an unsubstantiated assertion that because they were not ultimately hired, the Union must have breached its duty of fair representation. Such a conclusory allegation is clearly insufficient to sustain plaintiffs' burden of production on summary judgment.

Accordingly, for the above and foregoing reasons,

**IT IS ORDERED** that the motion of defendant, Local 270 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers, is **GRANTED** and plaintiff's claims are **DISMISSED** with prejudice.

New Orleans, Louisiana, July 15, 2004.


**LANCE M. AFRICK**

**UNITED STATES DISTRICT JUDGE**

---

End of Document

---

[40] *See* Dep. Perkins, pp. 43-45. Although plaintiffs' have made a vague allegation that Perkins is a "pawn" of the Union, they offer no serious argument that Perkins' subjective conduct in hiring drivers in his capacity as a non-union transportation coordinator is attributable to the Union.

*Lalo LLC v. Hawk Apparel, Inc.*, 2022 U.S. Dist. LEXIS 72218, 2022 WL 1173801 at *5-7 (N.D. Tex. 2022) (J. Lindsay)

 Neutral
As of: October 6, 2022 8:50 PM Z

# *Lalo, LLC v. Hawk Apparel, Inc.*

United States District Court for the Northern District of Texas, Dallas Division

April 20, 2022, Decided; April 20, 2022, Filed

Civil Action No. 3:18-cv-2502-L

**Reporter**
2022 U.S. Dist. LEXIS 72218 *; 2022 WL 1173801

LALO, LLC, Plaintiff, v. HAWK APPAREL, INC. and ERNEST "ERIC" COLTON, JR, Defendants.

**Prior History:** *LALO, LLC v. Hawk Apparel, Inc., 2019 U.S. Dist. LEXIS 187748, 2019 WL 5595164 (N.D. Tex., Oct. 30, 2019)*

## Core Terms

arbitrator, arbitration award, confirm, vacate, postjudgment interest, attorney's fees, parties, prejudgment interest, arbitrator exceeded, operating agreement, percent per annum, prejudgment, damages, per annum, challenges, post-award, jointly

**Counsel:** **[*1]** For LALO LLC, Plaintiff: Lindy D Jones, LEAD ATTORNEY, Jones Allen & Fuquay, Dallas, TX; Kevin John Allen, Nathan Allen, Jr, Ty J Jones, Jones Allen & Fuquay LLP, Dallas, TX.

Ernest Colton, Jr, Eric, Defendant, Pro se, Dallas, TX.

**Judges:** Sam A. Lindsay, United States District Judge.

**Opinion by:** Sam A. Lindsay

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff LALO, LLC's ("Plaintiff") Application to Confirm Arbitration Award ("Application") (Doc. 1), which seeks to confirm the award issued by Arbitrator Hon. Anne Ashby with the American Arbitration Association ("AAA") on May 7, 2018 ("Final Award") in *Hawk Apparel, Inc. and Ernest "Eric" Colton, Jr. v. LALO, LLC*, American Arbitration Association No. 01-16-0003-5060 ("Arbitration"). After considering the Application, answer, response, record, and applicable law, the court, for the reasons herein explained, **confirms** Plaintiff LALO, LLC's Final Award, *except with respect to its request for prejudgment and postjudgment interest.*

### I. Background

Plaintiff initiated this action on September 20, 2018, based on diversity jurisdiction, requesting that the court confirm the Final Award pursuant to *9 U.S.C. § 9* and enter a judgment in favor of Plaintiff against Hawk Apparel, **[*2]** Inc. ("Hawk") and Ernest "Eric" Colton, Jr. ("Mr. Colton") (collectively, "Defendants"). In support of its Application, Plaintiff contends the court must confirm the Final Award because Defendants did not timely move to vacate it pursuant to *9 U.S.C. § 12*. *See* Doc. 1. Plaintiff moved for an entry of default against Defendants on March 7, 2019, after it filed executed summons on Mr. Colton and Hawk. Mr. Colton, however, did not immediately file an answer or otherwise respond. He appeared in this case on February 20, 2020, and asserted that he was not properly served in this matter. *See* Doc. 15.

