<u>**In the Matter of Arbitration Between**</u>

|  |  |  |
|---|---|---|
| | ) | |
| **Melissa Chinery** | ) | |
| **Sandra Lee** | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Eugenio Vargas, Former APFA** | ) | |
| **National Treasurer** | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

**Before:** **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:** **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**September 14, 15 and 16, 2021**

**Appearances:**

**For Charging Party Members:** **Melissa Chinery, Representative**
**Sandra Lee, Representative**
**Heather Olenjack, Representative**

**For Charged Party Member:** **Heidi Morgan, Representative**
**Nena Martin, Representative**
**Eugenio Vargas, Former National Treasurer**

# Exhibit A

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing**

### *INTRODUCTION*

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on September 14, 15 and 16, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Eugenio Vargas, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Former Treasurer and Retired Flight Attendant Cathy Lukensmeyer, Business Owner Michael Trapp, Former Boston Base President and Flight Attendant Jennifer McCauley, DFW Base President and Flight Attendant Michael Truan, Flight Attendant Heather Olenjack, Los Angeles Base President and Flight Attendant John Nikides, Flight Attendant and National Treasurer Erik Harris, Flight Attendant Christopher Thedford, Flight Attendant Debbie Hoover, Flight Attendant and National Secretary Josh Black, Flight Attendant Sandra Lee and Flight Attendant Melissa Chinery.

Defendant presented for testimony Former Base Council Representative and Flight Attendant Shane Staples, Flight Attendant Chuck Ransdale, Budget Committee person Yvonne Johnston, Former National Treasurer Craig Gunter, Former APFA President Marcus Gluth, Former Board of Director and Miami Base President Randy Trautman and Former National Treasurer Eugenio Vargas

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined.  The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

### *THE ISSUES*

The issues presented in the Article VII grievance and heard in this proceeding are described as follows:

**The Plaintiff**

Plaintiff submits the issue to be determined by the Article VII arbitrator is stated as follows:

Whether Eugenio Vargas, the Charged Party herein violated the terms of the APFA Constitution and Policy Manual by;

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on November 16, 2021 and requested an extended to December 31, 2021 and was granted.  The post-hearing briefs were timely emailed and received, thus, the arbitrator finds the record in this matter closed on December 31, 2021.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

    (1) Violating the Meal Expense Policy?

    (2) Failing to maintain an inventory thereby violating Article III, Section 6.E. of the APFA Constitution by failing to maintain union assets?

    (3) Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such?

    (4) Allowing the payment to former National President Bob Ross thousands of dollars in Meal Expenses Allowance (MEA) and SAF when he was no longer working for APFA?

    (5) Violating the credit card policy by charging a rental car and meals for a trip to Spain?

    (6) And, if so, what should be the appropriate remedy?

**The Defendant**

Defendant submits the only issue to be determined by the Article VII arbitrator is stated as follows;

    (1) Whether Former APFA National Treasurer Eugenio Vargas committed the following act(s) was "**WILLFUL**" violation of an expressed Article of the APFA Policy Manual, the APFA Constitution, or of a proper and express written resolution or policy of the Board of Directors or Executive Committee of the APFA Constitution, as it is set forth in Article VII, Section 1.F.

    (2) And if not, what is the appropriate remedy?

### *THE FACTS*

It is undisputed the  charges herein arose from an internal filing of an Article VII grievance filed by Plaintiff Members Melissa Chinery and Sandra Lee against Defendant Member Eugenio Vargas, Former National Treasurer.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. Vargas charged meals in his city of residence, Dallas Fort Worth (DFW), when he had no right to meals in his home location, double-dipped when he was receiving per diem out of base, and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA officers who were committing similar violations of the meal expense policy.

Plaintiff alleged Former National Treasurer Eugenio Vargas failed to maintain an inventory and violated Article III Section 6.E. of the APFA Constitution by failing to maintain union assets. Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 4 of 39   PageID 3387
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

of dollars of furniture that he had no right to take, concealing the fact from the APFA leadership and members.

Plaintiff alleged Former National Treasurer Eugenio Vargas allowed himself and his fellow National Officers to receive inflated sick and vacation payouts that they were not entitled to. Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

Plaintiff alleged Former National Treasurer Eugenio Vargas was paying former National Officer Bob Ross thousands of dollars in Meal Expense Allowance (MEA) and SAF when he was no longer working for APFA. Vargas allowed Bob Ross to be paid expense allowances when he was no longer working for APFA. This payment was not specified in Ross' exit package.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the credit card policy by charging a rental car and meals for a trip to Spain. Vargas used the union credit card for a rental car while on vacation in Spain as well as charging a meal while also on per diem.

The APFA Board of Directors could not resolve this matter internally and pursuant to the provisions set forth in Article VII of the APFA Constitution, the undersigned Alternate Article VII arbitrator was selected solely to conduct an evidentiary hearing and decide this matter on its merits.

### THE RELEVANT PROVISIONS OF THE APFA CONSTITUTION AND POLICY MANUAL CITED IN THE CHARGES

### APFA CONSTITUTION

### Article I. Section 7.   DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

> **E.**   **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.
>
> **M.**   **"Privilege"** means a benefit or advantage enjoyed by a person in any position or   fiduciary capacity with or as a member of the APFA.
>
> **O.**   **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.
>
> **Q**   **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as  a  member  of  the APFA.

### Article II. Section 2. OBLIGATIONS OF MEMBERS:

> Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

amended in accordance with the provisions of this Constitution. Ignorance of
this Constitution will not be considered a proper excuse for any violation of the
provisions contained herein. Inherent in the rights, privileges, duties, and
responsibilities of membership in the APFA is the obligation to responsibly
exercise these rights, privileges, duties, and responsibilities.

## Section 3. BILL OF RIGHTS OF MEMBERS

**B.**    All members of the APFA shall have access to all administrative and
financial reports and records except as provided in Section 5.B(1) of
this Article II.

## Article III, GOVERNMENT OF THE APFA
## Section 3 Board of Directors

A. The Board of Directors is authorized and empowered to take any and all
lawful action consistent with this Constitution to safeguard and protect
the APFA, and the rights and privileges, duties and responsibilities of
the officers, representatives and members of the APFA.  The Board of
Directors is authorized to interpret this constitution and to establish,
prescribe and adopt such other policies which may be consistent with
this constitution as required for the direction and management of the
affairs of the APFA.

**L.**    Jurisdiction and Duties: The Board of Directors shall have the following rights,
privileges, duties and responsibilities;

1. Set policy for the APFA;
2. Modify the APFA Policy Manual as it deems appropriate;
3. Approve the annual budget;
4. Set annual goals for the APFA as it deems appropriate;
5. Assign to each Ad Hoc Member of the Executive Committee those Presidents
with whom s/he shall maintain regular contact and communication;
6. Determine the number of administrative, committee, and support positions as
may be required under Article IX of this Constitution to meet the needs of the
membership;
7. Nominate and appoint members of the National Balloting Committee and
Budget Committee when appointments are appropriate;
8. Review the base assignment of any OAL Operation or satellite and, when
necessary alter operation or satellite assignments.
While not limited to the following, the Board of Directors may:
9. Review the dues structure of the Association;
10. Override the Executive Committee rejection of a proposed Collective
Bargaining Agreement;
11. Establish the Regions and the National Vice President will assign the
Regional Representatives;

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

12. Establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;
13. Direct special mailings to the membership;
14. Recognize the accomplishments and achievements of members of the APFA;
15. Give annual awards;
16. Confer Honorary membership;
17. Approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;
18. Appoint special committees;
19. Appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);
20. Approve Article VII administrative changes;
21. Suspend officers or representatives pursuany to Article VII;
22. Take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.Bof this Constitution.

## Article VII. Section 1. Grounds For Charges:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

**A.** Failure to pay dues, assessments or penalties levied by the Association.

**B.** Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

**C.** Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section 1.C., above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

**D.** Willful violation of a Flight Attendant's Collective Bargaining Agreement

**E.** Theft or embezzlement of Association monies or property

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

**F.** Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee

**G.** Willfully acting in a manner that causes the Association to violate its legal obligations; or

**H.** Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

*APFA POLICY MANUAL*

**Section 5.G.1. Trip Removal and Expense Policy – Other Expenses**

**1.** Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

**Section 5.F.5.a. Trip Removal and Expense Policy–Meal Expense/Allowance**

**a.** Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

**(1)** Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

**(2)** The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

*PLAINTIFF TESTIMONY*

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as stated herein.

**Cathy Lukensmeyer**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Ms. Lukensmeyer is a retired 30-year American Airlines Flight Attendant. She is a member of the APFA. She has held several APFA positions in Chicago, Illinois as a Council Representative, Vice Chair, Chairperson, negotiations member in 1986 and National Treasurer for the APFA for 4-years from 2004 to 2008. She testified she had received training as a National Treasurer for only one transitional month. She stated she is familiar with the APFA Policy Manual and Constitution as it relates to financial matters and the role of the National Treasurer. The APFA Policy Manual dictates the day-to-day operations of the APFA and is approved by the Board of Directors. She further said, Article II, Section 2 states ignorance of the Constitution is not a proper excuse for any violation of the provisions. She further explained the duties of the National Treasurer to include the care of the office, the staff, all of the assets of the Union. They inventory the assets and are in charge of expense reports and the monitoring of expense reports, questioning expense reports, prepare government filings and to provide to the Board monthly financials. And making sure all meals have proper receipts in accordance with the policy manual, which is a part of the expense report. Only the Board of Directors (BOD) can modify the policy manual. Additionally, she testified that she was familiar with the Meal Expense Allowance (MEA) and per diem. When working for the Union, flight attendants would receive an expense, a per diem and an MEA. The Officers and the people on full time would lose out on that source of income. You have actual and you have guaranteed up to a certain point as defined by the policy manual as to how much you get. MEA is for persons away from their base and the per diem is also away from the base. The Officer's would receive a guaranteed base because they weren't flying and that is what would make them whole. And that is put on the weekly expense report. When asked, 'should one be getting the Union credit card to buy meals and getting guaranteed MEA for the .... same days?" She answered "No" it is double dipping. They are already getting paid, meals do not go on the credit card. The per diem is a daily allowance  and was negotiated for the Flight Attendant and then copied the CBA and it would cover those expenses. Per diem's away from the base. National Officers are assumed to be living within a radius of Dallas per the policy manual and for purposes of expenses and other policies regardless of where their permanent residence is located. A hosting exception is when there is an arbitration for example with lawyers and witnesses, the Vice President would order a meal and everyone would be included. Lunch does not qualify for a hosting exception. She was asked if one should be getting guaranteed MEA while getting per diem and she said "No." She was asked, "if all Union officers are receiving meal allowance, should they be charging a meal to the Union when everyone is on MEA and she said, "No."

