**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| EUGENIO VARGAS, | § § § | |
| Plaintiff/Counterclaim Defendant, | § § | Civil Action No. 4:22-cv-430-Y |
| v. | § § | Judge Terry R. Means |
| ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, *et al.*, | § § § | (Relates to Motion Referred to Magistrate Judge Cureton) |
| Defendants/Counterclaim Plaintiff. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION
TO AMENDED MOTION TO COMPEL
RESPONSES TO FIRST REQUESTS FOR PRODUCTION**

Pursuant to Local Rule 7.1(i) and Section II.C of this Court's Case Management Requirements, the Association of Professional Flight Attendants ("APFA") submits this appendix of non-published cases and materials cited in its Response in Opposition to Amended Motion to Compel Responses to First Request for Production:

| Description | Appendix Pages |
|---|---|
| Declaration of Charlette Matts | Appx. 1-2 |
| Declaration of Hal O'Neil | Appx. 3-5 |
| Arbitration decision excerpt, Doc. 1-1 | Appx. 6-10 |
| Email re Request for Production: -  J. Bartos to K. Phillips, 10/20/23 | Appx. 11-12 |
| Email re Confidentiality: - Between J. Bartos and K. Phillips | Appx. 13-16 |
| Email re IMA Production: - M. Norton to J. Bartos, 6/1/23 | Appx. 17 |
| **Non-Published Cases** | |
| *MC Trilogy Texas, LLC v. City of Heath, Texas,* No. 3:22-CV-2154-D, 2023 WL 5918925, at *8 (N.D. Tex. Sept. 11, 2023 | Appx. 18-29 |

Dated: November 13, 2023

Respectfully submitted,

  /s/ James D. Sanford
JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX 75246
Tel.: (214) 800-5111; Fax.: (214) 838-0001
Email: jim@gillespiesanford.com


JEFFREY A. BARTOS (*pro hac vice*)
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tel.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com

*Counsel for Defendant and Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*


CHARLETTE L. MATTS (*pro hac vice*)
Tex. Bar No. 24133870
Association of Professional Flight Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cmatts@apfa.org

*Counsel for Defendant and Counterclaim Plaintiff
Association of Professional Flight Attendants*

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, a true and correct copy of the foregoing Appendix of Non-published Cases and Materials Cited In APFA Defendants' Response in Opposition to Amended Motion to Compel Responses to First Request for Production was served upon all persons who have requested notice and service of pleadings in this case via the Court's ECF system.

KERRI PHILLIPS
K.D. Phillips Law Firm, PLLC
6010 W. Spring Creek Parkway
Plano, TX 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com

MICHAEL R RAKE
Michael R. Rake, Attorney at Law PO Box 1556
Lake Dallas, TX 75065
Tel.: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com

/s/ *James D. Sanford*
JAMES D. SANFORD

## DECLARATION OF CHARLETTE MATTS

Charlette Matts hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am an attorney licensed in the State of Texas and am employed as a Staff Attorney by the Association of Professional Flight Attendants ("APFA"). I am one of the attorneys for APFA in this matter.

2.    I am familiar with the First Amended First Request for Production which was served by Plaintiff's counsel on APFA in this matter and which has been filed by Plaintiff as Appendix pages 3-9 in support of his Motion to Compel. Doc. 136 at ECF 6-12. Prior to my involvement in this case APFA had served a variety of objections to that Request. I later became involved in the gathering of documents responsive to that Request.

3.    The Request listed three categories of documents to be produced: (a) various insurance policies held by APFA; (b) "documents, correspondence and communications" between APFA and its accounting firm, Wood, Stephens & O'Neil, LLP, "concerning the Ross Administration"; and c) "All communications between any APFA officials … or any APFA counsel … which disseminated any … documentation from Wood, Stephens & O'Neil, LLP concerning the Ross Administration." Doc. 136 at ECF 11.

4.    I was involved in APFA's efforts to identify and produce documents responsive to these requests. As part of that effort, I became aware that, with respect to the second and third items, Plaintiff's counsel had agreed to limit the requests to documents and communications from August 2018 to the present and which involved the former members of the Ross Administration. To identify responsive documents, I supervised a search of the electronic and physical files of APFA representatives, who may have communicated with the O'Neil firm or would have received communications between APFA and the O'Neil firm, for responsive documents. Subsequently, I reviewed the documents and communications produced from the

search to determine whether the subject matter of the document and correspondence reasonably related to the subject of Plaintiff's request. Documents not already maintained as a PDF file were converted to PDF files. Further, I supervised the indexing and numbering of the documents and communications for transmission to APFA's outside counsel. My office prepared a set of emails which separated out individual emails for the sake of clarity and I understand these were produced to the Plaintiff. Thereafter, in response to a further request by Plaintiff's counsel, full sets of email chains were also produced. In addition, APFA produced an audit report regarding the APFA for fiscal year end 2018.

5. Compliance with the broad requests not previously pursued by Mr. Ross would impose a substantial and undue burden on APFA. APFA would be required to search physical and electronic files going back over seven years for all communications with WSO regarding any member (or, potentially, any "supporter") of the Ross Administration on any topic whatsoever, as well as all documents exchanged which related to any transactions involving such people. APFA would also have to search physical and electronic files for any internal communications among or between any "current or former", "elected or appointed" APFA officials. APFA has at any given time approximately 33 elected representatives at the national level, and approximately 32 appointed representatives. Plaintiffs' unlimited request for seven years of such documents would multiply that number significantly. Compliance with the Requests as now pressed by Plaintiff would consume substantial amounts of APFA staff resources and funds.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November, 2023.

Charlette Matts

2

### DECLARATION OF HAL O'NEIL, CPA

Hal O'Neil, CPA hereby declares as follows:

1.     I am an adult resident of the State of Texas and make this Declaration based on my personal knowledge.

2.     I am a Certified Public Accountant and one of the owners of the firm Wood, Stephens & O'Neil, LLP, based in Fort Worth Texas. Wood, Stephens & O'Neil, LLP currently has five full and part-time employees.

3.     I have provided accounting services to the Association of Professional Flight Attendants ("APFA") since 2004. Our firm conducts an annual audit of the APFA, works on tax returns, and performs audits relating to certain requirements of the Railway Labor Act regarding union dues. We also respond to requests for additional analysis on an as-needed basis.

4.     In 2019, I was asked by the APFA to review certain payments that had been made to former officers of APFA. This initial review did not involve payments to Robert Ross. In 2020, I was also asked to conduct a review regarding Robert Ross. In connection with those requests, I prepared and produced to APFA worksheets showing the overpayment calculations we had made along with a memorandum.

5.     In the course of performing that work, I exchanged emails and documents with APFA. As part of my normal course of business, I printed and kept in a separate file the emails and documents which were pertinent to my work. I did not maintain, and do not have, a separate electronic file separating out all email or other documents pertaining to that particular work.

6.     In October 2022, I was served with a subpoena issued by the attorney for Robert Ross in this lawsuit. The subpoena directed Wood, Stephens & O'Neil, LLP to produce or permit inspection and copying of the following:

> All materials including but not limited to correspondence, emails, calendar invites, text messages, phone records, reports, internal memoranda, personal notes, notations, work papers, drafts, and other writings, drawings, charts, photographs, computer printouts, spreadsheets, ledges, graphics, analytics, and all other information kept by written, electronic, or other means relating to the parties in the above-entitled lawsuit and in relation to Association of Professional Flight Attendants, Eugenio Vargas, Nena Martin and Robert 'Bob' Ross.

7.     In light of the many years our firm has represented APFA, the scope of this demand appears extremely burdensome to me, and raises significant issues regarding the possible release of sensitive financial information regarding APFA and its employees.     I consulted with counsel for APFA at that time, and then, jointly with APFA, served objections to the subpoena on November 3, 2022. The objections included that the subpoena would subject Wood, Stephens & O'Neil, LLP to undue burden and expense and that the burden on my firm was not proportional to the needs of the case.

8.     I did not hear from Plaintiff's counsel regarding that objection for many months, and assumed the issue had been resolved. I was surprised to receive, on August 16, 2023, an email from Plaintiffs' counsel seeking compliance with the subpoena "as soon as possible."

9.     After receiving that demand, I retained counsel to assist with the dispute, including the potential need to respond to a motion in the pending litigation.