On January 22, 2021, after a detailed hearing, this court issued an order that set aside the Clerk's Entry of Default against Mr. Colton and Hawk. Doc. 28. The court further directed Plaintiff to file any supplemental documents in support of its Application and directed Mr. Colton to file his response. *Id.* On March 4, 2022, and March 22, 2022, Plaintiff subsequently filed three executed returned summonses from the Texas Secretary of State indicating that Hawk had been served through its registered agent, Mr. Colton. *See* Docs. 37-39. Mr. Colton, on the other hand, further argued that the court should not confirm **[*3]** the Final Award because: (1) the arbitrator exceeded her authority and therefore, the Final Award should be vacated under *9 U.S.C. § 10*; (2) res judicata and collateral estoppel bar the Final Award; and (3) Plaintiff was unable to show it suffered damages caused by Defendants' alleged conduct. *See* Doc. 32. The court, having determined

that Defendants appeared or have been properly served with process in this matter, will now consider the Application and Mr. Colton's objections.[1]

## II. Confirmation of Award

The parties agreed to arbitrate their disputes in accordance with the AAA's Commercial Arbitration Rules, including Commercial Arbitration Rule R-52(c) that states, "Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof." Pursuant to the *Federal Arbitration Act* ("FAA"), if the parties have agreed that a judgment of the court shall be entered upon the entry of an arbitration award, then upon application by a party, the court must grant such an order unless the award is vacated, modified, or corrected. *9 U.S.C. § 9*. A party to an arbitration may move to vacate an arbitration award in the following instances: **[*4]**

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id. § 10.* "Notice of a motion to vacate, modify, or correct an [arbitration] award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." *Id. § 12*.

The record establishes that the Final Award was issued on May 7, 2018, which held that Mr. Colton and Hawk were jointly and severally liable for the amount awarded.

*See* Doc. 1-1 at 35. The deadline for Defendants to move to vacate the Final Award, therefore, expired on August 7, 2018. Mr. Colton did not petition this court, or any other court, to vacate the Final Award until February 20, 2020, **[*5]** when he filed his answer in this action. *See* Doc. 15. Accordingly, Mr. Colton did not timely assert his grounds for vacating the Final Award pursuant to *9 U.S.C. § 12* and, therefore, waived his right to have the Final Award vacated, modified, or corrected. Even if the court considers Mr. Colton's objections as timely and not waived, they are insufficient to serve as bases to vacate the Final Award for the reasons the court sets forth.

### A. Arbitrator's Authority

Mr. Colton contends the Final Award should be vacated on three grounds;[2] however, only one—vacatur based on the arbitrator exceeding his or her authority—is recognized under the FAA. *See 9 U.S.C. § 10*; *see also Citigroup Global Mkts., Inc. v. Bacon, 562 F.3d 349, 358 (5th Cir. 2009)* (holding there are no longer nonstatutory grounds for vacating arbitration awards). The court, therefore, limits its consideration to Mr. Colton's objection that the arbitrator exceeded her authority.

### 1. Legal Standard

Judicial review of an arbitration award is "exceedingly deferential." *Petrofac, Inc. v. DynMcDermott Petro. Operations Co., 687 F.3d 671, 674 (5th Cir. 2012)* (quoting *Apache Bohai Corp. LDC v. Texaco China BV, 480 F.3d 397, 401 (5th Cir. 2007)*). The party seeking to vacate an arbitration award has the burden of proof, and the court must resolve any doubts or uncertainties in favor of upholding the award. *Brabham v. A.G. Edwards & Sons, Inc., 376 F.3d 377, 385 (5th Cir. 2004)*. Likewise, questions of contract interpretation must be decided in favor of the arbitration **[*6]** decision. *Apache Bohai Corp. LDC, 480 F.3d at 405*. The reviewing court may not substitute its judgment for that of the arbitrator merely because it would have reached a different

---

[1] As stated earlier, Hawk was served with service of process through its registered agent, Mr. Colton, on March 4, 2022, and March 22, 2022. *See* Docs. 37-39. Hawk, however, has not made an appearance in this matter through designated counsel. Because Mr. Colton has appeared in this action and is the current registered agent of Hawk, Hawk is now a proper party to this action.