She further testified that under the APFA Constitution, the National Treasurer is responsible for assuring accurate receipts, the purpose of the expense and who was present. She was provided Exhibit (CP-2) and reviewed some of the credit card and receipts related to Vargas expenses. She said Officers are not allowed to take guaranteed and actual meal expense.

Lukensmeyer additionally testified that in 5h 3 deals with electing an apartment or a paid move.  She said that when you get elected to office, you have a choice. You can either move, or transfer totally to Dallas. The Union will cover the expenses, $10,000.00 will be given or you could choose to have an apartment in Dallas that is furnished, no smaller than one bedroom. The Officers get two bedrooms that has an office.  She explained that when she came into office, her apartment was from the preceding Treasurer and it was already furnished with towels and sheets, you name it, it was there, except for one room, the office. She had to get a couch and table because no furniture was there, but the rest of the apartment was fully furnished.  The Treasurer's Office

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

takes care of corporate apartments. The Treasurer would obtain the apartments and take care of
furnishing them if there was no furniture. The furniture should already be there. She said she put
into place a policy 5.22, No. 7, for incoming National Officers and other representatives shall
normally be able to use outgoing National Officers or Representatives furniture and furnishings
rather than replace these items with each change of National Officer or Representative, subject to
the right to reasonably refuse furniture and furnishings.  This policy was in place before October
2016 and the policy requires that there be a silent auction of furniture.  These are assets of the
Union and we have to consider the depreciation value and the fair market value.  It's not possible
for an item to be depreciated to zero. The Bylaws do not provide for rental cars in the city of
residence. So once a National Officer takes office, they are not entitled to a car in DFW or Dallas.
The expense reports are supposed to have two signatures, so there should be another person who
is overseeing what the Treasurer is doing or spending, whomever signs the other half of that
expense report. It is not normal for a Treasurer to repeatedly have to pay back the organization for
erroneous charges.

On cross-examination, Defendant presented Resolution No. 14 into the record and was
identified as APFA Apartments Board of Directors Resolution No. 14 dated March 9, 2016. She
testified it is a new policy on apartments and furnishings. Equipment in need, furnishings in need
of replacement, replace as needed and they talk about damaged, worn out, depreciated, not useful
and that replacement items may be purchased in accordance with the table. Surplus furnishings
shall be sold through a public online market, Craigslist and it must be stored and inventoried.  It
also says, Outgoing National Officers or Representatives shall have the option of purchasing at
Fair Market Value the furniture, furnishings, appliances, equipment that were provided in their
APFA accommodations. Lukensmeyer said she was not aware of this new policy.

**Michael Trapp**

Mr. Trapp is the owner of Trapp's Residential Services, and Trapp's construction. He
testified that he has performed work for the APFA from 2014 until he became sick. He performed
maintenance, electrical, plumbing, painting, moving stuff and remodeling. He said he would clean
the apartment and move all of that stuff. Ms. LaDonna Casey would let him know where to go and
they would pack up everything. Take it to the office or other apartments. After Mr. Gunter, former
National Treasurer passed away, he moved his furniture from Corporate APFA apartments to the
back room of the APFA since there was no room to store the furniture at Uncle Bob's storage
place. Trapp identified Exhibit (CL-13) as being his invoices for work performed. There were three
storage lockers full at the time. After the elections Greg's stuff was moved to Mr. Vargas
apartment.

On Cross-examination, Trapp stated that between 2016 and June 2017 he picked up
furniture at the APFA storage units and dropped them off at donation. He said he dealt with Ms.
LaDonna for him to pick up items, take it, put it back together

**Jennifer McCauley**

Ms. McCauley is a Flight Attendant for American Airlines and based in Boston, MA.  She
has been employed with American Airlines for over 30 years.  She has held Union positions such

Case 4:22-cv-00430-Y    Document 85-2    Filed 04/14/23    Page 10 of 39    PageID 3393
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

as Base President (1997-2012) for the Boston International and Domestic domiciles. From 2012 to 2016 she was appointed to the SBA department as a Regional Representative. And from 2016 to 2019 she was elected to the Executive Committee as an ad hoc by the APFA Board of Directors. She testified that she attended the Executive meeting on September 8 or 9, 2016 regarding furniture but was told by Eugenio Vargas the furniture was in storage and had not been inventoried because it was too hot to go to the storage area Exhibit (CL-14). Exhibits CL-14, Cl-15 and CL-16 were offered and received into the record without objection.

## Michael Truan

Mr. Truan is a 23-year Flight Attendant with American Airlines. He has held several positions with the APFA. In 2004 he worked in the communications department and moved on to be a DFW Base Representative and then became a full-time Dallas Base Representative. He worked in contract scheduling as well in the safety department. He was elected to the position of a domestic negotiator with the negotiating Team back in 2013 and DFW base president in 2019. Truan testified that at a Board of Directors meeting, it was discovered that Mr. Vargas, Ms. Martin and Mrs. Dunaway received large payouts at the end of their term for unused vacation and sick leave and it wasn't calculated correctly. Two Special BOD meetings were held on August 26, 2019 and via resolution the BOD passed to have these former Officers pay back the money owed to the Union. Payout is supposed to be calculated per APFA policy and National Officers salary. The former Treasurer had calculated additional income into that calculation which is not part of the policy at APFA. Exhibit (CLX-18) is the Executive Meeting that transpired on December 5-7, 2019 and Resolution No. 2 was passed on August 29, 2019. In this resolution, if the payouts were not paid back no later than January 26, 2020, the APFA Attorney was directed to file a civil lawsuit to collect these funds. Truan stated that from August to December, the money had not been paid back. Exhibit (CLX-17) is the second meeting of the BOD. National Treasurer Craig Gunter and BOD voted pretty much unanimously on Resolution No. 2 (Ms. Martin was on the Board of Directors and abstained), where it directed Mr. Vargas, Ms. Martin and Ms. Dunaway to make APFA whole to recover the overpayment. Both CLX-17 and 18 were received into the record without objection. On cross-examination, Truan was asked how is the Officer salary calculated and he said through APFA policy. The officers (President, Vice President and Secretary) are paid the highest international purser rates. As far as vacation, sick, or any other items included in their monthly salary. Truan said that according to their attorney's at the time, MEA, SAF was not additional income to be added to the payout. The officer's salary should only include the highest international rate, purser premiums per APFA policy. Charged Party Exhibit (CL-99) was introduced into the record and is a string of emails requesting an explanation of the formula used for the calculation. The formula should not have included MEA and SAF. The former National Officers were disputing the APFA calculation of the amount of overpayment owed back to the APFA in Resolution No. 2 (CL-99). Truan stated in the Executive Committee meeting, he became aware that the recalculation was based on a 1987 payout formula, Exhibit (CP-99) and Exhibit (CP-1) were received into the record. On re-direct, Truan stated a power point presentation was given of the formula that should have been used for payout.

Truan stated the elevated overpayment was included in the Bob Ross exit package. Truan said that they had a Base President call with Attorney Bruce Lerner and several BOD's where he asked Vargas if he wanted an attorney to be present as this could possibly become criminal charges. In

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

the e-mail chain from Patrick Hancock, he told Ms. Martin the original formula has been used for
over 30 years and has been included in 30 plus audits and multiple DOL reviews and is a long-
standing established practice. This is the appropriate starting point. The amount you owe APFA is
calculated by taking what you should have been paid, original formula, and subtracting what you
were actually paid. On further re-direct, Exhibit (CL-99) Truan was asked to further read it into
the record as follows,

A. "APFA does not and should not have to decipher what was wrong with
the new formulas and try and fix it for you. The fully functional original
formula defines what you should have been paid. Your overpayment is
easy to calculate using that number. The EC has now established the
deadline of January 6, 2020 for you to reimburse the Union. I look
forward to hearing that APFA has been reimbursed and we can move on
to addressing the many challenges facing our Union. Patrick Hancock
Ad hoc 5."

On re-cross-examination Truan was again asked, "isn't it true the original formula is a
formula that has nothing to do with MEA and SAF and he said "yes."

**Heather Olenjack**

Ms. Olenjack has been an American Airlines Flight Attendant for over 24 years. She has
been Base Council Representative and Health Representative from 2014-2015 at National
Headquarters. Laura Glading was the National President from 2014 and 2015. In the summer of
2016, she had concerns over APFA furniture and spoke with National Treasurer Vargas on
September 21, 2016. She had concerns of moving expenses, furniture. Vargas had a book of
financials that he showed her. She discovered several APFA apartments were vacant. She
discovered that Bob Ross and Nena Martin had used their whole allotment and was concerned that
it may have gone over that amount. She asked about moving expenses and he showed her receipts
of Bob Ross and Nena Martin. Vargas said Ross was about $2500.00 as he moved with nothing
and that he actually purchased Greg Gunter's furniture. Vargas said Ross wrote a personal check
to the Union. In the meeting of June 2017, Vargas said that he had paid $219.00. She further stated
APFA policy was not used for the handling of this furniture. It could have been reused, given to
another representative or National Officer in a corporate apartment. If not used, should have been
placed into storage until needed and if it was deemed unusable, then it was to be placed on the
silent auction at APFA for Flight Attendants to bid on or a staff member. She further said she was
looking into furniture. Gaby Harty was the Health Chair and she had purchased quite a bit of new
furniture. Harty resigned 8 months later and that furniture was sent to a consignment store for
resale and not stored. Vargas said he was following the policy. She told him that he made a policy
change in October to include it. The APFA took a big loss on reselling the furniture as they
purchased a couch for $800.00 and listed it at the consignment store for $300.00. APFA would
only receive 50% of the retail cost. On cross-examination Ms. Olenjack said the policy said
$5000.00 one way move and $10,000.00 for a round trip. She was given Exhibit (CP-10),
Resolution No. 12 dated October 5-6 as to the disposition of furniture of outgoing National Officers
or Representatives. She also said she was aware Ms. Harty resigned in January and there was a
lease on that apartment until May. The furniture remained in that apartment for the duration and a

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

representative was moved in. She said she was aware of this Resolution. She said she was aware Vargas presented a change for the disposition of the furniture that passed where Outgoing National Officers or Representatives shall have the option of purchasing furniture at fair market value. If not, it shall be sold through a consignment store and if not sold within 6 months, it shall be donated to charity. And four months later the consignment store gave a check for $1,159.00 for the items submitted.