10.     I provided counsel with the contents of my file of emails and documents relating to the 2019-2020 work concerning the former officers' overpayments. This file included not only documents concerning Mr. Ross, but also backup material I had used regarding calculations of sick leave and vacation pay for other former officers and representatives of APFA who I

2

understand are not parties to this litigation. It also included payroll summary information for several APFA office staff from early 2018. I understand that, except for the backup materials regarding non-parties and the staff payroll information, the remainder of that file has been produced to Plaintiff's counsel.

11.     I have reviewed the Proposed Order submitted by Plaintiff to this Court and understand that Plaintiff is now asking the Court to order Wood, Stephens & O'Neil, LLP to produce all documents "related to the matters before this court," dating back to April 1, 2016 "discussing or relating to Mr. Ross, Eugenio Vargas and /or Nena Martin," and to produce documents "in the original .PST format." Compliance with this request would require review of all annual audit workpapers for six or more audit years, as well as a comprehensive search of years' worth of emails in our system, a determination of whether such documents "relate[] to the matters before this court" and relate to any of the three individuals named, a determination of whether sensitive financial information of individuals aside from Mr. Ross are included and arranging for the logistics of production of such documents consistent with protecting sensitive financial or personally identifying information. This request would place a substantial burden on Wood, Stephens & O'Neil, LLP and significantly interfere with our ongoing obligations to existing clients.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November 2023.

Hal O'Neil, CPA

3

<u>In the Matter of Arbitration Between</u>

|  |  |  |
|---|---|---|
| Melissa Chinery | ) | |
| Sandra Lee | ) | RE: Article VII Charges |
| | ) | Violations of APFA Constitution |
| **APFA Charging Party Members** | ) | and APFA Policy Manual |
| **(Plaintiff)** | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Eugenio Vargas, Former APFA | ) | |
| National Treasurer | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

| | |
|---|---|
| **Before:** | Alternate Article VII Arbitrator Ruben R. Armendariz |
| | |
| **Place and Dates of Hearing:** | The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas. |
| | **September 14, 15 and 16, 2021** |
| | |
| **Appearances:** | |
| **For Charging Party Members:** | **Melissa Chinery, Representative** |
| | **Sandra Lee, Representative** |
| | **Heather Olenjack, Representative** |
| | |
| **For Charged Party Member:** | **Heidi Morgan, Representative** |
| | **Nena Martin, Representative** |
| | **Eugenio Vargas, Former National Treasurer** |

# Exhibit A

not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

Here, Defendant objected at hearing for Plaintiff broadening the scope of this charge over questions asked of Vargas regarding Greg Gunter's furniture that he had purchased it for his own personal use. Defendant states the charges were deemed valid, timely and specific before the EC and it only raised issues with Ashley Furniture. Defendant agrees Vargas needs to answer to the charge of the Ashley furniture of $8,733.95 that he purchased as the Treasurer of APFA. Plaintiff however argues Defendant failed to follow proper procedure in raising objections and in doing so failed to follow the APFA Policy Manual and Constitution. By failing to follow proper procedure, Defendant raised an objection in a manner which does not protect the rights of the charging parties. This arbitrator does not agree, the Ashley Furniture is the only issue that is valid, specific and timely in the grievance charges. It does not say anything else about Greg Gunter's furniture. Plaintiff failed to amend the grievance charge to include Greg Gunter's furniture. By Plaintiff raising this additional issue at hearing for the first time, this is an attempt by Plaintiff to engage in an "ambush through arbitration." Thus, the objection raised by Defendant is correct and is hereby sustained.

Plaintiff argued that Section 8.I.3.b.(5) of the Policy Manual deals with the National Treasurer duty to maintain a procedure to monitor the transfer of equipment, when appropriate, between representatives in the field. The arbitrator finds no evidence was presented to support this allegation.

The arbitrator finds Vargas failed to prepare an inventory list. This arbitrator is of the Opinion that all of the Ashley furniture has been fully explained and accounted for. Record evidence however revealed there was no inventory list prepared and Harris testified there was no inventory list. Under these circumstances, Vargas did fail in his fiduciary duty as National Treasurer to prepare an inventory list to maintain Union assets and violated Article 1, Section 2.J, Section 7.E.O.Q and Article 1II, Section 6.E. of the APFA Constitution.

Thus, it is the arbitrator's Opinion Issue #2 has merit by Vargas failing to prepare an inventory list to maintain Union assets.

| Issue No. 3 | Allowing himself and his fellow National Officers to receive inflated sick and vacation payouts when they were not entitled to such, and |
|---|---|
| Issue No. 4 | Allowing the payment to former National President Bob Ross thousands of dollars in Meal Expenses Allowance (MEA) and SAF when he was no longer working for APFA? |

The arbitrator has consolidated Issue No. 3 and Issue No. 4 as it involves the same issue.

Plaintiff argued that Vargas changed the longstanding formula on vacation payout for himself and fellow officers Bob Ross, Nena Martin and Marcy Dunaway. Vargas included expense items such as Meal Expense Allowance (MEA) and SAF.

APPENDIX 7

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

Plaintiff argued the Policy Manual provides that officers may be paid out of unused sick and vacation. This should be paid at their rate of pay. Vargas inflated their pay to include MEA, SAF and stipend, which created an overpayment of $5,000.00 above what they were entitled.

Plaintiff argued Section 6.B.1.c of the Policy Manual allows an outgoing National Officer to be paid out vacation "at a rate prorated on the National Officer's annual salary, as defined in 6.A above…" Section 6.A provides, "The salary of the National Treasurer shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for flight attendant based on 105 hours monthly." Plaintiff argued this was simply a money grab on their last days in office. Vargas admitted on cross-examination that this was his idea to do this and that he did not inform the BOD. Even worse they broke the checks up into a series of four $4000.00 checks which they signed for each other three days before they left office. Vargas claimed it was to avoid taxes.

Plaintiff presented accountant Debbie Hoover who testified that National Officer Eugenio Vargas approached her about changing the formula. She said she was also told to add SAF and MEA. This did raise a red flag with her because this has never been done before, it wasn't past practice and this was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they were all included in box 1.

Defendant Vargas testified that Attorney Mark Richards showed him only the economic Items 3, 4 and 5 of the Bob Ross Transition Agreement, Exhibit (V-100). Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Vargas stated that Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and this is what Ross was paid. Laura Glading in her exit agreement received the same as Ross and the BOD agreed.

Defendant Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination he created to be used for "Full Salary" vs "Basic Salary" for said payments. The Ross "Transition Agreement" has been deemed valid by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross "Transition Agreement".

Defendant Vargas takes full responsibility for his actions involving his changing of the mathematical formula when using "Full Salary" vs "Basic Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross Administration when leaving office. Vargas said that Patrick Hancock informed him that the formula always used was a 1987 package formula. Vargas has provided his full support in these charges, including months of

**APPENDIX 8**

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

correspondence between the three former officers, APFA National Officers, APFA Board of Directors, APFA In-House Counsel, APFA Executive Committee and Members Melissa Chinery and Sandra Lee, by providing a clear picture of his willingness to repay the overage, once established from the "**1987** " formula that was exposed months after the July 11, 2019, Facebook post by Member Sandra Lee. Eugenio Vargas never stated he would not pay an amount if owed, but expected the calculation to be accurate and accounted for.

The arbitrator finds Vargas interpretation of the Ross Transition Agreement to not only include MEA and SAF but he included a stipend. Vargas had instructed Hoover to change the formula to include MEA and SAF and the stipend in the payouts of National Officers Ross, Martin, Dunaway and himself. Thereafter, written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on November 8, 2019, stating *"After the meeting held on October 30, 2019, to allow you to review the independent auditor's calculations, it is our understanding that you take issue with how the calculations were made. We researched the issue again and believe our initial calculation is correct".*

Defendant argued in the calculations provided at the October 30, 2019, meeting, simple math was used to determine the alleged monies owed by taking "**Full Salary**" minus "**Basic Salary**", then stating the difference was MEA and SAF. Calculating MEA and SAF in this manner was incorrect due to other income being included in the "**Full Salary**", like the UAL Arbitration payout, which provided a pay increase with retroactive pay.

The arbitrator finds in the APFA Executive Committee meeting dated December 5-7, 2019 Resolution #69 where the EC resolved this matter by stating, "that if the repayment plan is not received, the APFA Attorney is directed to file a State Civil lawsuit no later than January 6, 2020 to collect these funds," and any settlement agreements be approved by the Executive Committee prior to APFA acceptance.

Defendant Vargas said he has since entered into a payment agreement to repay the overage debt. Vargas admitted that it was his interpretation of the Ross Transition agreement to change the formula for the MEA, SAF to be included in their payouts and this is what created the overage.