[2] Mr. Colton contends the Final Award should be vacated because: (1) the arbitrator exceeded her authority by resolving the underlying case that led to the settlement agreement, which Mr. Colton asserts is the sole basis for the Arbitration and the Final Award; (2) res judicata and collateral estoppel bar the Final Award; and (3) Plaintiff is unable to show it suffered damages caused by Defendants' alleged conduct. Doc. 32.

decision or interpreted a contract differently. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598-99, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)*; *City of San Antonio v. McKenzie Constr. Co., 136 Tex. 315, 150 S.W.2d 989, 996 (1941)* (same); *Riha v. Smulcer, 843 S.W.2d 289, 292-94 (Tex. App.—Houston [14th Dist.] 1992, writ denied)* ("An arbitration award has the same effect as a judgment of a court of last resort, and a trial judge reviewing the award may not substitute his [or her] judgment for the arbitrator's merely because the trial court judge would have reached a different decision. Not every error of fact or law warrants setting aside an arbitration award, but only those errors that result in a fraud or some great and manifest wrong and injustice.") (internal citation omitted). As a result, "vacating an arbitrator's award is rare." *City of Laredo v. Mojica, 399 S.W.3d 190, 197 (Tex. App.—San Antonio 2012, pet. denied)*.

"An arbitrator exceeds his [or her] authority when he [or she] acts 'contrary to express contractual provisions.'" *Kemper Corp. Servs., Inc. v. Computer Scis. Corp., 946 F.3d 817, 822 (5th Cir. 2020)* (quoting *Beaird Indus., Inc. v. Local 2297, Int'l Union, 404 F.3d 942, 946 (5th Cir. 2005)*). In determining whether an arbitrator exceeded his or her authority as a basis for vacatur under the FAA, the language of the arbitration agreement is critical. *See Kemper Corp. Servs., 946 F.3d at 822*; *Glover v. IBP, Inc., 334 F.3d 471, 474 (5th Cir. 2003)*. "If the agreement gives an arbitrator authority to interpret and apply a contract, the arbitrator's construction of that contract must be enforced so long as it is rationally inferable from **[*7]** the letter or purpose of the underlying agreement." *Kemper Corp. Servs., 946 F.3d at 822* (internal quotations omitted). Stated another way, a court must accord strong deference toward and sustain the arbitrator's interpretation of the contract, even if the court disagrees with the arbitrator's interpretation of the underlying contract, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Pace Local 4-1201, 480 F.3d 760, 765 (5th Cir. 2007)* (internal quotation omitted); *Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1320 (5th Cir. 1994)*. "The single question is whether the award, however arrived at, is rationally inferable from the contract." *Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co., 918 F.2d 1215 n.3 (5th Cir. 1990)* (citations omitted). As long as the arbitrator's award draws its essence from the parties' agreement and is not merely "his [or her] own brand of industrial justice," the award is legitimate. *United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)* (quoting *Steelworkers, 363 U.S. at 596*).

## 2. Analysis

The Arbitration at issue in this case stems from Plaintiff's allegations that Defendants breached their settlement agreement and operating agreement. *See* Doc. 36. The operating agreement contains a paragraph setting out certain obligations to be performed by Hawk, including the requirement that it finance certain purchases. *Id.* at 4. The operating agreement also contains an arbitration provision that requires the **[*8]** parties to arbitrate "any controversy of any nature whatsoever, including but not limited to tort claims or contract disputes . . . relating to the formation, execution, interpretation, breach or enforcement of this [operating agreement] . . . ." *Id.* at 81. The arbitration paragraph goes on to state that the arbitrator's award "shall be final, binding and conclusive upon the parties to this [operating agreement]." *Id.* After reviewing the Final Award and the arbitration provision in the operating agreement, the court disagrees with Mr. Colton's argument that the arbitrator exceeded her authority. The court, instead, finds that the disputes resolved by the Final Award in the Arbitration were within the express authority conveyed to the arbitrator by the parties' operating agreement. Accordingly, the court determines that Arbitrator Hon. Anne Ashby did not exceed her authority when she issued the Final Award.