**John Nikides**

Mr. Nikides has been employed with American Airlines for 37½ years. He is the Los Angeles Base President. He has been a Rafety representative with LaGuardia, San Francisco Vice Chair, Assistant to the President, American Eagle liaison, LAX International Vice Chairperson, LAX Domestic Chairperson and LAX Base President since April 1, 2001. He testified that he was on a BOD call with Vargas discussing the change of Formula for vacation payouts. Discussed at this meeting was MEA and SAF. The MEA is the meal expense allowance. And SAF is Special Activity fee. In the phone conversation MEA and SAF had come up as to whether were considered wages. Vargas claimed MEA ands SAF are wages and that was based on certain payouts the National Officers. Vargas said in this phone conversation that there would have been no reason to exclude Bob ross from our actions, the actions we took to secure the monies from the other three national Officers. Attorney Bruce Lerner informed Vargas to get Legal Counsel. MEA and SAF were never intended to be wages. He said he became aware of several moving resolutions in September 2016 to October 16, 2016, that Bob Ross was in violation of the policy manual but had been permitted by Vargas to first get an apartment, which he was entitled to under APFA Policy Manual but then decided this wasn't working out for him and decided to move his family down there and Vargas paid his moving expense. You get either an apartment or you get moving expenses. You don't get both. This came up in the BOD meeting of what Bob Ross had been permitted to do and that moving resolution was turned down. Ross had an exit package and Nikides was one of the BOD members. Ross got paid MEA and SAF. MEA and SAF is intended for work actually done. Ross wasn't working during that time period. Nikides stated he expected the Treasurer to be the gate keeper. Nikides also said there was a BOD call and was informed that Bob Ross had to pay back $3600 for the furniture. This furniture went to Ross residence and not to the Corporate apartment. So, Ross paid it back two years later. Vargas also paid back some money for a rental car. Vargas used the APFA credit card to rent a car in Spain.

Nikides also testified that once the formula was clarified using the 1987 formula calculation Ms. Martin immediately paid off the owed debt. He stated that he is familiar with the Ross Transition Agreement (CL-98), he also verified that was his signature on the last page. He said they signed this page in the absence of a printed Transition Agreement. Nikides also stated you cannot use a Union credit card to eat a meal when you are on MEA, that is double dipping. On re-cross examination, Nikides was asked if any National Treasurer, the gatekeeper of the books, has ever told him how to deduct MEA from your expenses because the secretary who sets up those meetings are purchasing meals with an APFA credit card while you are on MEA, and he answered "no." On further re-direct examination, Nikides was asked if it would be a violation to go to a golf course 54 times when it's just the National Officers on the ticket and he answered "yes."

**Erik Harris**

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

Mr. Harris has been an American Airlines Flight Attendant since May 2014 and is currently the National Treasurer for APFA since April 1, 2020.  He said the state of the Union financial records were bad. There were pay loss bills behind and lots of overspending. The books were not kept well. Harris was asked what is the obligation for Union Officers to substantiate credit card spending. He said prior to this year, the only requirement or obligation was that OLMS and that requirement was to provide receipts and substantiate credit card purchases and document those items with a receipt along with credit card statements. On the receipt, it should be the same date, the same charge amount and what was purchased and what department to charge it to for financials in the budget and who was there and who made the purchase, and this is done on a monthly report. Harris issued the Charging Party's an email in response to a subpoena request. It was discovered while retrieving documents, certain items were missing. In item #1, the box containing all accounts payable invoices, reports and documents for fiscal year ending 2017 beginning with the letter S through V was missing. This would contain all backup and support documents, receipts for Eugenio Vargas monthly reports during this time frame. In item #2, receipts for Eugenio Vargas purchases -  purchase of Greg Gunter's APFA owned furniture. In item #3, we ended up locating the petty cash. Harris said they did not locate the record and receipts for letters S through V for fiscal year ending 2017 – April 1 through March 31.  Harris also talked about an email from Liz Marko to Rachel Early regarding a rental car that was reserved in Eugenio's name to be driven by Ellen Eherts and charged to the General Administrative Account. (CL-1, 2, 3, 5, 6, 7, 8, 9,10 and 11) were introduced and received into the record. Harris also said the monthly and weekly's were missing from April 1, 2016 to March 31, 2017 (S through V). Harris also said the receipts for furniture purchased by Eugenio Vargas from April 2016 through March 31, 2017 could not be found. Harris also said APFA has a policy on keeping inventory, there are no specifics on how they are to be kept and this is the responsibility of the Treasurer.  Harris also said he could not locate the inventory list for furniture from the Vargas Administration. Harris also talked about the issue related to the formula for the payout of vacation for former officers Vargas, Ms. Martin, Mrs. Dunaway and Bob Ross. There was a disagreement on the formula whether it included the MEA and SAF payments. For calculating the payout, the annual payout takes your annual salary and it's a formula based on that.  The MEA and SAF are payments above and beyond the salary and those amounts were included in the formula. Harris also said Vargas is currently making payments as well as Dunaway and Ms. Martin has paid her debt in full. Bob Ross has not paid back the money ($5400.00) owed. Harris did state Bob Ross received an exit package when he left office as National President and it paid him from March through July. Ross was paid a guaranteed meal expense during the time he was no longer working for APFA. Bob Ross did not fill out a weekly report. Payment is approved by two National Officers who would sign off on a weekly report. The weekly report would substantiate the meal allowances or the MEA and the SAF. Harris said they sponsored a set of Resolutions related to financial matters, financial reform. It was a cleaning up policy related to Section 5 and 6 of the Policy Manual. Section 5 is the trip removal and expense policy and Section 6 is the National Officers' salaries and benefits. Resolution No. 8 was APFA credit cards basically aligning APFA policy with OLMS and the OLMS standards for corporate cards for unions because there was no policy. Resolution No. 9 is creating policy or creating and cleaning up policy related to apartments and furnishings, relocations, determining limits, things that were not really defined. Harris said they saw a need to create parameters and boundaries concerning apartments and furnishings. Resolution No.10 deals with business related meals realigning the credit card policy with OLMS, but to also further clarify what business related meals

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

and expenses are and what the procedure is for seeking reimbursement or use of the APFA credit card. Harris said there was no policy in place for credit card expenses, name, nature of business, etc. but it was in place with OLMS, because it is the law. Resolution No. 10, business related meals and this new policy is for group meals to be incompliance with LMRDA regarding meal purchases using an APFA credit card. All meal charges must be accompanied with a written explanation of the specific union business conducted during the meal and the full name of and title of all attendees, created policy to reinforce what the law states. On Resolution No. 11, the policy language in the manual had very minimal language on parameters around rental cars. It only allowed officers to just authorize it, but we wanted to further clarify the procedures over rental cars. We don't provide rental cars for your home base as you are a resident. Resolution No. 12 deals with officer relocation and speaks of $10,000.00 round trip move to Dallas. We clarified what is round trip versus one way. Resolution No. 13 deals with the collection of non-dues owed to APFA. Resolution No. 14 deals with resignation or recall of a National Officer. This eliminated the need for an exit agreement in the future. Harris said that they realized the policy manual was not clear enough and were receiving a lot of questions about certain policy and it left areas open for interpretation. This is the reason for so many resolutions to be created to clarify policy.

On cross-examination, Ms. Morgan asked Harris, did the charging party's ever request to review documents from any other administration outside of the Ross Administration and he said "no." He also said they would have working lunches for the budget committee team. Harris also said that prior to March, the APFA did not have a set policy on the handling of receipts in Section 5 of the Policy Manual. Plaintiff objected to Ms. Morgan introduction of several documents into the record to reveal their conclusive proof these documents received disclosed a past practice and were shared with the Plaintiff through email as soon as Harris provided it to them. The arbitrator overruled the objection and allowed these documents into the record. Harris said no Article VII charges were ever filed against him for not having receipts. Harris said the Treasurer before him was Craig Gunter. He took office in 2018. Harris said that he was on Vargas budget committee in the administration prior. Harris further said APFA's finances were strong when Vargas left office on July 1, 2018. Harris said they went from a strong financial position to dire state October 31, 2019 due to rampant overspending. The prior administration brought in their own outside opinion and they advised the administration and the BOD that there needed to be some oversight. The BOD then created the budget oversight committee. Harris also said that it appeared from the depreciation schedule that two persons share the Ashley furniture. Harris also said that he has had to rent cars when additional representatives are in town and are rented under the National Officers name for the representative. Harris said Section 5 of the policy manual governs trip removals, which is a pay loss, representative salaries, reimbursements and meal expenses. National Officers are paid in accordance with Section 6. As an officer, Harris said he receives guaranteed MEA and SAF in Section 6 and stipend for maintaining an office outside of his home. Section 6 covers four officer salaries including him. Section 5 applies to all representatives. Defendant's Exhibit (V-44) was introduced and received into the record. Harris also said that in his email that he had read previously into the record that "there are individuals, who have seen these documents in the recent past; however, they have inexplicably disappeared from my custody." Defendant Exhibit (V-98), the Ross Transition Agreement was introduced into the record and discussed. Harris confirmed this was the document given to the Plaintiff. Harris read into the record Item No. 4, the economic terms of the Ross Transition Agreement, "APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time from April 1, 2016 through July 31, 2018.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

On cross-examination, Harris testified to Laura Glading's administration was not providing receipts for year ending 2013. Harris testified that Marcus Gluth was not providing receipts for year ending 2014. Harris testified that based upon what he has seen the practices in the past are not the same as the present. The reason is, we have a different system and put in place policy procedures on how to use the corporate card to correct deficiencies and to be in alliance with the law. On re-direct, Harris said that Ross was overpaid on his vacation by 35 days. Vargas made this mistake and the check went to Ross. Vargas did not benefit from this error. Harris also said they got overpaid on their 401K, it was inflated wrong by the amount used to calculate that was based on that formula. Vargas made this mistake.

**Christopher Thedford**

Thedford testified that he has been employed with the APFA since November 2019 as a Staff Member and Senior Accountant. He does general ledger entries, credit card entries to the general ledger including invoicing and payments. He is very familiar with the standard accounting procedures. He says that it is important for a business or an organization to maintain proper inventory control of furniture. You need to know what you have in the building, the cost you paid for it and the current market value. There are different ways, different accounting methods that you can do it, one is just a simple depreciation where you recognize the initial value of it and then depreciate it over a certain time span, at a straight-line method, that's the most common method. So, each item, such as furniture, it needs to be accounted for until it's taken off the books. He says he has viewed APFA records, and seen the entries but that he really does not know their standards. He is not aware how long Union's are required to keep financial records. He explained book value is what you initially purchased an item. Market value is essentially the same thing but the price is now is set at a certain time period. And then the depreciated value is after a certain time period how much it's worth after depreciation. As to the APFA vans, they are paid off. After seven years in possession, the vans would have depreciated to zero for accounting purposes, but it would still have a fair market value and a salvage value. Exhibit (CL-6) was introduced, the APFA's General Ledger October 2016. He was asked to see the reference to Greg Gunter's furniture being written off. He said he doesn't recognize if it's normal or not and did not see a reason to write off the full value of the furniture with the information here. He was asked in terms of meal receipts, what should be on a receipt for a business meal. He said it would be an itemized receipt listing every item. What is needed on the receipt is the item, the amount and then a signature for payment. He said, the treasurer deals with policy and the accountant deals with accounting. He also said that he assisted in locating documents in response to the subpoenas and there were a few credit card receipts missing between fiscal year 2016 -2018. On cross-examination he said the missing credit card receipts for 2018 – 2020 were from National Officer Lori Bassani.