It is this arbitrators Opinion, Vargas attempted to benefit monetarily and thus failed in his fiduciary duty as National Treasurer by willfully changing the formula for the payouts for Bob Ross, Nena Martin and Marcy Dunaway as well as himself.

It is therefore the Opinion of this arbitrator, Issue No. 3 has merit as Vargas violated his fiduciary duty as National Treasurer.

With respect to Issue No. 4, the arbitrator finds Vargas admitted that he had changed the formula, this has been established in Issue No. 3. But in Issue No. 4, Plaintiff argued that Vargas paid Ross MEA and SAF when he was not working. Under item No. 3 of the Ross Transition Agreement, it clearly states, *"APFA agrees that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018."* The Ross agreement is binding as stated by Arbitrator Edward B. Valverde. Vargas did include MEA

**APPENDIX 9**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

and SAF in Ross's salary in accord with Item No. 3 as well as Item No. 4. *"APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018."* But Ross too received an overage because Vargas had changed the formula and he too is required to pay the debt owed.

In Issue No. 4, Ross did receive an overpayment because Vargas admittedly changed the formula. It is my understanding Ross has an outstanding debt with the APFA. It is clear Vargas manipulated the payout formula. In the Bob Ross Transition Agreement, MEA and SAF were included. The issue with MEA and SAF has been resolved as well as the overpayment to Ross, Nena Martin, Eugenio Vargas and Marcy Dunaway. Dunaway and Vargas have agreed to a payment plan and Martin has paid her debt in full. Only Ross has not paid. Thus, Issue No. 4 has been resolved and is now moot.

**Issue No. 5    Violating the credit card policy by charging a rental car and meals for a trip to Spain?**

Here, Vargas made two trips to Madrid Spain. One was for vacation and the other was work related for the APFA where he engaged in a time study aboard a 787 airplane. On the vacation trip, he approached the Enterprise Rental Car counter to rent a car. He told his spouse he needed to go to the restroom and gave his spouse his wallet. Upon his return was the rental agreement and he signed it. He did not notice the charge was on the APFA Union credit card and not on his Chase Visa card. In early September when the bill for the credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit card was used. He brought the receipt back to APFA the following morning and when senior Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study.

The arbitrator finds Vargas in this instance recognized the charge of the rental car he rented in Spain while on vacation. The charge was on his APFA credit card statement. Vargas paid back the APFA $614.29. This reveals Vargas recognized that he had made an error and rectified it. As to the meal alleged this was a work-related meal when he conducted the time study on a trip to Madrid. It is therefore, the Opinion of this arbitrator this matter is now moot. Thus Issue No. 5 has no merit.

**Conclusion**

The arbitrator having found no merit to Issue # 4, #5 are hereby dismissed. Issue #2, #3 have merit. Issue No.1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Additionally, if there are missing files in the possession of the Defendant, it is hereby Ordered that they be turned over to Erik Harris,

**APPENDIX 10**

**Re: Vargas v. APFA - Vargas' 2022 Requests for Production**

Jeff Bartos <jbartos@geclaw.com>
Fri 10/20/2023 12:22 PM
To:Kerri Phillips <Kerri@KDphillipslaw.com>
Cc:Charlette Matts <cmatts@apfa.org>;James Sanford <jim@gillespiesanford.com>

📎 1 attachments (35 MB)
APFA 100-176.pdf;

Kerri,

     As promised in my email of yesterday, attached please find documents numbered APFA 100-176, which are the email chains of the documents numbered APFA 1-82, and responsive to the 2022 RFPs.

Jeff

---

**From:** Jeff Bartos <jbartos@geclaw.com>
**Sent:** Thursday, October 19, 2023 11:50 AM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Cc:** Charlette Matts <cmatts@apfa.org>; James Sanford <jim@gillespiesanford.com>
**Subject:** Vargas v. APFA - Vargas' 2022 Requests for Production

Kerri,

     I'm writing to determine whether, and if so to what extent, we still have any dispute regarding the Mr. Vargas' 2022 Requests for Production. My views are set forth below:

     In July 2022, you served three requests for production on behalf of Mr. Vargas. These sought (1) insurance policy documents; (2) communication between APFA and Woods Stephens & O'Neil ("WSO") "concerning the Ross Administration"; and (3) communications between "APFA officials … or any APFA counsel … which disseminated any communications or documentation from Wood, Stephens & O'Neil LLP concerning the Ross Administration."

     APFA timely responded to those requests with a variety of objections. On August 14, 2023, you asked whether documents would be produced, "in particular those relating to the Confidential Memo." After an exchange of emails and at least one phone call, on September 1, 2023, APFA produced documents numbered APFA 1-99 which were all communications between O'Neil and APFA, and within APFA, regarding the Confidential Memo, including any dissemination of that memo. In addition, the requested insurance policy documents have been produced, in full, by IMA in response to your subpoena, identified as documents IMA1-1480.

     You have raised an issue regarding the format of production of APFA1-99, and we will be producing complete email chains as you requested.

     You have also raised an issue regarding a privilege log. We are in the process of determining whether there are any privileged communications within the narrowed scope of this production, and will provide one, if applicable, as soon as we can.

Please let me know if, with respect to the APFA responses to Mr. Vargas' 2022 Requests for Production, you feel there are any issues other than the ones I have described above, so that we may promptly address them.   I am in meetings this afternoon, but am generally available tomorrow if you would like to discuss

Thank you,

Jeff


*Jeffrey A Bartos*
*Guerrieri Bartos & Roma PC*
*1900 M Street, NW*
*Suite 700*
*Washington, DC  20036*
*202-624-7400*

*www.geclaw.com*

## RE: Ross & Vargas v APFA -- IMA Subpoena

Kerri Phillips <Kerri@KDphillipslaw.com>
Thu 6/1/2023 10:56 AM

To:Jeff Bartos <jbartos@geclaw.com>;Norton, Michael <MNorton@foulston.com>
Cc:James Sanford <jim@gillespiesanford.com>;Charlette Matts <cmatts@apfa.org>;Antonia Bird <abird@geclaw.com>;
Stephanie Lewis <Stephanie@KDphillipslaw.com>

Mr. Bartos and Mr. Norton,

I've already responded that my clients decline to agree to any confidentiality in relation to any discovery
documents. Taking up my time and frivolously charging your client for drafting a document to which my clients
already declined, not to mention subverting timely discovery responses, is sanctionable conduct. Considering
your predecessor's conduct, I'd advise you to please cease further misrepresentations of the facts and subversion
of the discovery process.

I will be filing a motion to compel and a motion for sanctions next week to reimburse for legal expenses incurred
as a result of any failure to comply with the subpoena. For purposes of conference, please advise whether you
agree.

Thank you,



**Kerri Phillips**
KD Phillips Law Firm, PLLC

**Phone:** 972-327-5800 ext. 1001
**Fax:** 940-400-0089
**Email:** Kerri@KDphillipslaw.com

6010 W. Spring Creek Parkway
Plano, TX 75024

**www.KDphillipslaw.com**

**IMPORTANT/CONFIDENTIAL:**

IMPORTANT \ CONFIDENTIAL: This message contains information from the law firm of KD Phillips Law Firm, PLLC that may be subject to the attorney-client
privilege or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise,
nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an
agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent
responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this
communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. §
2510, et seq. If you have received this communication in error, please notify us immediately at our telephone number: (972) 327-5800

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we
inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person,
for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any
transaction or matter addressed herein, within the meaning of IRS Circular 230.

**From:** Jeff Bartos <jbartos@geclaw.com>
**Sent:** Thursday, May 25, 2023 3:13 PM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Cc:** James Sanford <jim@gillespiesanford.com>; Charlette Matts <cmatts@apfa.org>; Norton, Michael
<MNorton@foulston.com>; Antonia Bird <abird@geclaw.com>
**Subject:** Re: Ross & Vargas v APFA -- IMA Subpoena

**APPENDIX 13**

Kerri,

Thank you for your response.

In the interest of seeing if we can resolve any dispute among ourselves, I'll ask you to please consider the proposed order which I have attached here - it would fully protect the right of any party to contest a confidentiality designation and put the burden on the designating party to justify the designation in the event of a dispute. It also would not limit the ability of any party to use information designated as confidential in any court filing. I hope having something concrete might address your concerns on this subject or at least provide the basis for discussion.

Independently, with regard to the policies covering solely "Cyber Incident" claims, will you agree that these do not need to be produced? I understood your purpose for seeking insurance policies was directed to coverage of conduct by parties on either side of this dispute, such as a surety bond or errors and omissions coverage. I think it is clear that a policy protecting against computer hacking would not bear on this question.