## III. Prejudgment Interest, Post-Award Interest, Postjudgment Interest, and Attorney's Fees

In addition to requesting that the court confirm the Final Award, Plaintiff also requests that the court adopt the Final Award entered by the arbitrator as the judgment in this case, and award **[*9]** it $10,000 for attorney's fees incurred in seeking to confirm the Final Award and postjudgment interest at 6% per annum interest rate in accordance with the Final Award. Instead of adopting the Final Award as is, the court accepts it in all respects as if repeated herein verbatim, *except that portion dealing with the interest rate specified for prejudgment and postjudgment interest.*[3]

---

[3] As the court has held that Hawk is in default, and the arbitrator's Final Award held Defendants jointly and severally liable, this opinion holds both Defendants jointly and severally

The Final Award entered on May 7, 2018, states that LALO, LLC is entitled to recover (1) "pre-judgment interest at the rate of 6% per annum from March 17, 2015, [] until the [Final Award] is satisfied;" and (2) "post-judgment interest at the rate of 6% per annum from [May 7, 2018] until [the Final Award] is satisfied." Doc. 1-1 at 35.

In diversity cases such as this one, postjudgment interest is awarded at the applicable federal postjudgment interest rate, pursuant to *28 U.S.C. § 1961*, unless the parties contracted for a different rate. *See Travelers Ins. Co. v. Liljeberg Enters., Inc., 7 F.3d 1203, 1209 (5th Cir. 1993)* (citation omitted); *Woods v. P.A.M. Transport Inc.-L.U., 440 F. App'x 265, 270 (5th Cir. 2011)* ("The post-judgment interest rate for all judgments entered in federal courts, including those in diversity cases, is governed by *28 U.S.C. § 1961*."). Similarly, prejudgment interest is calculated under state law in diversity cases such as this one. *See Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 234 (5th Cir. 2002)*. Prejudgment interest is [*10] awarded to compensate fully the injured party, not to punish the defendant, and is considered compensation allowed by law as additional damages for lost use of the money due between the accrual of the claim and the date of judgment. *See Johnson & Higgins, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998)*. Moreover, while arbitrators have authority to specify the rate of post-award interest, they do not have authority to specify the rate of postjudgment interest, which is governed by the federal statutory rate, unless an arbitrator has been granted authority by the parties to award a nonstatutory rate of postjudgment interest. *Tricon Energy Ltd. v. Vinmar Int'l, Ltd., 718 F.3d 448, 456-60 (5th Cir. 2013)*; *Mantle v. Upper Deck Co., 956 F. Supp. 719, 739-40 (N.D. Tex. 1997)*.

The Final Award orders prejudgment interest of 6% per annum to run from March 17, 2015, until the Final Award is fully satisfied. Doc. 36 at 42. Pursuant to the controlling arbitration provision, the parties empowered the arbitrator to "award prejudgment interest" to the prevailing party; however, they did not specify or otherwise agree upon a specific prejudgment interest rate. Doc. 36 at 81. Accordingly, the court will apply the prejudgment interest rate of 5% per annum from March 17, 2015, to the date of entry of the Final Award on May 7, 2018.[4]

---

liable to Plaintiff.