**Debbie Hoover**

Ms. Hoover has been employed with APFA for 22 years as an accountant. She does payroll, trip removal stuff and flight attendant expenses. She said she was familiar with the issue related to former National Officers during the Ross Administration changing their vacation formula for their vacation payout at the end of their term in June 2018. She said National Officer Eugenio Vargas approached her about changing the formula. She said she was told to add SAF and MEA. This did

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 16 of 39   PageID 3399
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

raise a red flag to her because this has never been done before, it wasn't past practice. This was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they are included in box 1.

**Josh Black**

Black is employed with American Airlines and is currently, the National Secretary for APFA. He maintains files related to the Executive Board and BOD's meetings. And he oversees the Article VII process. At the August 4, 2020 meeting Melissa Chinery, Sandra Lee, Josh Black, Margot were present to view the Ross Transition Agreement. Union Attorney Bill Osborne provided a copy of the Ross Transition Agreement to the APFA.

**Sandra Lee**

Ms. Lee has been employed with American Airlines for 36 years as a Flight Attendant. She has never held a position with the Union. Her concern for looking into the Union's finances was the Bob Ross exit package. She had requested to see the Union's finances at APFA headquarters. She had a meeting with Liz Geiss APFA Vice President and Craig Gunter, the APFA National Treasurer in a conference room. The monthlies were spread out for each month of the year. It had a breakdown of payroll, fixed costs in the building, secretary's salaries, etc. Several months were missing of payroll for Bob Ross and Nena Martin. Chinery asked about furniture, an inventory list and she was told there was no inventory list. Exhibit (CL-2) is the furniture receipt purchased from Ashley Furniture. We were able to review the Ross Transition Agreement under Julie Hedrick's Administration. Bill Osborne was the attorney who allowed us access. Ms. Lee stated they also learned that MEA and SAF was included in the payout to the four National Officers. It was included in the Bob Ross exit agreement. Bob Ross was paid five months after he exited the building as President. The five months of pay included MEA and SAF. Also learned was that Ross had received extra vacation.

**Michele Chinery**

Ms. Chinery has been a Flight Attendant with American Airlines for 25 years. She stated she supported Bob Ross, Eugenio Vargas, Nena Martin and Marcy Dunaway. But, could no longer support Ross because he promised to do a lot for the merger with Legacy US. Air and Legacy American and unite us. Ross ignored the U.S. Airway Flight Attendants. She stated per the constitution, they initiated a recall for all four of them. It lasted about a year and they had enough signatures on the petition to trigger an election. Thirty percent is all that is required to trigger a recall and they presented the petitions at the National Convention but they were not validated and there was no recall vote. She also stated she was allowed to view financials from the Bassani Administration. She also asked for credit card receipts of the Ross Administration. Chinery stated they looked at the Ross exit package first and then looked at Laura Glading's exit package. We then looked at credit cards. We looked at mileage. We looked at monthlies, and weeklies receipts. The financial records were a mess. We only saw the records that were provided to us as some were missing. The receipts for Vargas monthlies were missing. We were also informed of missing boxes

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

of financial documents. Harris said the box S to Z was missing for fiscal year 2017. She also said
there were a hundred and fifty restaurant charges. It could be Vargas charged those for other
individuals, reps.. She also stated she prepared a document using Exhibit (CL-1 and 2) and
compared this information against the receipts. The first entry was May 9, 2016 to May 25, 2018
and $10,945.28 was spent with the Union credit card on food. Vargas was receiving guaranteed
MEA. The food chart exhibit mentioned includes meals purchased on Vargas credit card and
equates 150 meals for a total cost of $10, 945.28. Vargas loved Taco Cabana and he went 52-54
times to the Raven's Grill & Golf course. Some of these receipts were filled out properly and some
were not. Most of them were not. For example, June 30, 2016, it does not list the reason or who
was there with him. Most of the receipts are undocumented.  There were receipts where Officers
were purchasing meals for one or two other Officers and they were listed on the receipt. She said
the policy manual does not allow an Officer to take both guaranteed meal expense and actual meal
expense. When Vargas actually charged a meal, he did not reduce guaranteed meals for the day.

### *DEFENDANT TESTIMONY*

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as
stated herein.

### Shane Staples

Mr. Staples has been employed with American Airlines for over 30 years as a Flight
Attendant. He served in the APFA Bob Ross Administration starting in March 2016 in
Communications. APFA provided furniture to be used at the Bear Creek apartment he was given.
He stayed in a hotel for a month prior to being accommodated. When his term ended in July 2018,
he moved out of the apartment. This occurred after Vargas left office. He said it is standard practice
for the Coordinators or the National Chairs to stay on with the new administration. When he moved
out, he did an inventory of the items in the apartment. Exhibit (V-32) is an email of his inventory
list.

### Chuck Ransdale

Ransdale has worked as a Flight Attendant for American Airlines for over 33 years. With
the APFA, he was the Vice President for the Baltimore domicile as well as the National Contract
Chair. He served in the Bob Ross administration as a contract chair. APFA provided
accommodations and he provided documentation in support.  Maddie was the attorney for the
APFA at the time. He did go to a garage in the Bear Creek complex but all the furnishings were
tagged going to other apartments. He said he was on a flight to Madrid doing a time study.
Vargas was working the flight and we did have a working dinner to talk about the time study.
Vargas picked up the dinner tab and he picked up the wine tab. And they were all on MEA and
SAF and getting per diem. He paid for the wine with his personal credit card. On re-direct,
Ransdale was asked if he knew of Melissa Dyer. He said Dyer worked on policies and
procedures for American Airlines under Michelle Morenas.

### Yvonne Johnston

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Johnston has been employed with American Airlines for 34 years. She has a Bachelor's Degree in Behavioral Science and Health and Economics. She also has a Master's Degree in Forensic Accounting. She has served on APFA Budget Committee and served under National Treasurer(s) Eugenio Vargas, Craig Hunter, Erik Harris and Greg Gunter. She states that she helped streamline the way the taxes are taken out of APFA representative paychecks and unemployment insurance. On the budget committee she worked with Kimberly Smedley, Russ Reed, Erik Harris, Amy Milinkovich, Todd Breckenridge, Robert Norvell and Beth Flannery. She said usually the Treasurer would have lunch brought in so we could continue to work. The group would usually go out for dinner and the Treasurer would pay the bill with the APFA credit card. Some of them claimed MEA and SAF. Vargas would take them out and would pay using the Union credit card. Erik Harris, Craig Gunter, Greg Gunter would take her out and use the credit card to pay for the bill. She also said that she saw other officers in all other administrations have the practice of purchasing food and beverages for themselves and for others who were already receiving MEA and SAF. She stated it has been a standard practice across the board not only Treasurers but all other Officers to be permitted to use the APFA credit card for food purchases and beverage purposes when people are receiving MEA and SAF when they are at APFA. She resigned her position because she was not getting the proper financial documents in a timely manner in order to be able to do her job properly. She also stated that when Eugenio was in office, the state of the finances in her opinion looked good. She also said that if a personal purchase was made and it was corrected within the same billing cycle and repaid, the institution was not harmed. She also stated Vargas has an impeccable work ethic, he is fair, honest and reliable.

**Craig Gunter**

Gunter was treasurer of APFA and said that Ms. Chinery and Ms. Lee came to APFA to view documents four or five times. He stated he was the Chair of the Budget Committee and there were six persons on the budget committee. When the members of the budget committee came into town for their regularly scheduled meeting, he would order food for them to have a working lunch. The food was paid for on a APFA credit card and they were receiving MEA and SAF. This has been a past practice for many years. This was actually a cost savings to have the meetings continue. Ms. Lee and Ms. Chinery when examining Vargas documents never questioned him about similar expenditures. He said that when he took over from the Ross Administration the state of the APFA Treasury was in order.

On cross-examination, Gunter stated that he had prepared and presented a PowerPoint presentation showing in great detail how the payouts were calculated and determined the calculations were correct. Ms. Martin requested of him to set up a conference call with the BOD to talk to Eugenio Vargas because they did not trust the calculations he did. The attorneys and BOD members interviewed Vargas. Vargas admitted that he had calculated the amounts using additional salary, the additional income added into the salary amounts. And he admitted that he knew the past practice did not use this calculation. He admitted that he directed the accountant to use his calculations and the accountant was not comfortable in doing so. After verifying the calculations and interviewing Vargas, the Board passed a resolution demanding repayment. The attorney got involved as this was going on for over four months. In December the Executive Committee had to threaten to file a lawsuit if they did not pay it back within 30 days. The

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Resolution was passed by the Executive Committee and Ms. Martin paid the full amount and
Vargas and Dunaway set up a repayment plan.

**Marcus Gluth**

Mr. Gluth has been employed with American Airlines for approximately 30 years as a
Flight Attendant. He was the Southeastern Division Representative and had seven bases in his
division dealing with upper-level grievances. A member of the National Committee from 2000-
2002. In 2015 the APFA president resigned and he was elevated to the President until April 2016.
The Bob Ross agreement was negotiated with a Non-Disclosure Agreement (NDA). He assisted
the BOD as Lead Counsel in their representation when they were charged with violating the APFA
Constitution by Julie Moyer.

Mr. Gluth discussed the Ross Agreement and the Laura Gladings Agreement. Admitted
into the record as Exhibit (V-100) the amicus brief.

**Randy Trautman**

Trautman is the APFA Miami Base President. He has been employed for over 38 years. He
has held positions such as National Scheduling Coordinator and International Negotiator.  He was
on the BOD on March 1, 2018. Attorney Mark Richards and the BOD were present regarding the
Ross Transition Agreement. In the Laura Glading's exit agreement, it included full salary and SAF
and related payments. He has been a member of the BOD for over 22 years. He represents the
fiduciary responsibility of the Union, sets policy and interprets the Constitution. As a Board
Member, he became aware at a Board meeting that Eugenio Vargas, Marcy Dunaway and Nena
Martin had received an inflated formula for MEA and SAF.

Trautman admitted that at the last convention in March, the BOD passed several
resolutions. Those resolutions passed by the BOD are to set policy on moving expenses, National
Officers payouts, APFA apartments and furniture because there was no policy in place.