As for the demand for a response regarding APFA's legal position, we will make appropriate arguments in court based on the operative pleadings. The reference to conferring with my clients in my earlier email related to the IMA subpoena, not to the legal inquiry.

Thank you for your consideration,

Jeff

**From:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Sent:** Thursday, May 25, 2023 2:33 PM
**To:** Jeff Bartos <jbartos@geclaw.com>
**Cc:** James Sanford <jim@gillespiesanford.com>; Charlette Matts <cmatts@apfa.org>; Norton, Michael <MNorton@foulston.com>; Antonia Bird <abird@geclaw.com>
**Subject:** RE: Ross & Vargas v APFA -- IMA Subpoena

Jeff,

My clients do not agree to any confidentiality with your clients. I expect discovery responses to be delivered in a timely manner per the requirements under the law, otherwise I'll proceed against IMA for failure to comply with a federal subpoena.

I'd like to know whether your clients intend to continue their assertion that APFA is a dual union. I inquired about this issue on May 9, 2023 in the attached email thread. You replied that you would confer with your clients. I have yet to receive a response. My clients demand a response to this issue by the end of the month.

Please advise if you have further questions.

Thank you,



**Kerri Phillips**
KD Phillips Law Firm, PLLC

**Phone:** 972-327-5800 ext. 1001
**Fax:** 940-400-0089
**Email:** Kerri@KDphillipslaw.com

6010 W. Spring Creek Parkway
Plano, TX 75024

www.KDphillipslaw.com

IMPORTANT/CONFIDENTIAL:

IMPORTANT \ CONFIDENTIAL: This message contains information from the law firm of KD Phillips Law Firm, PLLC that may be subject to the attorney-client privilege or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq. If you have received this communication in error, please notify us immediately at our telephone number: (972) 327-5800

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (I) avoiding penalties imposed under the Internal Revenue Code or (II) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

**From:** Jeff Bartos <jbartos@geclaw.com>
**Sent:** Thursday, May 25, 2023 10:58 AM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Cc:** James Sanford <jim@gillespiesanford.com>; Charlette Matts <cmatts@apfa.org>; Norton, Michael <MNorton@foulston.com>; Antonia Bird <abird@geclaw.com>
**Subject:** Ross & Vargas v APFA -- IMA Subpoena

Ms. Phillips,

I'm emailing regarding the subpoena you have served on IMA for various insurance policies. I have reviewed the policies which had been issued to APFA during the time period covered by the subpoena, and have two concerns which I hope we can resolve to our mutual satisfaction.

1.      Some of the policies cover purely "Cyber Incident" claims, and have nothing remotely to do with any of the issues in this case. I am concerned that disclosure of these policies might, if ultimately in the hands of a non-party, create an unnecessary risk to AFPA should someone see an opportunity to exploit the insurance coverage. I would request on behalf of APFA that these policies not be produced.

2.      The remaining policies, while perhaps not all relevant to this case, do not raise the same concern. However, I have become aware of a variety of social media postings by Mr. Ross in particular concerning this litigation, and am concerned about discovery documents being misused outside of this litigation. I also expect that as the litigation proceeds, there may be sensitive information from all parties being produced in discovery. In order to minimize the risk of public disclosure of sensitive information, while preserving fully the ability of the parties to fairly litigate this case, I propose that we confer on an Agreed Confidentiality Order which we can submit to the Court. I should have a draft to you today for your consideration. This would not limit production of documents, or restrict the right to file exhibits, but would enable all parties to assert good faith claims of confidentiality which would limit use of documents outside of this case.

I hope to get you a draft today for your review and consideration, and in the meantime am asking Mr. Norton, on behalf of IMA, to defer production of documents until we have had a chance to reach agreement on a proposed order.

I will of course be available to discuss this or any other issues in this case.

Best regards,

Jeff

*Jeffrey A Bartos*

*Guerrieri Bartos & Roma PC*

*1900 M Street, NW*

*Suite 700*

*Washington, DC  20036*

*202-624-7400*

*www.geclaw.com*

## Vargas and Ross v APFA - IMA Production

Michael Norton <mail@sf-notifications.com>
Thu 6/1/2023 3:48 PM
To:Jeff Bartos <jbartos@geclaw.com>

Jeff,

Michael Norton has sent you files.                    Expires 07/01/2023

A note from Michael :

In response to the subpoena issued by plaintiff, IMA produces documents Bates numbered IMA 000001 -
001480, linked in this email. The link is being sent to the following email addresses:
Kerri@KDphillipslaw.com; Stephanie@KDphillipslaw.com; jbartos@geclaw.com; and
abird@geclaw.com.

Please call or email if you have any issues downloading the documents.

Michael Norton
Foulston Siefkin LLP
(316) 291-9743
mnorton@foulston.com

Open

Trouble with the above link? You can copy and paste the following URL into your web browser:
https://foulston.sharefile.com/d-46fa3f4aedb74cfd

ShareFile is a tool for sending, receiving, and organizing your business files online. It can be used as a
password-protected area for sharing information with clients and partners, and it's an easy way to send files that
are too large to e-mail.

Powered By Citrix ShareFile 2023

**APPENDIX 17**

2023 WL 5918925
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

MC TRILOGY TEXAS, LLC, Plaintiff,

v.

CITY OF HEATH, TEXAS, Defendant.

Civil Action No. 3:22-CV-2154-D
|
Signed September 11, 2023

**Attorneys and Law Firms**

Richard T. Archibald, Garon Ray Horton, Horton & Archibald PC, Rockwall, TX, for Plaintiff.

Frederick Fritz Quast, Alicia Kreh, Wayne K. Olson, Taylor Olson Adkins Sralla & Elam, Fort Worth, TX, Bradford E. Bullock, Messer Fort PLLC, Austin, TX, Timothy Allen Dunn, Wm Andrew Messer, Messer & Fort PLLC, Frisco, TX, for Defendant.

MEMORANDUM OPINION AND ORDER

SIDNEY A. FITZWATER, SENIOR JUDGE

\*1  In this action challenging a municipality's land use decisions, subpoenaed non-party city officials[1] and defendant the City of Heath, Texas ("Heath") move in separate motions under Fed. R. Civ. P. 45(d)(3)(A)(iii) and (iv) to quash and for a protective order. They maintain that plaintiff MC Trilogy Texas, LLC ("MC Trilogy") is seeking information that is privileged or protected and that imposes an undue burden. Alternatively, both request that the court modify the subpoenas to allow only the disclosure of necessary information. MC Trilogy moves to compel production of documents. For the reasons explained, the court grants in part and denies in part the non-party city officials' July 13, 2023 motion to quash and for a protective order and imposes a meet and confer requirement; denies Heath's July 13, 2023 motion to quash and for a protective order; and grants MC Trilogy's August 3, 2023 motion to compel.[2]

I

The court assumes the parties' familiarity with its prior memorandum opinions and orders in this case, *see MC Trilogy Tex., LLC v. City of Heath (MC Trilogy I)*, ——— F.Supp.3d ———, 2023 WL 2544308, at \*1 (N.D. Tex. Mar. 16, 2023) (Fitzwater, J.); *MC Trilogy Tex., LLC v. City of Heath (MC Trilogy II)*, 2023 WL 3635639, at \*1 (N.D. Tex. May 24, 2023) (Fitzwater, J.), and recounts the background facts and procedural history only as necessary to understand this decision.

In *MC Trilogy II* the court granted Heath's motion for a protective order preventing MC Trilogy from obtaining discovery from non-party city officials under Rule 34.[3] *See MC Trilogy II*, 2023 WL 3635639, at \*1. "The court expressed no view regarding the extent to which another discovery procedure, such as the subpoena process outlined in Rule 45, could be used." *Id.* at n.3. MC Trilogy then served Rule 45 subpoenas duces tecum on the same non-party city officials from whom it had previously sought discovery. The subpoenas seek documents that can be broadly categorized as concerning the following: (1) the preliminary and final plat application; (2) the Heath and McLendon-Chisholm Portion of MC Trilogy's development; (3) telephone data; (4) the Rockwall County Municipal Utility District No. 10 ("MUD"); and (5) Heath's local ordinances and development plans. The non-party city officials object to the subpoenas and move to quash and for a protective order on the basis of legislative privilege, deliberative process privilege, undue burden, attorney-client privilege, and work product protection.[4] Heath has filed a motion in support of the non-party city officials' motion. MC Trilogy moves to compel the production of documents. The court is deciding the motions on the briefs, without oral argument.