[4] "The Texas Supreme Court has recognized two separate

Additionally, Plaintiff does not point to any evidence that the parties [*11] contracted for a postjudgment rate different from the federal statutory rate or authorized the arbitrator to specify a postjudgment interest rate different from the federal statutory rate. It, instead, relies on the rate specified by the arbitrator in the Final Award. Accordingly, the court will apply the post-award interest rate specified in the Final Award—6 percent—from February 20, 2020,[5] to the date the judgment is entered in this case. Postjudgment interest, on the other hand, will be awarded at the current federal rate in accordance with *28 U.S.C. § 1961*.

Finally, Plaintiff seeks $10,000 in attorneys' fees for enforcing the Final Award in this case. Doc. 10 at 40. A district court may award attorney's fees against a party making challenges to arbitration awards that are not cognizable under the FAA, when the challenges are frivolous, or are without legal justification. *International Ass'n of Machinists & Aerospace Workers, Dist. 776 v.*

---

bases for the award of prejudgment interest: (1) an enabling statute; and (2) general principles of equity." *International Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 499 (5th Cir. 2002)*. "[S]tatutory prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases." *Id. at 499*. Because the claims in this case do not fall within the statutory provisions, prejudgment interest in this case is governed by Texas common law. *Id.* "Texas common law allows prejudgment interest to accrue at the same rate as postjudgment interest on damages awarded for breach of contract." *Id.* When, as here, an interest rate is not specified in the parties' contract, prejudgment interest is calculated based on the statutory rate for postjudgment interest provided in *section 304.003 of the Texas Finance Code*. *Id.* *Section 304.003 of the Texas Finance Code* provides that the postjudgment interest rate is "five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System . . . is less than five percent[.]" *Tex. Fin. Code Ann. § 304.003(c)(2)*. The current prime rate is 3.5%, which is less than five percent. Accordingly, the prejudgment interest rate that the court will apply is five percent per annum.

[5] Because Mr. Colton was not properly served with service of process and, as a result, did not make an appearance in this proceeding until February 20, 2020—more than a year after Plaintiff moved to confirm the Final Award—the court, in the interest of equity, revises the post-award interest to run from the time Mr. Colton made his appearance until a judgment is entered in this case. Prejudgment interest is not meant to punish a defendant; therefore, it would be unjust and not in the interest of equity to allow interest to accrue on the Final Award through the issuance of a judgment in this case when Plaintiff failed to properly effect service on Defendants in a timely manner.

*Texas Steel Co., 639 F.2d 279, 283 (5th Cir. 1981)*. A challenge is without justification if it "go[es] to the 'intrinsic merits' of a dispute. *Delek Ref., Ltd. v. Local 202, United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFLCIO, 891 F.3d 566, 573 (5th Cir. 2018)*. "[W]hen parties have agreed to arbitrate a dispute, a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the parties' agreement to be bound by the arbitrator's **[*12]** decision." *Id. at 573-74*.

Mr. Colton challenged Plaintiff's request to confirm the Final Award by arguing that: (1) he was improperly served with process in this action; (2) the arbitrator exceeded his authority; (3) res judicata and collateral estoppel bar confirmation; and (4) Plaintiff failed show it suffered damages caused by Defendants' alleged conduct. *See* Doc. 32. There is a legal justification for Mr. Colton's first two arguments. First, *9 U.S.C. § 9* requires that Mr. Colton be served with notice of the application to confirm the arbitration award. Mr. Colton's challenge that he was not properly served pursuant to *9 U.S.C. § 9* is, therefore, not frivolous or without legal justification. Second, *9 U.S.C. § 10* provides that an arbitration award may be vacated "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Because Mr. Colton's second challenge is authorized by *9 U.S.C. § 10*, it too was asserted with legal justification and, therefore, was not frivolous. *See Glover, 334 F.3d at 471* (affirming district court's refusal to award attorney's fees incurred to enforce arbitration award where the defendant argued the arbitrator exceeded his authority). **[*13]** Mr. Colton's last two challenges are not recognized by the FAA; however, they are not so frivolous to warrant an award of attorney's fees. *See 9 U.S.C. § 10*. In particular, Mr. Colton, who appeared pro se, used four pages to assert his arguments regarding his last two challenges. Doc. 32 at 3-6. Plaintiff occupied two pages to respond to those arguments. Doc. 36 at 3-5. In other words, the briefing related to these issues between the parties did not amount to extensive or otherwise fact-intensive briefing that would cause strenuous or costly effort to prepare. Moreover, any delay in confirming the Final Award was caused by Plaintiff's failure to comply with *9 U.S.C. § 9* when it failed to properly serve Defendants, and *9 U.S.C. § 13* when it failed to file the agreements requiring arbitration, than Mr. Colton's challenges to confirming the Final Award. *See* Docs. 12, 28. The court, therefore, declines to exercise its discretion to award attorney's fees to Plaintiff. Accordingly, the court