**Eugenio Vargas**

Vargas has been employed with American Airlines for 26 years. He has held the position
of Boston International Vice Chair, Boston International Chairperson and APFA National
Treasurer.  He testified that on August 11, 2016 he was on vacation with his spouse in Madrid,
Spain. He rented a car from Enterprise Car Rental. He walked over to the Enterprise counter but
he had to go to the restroom and asked his spouse to handle it. When he came back the car rental
agreement was ready for him to sign and he signed it. In early September when the bill for the
credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise
charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit
card was used. He brought the receipt back to APFA the following morning and when senior
Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you
have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase
account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from
his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 20 of 39   PageID 3403
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He has made one trip to Madrid on vacation and one trip to Madrid with APFA. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study. National Contract Chair Chuck Ransdale, AFPA Representative Neil Fernandez and Melissa Dyer. Exhibit (V-17) is Vargas (V-1) showing the dates on which he traveled to Madrid doing the time study as a working Flight Attendant where he displaced a Flight Attendant to work. He said he did have a working dinner with the group and he paid for the dinner and Chuck Ransdale paid for the alcohol tab. This was only time he charged meals in Madrid. He said he saw no issue for Flight Attendants who were receiving MEA. He also stated that he has working lunches with other officers.  He said that he did order lunch for the budget committee. He took them to dinner and paid for it with the APFA credit card.  He said that he has never used the APFA credit card for his personal use. He stated that in all of the years of eating food provided by APFA, no one from APFA has ever instructed him to deduct any amount from his MEA.  Exhibit (V-28) is a document of purchased furniture. The three persons listed on the document of the furniture purchase were National Chairs, Shane Staples, the Communication Chair, Gaby Harty, Health and Chuck Ransdale were on the contract. Vargas said the purchase was for the Coordinator's. He asked them to go over to the garage where Bob Ross' apartment and go through the furniture that was there and see what they could use prior to going out and getting new furniture. Exhibit (V-36) is an email from Bob Ross stating that Gaby Harty had resigned and Kim Coats Tuck would be the interim National Health Chair until it is filled with a permanent appointment. Gaby's apartment lease was up in May, five months away and APFA had to pay for it. Vargas decided to move one of the representatives in the back, that there was a full month removal into Gaby's apartment and that would be a net savings for APFA. She moved in until the May 15, 2017 and allowed enough time to take inventory of what was there because the lease was up at the end of the month. Rachel Early worked in the account department and dealt with apartments, took inventory and packed some stuff. Exhibit (V-29) is an email from LaDonna stating that she had contacted, Kiss it Good Buy, and set up a meeting for May 25.  Mike Trapp would move the furniture to, Kiss it Good Buy. Exhibit (V-30) is an email from LaDonna Casey to Vargas informing him that the items had been sold and they would send a check to APFA for $1,159.00. Exhibit (V-33) is a check for $339.10. All three of the representatives furniture were accounted for and this documentation accounts for the record location of the Ashley furniture addressed in the charges totaling $8,753.89. Attorney Mark Richards showed him Items 3, 4 and 5 of Exhibit (V-100) the Bob Ross Transition Agreement. Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and Ross was paid this way.  Laura Glading received the same as Ross and the BOD agreed. Vargas said that Patrick Hancock informed him that the formula used was a 1987 package formula. Vargas said he entered into a payment agreement to repay the overage debt. Vargas also said that it was his interpretation to change the formula for the MEA, SAF to be included in their payouts.

## THE PLAINTIFF'S ARGUMENTS

Plaintiff argues Vargas violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. Vargas charged

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

meals in his city of residence, Dallas Fort Worth (DFW), when he had no right to meals in his home location, double-dipped when he was receiving per diem out of base, and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA officers who were committing similar violations of the meal expense policy.

Plaintiff argues Section 5.F of the policy manual provides the following.

1. Per Diem MEA Away From Residence
   a. Per Diem Rate (Accountable Plan)
      (i) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA when away from their residence for one (1) or more nights at the Collective Bargaining Agreement Domestic Per Diem rate while traveling domestically and the Collective Bargaining Agreement International Per Diem rates while traveling internationally, for each hour they are away from their residence.

2. Actual MEA at Residence
   a. On days s/he is not trip removed, the APFA will reimburse a representative actual meal expenses at his / her residence city to the limit provided in F.2.a.(1) below when it is necessary to conduct APFA business during such meal, or when a representative is required by the transaction of APFA business to meet during a normal meal time.

      (1)   Allowable MEA at Residence City is as follows:
            Breakfast up to: $ 6.00
            Lunch up to: $10.00
            Dinner up to: $17.00
            Snack up to: $ 3.00

      (2) In addition to the required receipt, all such MEA reimbursements shall require the representative to note the name(s) of the other individual(s) meeting during the meal time and the nature of the APFA business being conducted.

3. Guaranteed MEA at Residence
   1. On days a representative is both trip removed by and performing work for the APFA at his / her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2. above.
   2. The "Guaranteed MEA at Residence" shall be paid at the rate of twenty-five dollars ($25) per day.
   3. The maximum "Guaranteed MEA at Residence" that will be paid to a member shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

    4.   National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of three hundred dollars ($300) per month.

4. Calculation of MEA
   a.   National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent (e.g. "Payback" as provided in paragraph D. above) shall receive a minimum MEA of three hundred dollars ($300) per month.
   b.   The combination of "Per Diem MEA Away from Residence" as provided in f.1 above, "Actual MEA at Residence" as provided in F.2 above, and "Guaranteed MEA at Residence" as provided in F.3 above shall not be capped.
   c.   MEA expenses will be calculated and paid in the following order:
      (1) "Per Diem MEA Away from Residence," then the remaining balance owed, if any, will be paid as
      (2) Actual MEA at Residence," then the remaining balance owed, if any, will be paid as
      (3). "Guaranteed MEA at Residence."

5. Business Related Expenses
a.   Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.
   i.   Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business- Related Expense.
   ii.   Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.
   iii.   In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision. The reimbursement of a Business-Related Expense shall not count against a representative's maximum MEA.

      Plaintiff argues that Vargas spent thousands of dollars in DFW on meals not allowed by the Policy Manual. The APFA Policy Manual does not permit National Officers to charge actual meals in their City of Residence, except for narrow exceptions. The hosting exception is very narrow. National Officers who travel away from DFW on Union business are paid at per diem at the same rate as American Air Lines Flight Attendants and are not permitted to "Double Dip: and receive actual meal expenses. There is no working lunch exception in the Policy Manual. APFA Representatives are required to follow Provisions of the Policy manual. The Charged parties failed to establish a practice of violating meal policy.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Plaintiff argues Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands of dollars of furniture he had no right to take, concealing the fact from the APFA leadership and members. The portion of the charges dealing with furniture reads as follows:

> Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for. As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property. On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture. There is no record or inventory of that furniture nor can the furniture be located. The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done.

> The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer: The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA.

> The specific charge was failure to maintain an inventory list but the charges also listed a violation of the broad duty as APFA Treasurer to "be responsible for the care and custody of the funds and securities of the APFA."

> Article VII, Section 2 of the APFA Constitution states members can file charges over "act(s) *and/or* the Article(s) of this Constitution allegedly violated which constitute the basis of the charge(s)." (emphasis added) Here Vargas is charged with both a specific act and a violation of an article of the Constitution.

Vargas did not maintain an inventory list. The Ashley furniture purchased by Vargas cannot be accounted for. The missing furniture from the prior administration. Vargas last minute objections should be rejected. Eugenio Vargas failed to safeguard the furniture of the prior administration.

Plaintiff argues Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

On his last days in office, Eugenio Vargas changed the longstanding formula on vacation payout to inflate the pay of himself and his fellow officers, Bob Ross, Nena Martin, and Marcy Dunaway. Rather than including just the salary in the payout of vacation, they included items from expenses such as Meal Expense Allowance and SAF.

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

The policy manual provides that officers may be paid out of unused sick and vacation. (Joint Ex 1.) This should be paid out at their rate of pay. Instead, Vargas inflated their pay to include MEA, SAF and stipend which caused them to each be paid over $5000 above what they were entitled to.

Section 6.B.1.c of the policy manual allows an outgoing National Officer to be paid out vacation " at a rate prorated on the National Officer's annual salary, as defined in 6.A above..." Section 6.A provides the "The salary of the National Treasurer shall be equivalent to the highest purser

flight attendant pay rates, including international override pay, for a flight attendant based on 105 hours monthly." (Joint Ex 1) There is no ambiguity in the language whatsoever.

Vargas, along with his fellow national officers Marcy Dunaway and Nena Martin, inflated this pay by adding in MEA, SAF and stipend. But nowhere in the policy does it provide that expenses and other payments are included.

This was simply a money grab on their last days in office. Vargas admitted on cross examination that this was his idea to do this and that he did not inform the BOD. (TR 656) Even worse they broke the checks up into a series of four $4000 checks which they signed for each other three days before they left office. (TR 213-214, 661.) While Vargas claims it was to avoid taxes that makes no sense since lump sum distributions are always taxed the same.A member of the APFA accounting department, Debbie Hoover was subpoenaed and testified in this hearing. Ms Hoover testified that she was ordered to add the MEA, SAF and stipend to their pay. She testified it raised red flags as it "just had not been done that way. It wasn't past practice."

In an exchange, Patrick Hancock, a longstanding member of the APFA leadership, explained to Vargas and his cohorts that this policy had been in place since 1987 and was very simple. It was based on their pay using their hourly rate. Hancock noted they had paid themselves based on a new formula which added in "things like profit sharing, MEA/SAF, Grand Slam rewards, and who knows what all. This New Formula was not approved by the BOD or EC...."

Plaintiff argues Vargas allowed Bob Ross to be paid expense allowances when he was no longer working for APFA. This payment was not specified in Ross' exit package.

Bob Ross resigned office in March, 2018 receiving an exit package negotiated by outside attorney Mark Richard. The validity of the Ross exit package is not in play in this arbitration. A separate arbitration ruled the BOD was within their authority to sign that deal. Chinery and Lee were not parties to that case.

Plaintiff argues this case does not challenge the exit package but rather charges Vargas allowed Ross to receive thousands of dollars in payments not provided for in the policy manual or the exit package. The exit package provides that Ross shall receive the following economic items:

3.     Bob Ross will continue to receive from APFA his current full salary and benefits including his insurance through July 31,2018.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

4.    APFA agrees to pay Ross all of his accrued and unused back vacation time from
      April 2016 through July 31 2018.

5.    APFA agrees to pay upon his request a one time lump sum in the total amount of
      ten thousand dollars ($10,000) which represents Ross's moving expenses. Ross
      shall present the moving expenses to APFA for payment through 2019.

Nowhere in the exit package language does it specify Ross should get paid expense
payments for months he is not working. Yet Vargas paid Ross $1050 for five months from
March through July 2018 for a total of $5250.

Plaintiff argues Vargas used the union credit card for a rental car while on vacation in
Spain as well as charging a meal while also on per diem. Vargas was charged with violating
policy by charging a rental car for the week at a cost of almost $700 when he was on vacation in
Madrid, Spain. Additionally, Vargas was charged with violating meal policy by charging meals
in Spain while on per diem. Here the record is undisputed that Vargas used the union credit card
to purchase the rental car. Vargas claims that he was on vacation with his husband and used the
restroom and somehow his credit card was signed. Vargas claims he paid it back on September 9
after discovering the mistake. The question then becomes was this an inadvertent mistake or did
Vargas intentionally misuse the credit card and pay after he realized? Current treasurer Erik
Harris testified that when Chinery and Lee originally filed the charges he could not find the
receipt. (TR 378-382.) The receipt was provided by Vargas. So based on the information
available at the time of charging, these charges were proper.