II

\*2  The court turns first to the non-party city officials' motion to quash and for a protective order (ECF No. 57).

A

The non-party city officials seek to prevent MC Trilogy from obtaining production regarding notes and communications concerning the MC Trilogy development. They maintain that some of the production that MC Trilogy seeks is protected by the legislative privilege because land use decisions relate

**APPENDIX 18**

to a legislative function insofar as they reflect discretion, policymaking, and are generally applicable. Regarding the remaining production requests, the non-party city officials posit that the subpoenas impose an undue burden because they seek duplicative and irrelevant production.[5] Alternatively, the non-party city officials request that the court modify the subpoenas to allow only the disclosure of necessary information.

MC Trilogy responds that the production it seeks is not protected by legislative privilege because the challenged acts relate to an administrative or ministerial, not a legislative, function. It contends that, to the extent the challenged acts are legislative, the privilege is either strictly construed to permit discovery or is waived. MC Trilogy also maintains that the discovery requests do not impose an undue burden because MC Trilogy is seeking information that is relevant to its federal- and state-law claims and proportional to the needs of the case. For example, according to MC Trilogy, communications among the subpoenaed non-party city officials relating to the Trilogy development are relevant to establish "the character of the City's action ... and its investment-backed expectations" to prove a takings claim. P. Resp. to Mot. to Quash (ECF No. 70) at 15. And, MC Trilogy contends, the requests are also "sufficiently tailored in time, scope[,] and subject matter." *Id.* at 12.

B

Rule 26(b)(1) provides that a party may obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Under Rule 45(d)(3)(A)(iii), if the party seeks information that "requires disclosure of privileged or other protected matter [and] no exception or waiver applies," the court, on timely motion, "must quash or modify [the] subpoena." *Sully v. Freeman*, 2017 WL 3457123, at *1 (W.D. Tex. Feb. 1, 2017). The moving party must establish that information sought by the subpoena is "privileged or other protected matter." *Id.*

Federal courts have the authority and duty to recognize claims of privilege that are valid under federal common law. *See* Fed. R. Evid. 501. The legislative privilege "is an evidentiary privilege, 'governed by federal common law.' " *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't (Jefferson)*, 849 F.3d 615, 624 (5th Cir. 2017) (quoting *Perez v. Perry*, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014)). "State lawmakers can invoke legislative privilege to

protect actions that occurred within 'the sphere of legitimate legislative activity' or within 'the regular course of the legislative process.' " *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 235 (5th Cir. 2023) (internal quotation marks omitted) (first citing *United States v. Helstoski*, 442 U.S. 477, 489, 499, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); and then citing *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). "[T]he privilege is not limited to the casting of a vote on a resolution or bill; it covers all aspects of the legislative process" and protects the function of the legislature more broadly. *La Union Del Pueblo Entero*, 68 F.4th at 235; *accord In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015).

**\*3** The legislative privilege's primary purpose is to allow lawmakers to "focus on their public duties." *See, e.g., Hubbard*, 803 F.3d at 1310 (citing *E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (explaining that the Speech or Debate Clause ensures that civil litigation will not "create[ ] a distraction and force[ ] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation")). Complying with discovery requests detracts from lawmakers' public duties. *See La Union Del Pueblo Entero*, 68 F.4th at 237-38.

> The Supreme Court explained in *Tenney* that "[t]he reason for the privilege is clear." "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary[ ] that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense." ... "[I]t [i]s not consonant with our scheme of government for a court to inquire into the motives of legislators," and courts are not to facilitate an expedition seeking to uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation.

*Id.* at 238 (quoting *Tenney*, 341 U.S. at 374, 377, 71 S.Ct. 783).

But the state legislative privilege is not absolute. *See, e.g., League of United Latin Am. Citizens v. Abbott*, 2022 WL 2713263, at *1 (5th Cir. May 20, 2022) (stating that the court and the Supreme Court have confirmed that the state legislative privilege is not absolute.). "[T]he legislative privilege for state lawmakers is, at best, one which is qualified." *Jefferson*, 849 F.3d at 624. The extent to which the

legislative privilege is qualified is determined by "balancing the interests of the party seeking disclosure against the interests of the party claiming the privilege." *Harding v. County of Dallas*, 2016 WL 7426127, at *3 (N.D. Tex. Dec. 23, 2016) (Fitzwater, J.) (citing *Perez*, 2014 WL 106927, at *2). Courts assess the following five factors in performing the balancing test:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* In considering these factors, "the court's goal is to determine whether the need for disclosure and accurate fact finding outweighs the legislature's 'need to act free of worry about inquiry into [its] deliberations.'" *Id.* (quoting *Veasey v. Perry*, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014)).

C

With the foregoing principles in mind, the court turns to the parties' arguments.

1

The court begins by considering whether the topics on which MC Trilogy seeks production relate to a "legislative function," as required for the legislative privilege to apply.

MC Trilogy seeks production on the following topics:

> all notes prepared by or provided to [city officials] relating to (i) the ROW Final Plat Application, or any portion thereof, including all notes prepared by or provided to [city officials] at any meeting of the City Council Planning and Zoning Commission where the ROW Final Plat Application, or any portion thereof, was considered or discussed; (ii) the Heath Portion Trilogy Development, including all notes prepared by or provided to [city officials] at any meeting of the City Council Planning and Zoning Commission where the Heath Portion Trilogy Development was considered or discussed; (iii) the minimum lot size for a single-family dwelling property in the City of Heath (A) Agricultural zoning classification; (iv) the City of Heath, Texas Ordinance No. 210824A,

including all notes prepared by or provided to [city officials] at any meeting of the City Council Planning and Zoning Commission where Ordinance No. 210824A was considered, discussed, or voted upon.

**\*4** P. Resp. to Mot. to Quash (ECF No. 70) at 7.

The court concludes that topics (iii) and (iv) relate to a legislative function to the extent MC Trilogy seeks to discover the Heath City Council's motives or objectives to enact the agricultural zone's minimum lot size and Ordinance No. 210824A. In *MC Trilogy I* the court stated that Heath's decision to enact an ordinance was "clearly legislative in nature." *MC Trilogy I*, 2023 WL 2544308, at *3. MC Trilogy does not dispute this. Instead, MC Trilogy maintains that it seeks only to discover these topics insofar as they relate to Heath's "ministerial" duty to approve MC Trilogy's final plat application. The court addresses this argument below as it relates to topics (i)-(iv).

The court also concludes that topics (i)-(iv) relate to a legislative function to the extent MC Trilogy seeks to discover Heath's motives or objectives in denying MC Trilogy's final plat application. In particular, MC Trilogy seeks to discover whether Heath "contrive[d] a 'basis'" upon which to deny the ROW Plat Application by considering laws and ordinances not in effect at the time the plat was filed. P. Resp. to Mot. to Quash (ECF No. 70) at 5-6. MC Trilogy maintains that the legislative privilege does not apply because the plat approval process relates to an administrative or ministerial, rather than a legislative, function. The court disagrees.

Plat approval relates to a legislative function because the decision impacts the larger population, not specific individuals or property alone. The Supreme Court of Texas has explained that "[t]he purpose of plat approval is to ensure that subdivisions are safely constructed and to promote the orderly development of the community. Plat approval protects future purchasers from inadequate police and fire protection, inadequate drainage, and insures sanitary conditions. Public health, safety, and morals are general public interests." *City of Round Rock v. Smith*, 687 S.W.2d 300, 302 (Tex. 1985). In *Smith* the Supreme Court of Texas addressed whether plat approval is a proprietary or governmental function for purposes of governmental immunity. *See id.* at 301-02. It concluded that plat approval or disapproval is a "quasi-judicial exercise of the police power" and thus subject to governmental immunity because plat approval requires the city to exercise "discretionary powers of a public nature embracing judicial or legislative functions."

*Id.* at 301-03. The court contrasted plat approval from "ministerial acts[,] which could be performed by a private subcontractor." *Id.* at 303. A governmental unit only has a "ministerial duty" to approve a plat application "once the relevant governmental unit determines that a plat conforms to applicable regulations." *Schroeder v. Escalera Ranch Owners' Ass'n*, 646 S.W.3d 329, 332 (Tex. 2022).