**denies** Plaintiff's request for attorneys' fees.

**IV. Conclusion**

For the reasons explained, the court **grants** Plaintiff LALO, LLC's Application, *except with respect to its request for prejudgment and postjudgment interest addressed below*; and **[*14]** **confirms** the Final Award to LALO, LLC in the amount of **$1,340,481.30**, which includes damages, attorney's fees and arbitration costs. Accordingly, the court:

(1) **confirms** the Final Award dated May 7, 2018, is in all respects, **except for the prejudgment and postjudgment interest rate**; and

(2) **orders** that LALO, LLC shall recover from Hawk Apparel, Inc. and Ernest "Eric" Colton, Jr., jointly and severally: **$895,223** awarded by the arbitrator for damages; **$404,343.30** awarded by the arbitrator for attorney's fees; **$40,915** awarded by the arbitrator for arbitration costs; prejudgment interest on these amounts at the rate of **5 percent per annum** from March 17, 2015, until May 7, 2018;[6] and post-award interest on these amounts at the rate of **6 percent per annum** from February 20, 2020, the date Mr. Colton first appeared in this case, through the date judgment is entered.[7]

The court further **determines** that LALO, LLC is entitled to and shall recover from Hawk Apparel, Inc. and Ernest "Eric" Colton, Jr., jointly and severally, postjudgment interest at the applicable federal rate of **1.81 percent per annum** from the date judgment is entered until it is paid in full. The court, as required **[*15]** by *Rule 58 of the Federal Rules of Civil Procedure*, will issue judgment by a separate document.

**It is so ordered** this 20th day of April, 2022.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge

**JUDGMENT**

---

[6] The court determines that prejudgment interest of 5 percent per annum on $1,340,481.30 is **$210,620.83**.

[7] The court determines that post-award interest of 5 percent per annum on $1,340,481.30 is **$ 174,078.94**.

The court issues this judgment pursuant to its memorandum opinion and order dated April 20, 2022. It is therefore, **ordered, adjudged, and decreed** that Plaintiff LALO, LLC is entitled to and shall recover from Hawk Apparel, Inc. and Ernest "Eric" Colton, Jr., ("Defendants") jointly and severally: **$895,223** awarded by the arbitrator for damages; **$404,343.30** awarded by the arbitrator for attorneys' fees; **$40,915** awarded by the arbitrator for arbitration costs; pre-judgment interest on these amounts at the rate of **5 percent per annum** from March 17, 2015 until May 7, 2018, which the court determines to be **$210,620.83**; and post-award interest on these amounts at the rate of **6 percent per annum** from February 20, 2020, the date Mr. Colton first appeared in this case, through the date of entry of this judgment, which the court determines to be **$174,078.94**.

It is **further ordered, adjudged, and decreed** that Plaintiff LALO, LLC is entitled to and shall recover from Defendants, jointly and severally, postjudgment interest on the total amount **[*16]** of this judgment (**$1,725,181.07**) at the applicable federal rate of **1.81 percent per annum** from the date of entry of this judgment until it is paid in full.

It is **further ordered, adjudged, and decreed** that all allowable and reasonable costs are taxed against Defendants; and that all relief not expressly granted herein is **denied**.

**It is so ordered** this 20th day of April, 2022.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge

---