Plaintiff argues Article III, Section 6.E of the APFA Constitution places the responsibility
on the APFA National Treasurer the duty to safeguard the assets of the union. Vargas, in fact, did
the opposite, repeatedly violating the policy manual for the benefit of himself and others.

Plaintiff's request the following remedy:

1.   Vargas repay APFA for the following economic harm:

     a.  Vargas repay APFA for all meals charged to his card which lack a proper receipt
         containing itemized meal, business purpose, attendees and/or any meal which
         does not meet the hosting exception. Alternatively, Vargas should repay APFA
         the value of MEA he received during his term which is $7500.

     b.  Vargas repay APFA for the fair market value of Greg Gunther's furniture he
         embezzled.

     c.  Vargas repay APFA for the value of furniture he failed to protect, including from
         prior administrations.

2.   Vargas be prohibited from serving in any APFA position for life.
3.   We request that a fine be leveled against Vargas equal to the cost of this arbitration
     proceeding pursuant to Article, Section 7.C.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

4. That APFA be instructed to conduct a full audit of Vargas' administration and assess
   Vargas any additional funds which are uncovered in the audit.
5. We ask that the arbitrator retain jurisdiction in case the parties cannot agree on any
   amounts due.

## THE DEFENDANT'S ARGUMENTS

Defendant argues the only issue to be determined is whether former APFA National
Treasurer, Eugenio Vargas, committed the following act(s) was a "**willful** violation of an express
Article of this Constitution, or of a proper and express written resolution or policy of the Board of
Directors or Executive Committee" of the APFA Constitution, Article VII, Section 1.F. and did
Members Melissa Chinery and Sandra Lee (Plaintiff) willfully bring these charges against the
former APFA National Treasurer, Eugenio Vargas (Defendant), without having evidence
sufficiently sustain the charges.

Defendant argues that by definition, were the actions of the former APFA National
Treasurer, Eugenio Vargas; deliberate, intentional, premeditated or calculated regardless of the
consequences or effects? Or were they not accidental or done deliberately with disregard to the
APFA Policy Manual or APFA Constitution.

Defendant argues the allegations raised by the Plaintiff against former National Treasurer
Eugenio Vargas were not willful or deliberate, intentional, premeditated or calculated. Mr. Vargas
however, takes full responsibility for his actions and has provided his full support in Defense of
these charges.

Defendant argues the plaintiff has the burden of proof. There are three standards of the
burden of proof, (1) preponderance of the evidence, (2) clear and convincing evidence and (3)
beyond a reasonable doubt. This obligation has not been met by any the burden of proof standards.

Defendant argues the Plaintiff argued in the Article VII charges the credit card use and
expenses, where the union credit card was used for personal use (rental car) in Madrid Spain.

Defendant argues the charging parties cite Policy Manual Section 5.G. in support of their
Article VII charges, when the referenced section of the Policy Manual actually applies to "Actual
out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed."
Not only was this an invalid citing of the APFA Policy Manual but an indication of their lack of
understanding of said policy and it's interpretation, while arguing inaccurate and irrelevant points
to support their charges. While on vacation with his spouse in Madrid, Spain, and while awaiting
the keys for a rental car at the Enterprise car rental counter, Vargas handed his spouse his wallet
to pay for the rental car while he went to the restroom. Upon his return to the car rental counter
the rental agreement was ready for a signature and the car was ready for pick up. Not until early
September did Vargas realized a mistake had been made with the payment for the rental car while
in Madrid, Spain. Vargas realized his spouse had used the APFA Chase Credit Card from his wallet
instead of his personal Chase Credit Card, when paying for the car rental in Madrid, Spain. The
following day Vargas returned to APFA with the car rental receipt and explained to the APFA
senior accountant, Rene Berthelot what had happened, to which he responded  "don't worry, all

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

you have to do is pay it back. It happens."  Vargas made a payment of $614.20 to APFA on
September 9, 2016, for the personal rental car charge made to his union credit card. Former APFA
National Treasurer, Craig Gunter, a licensed CPA, was also questioned on the record about any
personal purchases he may have inadvertently made with his union credit card, stating "I could
have, but I don't think I ever charged anything on it, but you know, they're all in your wallet so."
He further stated, if I had done so "I would have gone to the accountant and said I accidentally did
this. Here, let me write you a check". Former APFA National Treasurer, Craig Gunter, also stated
for the record the process for personal purchases inadvertently made on a union credit card by
other officers in his administration.

Defendant argues the Current APFA National Treasurer, Erik Harris, also confirmed that
the personal car rental purchase inadvertently made by Mr. Vargas on his union credit card while
on vacation in Madrid, Spain was reimbursed to APFA. Personal purchases made by other APFA
National Officers using their union credit card were identified on the record. Former APFA
National Secretary, Jeff Pharr's union credit card statements revealed multiple personal purchases.
Mr. Pharr's union credit card statements also expose this practice as an acceptable habit, multiple
personal credit card charges along with charges identified for other union representatives. Former
APFA National Secretary, Jeff Pharr had approximately eight (8) identified personal charges to
his union credit card along with personal charges made for other union representatives. Mr. Pharr
was subpoenaed without acknowledgement.

Defendant argues that former APFA National Treasurer, Eugenio Vargas was charged with
failing in his responsibility to act in accordance with the APFA Policy Manual Section 5.F., by
citing "The policy is clear that meals may only be reimbursed on rare and limited occasions when
entertaining outside guests and in no instance when all participates are already receiving meal
expenses. This is to prevent double dipping by having APFA pay MEA for meal expenses and
then also pay for a representative's meals."

Defendant argues APFA had no policy in place on how to differentiate or separate any
amount from the guaranteed MEA/SAF totals when a National Officer, Regional Representative,
National Chair, or another Representative, who are authorized a full month removal and receiving
guaranteed payments of MEA/SAF, is considered a host of an authorized APFA meeting. APFA
also had no policy in place until this year for a National Officer in relation to ones union credit
card practice. Current APFA National Treasurer, Erik Harris clarified this fact on the record. APFA
MIA Base President, Randy Trautman also confirmed no polices were in place for said issues.
APFA National Treasurer, Erik Harris identified on the record, he himself was non-compliant with
the "OLMS Law" by not providing the required information while receiving MEA/SAF and was
never charged with Article VII. The Budget Committee meetings hosted by the APFA National
Treasurer is one example of an authorized APFA meeting. It is an established practice that has
been followed through the years for the APFA National Treasurer to provide lunches/dinners for
their committee members. Yvonne Johnston, Craig Gunter and Erik Harris this practice.

Defendant argues that the APFA Board of Directors Annual Convention was held in March
2021, APFA National Vice President, Larry Salas, put forth Resolution No. 10, Business Related
Meals, which provides a clear policy on reimbursement of business-related meals and group meals
and entertainment expenditures. The APFA Board of Directors unanimously passed this resolution.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

This resolution secures the established practice of an APFA Representatives authorization to pay for meals of a guest/business associate when the Representative would be considered the host of an authorized APFA function or meeting, while not counting against a Representatives MEA.

Defendant argues The APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs. The G/L Acct 1246 document for Furniture & Fixtures provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

Defendant argues that in January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck, as interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty apartment lease, and in a cost saving measure for the union, Mr. Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty. Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when leaving Dallas. Shane Staples, after being appointed to the position APFA National Communications Chair, testified he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used by APFA as storage.  After these items were repurposed, the Ashley Furniture items were purchased. In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all his furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture.

Defendant argues Members Melissa Chinery and Sandra Lee have cited language from Section 8.I.3.b.(5) of the APFA Policy Manual which governs the inventory and transfer of Office Equipment only. The Charging Parties have once again quoted and used invalid language to substantiate their Article VII charges against former APFA National Treasurer, Eugenio Vargas.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

the APFA Policy Manual by citing *" Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all which is not part of basic salary."* The APFA has an organizational structure that is two-tier, consisting of Base Presidents, who are the voting members and the four (4) National Officers, who are non-voting members collectively they make up the APFA Board of Director. In February 2018, Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark Richard, negotiated a Ross "Transition Agreement." The negotiations were solely between the voting Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the Ross "Transition Agreement" nor was he present in the room or a signatory of said agreement. In fact, APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement" in its entirety, only the economic portions which encompassed covenants #3, #4 and #5.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing " *Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all which is not part of basic salary."*

Defendant argues the APFA has an organizational structure that is two-tier, consisting of Base Presidents, who are the voting members and the four (4) National Officers, who are non-voting members collectively they make up the APFA Board of Director. In February 2018, Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark Richard, negotiated a "Transition Agreement". The negotiations were solely between the **voting** Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the Ross "Transition Agreement" nor was he present in the room or a signatory of said agreement. APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement" in its entirety, only the economic portions which encompassed covenants #3, #4 and #5.

Defendant argues Covenant #3 of the Ross "Transition Agreement" states "APFA agrees that Bob Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018. Former APFA National Treasurer, Eugenio Vargas, stated for the record the difference between, "Basic Salary" and "Full Salary" regarding a National Officers compensation. Former APFA National President, Laura Glading, also received "Full Salary" upon her exit, per the terms of her "Transition Agreement." "Full Salary" for a National Officer, per the APFA Policy Manual, Section 5, entitles them to receive guaranteed MEA, SAF and Office Outside Residents payments. This guaranteed payment of $1050 is included in the gross wages "Box 1" of the National Officers W-2 tax form. Marcus Gluth corroborates the meaning of Basic Salary vs. Full Salary.

Defendant argues The NDAs on both the Glading "Transition Agreement" and the Ross "Transition Agreement" were lifted at the same time by APFA National President, Julie Hedrick,

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 30 of 39   PageID 3413
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

allowing Members Melissa Chinery and Sandra Lee, to view both agreements in their entirety for any language and payment comparisons. No article VII charges were filed against Laura Glading for her 'Transition Agreement."

Defendant argues the hearing in the Matter of Arbitration between Julie Moyer (charging party) and the 2018 APFA Board of Directors (charged party), before Article VII Arbitrator, Edward B. Valverde, Esq., was held on June 1-3, 2021, with a decision rendered on September 21, 2021. The Award clearly determined, in line with the charged party's defense, that Article III, Section 3.A authorizes the APFA Board of Directors to take any and all lawful action consistent with the Constitution to safeguard and protect APFA.