Plat approval also relates to a legislative function because it is "part and parcel" of modern zoning procedures. *See La Union Del Pueblo Entero*, 68 F.4th at 236. The Fifth Circuit interpreted legislative privilege broadly when it extended the privilege to third party communications outside the legislature. *See id.* In doing so, the Fifth Circuit held that the legislative privilege covered some third party communications because "[m]eeting with 'interest' groups ... is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider." *Id.* (quoting *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)). Consequently, "the legislative privilege's scope is necessarily broad." *La Union Del Pueblo Entero*, 68 F.4th at 236 (citing *Hubbard*, 803 F.3d at 1308).

*5 Here, the non-party city officials considered general public interests when reviewing MC Trilogy's plat. The plat was denied because it "depicted a residential subdivision with minimal farming, ranching, and related agricultural uses" and "a high volume of through traffic and drainage runoff," contrary to the stated intent of the agricultural district. Compl. (ECF No. 1) at 17 (quoting September 10, 2021 communication from Heath Director of Planning). Other courts have similarly held that the application of zoning and planning ordinances to individual property relates to a legislative function. *See Canaan Christian Church v. Montgomery County*, 335 F.Supp.3d 758, 764 (D. Md. 2018) (holding that county's denial of church's sewer change request was legislative act for purposes of legislative privilege during discovery); *Buonauro v. City of Berwyn*, 2011 WL 2110133, at *3-7 (N.D. Ill. May 25, 2011) (holding that city's denial of clinic's license application integrally related to city's zoning laws was legislative act for purposes of legislative privilege during discovery). The plat approval process is merely another procedure steeped in legislative thought and function. *See La Union Del Pueblo Entero*, 68 F.4th at 236. The court therefore holds that plat approval is a legislative act for purposes of the legislative privilege.

2

Having determined that topics (i)-(iv) relate to a legislative function, the court next considers whether the non-party city officials can rely on the legislative privilege to refuse production on these topics. The court applies the *Perez* five-factor balancing approach to determine whether the interests of the party seeking disclosure (here, MC Trilogy) outweigh the interests of those claiming the privilege (here, the non-party city officials). *See Perez*, 2014 WL 106927. at *2. The court considers, together, topics (i)-(iv) and concludes that each factor weighs against allowing discovery.

a

Factor one—relevance—weighs against allowing discovery. The non-party city officials contend that the discovery is not relevant because notes of a single legislator, which may reflect mental impressions and the reason for the legislator's vote, are not controlling and may not be attributed to the body as a whole. In their reply, however, they "concede that their internal notes may be relevant to the Plaintiff's federal taking claim." Non-Party Officials Reply in Support of Mot. to Quash (ECF No. 82) at 3.

In deciding MC Trilogy's takings claim, the court can consider the character of the governmental action and the extent to which the regulation has interfered with distinct investment backed interests. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646. 57 L.Ed.2d 631 (1978). The "character " of the governmental action refers to the type of regulation at the heart of the underlying takings claim. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 840 (Tex. 2012). For example, in *Penn Central* the "character" of the governmental action was New York City's designation of Grand Central Terminal as a "landmark." *See Penn Cent. Transp. Co.*, 438 U.S. at 110-11, 98 S.Ct. 2646. The action benefited those who might visit the landmark and damaged Penn Central, who could no longer execute longstanding plans to build a skyscraper above the terminal. *Id.* at 116-19, 98 S.Ct. 2646. Additionally, "investment-backed expectations" refer to " 'the regulatory environment at the time of the acquisition of the property.' " *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327,

**APPENDIX 21**

1350 n.22 (Fed. Cir. 2001)) (en banc). To the extent MC Trilogy seeks to discover whether the Heath city council "contrive[d] a basis" on which to deny the plat, proof of motive is not required to prove character or investment-backed interests for a takings claim.

MC Trilogy also maintains that the discovery it seeks is relevant to its declaratory judgment claim because the Texas Local Government Code mandates that the City shall consider the approval of an application for permit "solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time." *See* Tex. Loc. Gov't Code Ann. § 245.002. Plaintiffs in factually similar cases used publicly available documents to prove the city considered more than the laws in effect at the time. *See Save Our Springs All. v. City of Austin*, 149 S.W.3d 674, 682 (Tex. App. 2004, no pet.) (development agreement); *Jacks v. Zoning Bd. of Adjustment*, 2019 WL 2998807, at *2 (Tex. App. 2019, pet. denied) (permit); *Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, 387 F.Supp.3d 703, 706 n.3 (W.D. Tex. 2019) (regulatory code). The court has not located a case in which discovery into a city council's non-public motives, objectives, impressions, and/or opinions was required to prove a Chapter 245 claim. It therefore appears on the present record that MC Trilogy can prove its takings and declaratory judgment claims without relying on the privileged information it seeks in topics (i)-(iv). Accordingly, the court concludes that the non-party city officials' notes and communications regarding topics (i)-(iv) are not sufficiently relevant to weigh in favor of discovery.

b

*6 Factor two—the availability of other evidence—weighs against allowing discovery for the same reasons as factor one. MC Trilogy can obtain evidence regarding the Heath city council's "basis" for denying its plat from documents already in its possession, like the city attorney's letter in response to MC Trilogy's plat application, and other publicly available records, like City of Heath, Texas Ordinance No. 210824A and the date it took effect. MC Trilogy can rely on this information to establish the character of Heath's action or whether Heath properly or improperly denied the plat in accordance with Chapter 245. Factor two weighs against disclosure.

c

Factors three and four—the "seriousness" of the litigation and the issues involved and the role of the government in the litigation—weigh against allowing discovery. The Supreme Court's view on a state and local government's exercise of police power is well-established:

It is to be remembered that we are dealing with one of the most essential powers of government—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. *See Chi. & Alton R.R. Co. v. Tranbarger*, 238 U.S. 67, 78, 35 S.Ct. 678, 59 L.Ed. 1204 (1915). To so hold would preclude development and fix a city forever in its primitive conditions. [T]here must be progress, and if in its march private interests are in the way, they must yield to the good of the community.

*Hadacheck v. Sebastian*, 239 U.S. 394, 410, 36 S.Ct. 143, 60 L.Ed. 348 (1915). Applying the reasoning of *Hadacheck*, the court concludes that factors three and four weigh against disclosure.

d

Regarding factor five—the possibility of future timidity among government employees (here, legislators)—"courts have long recognized that the disclosure of confidential documents concerning intimate legislative activities should be avoided." *Veasey*, 2014 WL 1340077, at *3 (citation omitted). Accordingly, the court holds that the fifth factor weighs against disclosure.

e

The court concludes that the overall balance of factors weighs in favor of applying the legislative privilege to excuse the non-party city officials from producing the information covered by topics (i)-(iv).

D

APPENDIX 22

The court now considers whether, and to what extent, the non-party city officials waived the legislative privilege.

I

The legislative privilege can be waived under certain conditions. *See Favors v. Cuomo*, 285 F.R.D. 187, 211-12 (E.D.N.Y. 2012). For example, legislative privilege can be waived when "the Legislator publicly reveal[s] those documents" or "the statements have no connection whatsoever with 'legitimate legislative activity.' " *Id.*; *see also Hubbard*, 803 F.3d at 1308 (quoting *Tenney*, 341 U.S. at 376, 71 S.Ct. 783). But "formal technicalities are not a proper basis for denying an otherwise proper claim of governmental privilege if the grounds for assertion of the privilege are adequately presented to the district court." *Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 882-83 (5th Cir. Unit A Mar. 1981). The purpose of some procedural prerequisites is simply "to insure that subordinate officials do not lightly or mistakenly invoke the government's privilege in circumstances not warranting its application." *Id.* at 882. If there is "sufficient compliance" to satisfy that goal, the privilege should be honored. *Id.* at 882-83. In *Branch* it was enough that the Equal Employment Opportunity Commission's ("EEOC's") Houston director: (1) consulted with the office of the General Counsel at the EEOC, and (2) "made the EEOC's objections to disclosure and its basis for them known to the court in written responses to questions accompanying the subpoena itself." *Id.* at 883.

2

\*7 The court concludes that the non-party city officials did not waive the legislative privilege for any request where the non-party city officials asserted the privilege. The non-party city officials did not publicize the production that MC Trilogy seeks (which is why MC Trilogy requests the documents), and the communications and notes connect with "legitimate legislative activity," as established above. *See Hubbard*, 803 F.3d at 1308. In *Branch* the Fifth Circuit held that a party who consults with an attorney and makes the objection to disclosure and its basis known has demonstrated "sufficient compliance" with any procedural safeguards concerning legislative privilege. *See Branch*, 638 F.2d at 883. Because the non-party city officials did not publicize the communications and notes that MC Trilogy seeks and consulted with an attorney and asserted the privilege in response to some

document requests, the legislative privilege has not been waived to request for production ("RFP") Nos. 4, 6, 17, and 20. Accordingly, the court grants the non-party city officials' motion to quash to the extent MC Trilogy seeks production of documents in topics (i)-(iv) barred by the legislative privilege under Rule 45(d)(3)(A)(iii).