Defendant argues Former APFA National Treasurer, Eugenio Vargas used "Full Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office, which included MEA and SAF. After numerous requests for a meeting, the first written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on September 4, 2019, approximately 2 months after the original Facebook post on July 11, 2019. The letter confirms that certain payouts made in 2018, incorrectly included MEA and SAF in the calculation. The letter continues to request that the "Union be made whole" but still no specific dollar amount owed had been established. Not until September 18, 2019, was the three (3) members of the Ross administration noticed of a dollar amount owed, supported by a single sheet of paper and without documents to substantiate the claim. Patrick Hancock revealed that APFA believed their calculations were correct based on a 1987 formula invented by former APFA National President, Patti Gibbs. Former APFA National Treasurer, Eugenio Vargas, stated for the record that he did include "Full Salary" which included MEA and SAF in the calculations of vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office. He has **never** disputed that fact. Mr. Vargas used the same "Full Salary" logic that was used in the calculation of the Ross "Transition Agreement" and the Glading "Transition Agreement." He used the one and only number identified on the officers W-2 as gross wages, which include MEA and SAF in his calculations, but in actuality this calculation was irrelevant due to the fact that a "1987 formula" should have been used.

Defendant requests the Article VII charges against Eugenio Vargas be dismissed in its entirety.

DISCUSSION AND OPINION

The arbitrator finds the allegations raised by Plaintiff against Defendant, the former National Treasurer Eugenio Vargas must be a *willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee.* (See Article VII, Section 1) The definition of "willful" has many meanings, its construction often influenced by its context. It often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal context it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. It may also be construed to mean an act or omission is willfully done, if done voluntarily and intentionally and with the specific intent to do something the law

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.  Additionally, a willful act may be described as done intentionally, knowingly, and purposely, without justifiable excuse as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently. (Black's Law Dictionary, 5th Edition, pg. 1434).

Additionally, the arbitrator is of the Opinion that in order for the Plaintiff to meet its' burden of proof, it must not only be a "willful" violation but such proof must be supported with clear and convincing evidence.

## Issue No. 1: – Violating the Meal Expense Policy

The arbitrator finds the scope of Section 5.F. of the Policy Manual deals with Meal Expenses/Meal Expense Allowance (MEA); Per diem MEA Away from Residence; Actual MEA at Residence; Guaranteed MEA at Residence; Calculation of MEA and Business Related Expenses.

Plaintiff argued that Former National Treasurer Eugenio Vargas spent thousands of dollars in DFW on meals that are not allowed by the policy manual. Vargas spent $10,945.28 on his APFA Union credit card on meals during his two-year term of office. Plaintiff submits that many of the meals lacked the proper documentation; by failing to provide an itemized receipt, the purpose, and/or the attendees of the meal. At the same time, Vargas was receiving a guaranteed meal expense allowance of $300.00 per month for his National Officer position and was therefore double-dipping at the expense of the membership. Thus, for his 25-month tour as National Treasurer, Vargas received $7,500.00.

The arbitrator finds and the record evidence supports the fact that APFA maintained a check and balance system to insure the proper disposition of these expenses. Lukenmeyer testified expenses are reported on an expense report and are supposed to have two signatures, so there should be another person who is overseeing what the Treasurer is doing or spending, whomever signs the other half of that expense report. Another National Officer is usually the person signing and affirming the expenses are true and accurate. The only way this could be accomplished is by having the proper documentation to include an itemized receipt, the purpose of the meal expense and the name of the attendees. Record evidence revealed that Vargas and his fellow National Officers frequented Raven's Grill Country Club. Vargas spent $1,727.00 on his APFA credit card for several meals at Raven's Grill but other National Officers took turns buying meals for each other on their own APFA credit card.  This raises the question as to whether or not the check and balance system had failed.  We however have to consider that the person who is approving these expenses was knowledgeable of the policy manual and what was required for it to be a true and accurate expense report was submitted with the proper documentation. Defendant argued this Check and balance procedure is a past practice of prior administrations. Record evidence revealed that this has been a frequent ongoing past practice in several administrations prior to and after the Ross Administration.  Plaintiff filed an Article VII charge against Vargas when they could have filed charges on other National Officers as well.  Plaintiff' represented that these meal expenses lacked the proper documentation. Record evidence revealed there were missing files of the Vargas administration, then it could be conceivable that these missing files contained the rest of the

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

documentation. Thus, the check and balance system in place may or may not have failed to catch the meal purchases lacked the proper documentation, as we are unsure. Record evidence revealed other National Officers were also taking turns in buying meals on their APFA credit card. They too may not have been aware of this activity could be viewed as "double dipping" to uphold an inappropriate use of the APFA Union credit card. So, when a weekly expense report is submitted to whomever for signature from Vargas, the individual signing it did not foresee a problem and signed off affirming the expenses were true and accurate. Present day National Treasurer Erik Harris testified there has been a lot of interpretation and no definitive policy was in place on the use of the APFA Union credit card. He also said the Union was aware of these shortcomings and the BOD recently took affirmative action and passed Resolution No. 10 - Business Related Meals, Exhibit (V-15) to correct and clarify. Without a clear policy in place, this arbitrator cannot affirm the expenses Vargas submitted for payment was proper.

Thus, the arbitrator is of the Opinion the evidence Plaintiff submitted is their interpretation of what they believe should be considered improper use of an APFA Union credit card. This arbitrator is not persuaded with the evidence presented. Additionally, no questions were asked of Vargas regarding all of these expenses. Plaintiff argued that the APFA Constitution states, "Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein." Without a definitive explanation or proper documentation from Vargas over each expense, we would be guessing if Vargas engaged in improper use of the APFA Union credit card!

It is the arbitrator's Opinion an independent auditor be hired to audit Vargas APFA credit card usage as to whether proper documentation was provided with the expense reports. Additionally, such auditor shall audit Vargas Tenure as National Treasurer and inspect his APFA credit card statements, expense reports, and whether two signatures were provided and whether it documented the purpose of the meal and with the names of the attendees. Thus, the evidence presented does not establish Vargas' behavior at this juncture was "willful" in violation of Article VII, Section 1, but if the audit conducted finds Vargas purchased meals for himself only then it would be found that his conduct was "willful" and would require him to repay APFA. This audit would reveal whether Defendant failed in his fiduciary duty as National Treasurer. Moreover, the record evidence at this point is not clear and convincing enough to establish Vargas expenses were inappropriate at this juncture. Only an independent audit will determine whether the evidence compiled is clear and convincing.

Moreover, the arbitrator finds in Exhibit (V-13, dated March 8-10, 2021) Resolution No. 8 where the BOD adopted a new credit card policy for APFA issued credit cards. Under "**Documentation of usage**" it states,

    a. Each National Officer shall submit an electronic report to the accounting department within thirty (30) days of the end of the month in which the charges were made. The report to be sent to the accounting department shall include:

        (1) The month and year must clearly be denoted on the report.

        (2) A copy of the itemized receipts for all purchases made.

        (3) The department(s)/budgets to which the charges are being made.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

      b.  Each report must be signed by two (2) National Officers, one of whom must
         be the National Officer who submitted the report.

Resolution No. 8 also provides for the "Maintenance of Records", "Payment of statements should
be paid as soon as possible so as to avoid unnecessary interest charges", "Policy Compliance",
"Training" and all credit card holders are required to sign the APFA Card-Holder Agreement. The
National Treasurer will maintain a copy of all signed agreements.

      Under these given circumstances Issue No.1 is remanded to the BOD or EC to hire an
Independent Auditor to audit Vargas credit card charges during his term as National Treasurer.
Additionally, if the missing files are in the position of the Defendant, it is hereby Ordered that they
be turned over to Erik Harris, the National Treasurer for the independent auditor's audit. In the
hearing, Plaintiff argued that some of Defendant's evidence were part of the missing documents.
If not provided, an adverse inference may be drawn.

**Issue No. 2: - Failing to Maintain an Inventory list thereby violating Article 11, Section 6.E.
         of the APFA Constitution by failing to maintain Union assets?**

      Plaintiff argued that Vargas handling of APFA furniture is unaccounted for. Plaintiff
stated,

> *"Finally, thousands of dollars of furniture, including furniture purchased
> by Vargas, is unaccounted for. As Treasurer Vargas had an obligation
> under the APFA constitution and federal labor law to safeguard union
> property. On one receipt dated 5/18/16 under Vargas's union credit card
> charges we found a purchase for $8733.89 at Ashley furniture. There is no
> record or inventory of that furniture nor can the furniture be located. The
> APFA policy manual requires that the National Treasurer inventory
> equipment and monitor the transfer of equipment between representatives.
> This was never done.*
>
> *The Treasurer has the responsibility to safeguard the funds of the APFA
> union members as outlined in Article III Section 6.E. of the APFA
> Constitution: Duties of the Treasurer: The Treasurer shall be responsible
> for the care and custody of the funds and securities of the APFA."*

      Plaintiff argued Vargas is charged with an act of omission, the failure to maintain an
inventory of furniture. Vargas is also charged with a violation of a specific Article of the
Constitution, which is his duty "to safeguard the funds of the APFA union members as outlined in
Article III, Section 6.E. of the APFA Constitution."

      Plaintiff requested of then National Treasurer Craig Gunther to supply the inventory lists
and Craig Gunther testified the APFA has no records of furniture from Vargas' tenure as National
Treasurer. This is corroborated by present National Treasurer Erik Harris who also stated there is
no record of inventory from the Vargas Administration.

      Record evidence revealed the Defendant submitted a depreciation list which referenced the
furniture but according to Erik Harris' testimony,  a depreciation list does not constitute a proper

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

inventory list. Defendant argued the Ashley Furniture has been accounted for as Vargas purchased
the furniture for three committee chairs, Gaby Harty, Chuck Ransdale and Shane Staples.

Defendant argued the APFA Chase Credit Card statement dating, May 9, 2016, to June 8,
2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016,
in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed
for the corporate apartments for the three (3) newly appointed APFA National Department Chairs.
The General Ledger Account 1246 document for Furniture & Fixtures provides a record of items
purchased under the name of each APFA National Department Chair and amount spent. The total
value of the initial charge differs due to a credit of $104.98.

Defendant argued that in January 2017, APFA National Health Chair, Gabby Harty
tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck,  as
interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty
apartment lease, and in a cost saving measure for the union, Vargas proffers the empty furnished
apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel
expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of
the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA
with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months
after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with
the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it
Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye"
by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure
from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the
furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty.
Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified
that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs,
including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA
National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture
purchased by APFA from Ashley Furniture was in his corporate apartment when he left Dallas.
Shane Staples, after being appointed to the position APFA National Communications Chair,
testified he was instructed to salvage any furniture he could use for his corporate apartment from
a garage at the Bear Creek apartment complex, which was being used by APFA as storage.  After
these items were repurposed, the Ashley Furniture items were purchased. In preparation for the
end of his term and transition period, APFA National Communications Chair, Shane Staples
completed a detailed inventory of all his furnishings in his APFA corporate apartment, which
contained the contents purchased at Ashley Furniture.