To the extent the non-party city officials have *not* asserted legislative privilege in response to some document requests, however, the privilege has been waived.[6] Rule 45(d)(2) provides, in pertinent part: "When information subject to a subpoena is withheld on a claim that it is privileged ..., the claim shall be made *expressly* ...." Rule 45(d)(2) (emphasis added). Thus some withheld documents are subject to disclosure despite the fact that they contain the non-party city officials' motives, impressions, and/or opinions of legislative actions. The disclosure is nonetheless limited to the extent it poses an undue burden or is covered by attorney-client privilege or work product protection.

E

The court next considers the extent to which the remaining discovery requests pose an undue burden.

I

Rule 45(d)(3)(A)(iv) requires that, on timely motion, the court by which a subpoena was issued must quash or modify the subpoena if it "subjects a person to undue burden." Rule 45(d)(3)(A)(iv). The movant has the burden of proof, *see id.*; *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) (citing *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998) (Fitzwater, J.)), and must meet "the heavy burden of establishing that compliance with the subpoena would be 'unreasonable and oppressive.' " *Williams*, 178 F.R.D. at 109.

"Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case.' " *Linder v. Dep't of Def.*, 133 F.3d 17, 24 (D.C. Cir. 1998) (internal quotation marks omitted). Among the factors that the court may consider in determining whether there is an undue burden are "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Wiwa*, 392 F.3d at 818 (citing

*Williams*, 178 F.R.D. at 109). The status of a witness as a non-party entitles the witness to consideration regarding expense and inconvenience. *See* Rule 45(c)(2)(B). Undue burden can be found when a subpoena duces tecum is facially overbroad. *See, e.g., Wiwa*, 392 F.3d at 818.

2

The non-party city officials assert that RFPs Nos. 7-15, 22, and 23 pose an undue burden. The first category of requests (Nos. 7, 8, 9, 11, 14, and 15) concerns information relating to the McLendon-Chisholm Portion Trilogy Development, MUD, and the Trilogy Development as a whole. The second category of requests (Nos. 10, 12, and 13) concerns information relating to the non-party city officials' telephone records. The third category of requests (Nos. 22 and 23) concerns information relating to the modification of Horizon Road or any road adjacent to the Trilogy Development.

3

*8 Category 1 RFPs (Nos. 7, 8, 9, 11, 14, and 15) pose an undue burden. As written, the RFPs are facially overbroad because they have no attempt to limit production by any means. The most egregious example is RFP No. 9, which requests production of "all communications between [subpoenaed non-party city official] and any other Person relating to the Trilogy Development." The request does not specify reasonable restrictions on time, like dates Heath's Planning and Zoning Commission met; relevant persons with whom the non-party city officials communicated, like parties to the instant action; or particular documentary descriptions. RFP No. 9 arguably encompasses almost all RFPs considered in the instant subpoena. The status of the witnesses as non-parties only compounds the expense and inconvenience of such a broad request because the non-party city officials are only part-time citizen legislators. Modification of a subpoena is preferable, however, to quashing it. *See Wiwa*, 392 F.3d at 818 (footnote and citations omitted). The court orders the parties to meet and confer regarding the scope of RFPs Nos. 7, 8, 9, 11, 14, and 15. *See infra* § II(E)(6). The court will then consider modifying the scope of any RFP that remains in dispute.

4

Category 2 RFPs (Nos. 10, 12, and 13) also pose an undue burden. RFPs Nos. 10, 12, and 13 seek documents between January 1, 2021 and September 27, 2022 sufficient to evidence "all mobile phones [subpoenaed non-party city official] used," and log or list all incoming and outgoing "text messages" and "phone calls." Non-Party Officials App. (ECF No. 59) at 78-80, ¶¶ 10, 12, and 13. All the Fifth Circuit's factors for quashing a subpoena weigh against production. Regarding relevance and the need for the documents, MC Trilogy asserts no reason why *all* text messages and phone calls from any of the subpoenaed non-party city officials' phones have a bearing on its claims. In fact, MC Trilogy admits that the search would be "a means to *begin* a determination to the probable existence" of "relevant communications." P. Resp. to Mot. to Quash (ECF No. 70) at 16. Such a request is "akin to an impermissible attempt to 'obtain every document which could conceivably be relevant to the issues in the case.' " *Williams*, 178 F.R.D. at 110 (quoting *Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 756 (11th Cir. 1985)). Regarding the breadth of the request, it is clear that a request for every incoming and outgoing text message and phone call from each of the subpoenaed non-party city officials' phones is overly broad. The time period covered also weighs against production because MC Trilogy cannot justify why it needs telephone records from January 1, 2021 to September 27, 2022 when the plat was denied in August 2021.

Taken as a whole, the burden imposed on the non-party city officials is too great when compared to the negligible discoverable information that MC Trilogy may obtain. The court is particularly concerned about the burden on non-party city officials' privacy interests. *See Riley v. California*, 573 U.S. 373, 393-96, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). Based on the preference for modifying rather than quashing a subpoena, the court orders the parties to meet and confer regarding the scope of RFPs Nos. 10, 12, and 13. *See infra* § II(E)(6). The court will then consider modifying the scope of any RFP that remains in dispute.

5

Category 3 RFPs (Nos. 22 and 23) also pose an undue burden. RFPs Nos. 22 and 23 seek production regarding "all communications" "relating to" the modification of Horizon Road and roads adjacent to the Trilogy Development since May 1, 2017. Overall, the Fifth Circuit's factors for quashing a subpoena weigh against production. Factors one and two—

**APPENDIX 24**

relevance and the need for the documents—weigh in favor of production. The court agrees with MC Trilogy that the production is relevant and necessary because the non-party city officials denied MC Trilogy's plat in part because it was inconsistent with Heath's Thoroughfare Plan. Factors three and four—the breadth of the request and the time period —weigh against production. Although RFP Nos. 22 and 23 are limited to Horizon Road and roads adjacent to the Trilogy Development, the requests do not offer particular documentary descriptions. MC Trilogy also does not explain why it chose the time frame of May 1, 2017 to the present, especially when the plat was denied in August 2021. Taken as a whole, the burden imposed on the non-party city officials outweighs MC Trilogy's discovery needs. The expense and inconvenience on the non-party city officials, as part-time citizen legislators, to produce documents largely in Heath's custody and control is great. As written, the RFPs are improper; however, the court will modify rather than quash the subpoenas. The non-party city officials must produce all communications relating to the modification of Horizon Road and roads adjacent to the Trilogy Development in August 2021, when the action underlying the instant case occurred.

6

*9 Within 21 days of the date this memorandum opinion and order is filed, counsel for MC Trilogy, with authority to bind their client, and for the non-party city officials, with authority to bind their clients, must meet face-to-face to fully confer regarding the scope of RFPs Nos. 7, 8, 9, 11, 14, and 15, and RFPs Nos. 10, 12, and 13. At the face-to-face meeting, counsel must engage in an item-by-item discussion of each disputed issue or discovery request and corresponding objection. If unresolved issues remain, counsel for the non-party city officials must file a joint submission that identifies the RFP in question and states the basis of the parties' remaining disagreement. This joint submission must be filed within 7 days of the date the meeting was held.

F

In summary, the motion is granted as to RFPs Nos. 4, 6, 17, and 20 based on legislative privilege. The motion is denied as to RFPs Nos. 7-15, 22, and 23, and the subpoenas are modified rather than quashed based on undue burden. The parties must meet and confer regarding RFPs Nos. 7-15, and, if unresolved issues remain, counsel must file a joint

submission that identifies the RFP in question and states the basis for the parties' remaining disagreement. The motion is denied as to RFPs Nos. 1-3, 5, 16, 18-19, 21, and 24-25.

III

The court now considers Heath's motion to quash and for a protective order.