Plaintiff argued Vargas violated his duty as National Treasurer of APFA to safeguard union
property as required in Article III, Section 6.E.

Plaintiff argued the APFA Constitution, Article VII, Section 6.D specifies the procedure a
charged party can utilize if they want to narrow the scope of charges, stating:

> D.      The Article VII Arbitrator may, on his/her own motion, or
>         upon motion filed by the accused, determine that charges are

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

not sufficiently specific and that they will be dismissed
unless the accuser amends them to provide sufficient
specificity.

Here, Defendant objected at hearing for Plaintiff broadening the scope of this charge over
questions asked of Vargas regarding Greg Gunter's furniture that he had purchased it for his own
personal use. Defendant states the charges were deemed valid, timely and specific before the EC
and it only raised issues with Ashley Furniture. Defendant agrees Vargas needs to answer to the
charge of the Ashley furniture of $8,733.95 that he purchased as the Treasurer of APFA. Plaintiff
however argues Defendant failed to follow proper procedure in raising objections and in doing so
failed to follow the APFA Policy Manual and Constitution. By failing to follow proper procedure,
Defendant raised an objection in a manner which does not protect the rights of the charging parties.
This arbitrator does not agree, the Ashley Furniture is the only issue that is valid, specific and
timely in the grievance charges. It does not say anything else about Greg Gunter's furniture.
Plaintiff failed to amend the grievance charge to include Greg Gunter's furniture. By Plaintiff
raising this additional issue at hearing for the first time, this is an attempt by Plaintiff to engage in
an "ambush through arbitration." Thus, the objection raised by Defendant is correct and is hereby
sustained.

Plaintiff argued that Section 8.I.3.b.(5) of the Policy Manual deals with the National
Treasurer duty to maintain a procedure to monitor the transfer of equipment, when appropriate,
between representatives in the field. The arbitrator finds no evidence was presented to support this
allegation.

The arbitrator finds Vargas failed to prepare an inventory list. This arbitrator is of the
Opinion that all of the Ashley furniture has been fully explained and accounted for. Record
evidence however revealed there was no inventory list prepared and Harris testified there was no
inventory list. Under these circumstances, Vargas did fail in his fiduciary duty as National
Treasurer to prepare an inventory list to maintain Union assets and violated Article 1, Section 2.J,
Section 7.E.O.Q and Article 1II, Section 6.E. of the APFA Constitution.

Thus, it is the arbitrator's Opinion Issue #2 has merit by Vargas failing to prepare an
inventory list to maintain Union assets.

**Issue No. 3**    **Allowing himself and his fellow National Officers to receive
inflated sick and vacation payouts when they were not entitled to
such, and**
**Issue No. 4**    **Allowing the payment to former National President Bob Ross
thousands of dollars in Meal Expenses Allowance (MEA) and
SAF when he was no longer working for APFA?**

The arbitrator has consolidated Issue No. 3 and Issue No. 4 as it involves the same issue.

Plaintiff argued that Vargas changed the longstanding formula on vacation payout for
himself and fellow officers Bob Ross, Nena Martin and Marcy Dunaway. Vargas included expense
items such as Meal Expense Allowance (MEA) and SAF.

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 36 of 39   PageID 3419
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Plaintiff argued the Policy Manual provides that officers may be paid out of unused sick and vacation. This should be paid at their rate of pay. Vargas inflated their pay to include MEA, SAF and stipend, which created an overpayment of $5,000.00 above what they were entitled.

Plaintiff argued Section 6.B.1.c of the Policy Manual allows an outgoing National Officer to be paid out vacation "at a rate prorated on the National Officer's annual salary, as defined in 6.A above…" Section 6.A provides, "The salary of the National Treasurer shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for flight attendant based on 105 hours monthly." Plaintiff argued this was simply a money grab on their last days in office. Vargas admitted on cross-examination that this was his idea to do this and that he did not inform the BOD. Even worse they broke the checks up into a series of four $4000.00 checks which they signed for each other three days before they left office. Vargas claimed it was to avoid taxes.

Plaintiff presented accountant Debbie Hoover who testified that National Officer Eugenio Vargas approached her about changing the formula.  She said she was also told to add SAF and MEA. This did raise a red flag with her because this has never been done before, it wasn't past practice and this was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they were all included in box 1.

Defendant Vargas testified that Attorney Mark Richards showed him only the economic Items 3, 4 and 5 of the Bob Ross Transition Agreement, Exhibit (V-100). Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Vargas stated that Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and this is what Ross was paid.  Laura Glading in her exit agreement received the same as Ross and the BOD agreed.

Defendant Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination he created to be used for "Full Salary" vs "Basic Salary" for said payments. The Ross "Transition Agreement" has been deemed valid  by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross "Transition Agreement".

Defendant Vargas takes full responsibility for his actions involving his changing of the mathematical formula when using "Full Salary" vs "Basic Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross Administration when leaving office. Vargas said that Patrick Hancock informed him that the formula always used was a 1987 package formula. Vargas has provided his full support in these charges, including months of

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

correspondence between the three former officers, APFA National Officers, APFA Board of
Directors, APFA In-House Counsel, APFA Executive Committee and Members Melissa Chinery
and Sandra Lee, by providing a clear picture of his willingness to repay the overage, once
established from the "**1987** " formula that was exposed months after the July 11, 2019, Facebook
post by Member Sandra Lee. Eugenio Vargas never stated he would not pay an amount if owed,
but expected the calculation to be accurate and accounted for.

The arbitrator finds Vargas interpretation of the Ross Transition Agreement to not only
include MEA and SAF but he included a stipend. Vargas had instructed Hoover to change the
formula to include MEA and SAF and the stipend in the payouts of National Officers Ross, Martin,
Dunaway and himself. Thereafter, written communication on behalf of APFA was sent by In-
House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross
administration on November 8, 2019, stating *"After the meeting held on October 30, 2019, to allow
you to review the independent auditor's calculations, it is our understanding that you take issue
with how the calculations were made. We researched the issue again and believe our initial
calculation is correct".*

Defendant argued in the calculations provided at the October 30, 2019, meeting, simple
math was used to determine the alleged monies owed by taking "**Full Salary**" minus "**Basic
Salary**", then stating the difference was MEA and SAF. Calculating MEA and SAF in this manner
was incorrect due to other income being included in the "**Full Salary**", like the UAL Arbitration
payout, which provided a pay increase with retroactive pay.

The arbitrator finds in the APFA Executive Committee meeting dated December 5-7, 2019
Resolution #69 where the EC resolved this matter by stating, "that if the repayment plan is not
received, the APFA Attorney is directed to file a State Civil lawsuit no later than January 6, 2020
to collect these funds," and any settlement agreements be approved by the Executive Committee
prior to APFA acceptance.

Defendant Vargas said he has since entered into a payment agreement to repay the overage
debt. Vargas admitted that it was his interpretation of the Ross Transition agreement to change the
formula for the MEA, SAF to be included in their payouts and this is what created the overage.

It is this arbitrators Opinion, Vargas attempted to benefit monetarily and thus failed in his
fiduciary duty as National Treasurer by willfully changing the formula for the payouts for Bob
Ross, Nena Martin and Marcy Dunaway as well as himself.

It is therefore the Opinion of this arbitrator, Issue No. 3 has merit as Vargas violated his
fiduciary duty as National Treasurer.

With respect to Issue No. 4, the arbitrator finds Vargas admitted that he had changed the
formula, this has been established in Issue No. 3. But in Issue No. 4, Plaintiff argued that Vargas
paid Ross MEA and SAF when he was not working. Under item No. 3 of the Ross Transition
Agreement, it clearly states, *"APFA agrees that Ross will continue to receive from APFA his
current full salary and benefits, including full insurance coverage, through July 31, 2018."* The
Ross agreement is binding as stated by Arbitrator Edward B. Valverde. Vargas did include MEA

Case 4:22-cv-00430-Y   Document 85-2   Filed 04/14/23   Page 38 of 39   PageID 3421
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

and SAF in Ross's salary in accord with Item No. 3 as well as Item No. 4. *"APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018*." But Ross too received an overage because Vargas had changed the formula and he too is required to pay the debt owed.

In Issue No. 4, Ross did receive an overpayment because Vargas admittedly changed the formula. It is my understanding Ross has an outstanding debt with the APFA. It is clear Vargas manipulated the payout formula.  In the Bob Ross Transition Agreement, MEA and SAF were included. The issue with MEA and SAF has been resolved as well as the overpayment to Ross, Nena Martin, Eugenio Vargas and Marcy Dunaway. Dunaway and Vargas have agreed to a payment plan and Martin has paid her debt in full.  Only Ross has not paid. Thus, Issue No. 4 has been resolved and is now moot.

## Issue No. 5    Violating the credit card policy by charging a rental car and meals for a trip to Spain?

Here, Vargas made two trips to Madrid Spain. One was for vacation and the other was work related for the APFA where he engaged in a time study aboard a 787 airplane. On the vacation trip, he approached the Enterprise Rental Car counter to rent a car. He told his spouse he needed to go to the restroom and gave his spouse his wallet. Upon his return was the rental agreement and he signed it. He did not notice the charge was on the APFA Union credit card and not on his Chase Visa card. In early September when the bill for the credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit card was used. He brought the receipt back to APFA the following morning and when senior Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study.

The arbitrator finds Vargas in this instance recognized the charge of the rental car he rented in Spain while on vacation. The charge was on his APFA credit card statement. Vargas paid back the APFA $614.29. This reveals Vargas recognized that he had made an error and rectified it. As to the meal alleged this was a work-related meal when he conducted the time study on a trip to Madrid. It is therefore, the Opinion of this arbitrator this matter is now moot. Thus Issue No. 5 has no merit.

## Conclusion

The arbitrator having found no merit to Issue # 4, #5 are hereby dismissed.  Issue #2, #3 have merit. Issue No.1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Additionally, if there are missing files in the possession of the Defendant, it is hereby Ordered that they be turned over to Erik Harris,

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

the National Treasurer for the independent auditor's audit. If not, an adverse inference may be drawn.

**Remedy**

Vargas is to repay APFA for the following:

1. If after the Independent Auditors audit is completed and he/she determines that Vargas had used the APFA credit card for his own personal use on meals during his tenure as National Treasurer, Vargas is hereby Ordered to repay APFA for all meals he charged to the APFA credit card.
2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.
3. Vargas is hereby fined and Ordered to repay the APFA for half of the Arbitrator's Fee for this arbitration.
4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Vargas, that will be the amount to be assessed or due and the BOD or EC shall Order said repayment from Vargas.

**AWARD**

The grievance is sustained in part and dismissed in part as stated above.

**Issued in San Antonio, Texas, the 18th day of February, 2022.**

Ruben R. Armendariz, Arbitrator