A

A party's standing to quash subpoenas served on non-parties pursuant to Rule 45 is limited. The movant must "be in possession or control of the requested material; be the person to whom the subpoena is issued; or have a personal right or privilege in the subject matter of the subpoena." *Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979). A party challenging a subpoena issued to a non-party may not object on the grounds that it "violates another person's privacy rights ..., that the subpoena is overly broad, or that the subpoena seeks information that is irrelevant because only the responding third party can object and seek to quash a Rule 45 subpoena on those grounds." *Deitz v. Performance Food Grp., Inc.*, 2021 WL 2715974, at *1 (W.D. Tex. Apr. 21, 2021) (citing *River House Partners, LLC v. Grandbridge Real Est. Cap. LLC*, 2016 WL 3747613, at *3 (M.D. La. July 11, 2016)). Nevertheless, "a party does have standing to move for a protective order pursuant to [Rule 26(c)] ... even if the party does not have standing pursuant to Rule 45(d)." *Field v. Anadarko Petroleum Corp.*, 2020 WL 4937122, at *2 (S.D. Tex. Aug. 24, 2020).

Rule 26(c) provides, in pertinent part: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Rule 26(c). The burden is on the movant to show that good cause exists, "which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (per curiam) (internal quotation marks omitted) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)). The movant "must show how the requested discovery is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Samsung Elecs. Am. Inc. v. Yang Kun "Michael" Chung*, 325 F.R.D. 578, 590 (N.D. Tex. 2017) (Horan, J.) (first citing

*Merrill*, 227 F.R.D. at 477; and then citing *SEC v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) (Ramirez, J.)).

**B**

The court need not address Heath's motion insofar as it is mooted by the court's decisions *supra* at § II(E) regarding RFPs Nos. 4, 6-9, 11, 17, 20, 22, and 23. Regarding the remaining RFPs (Nos. 1-3, 5, 16, 18, 19, 21, 24, and 25), Heath lacks standing to seek to quash the non-party subpoenas. Heath asserts standing under Rule 45 on the ground that "the subpoenas concern information which is legally under the City's control." D. Br. Mot. to Quash (ECF No. 61) at 2. Heath cites the Texas Public Information Act ("TPIA" or "Act"), Chapter 552 of the Texas Government Code, to support its assertion: a government officer or employee *does not* have a "personal property right" to public information and thus *must* "surrender" it "to the governmental body" when the officer or employee has "control" of information requested under the Act. *See* Tex. Gov't Code Ann. §§ 552.203(4)(B), 552.233(a). In other words, Heath asserts that it has "control" over the subpoenaed documents because government officers or employees surrender "control" of public information to a governmental body pursuant to information requests under the TPIA.

*\*10 But the TPIA does not apply here. MC Trilogy's complaint does not raise a claim that makes the Act relevant. Even if the TPIA were relevant to the issue of standing, the brief "control" that the government may have over documents before making a comprehensive public disclosure under the Act is insufficient to confer standing. Heath does not cite (and the court has not found) any case where a government's "control" of documents made or used by government officials or employees conferred standing to quash a non-party subpoena personally served on those officials or employees. Other courts have held that the government has standing to quash a non-party subpoena served on government officials or employees based only on some personal right or privilege with regard to the documents sought. *See Perez v. Kazu Constr., LLC*, 2017 WL 628455, at *10-11 (D. Haw. Feb. 15, 2017); *Zhou v. Pittsburg State Univ.*, 2002 WL 1932538, at *1 (D. Kan. July 25, 2002); *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 1990 WL 255000, at *1 (D. Kan. Dec. 18, 1990). Heath's only assertion of personal privilege is that "given the breadth of [the document] requests ... [attorney-client privilege and work product protection] are

clearly implicated." D. Br. Mot. to Quash (ECF No. 61) at 7. Such a blanket assertion is insufficient to confer standing to move to quash a non-party subpoena. Accordingly, the court denies Heath's motion to quash for lack of standing.

Regarding the motion for a protective order, Heath has not met its burden of demonstrating that a protective order is warranted. In a single sentence, Heath asserts that "the requests [ ] are duplicative, harassing, burdensome, redundant[,] and completely unnecessary." *Id.* at 4. A party must do more than make such conclusory statements to persuade the court that the discovery MC Trilogy seeks is unduly burdensome, oppressive, or the like. Accordingly, the court denies Heath's motion for a protective order.

**IV**

The court now considers MC Trilogy's motion to compel.

**A**

A party seeking discovery can move to compel production where the opposing party fails to comply with a Rule 34 RFP. *See* Rule 37(a)(3)(B)(iv). An incomplete response to an RFP "must be treated as a failure to disclose, answer, or respond." Rule 37(a)(4). The burden is on the party resisting discovery—here, Heath—to establish why the motion to compel should not be granted. *See Merrill*, 227 F.R.D. at 470; *see also Lozano v. Dorel Juv. Grp.*, 2010 WL 11619687, at *1 (N.D. Tex. May 26, 2010) (Means, J.) ("Generally, the burden is on the party seeking to avoid compliance with a discovery request to show that the request is improper[,]" such that "in the context of a motion to compel, the party who opposes discovery must 'show specifically how [the request] is not relevant or how [the request] is overly broad, burdensome, or oppressive.' " (second and third alterations in original) (quoting *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990))).

**B**

Heath's only response to the motion to compel is to request that the court establish a date by which litigation was reasonably anticipated for the purposes of work product protection. The federal work product protection found in Rule 26(b)(3) provides for the qualified protection of documents

**APPENDIX 26**

and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." "The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial." *Harding*. 2016 WL 7426127, at *11. Absent a merits-related motion, the court will not make a substantive ruling regarding the date by which litigation was reasonably anticipated.[7] Heath has failed to establish that the discovery MC Trilogy seeks is improper. Accordingly, MC Trilogy's motion to compel is granted.

*11 No later than 21 days after the date of this memorandum opinion and order is filed, Heath must either produce any documents that are responsive to MC Trilogy's RFPs, or, if Heath withholds production of any responsive document

based on a privilege or protection, produce a privilege log that includes all such documents.

* * *

The non-party city officials' July 13, 2023 motion to quash (ECF No. 57) is granted in part and denied in part. Heath's July 13, 2023 motion to quash and for a protective order (ECF No. 60) is denied. MC Trilogy's August 3, 2023 motion to compel production of documents (ECF No. 67) is granted.

**SO ORDERED**.

**All Citations**

Slip Copy, 2023 WL 5918925

Footnotes

1       The subpoenaed non-parties are all individuals who served as members of the City of Heath City Council or the City of Heath Planning and Zoning Commission at the time of the alleged conduct. The individuals include Brent Weaver, Donna Rolater, Frank New, Harry Heinkele, Jim Chester, Joe Ruszkiewiez, James Tunnell, Paul Ruff, Rich Krause, Robert Shaw, Thomas Bishop, Wayne Gordon, Kelson Elam, and Sharon Caldwell.

2       There are several other discovery motions that are currently pending. These will be decided in due course, after they become ripe.

3       All references in this memorandum opinion and order to a "Rule" are to a Federal Rule of Civil Procedure. Other rules are identified specifically.

4       The court does not address whether the deliberative process privilege applies to certain production requests because the court grants the motion to quash regarding those requests on legislative privilege grounds. Nor does the court address whether attorney-client privilege or work product protection applies because the non-party city officials lack standing to assert either the privilege or protection. It is well established under Texas and federal law that the attorney-client privilege can be asserted only by the client or by one authorized to act on the client's behalf, like an attorney. *See* Tex. R. Evid. 503(c); *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). And work production protection "belongs to both the client and the attorney, either of whom may assert it." *In re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009).

5       The non-party city officials also move for relief on the ground that the subpoenas pose an undue burden because they do not allow "reasonable time" for compliance. Time for compliance is a separate ground under Rule 45(d)(3)(A)(i) rather than 45(d)(3)(A)(iv). Nevertheless, the court need not address this argument because it is modifying the subpoenas based on undue burden.

6       The non-party city officials expressly asserted the legislative privilege only in response to some discovery requests, but not other, similar requests. For example, RFP No. 2 requests "all notes prepared by You or provided to You relating to the Preliminary Plat Application, or any portion thereof, including all such notes prepared by You or provided to You at any meeting of the City Council where the Preliminary Plat Application, or any portion thereof, was considered or discussed." Non-Party Officials App. (ECF No. 59) at 78, ¶ 2. RFP No. 4 makes an identical request concerning the ROW Final Plat Application. Yet counsel for the non-party city officials only asserted legislative privilege in response to RFP No. 4.

7       Heath misinterprets Rule 26(b)(3), which provides for a fact intensive inquiry into the "primary motivating purpose" behind the creation of the materials at issue. *See In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000). Heath

**APPENDIX 27**

merely asks the court to confirm that August 31, 2021 is the date by which litigation was reasonably anticipated, while simultaneously admitting that "there are other dates by which litigation would have been reasonably anticipated." D. Br. Mot. to Compel (ECF No. 95) at 3.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 28**